CANDACE  HARPER

1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

4    -----------------------------------x

5    CANDACE HARPER, Individually and on

     behalf of all other persons similarly

6    situated,

7                          Plaintiff,

                                         Civil Action No.

8            -against-                   09-CV-2254

9    GOVERNMENT EMPLOYEES INSURANCE COMPANY,

10                         Defendant.

11   -----------------------------------x

12                         March 18, 2010

                           12:14 p.m.

13

14

15

16

17       Videotaped Deposition of CANDACE HARPER,

18   taken by Defendant, pursuant to Notice, at the

19   offices of Dorsey & Whitney, LLP, 250 Park

20   Avenue, New York, New York, before William

21   Visconti, a Shorthand Reporter and Notary Public

22   within and for the State of New York.

23

24

25

2

1
2    A P P E A R A N C E S:
3        KLAFTER OLSEN & LESSER LLP
         Attorneys for Plaintiff
4            Two International Drive, Suite 350
             Rye Brook, New York  10573
5
     BY:    FRAN L. RUDICH, ESQ.
6            LANA KOROLEVA, ESQ.
7
8    SHAWE ROSENTHAL LLP
     Attorneys for Defendant
9            20 S. Charles Street, 11th Floor
             Baltimore, MD  21201
10
     BY:    ERIC HEMMENDINGER, ESQ.
11
             -AND-
12
     DORSEY & WHITNEY LLP
13           250 Park Avenue
             New York, New York  10177
14
     BY:    LAURA M. LESTRADE, ESQ.
15
16
   ALSO PRESENT:
17
         JOHN HAGIN, Videographer
18       WILLIAM C.E. ROBINSON, Geico
         JOHN PHAM, Geico
19       MARLENE HARRIS-GRANT, Geico
20
21
22
23
24
25

CANDACE   HARPER

3

1

2            IT IS HEREBY STIPULATED AND AGREED

3       by and between the attorneys for the

4       respective parties herein that filing and

5       sealing be and the same are hereby waived.

6            IT IS FURTHER STIPULATED AND AGREED

7       that all objections, except as to the form

8       of the question, shall be reserved to the

9       time of the trial.

10           IT IS FURTHER STIPULATED AND AGREED

11      that the within deposition may be signed

12      and sworn to before any officer authorized

13      to administer an oath with the same force

14      and effect as if signed and sworn to before

15      the Court.

16

17

18

19

20

21

22

23

24

25

CANDACE   HARPER

4

1

2          THE VIDEOGRAPHER:   This is the video

3    operator speaking, John Hagin, of Merrill.   Today

4    is Thursday, the 18th of March, 2010.   The time

5    on the video monitor is 12:14 p.m.   We are at the

6    offices of Dorsey & Whitney, 250 Park Avenue, New

7    York, New York to take the videotape deposition

8    of Miss Candace Harper.   In the matter of Candace

9    Harper individually and on behalf of all other

10   persons similarly situated versus the Government

11   Employees Insurance Company, Geico.   In the

12   United States District Court, Eastern District

13   New York.   Will counsel introduce themselves for

14   the record.

15          MS. RUDICH:   Fran Rudich from

16   Klafter Olsen & Lesser for the Plaintiff.

17          MS. KOROLEVA:   Lana Koroleva from

18   Klafter Olsen & Lesser also for the Plaintiff.

19          MR. HEMMENDINGER:   Eric Hemmendinger

20   for Geico.

21          MS. LESTRADE:   Laura Lestrade for

22   Geico.

23          THE VIDEOGRAPHER:   The court

24   reporter today is Mr. Bill Visconti from Merrill

25   and you may swear the witness.

5

1

2              C A N D A C E    H A R P E R,

3    having been first duly sworn by the Notary Public

4    (William Visconti), was examined and testified as

5    follows:

6         EXAMINATION CONDUCTED BY MR. HEMMENDINGER:

7         Q.    Miss Harper, my that name is Eric

8    Hemmendinger, I'm counsel for Geico in the

9    lawsuit you filed.  I'm going to be asking you

10   some questions about your job at Geico.  Has your

11   lawyer had an opportunity to explain the

12   procedure for this deposition to you?

13        A.    Yes.

14        Q.    And do you understand that the

15   testimony that you give in a deposition can be

16   used as evidence in your lawsuit?

17        A.    Yes.

18        Q.    I'm going to ask you a couple of

19   questions about your job history at Geico.  If

20   you count back six years from the date the

21   complaint was filed in this case you get to the

22   date of May 28, 2003.

23        A.    Okay.

24        Q.    Am I correct that at that time you

25   your job was PIP Specialist 1?

CANDACE HARPER

6

1                    CANDACE HARPER

2        A.    I believe so.

3        Q.    And was that job exempt or nonexempt

4   from overtime?

5        A.    I'm not sure, but I think it was -- I

6   think I was salary.

7        Q.    You were salaried with overtime in

8   that job, am I correct?

9        A.    Salaried with -- that is --

10       Q.    You don't recall that?

11       A.    I don't recall.

12       Q.    Am I correct in September -- from

13  September 20th, 2003 to November 13th, 2004 you

14  were a PIP Specialist 2?

15       A.    I guess so.  I'm not sure about the

16  dates, but I believe so.

17       Q.    Am I correct that this lawsuit does

18  not cover your employment as a PIP Specialist 1

19  and 2?  Your lawsuit concerns your employment as

20  a TCR 2?

21       A.    I'm not sure.  I'm not sure about

22  that.

23       Q.    Do you know or do you not know

24  whether you were eligible to receive overtime or

25  not eligible to receive overtime when you were

CANDACE HARPER

7

1              CANDACE HARPER
2    working as a PIP?
3         A.   I believe when I was a PIP Specialist 2
4    I was exempt from overtime, I guess.  That's what
5    I'm thinking, yes.
6         Q.   Do you have a firm recollection of
7    that?
8         A.   No.  But I believe so.
9         Q.   Am I correct from November 13th, 2004
10   to April 23rd, 2009 you were employed in the job
11   of Telephone Claim Representative 2?
12        A.   Yes.
13        Q.   And that is also referred to as
14   TCR 2, it is also referred to as TA 2?
15        A.   Yes.
16        Q.   And in that job you were classified
17   as exempt from overtime, am I correct about that?
18        A.   Yes.
19        Q.   And you are alleging that that was a
20   violation of the law by Geico, am I right about
21   that?
22        A.   Yes.
23        Q.   This will work better if you wait
24   until I completely finish so we don't talk over
25   each other.

CANDACE  HARPER

8

1          CANDACE HARPER

2          Do you recall who you your

3   supervisors were when you were employed as a

4   TCR 2.

5          MS. RUDICH:   Objection, you can

6   answer.  You can answer.

7     A.    Carol Vilar and Marlene Harris-Grant.

8   Those were my two main supervisors.

9     Q.    Do you recall that we served some

10  written discovery requests on you through your

11  attorneys including a document called Request For

12  Admissions?

13    A.    I believe so.  I'm not sure.  I'm not

14  sure.

15    Q.    Would you agree with me that it is

16  undisputed that you were paid by salary the

17  entire time that you were employed as a Telephone

18  Claim Representative 2?

19    A.    I wouldn't dispute that, no.

20          MR. HEMMENDINGER:   I guess we should

21  mark this as an exhibit, this will as Exhibit 1.

22                      (Harper Exhibit 1 for

23  identification, Defendant's Answers To Plaintiffs

24  First Set Of Interrogatories.)

25    Q.    Miss Harper, I handed you what is

CANDACE  HARPER

9

1              CANDACE HARPER

2   mark as Harper Deposition Exhibit 1 and this

3   document is entitled Defendant's Answers To

4   Plaintiffs First Set Of Interrogatories.  This is

5   a set of documents that we, that Geico provided

6   to your attorneys in this lawsuit.  Have you seen

7   this before?

8          A.   Yes, I have.

9          Q.   I would like you to look at page 16,

10   please.  At the bottom of page 16 there is a

11   salary history for you, it starts in May of '03

12   at $38,000, 38,055 and proceeds up to your

13   employment with your salary increasing

14   periodically, do you see that?

15          A.   Yes, I do.

16          Q.   Do you have any reason to disagree

17   with those figures as being what your salary was?

18          A.   No.

19          Q.   Do you understand as a salaried

20   exempt employee you received the same amount each

21   week regardless of the amount of hours you

22   worked?

23          A.   Can you repeat the question again

24   please?

25          Q.   When you were working as a TCR 2, did

CANDACE   HARPER

10

1                       CANDACE HARPER
2        you understand that your salary was the same
3        every week regardless of how many hours you
4        worked?
5              A.     Yes.
6              Q.     Miss Harper, what was your schedule --
7        let me back up and ask you a question before
8        that.
9                    As a TCR 2 during the period that you
10       were employed, did your schedule and hours vary
11       over time or did you always have the same hours
12       and schedule?
13                   MS. RUDICH:    Objection.
14             Q.     Let me clarify that.  I'm not -- I
15       know it varied from week to week.  But was your
16       basic -- you had a basic schedule that it was
17       Monday through Friday from some time to some time
18       I assume; is that correct?
19             A.     Right, that is correct.
20             Q.     Did that change over time or was it
21       always the same?
22             A.     I'm not understanding the question.
23             Q.     Let's start when you started as a
24       TCR 2, what was your schedule?
25             A.     When I started as a TCR 2 my schedule

CANDACE  HARPER

11

1          CANDACE HARPER

2    was, I believe, I'm not quite certain, but I

3    believe it was probably 7:30 to 4:00 or it could

4    have been 4:30.

5          Q.     Monday through Friday?

6          A.     Monday through Friday.

7          Q.     Did that ever change?

8          A.     There was -- it is called a -- where

9    you would work maybe an hour extra a day or half

10   an hour so that you could have Friday off, but

11   you would make it up during those two weeks.

12         Q.     In a typical week can you describe

13   when you came to work and when you left work?

14         A.     A typical week?

15         Q.     Yes.

16         MS. RUDICH:   Objection, you can

17   answer.

18         A.     A typical week would -- I would get

19   in probably around 7, 7:30 and would leave 5:30.

20   I would come in on Saturdays, Sundays sometimes.

21         Q.     Is that every Saturday and Sunday or

22   some Saturdays and Sundays?

23         A.     I would say a lot of Saturdays and

24   Sundays.

25         Q.     Do you have any way of measuring how

CANDACE   HARPER

12

1                      CANDACE HARPER

2    many of them?

3         A.    No.

4         Q.    When you came in on a Saturday, how

5    many hours would you work?

6              MS. RUDICH:   Objection.  Are you

7    talking about generally?

8              MR. HEMMENDINGER:   Yes, generally.

9         A.    Generally, five.

10        Q.    On a Sunday?

11        A.    Same.

12        Q.    Would you work a Saturday and Sunday

13   the same weekend or would it be Saturday or

14   Sunday?

15        A.    The same weekend most of the time.

16        Q.    Let me just ask you again.  Would you

17   work -- would that be every other Saturday and

18   Sunday that you would come in to the office or

19   every third Saturday and Sunday?

20        A.    No.  It could be a month straight

21   Saturday and Sunday.

22        Q.    And then could if be a month straight

23   of no Saturdays and Sundays?

24        A.    No.

25        Q.    Did the workload vary from time to

CANDACE  HARPER

13

1              CANDACE HARPER
2    time based on the case load?
3         A.    The workload did vary from time to
4    time.
5         Q.    Did your hours vary with the
6    workload?
7         A.    I'm not sure how to answer that
8    question.  Ask me one more time.
9         Q.    Did your hours -- did the amount of
10   hours that you worked in a week change from time
11   to time based on how heavy the case load was?
12        A.    Yes, it did.
13        Q.    In your view what would the high
14   number of hours in a week be?
15        A.    15.
16        Q.    50?
17        A.    15.  1-5.
18        Q.    That is the number of overtime hours?
19        A.    Yes.
20        Q.    So 65 total?
21        A.    Yes.
22        Q.    Sorry, 55 total hours?
23        A.    I think I worked 37 1/2 hours.
24        Q.    So --
25        A.    77.5 hours a week, every other week,

14

1                    CANDACE HARPER

2     every two weeks.

3            Q.    So we are talking about the same

4     thing, the base schedule is 37 1/2 hours a week,

5     correct?

6            A.    15 above that.

7            Q.    So it would be 15 above that would be

8     the high, what would the low be?

9            A.    I don't recall exactly, but I would

10    say probably between 7 and 10.

11           Q.    Do you have a sense of what the

12    average was?

13           A.    No.

14           Q.    Let's shift gears here and talk a bit

15    about the training.  Do you recall the training

16    that you had at Geico?

17           A.    Yes.

18           Q.    When you first were hired by Geico,

19    what training did you attend?

20           A.    When I was first hired when, for what

21    position?

22           Q.    Your first position were you hired

23    into I believe was sort of a trainee slot where

24    you could have gone into either personal injury

25    protection or adjusting; am I correct?

CANDACE   HARPER

15

1                    CANDACE HARPER

2          A.     Yes.

3          Q.     Or liability claims?

4          A.     Yes.

5          Q.     Were you attending a training class

6     at that time?

7          A.     Yes, I was.

8          Q.     Where did that training class take

9     place?

10         A.     At 750 Woodbury.

11         Q.     How long did that last?

12         A.     It lasted for eight weeks but I was

13    there for six weeks.

14         Q.     What happened to the other two weeks?

15         A.     I was on vacation.

16         Q.     What was the nature of that training?

17         A.     That was CSR training.

18         Q.     For the record, can you tell us what

19    the CSR is?

20         A.     Customer service.

21         Q.     So were you training for an entry

22    level claims service rep job?

23         A.     I believe it was something new that

24    Geico was doing.  They were hiring people from

25    outside and they had set up training for the CSR

CANDACE  HARPER

16

1              CANDACE HARPER
2    training and you would have to do that first.
3         Q.    Do you recall what that covered?
4         A.    Policy contracts, we talked about
5    liability scenarios.
6         Q.    After that training, what did you do?
7              MS. RUDICH:   Objection.  Do you mean
8    --?
9              MR. HEMMENDINGER:   I don't know the
10   answer, so I'm asking.
11              MS. RUDICH:   The question you mean
12   what did you do relating to what job?
13        Q.    What job did you hold?  Did you go to
14   another trainee position or did you start working --
15        A.    In 2001 I started in property damage.
16        Q.    What were you doing in property
17   damage?
18        A.    I was a liability claims examiner.
19        Q.    So you were a liability claims
20   examiner for what types of claims?
21        A.    Property damage claims.
22        Q.    How long did you stay in that?
23        A.    From September 10th, 2001 until I
24   believe October of 2002, or November of 2002.
25        Q.    What was the next position that you

CANDACE HARPER

17

1              CANDACE HARPER
2    went to within Geico?
3         A.    Then I transferred to the personal
4    injury protection department.
5         Q.    Did you receive any additional
6    training when you went into that?
7         A.    Yes, I did.
8         Q.    What was that training about?
9         A.    That was no-fault training.
10        Q.    How long did that last?
11        A.    I believe that lasted, I'm not sure,
12   but I think it lasted maybe six to eight weeks.
13        Q.    After that training, did you start
14   working as a no-fault examiner?
15        A.    Yes.
16        Q.    How long did you work as a no-fault
17   examiner?
18        A.    I'm not sure, but I think it was two
19   years, two, three years maybe.
20        Q.    After doing that, you became a TA 2;
21   correct?
22        A.    Yes, I did.
23        Q.    So, focusing back on the training,
24   there was the initial training that you received
25   when you were hired and then there was the

CANDACE   HARPER

18

1              CANDACE HARPER

2    personal injury protection claim training that

3    you received when you went into that job.  Did

4    you go through any other training courses with

5    Geico?

6         A.    You mean as far as any positions are

7    concerned?

8         Q.    Yes.

9         A.    I had some training doing TA 1 -- I

10   mean TA 2.

11        Q.    How long did that training last?

12        A.    I don't recall.

13        Q.    Was that conducted at Woodbury?

14        A.    Yes.

15        Q.    Did you go to any training anywhere

16   apart from Woodbury?

17        A.    No.

18        Q.    When you were in training, was this

19   classroom training?

20        A.    When you say classroom, what do you

21   mean?  Are we actually in a classroom?

22        Q.    Not in a work site, but in a training

23   place where there were instructions going on.

24        A.    Basically the training that I

25   received took place at the desk.  There were a

CANDACE HARPER

19

1              CANDACE HARPER
2    group of desks that were on the floor.  It wasn't
3    in a room, and basically it was kind of like we
4    were self-teaching.
5          Q.    Did you receive any written materials
6    as part of those training programs?
7          A.    Yes, lots of written materials.
8          Q.    Did you keep any of them when you
9    left Geico?
10         A.    No.
11         Q.    So do you still have any of the
12   training material that you received from Geico?
13              MS. RUDICH:   Objection, asked and
14   answered.
15         A.    No.
16         Q.    Let me ask you about the period that
17   you were employed as a TCR 2.  Were you licensed
18   anywhere?
19         A.    No.
20         Q.    Were you working on being licensed
21   anywhere?
22         A.    No.
23         Q.    Does New York State require an
24   insurance adjuster to be licensed?
25         A.    I don't think so.  I wasn't.

CANDACE  HARPER

20

1          CANDACE HARPER

2     Q.    Let me ask you this, I think I saw

3  some reference in your personnel file to your

4  discussing getting licensed in Connecticut, does

5  that ring any bells with you?

6     A.    No.

7     Q.    As a TCR 2, how many claims on the

8  average would you intake in a week say?

9          MS. RUDICH:   Objection.  You can

10  answer.

11     A.    Wow, I really couldn't tell you.

12  Sometimes I could get three a day.

13     Q.    Do you have any ability to tell us if

14  on a weekly basis or monthly basis or yearly

15  basis how many claims you handled?

16     A.    Well, looking at claims it was really

17  your feature count is what I basically -- how I

18  basically looked at my production or my intake.

19  How many features.  Are you talking if you're

20  talking about features, there was a time when I

21  had 320 some odd features.

22     Q.    Open or in a year?

23     A.    Yes, open.

24     Q.    That would be your -- is that what we

25  call your pending?

CANDACE   HARPER

21

1                    CANDACE HARPER

2          A.    Yes.

3          Q.    Do you have a sense of how many

4    features per claim there would typically be?

5          A.    No.

6          Q.    For the benefit of somebody that may

7    look at this deposition that doesn't know

8    insurance, what is a feature?

9          A.    Okay, a feature is -- it is

10   something, how many am I going to say -- a

11   feature is a dollar amount.

12         Q.    Let me see if I could help you here.

13   This may be a little -- I'm not that great on it

14   myself, but somebody is in an automobile accident

15   and the car is damaged and they also have a

16   personal injury.  Okay, would there be a feature

17   for the damage to the automobile?

18         A.    Yes, absolutely.

19         Q.    And the feature would be what type of

20   claim, what part the policy the claim is being

21   made under?

22         A.    Yes.

23         Q.    So that could be the collision damage

24   portion of the --

25         A.    Exactly.

CANDACE  HARPER

22

```
1                    CANDACE HARPER
2        Q.    -- of the policy?
3        A.    Yes.
4        Q.    And there would be another feature
5   for bodily injury?
6        A.    Yes, absolutely.
7        Q.    What other types of features are
8   there?
9        A.    There is PIP.  There is collision,
10  there is rental, there is LOU.
11       Q.    Is that a loss of use?
12       A.    Yes.  Then there is COP.
13       Q.    What does that mean?
14       A.    Cash payout -- I don't know the exact
15  meaning.  I think the total loss features.  But
16  I'm not familiar with all the features, but yes.
17            MR. HEMMENDINGER:   Mark this as
18  Exhibit 2.
19                      (Harper Exhibit 2 for
20  identification, Group of documents taken out of
21  Miss Harper's personnel file.)
22            MS. RUDICH:   Are you marking it or
23  using the Bates stamp number?
24            MR. HEMMENDINGER:   This one I will
25  mark and refer to the Bates stamp numbers.
```

CANDACE  HARPER

23

1                        CANDACE HARPER

2              MS. RUDICH:   That's fine.

3              MR. HEMMENDINGER:   But your point is

4    well taken.

5         Q.   Miss Harper, in Exhibit 2 what I did

6    was staple together a group of documents that we

7    took out of your personnel file and they are kind

8    of grouped.  The first one is Geico 6162 and the

9    title of it is Memorandum Subject Performance

10   Review, 2007 Candace Harper and then it has

11   writing on it which is by your supervisor; am I

12   correct?

13        A.   Yes, that looks like her signature.

14        Q.   On the second page, page 62, is that

15   your signature?

16        A.   I believe it is, yes.

17        Q.   Then we go to the next document, 63

18   and that is -- is that part of the same

19   performance appraisal package?  The reason that I

20   ask, the performance appraisal is dated February 8th,

21   2008 and this document is dated February 4th,

22   2008.  63 is dated February 4th, do you see that?

23        A.   I'm looking at my signature and date

24   and it says 2007.

25        Q.   Right.  If we look at the front that

CANDACE  HARPER

24

1                    CANDACE HARPER

2     appears to be a mistake, doesn't it?

3              MS. RUDICH:   I'm just pointing out

4     the date.

5              MR. HEMMENDINGER:   That's fine.

6              MS. RUDICH:   If you look at the date

7     on that.

8         A.   Okay, what is the question?

9         Q.   So Geico 63, the third page is an

10    attachment to your performance appraisal,

11    correct?

12        A.   Yes.

13        Q.   And it's an attachment to 61 and 62?

14        A.   Yes.

15        Q.   And the text in this that is typed

16    in, this was written by you, am I correct?

17        A.   I believe so, yes.

18        Q.   Under skill development

19    accomplishments it lists some things that you did

20    and I want to ask you about what these consisted

21    of.  One is -- the first one is Serious Injury

22    Seminar NYS.  New York State is that what that

23    means?

24        A.   Yes.

25        Q.   What was that seminar?

CANDACE   HARPER

25

1                      CANDACE HARPER

2          A.     I don't recall.

3          Q.     Do you have any recollection of

4    attending a seminar on serious injuries?

5          A.     I probably did, but I don't recall

6    what it was about.

7          Q.     What do serious injuries have to do

8    with your job as a TCR 2?

9          A.     I would get claims where people were

10   injured in accidents and they were injured

11   seriously, some not seriously.

12         Q.     So is it important for you to know

13   about the medical aspects of the injuries?

14         A.     Yes.

15         Q.     The next thing is threshold.  Was

16   this a class or seminar that you attended?

17         A.     Yes, I believe so.

18         Q.     Do you recall the class or the

19   seminar?

20         A.     Yes, I do.

21         Q.     What was it?

22         A.     I can't tell you exactly what it was

23   about, but I know that an attorney's firm came in

24   and spoke on what the threshold was, what kind of

25   things -- what kind of things I guess we would

26

1          CANDACE HARPER
2     settle on.  We would be able to settle on.
3          Q.   Can you explain what the threshold
4     was or is?
5          A.   How I understood it is that I guess
6     there was a series of events or things or serious
7     injury that would have to occur in order for
8     someone to have a valid bodily injury claim.
9          Q.   Is the threshold a legal concept?
10          A.   I believe so.
11          Q.   Was it one that you had to employ in
12     your work as a TCR 2?
13               MS. RUDICH:   Objection.  Vague and
14     ambiguous.
15          A.   I would have to know -- yes, about
16     the threshold.
17          Q.   The threshold is a legal test, it
18     comes out of a statute?
19          A.   I'm not sure about that.
20          Q.   What is the -- do you know what the
21     point of the threshold test is?  What happens if
22     you pass the threshold?
23               MS. RUDICH:   Objection.  Vague and
24     ambiguous.
25          A.   Say that one more time.

CANDACE   HARPER

27

1                          CANDACE HARPER

2          Q.    Well, obviously I didn't say it in a

3     way that is ringing any bells with you, so let me

4     try it from a different angle.

5                The threshold is a legal testing, am

6     I correct, that enables -- that determines

7     whether somebody can bring a personal injury

8     lawsuit in New York?

9          A.    Okay, I would agree with that.

10         Q.    Would you agree with that?

11         A.    Yes.

12         Q.    If they do not meet the threshold,

13    their remedies are limited to the PIP remedies,

14    am I correct?  Their payment, they would only be

15    paid what PIP protection provides?

16         A.    I think it is two different things.

17         Q.    Okay, if they -- let me try it a

18    different way.

19                If they do not pass the threshold

20    could they file a lawsuit against the adverse

21    driver?

22         A.    Could they -- say it again.

23         Q.    Say I'm in an accident and Fran and I

24    are in an accident, and I'm injured.

25         A.    Right.

28

1                    CANDACE HARPER

2        Q.    In order to file a claim against

3   Fran, do my injuries have to pass the threshold?

4        A.    No, you -- no, anyone can file a

5   claim.

6        Q.    They could file a claim against

7   Geico?

8        A.    Yes.

9        Q.    Can they file a lawsuit in court?

10        A.    I wouldn't know about that.

11        Q.    Did the threshold make a difference

12   in how you handled the case, a claim?

13        A.    Sometimes it did.

14        Q.    Can you describe what difference it

15   made?

16        A.    Well some times you did things for

17   what they were to be a business decision.

18        Q.    What does that mean?

19        A.    Depending on what type of claim it

20   is.  If --

21        Q.    Can you give me an example?

22        A.    Pedestrian knock down, a child, you

23   might after a discussion with your supervisor,

24   you might -- it might be decided instead of them

25   filing a lawsuit, that you would give them a

CANDACE  HARPER

29

1          CANDACE HARPER
2    couple of hundred dollars.
3          Q.    Let's move down to the next item on
4    this list, Safeguarding Customer Privacy.  Do you
5    recall receiving training on that?
6          A.    I don't remember, but I probably did,
7    yes.  I don't remember exactly what the training
8    was, but I believe I did have -- I think it was
9    on the computer that we did it.  I'm not
10   remembering.
11         Q.    The next item is Auto Repair Express
12   Training, what was that?
13         A.    That was for the what they call the
14   ARXs.  Basically just told you how you should, I
15   guess, basically explain to the customer the
16   benefits of using their -- Geico's auto repair
17   services.
18         Q.    As a TA 2 or TCR 2, what involvement
19   did you have in the auto damage portion of the
20   claim?
21         A.    When you say involvement, well some
22   of the claims would come to me with property
23   damage still opened on them and I would
24   basically, either if it was a Claimant and we
25   were at fault, I would just refer them to an

CANDACE   HARPER

30

1                    CANDACE HARPER

2    adjuster.

3        Q.    Did you ever to assign a pay code to

4    the claim?

5        A.    Yes.

6        Q.    What were the possible pay codes?

7        A.    There was pay code 1, which would be

8    if I just wanted pictures, I believe.  Pay code 2

9    I believe was a good pay code.

10       Q.    That meant it was okay to pay?

11       A.    Okay to pay.  And then there was pay

12   code 4 which is a bad pay code, I believe.

13       Q.    You would assigned a good or bad pay

14   code to the claim?

15       A.    Yes.

16       Q.    Who would use that pay code?

17       A.    The adjusters would use that pay code

18   to pay.

19       Q.    What you would be doing is telling

20   them whether it is okay or not okay to pay the

21   auto damage claim?

22       A.    Yes.

23       Q.    Let's go to the next item on this

24   list, what does CAP mean?

25       A.    I don't remember what CAP means.

CANDACE  HARPER

31

1                        CANDACE HARPER

2         Q.     Do you recall a training that was CAP

3    awareness training?

4         A.     That was also done on the computer, I

5    believe.

6         Q.     Do you recall the words Competitive

7    Advantage Process?

8         A.     Yes, okay.  I kind of remember.

9         Q.     What does that mean?

10        A.     I wouldn't really be able to tell you

11   that.

12        Q.     Do you recall the training?

13        A.     I remember it was done on the

14   computer, yes.

15        Q.     The next thing is Claims IQ Injury

16   Knowledge Test.  What kind of training was that?

17        A.     I believe we had to take a test -- we --

18   all the examiners who used Claims IQ in the

19   liability department, we had to show proficiency

20   of using the Claims IQ and there was a test, we

21   had to go through each and every single screen.

22        Q.     The next item is evaluating causation

23   of injury and bodily injury claims.  Do you

24   recall the training program on that?

25        A.     I don't recall that.  I don't recall

CANDACE  HARPER

32

1                    CANDACE HARPER

2    that.

3         Q.    Can you tell me what evaluating

4    causation of injury and bodily injury claims how

5    that related to your work as a TA 2?

6         A.    We would get medical reports from

7    doctors or from attorneys would send me medical

8    records and I would take them, put them in order,

9    count the number of times, of the different

10   treatments that they had.  I would read over the

11   treatment and the prognosis and that is basically

12   how --

13        Q.    You described to me reading a medical

14   file.  How did you use that information to

15   evaluate causation of injury?

16        A.    I don't know that I actually

17   evaluated causation.  A doctor would basically

18   say whether or not it was causally related.  I

19   would read the reports.  If someone was involved

20   in an accident and they complained that they hit

21   their head and now they have to have a CAT scan,

22   would you say that it was related to the

23   accident.  I don't know if that is evaluating

24   causation.

25        Q.    Did you have to look at medicals and

CANDACE  HARPER

33

1                      CANDACE HARPER

2     decide whether you thought they were validly part

3     of the automobile claim or perhaps were

4     fraudulent or a preexisting condition?

5          A.     Say that one more time.

6          Q.     If somebody comes in, you got the

7     medical, a person has been in an accident and you

8     got the medical, did you have to evaluate whether

9     those medicals -- whether it seemed sensible that

10    those medicals were caused by the accident in

11    question?

12         A.     No.

13         Q.     Did you have to evaluate whether they

14    were possibly fraudulent medicals?

15         A.     No.

16         Q.     Let's go on to the next two pages

17    which is 68 and 69.  Would you agree with me that

18    this is an appraisal form for you for the period

19    of -- well it is the year of 2005?

20         A.     Yes.

21         Q.     And I want you to look at the second

22    page which is Geico 69 in Exhibit 2?

23         A.     Okay.

24         Q.     Is the typing in each of these

25    sections your writing?

CANDACE  HARPER

34

1              CANDACE HARPER
2          MS. RUDICH:   Objection.  Do you mean
3      did she type it?
4          MR. HEMMENDINGER:   Did she author it.
5          MS. RUDICH:   Okay.
6      A.    Yes.
7      Q.    So the I is Candace Harper?
8      A.    Yes.
9      Q.    Is that your signature at the bottom?
10     A.    Yes, it is.
11     Q.    Under skill development
12     accomplishments, that is the third section, it
13     says the second sentence says, "I have been able
14     to learn and utilize ADR procedures and negotiate
15     parameters."  What is ADR?
16     A.    Wow, I don't remember.
17     Q.    Does it mean alternative dispute
18     resolution?
19     A.    I don't remember, but I know I wrote
20     this, but I don't remember what ADR stands for.
21     Q.    Do you know what negotiate parameters
22     means?
23     A.    I believe that has to do with CIQ.
24     Q.    Can you put into noninsurance
25     language what you meant in this sentence?

CANDACE  HARPER

35

1                    CANDACE HARPER

2         A.    To the best of my recollection I had

3    to be talking about the parameters I guess from

4    the CIQ screen, but I'm not sure.  To be quite

5    honest with you, I'm not sure what I meant by

6    that sentence at that time.  I'm not sure.

7         Q.    Let's go to the next page the next

8    item which is pages 70 and 71.  And this is dated --

9    this is still in Exhibit 2, it is dated February 15th,

10   2006 and this is another evaluation.  This is

11   from Carol Vilar, am I correct?

12        A.    Yes.

13        Q.    On the second page which is 71 is

14   that your signature at the bottom?

15        A.    Yes.

16        Q.    And did you write in, I agree with

17   all of the above comments.

18              Let's go to the next page, 179, Geico

19   179, 180 and 181.  Am I correct that that was

20   your evaluation given to you in 2009?

21        A.    Yes.

22        Q.    So the first page is from Marlene

23   Harris-Grant and she typed that up or used a

24   computer to prepare that?

25        A.    Yes.

CANDACE   HARPER

36

1                    CANDACE HARPER

2          Q.     And the second page has your

3     comments?

4          A.     Yes.

5          Q.     Am I correct?

6          A.     Yes.

7          Q.     And the third page is your

8     self-appraisal for the same period, am I correct?

9          A.     Yes.

10         Q.     So, I want to ask you about the

11    training courses that are listed on page 181 of

12    Exhibit 2.

13                Do you recall, do you see where it

14    says Bad Faith Seminar by Connors & Connors?

15         A.     Yes.

16         Q.     Do you recall that?

17         A.     I remember the seminar, yes, I do.

18         Q.     What did that concern?

19         A.     Bad faith.

20         Q.     What is bad faith?

21         A.     I wouldn't be able to explain that.

22         Q.     Did it have something to do with your

23    obligations as a TCR 2 to the people that you

24    were dealing with?

25         A.     I mean I guess it has to do with how

CANDACE HARPER

37

1           CANDACE HARPER

2    you handle a claim and you should be fair and,

3    but, yes, I really couldn't tell you what the

4    seminar was about.

5           Q.    Can you give me an example of some

6    work that you would have to do that would cause

7    you to have to be fair to a member of the public?

8           A.    What I would do in my job that would

9    cause me to be fair?

10          Q.    Yes.  When did you have to think

11   about being fair?

12          A.    Any time I handled a claim I believe

13   I handled it fairly.

14          Q.    Who are you being fair to?

15          A.    To Claimants, policyholders.

16          Q.    What were you being fair about?

17          A.    Proper claims handling.

18          Q.    What kind of decisions would you have

19   to make where you would have to be fair?

20          A.    I don't know what you mean by

21   decisions.

22          Q.    What kind of things did you deal

23   with, say Claimants on, where you would have to

24   be fair to them?

25          A.    I guess -- I don't know how to answer

1                    CANDACE HARPER
2    that question.
3         Q.    All right.  Then we have CAP
4    Awareness Training 2.  Did that sink in any more
5    than the first time?
6         A.    No.  I believe that was another
7    computer training that we had to do.
8         Q.    And the next one is Good Negotiating
9    Strategies And Practices.  Do you recall
10   attending that?
11        A.    I don't remember that.
12        Q.    I'm wondering --
13        A.    I don't remember that.  I don't
14   remember.
15        Q.    Then it says Liability Post Training
16   Certification Quiz For Rental.  Do you recall
17   that?
18        A.    I don't recall that.
19        Q.    In your job what did you have to do
20   with rental?
21        A.    Like if they had collision and they
22   had rental on their policy you would open the
23   feature for rental.
24        Q.    Okay, that would be the coverage
25   would pay them to rent a car while the car was in

CANDACE   HARPER

39

1                      CANDACE HARPER

2    the shop?

3         A.    Right.

4         Q.    The next item says Permissive Use

5    Seminar, do you recall that?

6         A.    Wow.  Vaguely remember that.

7         Q.    What is permissive use?

8         A.    That is you lend your car to someone

9    and you're actually giving them permission, that

10   would be considered permissive use.  If you -- if

11   they just took your car -- or you say you left

12   your keys in the car and your windows open and

13   your car running and you run into 7-11, that is

14   implied permissive use because you left your car

15   open.

16        Q.    How did you use that information in

17   handling claims?

18        A.    I really don't recall having

19   permissive use issues in any of the claims that I

20   handled, that I can recall.

21        Q.    How could permissive use come up in a

22   claim?

23        A.    If someone said someone stole their

24   car and they left the keys in the car and went to

25   7-11 and they took the car and got into an

CANDACE HARPER

40

1          CANDACE HARPER

2    accident, that could play a role.

3         Q.    What would the TCR 2 be required to

4    do about that?

5         A.    If there is a question on -- it is

6    like a policy question, then you would speak with

7    your supervisor who would advise you to go see

8    the RLA.

9         Q.    What is the RLA?

10        A.    I believe it is the Regional Law

11   Advisor.  I'm not sure, I believe that is what it

12   is.

13        Q.    Did you ever do that?

14        A.    Yes, I have.

15        Q.    When you did that, would you -- what

16   would you do, present the facts to the

17   investigator?

18        A.    He would ask questions about the

19   claim.  I guess you could say that I presented

20   the facts to him as he asked the questions and

21   then he would make a decision on how we should

22   handle the claim.

23        Q.    Let me go down to where it says Skill

24   Development Accomplishments.  You wrote "I was

25   able to get quite a bit out of class that I took

CANDACE  HARPER

41

1                    CANDACE HARPER
2    on good negotiation strategies and practices.  I
3    believe it has made me an attuned, personable and
4    yet firm negotiator.  I use what I learned in
5    that seminar on a daily basis when dealing with
6    the attorneys."  Do you see that?
7         A.    Yes.
8         Q.    Those were your words?
9         A.    Yes, yes.
10        Q.    Does that refresh your recollection
11   at all about the good negotiation strategies and
12   practice course that you took?
13        A.    It doesn't refresh it, no.
14        Q.    How would you use negotiation
15   strategies in your work as a TCR 2?
16        A.    Once I have money on my file, I would
17   call the attorneys and basically negotiate a --
18   try to negotiate, attempt to negotiate a
19   settlement.
20        Q.    That I gather required some artistry
21   on your part; am I correct?
22             MS. RUDICH:   Objection.
23        Q.    To get good settlements.
24             MS. RUDICH:   Objection, vague.
25   Artistry?

CANDACE   HARPER

42

1                   CANDACE HARPER

2        Q.    It required some finesse?

3        A.    Yes.

4        Q.    That was something that you took some

5   pride in, am I correct?

6        A.    Yes.

7        Q.    Were you good at that?

8        A.    Finessing, yes.

9        Q.    Negotiating?

10        A.    Negotiating, yes.  I was good at

11   doing that, yes.

12            MS. RUDICH:   When we get a chance,

13   could we take a break?

14            MR. HEMMENDINGER:   This is perfect.

15            THE VIDEOGRAPHER:   Going off the

16   record the time is 1:09 p.m.

17            (Recess taken.)

18            THE VIDEOGRAPHER:   Back on the

19   record the time is 1:20 p.m.

20   BY MR. HEMMENDINGER:

21                         (Harper Exhibit 3 for

22   identification, Claim file 1013.)

23        Q.    Miss Harper, I placed in front of you

24   what is marked as Harper Exhibit 3.  You see it

25   is a folder that you have in front of you?

CANDACE   HARPER

43

1                    CANDACE HARPER

2          A.    Yes.

3          Q.    And for the record what Harper

4    Exhibit 3 is a claim file, the last four digits

5    of the claim number are 1013.  Do you see that?

6          A.    Yes.

7          Q.    And then each document in this has a

8    number starting with 1 and going up to several

9    hundred.  Do you see where the document numbers

10   are on the bottom of each page in this file?

11         A.    Where it says confidential?

12         Q.    Yes.

13         A.    Yes.

14         Q.    And each number starts 1013 and then

15   there is dash and 42, 43 or 1, 2, 3, do you see?

16         A.    Yes.

17         Q.    Until we move to another file.  When

18   I give you a document number, refer to a document

19   number page 1 or page 2 or page 19, I'm going to

20   be referring to one of these -- to the Bates

21   stamp number at the bottom right-hand side of the

22   page within this claim file 1013 which is

23   Exhibit 3.  Okay?

24         A.    Okay.

25         Q.    What I would like to do is start with

44

1                    CANDACE HARPER
2    the set of documents in this file that begins
3    with 1, do you see that?
4         A.    Yes.
5         Q.    The top of this page it says activity
6    log for and then it has a claim number that ends
7    1013?
8         A.    Yes.
9         Q.    Can you tell me what an activity log
10   is at Geico?
11        A.    A place where examiners would put
12   their notes or discussions or what they plan to
13   do on a file.
14        Q.    Is this a computerized record?
15        A.    Yes, it is.
16        Q.    Did you make entries into it on cases
17   from claims?
18        A.    Yes.
19        Q.    Do other people as well?
20        A.    Yes.
21        Q.    I would like to ask you to go -- if
22   you look at this set for a second, page 1 through
23   41, it starts at the most recent and works back
24   to the earliest.  Am I right about that?
25        A.    Okay.

CANDACE   HARPER

45

1               CANDACE HARPER

2          Q.    So I would like to start at the

3     beginning which means I would like to ask you to

4     flip to the back which is page 41.  And I will

5     point out various line items in this A Log to you

6     and ask you questions about it.  The first one

7     begins May 31st, '08 at 5:29 p.m.  Do you see

8     that?

9          A.    Yes, I do.

10         Q.    You're familiar with working with

11    these files from working with them at Geico,

12    correct?

13              MS. RUDICH:   Objection.  Which

14    files?

15              MR. HEMMENDINGER:   The A Log record.

16              MS. RUDICH:   This is an A Log?

17              MR. HEMMENDINGER:   Yes, the whole

18    thing is an A Log.

19         Q.    You're familiar with these, aren't

20    you?

21         A.    Yes, I am.

22         Q.    The first item on this, this is where

23    there is a new claim and it was assigned to you

24    as the TCR 2 assigned to this claim.  Am I

25    correct about that?

CANDACE  HARPER

46

1                    CANDACE HARPER

2          A.    Yes, that is what it looks like, yes.

3          Q.    I would like you to flip over to page 39,

4     please and go to the item dated June 1st, '08 at

5     10:15 a.m.

6          A.    Is that Sunday?

7          Q.    Yes.  Is this an entry made by you

8     into the A Log?

9          A.    That is what it looks like, yes.

10         Q.    At the top it says TA 2 opening?

11         A.    Where does it say that.

12         Q.    The top line of this entry?

13         A.    At 10:03.

14         Q.    I'm looking at June 1st, '08.  Do you

15    see that?

16         A.    Yes.

17         Q.    10:15.

18         A.    10:15?

19              MS. RUDICH:   It is like slashes,

20    look at the entry.

21              MR. HEMMENDINGER:   Page 39.

22              MS. RUDICH:   39, look on the

23    bottom.

24         A.    Okay.

25         Q.    Do you see where it says TA 2

CANDACE  HARPER

47

1                    CANDACE HARPER
2    opening?
3         A.    Yes.
4         Q.    What does TA 2 opening mean?
5         A.    Well, that is a -- it was like a
6    template that we would have to follow and we
7    basically would just sum up the claim.
8         Q.    This is your -- so your opening your
9    notes on this claim essentially?
10        A.    Yes.
11        Q.    The next line says New York -- it
12   says NYR and what does that mean?
13        A.    It is supposed to be an L.  That
14   means New York Risk And Loss.
15        Q.    The next line over on same line it
16   says venue, what does that mean?
17        A.    Well, it is supposed to be where the
18   accident occurred.
19        Q.    Do you know what the term venue
20   means?
21        A.    As far as I know, it changed
22   overtime, but I was told when I started that it
23   is where the accident occurred and I believe
24   later on they changed it.
25        Q.    What did they change it to?

CANDACE  HARPER

48

                        CANDACE HARPER

1

2        A.    To the place where I guess it would

3   be less desirable for Geico if the claim were to

4   go to suit.

5        Q.    Did you have to make that entry as to

6   where it would be less desirable if it were to go

7   to suit?

8        A.    It was a procedural thing, so this

9   was a template that all the claim examiners used.

10        Q.    It didn't come with Suffolk inserted

11   there, you had to put that in?

12        A.    That was because the accident

13   probably occurred in Suffolk County.

14        Q.    And later on if you had to determine

15   where the lawsuit was going to be, did you enter

16   that information?

17        A.    Well, no.  I didn't determine where

18   the lawsuit was going to be.  I was told that if

19   the person lived in Brooklyn and the accident

20   happened in Suffolk, then we should put Brooklyn.

21        Q.    Why would you put Brooklyn?

22        A.    Because that is what we were told,

23   because Brooklyn, as I was told Brooklyn was, you

24   know, a less desirable place for Geico.  If the

25   case were to go to suit.

CANDACE  HARPER

49

1                    CANDACE HARPER
2        Q.    The next line says good coverage.
3   What does good coverage mean?
4        A.    Meaning that there were no coverage
5   issues for the claim.  There was no coverage
6   issues that came up that were flagged.
7        Q.    What kind of coverage issues could
8   there be on a claim?
9        A.    I guess if the policy wasn't in
10  effect there could be -- that would be considered
11  a coverage issue.
12       Q.    Would it be a coverage issue if the
13  accident occurred prior to the effective date of
14  the policy?
15       A.    I think that is like the same thing.
16       Q.    Did you ever have to investigate
17  whether or not the coverage was good on the
18  policy?
19       A.    Well, yes, procedurally we would have
20  to I guess look at -- send underwriting an e-mail
21  or whatever to see whether or not there was
22  coverage and then they would say whether there
23  was or not.
24       Q.    They could -- underwriting could look
25  up what their records showed; correct?

CANDACE  HARPER

50

CANDACE HARPER

1

2      A.      Underwriting, right, they would tell
3  us if in that case if the policy was in effect I
4  would have to contact underwriting.

5      Q.      How would you find out when the
6  accident occurred?

7      A.      I'm sorry?

8      Q.      How would you know when the accident
9  occurred?

10             MS. RUDICH:    Objection.

11     A.      I don't understand the question.

12     Q.      Let's say there is an issue about
13  whether or not the coverage was in effect at the
14  time of the accident, am I correct?  Does it ever
15  happen -- let me back up.

16             Have you ever had experience with a
17  claim where somebody made a claim for a damage to
18  or an injury that occurred before the policy
19  period?

20     A.      I don't remember having a claim like
21  that.

22     Q.      Have you ever had any claims where
23  there's a problem with coverage?

24     A.      Yes.

25     Q.      What kind of claims did you have

CANDACE  HARPER

51

1                    CANDACE HARPER
2    where there was problems with coverage?
3         A.    Where maybe there was and I don't
4    remember an exact case, but where there were
5    occasions where there would be no coverage, like
6    perhaps maybe they didn't pay so there would be
7    no coverage.  There would be a flag.
8         Q.    Did you ever have to investigate any
9    issues that involved coverage by talking to the
10   Claimant?
11        A.    I mean we were told that we should
12   call the Claimant and ask them what time the
13   accident occurred.  There was like a list of
14   questions that you would ask.  That is what we
15   would do.
16        Q.    The purpose of asking those questions
17   was to determine -- one of the purposes was to
18   determine whether the coverage was in order for
19   the claim?
20        A.    Well, I would get all the facts
21   together and I would see the supervisor who would
22   then either tell me that I should go to the RLA.
23        Q.    If you thought there was a problem?
24        A.    If there was a question.
25        Q.    If you thought there was no question

CANDACE HARPER

52

```
 1                    CANDACE HARPER
 2   you would just write in good coverage, am I
 3   correct?
 4             MS. RUDICH:   Objection.
 5        A.    No.
 6        Q.    You would not write good coverage?
 7        A.    Who, me?
 8        Q.    Yes.
 9        A.    I'm not really understanding.  I'm
10   not understanding the question.
11        Q.    Who wrote good coverage on the item
12   that we are looking at on page 39?
13        A.    I wrote that.
14        Q.    You determined there was no problem;
15   correct?
16        A.    Because there was no flag that came
17   up on -- when I'm opening up the claim screen,
18   there was no coverage issue.  There would be --
19   if there was a coverage issue and I'm forgetting
20   my screens because there were a lot of them.  But
21   it was a screen that we could go to and I think
22   there would be an indication on whether or not
23   there was a coverage issue.  And if that screen
24   came up and there was a number on there, then we
25   would say, you know -- if there was no number
```

53

1                     CANDACE HARPER
2    which this probably was the case here, then there
3    was no coverage problem.
4         Q.    Who has the front line responsibility
5    for determining whether there is a coverage
6    problem or not?
7         A.    All the examiners, every examiner who
8    handles a claim has to go through the same
9    process.
10        Q.    And that would include you?
11        A.    That would include me and every
12   examiner.
13        Q.    Then it says next to good coverage,
14   BI 100/300, what does that mean?
15        A.    That was like how many -- a dollar
16   amount on how much coverage a person would have
17   or a whole incident.  So, if someone was involved
18   in an accident, 100,000 is the most they could
19   collect under that policy.  And 300 is the most
20   that every one can collect in that incident, in
21   that accident.
22        Q.    The next line it says "PH VERF."
23   V E R F.  What does that mean?
24        A.    Policyholder verification.
25        Q.    What does that mean?

54

1                    CANDACE HARPER

2       A.    That the policyholder verified the

3  accident, I believe.

4       Q.    Are you guessing?

5       A.    No.  I'm trying to remember, it has

6  been a while.

7       Q.    Do you know what it means?

8       A.    Policyholder verification.

9       Q.    And what do you have to do to verify

10 the policyholder?

11      A.    Well, that was just to make sure that

12 the address and everything is correct.

13      Q.    Then next line says "permissive use

14 not an issue."  What does that mean?

15      A.    Again, this is a template that we all

16 would use.  It meant that there was no issue with

17 lending the vehicle.

18      Q.    If there had been an issue about

19 lending the vehicle, who would have investigated

20 that issue?

21      A.    Well, any examiner would have to --

22 again, it's a procedural thing.

23      Q.    Would you have to do it?

24      A.    All the examiners would have to do

25 it.

CANDACE HARPER

55

1           CANDACE HARPER

2       Q.    Okay, at the moment we are just

3   talking about you.  Would you have to do it?

4       A.    If there was an issue, I would,

5   again, there was questions that you would ask,

6   yes, the policyholder.

7       Q.    And you would ask -- you would be the

8   one asking those questions of the policy holder

9   if it was your claim?

10      A.    If it were my claim, yes.

11      Q.    And then it says "no late notice."

12  What does that mean?

13      A.    That the accident was reported

14  timely.

15      Q.    How do you determine whether or not

16  it is timely or not?

17      A.    Well, we were told that an accident

18  should be reported within 24 to 48 hours after it

19  occurs by the policyholder or somebody.

20      Q.    Are there situations in which

21  reporting after that is okay?

22      A.    I guess, yes, it would be.

23      Q.    What kind of situations would make it

24  permissible to give late notice?

25      A.    I would talk to my supervisor about

56

CANDACE HARPER

1

2    that.

3         Q.    And what the --

4         A.    Or the RLA.  The supervisor -- it was

5    a chain of command.  I would go to my supervisor

6    and then if there was -- I would be told to go to

7    the RLA if there was an issue.

8         Q.    Who would identify if there was an

9    issue?

10        A.    Well, again, it's a procedural

11   thing.  If it comes a certain amount of time that

12   we were told it, it would be a late notice issue.

13        Q.    What kind of excuse could a

14   policyholder or Claimant make for not -- for

15   being untimely?

16             MS. RUDICH:   Objection.

17        A.    From?

18        Q.    Could they say I was hurt or I was

19   very distressed because my daughter was hurt in

20   the accident?

21        A.    Yes.

22        Q.    And would you be the one to talk to

23   the person saying that?

24        A.    Would I be the one to talk to them?

25        Q.    Yes.

57

1                    CANDACE HARPER

2        A.    If they are telling me that?

3        Q.    Yes.

4        A.    Yes, I would talk to them but then --

5    the decision would not be mine to make.  It would

6    be -- that would be something that I would then

7    discuss with my supervisor.

8        Q.    Would you tell your supervisor, well

9    I thought the person sounded credible or I

10   thought the person -- it sounded to me like she

11   was making an excuse and I didn't believe it?

12       A.    We could have those kind of

13   discussions, but the decision wouldn't be my

14   decision to make.

15       Q.    The next thing it says "acc

16   description."  I assume that means accident

17   description?  It says "policy holder pedestrian

18   ran into the vehicle."  That is your writing?

19       A.    Yes.

20       Q.    And the next thing is "liability to

21   be determined"?

22       A.    Yes.

23       Q.    "Policyholder statement needed,

24   Claimant statement needed.  Poly report needed,"

25   correct?

                                                                58

1                      CANDACE HARPER

2         A.    Yes.

3         Q.    Who would take the policyholder

4    statement?

5         A.    I would.

6         Q.    Who would take the Claimant

7    statement?

8         A.    If no attorney, then I would.

9         Q.    And if there was an attorney who

10   would take it?

11        A.    I didn't get a statement.

12        Q.    Did you get a police report in every

13   case?

14        A.    Not in every case.  Mostly in every

15   case I would get a police report.

16        Q.    In some cases you didn't?

17        A.    In some cases there might not be a

18   police report.

19        Q.    Were there cases where you decided

20   that you didn't need to get the police report?

21        A.    We were always told that we need to

22   get a police report.

23        Q.    It says "injured Jamie all

24   information unknown."

25        A.    Yes.

CANDACE  HARPER

59

CANDACE HARPER

1

2      Q.    "Attorney?  Will request ISO."  That

3  is the accident database?

4      A.    Yes.

5      Q.    Go to page 38.  I would like you to

6  go to the line item starting on the bottom, go up

7  to 6/2/08 at 2:30.  Do you see that?

8      A.    Yes.

9      Q.    Is that your entry?

10     A.    Yes.

11     Q.    Just to save time, does that say

12 "Called and spoke with D1 and she is a crossing

13 guard and she was unable to give a statement and

14 does not get off work until 4 p.m. and will sub

15 for a night call"?

16     A.    Yes.

17     Q.    What does D1 refer to in that case?

18     A.    That means driver 1.  Our driver.

19     Q.    That is Geico's insured?

20     A.    Yes, our insured driver.

21     Q.    Will sub for a night call, what does

22 that mean?  Will submit for a night call?

23     A.    Yes.

24     Q.    That means you're going to get

25 somebody else to call this person after hours?

CANDACE   HARPER

60

1          CANDACE HARPER

2      A.    Well, we were told if we were unable

3  to get them, there were people who stayed all

4  night.  Stayed up I guess until 9 or 10:00.  I

5  don't know what their hours were, but they would

6  try to reach them at a later time.

7      Q.    If she had been available to talk

8  when you called her, would you have taken the

9  statement from her then?

10      A.    Yes.

11      Q.    Is the statement basically getting

12  down what the driver's version of the accident is

13  and what she knows about the injuries?

14      A.    The statement is a list of questions

15  that is on CIQ that we are supposed to ask and

16  that is basically what the statement is supposed

17  to be.

18      Q.    When you're taking the statement, do

19  you use you instincts --

20      A.    We were told that we needed to read

21  off the CIQ to get the statement.

22      Q.    Certainly I understand that as a

23  starting point, did you ever ask additional

24  questions to follow up on things?

25      A.    Well, we were told that we would have

CANDACE  HARPER

61

                        CANDACE HARPER
1
2     to use the CIQ to ask those questions and then
3     you know, you would say, okay, tell me in your
4     own words.
5          Q.   So, let's read up the page to the
6     same date, page 38, 7:50 p.m.  Is that -- there
7     is an entry that is not by you; am I correct?
8          A.   That's true.
9          Q.   And that is the -- is that a summary
10    of the interview that was made of D1?
11         A.   I guess so.
12         Q.   Don't guess, is that what it looks
13    like?
14         A.   I didn't take this, someone else
15    did.
16         Q.   Right, Lisa DePaula took it?
17         A.   Yes.
18         Q.   And it says "called for D1" right at
19    the top?
20         A.   Yes.
21         Q.   And then it gives a statement of what
22    happened in the accident, am I correct?
23         A.   Yes.
24         Q.   How did you use -- this is
25    information in the file.  Did you use this

CANDACE  HARPER

62

1                    CANDACE HARPER

2    information later on?

3              MS. RUDICH:   Objection.

4         A.    I would have looked at it.

5         Q.    How would you have used the

6    information that you looked at?

7         A.    You mean how would I use it --

8         Q.    I will ask you a different question.

9    Let's keep going.

10             Let's go to page 35.  By the way,

11   just so we are clear.  You agree with me when we

12   are skipping pages here, there are a lot of

13   entries in these files that are made by other

14   people or made by the system, am I correct?

15        A.    Yes.

16        Q.    So I want to go to page 35, date

17   6/5/08, 11:16.  Do you see that entry?

18        A.    Yes.

19             MS. RUDICH:   Can you repeat that?

20             MR. HEMMENDINGER:   Page 35, 6/5,

21   11:16.

22             MS. RUDICH:   Okay, thank you.

23        Q.    Do you see the entry Miss Harper?

24        A.    Yes I do.

25        Q.    Am I correct that what that entry

CANDACE   HARPER

63

1          CANDACE HARPER

2   describes is you received a call from the mother

3   of one of Claimants in this case and one of the

4   Claimants is named Alissa?

5          A.    Yes.

6          Q.    And the other Claimant in this case

7   is Jamie?

8          A.    Yes.

9          Q.    And Alissa's mother here is telling

10  you facts about what happened in the accident?

11         A.    Yes.

12         Q.    A then go a few lines up 6/5, 11:19

13  a.m.  Do you see that you had another

14  conversation with Alissa's mother?

15         A.    Yes.

16         Q.    So you called her back to describe to

17  her what she is going to have to do to make a

18  claim in this case?

19         A.    I don't know if I called her back.

20         Q.    You had another --

21         A.    That might be part of the same

22  conversation.

23         Q.    You think it might be the same as the

24  call?

25         A.    Yes.

CANDACE  HARPER

64

1          CANDACE HARPER

2          Q.    Let's go to 6/18 -- I'm sorry, that

3     has to be a mistake.  No.  Let's go to page 32.

4     Flip some pages.  Do you see looking at the

5     bottom item it is 6/18 at 10:28 a.m.

6          A.    Yes.

7          Q.    Is that your entry?

8          A.    Yes, it is.

9          Q.    Am I correct that what you're doing

10    here is calling the policyholder, that would be

11    D1, the driver to find out how many pedestrians

12    were in this accident?

13         A.    In this entry, yes, it is the driver,

14    the policyholder and the driver are the same

15    people, yes.

16         Q.    Let me go over this with you for a

17    second.  It says "Called and spoke with

18    policyholder do to get straight how many

19    pedestrians there were involved."  Right, it says

20    that?

21         A.    Yes.

22         Q.    "At first policyholder says she only

23    struck one pedestrian but never struck the other

24    pedestrian."  That is what you wrote, right?

25         A.    Yes.

65

1                        CANDACE HARPER

2          Q.    "And when I asked her where was the

3     second pedestrian in regard to the first

4     pedestrian she advised me they were side by

5     side."

6          A.    Yes.

7          Q.    That was a question that you had to

8     make up, that wasn't on any template, was it?

9          A.    No.

10         Q.    So, we have our yeses and no's

11    straight.  It is correct that you made up that

12    question, correct?

13         A.    Yes.

14         Q.    Because no template would have a --

15    there is no template for two pedestrians getting

16    hit by the same car and bouncing into each other?

17         A.    The template was for the actual

18    statement, so I'm not getting a statement from

19    her.  I'm trying to get how many pedestrians were

20    actually struck in the accident.

21         Q.    So you have to use your knowledge of

22    the accident to ask her probing questions to

23    figure out what happened, am I correct?

24         A.    I'm using the statement that Lisa

25    DePaula took.

CANDACE   HARPER

66

CANDACE HARPER

1

2    Q.    And you're probing further?

3    A.    Yes.

4    Q.    She said "she advised me they were

5    side by side and then you asked her if side by

6    side, how could she be sure she did not strike

7    the second pedestrian and then you told her I

8    advised her there is a witness whose statement

9    I'm waiting for who states there were two

10   pedestrians involved."  Is that what it says?

11   A.    That is what it says.

12   Q.    "And then policyholder then states

13   that she hit the first pedestrian and then when

14   that pedestrian came off the hood struck the

15   other pedestrian."  Is that correct?

16   A.    That is what is on the paper.

17   Q.    And then you last write "will await

18   the witness statement."  Correct?

19   A.    Yes.

20   Q.    So the purpose of this call and am I

21   correct is to try to figure out who hit whom in

22   this accident?

23   A.    The purpose of the call was to find

24   out how many pedestrians were involved in the

25   accident.

67

```
 1                   CANDACE HARPER
 2        Q.    And how many this driver hit?
 3        A.    Right, involved in the accident.
 4        Q.    Let's fast forward to page 24 and I
 5   would like you to go to the item on 7/16/08 at
 6   1:19 p.m.  Do you see that?
 7        A.    Yes.
 8        Q.    That is an entry made by you;
 9   correct?
10        A.    Yes.
11        Q.    And that's -- what you have done here
12   is summarize the police report, am I right about
13   that?
14        A.    This is Wednesday 7/16 at 1:59 p.m.?
15        Q.    No, 7/16 at 1:19 p.m.
16        A.    Oh, 1:19.  This is what was written
17   on the police report.
18        Q.    And you summarized it?
19        A.    No, this basically is what is written
20   on the police report.
21        Q.    Go toward top of the page the item
22   1:59 p.m.  And this is another entry made by you?
23        A.    Okay, yes.
24        Q.    Yes?
25        A.    Yes.
```

68

1               CANDACE HARPER
2        Q.    At the top it says it's a little
3   garbled, is that a misspelling?
4        A.    My typing.
5        Q.    That a misspelling.  Okay, no
6   problem.  So you put here was "Call attorney
7   office for Claimant Alissa, spoke with female,
8   she explained the Claimant Alissa not on the
9   police report."  Am I reading it correctly?
10        A.    Yes.
11        Q.    "Due to the fact that they were all
12   just worried about Claimant Jamie and Alissa
13   never told anyone she was involved in the
14   accident.  Was advised that the Claimant did go
15   to the emergency room after she got home and
16   advised female to have attorney call back when he
17   gets a chance to discuss."  Am I right?
18        A.    That is my entry.
19        Q.    So at this point you're trying to get
20   a hold of the attorney for Alissa to talk about
21   the claim?
22        A.    Yes.
23        Q.    And what were you -- you didn't speak
24   with the attorney, what was your -- what would
25   you have wanted to cover with the attorney?

69

1                    CANDACE HARPER
2          MS. RUDICH:   Objection,
3    hypothetical.  I don't understand the question.
4          Q.    Why were you calling the attorney?
5          MS. RUDICH:   Thank you.
6          A.    To ask why she wasn't on the police
7    report.
8          Q.    What difference would that make to
9    you?
10          A.    Because she was making a claim.
11          Q.    And if she -- how would that affect
12    what you're handling of the claim?
13          A.    You mean if she want on the police
14    report I don't know whether or not she was
15    involved in the accident.
16          Q.    Do you think it was possible that she
17    was making a claim and not really have been
18    involved in the accident?
19          A.    Basically my training was that if
20    someone is involved in an accident, they are
21    going to be on the police report.  If they are
22    making a claim they should be on the police
23    report.  So, me calling the attorney was to find
24    out why wasn't Alissa on the police report and
25    she gave me, the woman that I spoke to gave me

CANDACE  HARPER

70

CANDACE HARPER

1       the answer.  That's basically it.

2

3             Q.    Let me ask you this.  Does Geico --

4       did you get when you were at Geico fraudulent

5       claims?

6             A.    I don't think I ever had a fraudulent

7       claim -- myself personally had a fraudulent

8       claim.

9             Q.    Did you have claims where the extent

10      of the injuries were exaggerated?

11            A.    I guess a lot of people exaggerate

12      their injuries.

13            Q.    Did you have claims where the

14      treatment was perhaps excessive or unwarranted

15      given the injuries?

16            A.    I mean I'm not a doctor or anything.

17      They treated how they treated.

18            Q.    Are you familiar with a part of Geico

19      called the special investigations unit?

20            A.    Special investigations -- okay.

21            Q.    SIU?

22            A.    SIU, yes.

23            Q.    What did they do?

24            A.    I don't know their exactly -- I guess

25      claims that would be fraudulent they would

CANDACE   HARPER

71

```
 1                    CANDACE HARPER
 2     handle.
 3          Q.    Was it the job of examiners to refer
 4     cases to SIU?
 5          A.    For what reason?
 6          Q.    If you -- if the examiner suspected
 7     that there was fraud in the claim somewhere, did
 8     they refer it to SIU for further investigation?
 9          A.    Well, we were told, okay, this was
10     the whole procedural type of thing, if doctor's
11     offices called in and they reported the claim,
12     then we would have to refer the claim.  We should
13     refer the claim over.
14          Q.    Did you ever refer claims to the
15     special investigations unit?
16          A.    We were told that we had to -- I
17     think at times there was a number.  I believe
18     there was a number of claims that you had to
19     refer.
20          Q.    You didn't refer just the first -- if
21     it was 10, you didn't refer the first 10 claims
22     that you got, you had to choose which claims to
23     refer; correct?
24          A.    I don't recall really any of the
25     claims that I referred over, but if they -- if it
```

CANDACE   HARPER

72

1                          CANDACE HARPER
2        was something that -- like a provider calling in,
3        then that claim should be referred over.
4               Q.    The ones that were referred were
5        referred for a reason?
6               A.    Like if the provider called in and
7        they report the claim, then we would refer it.
8               Q.    What other reasons could there be?
9               A.    I don't recall.
10              Q.    Let's go back --
11              A.    There is a list of reasons I'm sure.
12              Q.    Let's go back on 7/16/08.  Page 24.
13       Do you have that in front of you?
14              A.    Yes.
15              Q.    Do you see at 3:01 you had another
16       conversation with the policyholder?
17              A.    Okay.
18              Q.    Do you see that?
19              A.    Yes.
20              Q.    And at that time it says, "The
21       policyholder called in again and she advised she
22       did not strike the pedestrian with her vehicle.
23       She states that she struck Jamie and Jamie rolled
24       off the hood and Jamie rolled into Alissa."  That
25       is her version of how it occurred?

CANDACE  HARPER

73

1                    CANDACE HARPER

2         A.    Yes.

3         Q.    Right?

4         A.    Yes.

5         Q.    Let's go to the next page which is 23,

6    a little below the center of the page, 7/17/08.

7    6:39 p.m.  This is not an entry by you, is it?

8         A.    No.

9         Q.    Who is it an entry by?

10        A.    It says Joan Roland.

11        Q.    Who is Joan Roland?

12        A.    I don't know.

13        Q.    Would she be a field investigator for

14    Geico?

15        A.    I have no idea who she is.

16        Q.    What is going on in this entry?

17        A.    Joan Roland took an RI, recorded

18    interview from a witness.

19        Q.    What is a recorded interview?

20        A.    It is just I guess it's a -- she is

21    asking questions on how the accident occurred.

22        Q.    Is she doing fieldwork for you

23    investigating the claim?

24        A.    She does fieldwork for all examiners.

25        Q.    In this particular case for you?

CANDACE  HARPER

74

1              CANDACE HARPER

2        A.     Yes, for the claim, yes.

3        Q.     I'm going to fast forward pretty far

4   up to page 6?

5              MS. RUDICH:   I just want to

6   interrupt here.  Eric, I'm under the impression

7   that this phase of discovery is limited to class

8   issues.

9              MR. HEMMENDINGER:   That wasn't our

10  agreement.  Do we need to discuss this on the

11  record?

12             MS. RUDICH:   We could discuss this

13  off the record.  What was your understanding?

14             MR. HEMMENDINGER:   I recited it when

15  I answered the interrogatories, your

16  interrogatories.

17             MS. RUDICH:   Okay.  I withdraw it.

18             MR. HEMMENDINGER:   Okay, thank you.

19  So are we still on the record.

20             THE VIDEOGRAPHER:   Yes, sir.

21        Q.     Let's go to page 6, 10/18/08, 9:47.

22        A.     I'm sorry, which page, 6?

23        Q.     Yes.  It says "Received call from

24  attorney office advising me that Jamie has

25  concluded her treatment and they will send a

CANDACE   HARPER

75

CANDACE HARPER

1

2     partial package, but are waiting some sort of

3     doctor report.  As far as Alissa is concerned

4     they are still awaiting all of her meds, will

5     come in and then will send."  Is that what it

6     says?

7          A.    Yes.

8          Q.    What is the package?

9          A.    The package refers to all of her

10    treatment.

11         Q.    Am I correct that getting the package

12    is the point at which you can then proceed to

13    settle the case?

14         A.    That is the beginning of a process.

15         Q.    That leads to settlement?

16         A.    That will end up leading to

17    settlement after, but it's a process that all

18    examiners would go through.

19         Q.    Let's turn to page 5, there is an

20    entry dated 11/22/08 at 10:50.  It starts at the

21    beginning "C 63 six month file review."  C 63

22    means six months file review, doesn't it?

23         A.    Yes.

24         Q.    This is an entry made by you?

25         A.    It's a series of questions.  It is

76

CANDACE HARPER

1

2     like a program they have and you put in certain --

3     it will ask you questions and you put in certain

4     answers.

5          Q.    Is that the Claims IQ or is it

6     something different?

7          A.    This is something different.

8          Q.    So it is --

9          A.    It is in doc magic.

10         Q.    Doc magic is a document processor?

11         A.    Yes.

12         Q.    It's a form that you fill out on the

13    computer to answer questions about the claim?

14         A.    Exactly, all examiners have to do

15    this file review.

16         Q.    And that the information is input by

17    you?

18         A.    Yes, all examiners would do it.

19         Q.    So if we go down through this, some

20    of this information we have seen before.  It is

21    risk state, New York, loss state, New York.  That

22    hasn't changed from the beginning, right?

23         A.    Right.

24         Q.    And then you have the coverage

25    limits, right, in the next line?

77

1                    CANDACE HARPER

2         A.    The next line?

3         Q.    Yes.

4         A.    Is accident description.

5         Q.    Well, maybe I'm missing something.

6    Are we on the same line?

7         A.    Page 5, 10:50 a.m.

8         Q.    It says coverage limits?

9         A.    Coverage limits, yes.

10        Q.    And then it says claims pending,

11   right?

12        A.    Yes.

13        Q.    Good coverage still, accident

14   description, then there is an entry that says

15   liability 33 percent.

16        A.    Right.

17        Q.    Who made that entry?

18        A.    I would have put that entry in.

19        Q.    What does that mean?

20        A.    Well, that means that through the

21   process of the claim that it was determined that

22   liability was 33 percent.

23        Q.    Now, in New York you have comparative

24   negligence, right?

25        A.    Yes.

CANDACE   HARPER

78

1        CANDACE HARPER

2        Q.    Do you know whether comparative

3   negligence exists in states other than New York?

4        A.    Does it exist in other states?

5        Q.    Yes.

6        A.    I think so, yes.

7        Q.    Does it exist in every state where

8   Geico operates?

9        A.    I'm not sure.  I don't believe so.

10       Q.    Under comparative negligence, you're --

11   Geico's insured's liability for the accident can

12   be anywhere from between 0 which would be no

13   liability and 100 percent which is total

14   liability or any number in between; correct?

15       A.    As far as New York State is

16   concerned, it could be from 0 to 100.

17       Q.    And in this case you entered 33

18   percent meaning that you -- meaning that Geico's

19   insured was 33 percent liable for the accident?

20       A.    Well, that figure would have been --

21   see Claims IQ basically you answer the questions

22   in Claims IQ and it gives you a range of

23   liability, and then you can pick.  That is how

24   you getter liability through Claims IQ and

25   sometimes a discussion with your supervisor.

CANDACE HARPER

79

1          CANDACE HARPER

2     Q.    But you have to -- basically this is

3 a result of having analyzed the facts of the case

4 and determining in Geico's view its insured had

5 33 percent of the fault in this case?

6     A.    Putting it into Claims IQ, yes.

7 After you put the questions and everything Claims

8 IQ comes up with a range.

9     Q.    And then you have to pick a number

10 within the range; correct?

11     A.    A number is picked within the range.

12     Q.    Who picks the number?

13     A.    Well, it all depends.

14     Q.    Did you pick this number?

15     A.    I can't tell you for sure if I

16 actually picked that number.  Sometimes -- it

17 could be a discussion that you had with your

18 supervisor.

19     Q.    And that --

20          MS. RUDICH:   Let her finish?

21     A.    I don't recall.  33 percent is an odd

22 amount.  I don't know why 33 percent is -- it's

23 an odd amount.

24     Q.    We agree that this is your entry to

25 indicate --

CANDACE   HARPER

80

1                         CANDACE HARPER

2           A.     It is an entry on the liability

3    decision that was made.  But that is just -- this

4    is not -- that is what is on the claim at this

5    time.  So it doesn't -- say even if I didn't make

6    the liability decision, this would be what is on

7    the claim.  Because it is basically a snapshot of

8    what is on the claim now.

9           Q.     In looking over the claim, have you

10   seen a liability percentage figure prior to this

11   in the A Log?

12          A.     Not in any of the pages that I

13   reviewed.

14          Q.     This is the first time that there is

15   a liability figure in A Log, isn't it?

16          A.     I'm not sure.

17          Q.     You can look at the file.

18          MS. RUDICH:   Please let her finish

19   her response, Eric, so the response is clear.

20   You keep interrupting her at the end and it is

21   not going to have -- we are not going to have a

22   clear record.

23          MR. HEMMENDINGER:   Very well.

24          (Witness reviewing document.)

25          Q.     Are you still reviewing?

CANDACE   HARPER

81

1                    CANDACE HARPER

2        A.    Yes, I am.

3        Q.    Well the question on the table was

4    whether this is the first time in the A Log the

5    figure of 33 percent appears on 11/22/08.  Do you

6    think that is right?

7        A.    I don't know.  I haven't found it.

8        Q.    Let's move on.  Below the 33 percent

9    number on page 5 you have some information about

10   Jamie, right?

11       A.    On page 5 at which time?

12       Q.    10:22.

13       A.    10:22.

14       Q.    You have information about Jamie one

15   of the injured people?

16       A.    Okay.

17       Q.    And she has an attorney, right?

18       A.    Yes.

19       Q.    And Alissa, she also has an attorney?

20       A.    Yes.

21       Q.    And at the bottom it says 2 RBI,

22   pending.  What does RBI pending mean?

23       A.    Those are the bodily injuries.

24       Q.    Can you please translate that line

25   into English for me?

CANDACE HARPER

82

CANDACE HARPER

1

2       A.      There are two people and I'm just

3   waiting for the attorney to send me the

4   authorizations for -- because that is what we

5   were told that we had to get the authorizations

6   for the no-fault file which I never asked for --

7   well, in this case I would ask for it because we

8   had the PIP files upstairs.

9       Q.      There is a line that says "Will

10  continue to follow up with attorney and NF

11  carrier," does NF carrier mean no-fault carrier?

12      A.      Yes.

13      Q.      Why would you be following up with

14  the no fault carrier?

15      A.      We were told that we had to contact

16  the no-fault carrier.

17      Q.      And do what?

18      A.      And just -- basically, that's a good

19  question.  Ask them are they still treating, if

20  the claimant was still treating.

21      Q.      Why would that information be useful

22  to you?

23      A.      I guess it meant that the claim was --

24  is going to be open for awhile if they are still

25  treating.

CANDACE   HARPER

83

1          CANDACE HARPER
2      Q.    The next line it says "RES adequate."
3  Does RES mean reserves?
4      A.    Yes, that was a standard.
5      Q.    What does your entry of reserves
6  adequate mean?
7      A.    Meaning that your supervisor opens up
8  a claim with reserves and that just meant that
9  basically that where they are was okay at this
10 point.
11     Q.    Okay based on your knowledge of the
12 value of the claim?
13     A.    To be quite honest with you that was
14 something standard because you knew in the end
15 whatever my supervisor's, she was going to -- she
16 would read this over and basically she would make
17 the decision on whether or not it was going to be --
18 what the reserves were going to be.  That was
19 just something standard that I would put unless
20 there was some horrific -- something horrific
21 happened.
22     Q.    What if the accident was pretty bad,
23 did you ever say enter reserves are not adequate?
24     A.    Well, if something happened bad, that
25 would have happened a lot sooner than six months

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

CANDACE  HARPER

84

CANDACE HARPER

1

2    and my supervisor would have seen it and she

3    would have set the reserves accordingly.

4         Q.    Did you ever have to suggest that the

5    reserves be adjusted in a case?

6         A.    If we as an examiner, if you got a

7    call and the attorney said -- if I got a call and

8    they said that the person had surgery, you would

9    go to your supervisor and advise them and she

10   would set the reserve.

11        Q.    Let's go up to page 2, 11/25/08.

12   That is an entry by your supervisor, Miss Marlene

13   Harris-Grant; is that correct?

14        A.    The same page?

15        Q.    The same page, 11/25, 10:47.

16        A.    Yes.

17        Q.    Go to page 4 it starts at 1/19/09

18   right in the middle of the page.  Do you see the

19   entry --

20        A.    On page 4, 1/19.

21        Q.    '09, yes.

22        A.    I see 1/2.  1/9.

23        Q.    My mistake, 1/9/09.

24        A.    Yes.

25        Q.    And this is you made an entry, you're

85

CANDACE HARPER

1
calling the attorney's office to find out where
2
the meds are; correct?
3
      A.   Yes, we had to make calls to the
4
attorney -- we called it working the file.  That
5
was part of your job that you had to make calls.
6
      Q.   And the next item 1/28/09, that is
7
immediately above it -- not the next page, the
8
next item?
9
      A.   Okay.
10
      Q.   Right above it it says "small packets
11
of meds came in, received in, will review
12
conference."  Right?
13
      A.   Yes.
14
      Q.   What does this mean?
15
      A.   That means that I probably got a
16
small packet of medicals treatment for one of the
17
Claimants, I would need to take them up and get
18
them in order and conference the file with my
19
supervisor.
20
      Q.   The next item up from that is, it
21
says this is 2/5/09, 5 p.m. it says, "called
22
attorney in office with reference to meds
23
received for both Claimants."
24
      A.   Yes.
25

86

1               CANDACE HARPER
2        Q.    "I did advise attorney that Alissa
3   did not meet the threshold.  I did ask the
4   attorney what he was looking for Claimant Jamie
5   and he advise me that he would have to call back
6   he was in with clients."  Did I read that
7   correctly?
8        A.    Yes.
9        Q.    Now you use the word Alissa did not
10  meet the threshold?
11       A.    Yes.
12       Q.    We talked about that earlier.  Can
13  you tell me in this case why you said Alissa did
14  not meet the threshold?
15       A.    Because I was -- when I conferenced
16  the file with my supervisor it didn't meet
17  threshold.  I was advised that I wouldn't get any
18  money on the file.
19       Q.    I'm looking for the reference to the
20  conference with the supervisor, when did that
21  occur?
22       A.    It would have had to have occurred
23  between me receiving the small packet of meds and
24  my entry on the 5th of February.  I don't know.
25  I don't determine whether something met

1          CANDACE HARPER

2   threshold.  That would be something that I would

3   discuss with my supervisor as an examiner.  Not

4   as a TA 2 examiner.

5          Q.    So when you talk about it with your

6   supervisor, tell me how the conversations -- what

7   do you say to her?

8          A.    Well, I would basically present the

9   treatment and she would review it and if she felt

10  it didn't meet the -- no money was warranted on

11  the file or didn't meet threshold, then I

12  wouldn't get any money.

13         Q.    So, the other part of this you said

14  you did ask attorney what he was looking for with

15  Claimant Jamie, so did you decide to ask that

16  question?

17         A.    Well, we were told -- we are told as

18  examiners that you kind of want to know where the

19  attorney is so that when you go in to talk to the

20  supervisor, that, you know, you're discussing the

21  file, that you kind of know where the attorney

22  is.

23         Q.    Do you recommend to the supervisor

24  that the claim doesn't meet threshold?

25         A.    Basically -- I mean you can recommend --

CANDACE  HARPER

88

1                    CANDACE HARPER
2   I recommended a lot of things but it really
3   wasn't my decision.  It is the supervisor's
4   decision.
5        Q.    Let's talk about the supervisor is
6   not following each of these cases the same way
7   you are, right?
8        A.    When you go into the -- in to conference
9   a file you basically give the facts of the claim.
10       Q.    And don't you also because you're an
11  experienced and competent TA 2 say I don't think
12  this one meets threshold, I think this one we
13  should deny?  Don't you have a conversation?
14       A.    We have -- you see Claims IQ,
15  everything has to be put into Claims IQ.  There
16  are times when you have on, I guess when you're --
17  on your printout that you would -- it would give
18  you a dollar amount.  Just because it gives you a
19  dollar amount don't mean that you would go in
20  with that dollar amount or that's the dollar
21  amount that you're going to get.
22            In the end it wasn't my decision to
23  make whether it is threshold or not.  I mean I
24  could go in there and say I think this case is
25  worth 100,000.  If she didn't think that, then I

CANDACE   HARPER

89

```
 1              CANDACE HARPER
 2   wouldn't get the money on the file.
 3         Q.    But you would go -- were there cases
 4   where you would go in -- I'm sorry.
 5              THE VIDEOGRAPHER:   This marks the
 6   end of tape number one in the deposition of Miss
 7   Candace Harper and we are going off the record
 8   the time is 2:23 p.m.
 9              (Lunch recess taken at 2:30 p.m.).
10
11       A F T E R N O O N    S E S S I O N
12              3:06 p.m.
13         C A N D A C E    H A R P E R,
14   resumed, having been previously duly sworn, was
15   examined and testified further as follows:
16              THE VIDEOGRAPHER:   This marks the
17   beginning of tape number 2 in the deposition of
18   Miss Candace Harper, we are back on the record
19   the time is 3:06 p.m.
20   BY MR. HEMMENDINGER:
21         Q.    Miss Harper, we were talking about
22   before we took the lunch break for you, we were
23   on page 3 and we were looking at the entry on
24   2/21/09 at 9:17.  Do you recall that or can you
25   go back to that in any event?
```

CANDACE  HARPER

90

1                    CANDACE HARPER

2        A.    On page 3, 9/17.  Saturday?

3        Q.    Right.  I think I was talking to you

4    about -- excuse me, that may not be where we

5    were.  Let me back up for a second.

6              On page 4 we covered the entry on

7    2/5/09 where you call the attorney and told him

8    that the threshold had not been pierced and you

9    asked him what he was looking for; correct?

10       A.    Yes.

11       Q.    And the next entry, Saturday, 2/21/09

12   it says -- it's a Claims IQ note; is that

13   correct?

14       A.    Yes.

15       Q.    Am I correct that that is basically

16   output of information that you have input using

17   the Claims IQ system?

18       A.    That I put the information into

19   Claims IQ, yes.

20       Q.    And that is part of the information

21   that is in Claims IQ about the case?

22       A.    Yes.

23       Q.    It says negotiation for -- do you

24   know what IPO 3 means?

25       A.    Interested party.  That is the number

CANDACE  HARPER

91

1          CANDACE HARPER
2    that I guess that corresponds with Jamie.  She is
3    interested party number 3.
4          Q.    And if you read down you can see that
5    identifies her as Jamie, right.  You don't have
6    this for Alissa because her claim does not meet
7    the threshold, correct?  Alissa is covered
8    immediately above?
9          A.    Alissa is right above her.  There is
10   a CIQ note.
11         Q.    We will come back to that.  Under
12   Jamie you have some summaries of what her
13   situation is.  It says she is a student that
14   works as a busgirl and out of work for one day
15   and a summary of her injuries, etc.  This is all
16   information that is -- where there is written out
17   information such as he further states, this is
18   information that has been input by you into the
19   system; correct?
20         A.    Are you still on Saturday?
21         Q.    Yes.
22         A.    Saturday the 21st and you're at, you
23   said that he?
24         Q.    If you look at last part of this it
25   says he further says there is evidence of the

CANDACE   HARPER

92

1                    CANDACE HARPER

2    disability and she is a student unable to perform

3    activity, daily living with restrictions.   That

4    is information that you recorded into the system,

5    right?

6              MS. RUDICH:   You're talking about on

7    page 4, right?

8              MR. HEMMENDINGER:   Yes.

9         A.    Page 4.

10             MS. RUDICH:   The top part?

11        A.    Where she reports?

12        Q.    Right.

13        A.    I inputted that information into the

14   system.

15        Q.    And then let's go to the next item up

16   which is --

17        A.    But that is from the doctor's report.

18             MS. LESTRADE:   Let's go off the

19   record a second.

20             THE VIDEOGRAPHER:   Going off the

21   record the time is 3:10 p.m.

22             (Recess taken.)

23             THE VIDEOGRAPHER:   Back on the

24   record the time is 3:11 p.m.

25   BY MR. HEMMENDINGER:

CANDACE   HARPER

93

1                    CANDACE HARPER

2        Q.    So if you look on page 3, we are

3    still on claim number 1013.  There is two entries

4    on Wednesday, 2/25, do you see those two?

5        A.    Yes.

6        Q.    And one of them says Jamie and one of

7    them says Alissa.

8        A.    Yes.

9        Q.    And those are both entries by your

10    supervisor, not by you; correct?

11        A.    Yes.

12        Q.    So the one at the bottom which would

13    be the first one, the 2:10, it says you

14    "discussed Alissa and it reports threshold not

15    pierced, no significant disfigurements, etc."

16        A.    That is what it says.

17        Q.    That is based on information that you

18    reported to your supervisor?

19        A.    That is based on the information that

20    she got from the medicals that the doctor -- that

21    I inputted into the system.

22        Q.    Well let me ask you, did she

23    duplicate all the work that you do?

24        A.    She reviews very closely the work

25    that I do, yes.

CANDACE   HARPER

94

1                    CANDACE HARPER

2        Q.     And then it says "okay to send, no

3   threshold denial correct below."?  Do you see

4   that?

5        A.     Okay, yes.

6        Q.     And it is okay because you asked for

7   permission to do it?

8        A.     No.

9        Q.     And it is okay to close RBI that is

10   the feature because you asked permission to close

11   the feature; correct?

12        A.     No.

13        Q.     The item above that, 2:13 it says

14   "briefly discuss the case for this interested

15   person."  That is Jamie, right?

16        A.     Yes.

17        Q.     And it says "examiner will revisit

18   liability with scene photos."

19        A.     Yes.

20        Q.     The next item above that which is

21   dated 3/7/09 at 9:46 is your entry, correct?

22        A.     Yes.

23        Q.     And this one says "unable to pull up

24   Street Delivery."  What is Street Delivery?

25        A.     That is to get the scene photos which

CANDACE  HARPER

95

CANDACE HARPER

1

2   Miss Harris-Grant wanted me to because she felt,

3   I guess, liability needed to be looked at

4   closer.  So she is telling me to pull up the

5   Street Delivery so we could go over the liability

6   again.

7       Q.    Is Street Delivery a computer system

8   of Geico's or is this a service that Geico buys?

9       A.    I believe it's a service that Geico

10  subscribes to.

11      Q.    And it shows pictures of streets?

12      A.    It shows pictures of streets.  We are

13  told that we have to pull up street delivery on

14  every claim and I guess at this point I didn't

15  pull it up.

16      Q.    Then it says "Did review Google maps

17  which shows there is a defined crosswalk for

18  pedestrian as policy holder states in her

19  recorded interview, pedestrians were not in walk

20  and graduated left turn lane and policyholder

21  should have had view of pedestrian in crosswalk

22  and will review claims in Claims IQ."

23      A.    Yes.

24      Q.    When you looked at this you

25  determined that the policyholder should have been

96

1                    CANDACE HARPER

2    able to see the pedestrians in the crosswalk?

3         A.    You have to remember that I was told

4    that I would have to do the -- redo the liability

5    because my supervisor didn't agree with the

6    liability and that I should pull up the industry

7    delivery and look at it again.

8         Q.    Look at it again, you hadn't looked

9    at it all?

10        A.    No, I -- what do you mean, Street

11   Delivery.  Go back and review liability.  Street

12   Delivery obviously wasn't pulled up on because

13   she is asking me to pull up Street Delivery.

14        Q.    This is the first time that you

15   looked at any photos of the scene; correct?

16        A.    Just it is in there, I had to pull up

17   Street Delivery, maybe I didn't have it readily

18   available.  I don't know, I would have to go back

19   and look at the claim to see if Street Delivery

20   was actually pulled up.  Maybe I didn't have the

21   pictures on file.  I couldn't tell you.

22        Q.    In any event, based on looking at it

23   on March 7th, '09, you determined that you need

24   to redo the breaches in Claims IQ?

25        A.    Because my supervisor wanted me to

CANDACE HARPER

97

1          CANDACE HARPER

2    change the liability.  The liability I couldn't

3    go forward unless I revisited the liability.  She

4    didn't agree with the liability decision.  So

5    that is why she is saying the liability.

6         Q.    Where does it say she didn't agree

7    with it?

8         A.    The fact that it is saying that

9    examiner will revisit the liability with scene

10   photos, a discussion had to have taken place

11   there that the liability wasn't agreed on because

12   I would have just gotten money on the file.

13   There are discusses that take place with your

14   supervisor that are not on the record in your

15   A Log because you're sitting in her office and

16   you're asking a discussion.

17            So I don't remember every discussion

18   that I had, but looking at it it meant that she

19   did not agree with my liability.  That she wanted

20   me to go and get the Street Delivery photos, so,

21   I don't know if it was one conversation that took

22   place or two or three conversations that took

23   place with her.  But it had to be -- she didn't

24   agree with it.

25        Q.    When you say she didn't agree with

CANDACE  HARPER

98

1          CANDACE HARPER
2   your liability, what was your liability?
3       A.    The decision, -- the liability
4   decision that came up in CIQ.  The breaches are
5   the questions that CIQ actually asks you.  So I
6   had to go back in and redo the CIQ breaches so
7   that CIQ would come up with a number.  Because
8   CIQ --
9       Q.    How confident are you --
10          MS. RUDICH:   She is still
11   testifying.
12       A.    CIQ is a system -- I mean I was told
13   several times by both my supervisors that CIQ was
14   created to make your liability decision.  To
15   create the liability -- that is why we have that
16   program.
17       Q.    Who told you that?
18       A.    Marlene Harris-Grant and Carol
19   Vilar.  I was told that is the purpose of it and
20   for putting in the breaches so it would come up
21   with a liability determination.
22       Q.    Read up the page to 3/25/09, "I don't
23   remember talking about Jamie again."  Do you see
24   that?
25       A.    Yes.

CANDACE HARPER

99

1          CANDACE HARPER

2      Q.    That is a supervisor's note.  You

3   conferenced the file again and she gave you

4   element authorization at that point; correct?

5      A.    Yes.

6      Q.    Let's go to page 2.  This is at the

7   bottom of the page it is 3/25/09 this is Claims

8   IQ note but it is an entry that you made, am I

9   correct?

10     A.    Yes.

11     Q.    And so let me read it to you so we

12  could talk about it.  You say "I spoke with the

13  attorney, his initial demand was for 15,000.  I

14  advised attorney that the liability would be

15  split 50/50 due to the fact that the pedestrian

16  was crossing in the middle of the street on a

17  busy road.  I offered $3,750 to settle the file.

18  Attorney then stated that she did have" patal --

19  can you can you pronounce that?

20     A.    Patella femora syndrome.

21     Q.    "I advised at the time of her" what

22  is POS IME?

23     A.    Positive IME.

24     Q.    "Positive IME her knee issues had

25  resolved."

CANDACE   HARPER

100

1          CANDACE HARPER

2              MS. RUDICH:   Had resolved.

3          Q.    "Had resolved.  Attorney then advised

4      me that he would mark the file for the 7500

5      advise the attorney do not think the file is

6      worth that much full value.  Attorney then

7      lowered demand to 5,000, advised 4,500 to settle,

8      he advised me that he would mark the file settled

9      and call pedestrian and advise them to accept."

10     Is that what it says?

11         A.    Yes.

12         Q.    Is that an accurate recounting of how

13     you negotiated the settlement of this claim?

14         A.    Yes, with the attorney.

15         Q.    How much authority did you have on

16     this claim?

17         A.    I don't know how much authority I was

18     given on the claim, but if it had to be either

19     more than the 45 or it could have been the 45, I

20     don't know.

21         Q.    But it could have been more I gather?

22         A.    It was probably around the 45.  I

23     don't remember on this file.

24         Q.    Did you ever negotiate settlements

25     that are less than the amount that you're

101
1                        CANDACE HARPER
2    authorized?
3         A.    Have I ever -- you mean I had a claim
4    where an attorney asked for less than what I had
5    on the file and I did accept it.
6         Q.    Have you ever offered less than your
7    full authorization and had it be accepted?
8         A.    We were always told that Claims IQ
9    would give you a low amount and a high amount and
10   we had to start at the low amount.
11        Q.    That wasn't my question.
12        A.    Oh.
13        Q.    If you had $5,000 authority on a
14   case, could you settle it for 4500?
15        A.    It was a range so I did answer the
16   question.  The range is --
17        Q.    What is the answer to my question?
18             MS. RUDICH:   She is testifying and
19   you're interrupting her again.  I will keep doing
20   this while you keep interrupting her?
21        A.    If my supervisor gave me 55,000 on
22   the file we had to put in a range on CIQ.  So it
23   would be say from 2000 to 7,000.  Sometimes
24   you're supervisor would tell what your ranges
25   should be because if they felt your ranges were

CANDACE  HARPER

102

                              CANDACE HARPER

1

2      too small or too large, the ranges had to be

3      adjusted.  And we were told that we had to start

4      off at that low -- the low range, that is where

5      our negotiations would start.  And sometimes we

6      would even be told that sometimes we should do

7      instead of increments of a thousand, we should do

8      it may be $50 or $100.  That is how we negotiated

9      the claims.

10         Q.    That is not my question.

11         A.    Okay.

12         Q.    If you had $5,000 authority, could

13     you settle it for 4500?

14         A.    Yes.  As long as it was within the

15     ranges.

16         Q.    So let's go back to exhibit -- to the

17     file that we are looking at.  Page 2.  Right

18     above that Claims IQ note there is a net on

19     3/25/09 at 9:37 and I gather this concerns the

20     other Claimant who was Alissa?

21         A.    Yes.

22         Q.    And it says "Attorney also advises me

23     that he did receive the no threshold denial and

24     was expecting it to come."  Correct?

25         A.    Yes.

CANDACE  HARPER

103

1          CANDACE HARPER

2     Q.    Let me ask you to go into the hard

3  copy file which is the folder, still in claim

4  1013.  You're looking right now at something

5  else.  Take the loose stuff out of the file.

6     A.    Okay.

7     Q.    On the left side you see the first

8  number is 71?

9     A.    Yes.

10     Q.    And the right side the number is 109?

11     A.    Yes.

12     Q.    So I'm going to ask you to look at

13  some documents with me and the first document I'm

14  going to ask you about is on the right side it is

15  109.  And that is a letter on Geico stationery to

16  an attorney; am I correct?

17     A.    Yes.

18     Q.    And it is signed by you?

19     A.    Yes, my name comes up.  It is not

20  signed by me.

21     Q.    It is over your name?

22     A.    My name is there.

23     Q.    There is the threshold denial letter,

24  am I correct?

25     A.    Yes, it is.

CANDACE   HARPER

1                          CANDACE HARPER

2          Q.      And quoted in the letter is the

3     language concerning what the threshold test is?

4          A.      Yes, that is the language.

5          Q.      And that language comes from the New

6     York Insurance Law?

7          A.      Yes, and doc magic.

8          Q.      And doc magic is a word processing

9     program that puts it into the letter?

10         A.      That creates this whole letter.

11         Q.      The next page which is 110 is

12    entitled at the top Claims Evaluation Short Form,

13    am I correct?

14         A.      Yes.

15         Q.      That is a two-page document?

16         A.      Yes.

17         Q.      And at the top it has information

18    about the claim and the policy?

19         A.      Yes.

20         Q.      And then it has in the middle

21    information about the treatments, right?

22         A.      Yes.

23         Q.      And then at the bottom it has the

24    information that we looked at earlier in Claims

25    IQ which is your negotiating action plan;

105

1                     CANDACE HARPER
2    correct?
3         A.    Yes, that is all the information that
4    I put in from the medicals.
5         Q.    On the second page it has a place for
6    the supervisor to sign and this one has some
7    writing by the supervisor, right?
8         A.    Yes.
9         Q.    And the supervisor says "okay to
10   denial for no threshold seen in meds."
11        A.    Yes.
12        Q.    Whose signature is next to that?
13        A.    I don't know, but it looks like it
14   could be --
15        Q.    Is it Marlene Harris-Grant?
16        A.    It looks like it could be, but I
17   would have to see a supervisor so I would suggest
18   that it probably is.
19        Q.    This is -- when we look at the A Log
20   we know that Marlene Harris-Grant was your
21   supervisor at the time of this case, wasn't she?
22        A.    Yes, but if you had to make a
23   decision on a file and say Marlene was not there,
24   you can go to another supervisor and they could
25   also -- you could also sit down and conference

1                    CANDACE HARPER

2    files with them.  So I mean I'm going to say that

3    it is Marlene, because it looks like her

4    signature, but I'm not sure.

5         Q.    2/25/09, this is when you discuss

6    with her the fact that this injury did not meet

7    the threshold; correct?

8         A.    I brought the claim in to her to look

9    at, yes.

10        Q.    The next page which is 1/12.  It goes

11   on for a few pages, is a letter from a doctor.

12   Do you see that?

13        A.    Yes.

14        Q.    This is an IME report on Alissa, am I

15   right about that?

16        A.    Yes, it is.

17        Q.    Who ordered the IME in this case?

18        A.    Probably the PIP examiner.

19        Q.    And why would the PIP examiner order

20   an IME?

21        A.    When I was a PIP examiner you were

22   told that you should, after a certain amount of

23   time, that an independent medical professional

24   should look at the -- examine the patient or

25   Claimant to see if treatment is warranted.  It is

1                    CANDACE HARPER

2    causally related.  That sort of thing.

3         Q.    Leaving aside what the PIP examiner

4    did with this, what information -- did you use

5    this information?

6         A.    Yes, I did use this information.

7         Q.    How did you use this information?

8         A.    Basically if they were cut off that

9    is an argument that we would use.

10         Q.    If what was cut off?

11         A.    If their treatment -- if the doctor

12    said they didn't need any more treatment.

13         Q.    What argument would you make?

14         A.    That they didn't need anymore

15    treatment.

16         Q.    Who would you argue that to?

17         A.    We would discuss that with -- that

18    would be a discussion with the attorney.

19         Q.    Who would have that discussion?

20         A.    I would have the discussion with the

21    attorney -- any examiner, I mean there are

22    certain things as an examiner that he were

23    basically told that we needed to -- certain

24    information that we needed or how to argue a

25    claim.  This could be used as something on our

CANDACE   HARPER

108

1                    CANDACE HARPER
2        side.
3            Q.    So that would be ammunition for you
4        in negotiating with the attorney?
5            A.    All claims examiners.
6            Q.    Well I know.  But you're the only one
7        in this room.
8            A.    Okay, so.
9            Q.    I'm asking you, did you use it as
10       ammunition to negotiate with the attorney?
11            MS. RUDICH:   Objection.  Vague.
12            Q.    Did you use this information to help
13       you support an argument with the attorney?
14            MS. RUDICH:   Objection.  Vague.
15            A.    I mean I used the report as I was
16       told that I should use the report.  If they were
17       cut off, that would be something that I could use
18       in speaking with the attorney to try to settle
19       the claim.
20            Q.    And presumably to speak with the
21       attorney to persuade him to accept less money
22       than he was asking for?
23            A.    Not to persuade him but basically
24       just to state the facts of whatever the claim is.
25            Q.    This was in the context of the

CANDACE  HARPER

109

CANDACE HARPER

1

2     settlement negotiations that you would be having

3     this discussion, am I correct?

4          A.    It is in the context of the amount of

5     money that I have on the file that he needed to

6     either accept that amount of money or not.

7          Q.    Let's go to page 1062.  It is on the

8     same side of the file.

9          A.    1062?

10         Q.    Yes.

11         A.    You mean 0162?

12         Q.    Right.  I said that wrong, you're

13    right.  It is 0162 at the top it says Claim

14    Evaluation Short Form.  This was on Jamie, that

15    this was the other teenager in the accident?

16         A.    Yes, yes.

17         Q.    And you have again the information

18    about the policy, the information about her

19    treatments, and I see she had quite a bit of

20    treatment, it looks like she went to physical

21    therapy 47 times.  It is on the first page

22    still.

23         A.    Yes.

24         Q.    And there is a box that says

25    negotiation action plan and that is sort of a

CANDACE HARPER

110

1                    CANDACE HARPER
2     printout of information that you put into the
3     system, am I correct?
4          A.    It is the information that I got off
5     of the medical reports.
6          Q.    But you wrote this, right?
7          A.    I copied it.  I don't write -- I mean
8     I put it on the action plan but these --
9          Q.    Let me ask, let's go through this
10    thing for a second.  We have the New York Risk
11    And Loss, etc.  accident description and then it
12    says liability -- now it says liability
13    50 percent.  Before it had been 33 percent, did
14    you put in the 50 percent figure?
15         A.    Yes, I had to change it.  That was
16    changed.
17         Q.    But you are the one that made the
18    change?
19         A.    I inputted the change after I did the
20    breaches in CIQ which gives me the range.
21         Q.    And you input that here occupation
22    was student and busgirl; correct?
23         A.    Which I got off the medicals.
24         Q.    And you inputted out work for one
25    day?

CANDACE   HARPER

111

1                    CANDACE HARPER

2           A.    Probably got that off the medicals

3     also.

4           Q.    And you inputted additional

5     information about her medical; correct?

6           A.    Yes.

7           Q.    On the second page of this which is

8     0163 at the bottom of the box it says the words

9     are "recommend to pierce the threshold based on

10    limitation more than 90 days from the DOL."  That

11    means date of loss; correct?

12          A.    Yes.

13          Q.    And that is also information that you

14    inputted; correct?

15          A.    We had to do that on every single

16    claim, yes, that we were bringing in to

17    supervisor.

18          Q.    Then there are some figures and I

19    will come back to this and we will look at Claims

20    IQ about the negotiation range below that;

21    correct?

22          A.    Yes.

23          Q.    And then your supervisor wrote the

24    information that is handwritten on this page.  Am

25    I right about that?

112

1          CANDACE HARPER

2     A.     Yes.

3     Q.     And your supervisor agreed with your

4  recommendation to pierce the threshold, correct?

5     A.     Yes, she agreed.

6     Q.     And then she gave you settlement

7  authorization, it says okay to settle up to 5.2

8  thousand, right?

9     A.     Yes.

10     Q.     Tell me how the conversation about

11  what amount to offer went?

12     A.     I couldn't tell you what the

13  conversation was.

14     Q.     You can't recall who said what in

15  that conversation?

16     A.     No.

17     Q.     Below that there is kind of a cross

18  and it says demand offer and there is some

19  handwritten entries?

20     A.     Right.

21     Q.     That is your handwriting, isn't it?

22     A.     Yes, it is.

23     Q.     And I think we looked at that

24  information earlier, the demand was 15 and you

25  offered 3750 and the demand was -- came to 5 and

CANDACE HARPER

113

1                        CANDACE HARPER
2      then you offered 4500, correct?
3           A.   I believe that is the way the
4      conversation went but I don't recall.  I don't
5      remember.
6           Q.   We looked at that on page 2 where we
7      were talking about the narrative that you wrote?
8           A.   3/25 at 9:37 a.m.?
9           Q.   Right.  9:35 a.m.
10          A.   Yes.
11          Q.   Look at the last part of this file
12     which is the Claims IQ screens that is not in the
13     folder.  It is one of these loose sets.  That
14     begins on page 42 of file 1013.  Claims IQ just
15     so we know what we are talking about here is a
16     computer system?
17          A.   Yes.
18          Q.   And it has various screens and I want
19     to ask you about some of them in this case.
20               Did you have an adjuster code when
21     you made entries into Claims IQ?  For example,
22     when we look at the first page, 0042, there is
23     some entries that say that are a code -- it says
24     system and then there are some that have a
25     number.  What number there was your number?

CANDACE  HARPER

114

1                         CANDACE HARPER

2          A.     I would be H018.

3          Q.     So anything that has your H018 would

4     be something -- that would be something that you

5     entered into this system?

6          A.     Yes.

7          Q.     Now, let's go over to page 48.  There

8     is a prompt here.  Basically this is asking you

9     whether you did certain things, am I correct,

10    under verification?

11         A.     Yes, but I don't remember -- yes.

12         Q.     I'm looking at one that says

13    "verified permissive use of insured if

14    applicable" and the entry says "yes."  Am I

15    correct?

16         A.     I'm not sure if I inputted those

17    answers.

18         Q.     Is there a way to find that out?

19         A.     I don't know.  You have to ask

20    Geico.  I'm not sure that I put those answers in.

21         Q.     Are you sure you didn't or you just

22    don't know?

23         A.     To be quite honest, they don't even

24    look -- they don't look familiar to me.  I mean

25    it looks like something that is part of CIQ, but

CANDACE HARPER

                                                                    115

1                          CANDACE HARPER
2      if someone else is working it or if someone took
3      a statement like Lisa DePaula she could have
4      input the information when she took the
5      statement, I don't know.
6            Q.   I'm not terribly concerned with
7      whether or not you verified permissive use of
8      insured if applicable or not in this particular
9      file.  Is that something that would be, verifying
10     permissive use, be something that would be
11     standard operating procedure for the examiner on
12     a file?
13           A.   You mean standard for all examiners?
14           Q.   Yes.
15           A.   Yes.
16           Q.   And when we use the examiner, does
17     that include the job that you held, TCR 2?
18           A.   Yes.
19           Q.   Verifying permissive use means that
20     if somebody else was driving the car, you had to
21     ascertain whether that was with the permission of
22     the owner of the insured?
23           A.    If the owner, if you talked to the
24     policyholder and the policyholder basically said
25     I never gave them permission, would you ask did

CANDACE  HARPER

116

1                    CANDACE HARPER

2  you give such and such permission to drive your

3  vehicle.  That is basically verifying permissive

4  use if the names aren't the same, basically.  If

5  the names are the same and they live in the same

6  household, you just assume if it is their son or

7  they are on the policy.  If it is a different

8  name you would ask them, did you give them

9  permission to drive the car, that was the

10 question that all examiners would ask.

11       Q.    Did you ever have disputes about

12 that?  I mean were there ever disputes about

13 whether the use was permissive or not?

14       A.    I might have had a claim where there

15 was discussion about permissive use, yes.

16       Q.    What would you have to do to resolve

17 that?

18       A.    I don't know if I ever went to the

19 supervisor about it, but -- I don't know what the

20 procedure would be.  I'm trying to think of an

21 instance where I had a permissive use issue.  But

22 I mean it didn't really come up very often for

23 me.

24       Q.    Let's move on to the next page, 49.

25 We were talking earlier about redoing breaches;

CANDACE HARPER

117

1                    CANDACE HARPER

2    correct?

3          A.    Yes.

4          Q.    And this -- page 49 and page 50 of

5    this exhibit are screens from Claims IQ which

6    show you entering the breaches in this claim;

7    correct?

8          A.    These are the breaches that were

9    entered into the claim.

10          Q.    Who entered them in this case?

11          A.    I can only assume myself since I said

12    I had to redo them.  I don't know if this one is

13    the one before or this one is the one after.

14          Q.    We look at the claims -- at the A Log

15    file.  Did any other claims examiner work this

16    file?

17          A.    There was an examiner that took the

18    RI.

19          Q.    Did anyone else do anything else with

20    this file on the claims liability side?

21          A.    I think there was another person that

22    we saw in there in the file.  But I mean, I mean

23    I would say that if I said I was going to redo

24    them then I was going to do them over.

25          Q.    So --

CANDACE   HARPER

118

1                        CANDACE HARPER

2          A.    So if this is the do over, I probably

3    did it.

4          Q.    Let's start with the first one.

5    Actually let's go down the left-hand column

6    first.  You have various rules of the road; is

7    that correct?  Such as observe right of way, obey

8    rules of the road, conform to traffic code,

9    maintain control of vehicle, take evaluation,

10   maintain proper look out.  Right?

11         A.    Yes.

12         Q.    Are you with me?

13         A.    Yes, I am.

14         Q.    Under each of these potential -- each

15   of these rules there are each of the parties

16   involved in the accident, Jamie, Alissa and the

17   driver; correct?

18         A.    Yes.

19         Q.    And then for each of them there are

20   five choices which are "no breach." The next item

21   means "Yes breach but no approximate cause."  The

22   next one means "yes breach but low approximate

23   cause."  The next one means "yes breach but

24   medium approximate cause."  And the last on means

25   "yes breach but high approximate cause."  Am I

119

1                    CANDACE HARPER
2    reading that correctly?
3        A.    Yes.
4        Q.    For this one you entered under the
5    first one, under "observe right of way, Jamie
6    yes, low; Alissa yes, low." And Kim, I assume
7    that was the driver," yes, medium"?
8             MS. RUDICH:   Objection.
9        Q.    Okay; is that correct?
10       A.    Those are the breaches, yes.
11       Q.    And that is information that you
12   input?
13       A.    Again, the only way that I would know
14   that I put in every single one of these breaches
15   to see if my code was in there.
16       Q.    Let me just ask you, is it standard
17   operating procedure to fill out Claims IQ on a
18   claim?
19       A.    Yes, but sometimes when you do sit
20   with your supervisor and you do conference a
21   file, I know a lot with Miss Vilar, that she --
22   we could go and she would change the breaches as
23   we sat there.
24       Q.    Let's go to page 44 just so we have
25   this clear.  That is page 43, I'm sorry.  This is

120

CANDACE HARPER

1

2    what is known as a footprint, right?

3         A.    Exactly.

4         Q.    And it shows who made the entry at

5    various times?

6         A.    Exactly.

7         Q.    On this page, the date of 3/7/09,

8    liability assessments were made by and you could

9    see where you have the low, mediums and highs

10   being put in; correct?

11        A.    Exactly, so, yes I did change them.

12        Q.    And those are you?

13        A.    Those are me.

14        Q.    And those are you changing the

15   original ones?

16        A.    Yes.

17        Q.    Go back to page 49.  We could go

18   through each of these rules and each of these

19   people and for each of them you put in no breach

20   or some degree of breach, right?

21        A.    Right.

22        Q.    And that is based on your

23   investigation of the accident; correct?

24        A.    That is based on me going back, yes.

25   I was instructed to go back and redo the

CANDACE  HARPER

121

1                              CANDACE HARPER
2       liability.
3              Q.    I understand that.  But the facts
4       when you redid it, the facts were based on the
5       fact what you knew about the accident from prior
6       investigation and then you had also seen photos
7       of the intersection; correct?
8              A.    Yes, that I got the Street Delivery.
9       Now I believe if I did get the Street Delivery
10      that there was probably a discussion with my
11      supervisor about that and I probably did go back
12      and change -- I had to go back and change the
13      breaches, because I wouldn't have gotten any
14      money on the file.
15             Q.    And you put these items into the
16      claim IQ?
17             A.    Yes, you have to put something in
18      there.
19             Q.    Go to page 51.  At the top it says
20      evaluate liability; correct?
21             A.    Yes.
22             Q.    Based on what you previously put in
23      no breach, high, medium, low, etc., claim IQ
24      gives you a range of liability for each person;
25      am I right about that?

CANDACE   HARPER

122

1                        CANDACE HARPER

2          A.     Yes, it does.

3          Q.     And it looks in each case there is a

4    20 point spread in the range.

5          A.     In this instance.

6          Q.     For Kim who is the driver and she is

7    the only one who is potentially liable, the range

8    is 33 to 53 percent; correct?

9          A.     Yes.

10         Q.     And then somebody has to input the

11   figure 50, that is a choice, correct?

12         A.     Well I had to change the liability,

13   the liability was 33 and I had to change it

14   because I was told that she didn't agree on it.

15   My supervisor didn't agree so it had to be

16   changed.

17         Q.     Can you testify that you actually

18   recall the conversation with your supervisor?

19         A.     No, I don't recall the conversation,

20   but if I'm told to go back and investigate a

21   claim more, that means she didn't agree with the

22   liability.

23         Q.     Is it possible that she just looked

24   at it and she said have you looked at pictures

25   and you said no and she said look at pictures

123

1                       CANDACE HARPER

2     before you finalize this?

3          A.     If I'm bringing a claim to my

4     supervisor for conferencing a file, I already

5     felt that I was confident in the decision that I

6     made.

7          Q.     In this case she didn't agree with

8     your decision?

9          A.     She wanted me to go back and review

10    the liability.

11         Q.     So then you made a different decision

12    and you put in 50 percent?

13         A.     I had to put in -- yes.  I couldn't

14    come back and say, oh, I say it is 33 percent.  I

15    had to look at liability again.

16         Q.     Are there claims where you're

17    supervisor did not kick it back to you to redo

18    and the numbers that you came in with the first

19    time were accepted?

20         A.     As liability?

21         Q.     Yes.

22         A.     Yes.  As long as it is between the

23    ranges that Claims IQ gives you.

24         Q.     Most of the time you didn't have to

25    redo your investigation, did you?

124

1                    CANDACE HARPER

2              MS. RUDICH:   Objection.

3              MR. HEMMENDINGER:   Let me try it

4    again, I don't know what the objection is.

5              MS. RUDICH:   Most is vague and

6    ambiguous.

7              MS. LESTRADE:   It is more than

8    50 percent.

9              MS. RUDICH:   So then ask it that

10   way, that would be proper.

11       Q.   Let me ask you, what percentage of

12   the cases do you think were approved without

13   being told to go back and redo the Claims IQ?

14             MS. RUDICH:   Objection.

15       A.   I really couldn't tell you.  I don't

16   know what the percentage would be.  I can only

17   say that it wasn't on every case.

18       Q.   It wasn't on every case that you were

19   sent back?

20       A.   No.

21       Q.   Most cases you were not sent back?

22             MS. RUDICH:   Objection.  Misstates

23   the testimony.

24       Q.   Are we on the same page here?  Most

25   of the time you did not have to redo the Claims

CANDACE   HARPER

125

CANDACE HARPER

1

2      IQ liability determination?

3              MS. RUDICH:   Objection.

4          A.    I could say there were times when I

5      didn't have to redo it.

6          Q.    Do you know what -- this was your

7      job.

8          A.    Yes.

9          Q.    You lived with this, was it usual or

10     unusual in your experience to have to redo the

11     Claims IQ?

12         A.    It was often that I redid the Claims

13     IQ.

14         Q.    I didn't ask you that.  Often could

15     mean 10 times out of a hundred.

16             MS. RUDICH:   When I said when I

17     objected to most you said no objection and now

18     she is saying often and you're saying no.

19             MR. HEMMENDINGER:   I'm allowed to

20     probe, okay.

21             MS. RUDICH:   Objection.

22         Q.    Do you think it happens in a majority

23     of cases?

24             MS. RUDICH:   Objection, you asked

25     her the same question.

126

1              CANDACE HARPER
2          MR. HEMMENDINGER:   Please, counsel,
3    I have all the time in the world.
4          MS. RUDICH:   So do we.  So do we.
5    If she doesn't remember, she doesn't remember.
6       A.    It happened often.  It happened often
7    that sometimes I would be sitting there specially
8    with Miss Vilar and we would have to go over and
9    she would change the breaches.
10      Q.    You don't know what percentage of the
11   cases that is?
12      A.    I don't know the percentage of
13   cases.  I would be guesstimating.
14      Q.    And often is a guesstimate too,
15   right?
16      A.    Well, you're pressing me to give you
17   an answer, so often is the best.  Often enough.
18      Q.    Often enough.  Often enough for what?
19      A.    Often enough for -- if my supervisor
20   didn't agree then I would have to go back and
21   make the changes.
22      Q.    Let's move on.  Let's go to page 54
23   and these -- this is an injury evaluation page,
24   am I correct?
25      A.    Yes.

CANDACE  HARPER

127

CANDACE HARPER

1

2     Q.    For example, it reports this is on

3   Jamie, am I right?  We could tell by looking at

4   the bottom of the page.

5     A.    Yes.

6     Q.    And so it reports one her injury is

7   left strained knee; correct?

8     A.    Yes.

9     Q.    And then there are various, below

10   that various items, medical history, treatment,

11   delay in treatment, lapse in treatment, course of

12   treatment, correct?

13     A.    Yes.

14     Q.    And below that, beside that there are

15   little windows for you to enter an answer;

16   correct?

17     A.    Yes.

18     Q.    And are you the person who chooses

19   what entry to put into that -- into those answer

20   spaces?

21     A.    I get all of that information off the

22   doctor's medical reports.  I'm the one who

23   actually -- there is a drop down and you pick one

24   of the drop down answers.

25     Q.    Based on what you read in the medical

128

1                    CANDACE HARPER

2     file?

3          A.    Based on what is in the medical file.

4          Q.    But that requires you to take a lot

5     of information in the medical file and boil it

6     down to some conclusions, am I correct?

7                MS. RUDICH:    Objection?

8          A.    No, no, these aren't conclusions.

9     These are facts that are in the medical file.

10         Q.    Let me ask you this, treatment for

11    injury and then it says next to that causation,

12    what does causation mean?

13         A.    I believe they are saying is this --

14    was the injury caused by the accident.

15         Q.    Now, does a doctor make that

16    determination?

17         A.    Yes.

18         Q.    How does the doctor know the facts of

19    the accident, does a doctor conduct an

20    investigation of the accident?

21         A.    There is history that the doctor --

22    when a person comes in they tell the doctor that

23    how the accident occurs.  It is in the IME report

24    and in all doctor's reports.

25         Q.    What about delay in treatment, is

CANDACE  HARPER

129

1                      CANDACE HARPER

2     that something that the doctor reports?

3          A.    Delay in treatment is if the person

4     didn't go -- we were told if the person doesn't

5     go straight to the ER from the scene and they go

6     a week later, that is delay of treatment.  They

7     didn't go right away.

8          Q.    Now, below that it says "determine

9     impact on lifestyle."  Correct?

10         A.    Yes.

11         Q.    And there is four spaces you can fill

12    in, low, -- I'm sorry "none, low, medium and

13    high"?

14         A.    Yes.

15         Q.    And you make the input into one of

16    those --

17         A.    We were told that we needed to put in

18    -- I was told that I should put in low on some

19    case, yes.  If it were soft tissue issues, that

20    is what I was told, that I should put in the low.

21         Q.    Would I ever find in one of your

22    files that you put in something other?

23         A.    Yes, if there was a broken leg, then

24    you would have to put in something different.

25    But if it was soft tissue injury, if it is soft

CANDACE  HARPER

130

1                       CANDACE HARPER

2    tissue injury then would you put in low.  If it

3    is a broken leg, surgery then you would put in

4    medium to high.  But you could never put in none.

5         Q.    When you say we were told, where is

6    that -- is that part of the training material?

7    Where would I look for where were you told that?

8         A.    Well, we -- when Claims IQ was rolled

9    out there was a lot of changes going on.

10   Sometimes we would get e-mails every day about

11   different changes and different things that you

12   had to do.  Until I believe we had that training,

13   that CIQ training where every one had to be

14   brought up to speed on CIQ because people were

15   doing things or understood it differently.  I

16   don't know if it is written down, sometimes there

17   are supervisors that do things differently.  Or

18   trainers that tell you differently, but it was

19   never actually all that clear.

20        Q.    You say it is how to use this Claims

21   IQ is not clear --

22        A.    Times, it is not clear for a very

23   long time.  There were still questions about lots

24   of things in it.

25        Q.    If we go to page 56, there is a place

131

1              CANDACE HARPER
2    for you to enter your threshold determination; am
3    I correct?
4         A.    Yes.
5         Q.    And then if we go to page 57 it looks
6    like the computer has generated a range of
7    numbers for general damages for pain and
8    suffering.  Is that right?
9         A.    Is this on page -- okay, yes.
10        Q.    57?
11        A.    Yes.
12        Q.    What numbers did the computer
13   generate?
14        A.    On here it generated 8,800 to 12,000.
15        Q.    And next to that a figure of $7500 is
16   entered; correct?
17        A.    Yes.
18        Q.    And you made that entry; correct?
19        A.    Yes, we have to put a number in
20   there, those two numbers.
21        Q.    That is lower than the numbers?
22        A.    It is higher than -- oh, is it?  Oh,
23   it is not supposed to be.  I would get a
24   downgrade for that file.
25        Q.    We go to the next page, okay, and

CANDACE   HARPER

132

CANDACE HARPER

1

2       your $7500 number comes over under pain and

3       suffering.  That is the number that you entered;

4       correct?

5            A.    Yes.

6            Q.    And then the computer -- then there

7       is a range and that is the number that you --

8       there is another place for you to enter numbers

9       and it is the range of 7500 to $10,000.  Those

10      are numbers that you input; correct?

11           A.    Yes, those are numbers that I put

12      in.

13           Q.    And both the high and low are lower

14      than the number that the computer generated, am I

15      correct?

16           A.    Yes.

17           Q.    And then the computer takes your

18      50 percent liability figure and divides that in

19      two to give you an adjusted range, correct?  That

20      is page 59.

21           A.    Let me go back to this page.  This is

22      the way that I understood it.  This number here.

23           Q.    Which number where --

24           A.    No, go ahead.

25           Q.    Based on your 50 percent the computer

CANDACE  HARPER

133

CANDACE HARPER

1
2   has divided your low number in half and your high
3   number in half to give you an adjusted range?
4       A.    Yes.
5       Q.    And the adjusted range is 3750 to
6   5,000, right?
7       A.    Yes.
8       Q.    And that is the impact of New York's
9   comparative negligence, your assessment of the
10  value of the claim is divided in half in this
11  case because it is 50 percent, right?
12      A.    Yes, that is it.
13      Q.    If it would have been 33 percent it
14  would have been a different figure?
15      A.    Yes, the computer system.
16      Q.    So, would it be fair to think that
17  when you went in to talk to Miss Harris-Grant
18  about this claim you say you think the settlement
19  range is going to be 3750 to $5,000?
20      A.    Yes.
21      Q.    And she gave you some margin for
22  error, she gave you $5200?
23      A.    She gave me what she felt would be
24  the top dollar on the claim, yes.
25      Q.    What did you ask for?

CANDACE  HARPER

134

1                      CANDACE HARPER

2          A.    I asked for the money -- something in

3     between there.

4          Q.    Would you ask for a dollar figure or

5     would you ask for a range of figures?

6          A.    I'm trying to think back.  Would I

7     come in and ask for a dollar figure.  I think it

8     would be between ranges.

9          Q.    Typically when you came in, did you

10    come in and ask for a range or did you come in

11    with a particular figure and say this is my

12    figure?

13         A.    I think it was a range.  It would

14    have to be the range that CIQ is showing.

15         Q.    And then we know the next page shows

16    and we already know this from our discussions on

17    page 60, it shows that you settled the claim for

18    $4500; correct?

19         A.    Yes.

20         Q.    Let's go to page 63 for a second.

21    This is a page on -- this is a page on Alissa.

22    Do you see in the bottom on "impact on

23    lifestyle"?

24         A.    Yes.

25         Q.    There is none in that; correct?

CANDACE  HARPER

135

1                    CANDACE HARPER

2        A.    Yes.

3        Q.    So that is a possible outcome?

4        A.    Yes.

5        Q.    There was no discussion -- because

6    there was a determination of no threshold there

7    was no discussion of money for her, correct?

8        A.    I would have written up the meds I

9    believe and taken it in to be conferenced so that

10   discussion would have been taken place with the

11   supervisor.

12       Q.    But you as I think we saw before, you

13   recommended not to pierce the threshold on her

14   and that was agreed to so there was no offer

15   made; correct?

16       A.    Well, there was no offer made because

17   my supervisor felt that it met no threshold.

18       Q.    After you presented the case to her?

19       A.    After I presented the facts of the

20   claim to her, yes.

21       Q.    Before I move on, just one more

22   question.  Earlier on you talked about the

23   procedure for doing a recorded interview and you

24   say there are some standard questions for that.

25       A.    On CIQ you are supposed to follow

CANDACE   HARPER

                                                                    136

1                         CANDACE HARPER

2    standard questions.

3         Q.    Can you omit questions that you don't

4    think should be asked?

5         A.    You're not supposed to omit the

6    questions that pertain to the accident.  If there

7    is 100 questions on there it would give you like

8    one question would lead you to the next

9    question.

10        Q.    Right, but accidents come in all

11   kinds of infinite varieties, isn't that true?

12        A.    Yes.

13        Q.    And you have to tailor -- select

14   which questions to ask based on what happened in

15   the accident so you're not asking irrelevant

16   questions?

17        A.    I guess yes.

18        Q.    You don't want to sound foolish when

19   you ask the questions, you have to adapt them to

20   the situation?

21        A.    I mean if it was raining and, I

22   really don't remember all the questions on CIQ,

23   but I'm sure one or two of them didn't make

24   sense, no one would ask that.

25        Q.    You wouldn't ask them if they didn't

CANDACE   HARPER

137

CANDACE HARPER

1

2    make sense to the accident, so it was a guide for

3    you rather than forced?

4          A.    No, it was forced.  You were supposed

5    to do it.

6          Q.    Every single question?

7          A.    You were supposed to do the CIQ.

8    Like I said, I was told that the CIQ was created

9    to make the liability decision.

10         Q.    Let's go to another file.  We could

11   close this one out.  The next one is the one

12   labeled 1020.

13               MR. HEMMENDINGER:   Mark this as

14   Exhibit 4 please.

15                          (Harper Exhibit 4 for

16   identification, File labeled 1020.)

17         Q.    Okay, so you have in front of what is

18   Harper deposition Exhibit 4.  And it has the

19   statement structure as the previous exhibit.  And

20   I would like to start with the A Log again which

21   is page 1.  And actually I want to go to the --

22   again we have to work from the back.  So that is

23   page 39.  On page 39 we see that this claim is

24   assigned to you?

25         A.    Yes.

CANDACE   HARPER

138

CANDACE HARPER

1

2      Q.    And you're the first examiner on this
3  file.  It is not being transferred to you by
4  somebody else that has done any work on it,
5  right?

6      A.    As far as liability is concerned,
7  yes, I would be the first examiner on the file.
8  I don't know if PIP was open or PIP has any
9  entries.

10     Q.    Let's go on to page 38 and there is
11 an entry on 1/10/07 at 9:52?

12     A.    Yes.

13     Q.    And is that an entry that you made?

14     A.    Is that my user code down there?  I
15 don't know.  I don't think I made that.  No, I
16 didn't make that entry.

17     Q.    What does it say at the top?

18     A.    It says "new diary entry for Candace
19 Harper."  Not by.  I don't think I made that
20 diary entry.

21     Q.    It says, "losses under investigation
22 requires resolution of the liability issue."

23     A.    Right.

24     Q.    And that would be -- that is a diary
25 entry for you; correct?

CANDACE   HARPER

139

1                    CANDACE HARPER

2          A.    Yes.  I guess a systems entry.

3          Q.    Which means that you -- the

4    resolution of the liability issue is something on

5    your to-do list at this point, your diary?

6          A.    Yes, it says that after a certain

7    time it needs a number put in there.

8          Q.    Then if we read up a couple of lines,

9    10/10/07 at 10:37 there is an entry that starts

10   "recorded interview added".

11         A.    Yes.

12         Q.    And that is entered by Candace

13   Harper; correct?

14         A.    That is a system generated note, but

15   I would have had to prompt the system to put that

16   in there, yes.

17         Q.    Does that mean that you took a

18   recorded interview of Claudette?

19         A.    That means that at that point I

20   attempted to take a recorded interview of

21   Claudette.

22         Q.    Did you take one or did you attempt

23   to take one?

24         A.    I don't know.  Because sometimes you

25   can start one and something happens and you have

1                    CANDACE HARPER
2    to end it, so it is possible.
3         Q.    It says "duration is 561 seconds."
4         A.    Yes, okay, then yes, I did.
5         Q.    That is about ten minutes, isn't it?
6         A.    Yes, okay, yes, I took a recorded
7    interview.
8         Q.    Who is Claudette in this accident?
9         A.    She was IP 1.
10        Q.    What does that mean?
11        A.    She could have been the driver.  I'm
12   not sure who she was.  She could have been the
13   driver.  I think she probably was the driver.
14   That is probably why I would have had to take --
15   it's a pedestrian so she was probably the driver.
16        Q.    Go to page 37 please.  At 10/10/07,
17   11:05.  And that is basically after you just got
18   off the phone with Claudette; correct?
19        A.    Okay.
20        Q.    When you say okay, I don't know
21   whether you're saying I understand what you're
22   saying or you're agreeing with what I'm saying.
23        A.    I understand.
24        Q.    But I'm right?
25        A.    Yes, it would have been.

CANDACE  HARPER

141

1          CANDACE HARPER

2     Q.     And what you're doing is making notes

3   for the file about what happened -- what you

4   learned from your interview with Claudette;

5   correct?

6     A.     Was it right after?  I don't know if

7   it was right after I got off the phone with her.

8   But it is the same day.  This is at 11:05 and it

9   says that I reported the time at 10:27.  So that

10  is half hour almost.

11    Q.     It appears to be open season on

12  walking children because this is another claim

13  where somebody hit a child with a car, right?

14    A.     Yes.

15    Q.     "Rolled on the hood and rolled off."

16    A.     Yes.

17    Q.     This is your recording of Claudette's

18  version of what happened?

19    A.     Yes.

20    Q.     And then right after that on the same

21  day 11:09 you opened the file, correct?

22    A.     I did a TA 1 yes, opening.

23    Q.     And that is a -- we have talked about

24  that before, it is the same thing that you talked

25  about earlier?

CANDACE  HARPER

142

1              CANDACE HARPER

2        A.    Yes, a template.

3        Q.    You write in this one it says

4   liability 100 percent; correct?

5        A.    Yes.

6        Q.    What is the legal significance of

7   liability 100 percent?

8        A.    I didn't really handle legal matters.

9        Q.    What is the practical consequence

10   then?

11        A.    That a hundred percent meant that you

12   were at fault fully for the accident.

13        Q.    A little above that at 10/10, 11:15

14   you received a demand letter from -- you're

15   entering the fact that you received a demand

16   letter from the attorney; correct?

17        A.    Yes.

18        Q.    And he is demanding the policy limit?

19        A.    Yes.

20        Q.    What is the policy limit on this

21   case?

22        A.    It must have been 25,000.

23        Q.    And you know that from looking at the

24   entry below?

25        A.    I know that because I only can handle

CANDACE  HARPER

143

                    CANDACE HARPER

1

2   claims up to 25,000.

3        Q.    Let's fast forward to page 25, if you

4   could skim the pages that we are passing over

5   there is a lot of PIP activity, correct?

6        A.    Yes.

7        Q.    At 4/13/07 at 4:40 there is an entry

8   which is your three-month file review; correct?

9        A.    Yes.

10        Q.    In this particular case it says "Will

11   continue to follow up with attorney and no-fault

12   carrier."  Correct?

13        A.    Yes.

14        Q.    What information would you be seeking

15   in this instance from your no-fault carrier?

16        A.    We are told on every single claim,

17   specially C 71 and C 63 we should contact the

18   examiner and find out what the status of the

19   claim was.

20        Q.    Below that it says "STI reserve."

21   What does STI mean?

22        A.    Soft tissue.

23        Q.    What does RES mean?

24        A.    Those are to reserve.

25        Q.    There is a number next to it, 9250.

CANDACE   HARPER

144

1                          CANDACE HARPER

2          A.     Yes.

3          Q.     What does the 9250 mean?

4          A.     We were given parameters on how we

5   should -- well, not how we are setting reserves,

6   because the supervisor sets them.  But we were

7   told that we would have to put in a number

8   amount.  So if it were say 50 percent liability

9   with soft tissue injuries then it would be half

10  that amount.  If it were say she had more serious

11  injuries, most of the time I would just say set

12  reserves accordingly.

13         Q.     Were you the one who initially

14  recommended what level of reserves to set to the

15  supervisor?

16         A.     No.

17         Q.     Why did you put this number in it?

18         A.     The reserves have already been set.

19  I have to put the number in because we were told

20  that we had to put the number in by -- as soon as

21  the claim comes in the reserves are -- they have

22  a standard amount of reserves in and when your

23  supervisor reviews -- if my supervisor felt that

24  the reserves should be higher then she would set

25  them higher.  But at this point I believe we were

145

1                    CANDACE HARPER
2    told that we have to put in a reserve amount
3    because as you saw in the other case that I put --
4    I didn't put a dollar amount, I just put set
5    reserves accordingly.  Not set accordingly.  I
6    put reserves are adequate.  Sometimes I would put
7    in set reserves accordingly.
8              We were told that we had to put a
9    number amount and I believe that was by Miss
10   Vilar at that point that we had to put a number
11   amount in.
12        Q.    That number was for her guidance?
13        A.    I don't know why she wanted us to do
14   it.  She gave us a you piece of paper and on it
15   it had if it was soft tissue injury and it was
16   50 percent that is what you put in.  If it is 100
17   percent, this is what you put in.  That is what I
18   followed.
19        Q.    Let's go to page 24.  There is an
20   entry 4/19/07 at 6:08 p.m.  Do you see that?
21        A.    Yes.
22        Q.    It says, "Discuss claim with no-fault
23   department."  Can you tell us what the rest of
24   that line means?
25        A.    That means there were negative ortho

CANDACE   HARPER

146

1            CANDACE HARPER
2    IME.
3         Q.    It says "negative ortho/PT."
4         A.    Physical therapy and massage therapy.
5         Q.    And there is a number next to that,
6    what does that mean?
7         A.    Probably that could have been the cut
8    off.  The effective date of the IME when they
9    would be cut off by the doctor.  So if the doctor
10   said no more treatment, then you would say, okay,
11   as of 4/5/07 there would be no more treatment.
12        Q.    On panel 23 at 4/27/07 there is an
13   entry from Carol Vilar; correct?
14        A.    Yes.
15        Q.    And she is reviewing this file and
16   one of the things she is pointing out to you
17   there is a discrepancy between what you put in
18   the C 71 and what Claims IQ says about the
19   liability percent, correct?
20        A.    Yes.
21        Q.    And those are both numbers that you
22   entered but they are not the same number?
23        A.    Not necessarily, no.  Well, I mean I
24   guess, yes, I guess I did put in 100 percent,
25   because this is not -- yes, but on some cases it

CANDACE HARPER

147

1                        CANDACE HARPER
2      would come from a different department.  But in
3      this case, no, it was, yes.
4           Q.    In the next line up is your entry
5      that you're going to correct the C 71 to conform
6      to the Claims IQ; correct?
7           A.    Yes, she is telling me to correct it,
8      yes.
9           Q.    Let's go to page 21, 6/21/07.
10          A.    Which one is this?
11          Q.    6/21/07.  Page 21.
12          A.    6/21/07?
13          Q.    Yes.  That is another entry by you
14     and this is the same thing that you went through
15     in the other case, you're calling the attorney's
16     office for the treatment information and the
17     meds?
18          A.    Yes, we always have to call.  Every
19     30 days there has to be some entry on the file.
20          Q.    Go to page 19 and you get to a
21     six-month review here; correct?
22          A.    Yes.
23          Q.    And you're summarizing information
24     about the claim and it still says liability 100
25     percent, correct?

CANDACE  HARPER

148

1                    CANDACE HARPER

2          A.    Yes.

3          Q.    I'm not making a big deal, that is

4    just a mistake, correct, at this point?  It's a

5    discrepancy that you should have corrected?

6          A.    What did Carol say?  I can't remember

7    what she said I should do.  She said that CIQ and --

8          Q.    Go back to page 23.

9          A.    Oh, no.  That is correct, I guess,

10   yes, I should have corrected that.  What I would

11   do sometimes is cut and paste it.  So if it was

12   in my previous, this part, because usually this

13   part doesn't change, that -- it should be

14   50 percent.

15         Q.    The last entry in this is "reserves

16   adequate"?

17         A.    Yes.

18         Q.    We read up the page after you

19   write-up the six-month file review on 7/30/07

20   your supervisor reviews it, correct?

21         A.    Yes.

22         Q.    And it says "push attorney."  She

23   wants you to get the case settled, correct?

24         A.    Yes, push attorney.  Push to close,

25   push to close the file.

149

1                    CANDACE HARPER

2        Q.    On 8/31/08 on the same page at 8:06

3   you logged that you have gotten some meds from

4   the attorney?

5        A.    Yes.

6        Q.    The next page -- I'm sorry, page 18

7   to 19 at the bottom of 18 going on to 19 on

8   8/31/07 is the Claims IQ note which shows the

9   negotiation strategy and this is based on

10  information that you input and taken out of

11  Claims IQ; correct?

12       A.    This is information that I got off

13  the medicals that I received.

14       Q.    Let's look at the end of that entry,

15  it says "Recommend to pierce the threshold based

16  on limitations more than 90 days from the date of

17  loss."  Correct?

18       A.    Yes.

19       Q.    And that recommendation was made to

20  your supervisor; correct?

21       A.    Right, we were told that we -- there

22  were basically two reasons why we could get money

23  on the file and this was one of the reasons.  So

24  she liked us to put that on the file.

25       Q.    It is important in the piercing the

CANDACE HARPER

150

1        CANDACE HARPER

2    threshold is very consequential in these cases,

3    isn't it?

4        A.    It is inconsequential because my

5    determination didn't make a difference.  It was

6    going to be the supervisor's determination that

7    was going make the difference.

8        Q.    The consequence to the case is

9    whether the person gets money or not.  No

10   threshold, no money, right?

11       A.    Right, but even if I were to write on

12   here I don't feel it met threshold, if she did,

13   then she would put money on the file.

14       Q.    I understand --

15       A.    I was just told that I had to put

16   that.  I had to put something.  I had to make a

17   recommendation.

18       Q.    You had to put your best judgment?

19       A.    I had to put a recommendation.  My --

20       Q.    And you came up with a recommendation

21   based on your own best judgment?

22       A.    The recommendation that I was --

23   there were basically two things either it met

24   threshold or I would recommend to pierce the

25   threshold based on limitations?

151

1                    CANDACE HARPER
2          Q.     Right.  And that was based on your
3    own evaluation of the facts of the case?
4          A.     Based on the information that the
5    doctors had in the medicals.
6          Q.     You took that information, you
7    applied your own thought process to it and
8    recommended whether to have pierced the
9    threshold; am I right about that?
10         A.     We were told that we had to make a
11   recommendation.
12         Q.     I understand that.  You had to say
13   yes or no?
14              MS. RUDICH:   Don't interrupt,
15   please, she was in the middle of an answer.
16              MR. HEMMENDINGER:   Well she was in
17   the middle of not answering, actually.
18              MS. RUDICH:   Please don't
19   interrupt.  She was in the middle responding to
20   your question whether you like the answer or not,
21   she was responding.  Please don't interrupt her.
22         A.     I would look at medicals and based on
23   what the doctor's information what they gave us,
24   I would put recommended pierce the threshold
25   based on limitations on the threshold.

152

CANDACE HARPER

1

2      Q.    Okay.  Let's match up something.  Can

3   you go to the hard copy file.  This is the green

4   folder.  Okay?

5      A.    Okay.

6      Q.    On the right-hand stack of pages a

7   couple pages down from the top for page 8.  This

8   is the claims evaluation short form, am I

9   correct?

10      A.    Yes.

11            MS KOROLEVA:   What Bates number is

12   that?

13            MR. HEMMENDINGER:   It is 80.

14      Q.    This contains the same language that

15   you input that we were just looking at.  At the

16   bottom it says "Recommended pierce the threshold

17   based on limitations more than 90 days from the

18   date of loss."  Correct?

19      A.    This rolls on to the A Log.

20      Q.    Right, so when you put this -- when

21   you wrote in the A Log what we see on page 8,

22   that gets output into this form?

23      A.    No, I write it on CIQ and gets rolled

24   into A Log.

25      Q.    And it rolls into this form?

CANDACE  HARPER

153

CANDACE HARPER

1

2      A.     To what form?  This is CIQ.

3      Q.     I'm talking about document 80, the

4  claims evaluation short form?

5      A.     This is CIQ.

6      Q.     So this piece of paper is something

7  which is output by Claims IQ?

8      A.     It is in Claims IQ and then we make a

9  copy of it and we take the copy to our

10  supervisor.

11      Q.     But it is the exact same entry, we

12  could even see limitations --

13      A.     Yes.

14      Q.     -- is misspelled the same way on

15  both pieces of paper, right?

16      A.     Yes.  It is not misspelled, it's a

17  typo.

18      Q.     Okay.  Let's go back to -- let's stay

19  on the claims evaluation short form page 81.  You

20  got a range of liability figures, correct?  This

21  is 100 percent liability so it is not going to

22  get any reduction.  I'm sorry, it's a 50 percent

23  liability now, right.  I'm not trying to confuse

24  you, this is the one that had to be changed?

25      A.     Yes, that is what it says on here,

CANDACE  HARPER

154

1                    CANDACE HARPER

2     50 percent.

3          Q.    It has a -- the full value range is

4     6,000 to 15,000 and the 50 percent value range is

5     3,000 to 7,750; correct?

6          A.    Right.

7          Q.    Does this record here what

8     authorization your supervisor gave you?

9          A.    It says "okay to settle up to 10,000."

10         Q.    And that was in this case above the

11    range produced by Claims IQ; correct?

12         A.    Yes.

13         Q.    Do you recall the conversation that

14    you had with your supervisor about this

15    particular claim?

16         A.    No.

17         Q.    Now, let's go back to the A Logs.  We

18    have another Claims IQ note on page 16 at

19    9/24/07, correct.  9/24/07 at page 16?

20              MS. RUDICH:   1:24 p.m.

21              MR. HEMMENDINGER:   Yes, I'm sorry.

22         A.    There is two, both of them.

23         Q.    Well the one at the bottom.

24         A.    Okay, that is a continuation on the

25    other one.

155

1                    CANDACE HARPER

2        Q.    9/27/07 at 2:00 you made an entry.

3    It says "Called attorney's office in reference to

4    meds" and where I will try to supply some extra

5    words and you tell me if I'm getting this

6    correct.  Called attorney in reference to meds

7    and where did he see the threshold.  Advised --

8    he advise me that his system was down would

9    review and get back to me.  Reviewed the no-fault

10   file which did not give much more than already

11   written up.  ER bill and time report and IME

12   report obtain.  Correct?

13       A.    Yes.

14       Q.    So let's go to page 15 and we know

15   from previous -- we were looking at page 81 that

16   you had 10,000 authorized on 11 -- you had

17   $10,000 in authorization on this file when you

18   called the attorney; correct?

19       A.    Yes, Carol Vilar gave me up to

20   10,000.

21       Q.    And then on January 15, '08 at 3:53

22   you made an entry about your negotiation?

23       A.    Yes.

24       Q.    A Carmine the attorney, Carmine?

25       A.    Yes.

156

CANDACE HARPER

1

Q.    Is that his first or last name?

A.    I don't know if Carmine is the
attorney or just a negotiator.

Q.    What is a negotiator?

A.    Someone at an attorney's office that
I guess discuss the claims and they negotiate the
claims.  They make the calls.  I don't know
exactly what their job description is.  That is
what I assume they did.

Q.    This is somebody at the attorney's
office?

A.    Yes.

Q.    You "spoke with Carmine in reference
to settling the file and he advised me he was
looking for 25,000 based on claimant's
injuries."  Right.  That is what it says?

A.    Yes, that is what it says.

Q.    And then you said "I advised Carmine
that number one we are not accepting 100 percent
of the liability based on the fact that the
Claimant at the age of 9 should know better than
crossing a street in the middle."

A.    Yes.

Q.    So that is the argument that you were

157

CANDACE HARPER

1

2       making to try to sway the attorney; correct?

3           A.    Yes.  But that probably was after

4       discussion with Miss Vilar on how I should go

5       about handling the claim and the arguments that I

6       should use.

7           Q.    "The attorney advised that there was

8       a witness that saw or policyholder run the red

9       light and strike the pedestrian."

10          A.    Yes.

11          Q.    And you said that witness advised --

12      "advise that the witness on police report is the

13      claimant's mom."

14          A.    Yes.

15          Q.    Meaning what you're saying that you

16      don't necessarily believe her because she is an

17      interested party, correct?

18          A.    Back then we really -- if they were

19      related it held very little weight.

20          Q.    So you're saying okay, I know you

21      have a witness, but it is the mom and she is

22      going -- if there is money involved she is going

23      to benefit from it?

24          A.    Yes, basically.

25          Q.    "Advise attorney that the Claimant

CANDACE HARPER

158

1                    CANDACE HARPER
2    had all that amounts to a swollen knee."  That is
3    again you're saying come on, he has a swollen
4    knee, right?
5         A.    Yes, from medical reports it probably
6    was just like an edema or something.
7         Q.    "Advised that we offer $7,000."  That
8    is a number that you chose to offer him, correct?
9         A.    Yes, because as long as it was above
10   the -- I had to negotiate between those ranges.
11        Q.    Right, but you also had to be
12   intelligent and how you select your opening
13   figure, right?
14        A.    It all depends, like with Miss Vilar
15   sometimes she would actually tell me where I
16   should start.  But I mean in some cases I would
17   use my discretion.
18        Q.    Because you knew these attorneys and
19   had dealt with them before, correct?
20        A.    I didn't -- at this point I probably
21   didn't deal with them.  I don't know if I dealt
22   with Carmine before.
23        Q.    You dealt with a lot of attorneys on
24   a repeat basis, am I correct about that?
25        A.    I dealt with some of them on a basis,

CANDACE  HARPER

159

1                      CANDACE HARPER

2  I had some claims with some of them over and over

3  again, yes.

4       Q.    And part of -- part of the technique

5  of negotiation is trying to figure out what the

6  right starting point is and you don't want to be

7  too low and piss them off and you don't want to

8  be too high and send the wrong message, right?

9            MS. RUDICH:   Objection, vague.

10  Pissed off?

11            MR. HEMMENDINGER:   Okay, that is

12  your objection.

13       Q.    Do you understand what it means?

14       A.    What, pissed off?

15       Q.    Yes.

16       A.    Get them upset with you.

17       Q.    Yes, okay.

18       A.    Negotiating was a job that I did.

19       Q.    With -- have?

20            MS. RUDICH:   Let her finish.

21            MR. HEMMENDINGER:   Okay.

22       A.    It was a discussion -- you know with

23  Miss Vilar, specially, she was a good

24  supervisor.  She would give you negotiation

25  strategies.  So we would sit down and she would

CANDACE  HARPER

160

1          CANDACE HARPER

2    say oh, you should -- this is an argument that

3    you should use.  You might want to go in this

4    direction.

5          Q.    But I'm going to go back --

6          A.    You should start here at this point.

7    6,000 might be too low and you should start at

8    7,000.

9          Q.    But if I go back to Deposition

10   Exhibit 2, page 181, that is where you wrote on

11   one of your evaluations, "I believe that the

12   class has "'made me in attuned personable and a

13   fair negotiator.'" Being an attuned negotiator is

14   what you're putting to work here when you were

15   negotiating this settlement?

16         A.    That was back in 2009 and this is

17   2007.  At that point CIQ and how we were handling

18   it in 2007 was different than it was in 2009.

19   2009 we were told that we had to start at the

20   lowest range and work our way up.  When I was

21   doing it with Miss Vilar and she would give you

22   an amount and basically she would tell you kind

23   of where you should start.  You didn't have to

24   start at 6,000.  I could start higher.  So it was

25   a little different.  So if the $7,000 -- I mean I

CANDACE HARPER

161

1          CANDACE HARPER

2 could -- I started at the $7,000.  I mean I could

3 have started at the 6,000.

4          Q.    He said advised -- you're negotiation

5 range if we look at page 81 is 3,000 to 7,750 and

6 then your supervisor upped it to 10; correct?

7          A.    Well, my negotiating range -- the

8 50 percent then it would be cut in half.

9          Q.    That is the cut in half?

10          A.    Where are we?

11          Q.    Go back to page 81.  That is where

12 you got your authorization, right?

13          A.    Okay, but that is the 50 percent, the

14 3,000?

15          Q.    Right.  And that is what the basis of

16 your negotiation was, the 50 percent; correct?

17          A.    Yes.

18          Q.    So you could have started as low as

19 $3,000 and still be within the range, right?

20          A.    Yes.

21          Q.    Let's go back to page 15, please.

22 You "offered 7, attorney advised 7 will not do

23 it, we will go back to Claimant's mom and discuss

24 and get back to you."  Correct?

25          A.    Yes.

CANDACE  HARPER

162

CANDACE HARPER

1

2      Q.    On page 14 at 1/29/08 at 1:13.

3      A.    Page 14?

4      Q.    Yes.  This is little thing.  You're

5  having to call the attorney to get him to talk

6  about the case.  "Call the attorney's office left

7  message for call back"?

8      A.    Yes.

9      Q.    On the next page, page 3 is where you

10 actually talk to him; correct?

11     A.    Yes.

12     Q.    At 2:25 on 2/19/08.

13     A.    Yes.

14     Q.    So you get him on the phone and it

15 says "Spoke with Carmine in attorney's office and

16 advise that he will be willing to come off his

17 initial demand to 20,000."

18     A.    Yes.

19     Q.    And he advised you that "I will come

20 off 25 to 20" and --

21     A.    Yes.

22     Q.    And you say "Advised Claimant had

23 swollen knee and he was partially responsible for

24 his injuries crossing in between two parked

25 cars."

CANDACE   HARPER

163

1                    CANDACE HARPER

2        A.    Yes.

3        Q.    He says "the adverse," meaning that

4    is the Claimant, right "would lower his demand"?

5        A.    No, the attorney advised.

6        Q.    "The attorney advised that he would

7    lower his demand to 15 K to settle the file

8    today."  Correct?

9        A.    Yes.

10        Q.    And you said, "10,000 would be my

11    final offer."  Correct?

12        A.    Yes.

13        Q.    And you chose to -- you didn't --

14    your last offer had been 7; correct?

15        A.    Yes.

16        Q.    So you didn't offer 8 or 9, you

17    offered 10?

18        A.    Yes, I did.  But I shouldn't have

19    done that.  We are supposed to go up in

20    increments.

21        Q.    You said "he requested that I take to

22    be reconferenced."  Correct?

23        A.    Yes, that I should go back to my

24    supervisor.

25        Q.    He said, "Get more money" and you

CANDACE   HARPER

164

CANDACE HARPER

1

2    said "I advise him to take my offer."  He is

3    saying to you go back to your supervisor and get

4    more money and you're telling him go to your

5    client and tell him to accept my 10?

6         A.    I told him to take the offer to his

7    client.

8         Q.    And you told him why you thought it

9    was a good offer.

10        A.    Because of a swollen knee.

11        Q.    And the fact that it was partially

12   his fault.

13        A.    Right.

14        Q.    And then on page 12 at 3/6/08 -- let

15   me see, are you with me, do you see where I'm at?

16        A.    3/6/08 at.

17        Q.    5:25.  The top of the page, close to

18   the top of the page.

19        A.    Okay.  5:27 you mean?

20        Q.    Yes.  I don't know what I said but

21   that is what I meant?

22             MS. RUDICH:   You said 5:25.

23        Q.    What does RVM mean?

24        A.    Return voicemail.

25        Q.    That means you called him back?

165

1                    CANDACE HARPER

2        A.    Yes.

3        Q.    And you apparently spoke to him?

4        A.    Yes.

5        Q.    And he was looking for 15 at that

6   point, that was the same as the last time that

7   you spoke to him?

8        A.    Yes.

9        Q.    And you said, I advised him I didn't

10  have -- I advised him to go back -- I'm sorry,

11  "advise did not have."  You're telling him I

12  don't have 15, right?

13       A.    Yes, yes.  I said I advised did not

14  have, advised did go back to reconference.

15       Q.    Right, at that point you were sort of

16  blowing smoke at him because you did have more

17  money, didn't you?

18       A.    What do you mean?

19       Q.    Go back to 81, please?

20       A.    Okay.

21       Q.    Well, I apologize, let me withdraw

22  what I said before.  On 2/20/08 you had gone back

23  to your supervisor and said I need more money on

24  this file?

25       A.    On where?

166

CANDACE HARPER

1

2      Q.    2/20/08.  Look at the handwritten

3  notes on document 81?

4      A.    2/20/08 I went back, yes.

5      Q.    And you asked for more money?

6      A.    Yes.

7      Q.    And you got 12-5?

8      A.    Yes, she gave me 12,500.

9      Q.    Was that a figure that you asked for?

10     A.    That is the figure that she gave me.

11     Q.    I understand.  I want to know whether

12  you asked for that amount?

13     A.    No, I probably would have asked for

14  the 15.  But no, that is the amount that she gave

15  me.

16     Q.    Now you're talking to him on 3/6.

17  This is after you got your increased

18  authorization; correct?

19     A.    Right.  After she gave me the 12-5.

20     Q.    And told him he asked for 15 and you

21  said you did not have a -- you told him "I did go

22  back to reconference, did get a little more money

23  on the file."  Correct?

24     A.    Yes.

25     Q.    And then you advised can do 12,

CANDACE  HARPER

167

1              CANDACE HARPER

2    right?

3         A.    Yes.

4         Q.    And that -- you were holding back

5    $500 at that point?

6         A.    Yes.  Because we were always told not

7    to give up all the money at once.

8         Q.    Then he -- I'm not sure what the next

9    thing says, he asked to do 13-5?

10        A.    Yes.

11        Q.    And you at that point said, "I

12   advised 12-5 is my final offer."  Correct?

13        A.    Yes.

14        Q.    And he said I will take it to my

15   client and get back to you and you said to him,

16   that is -- that really is my final offer?

17        A.    That was my final offer, yes.

18        Q.    Now, above that on the top of the

19   page where the date appears on page 11 it says

20   3/25/08 at 10:35.  It says "return voicemail to

21   attorney's office."  What was going on there?

22             MS. RUDICH:   Wait, where are you

23   looking?

24             MR. HEMMENDINGER:   Bottom of

25   page 11, top of page 12.

168

1                    CANDACE HARPER

2              MS. RUDICH:   3/28.

3              THE WITNESS:   3/28?

4              MR. HEMMENDINGER:   No, it is THE

5     bottom of the page 3/25.

6              MS. RUDICH:   No, it says 3/28.

7              MR. HEMMENDINGER:  No, 3/25.

8         Q.    Return voicemail, you had to tell him

9     again it was 12-5?

10        A.    He must have called me because I'm

11    returning a phone call and advised him 12-5 was

12    my offer.

13        Q.    So did he call back and try to get

14    some more out of you?

15        A.    I don't know.

16        Q.    But you had to remake the same offer;

17    correct?

18        A.    I don't know if I was just stating

19    the same offer.  I just left a message for him

20    and he called me back and I called him back

21    again.

22        Q.    Go to page 11, please, at 3/31/08 at

23    3:58.

24        A.    Okay.

25        Q.    Who is Sebastian?

CANDACE   HARPER

169

CANDACE HARPER

1

2      A.    I don't know who Sebastian is.  I
3  guess he is someone at the attorney's office.
4  That is one that Keith Brown spoke do.

5      Q.    Who is Keith Brown?

6      A.    He is another examiner.

7      Q.    On 3/31 when he called were you at
8  work?

9      A.    I don't recall whether I was there or
10 not.

11     Q.    You could have been off work for any
12 number of reasons?

13     A.    Absolutely.

14     Q.    And in that case somebody else in
15 your department would take a message for you?

16     A.    Yes.

17     Q.    And this is the way that the message
18 would be recorded?

19     A.    Yes.

20     Q.    Then on 4/3/08, same page, 10:16
21 there is an entry by you.  You called Sebastian
22 back?

23     A.    Yes.

24     Q.    In reference to settling the matter
25 and advised him that "12-5 was my final offer and

170

CANDACE HARPER

1
2    I would not be able to get any more."  Correct?
3        A.    Yes.
4        Q.    And he advised will take back to the
5    attorney to discuss?
6        A.    Yes.
7        Q.    It sounds like they sent somebody
8    else to get more money and you have to keep
9    telling them that it is 12-5?
10       A.    Sebastian is probably somebody that
11   works at the attorney's office also.  A
12   negotiator also.  So he may be an attorney, I'm
13   not sure.
14       Q.    On page 10 at 4/18/08 at 2:44 there
15   is another entry by you and it says, "called and
16   spoke with the attorney advised he sent out the
17   release to client awaiting back."  Am I correct
18   in gathering from that that he ultimately
19   accepted your offer of 12-5?
20       A.    Yes.
21       Q.    By the way, what you're settling
22   there is what?  It is not the entire claim,
23   correct?  The 12-5 doesn't represent all the
24   money that that individual is going to get, does
25   it?

CANDACE  HARPER

171

                         CANDACE HARPER

1

2        A.    I'm not clear on what you mean.

3        Q.    The 12-5, does that include the

4   doctor's bills?

5        A.    You mean as far as the no-fault is

6   concerned?

7        Q.    As far as Geico -- as far as payments

8   that Geico makes on this claim, does the 12-5

9   include the doctor's bills?

10       A.    I couldn't answer that question.  I

11  mean if the no-fault was cut off.

12       Q.    Let me ask you what you're settling

13  in this case is the claim for pain and suffering?

14       A.    That is all I'm settling.  Anything

15  else that has to do with any other portion of the

16  file, that wouldn't be my concern.

17       Q.    You're only settling the pain and

18  suffering portion of it?

19       A.    In this case, yes.

20       Q.    Let's go to the Claims IQ screens on

21  this case which begins with number 40.  I would

22  like you to flip over to page 47 and you can see

23  where there is an entry for typing for an entry

24  that has been made by you, it says 50 percent

25  liability?

CANDACE  HARPER

172

1                  CANDACE HARPER

2         A.    Yes.

3         Q.    And then on the next page, 48, you

4    have the breaches by in this case Nicholas the

5    pedestrian and Claudette the driver, correct?

6         A.    Yes.

7         Q.    And then on page 50 you have what

8    Claims IQ -- I'm sorry, 48, you have to -- in

9    terms of the first one, observe right of way, you

10   decided you put in that each of them breached the

11   duty to observe the right of way and had a medium

12   approximate cause for the accident; correct?

13        A.    The breaches were absolutely done and

14   put in.  But sometimes, specially in the

15   beginning at this point, if you needed to -- how

16   could I say this.  Yes, the breaches were put in.

17        Q.    Then on page 50 based on your input

18   of the breaches, the computer is going to give

19   you a range of liability figures for Claudette

20   the insured; correct?

21        A.    They give you a liability -- yes, it

22   gives you the liability.

23        Q.    In this case it is reported as 44 to

24   64 percent.

25        A.    Right.

CANDACE   HARPER

173

1                    CANDACE HARPER

2          Q.    And that is a spread of 20 points,

3     right?

4          A.    Yes.

5          Q.    And then you chose the figure and

6     entered 50 percent?

7          A.    That was, yes, the figure of

8     50 percent.

9          Q.    If you had split the difference what

10    would the figure have been?

11         A.    What do you mean split the

12    difference?

13         Q.    What is halfway between 44 and 64.

14    It is 54, right?

15         A.    What is that, 64.  54 and 44.  So

16    that is 49.  Between 54 -- is that 64 or 54?

17         Q.    It is 64.

18         A.    Okay, then 54.  But 50, you know --

19         Q.    I will move on.

20              THE VIDEOGRAPHER:   This marks the

21    end of tape number 2 in the deposition of Miss

22    Candace Harper and we are going off the record

23    the time is 5:06 p.m.

24              (Recess taken.)

25              THE VIDEOGRAPHER:   This marks the

CANDACE   HARPER

174

1                    CANDACE HARPER

2     beginning of tape number 3 in the deposition of

3     Miss Candace Harper and we are back on the

4     record.  The time is 5:14 p.m.

5     BY MR. HEMMENDINGER:

6          Q.    To save a little time, Miss Harper,

7     we were going through the Claims IQ screens and a

8     lot of screens around choices you would have to

9     make are the same as in the previous file that we

10    discussed, correct?

11         A.    This is one 2007.  So I think Claims

12    IQ did change a little bit, but basically it was

13    the same.

14         Q.    Let me ask you about one thing here.

15         A.    Sure.

16         Q.    If you go to document 81?

17         A.    Okay.

18         Q.    And then go to document 62 and you

19    can have them both in front of you?

20         A.    81 and 62?

21         Q.    Yes.  81 is in the folder and 62 is

22    part of the Claims IQ package.

23         A.    Okay.

24         Q.    On page 62 I see where full value of

25    the claim is estimated by Claims IQ to be 6,000

CANDACE   HARPER

175

1                    CANDACE HARPER
2    to 15-5; correct?
3         A.    That is what it says, yes.
4         Q.    And that same figure appears in the
5    printed out production of page 81?
6         A.    Yes.
7         Q.    And then on the next page Claims IQ
8    cuts those figures -- gives a range from
9    50 percent to 75 percent of what the high and the
10   low would be.  50 percent of the low to 75
11   percent of the high.  Is that what it is doing?
12        A.    Yes.
13        Q.    So then it reports a negotiation
14   range of 3,000 to $11,625, am I correct?
15        A.    Yes.
16        Q.    But the figure that ended up being
17   discussed with your supervisor was $10,000
18   initially; correct?
19        A.    Well we didn't have a discussion on
20   10,000.  That is what she felt the file was worth
21   up to.
22        Q.    What is the standard operating
23   procedure or the instructions that are given to
24   examiners with respect to documenting
25   conversations about files?

                                                              176

1                    CANDACE HARPER

2        A.    You're supposed to try to get

3    everything into -- your conversations into the

4    documents.  Into the A Log.

5        Q.    That's it for that file.  Let's wrap

6    that one up.  I have another one for you.

7              MR. HEMMENDINGER:   Mark this as

8    Exhibit 5.

9                         (Harper Exhibit 5 for

10   identification, Claim file 1019.)

11       Q.    On this one I'm not going to ask you

12   the same -- all the same questions that I asked

13   before.  So we could save a little time.  But, I

14   want to ask you on page -- go to page 8 of the

15   set of documents.  This is exhibit -- so the

16   record is clear, we are looking at Exhibit 5

17   which is claim number 1019.

18              Are you with me, have you found 8

19   yet?

20       A.    Yes, I have.

21       Q.    I would like to go to the entry that

22   is on 11/13/07 at 8:12.

23       A.    Okay.

24       Q.    This entry says received TI, what

25   does TI mean?

CANDACE   HARPER

177

                    CANDACE HARPER
1
2       A.      That is an L.
3       Q.      TL.
4       A.      Total loss paperwork.
5       Q.      From?
6       A.      From the adverse carrier.
7       Q.      Is the adverse carrier Allstate?
8       A.      Yes.
9       Q.      What does the rest of that mean?
10      A.      That means that I took that paperwork
11  that they sent me and I sent it to the adjusters
12  in fair and reasonable who would review it.
13      Q.      "Received total loss paperwork from
14  adverse carrier Allstate submitted to" failure
15  what was it, --
16      A.      Fair and reasonable.
17      Q.      "for review"?
18      A.      They review the paperwork and put a
19  value to it.
20      Q.      Now, two entries up, 11/14/07 at 1:18
21  there is another entry concerning this.
22      A.      Yes.
23      Q.      It says "returned voice message."  Is
24  that voice message?
25      A.      Yes, yes.  I returned a voice message

1                    CANDACE HARPER
2    to the adverse carrier.
3          Q.    In reference to subrogation
4    paperwork?
5          A.    Yes.
6          Q.    Called adverse carrier advised it has
7    been received, advised paid 10.
8          A.    PD 10, that means there is only
9    property damage is only $10,000.  That the person
10   has on their policy.
11         Q.    And he advised to send release along
12   with affidavit of coverages?
13         A.    Yes.
14         Q.    So, can you explain to me what is
15   going on here?
16         A.    It looks like there was an accident
17   and our policyholder held some liability in it.
18   The estimate that the adverse carrier gave was
19   probably over the $10,000.  So I was just
20   advising them that that is what the policy --
21   that is what the policyholder had on their
22   policy.
23         Q.    Was it within your power to pay the
24   $10,000 that they had to the subrogation carrier?
25         A.    What do you mean by -- I didn't have

CANDACE HARPER

179

1          CANDACE HARPER
2    power, I didn't have power.
3          Q.    Your authority, did you have
4    authority to pay the $10,000?
5          A.    If the fair and reasonable department
6    basically said that -- if it were over the 10,000
7    or if it were 10,000 then I would pay it.
8          Q.    Were there circumstances where you
9    could deny a subrogation claim?
10          A.    Were there situations where I would
11   deny a subrogation claim?
12          Q.    Yes.
13          A.    Only if we didn't have liability.
14          Q.    So if a claim came in from the
15   adverse carrier and you had determined that
16   Geico's insured wasn't liable, you would tell the
17   adverse carrier that you weren't going to pay it,
18   correct?
19          MS. RUDICH:    Objection.
20          A.    On claims like these, sometimes they
21   would be transferred up to me from a previous
22   examiner, a PD examiner who determined the
23   liability.  If it is liability -- if we didn't
24   have liability, it wouldn't -- we won't pay
25   anything.

180

1                    CANDACE HARPER
2        Q.    Well, is the liability determination
3    that governs the subrogation claim the same
4    liability determination that you're making with
5    respect to the 0 to 100 percent scale?
6              MS. RUDICH:   Objection, are you
7    talking about in this claim or generally?
8              MR. HEMMENDINGER:   Generally.
9        A.    Say that one more time, I'm sorry.
10       Q.    Let's say you remember there was a
11   claim where there was 33 percent liability?
12       A.    Yes.
13       Q.    And you changed it to 50?
14       A.    Right.
15       Q.    Would that same percentage figure
16   apply to a subrogation claim?
17       A.    Yes, I guess so.
18       Q.    So if you determined the figure to be
19   zero, you would deny subrogation, the claim?
20             MS. RUDICH:   Objection, you mean she
21   determined it or --
22             MR. HEMMENDINGER:   Please.
23             MS. RUDICH:   I'm objecting to form.
24       Q.    If you had entered 33 -- if you
25   entered zero liability, you would deny the

181

CANDACE HARPER

1

2    subrogation claim; correct?

3         A.    If it were -- after you did your

4    whole thing with Claims IQ, if it came up with

5    zero percent, it would be zero percent and there

6    would be nothing paid on the claim because there

7    would no liability.

8         Q.    Who would advise the adverse carrier

9    that you were denying the subrogation claim?

10        A.    That was part of the every examiner

11   to contact the adverse and tell them that you're

12   not paying them anything.

13        Q.    In this case if you go to page 7 at

14   12/12/07 at 8:15 you see the note?

15        A.    12/7 --

16        Q.    Page 7, 12/12/07.

17        A.    8:15 a.m.

18        Q.    You made a note to the file that you

19   were going to send to Allstate a release for the

20   $10,000?

21        A.    Yes.

22        Q.    Which was paid?

23        A.    Yes, I guess so.

24        Q.    Now, can you go ahead with me to page 3,

25   please.  At the bottom of the page 5/19/08.  2:27

1              CANDACE HARPER

2    p.m.

3         A.    Yes.

4         Q.    And let me see if I can decipher this

5    correctly.  It says, "Spoke with attorney in

6    reference to this claim.  He feels threshold due

7    to scarring."  That it what he said, right?

8         A.    Yes.

9         Q.    And you said, "I would need to see

10   current pictures of the scars in order to review

11   properly."

12             MS. RUDICH:   Objection, that is not

13   what it says.

14             MR. HEMMENDINGER:   Well let the

15   witness tell us what it says.

16             MS. RUDICH:   You just read it -- you

17   just read to -- okay, objection.

18             MR. HEMMENDINGER:   I don't

19   understand the objection.

20             MS. RUDICH:   You said I will need.

21   It is adverse.

22             MR. HEMMENDINGER:   Advised.

23             MS. RUDICH:   Well, we don't know

24   what that means.

25             MR. HEMMENDINGER:   Let's ask the

CANDACE   HARPER

183

1                       CANDACE HARPER

2      witness.

3            Q.     What does that mean?

4            A.     It means, it means that I will advise

5      the attorney will need to see the current

6      pictures.

7            Q.     You advised the attorney that you

8      wanted to see the pictures?

9            A.     That I would need the pictures.  We

10     would need the pictures in order to review the

11     claim properly.

12           Q.     Because she is claiming I was

13     disfigured in this accident, I have these scars,

14     and you said let me see some pictures of these

15     scars?

16           A.     Right.  If there is scarring they

17     would have to send pictures.  Because I had two

18     scar cases where Claimants had to come in and

19     both my supervisor and I went down to -- Miss

20     Vilar and I both went down so she could get a

21     look at the scars also.  So it was something that

22     you would actually review.

23           Q.     So, let's just go fast forward here,

24     let's go to the top page here?

25           A.     The top of the same page?

CANDACE   HARPER

184

1                    CANDACE HARPER

2        Q.    Let's go to page 1 and let's get out

3   page 132 of the folder.  Let's go to page 131,

4   the page in front of it.  Page 131 is the claims

5   evaluation short form?

6        A.    Yes.

7        Q.    And we have the text that you input

8   and it says at the bottom, "you have the

9   pictures, pictures dated 2/2/09, minimal scarring

10  to her leg will submit for conference"?

11       A.    Yes.

12       Q.    In the next page reflects that you

13  had settlement authorization of $8,000; is that

14  correct?

15       A.    Yes.

16       Q.    And then -- that was on 2/24/09?

17       A.    Yes.

18       Q.    Now, go to page 1.

19       A.    Of where?

20       Q.    In the A Log, the top page of the A

21  Log file?

22       A.    Okay.

23       Q.    At 2/25/09, 5 p.m. that is the next

24  day, after you got the settlement authorization

25  you called the attorney's office, am I correct?

185

1                    CANDACE HARPER

2          A.     Okay, I'm sorry, where are we?

3          Q.     Page 1.

4          A.     Page 1.

5          Q.     Right in the middle of the page, 2 --

6          A.     2/25?

7          Q.     Right.

8          A.     5:15?

9          Q.     5:17.

10         A.     5:17, I'm sorry.

11         Q.     You called the attorney's office and

12    he said "heavy damages to her vehicle and the

13    only reason she did not have treatment was due to

14    the fact that she was pregnant."  Am I reading

15    that right?

16         A.     Yes.

17         Q.     His demand is $15,000; correct?

18         A.     Yes.

19         Q.     And you said, my initial offer would

20    be 5,000; correct?

21         A.     Yes.

22         Q.     Which is a number that you -- that's

23    where you decided to start?

24         A.     The funny thing on this page here it

25    doesn't seem to have a range on it, but there

186

1                    CANDACE HARPER

2       should be a range on it, but I don't know why

3       there is not a range on it.  I would have to

4       start from something that my supervisor and I

5       agreed on.  I wouldn't be able to just pick a

6       number out of the air like that.  So it had to be

7       a number that we agreed on.  There would have to

8       be a low and there would have to be a high.  It

9       would have to be a range.  So I don't understand

10      why there was not a range there.

11           Q.    Are you saying that you recall the

12      conversation that you had with Marlene about this

13      particular claim?

14           A.    No, I'm not saying that I recall it.

15      I'm saying that when we are conferencing these

16      claims, that when we -- there is a low number

17      that we are supposed to start off with and there

18      is a high number that we can't go over.  And your

19      supervisor gives you the money and that is where

20      you're supposed to start.

21                 If I started at 5,000 that was a

22      number that I didn't just pick out.  That had to

23      be -- it had to be some kind of discussion or it

24      would have been on Claims IQ.

25           Q.    Or it would have been within the

CANDACE   HARPER

187

1                        CANDACE HARPER

2    range; correct?

3         A.    Well, I don't know because there is

4    no range.  I would assume there would be range.

5    I don't know.  There would be a range.

6         Q.    So let's go back to Exhibit 1.  He

7    states "he could not do it for that much and

8    states if they were to trial the jury would say

9    that the Claimant was pregnant and had multiple

10   abrasions to her body."  That is what he told

11   you, right?

12        A.    Yes.

13        Q.    And you said, "I stated to the

14   attorney that the Claimant struck you're vehicle

15   and she had to be going at a pretty fast pace to

16   incur that kind of damage."  That is your

17   argument?

18        A.    Right.

19        Q.    "Attorney then lower his demand to

20   12-5."  Correct?

21        A.    Yes.

22        Q.    And you then said, "I will give you

23   advise 7 to settle" -- I not sure what that

24   means, to settle?

25        A.    The file.

CANDACE   HARPER

188

CANDACE HARPER

1

2      Q.    The file.  And he then stated that

3  "he would of have to split the difference and

4  settle for 9750."  Correct?

5      A.    Yes.

6      Q.    And you said "I will have to review

7  and get back to him."

8      A.    Yes.

9      Q.    Could you have said to him at that

10 point my authorization is for 8 and that is all

11 that I have to offer you like you did in the

12 previous file that we discussed?

13     A.    You mean the 12, I think it was 12-5?

14     Q.    Yes.

15     A.    That is all I had on the file and I

16 had already gone back.  I wasn't going to get any

17 more money on that claim.

18     Q.    On this particular file you only had 8;

19 correct?

20     A.    I only had 8.

21     Q.    You could have said to him, I'm not

22 going to -- I don't want to go back and

23 reconference it, 8 is my bottom line.  You did

24 that on another file, didn't you?

25          MS. RUDICH:    Objection,

CANDACE   HARPER

189

1                    CANDACE HARPER
2   hypothetical.  Could have.  She could have done
3   anything.
4                    MR. HEMMENDINGER:   That's true, I'm
5   asking.
6                    MS. RUDICH:   Well, she could have
7   walked out of the office at that moment.  She
8   could have gone to the bathroom.  She could have
9   done anything.  When you're talking about
10  hypotheticals it is objectionable, Eric.
11                   MS. LESTRADE:   I don't think so.
12                   MS. RUDICH:   It is.
13       Q.    Have you ever said to -- didn't we
14  see an example in another file of you're saying
15  to the attorney, I don't have any more
16  authorization, this is all the authorization that
17  I have?
18       A.    I believe that was on the file where
19  that was the only authorization that I had.
20       Q.    And at this point in this discussion
21  on page 1 of this claim, page 10, $8000 was all
22  the money that you had?
23                   MS. RUDICH:   Objection, no
24  foundation.  When was it established that 8,000
25  was all she had.  It was not established.

CANDACE   HARPER

190

1                     CANDACE HARPER

2              MR. HEMMENDINGER:   Fran, I just

3     established it.

4              MS. RUDICH:   She said there was no

5     range.

6              MR. HEMMENDINGER:   It says right on

7     document 132, please read it.

8              MS. RUDICH:   You don't know if it is

9     on that date.  At that time.  What time is this

10    put down.  You have to set the -- I have been

11    letting you go today with these objectionable

12    questions where there is no foundation.  Ask her

13    if she had 8,000 during that telephone call.

14             MR. HEMMENDINGER:   We already know

15    she did.

16        Q.   Did you have $8,000 at the time that

17    you made that telephone call?

18        A.   $8,000, yes.

19             MS. RUDICH:   There, that is a proper

20    question.

21             MR. HEMMENDINGER:   Well, if you want

22    to look back at the transcript when we are

23    finished when you get the transcript you can look

24    back and you can see that I established it about

25    three questions ago.

191

1       CANDACE HARPER

2   Q.  So at the time that you're having

3 this conversation you have $8,000, right?

4   A.  Yes.

5   Q.  And one of the things that a

6 negotiator, a skilled negotiator like you could

7 say is, that is my bottom line, correct?

8   A.  My job was to I had to move the

9 file.  So, whether I -- I have to move the file

10 and you get credit when you move the file.  So I

11 knew that I had to go back to my supervisor and

12 get more money.

13   Q.  And you knew based on your experience

14 that this attorney wasn't going to take your 8,

15 so you would have to go back and ask for more?

16   A.  My experience with this particular

17 attorney?  I don't know who the attorney is on

18 the file.

19   Q.  Let me ask you a different question.

20 You offered on 2/25 you offered 7, correct?

21   A.  Yes.

22   Q.  And he says that won't do it, we

23 could split the difference at 9750; correct?

24   A.  Yes.

25   Q.  You had $8,000 in authorization;

192

1                    CANDACE HARPER

2     correct?

3          A.    Yes.

4          Q.    So you chose not to use the $8,000 at

5     that time, correct?

6          A.    On 2/25?

7          Q.    Yes.

8          A.    No, because he wanted 9750.

9          Q.    So you evaluated the situation and

10    decided putting out your $8,000 wasn't going to

11    be a good negotiating move at that point?

12         A.    I thought I could get more money if I

13    went back to the supervisor, that I could get

14    more money on the file so that is what I did to

15    settle the file.

16         Q.    Let me ask you a question.  Why

17    didn't you offer the full extent of your

18    authorization before going back for more?

19         A.    I probably should have.

20         Q.    So you went back to the supervisor

21    and you said to the supervisor, 8 is not going to

22    cut it, we need 9750, correct?

23         A.    Yes.

24         Q.    And she gave you 9750?

25         A.    Yes, she did.

CANDACE   HARPER

193

1                    CANDACE HARPER

2        Q.    And you settled the case?

3        A.    Yes, I believe so.

4        Q.    That's it for that file.  The next

5    file is 1185.

6              MR. HEMMENDINGER:   Mark this as

7    Exhibit 6.

8                        (Harper Exhibit 6 for

9    identification, Claim file 1185.)

10       Q.    We have handed you the next file

11   which is Deposition Exhibit 6 which is the file

12   number 1185.

13             MR. HEMMENDINGER:   Counsel, do you

14   have it in front of you?

15       Q.    Let me ask you, who is JP

16   Chandonnet?  C-h-a-n-d-o-n-n-e-t.

17             MS. RUDICH:   Are you reading from a

18   specific page?

19             MR. HEMMENDINGER:  Yes.  Page 28.

20       A.    JP Chandonnet I believe is -- she is

21   an examiner or he is an examiner.  He is an

22   examiner, JP.

23       Q.    Same job title as you?

24       A.    Yes.

25       Q.    Were there times when you were off

194

CANDACE HARPER

1   work where JP Chandonnet would cover your files

2   for you?  I'm not saying you in particular.

3   Everybody did that for every one else, right?

4        A.    I think there was a period of time

5   during this -- I think when JP first started

6   where I was out of work for a few weeks and I

7   think he covered my desk, but I'm not sure I

8   wasn't there.  I believe he was handling my

9   files.

10       Q.    I'm looking at the entry date

11  August 14th, '08, was that a period of time when

12  you were off work?

13       A.    Yes, I believe so.

14       Q.    How long were you off work?

15       A.    From July until September.  For

16  medical reasons.

17       Q.    So the files don't standstill when

18  somebody is out, right, other people work the

19  files?

20       A.    Yes.

21       Q.    If JP Chandonnet make entries on

22  8/14/08 he would be doing work that you would be

23  doing if you were there, correct?

24            MS. RUDICH:   Objection.

195

CANDACE HARPER

1

2      Q.    He is substituting for you on this

3  case?

4      A.    I can't speak to JP's work, but as a

5  substitute he would be doing the same exact --

6  working the file the same exact way, possibly,

7  yes.  In general you would want uniformity, but I

8  don't know.  I can't speak to JP's work what he

9  did.  I wasn't there.

10     Q.    So you really only know the way that

11  you work yourself?

12     A.    I mean -- what do you mean by that

13  question?

14     Q.    When it comes to knowing how people

15  did their job, the only person that you're in a

16  position to talk about is yourself, is that what

17  you're saying?

18           MS. RUDICH:   Objection.  Am I

19  coaching, I'm not coaching.  I'm objecting.  If

20  you have a comment say it out loud.

21           MS. LESTRADE:   I have no comment.

22     A.    What I'm saying is I don't know what

23  JP did on this file.  On this particular file.  I

24  don't know.  Can I tell you what other examiners

25  are doing, I only know from what my job is, what

196

1                    CANDACE HARPER

2    I did.

3         Q.    That is what I was trying to figure

4    out, that's all.

5         A.    I would assume that they are doing

6    the same thing.  JP was new when he started to

7    this department, at that particular time.

8         Q.    Can you look at the entry on 10/24,

9    please, on page 26?

10        A.    You said 10/24?

11        Q.    Yes, and I was wrong as unusual.

12   9/24/08.

13        A.    What time?

14        Q.    9:02.  So it says here "spoke with

15   Jeanelle at AC" that means adverse carrier?

16        A.    Yes.

17        Q.    "In reference to the liability on

18   this case.  She wants to settle the file."  That

19   what it says?

20        A.    Yes.

21        Q.    "Comparative negligence to 15/85."

22   Who is saying that, you or her?

23        A.    That is what she is saying.

24        Q.    Who did she think is 15 and who did

25   she think is 85.

197

1          CANDACE HARPER

2      A.    I would have to look at the

3  description, but it is probably -- what the

4  accident description is.  But it is probably --

5  she wants us to accept 15.  So we would be 15

6  percent.

7      Q.    Then it says, "Advised her their

8  argument is that their insured had already passed

9  a lane of traffic when they collided."  Is that

10 what it says?

11     A.    Okay, yes.

12     Q.    And you responded, "I advised her

13 that there is only -- there is one lane for

14 traffic and a turning lane."

15     A.    Yes.

16     Q.    For their insured in a turning lane

17 and mine in a travel lane, therefore -- I'm sorry

18 "therefore insured in a turning lane and mine in

19 a travel lane."  That is what you told her?

20     A.    Yes.

21     Q.    And the last thing says "Advised my

22 insured did nothing wrong."  Correct?

23     A.    Yes.

24     Q.    And "advised let it go to arbitration."

25     A.    Right, because she probably said she

198

1                    CANDACE HARPER

2    would go -- it would go to Arb.

3         Q.    Would this be a subrogation claim?

4         A.    It is only a subrogation claim if we

5    pay something out on our insured.

6         Q.    Would it be a subrogation claim as

7    far as Jeanelle is concerned?

8         A.    You mean for the adverse carrier,

9    Jeanelle?

10        Q.    Yes.

11        A.    She might be the Arb person.

12        Q.    Is this claim from another insurance

13   company against Geico; correct?

14        A.    I'm not sure if they have a claim.

15   Obviously they do because they said they were

16   going to Arb, yes.

17        Q.    And you denied it; correct?

18        A.    I don't know if I ultimately denied

19   it or not until I read it.

20        Q.    Going to page 14.  Do you see that

21   there is a -- at the top of the page at 3/14/08

22   at 1:18 p.m. there is an entry by you concerning

23   Marie, policyholder Marie?

24        A.    Yes, I see it.

25        Q.    And what you wrote was "As of the

CANDACE   HARPER

199

CANDACE HARPER

1

2          last renewal date was the spousal coverage

3          endorsement sent to the insured and was it

4          returned signed and accepted or declined for the

5          spousal coverage."  Correct?

6                A.    Yes.  I was instructed to do that.

7                Q.    Who did you send that to?

8                A.    I sent it to that was an underwriting

9          referral.

10               Q.    Is there any -- can you show me in

11         the record where you were instructed to do that?

12               A.    All instructions are not in A Log.  I

13         don't think it is in here, but I would have been

14         instructed to do so.

15               Q.    Let me ask you to go to document 150

16         which is the hard copy file on the left-hand side

17         of the page.  This is a coverage worksheet, am I

18         correct?

19               A.    Yes.

20               Q.    It says summary of underwriting

21         decision; correct?

22               A.    Right.

23               Q.    And did you type that in?

24               A.    Yes, we have to fill in all of those

25         boxes.

CANDACE  HARPER

200

1              CANDACE HARPER

2       Q.    What you typed in was the spouse was

3  not covered?

4       A.    Where did I type that in?

5       Q.    "Therefore no spousal coverage for

6  loss date."

7       A.    Okay, yes.

8       Q.    Below that it says "in summary of

9  insured's version" --

10      A.    That is the underwriting decision.

11  That is from underwriting.

12      Q.    Then it has some facts about

13  accident, correct?

14      A.    Yes.

15      Q.    And it says "examiner's recommendation."

16      A.    Yes.

17      Q.    And did you type that in?

18      A.    Yes, we have to type something in.

19      Q.    You typed in "disclaim for no spousal

20  coverage on the policy."

21      A.    Yes, we have to type that in.

22      Q.    Now, are there -- do you use that

23  coverage worksheet for other types of coverage

24  issues?

25      A.    Yes.

CANDACE  HARPER

201

1                        CANDACE HARPER

2          Q.    That is all I have on this file.  The

3   last one is labeled confidential claims file 1012

4   and we will mark it as exhibit --

5               MS. RUDICH:   1012.

6               MR. HEMMENDINGER:   I apologize, I

7   misspoke.  It is marked 1010 but that is a

8   mistake.  The actual claim file is 1012.  So

9   let's correct it on the jacket like this.  And

10  mark it as Exhibit 7.

11                         (Harper Exhibit 7 for

12  identification, Claim file 1012.)

13         Q.    I don't have much on this.  You will

14  agree with me that this is a file that you

15  handled?

16         A.    Yes, I see my entries, yes.

17         Q.    In the A Log portion of it.  Go to

18  page 6, please.  Page item -- 12/17/08.  9:23

19  a.m.  You see an entry by you --

20              MS. RUDICH:   12 what.

21              MR. HEMMENDINGER:   12/17?

22         A.    Yes, I do.  9:23 a.m.?

23         Q.    Yes.  That refers to a doc 805.  What

24  is a doc 805?

25         A.    A doc 805 letter is a state mandate

202

CANDACE HARPER

1
2    letter that has to go out if a feature is still

3    open.  It's a system generated letter.  I don't

4    know exactly what it reads.

5          Q.    Why did you enter no need for that?

6          A.    Because the PD and the rental

7    features were closed.

8          Q.    Go to in this case flip in the other

9    direction, go to page 7.  This came at 11/24/08

10   do you see the entry at 4:56 p.m.

11         A.    I see that entry, yes.

12         Q.    This says this file was transferred

13   from Laura Gill to you, correct?

14         A.    That is what it says.

15         Q.    Who is Laura Gill?

16         A.    I don't know.

17         Q.    Can you described under what

18   situations files would be transferred to you by

19   another person?

20         A.    If there were -- a transfer could

21   come from -- if there was an attorney's letter on

22   there.  A letter of representation and it would

23   be transferred over to me.

24         Q.    That is all I have on that file.  You

25   can put the files aside now.  I don't think we

CANDACE   HARPER

203

1                    CANDACE HARPER

2     are going to go back to them.

3                You indicated that you had two

4     supervisors; correct?

5          A.    Yes.

6          Q.    You had Marlene and Carol; correct?

7          A.    Yes.

8          Q.    When were you under Marlene's

9     supervision, how many other people did she

10    supervise, do you know?

11         A.    Somewhere between six and eight.

12    Somewhere in there, I'm trying to think.

13         Q.    Do you know about Carol?

14         A.    Probably about the same amount.

15         Q.    I'm going to be jumping around, some

16    sort of clean up questions so they are not

17    necessary going to come in a particular order.

18         A.    Sure.

19         Q.    Where did you work before you worked

20    with Geico?

21         A.    Where?

22         Q.    Yes.

23         A.    Years ago I worked for Chase Bank.

24         Q.    What did you do there?

25         A.    I was a collection.  I did

CANDACE   HARPER

204

1              CANDACE HARPER

2    collections.

3         Q.    Can you describe your formal

4    education to me?

5         A.    I have a bachelor's degree in

6    finance.

7         Q.    From?

8         A.    From Old Westbury.

9         Q.    When did you obtain that?

10        A.    '96.

11        Q.    Have you gone to any further

12   schooling not at Geico?

13        A.    I started a master's program, but I

14   only took one class.

15        Q.    When was that?

16        A.    I don't recall the year but it was

17   after '96.

18        Q.    What were you pursuing?

19        A.    A master's in MBA.

20        Q.    In?

21        A.    Business administration.

22        Q.    You're currently employed, correct?

23        A.    Yes.

24        Q.    When did you start working in your

25   current job?

CANDACE HARPER

205

CANDACE HARPER

1

2      A.    In October, the end of October of

3   2009.  I don't remember the exact date.

4      Q.    What kind work do you do?

5      A.    I am an examiner.  No-fault.

6      Q.    For an insurance company?

7      A.    Yes.

8      Q.    I'm looking right now and I don't

9   have copies to make for everybody, so I'm going

10  to read this stuff and just ask you some

11  questions.  It will be fairly simple but these

12  are your answers to interrogatories.  You're

13  familiar with them; correct?

14     A.    Yes, I am.

15     Q.    In number 6 you say "Plaintiff states

16  that adjusters prepared damages estimates not

17  those employees holding the position TCR 2."

18     A.    I never -- yes, I never estimated

19  damages.

20     Q.    When you use the word damages in that

21  are you referring to the auto damage portion?

22     A.    Yes.  Because the adjusters are the

23  people that look at vehicles.

24     Q.    And what you do is settle bodily

25  injury claims, correct?

206

1                    CANDACE HARPER

2            MS. RUDICH:   Objection, you can

3      answer.

4            A.    With the proper supervision, yes.  I

5      settle the bodily injury claims.

6            Q.    Now, in your answer to interrogatory

7      number 10 you write, "Subject to and without

8      waiving this objection, Plaintiff states that she

9      did not negotiate settlements."  Do you recall

10     giving that answer?

11           A.    Well, what I --

12           Q.    The only -- it's a yes or no

13     question?

14           A.    If that is -- that would be the

15     answer.

16           Q.    Would you like to see it?

17           A.    No, I already saw the interrogatory.

18           Q.    Knowing what we know now, do you

19     think that is an accurate statement?

20           A.    Well, I think it was misunderstood,

21     the question.  Because I myself negotiated with

22     the help of, you know, my supervisor and things

23     that we have to do as claims examiners.

24           Q.    And then in interrogatory number 12

25     the question was, "If you deny the descriptions

207

1                    CANDACE HARPER

2     of liability claims positions set forth in

3     Geico's answers to interrogatory number 6 are

4     accurate, state the factual basis for your

5     denial."  And your response was, "Plaintiff

6     states she cannot respond to this interrogatory

7     because she did not have knowledge -- she does

8     not have knowledge of the descriptions of all

9     liability claim positions."

10              Do you recall that question and

11    answer in the interrogatories?

12         A.    Yes.

13         Q.    Did you ever look at Geico's answers

14    to interrogatories?

15         A.    Excuse me?

16         Q.    Did you look at Geico's answers to

17    interrogatories?

18         A.    I saw it, I don't remember them, no,

19    I didn't read them.

20         Q.    When did you see them?

21         A.    I saw them today.

22         Q.    Was that the first time that you saw

23    them?

24         A.    I don't recall.  I don't think -- I

25    know I was e-mailed some stuff, it could have

CANDACE   HARPER

208

1                    CANDACE HARPER

2    been in there.

3         Q.    Your attorney answered some requests

4    for productions that we addressed to you.  Is it

5    correct that you have no paperwork from your

6    employment at Geico in your possession?

7         A.    You mean like my -- as far as my

8    production, no, I don't have anything like that.

9         Q.    Let me ask you a different question.

10   What do you have from your employment at Geico in

11   your possession?

12        A.    I had one letter which I presented at

13   an unemployment hearing from Geico.

14        Q.    Anything else?

15        A.    No.

16             MR. HEMMENDINGER:   We may be done

17   here.  Let me take a little huddle and figure

18   that out.

19             THE VIDEOGRAPHER:   Going off the

20   record the time is 6:14 p.m.

21             (Recess taken.)

22             THE VIDEOGRAPHER:   Back on the

23   record the time is 6:24 p.m.

24   BY MR. HEMMENDINGER:

25        Q.    The job that you have now you said is

1            CANDACE HARPER

2    a no-fault job?

3        A.    No-fault examiner.

4        Q.    No-fault examiner, does that mean

5    you're handling PIP claims?

6        A.    Yes.

7        Q.    Who is that with?

8        A.    That is with Herford.  H E R F O R D.

9        Q.    Where is that located?

10        A.    Long Island City.

11        Q.    I assume it is automobile because it

12    is PIP?

13        A.    Personal lines, yes.  Commercial

14    vehicle, yes.

15        Q.    It is only commercial vehicles?

16        A.    Yes.

17        Q.    So, in the case of commercial

18    vehicles, the PIP claim comes from the person

19    that the commercial vehicle struck or from the

20    driver of the commercial vehicle or both?

21        A.    It could come from both.

22            MR. HEMMENDINGER:   That's all we

23    have.

24            MS. RUDICH:   I have some questions.

25        EXAMINATION CONDUCTED BY MS. RUDICH:

210

1                    CANDACE HARPER

2          Q.    Good afternoon, Miss Harper.  Do you

3    recall earlier today you testified that by

4    assigning a pay code, that would determine if a

5    claim is paid?  Do you recall your testimony

6    regarding that?

7          A.    Yes.

8          Q.    Would you have to receive the

9    approval of a supervisor before you could assign

10   a certain pay code to a claim?

11         A.    It wasn't something that would have

12   to be assigned by -- a supervisor wouldn't give

13   you an approval for that.  But in the training

14   that you had there were pay codes.  If liability

15   was 100 percent then you would give it a good pay

16   code.  Sometimes claims would come in with

17   liability already assessed, if it came to you

18   like that, then you would give it a good pay

19   code.

20         Q.    So the pay code you gave it depended

21   on liability that was assessed on that claim?

22         A.    Yes.

23         Q.    And did the CIQ determine the

24   liability that was assessed on the claim?

25         A.    Yes.

CANDACE   HARPER

211

1                    CANDACE HARPER

2        Q.    So you didn't have any discretion or --

3    you didn't have any discretion or use independent

4    judgment as to how much -- which pay code to

5    assign to a claim, did you?

6                 MR. HEMMENDINGER:   Objection,

7    leading.

8        A.    It was either a good pay code or a

9    bad pay code.

10       Q.    Based on what was in the CIQ?

11       A.    Based on the decision that came out

12   of claims IQ.  Claims IQ was supposed to make the

13   liability decision.

14       Q.    Do you recall earlier today you

15   testified that you would advise an adverse

16   carrier about Geico's decision regarding

17   liability, whether it would be -- whether you

18   would be disclaiming or whether it could be

19   accepted?  Do you recall your testimony regarding

20   that?

21       A.    Say that again.

22       Q.    Do you recall earlier today you

23   testified that you would advise an adverse

24   carrier regarding Geico's decision regarding

25   liability if there was an adverse carrier

212

1                        CANDACE HARPER

2       involved?

3             A.    You mean based on the liability?

4             Q.    Yes.

5             A.    Like if I -- yes, that was part of

6       what examiners did.  If there was no liability

7       then we would call -- we would have to call and

8       tell the adverse carrier that there wasn't.

9             Q.    You were essentially a messenger when

10      you did that, correct?

11                  MR. HEMMENDINGER:   Objection,

12      leading.

13            A.    Yes, basically.

14            Q.    You didn't use any independent

15      judgment or discretion on that, did you?

16                  MR. HEMMENDINGER:   Objection,

17      leading.

18            A.    It was based on what CIQ gave us and

19      what the supervisor -- your supervisor.  I mean

20      there were cases where we couldn't settle files

21      if it was 100 percent liability, we were told

22      that we couldn't -- we would have to speak with

23      the supervisor.  You couldn't accept 100

24      percent.  That would be something that where

25      those kind of claims would have to be discussed.

213

1           CANDACE HARPER

2  You couldn't accept 100 percent.

3          Q.    Now, Miss Harper, when you worked for

4  Geico as a I guess it was a Claims Examiner 2?

5          A.    Telephone claims.

6          Q.    Telephone Claims Representative 2.

7  Is it your opinion that all telephone claims

8  representative 2s did the same thing when they

9  worked?

10          A.    Yes.

11          Q.    And how do you know this?

12          A.    Because they started a centralized --

13  some centralized school down in, I forget where

14  it was.  I think it was in Washington and we were

15  told that all the claim examiners are doing the

16  same thing.

17          Q.    The Claims Examiner 2s that were in

18  your office, were you able to observe what they

19  did?

20          A.    Yes.

21          Q.    Did they do the same thing that you

22  did?

23          A.    Yes.

24          Q.    Now, you previously testified about

25  the files that you handled.  What were the claims

CANDACE  HARPER

214

1            CANDACE HARPER
2    limits on the files that you handled?
3         A.    They were minimal.  They were the
4    minimum limit, it was 25/50.
5         Q.    Were these considered small claims or --
6         A.    Yes.  That is the basic coverage you
7    have to carry.
8         Q.    Would there be a situation where you
9    would be handling a file and it would get to a
10   certain limit and it would have to be transferred
11   from you to a different claim examiner?
12        A.    Yes.
13        Q.    What was the circumstance when that
14   would occur?
15        A.    Like catastrophic injuries.  Those
16   would have to be transferred.  If a demand policy
17   limit demand would come in and say there was a
18   policy that was 100/300, that would have to be
19   transferred and the attorney -- you know the
20   attorney wants over the $25,000.  That would have
21   to be transferred.  Those kind of cases.
22        Q.    Now you testified previously that
23   when you were employed by Geico as a telephone
24   claims rep 2 you had two supervisors, correct?
25        A.    Yes.

CANDACE HARPER

215

1                    CANDACE HARPER
2          Q.     And that one was Carol Vilar?
3          A.     Yes.
4          Q.     And the other was Marlene Grant
5    Harris?
6          A.     Harris-Grant.
7          Q.     Harris-Grant, I'm sorry.  Was Marlene
8    Harris-Grant a hands-on supervisor?
9                    MR. HEMMENDINGER:   Objection,
10   leading.
11         A.     Marlene was a very -- she was very
12   hands-on.  She knew your claim.  She was what you
13   would consider to be a great supervisor.  She was
14   in the claims.  She gave you instructions in the
15   claims.  Yes, she was very hands-on.
16         Q.     Would you characterize her as a
17   micro-manager?
18                    MR. HEMMENDINGER:   Objection,
19   leading.
20         A.     As far as the claims are concerned,
21   she was very -- yes.
22         Q.     And while you worked for Marlene
23   Harris-Grant, she supervised you very closely,
24   right?
25                    MR. HEMMENDINGER:   Objection.

216

CANDACE HARPER

1

2    Leading.

3        A.    Yes.

4        Q.    Did Miss Harris-Grant tell you how to

5    negotiate claims?

6        A.    We were told, it was called coaching,

7    how we should go about increments, how we should

8    go up on our increments, where we should start.

9    It was coaching that was done.

10       Q.    Were you allowed to start at an

11   amount that was different than what Miss

12   Harris-Grant told you to start at?

13           MR. HEMMENDINGER:   Objection, no

14   foundation.

15       A.    Can you repeat the question again,

16   I'm sorry?

17       Q.    When you say that Miss Harris-Grant

18   told you the amount to start your negotiating --

19       A.    Well, that amount came, really came

20   from CIQ.  We were supposed to start at that --

21   the low amount that was in CIQ.

22       Q.    You couldn't start at an amount lower

23   than that, could you?

24       A.    No, we couldn't.

25       Q.    And you couldn't accept an offer or a

217

CANDACE HARPER

1

2      demand that was higher than the CIQ amount, could

3      you?

4          A.    No.

5                MR. HEMMENDINGER:   Objection.

6          Q.    You had to obtain your supervisor's

7      approval to change the reserve; correct?

8          A.    Well, the amount, yes, I would --

9      yes, definitely.

10         Q.    You couldn't change reserves

11     yourself, could you?

12               MR. HEMMENDINGER:   Objection.

13         Q.    Could you change reserves on a claim?

14         A.    No, I couldn't change -- no, I could

15     not change the reserves.

16         Q.    Mr. Hemmendinger asked you to -- I'm

17     going to ask you to look at what is marked as

18     Exhibit No. 6 which is Claim 1185.  Can you look

19     at 150 please.  It is the coverage worksheet.

20         A.    Yes.

21         Q.    Mr. Hemmendinger earlier ask you

22     questions about the summary of the underwriting

23     decision.

24         A.    Yes.

25         Q.    Did you make that decision?

CANDACE   HARPER

218

1          CANDACE HARPER

2       A.    No, that is a decision that was from

3   the underwriting department.

4       Q.    And Mr. Hemmendinger asked you

5   questions about the examiner's recommendation

6   where it says "disclaim for no spousal coverage

7   on the policy."

8       A.    Yes.

9       Q.    Did you decide that on your own?

10      A.    No, underwriting basically said there

11  was no coverage.  So there was no coverage.

12      Q.    You couldn't change that decision,

13  could you?

14      A.    No.

15      Q.    And you basically typed that into

16  this form based on what underwriting said;

17  correct?

18      A.    Yes.

19      Q.    Did you not use any independent --

20  did you use any independent judgment in deciding

21  whether or not to disclaim coverage on a policy

22  because of no spousal coverage or things like

23  that?

24      A.    No.

25      Q.    Did you use your own discretion?

219

1                           CANDACE HARPER

2          A.     No.

3          Q.     I'm going to ask you to look at what

4    is marked as Harper Exhibit 7.   Claim file 1012.

5    Look at page 2.

6          A.     Yes.

7          Q.     Do you see the entry dated Wednesday,

8    1/28/08 at 6:34 p.m.?

9          A.     Yes.

10         Q.     What is this entry -- can you just --

11   can you explain to us in lay terms what this

12   entry means?

13         A.     Well, basically that is an entry by

14   Miss Harris-Grant and she is giving me

15   instructions on how to proceed with the claim.

16         Q.     What is "I posted defense reserves

17   555 for each LP," what does that mean?

18         A.     That means that she is setting the

19   reserves.   She is putting money in.   She is

20   setting the reserves.

21         Q.     And you didn't do that, did you?

22         A.     No.

23         Q.     Did you have the authority to do

24   that?

25         A.     No.   No examiner has the authority to

220

1                    CANDACE HARPER

2      set the reserves.  Well, not in my department, as

3      far as I know.

4           Q.    Now, you testified -- when Carol

5      Vilar was your supervisor, would she tell you

6      exactly how to negotiate a claim?

7           A.    Carol she -- yes, basically she would

8      tell you how to -- what your argument should be.

9      So in that matter, yes, she would.

10          Q.    And you would have to listen to her,

11     correct?

12               MR. HEMMENDINGER:   Objection,

13     leading your own witness.

14          Q.    Would you have to -- would you be --

15     when she told you how to negotiate a claim, you

16     would -- since she was your supervisor you

17     listened to her?

18          A.    Yes.

19          Q.    You didn't use your own independent

20     discretion and authority, did you?

21               MR. HEMMENDINGER:   Objection.

22          A.    I mean if -- yes, I mean basically if

23     she told me how to argue, the arguments, I would

24     use the arguments that she gave me.

25               MS. RUDICH:   No further questions.

221

CANDACE HARPER

1

EXAMINATION CONTINUED BY MR. HEMMENDINGER:

2

3      Q.    Miss Harper, do you understand what

4   the significance of the term independent judgment

5   and discretion is in your claim for overtime?

6      A.    I'm sorry, do I understand?

7      Q.    What that means in connection with

8   your claim for overtime?

9      A.    Somewhat.

10      Q.    What does it mean?

11      A.    That did I have decision-making

12   capabilities.  Was I able to use my own judgment.

13      Q.    If the answer to that were no, how

14   would that affect this case?

15      A.    I don't know.

16      Q.    You testified I believe that all

17   TCR 2s did the same thing that you were, to your

18   knowledge?

19      A.    I know, yes, yes, that is to my

20   knowledge.

21      Q.    What is the scope of your knowledge?

22         MS. RUDICH:   Objection.

23      A.    As far as?

24      Q.    Well, are you familiar with the TCR 2

25   job in Woodbury?

CANDACE   HARPER

222

1                        CANDACE HARPER

2          A.     Yes.

3          Q.     Are you familiar with the TCR job in

4    Buffalo?

5          A.     I believe they did the same thing,

6    but not as familiar, no.

7          Q.     Are you familiar with the TCR job in

8    Tampa, Florida?

9          A.     All I know is that all the examiners

10   go to the, they call it the centralized school

11   and that is where they get their training and

12   they all come from all different parts of the

13   country.  So I'm going to assume that they are

14   getting -- they are in the same class and getting

15   the same training that is called centralized

16   training.

17         Q.     Do you know whether TCRs in Florida

18   or Arizona or Georgia get different training when

19   they -- in their regions?

20         A.     I know that everyone has to go to the

21   centralized training.  That is all I know.

22         Q.     So if there were different training

23   in different regions, you wouldn't know about it?

24         A.     Different training for?

25         Q.     For a start.  Are automobile damage

CANDACE  HARPER

223

1                        CANDACE HARPER
2    laws the same in every state?
3         A.    No.
4         Q.    Do they have the threshold concept in
5    every state?
6         A.    I don't know.
7         Q.    Do they have personal injury
8    protection in every state?
9         A.    No.
10         Q.    Do they have comparative negligence
11    in every state?
12         A.    No.
13         Q.    You testified that your claim
14    authority were limited to 25/50.  I wasn't sure
15    what those figures refer to.  Is that the value
16    of the policy limit on the insurance policy?
17         A.    That is the value on -- I can only
18    handle a claim payout of 25,000 for one person
19    and up to 50,000 on the whole entire claim for a
20    bodily injury claim.
21         Q.    And that is the portion of the claim --
22    so, on a single -- it is 25 on one and 50 on the
23    entire accident?
24         A.    Yes, if there were four people they
25    would have to split.

CANDACE   HARPER

224

1          CANDACE HARPER

2          Q.    If that the were policy limit, one of

3     the things that would have to be done was the

4     liability would have to be apportioned among the

5     different claims -- I guess the liability would

6     have to apportioned --

7          A.    No, just the money.

8          Q.    The money would have to be

9     apportioned among the different claims, correct?

10         A.    Yes.

11         Q.    And that would be based on the

12    comparative severity of their claims, their

13    injuries?

14         A.    Yes.

15         Q.    Let's assume that we are only talking

16    about one person, so policy limit is $25,000?

17         A.    Okay.

18         Q.    And that policy limit applies to the

19    portion, to the pain and suffering portion of

20    that claim, am I correct about that?

21         A.    Yes.

22         Q.    Now, I gather you received and we

23    have seen documentation, you went to classes and

24    there was discussion about how to effectively

25    negotiate claims, am I correct?

225

CANDACE HARPER

1

2      A.    I don't remember going to a class on

3  how to negotiate a claim.

4      Q.    I thought we looked at one, it was

5  listed in your evaluation as a course or seminar

6  that you attended that you said was very

7  valuable, do you remember that?

8      A.    Yes, I do.

9      Q.    So you had training in negotiating?

10      A.    Right, but I think that was later.  I

11  think that was like 2009.  I mean if you're

12  talking about like when I first started, there

13  was really no real training on that.  But they

14  had people who came in and we had to go to these

15  classes and courses, yes.

16      Q.    One of the things that they trained

17  you was don't spend all your money at once, so

18  negotiate in increments, am I correct?

19      A.    We were told that we should negotiate

20  in increments, yes.

21      Q.    But the number, the amount of those

22  increments you had to decide on the fly when

23  you're talking to the attorney, didn't you?

24          MS. RUDICH:   Objection.  You can

25  answer.

226

CANDACE HARPER

1

2      A.    I was told -- Miss Harris-Grant had a

3    discussion with a group of us that we should

4    negotiate -- they were basically telling us and

5    this wasn't just her, but there was other

6    supervisors also who were saying instead of going

7    up a thousand, you should go up $100.  Or go up

8    odd amounts.  That is what they wanted to see on

9    the files.

10      Q.    And at the same time they also talked

11    to you when you're talking to them you should be

12    making arguments about why they should accept

13    your offer?

14      A.    They would give you arguments.

15      Q.    And you had to figure out how to

16    deploy those arguments?

17      A.    You would use arguments that were

18    there.

19      Q.    You didn't just blurt them out all at

20    once, you had to choose when to make them or not

21    make them?

22      A.    I remember one case with Carol Vilar

23    that that was her whole thing.  You don't give

24    all the arguments at once, you give them one at a

25    time.

CANDACE   HARPER

227

1                    CANDACE HARPER
2          Q.    When it seems sensible to do that to
3     you, right?
4          A.    Well, I mean you would just -- yes, I
5     guess so.  You would try to give the arguments
6     and try to use all the arguments that were given.
7          Q.    It's an exercise in persuasion, am I
8     correct?
9               MS. RUDICH:   Objection.
10         A.    In persuasion?  I really basically
11    look at the facts, what the doctors said and that
12    is the arguments that I would use.  So I had the
13    money on the file.
14              MR. HEMMENDINGER:   I don't have
15    anything else.
16              MS. RUDICH:   I'm done.
17              (CONTINUED ON NEXT PAGE.)
18
19
20
21
22
23
24
25

CANDACE  HARPER

228

1               CANDACE HARPER

2            THE VIDEOGRAPHER:   This marks the

3     end of the deposition of Miss Candace Harper.

4     Total number of tapes used today is three and we

5     are going off the record, the time is 6:48 p.m.

6               (TIME NOTED:  6:48 P.M.)

7

8

9

      _____

10               CANDACE HARPER

11    Subscribed and sworn to before me

12    this _____ day of _____, 2010.

13

14    _____

      Notary Public

15

16

17

18

19

20

21

22

23

24

25

CANDACE   HARPER

229

1

2   STATE OF NEW YORK          )       Pg__of__Pgs

3                              ss:

4   COUNTY OF NEW YORK         )

5        I wish to make the following changes, for

6   the following reasons:

7   PAGE LINE

8   ____ ____    CHANGE: _____

9                REASON: _____

10  ____ ____    CHANGE: _____

11               REASON: _____

12  ____ ____    CHANGE: _____

13               REASON: _____

14  ____ ____    CHANGE: _____

15               REASON: _____

16  ____ ____    CHANGE: _____

17               REASON: _____

18  ____ ____    CHANGE: _____

19               REASON: _____

20  ____ ____    CHANGE: _____

21               REASON: _____

22  ____ ____    CHANGE: _____

23               REASON: _____

24

25

CANDACE   HARPER

230

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK    )

4                              : ss.

5    COUNTY OF NEW YORK   )

6

7              I, WILLIAM VISCONTI, a Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10             That CANDACE HARPER, the witness

11   whose deposition is hereinbefore set forth, was

12   duly sworn by me and that such deposition is a

13   true record of the testimony given by the

14   witness.

15             I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage, and that I am in no way

18   interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto

20   set my hand this _____ day of _____, 2010.

21

22

         _____

23                 WILLIAM VISCONTI

24

25

CANDACE   HARPER

231

1                E X H I B I T S

2

3     DESCRIPTION                              PAGE

4

5     (Harper Exhibit 1 for identification,

6     Defendant's Answers To Plaintiffs First Set

7     Of Interrogatories.)........................... 8

8

9     (Harper Exhibit 2 for identification, Group

10    of documents taken out of Miss Harper's

11    personnel file.)............................. 22

12

13    (Harper Exhibit 3 for identification, Claim

14    file 1013.)................................... 42

15

16    (Harper Exhibit 4 for identification, File

17    labeled 1020.)............................... 137

18

19    (Harper Exhibit 5 for identification, Claim

20    file 1019.)................................... 176

21

22    (Harper Exhibit 6 for identification, Claim

23    file 1185.)................................... 193

24

25

CANDACE   HARPER

232

1          E X H I B I T S

2

3    DESCRIPTION                                    PAGE

4

5    (Harper Exhibit 7 for identification, Claim

6    file 1012.)................................. 201

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25