1

1
2      UNITED STATES DISTRICT COURT
3      EASTERN DISTRICT OF NEW YORK
4      Index No. 2:09-CV-02254
5      -----------------------------------x
       CANDACE HARPER, Individually and on Behalf
6      of All Other Persons Similarly Situated,
7                    Plaintiff,
8
9         - against -
10
11     GOVERNMENT EMPLOYEES INSURANCE COMPANY
       a/k/a GEICO,
12
                     Defendant.
13     -----------------------------------x
                     May 3, 2010
14                   11:50 a.m.
15
16
17        Deposition of MARLENE HARRIS-GRANT,
18     taken by Plaintiff, pursuant to Notice,
19     held at the offices of Dorsey & Whitney
20     LLP, 250 Park Avenue, New York, New York,
21     before Todd DeSimone, a Registered
22     Professional Reporter and Notary Public of
23     the State of New York.
24
25

2

1

2     A P P E A R A N C E S :

3     THORNTON & NAUMES LLP

      100 Summer Street

4     30th Floor

      Boston, Massachusetts 02110

5            Attorneys for Plaintiff

      BY:   MARILYN T. McGOLDRICK, ESQ.

6             mmcgoldrick@tenlaw.com

7

8

      KLAFTER OLSEN & LESSER LLP

9     Two International Drive

      Suite 350

10    Rye Brook, New York 10573

             Attorneys for Plaintiff

11    BY:   LANA KOROLEVA, ESQ.

              lkoroleva@klafterolsen.com

12

13

14    SHAWE ROSENTHAL LLP

      20 South Charles Street

15    11th Floor

      Baltimore, Maryland 21201

16           Attorneys for Defendant

      BY:   ERIC HEMMENDINGER, ESQ.

17            eh@shawe.com

18

19

      ALSO PRESENT:

20      WILLIAM C.E. ROBINSON, GEICO

21

22

23

24

25

3

1

2    M A R L E N E   H A R R I S - G R A N T,

3    called as a witness, having been first

4    duly sworn, was examined and testified

5    as follows:

6    EXAMINATION BY MS. McGOLDRICK:

7        Q.     Good morning.  My name is

8    Marilyn McGoldrick, or Marty McGoldrick.

9    I'm an attorney for the plaintiff, Candace

10   Harper, and I understand you have sat in

11   on some of the depositions previously?

12       A.     Yes.

13       Q.     So you basically know the

14   drill?

15       A.     Yes.

16       Q.     I will tell you this:  If you

17   don't hear a question or you don't

18   understand a question, please just tell me

19   and I will try to rephrase it or have the

20   question read back.  If you do answer a

21   question, I will assume you heard it and

22   understood it.

23              You are not locked in here for

24   the day.  If you need to take a break at

25   any time, please let me know.  However,

4

                         HARRIS-GRANT
1
2     the only caveat to that is if there is a
3     question pending, could you please answer
4     completely before we take a break.
5          A.     Okay.
6          Q.     Sometimes I tend to speak
7     quickly.  If I'm talking too fast, don't
8     hesitate to slow me down so that you can
9     understand.
10                Can you state your full name
11    for the record, please.
12         A.     Marlene Harris-Grant.
13         Q.     And are you currently employed?
14         A.     Yes.
15         Q.     Where are you employed?
16         A.     GEICO Insurance.
17         Q.     Where is that?
18         A.     750 Woodbury Road, Woodbury,
19    New York, 11797.
20         Q.     Are you appearing here today on
21    behalf of GEICO?
22         A.     Yes.
23                MS. McGOLDRICK:  For the
24    record, this is a 30(b)(6) deposition.
25                MR. HEMMENDINGER:  Actually, I

5

1                     HARRIS-GRANT

2    think it is not, but I don't know if that

3    makes a difference.

4              MS. McGOLDRICK:  I thought it

5    was.  That is fine.

6         Q.    As far as deposition prep goes,

7    did you meet with anybody before coming

8    here today to discuss this deposition?

9         A.    No.

10        Q.    You didn't meet with any of

11   your attorneys?

12        A.    No.

13        Q.    Did you review any documents?

14        A.    Just the answer to, what is it,

15   number 6 or something.

16        Q.    The interrogatory?

17        A.    Yes.

18        Q.    And when did you review that?

19        A.    Sometime last week, maybe

20   Wednesday or Thursday.

21        Q.    So you didn't have any meetings

22   or conversations with the attorneys for

23   GEICO?

24        A.    No.

25        Q.    This deposition was previously

1          HARRIS-GRANT

2  scheduled in March.  Do you recall that?

3       A.     Yes.

4       Q.     Did you have any meetings with

5  anybody at that time?

6       A.     Yes.

7       Q.     Who did you meet with at that

8  time?

9       A.     It was Eric, John and I, and

10 Bill Robinson was there.

11      Q.     And did you review any

12 documents at that time?

13      A.     No, I didn't.

14      Q.     Who is Bill Robinson?

15      A.     He is GEICO counsel.

16      Q.     How long did you meet with

17 counsel for?

18      A.     Probably 30 minutes or so.

19      Q.     Did you speak with anybody else

20 regarding this deposition today?

21      A.     No.

22      Q.     You didn't have conversations

23 with anybody at GEICO concerning the

24 deposition?

25      A.     My supervisor knows that I'm

7

                    HARRIS-GRANT

1   here today for the deposition.

2          Q.       And did you have a conversation

3   about the deposition with your supervisor?

4          A.       No.

5          Q.       So does she know you are here

6   for the deposition?

7          A.       It is a he.  He knows of the

8   case and that I will be off from work

9   today as a result of being here to be

10  deposed.

11         Q.       And what is your supervisor's

12  name?

13         A.       Robert Leone.

14         Q.       What is your current position

15  at GEICO?

16         A.       I'm a claims TA2 supervisor.

17         Q.       Is a TCR2 supervisor the same

18  as at TA2 supervisor?

19         A.       Right.

20         Q.       And is a TCR2 a telephone

21  claims representative 2?

22         A.       Yes.

23         Q.       So if I refer to a TA2, it is

24  the same as a TCR2?

8

1                    HARRIS-GRANT

2       A.      Yes.

3       Q.      And how long have you held that

4  position?

5       A.      April of this year will be two

6  years.  A little over two years.

7       Q.      How long have you been at

8  GEICO?

9       A.      Ten years, a little over ten.

10       Q.      Can you give me a brief

11  description of your employment history at

12  GEICO, where you began?

13       A.      I started in CSR.  Then I

14  always get it mixed up whether I went to

15  PIP first or TA1.

16       Q.      Were you an examiner?

17       A.      I was an examiner.  And I was a

18  TA2 examiner, continuing unit examiner, CU

19  examiner for short.  Then I became a TA1

20  supervisor.  And now I'm a TA2 supervisor.

21       Q.      How long were you a CSR

22  examiner?

23       A.      A little over a year.

24       Q.      And then how long were you a

25  PIP examiner?

9

1          HARRIS-GRANT

2      A.      About one year.

3      Q.      TA2 examiner?

4      A.      About the same.

5      Q.      CU examiner?

6      A.      About the same.

7      Q.      About a year?

8      A.      About a year.

9      Q.      And then how long were you a

10  TA1 supervisor?

11     A.      Maybe a little over a year,

12  like a year and a half or so.

13     Q.      And how many individuals did

14  you supervise as a TA1 supervisor?

15     A.      I'm going to count by the best

16  of what I remember.  I believe it was six.

17     Q.      Did that number usually stay

18  the same?

19     A.      Yes.

20     Q.      And now as a TA2 supervisor,

21  you said you have been one for about two

22  years now?

23     A.      Yes.

24     Q.      How many examiners do you

25  supervise?

10

1                    HARRIS-GRANT

2        A.       Right now, six.

3        Q.       Has that number changed?

4        A.       Yes.  Before I had seven and

5   then we moved that down to six.

6        Q.       Was this all in the Woodbury

7   location?

8        A.       Yes.

9        Q.       Is there a particular hierarchy

10   at Woodbury?

11        A.       In terms of?

12        Q.       In terms of who --

13        A.       Our VP is and so forth?

14        Q.       Yes.

15        A.       Yes.

16        Q.       Can you describe that just

17   generally for me?

18        A.       The names of the individuals or

19   just the title?

20        Q.       The name and the title.

21        A.       The regional VP is Seth Ingall.

22   Then the AVP, assistant vice president, is

23   John Pham.  From a Liability standpoint, I

24   can only speak that we have our Claims

25   director, and he is Jeremy Connor.  Then I

1                    HARRIS-GRANT

2      have my direct supervisor, who is Rob

3      Leone.

4           Q.      This is in the Liability?

5           A.      This is in the Liability.  The

6      No-Fault Department has their own

7      director.  Then you have the president for

8      Underwriting.  So those are different

9      areas that I'm not very familiar with.

10          Q.      So your direct supervisor is

11     Rob Leone?

12          A.      Yes.

13          Q.      Has that changed in the two

14     years since you have been a TA2

15     supervisor?

16          A.      Yes.

17          Q.      How long has Rob been your

18     supervisor for?

19          A.      Maybe a year now.

20          Q.      And who was your supervisor

21     before that?

22          A.      Linda Wysocki.

23          Q.      So she was also your supervisor

24     for about a year?

25          A.      Yes.

12

1                    HARRIS-GRANT

2        Q.      Does the TCR Department that

3   you supervise have a name or is it

4   referred to as anything in particular?

5        A.      That's the name, TCR2, TA2.

6        Q.      But is there a department or --

7        A.      It is a TA2 Department.

8        Q.      How many other TA2 supervisors

9   are there?

10       A.      I think there is about 19 of

11  us.

12       Q.      Do they all supervise

13  approximately six examiners?

14       A.      Yeah, six or seven.

15       Q.      As far as your job duties and

16  responsibilities go, can you just describe

17  those for me briefly?

18       A.      I'm the supervisor for six

19  associates.  I'm responsible for helping

20  them to meet their goals and/or exceed it,

21  motivate them career-wise in whatever

22  direction it is that they want to go.  I

23  meet with them and I conference files with

24  them.

25               And I have my administrative

13

HARRIS-GRANT

1

2  stuff that I'm also responsible for. Do

3  you need me to break that down as well?

4      Q.    If you could, yes.

5      A.    I have reports I have to look

6  at on a weekly basis.

7      Q.    What kind of reports?

8      A.    Like feature reports, reports

9  in terms of I have to do SPRs, like file

10 audits for my associates as well.

11     Q.    What is an SPR?

12     A.    A self-performance review.

13     Q.    These are file audits you are

14 required to do for individuals you

15 supervise?

16     A.    Yes.

17     Q.    How many self-performance

18 reviews are you required to do?

19     A.    I do three. One is a cross,

20 meaning for someone else outside my group.

21 And two for each of my examiners.

22     Q.    Two for each, so twelve?

23     A.    Right.

24     Q.    How often are you required to

25 do this?

1                    HARRIS-GRANT

2        A.       Every month.

3        Q.       Do you have your performance

4    reviewed?

5        A.       Yes.

6        Q.       Is that done on a yearly basis?

7        A.       Yes.

8        Q.       Is it similar to the TA2s

9    performance reviews in that you have a

10   performance guide that you go by?

11       A.       Yes.

12       Q.       Who does your performance

13   review?

14       A.       My manager, my supervisor, Rob

15   Leone.

16       Q.       Is that done yearly?

17       A.       Yes.

18       Q.       So if the TA2s you supervise

19   meet their goals, is your review better?

20       A.       Yes, it is the same, uh-huh.

21       Q.       You said a TA1 is the same

22   thing as a TCR1?

23       A.       Right.

24       Q.       And you were a TCR1 supervisor

25   for about a year?

15

HARRIS-GRANT

1

2     A.     For about a year, a little over

3  a year.

4     Q.     What is your general

5  understanding of the duties of a TCR1?

6     A.     They pretty much have the same

7  duties as a TA2 except for the bodily

8  injury aspect of it, where they don't

9  negotiate the files with the attorneys,

10  but they investigate, you know, make

11  assessments and resolve liability, and

12  they also look like into exposures in

13  terms of injured parties to see if the

14  file should be moved up to the higher

15  level, which is TA2 or CU.

16     Q.     So their duties are essentially

17  the same, it is just the difference

18  between them is a TA1 does not handle

19  bodily injury claims?

20     A.     Yes.

21     Q.     And what dollar amount can a

22  TA1 handle claims up to?

23     A.     In terms of the property

24  damage?

25     Q.     Yes.

1                    HARRIS-GRANT

2         A.      I believe it is $5,000 as well,

3    the PD payout.

4         Q.      What does the PD payout mean?

5         A.      The property damage for both

6    first-party damage to our insured's

7    vehicle and to third-party vehicles.

8         Q.      And what dollar amount can a

9    TA2 handle claims up to?

10        A.      I believe it is the same.

11        Q.      $5,000?

12        A.      Yes.

13        Q.      Is that total?

14        A.      Yes.

15        Q.      So for bodily injuries they can

16   handle claims up to $5,000?

17        A.      No, not bodily.  Property

18   damage I was speaking about.

19        Q.      I'm sorry.  So when you are

20   saying TA2s also handle property damage

21   claims, they have a $5,000 maximum?

22        A.      Yes.

23        Q.      What about bodily injury claims

24   for TA2s?

25        A.      They have $10,000 for a single

17

1                    HARRIS-GRANT

2    person or 12.5 combined for the entire

3    file, if there is more than one person.

4        Q.      Are they allowed to handle

5    claims up to $25,000 total?

6        A.      Yes.

7        Q.      So when you are saying they

8    have a $10,000 injury max, what does that

9    mean?

10        A.      On their own they could settle

11    their file.

12        Q.      Settle their file without

13    authority?

14        A.      Yes.

15        Q.      Is this a new policy?

16        A.      No, it has always been that

17    way.

18        Q.      Has there been any change in

19    policy since March of this year with

20    regard to the TA2 and what kind of claims

21    they could handle?

22        A.      In what type of claims they

23    could handle?

24        Q.      Or their job responsibilities

25    and duties.

18

1           HARRIS-GRANT

2      A.     No, there hasn't been any

3  change.

4      Q.     So if a TA2 can handle bodily

5  injury claims up to $10,000, if there is

6  ever a case where they finish the

7  liability evaluation, they don't need to

8  come to you for approval first before they

9  could settle it?

10      A.     Let me try and understand that.

11  The $10,000 is for the bodily injury.

12  When you say "liability," in my mind, as a

13  liability person, I'm thinking percent

14  negligence.  So I'm not sure I understand

15  the question.  Could you repeat it for me.

16      Q.     You said that a TA2 could

17  handle a single bodily injury claim up to

18  $10,000 without approval?

19      A.     Right.

20      Q.     You said this has been the way

21  it has been across the board?

22      A.     Uh-huh.

23      Q.     So a TA2 is not required --

24  when is a TA2 required to seek approval

25  for authority of an amount to settle from

19

HARRIS-GRANT

1

2       you?

3           A.      Above their authority.

4           Q.      Does GEICO have a computer

5       claims system?

6           A.      Yes.

7           Q.      What is that called?

8           A.      Claim IQ.

9           Q.      Can you describe what that is,

10      please?

11          A.      It is a tool that we when we

12      are at the beginning of the claim when it

13      comes to our unit, the TA2 Unit, if they

14      have to take a recorded statement, it has

15      loss scenarios so they can choose what

16      they believe applies to the loss, it gives

17      them guidance in terms of questions.

18          Q.      When did the system come into

19      effect?

20          A.      I believe it was when I was

21      there as an examiner, maybe 2006.

22          Q.      And prior to Claims IQ, was

23      there any other kind of computer program?

24          A.      No, not a computer.  We did it

25      on paper.

20

1          HARRIS-GRANT

2     Q.     It was all done by paper?

3     A.     Uh-huh.

4     Q.     And were there particular forms

5  that the TA2 were required to complete?

6     A.     The paper form, which is a

7  summary.

8     Q.     So all of the work that used to

9  be done in the paper form can now be done

10 in Claims IQ?

11     A.     I don't know if I would say

12 all.  I mean like the liability question

13 in terms of the recorded statement, like

14 before it used to be the question would be

15 on a paper or you just knew it by heart.

16 You didn't have to look at the paper.

17     Q.     So before you might have a

18 piece of paper with a script of questions

19 on it?

20     A.     With a script of questions.

21     Q.     Now that script of questions is

22 contained in Claims IQ?

23     A.     Yes.

24     Q.     And what is the purpose of the

25 system itself?

1          HARRIS-GRANT

2     A.     It is basically a tool, like I

3  said, like a guide, to really show -- in

4  my opinion, it is like a reminder of the

5  critical thinking that they need to

6  utilize when they are investigating a

7  claim, like it has an area like, all

8  right, did you take a look at the police

9  report, there is a little area for that

10 that you can put that.

11          It gives a question guide.

12 They don't have to ask every question and

13 they don't normally ask every question.

14 But it is just used to remind them that

15 they could ask and it has areas that they

16 could put their notes.

17    Q.     Is that called the alog?

18    A.     No.  It has little boxes on

19 that screen.  The alog is a separate thing

20 that they could add notes.

21    Q.     What's the alog, then?

22    A.     It is for every transaction,

23 every conversation that you have with

24 someone, you document that in the claim

25 file.

22

1              HARRIS-GRANT

2      Q.      Is that separate from Claims

3  IQ?

4      A.      Whatever you write in Claim IQ

5  as a note, it rolls into the alog.

6      Q.      So you don't have to do it

7  again?

8      A.      You don't have to go back and

9  forth.

10     Q.      Are the examiners required to

11 put everything that they do in a file on

12 to Claims IQ?

13     A.      No, not everything onto Claim

14 IQ.

15     Q.      Are they supposed to document

16 the file?

17     A.      They are supposed to document

18 the file.

19     Q.      And do you have access to the

20 information contained in Claims IQ?

21     A.      Yes.

22     Q.      For each of the examiners that

23 you supervise?

24     A.      Yes.

25     Q.      So you can get onto Claims IQ

23

HARRIS-GRANT

1

2   and you can monitor their files?

3       A.      Yes, everyone can.

4       Q.      So it allows you to closely

5   monitor the work of the examiners that you

6   supervise?

7       A.      It is to have ready access in

8   case that person is out, someone else gets

9   a phone call, they can pick it up and go

10  in and see everything that is available

11  there.

12      Q.      How often do you go into, for

13  example, the alog to review the files that

14  your examiners are working on?

15      A.      If they come in to conference a

16  file with me, if I get a phone call from a

17  customer or a third party or someone, and

18  at three-month intervals, we call it time

19  reserve reviews.  So three months, six

20  months, 12 months and 18 months.

21      Q.      And those are file reviews?

22      A.      Yes.

23      Q.      Is that different than file

24  conferencing?

25      A.      Yeah.

24

1                    HARRIS-GRANT

2      Q.     So what occurs when you do a

3 file review?

4      A.     It is basically checking the

5 reserves, making sure the file is

6 progressing on track.  If it is off-track,

7 you give guidance to say let's get this

8 file back on diary.

9      Q.     So you are monitoring the

10 files?

11     A.     Yes.

12     Q.     Other than the three-month, the

13 six-month, the 12-month and the 18-month,

14 do you have informal file reviews?

15     A.     If they come in.  Like if they

16 need my opinion on liability, maybe it is

17 a complaint call, an upset customer, and

18 they want to discuss it with me before the

19 call comes in, they come in and we review

20 it together.

21     Q.     How often does that occur?

22     A.     In terms of complaints, not

23 very often.

24     Q.     Not just complaints.  How often

25 do the examiners that you supervise come

                    HARRIS-GRANT
1
2    in and talk to you?
3         A.      On a daily basis.
4         Q.      So they have questions on a
5    daily basis?
6         A.      Yes.
7         Q.      Are those conversations that
8    you have, are they recorded on the alog
9    system?
10        A.      Yeah, I will document my
11   conversation with them if that happened.
12        Q.      But are there occasions clearly
13   when an individual -- you have a
14   conversation with an examiner and it is
15   not then recorded in alog?
16        A.      No, not with me.
17        Q.      So if someone comes in and says
18   "Hey, I just got those meds in, I will get
19   them to you soon," you turn around and
20   document in alog?
21        A.      That doesn't take place.  To
22   say I got those -- most of their work is
23   done independently.  My examiners can just
24   walk in, they can say "You know what,
25   Marlene, I have this going on, can I run

26

1              HARRIS-GRANT

2    this by you, I asked a few people around

3    me and I'm not certain, can I run it by

4    you and see," on those occasions they will

5    see me, or if they specifically say "I

6    need to conference with you, are you

7    available at 2 o'clock today."

8        Q.    So on a daily basis you are

9    usually speaking with your supervisees,

10   either conferencing a file, reviewing a

11   file, auditing a file.  Are you in touch

12   with them on a daily basis?

13       A.    Yes.  I interact with them on a

14   daily basis to spot-check to see how their

15   day is going like in terms of their goals,

16   if they made a closure today, if they

17   resolved, because each settlement is like

18   a win for them, so they will say "Marlene,

19   do you know I resolved that case, it

20   finally got resolved," so on and so forth.

21            MS. McGOLDRICK:  Could you

22   please mark this as Exhibit 1.  It is

23   GEICO number 00130.

24            (Harris-Grant Exhibit 1 marked

25   for identification.)

27

1              HARRIS-GRANT
2       Q.      Would you agree with me this is
3   a snapshot of an alog, the top portion of
4   it, computer portion?
5       A.      Yes.
6       Q.      And then we have, at 12-11-08,
7   I think it says 7:22 p.m. -- it is hard to
8   read -- it says "C71 file three-month
9   review"?
10      A.      Yes.
11      Q.      Is that the three-month review
12  you talked about before?
13      A.      Yes.
14      Q.      That's called a C71?
15      A.      Yes.
16      Q.      That note is entered by you,
17  correct?
18      A.      Yes.
19      Q.      Does that mean that the file
20  was reviewed for three months and you are
21  putting your notes in the file?
22      A.      Yes, it came up for review.
23  The examiner wrote a review.  So it
24  escalated up.
25      Q.      When you review a file with an

28

1              HARRIS-GRANT

2    examiner, do they come into your office?

3         A.    No.

4         Q.    They put the information into

5    the computer and you review it on the

6    computer?

7         A.    Right.

8         Q.    So you don't have any

9    conversation with them about it?

10        A.    No.

11        Q.    So you put any information that

12   you want in response to the review into

13   the alog system?

14        A.    Right.  And it may get e-mailed

15   to them.

16        Q.    So then it says "Let's get

17   adverse info from attorney" --

18        A.    "Office."

19        Q.    -- "to contact for NF and subro

20   rep."

21             So you are asking Ms. Harper to

22   essentially get some additional

23   information on this file, correct?

24        A.    Yes.

25        Q.    Then we move up to 12-15-08 at

29

1                  HARRIS-GRANT

2    9:49, the entry at the top, and do you see

3    that that is entered by Candace Harper?

4         A.    Yes.

5         Q.    It says "RVM" -- is that

6    returned voice mail?

7         A.    Yes.

8         Q.    -- "to Ray at" --

9         A.    "at A/C adverse."

10        Q.    Do you know what that means?

11        A.    She wrote "Returned voice mail

12   to Ray at adverse carrier.  Advised him of

13   the policy limits."

14        Q.    Thank you.

15              At the bottom, there is a

16   handwritten note.  It is signed MHG.  Is

17   that you?

18        A.    Yes.

19        Q.    And it is dated 1-7-09?

20        A.    Correct.

21        Q.    It says "Candace, please read

22   your last alog entry upward to see what

23   transpired on your file whenever you're in

24   your file/claim.  See my C71 e-mail on

25   12-11-08.  See your 12-15 alog only

30

HARRIS-GRANT

1

2    leaving message disclosing our BI limit.

3    Your alog should've reflected you asked

4    for info I advised you to secure.

5    Thanks."

6              Is that what it says?

7       A.    Yes.

8       Q.    So is this more of an informal

9    review?

10      A.    This is a coaching.  It is like

11   a quick coaching to her.

12      Q.    So what is coaching?

13      A.    It is like the interaction that

14   you may have with something, you come

15   across something on a claim file that they

16   may have missed an opportunity to secure

17   information or something and you are just

18   pointing it out to them.

19              I could have written it on the

20   alog, but I chose to do it this way to her

21   to say "Next time you are in your file,

22   just take a look at what transpired in

23   your file from your last entry onwards."

24              Then right here where it is

25   saying the RVM, that can be used

31

HARRIS-GRANT

1

2    interchangeably, she could be saying

3    received voice mail or return voice mail

4    message to the person.

5         Q.      In order to perform your duties

6    coaching, you have to go into the alog to

7    check to see what your examiners are doing

8    so you can coach them?

9         A.      Right.  When you come across

10   things in a file, that happens, you coach

11   to it.

12        Q.      And in order to find it, if you

13   came across something in the file, you

14   have to review them on a regular basis,

15   right?

16        A.      When you say, like, review, I'm

17   not in every file every single day.

18        Q.      In this case you asked her to

19   do something on 12-15-08 and then you went

20   back into the file on 1-7-09 to see if she

21   did it, or were you just reviewing the

22   file for coaching?

23        A.      Let me review this.

24              On 12-11, I did the e-mail to

25   her.  On 12-15 -- this is signed 1-7-09.

1                   HARRIS-GRANT

2    I'm not sure why I was back in the file.

3        Q.    Were you monitoring the file to

4    make sure that Ms. Harper obtained the

5    information you advised her to get?

6        A.    I probably could have been

7    doing that.

8        Q.    Do all TA1s and TA2s use the

9    system in Woodbury?

10       A.    Yes.

11       Q.    Is that system, the Claims IQ

12   system, specific to Woodbury?

13       A.    No, it is company-wide.

14       Q.    So all GEICO regions use the

15   system?

16       A.    Yes, as far as I know.

17       Q.    So would you agree that

18   anything done on the file is supposed to

19   be documented in Claims IQ?

20       A.    Yes.  Not on Claims, on the

21   alog.

22       Q.    On the alog, I'm sorry.  And

23   would you agree that there is a lot of

24   file documentation that examiners are

25   supposed to do?

33

1               HARRIS-GRANT

2       A.      That everyone, right, is

3   supposed to do.

4       Q.      A lot of updating of claims

5   files in the system?

6       A.      Yes.

7       Q.      How are examiners trained to

8   use Claims IQ?

9       A.      How are they trained?

10      Q.      How are they trained.

11      A.      There is a training class.  I'm

12  trying to remember when it rolled out.  It

13  has been around for so long.  I think I

14  was trained.  One minute.  I'm trying to

15  think.

16      Q.      That's okay.  Take your time.

17      A.      I must have been trained at my

18  desk on the floor when it came out.

19      Q.      Did anybody have to go to a

20  sort of school to get trained in Claims

21  IQ?

22      A.      I know I didn't, no.

23      Q.      And you were there in 2006 when

24  it rolled out like everybody else, right?

25      A.      Yes.

34

HARRIS-GRANT

1

2       Q.      What was your position then?

3       A.      TA2 examiner.

4       Q.      So there was no centralized

5  training for all regions?

6       A.      I don't know if there was

7  centralized training, but I know I didn't

8  go anywhere to get trained for Claim IQ.

9       Q.      Is there continued training

10  over the years?

11      A.      There is always training.

12  That's the one thing that we are known

13  for.  We are always training.

14      Q.      What kind of training?

15      A.      In terms of the file handling,

16  negotiations, we have seminars that a firm

17  may come in and show you like trends of

18  what they are seeing, what the courts are

19  seeing.

20      Q.      I'm talking about in terms of

21  Claims IQ.

22      A.      In terms of Claims IQ, no.

23      Q.      So when you do your coaching,

24  would you coach them on how to be better

25  at Claims IQ?

35

HARRIS-GRANT

1

2      A.      How to update the system, yes.

3      Q.      Do you continue to get training

4  in Claims IQ as well?

5      A.      I personally?

6      Q.      Yes.

7      A.      No.

8      Q.      So when you are coaching them,

9  it is based on your prior training in 2006

10 when the systems rolled out?

11     A.      Right.

12     Q.      But that's one of your jobs, is

13 to make sure that the TA2s that you

14 supervise get better at working the Claims

15 IQ system?

16     A.      Right.  You know what, one

17 minute.  I take that back.  From time to

18 time you do get system enhancements.  And

19 it rolls out to everyone.

20     Q.      Those are just system updates?

21     A.      Yes, system updates in terms of

22 the Claim IQ system, and everyone gets

23 that.  It is nothing where you have to go

24 anywhere.  Like they will have tools that

25 they might add to it and stuff like that,

36

1                    HARRIS-GRANT

2    reference.

3         Q.      And they provide guidelines on

4    how to use that?

5         A.      Yes.

6         Q.      Is that sent via e-mail?

7         A.      It is via e-mail.

8         Q.      It is usually via e-mail?

9         A.      Uh-huh.

10         Q.      Are there any written

11   guidelines provided to TA1s and TA2s to

12   guide in the claims handling process?

13         A.      The claims handling process,

14   yeah.  We have the Claims Manual.  It is

15   also electronic as well for easy

16   reference.

17         Q.      When was the first time you

18   were provided with a copy of the Claims

19   Manual?

20         A.      I think years ago.  Probably

21   when I just started.

22         Q.      So is the Claims Handling

23   Manual provided to TA1s or TA2s when they

24   begin their job at GEICO or at some other

25   particular time?

1          HARRIS-GRANT

2     A.     It is when they begin their job

3     and it is readily available in the system.

4     I think it is one of the things along the

5     side there that says "Claims Manual."

6     Q.     So when someone first started

7     their job at GEICO, whatever their

8     position is, they will get a copy of the

9     Claims Manual?

10     A.     If they are in Claims.

11     Q.     As part of their initial

12     training, is it fair to say that they

13     receive a lot of training material when

14     they first begin?

15     A.     I'm trying to remember.  Even

16     if I get a new person, I don't follow up

17     to see what type of material they receive.

18     In the training, I know when I started, I

19     did get a Claims Manual, and I may have

20     gotten like other reference paperwork and

21     so forth.

22     Q.     Was there any centralized

23     training schools for TA1s or TA2s?

24     A.     If there is one now?

25     Q.     Well, is there one now?

1               HARRIS-GRANT

2      A.      Yes.

3      Q.      When did that come into effect?

4      A.      I don't know.

5      Q.      Did you go to a centralized

6   school when you first began?

7      A.      No.

8      Q.      As far as the Claims Handling

9   Manual, are the TA1s and TA2s required to

10  read this manual?

11     A.      Yes, we went through it because

12  there are aspects of claims handling that

13  we need to go through it.

14     Q.      Who went through it?

15     A.      Everyone that is in Claims.  If

16  it is given to you, it is not just a

17  manual for you to have.  You refer to it

18  throughout your training process and you

19  can always reference back to it as well.

20     Q.      When they are first given the

21  manual, are they required to read it in

22  its entirety?

23     A.      I'm not sure if it is in its

24  entirety that they would read it all.  I'm

25  not sure.  I would have to speak for

39

                    HARRIS-GRANT

1

2   myself, because I don't remember.

3        Q.     So they are given a copy of it.

4   You don't know whether or not they have to

5   read it, but they have access to it?

6        A.     I know they go through it.  But

7   I don't know if they read it like

8   literally page by page.  I couldn't speak

9   to that.

10       Q.     How do you know they go through

11  it?

12       A.     Because when I was trained, we

13  had to go through it.  Like the trainer

14  went through it with you.

15       Q.     So when you are beginning your

16  job and you are being trained, you go

17  through it with the trainer?

18       A.     Yes.

19       Q.     Are you required to read it,

20  continue to read it on a yearly basis, for

21  example?

22       A.     No, I don't read it on a yearly

23  basis, so I wouldn't think so.

24       Q.     So you may have gotten it at

25  the beginning of your training, you may

1                    HARRIS-GRANT

2      have gone through it then, and then you

3      have access to it, but are the TA2s and

4      TA1s required to keep updated with it?

5          A.      No.

6          Q.      So you don't know whether or

7      not they actually have read -- for

8      example, in Candace Harper's case, do you

9      know whether or not she read the manual in

10     its entirety?

11         A.      I wouldn't know.

12         Q.      Do you know whether or not she

13     referred to the manual on a daily basis?

14         A.      No.

15         Q.      Do you know whether or not she

16     referred to the manual on a regular basis?

17         A.      No.

18         Q.      Do you know whether or not your

19     TA2s referred to the manual on a regular

20     basis?

21         A.      No, I don't know that.

22         Q.      And there is no written policy

23     anywhere that they have to sign off that

24     they read this manual?

25         A.      We signed a bunch of paper I

41

HARRIS-GRANT

1

2      know when we started and we were given the

3      manual and a couple of stuff.  But I don't

4      know if it is specific to say that you

5      have signed that you have read the Claims

6      Manual.

7           Q.     So you don't know?

8           A.     I don't know.

9           Q.     Would you agree that the manual

10     itself provides very specific guidelines

11     and details regarding the claims handling?

12          A.     Yes.

13          Q.     You talked about file audits

14     briefly.  You said that there is --

15     actually, why don't you tell me again,

16     what kind of audits are done on files?

17          A.     It is called the SPR,

18     self-performance review.  And basically it

19     is our internal audit per examiner to make

20     sure that we are in compliance with New

21     York State regs and statutes, meaning have

22     we mailed out the required letters within

23     the time frame that we are supposed to

24     mail them out, did we resolve liability in

25     a timely manner, did we make a fair

1                    HARRIS-GRANT

2      settlement.  If you had all the

3      information, did you arrive at the

4      decision in a timely manner.

5                    You want to look to see was the

6      claim handled fairly and expeditiously.

7      Also was it resolved within our policy

8      limits as well.  Sometimes you can have an

9      error where someone is looking to have

10     paid above the policy.  You look to see

11     were payments made, if they were made,

12     were they accurate as well.

13         Q.     Who is doing the

14     self-performance, the individual

15     examiners?

16         A.     The supervisor.  And you have

17     it to where you will do it side by side

18     with the examiner or they may do it

19     independently.  It is at a supervisor's

20     choice.

21         Q.     So a supervisor must perform

22     the audit, though?

23         A.     Yes.

24         Q.     I'm sorry, how many of these

25     are you performing in a month?

43

HARRIS-GRANT

1

2      A.      I'm doing three per person.

3      Q.      Three per week was it?

4      A.      No, for the month.  I have the

5   month to do it all.

6              MS. McGOLDRICK:  Can you mark

7   this as Exhibit 2.  It is GEICO 00147.

8              (Harris-Grant Exhibit 2 marked

9   for identification.)

10     Q.      This document is the TA2

11  Examiner Goals; is that correct?

12     A.      Yes.

13     Q.      So this is examiner goals for

14  2008?

15     A.      Yes.

16     Q.      This document I gather is the

17  goals given to the examiner for the

18  following year.  So the examiner gets this

19  paperwork and goes over it with the

20  supervisor to know in advance what they

21  have to do for the following year?

22     A.      I'm just questioning the date

23  on this.  It is dated 5-1-07.

24     Q.      So would that mean that she was

25  given these goals well in advance of the

44

1              HARRIS-GRANT

2     2008 year?

3         A.      That's very unusual for that to

4     happen.  You usually get the goal within

5     the year that the goal comes out.

6         Q.      Would you get it when you were

7     having your performance review done or

8     could it be at any time during the prior

9     year?

10        A.      It is normally within the year

11    of the new goal.  So the 2010 goal, you

12    get the goal in 2010.  I don't know if she

13    made a mistake with the date or something.

14        Q.      So it may have been given to

15    her on 5-1-08 as opposed to 5-1-07?

16        A.      Well, that would be very late,

17    too.  I'm not sure.

18        Q.      But it is the TA2 Examiner

19    Goals for 2008, right?

20        A.      Yes.

21        Q.      And then at the top we have the

22    goals, number 1, 2, 3, 4, 5, and then a

23    weight given for each of the goals?

24        A.      Yes.

25        Q.      The third one down is a CPR

1                          HARRIS-GRANT

2       audit.  Can you tell me what a CPR audit

3       is?

4            A.      Claims performance review.

5            Q.      And what is that?

6            A.      Claims Home Office.

7            Q.      So it is done by Claims Home

8       Office?

9            A.      Yes.

10           Q.      And what occurs when there is a

11      claims performance review?

12           A.      It is the same type of audit

13      that I do.

14           Q.      And how often are these done?

15           A.      Maybe once a year, if it takes

16      place.

17           Q.      And why do you say if it takes

18      place?

19           A.      Because maybe they don't come

20      in, you know, maybe they didn't happen to

21      come in to do an audit, but it is if they

22      come.

23           Q.      And if they commonly do an

24      audit, how many files -- are they auditing

25      the files for the entire unit?

HARRIS-GRANT

1

2      A.      It is randomly chosen.  They

3  don't go by unit.

4      Q.      So they could do just the TA1s?

5      A.      If they come in, they are doing

6  everyone.  But, I mean, like they don't

7  look and say for Marlene's unit, I'm doing

8  one per her examiners.  It may be just a

9  whole number of files that they take and

10  it is dispersed wherever it falls out.

11      Q.      So if in 2008 there was a CPR

12  audit in this case, then it would be --

13  the weight would be 10 percent?

14      A.      Yes.

15      Q.      Then we have, is that first

16  quarter audit?

17      A.      Yes.

18      Q.      Then we have second quarter

19  audit and third quarter audit?

20      A.      Yes.

21      Q.      What are those?

22      A.      It is for the quarters in the

23  year if they did one, in the first

24  quarter, second, or the third.

25      Q.      And who does those?

1                    HARRIS-GRANT

2        A.        This was -- at Woodbury, we had

3    an audit team that did that.  They were

4    called the PRT, performance review team.

5        Q.        And who is made up of the PRT,

6    performance review team?

7        A.        It was supervisors, people that

8    had applied to that position and were

9    selected.

10       Q.        What occurred during these?

11       A.        They would randomly choose

12   files and do the same type of audit that I

13   would do.

14       Q.        And then the supervisor of the

15   SPR audit that you referred to, you

16   discussed that.  What's a CIQ audit?

17       A.        That's a Claim IQ.

18       Q.        And what happens during a

19   Claims IQ audit?

20       A.        You would look to see were

21   there any recorded statements taken, and

22   if it was, was it summarized.  You would

23   look to see if there was a police report

24   taken, was it updated in there as well.

25       Q.        And when you say you would

48

HARRIS-GRANT

1          HARRIS-GRANT

2     look, who does the CIQ?

3          A.     Whoever does the audit, the

4     supervisor.

5          Q.     So do you do CIQ audits?

6          A.     In that year when I started,

7     yes.

8          Q.     And has it changed since then?

9          A.     This is no more Claim IQ audit.

10    For '09 there wasn't any.

11         Q.     For '09 there wasn't any?

12         A.     No.

13         Q.     And do you know why?

14         A.     No.

15         Q.     So between the CPR audit, the

16    first quarter audit, second quarter audit,

17    third quarter audit, supervisor audit, CIQ

18    audit, and then here it says voice mail

19    audit, what does that mean?

20         A.     We would audit to improve our

21    customer service and to ensure outstanding

22    customer service, we audit to make sure

23    all calls received in that business day

24    was returned within that business day.

25         Q.     And who is "we"?

49

HARRIS-GRANT

1

2    A.      The supervisor.

3            And we had an independent audit

4    that would do that.  I'm looking at the 5

5    percent for the Claim IQ, and that may

6    have been the reason why, with the 5

7    percent weight on it, it was like

8    rudimentary.  It wasn't necessary.

9    Q.      That may be why you believe

10   there is no longer a Claims IQ audit?

11   A.      Yeah, because it is not

12   significant.

13   Q.      Are there still voice mail

14   audits?

15   A.      No.

16   Q.      That may be because it was the

17   5 percent?

18   A.      Yeah, that stopped, too, in

19   '08, because we did great on that.

20   Q.      And when you would audit the

21   voice mails, was it actually a voice mail

22   you were listening to or were you

23   listening in on a conversation that one of

24   your examiners was having?

25   A.      A voice mail.  You would

50

HARRIS-GRANT

1

2      randomly say I choose to listen to her, I

3      would just listen to the message and write

4      the time and date it came in.  I would

5      check like the next day on the alog to see

6      if it was documented that the customer's

7      call was returned.

8          Q.    So all of these audits, the

9      examiner's claims files are being

10     monitored closely, correct?

11         A.    No.  For a voice mail audit,

12     you just go in under the date that the

13     message came in and you would just look

14     the next day to see was that call returned

15     or not.  But it is not being closely

16     monitored.

17         Q.    How often did you do voice mail

18     audits?

19         A.    Not very often.

20         Q.    Once a week?

21         A.    Maybe once a week, and I

22     wouldn't even say per person.  If I had

23     six people, whatever, for the month, like

24     I would focus on one person for that week,

25     I would just write down and spot-check.

                          HARRIS-GRANT

1

2      You could tell, too, if you got an issue,

3      if you got complaint calls, that was an

4      indicator.

5          Q.      If you got complaint calls,

6      what would happen?

7          A.      You would have a coaching

8      session with the examiner to see what

9      happened, why wasn't this customer's call

10     returned, they keep saying they are

11     leaving messages.  And sometimes you find

12     out that they believe we have caller ID

13     and they would not leave like an actual

14     message, thinking that the person could

15     call back and see their number.

16         Q.      So there are seven audits here.

17     You've got seven audits.  You have file

18     reviews, third month, sixth month, 12

19     months and 18 months, and then you have

20     formal and informal reviews and file

21     conferences, right?

22         A.      Where is that?

23         Q.      I'm talking just in total.

24         A.      In total, in terms of audits?

25         Q.      In terms of audits, so there

52

1                    HARRIS-GRANT
2     are seven audits listed here.
3          A.      You are counting like one --
4          Q.      There are seven different types
5     of audits?
6          A.      Yes, I'm sorry.
7          Q.      So there are seven different
8     types of audits?
9          A.      Yes.
10         Q.      Then you have a three-month
11    file review?
12         A.      Uh-huh.
13         Q.      A six-month file review that is
14    done?
15         A.      Uh-huh.
16         Q.      A 12-month file review?
17         A.      Uh-huh.
18         Q.      18-month file review?
19         A.      Uh-huh.
20         Q.      You have informal meetings with
21    your examiners?
22         A.      Uh-huh.
23         Q.      And you do file conferences?
24         A.      Uh-huh.
25         Q.      And you review alog?

53

HARRIS-GRANT

1

2     A.     Throughout all of that you are
3 doing that.
4     Q.     So you don't -- you wouldn't
5 agree that that is closely monitoring your
6 examiners?
7     A.     No, because the thing is, it is
8 not all those different files.  I could be
9 doing a three-month review or a six-month
10 review and doing one of these audits on
11 it.  So it is that one file.
12          Like I wouldn't go look for
13 multiple different files, I just don't
14 have the time to do that.  If the person
15 came in and conferenced a medical file
16 with me for settlement authority, I would
17 choose that file to do the SPR with them
18 side by side to do the audit on it.
19     Q.     You might do some of the audits
20 on files that are being conferenced?
21     A.     Right.  You were just pointing
22 this out and saying closely monitored.  I
23 can go a week without conferencing or
24 meeting with an associate within that
25 week.

54

1          HARRIS-GRANT

2          Most of the conferences that I

3  have with my examiners, it is

4  self-generated, meaning they come to me

5  and they want to discuss something, or if

6  it rolls up on these monthly audits that

7  we all have to do to make sure that our

8  reserves are adequate and that the file is

9  on track, whether it should be closed,

10  opened, or not.

11      Q.      So you are saying essentially

12  you may not have some of these specific

13  file reviews, like a three-month review on

14  a weekly basis, but most of the time it is

15  on a daily basis that people are coming in

16  to you to speak about different things?

17      A.      If they choose to.  I could

18  have an examiner that I don't see for a

19  week.  They may come in just to socialize

20  and speak about non-claims-work stuff.

21          So it is not every day that I

22  see them work-related.  I could go a whole

23  week without seeing an examiner to discuss

24  any work-related stuff.

25      Q.      But would you be in the system

55

1                    HARRIS-GRANT

2    on the alog checking on what they were

3    doing on certain files?

4        A.     If that file was up on a

5    three-month review, six-month, 12-month,

6    or 18-month, I have to be in the file as

7    part of my function and they have to do

8    the same as well.

9        Q.     There are occasions that you do

10   that as well, though, correct?

11       A.     That I do what?

12       Q.     When you go into the file and

13   review it when it is not a formal file

14   review time period.

15       A.     If something generates for me

16   to be in it or I gave an instruction to

17   move the file to resolution, I would

18   follow up on it to see.

19             And it all depended on the type

20   of examiner that you have.  You have some

21   people that you could just tell to do

22   something and you know that it would get

23   done.  And you have examiners where you

24   have to follow to make sure that it gets

25   carried out.  Because part of the auditing

56

HARRIS-GRANT

1

2     as well as if instruction was given on the

3     file to move the file to resolution, to do

4     something and it wasn't done, then that

5     could be a downgrade on the file audit.

6          Q.     Downgrade on the file audit

7     means what?

8          A.     A non-satisfactory audit for

9     both the examiner and myself.

10         Q.     So you get downgraded as well?

11         A.     It is counted against me,

12    because their goals are pretty much my

13    goals.

14         Q.     So it is important for you to

15    make sure your examiners reach their goals

16    because your performance is reflected in

17    that?

18         A.     Yes, as well as meeting our

19    business needs, because it is a big part

20    of the goal I have for customer service.

21         Q.     When there is a file review

22    done, what is an examiner required to do?

23         A.     When there is a SPR audit done?

24         Q.     Say a C71 a three-month file

25    review.

1                    HARRIS-GRANT

2       A.      They are given the summary on

3    that sheet of paper as to whether there is

4    no coverage issues, our coverage is all in

5    place.

6       Q.      What sheet of paper?  I'm

7    sorry.

8       A.      I'm sorry, I was referencing to

9    this (indicating).

10      Q.      You are talking about 130?

11      A.      Yes.

12              So like part of it where the

13   examiner on 12-7-08 at 9:36 a.m. wrote up

14   a summary, that's basically what I'm

15   reviewing.  They are commenting on

16   coverage, whether there was any problems

17   with it, what are our limits.

18      Q.      They have to give you a

19   summary?

20      A.      Yes, they are writing their

21   summary.

22      Q.      They are only required to write

23   it in Claims IQ and then it gets rolled

24   into alog?

25      A.      No, this is being done on alog.

58

1          HARRIS-GRANT

2      Q.      So a three-month review is done

3  on alog?

4      A.      At this time I believe this was

5  being done in DocMagic.

6      Q.      What is DocMagic?

7      A.      It is a separate system that we

8  had.

9      Q.      What is it used for?

10     A.      It is our letter-writing

11  system.

12     Q.      When did you first meet Candace

13  Harper?

14     A.      4-28-08.

15     Q.      How do you know that?

16     A.      That's the day I started as a

17  TA2 supervisor.

18     Q.      So you did not know Candace

19  prior to that time?

20     A.      Yeah, in GEICO, as an examiner,

21  but I don't remember like the exact date.

22  But in terms of supervising her, that's

23  when I started.

24     Q.      You started supervising her on

25  4-28-08?

1                    HARRIS-GRANT

2          A.        Uh-huh.

3          Q.        I believe you said that part of

4     a TA2's job is to investigate a claim,

5     correct?

6          A.        Uh-huh.

7          Q.        Does that include interviewing

8     witnesses?

9          A.        Yes.

10         Q.        Does that include interviewing

11    insureds?

12         A.        Yes.

13         Q.        And claimants as well?

14         A.        Yes.

15         Q.        Do they ever go to the place of

16    the accident?

17         A.        No.

18         Q.        So their jobs are done all by

19    telephone?

20         A.        Right.

21         Q.        Do they ever visit witnesses in

22    person?

23         A.        No.

24         Q.        Do witnesses ever come into

25    GEICO to speak to them in person?

60

1                    HARRIS-GRANT

2      A.       No.  Our insureds may choose

3   to, but very rarely.

4      Q.       When TA2s are interviewing

5   witnesses, how do they know what to ask?

6      A.       It is the question guide they

7   would follow that was once in the paper,

8   but now is in the system.

9      Q.       So there is a specific guide

10  within the system that provides questions

11  for them to ask the individuals they are

12  interviewing?

13     A.       Right.

14     Q.       Do they receive training on

15  that?

16     A.       Yeah.  Part of the entry level

17  into liability period, like you started

18  that from CSR, how to take a statement

19  from the witness or our insured or a

20  claimant.

21     Q.       Are the TA2s or the examiners

22  required to interview the witnesses

23  themselves?

24     A.       Yes.  It is part of the job

25  function.

61

1                   HARRIS-GRANT

2        Q.      But are they required to do it

3    in every instance?

4        A.      As they see the need to do it.

5        Q.      What is a night call

6    submission?

7        A.      Oh, we had a night crew that if

8    they couldn't get a customer during the

9    day, they could refer it to the night

10   crew.

11       Q.      Because it is fair to say a lot

12   of people aren't home during the day to

13   speak to, correct?

14       A.      Uh-huh.

15       Q.      Who is the night crew?

16       A.      TA2 examiners.

17       Q.      So they are made up -- the

18   night crew is made up completely of TA2

19   examiners?

20       A.      Yes.

21       Q.      Do these people volunteer or is

22   that their job to work that shift?

23       A.      That's their job that they

24   chose to work that.

25       Q.      What's a liability floor

62

HARRIS-GRANT

1

2   assignment?

3       A.      A field rep.  FLR we call it,

4   field liability rep.

5       Q.      And what is that?

6       A.      That's the person that has a

7   job function where they are out in the

8   field getting statements.

9       Q.      And why would you need a

10   liability floor rep?

11       A.      Field.

12       Q.      Field rep, I'm sorry.

13       A.      Because, like you said before,

14   not every person you can get via the phone

15   even if it is nighttime.  So you may need

16   to send someone out to the home address to

17   get them to try to secure the statement.

18   And it is the examiners that assign them

19   to the file.

20       Q.      Do you know who Joan Rowland

21   is?

22       A.      She is a field rep.

23       Q.      When these persons go out,

24   individuals go out and they take the

25   statement, are they required to give you a

63

1                   HARRIS-GRANT

2    written report?

3         A.    Not a written.  Oh, they do a

4    summary, a closing summary.

5              MS. McGOLDRICK:  Can you mark

6    this as Exhibit 3.

7              (Harris-Grant Exhibit 3 marked

8    for identification.)

9         Q.    Would you agree with me that

10   this is an alog?

11        A.    Yes.

12        Q.    And it looks like it is for a

13   claim 1013?  If you look at the numbers at

14   the top, there is a long number that ends

15   in 0103.

16        A.    Yes, that ends in 1013, yes.

17        Q.    At the bottom, it is Bates

18   stamped with the number 1013, and then it

19   is 0001 through 0041.  Do you see that on

20   the very bottom right-hand side?

21        A.    Okay, yes.

22        Q.    That's how it is marked.

23              So this is an alog?

24        A.    Uh-huh.

25        Q.    I would like you to refer to

64

HARRIS-GRANT

1

2      23, please.  We have, at the entry at

3      7-17-08, 6:39 p.m., and this note was

4      entered by Joan Rowland?

5           A.     Yes.

6           Q.     So that was the liability field

7      rep you referred to before?

8           A.     Yes.

9           Q.     Is this her report of securing

10     a recorded interview with the witness?

11          A.     Yes, she summarized it.

12          Q.     And then at the end, she says

13     "The witness is well-spoken and makes a

14     good witness"; is that correct?

15          A.     Yes.

16          Q.     In this case she made the

17     determination that the witness was

18     well-spoken and made a good witness?

19          A.     Right, she gave her assessment,

20     her opinion of how the witness came

21     across.

22          Q.     So Candace wasn't required to

23     get that interview herself, if she

24     couldn't reach someone, she could refer it

25     out?

65

1          HARRIS-GRANT

2      A.     Yes, that's what it was.  She

3  couldn't reach someone.  This is a

4  department or someone that she could use

5  to help her secure that.  Like Joan made

6  the assessment in terms of how well the

7  person came across.  She would have done

8  the same if she secured this.

9      Q.     Are TA2s required to order

10 medical records?

11     A.     Yes, it is part of their job

12 function.  If the attorney says to them

13 that "I'm giving you the authorizations, I

14 want you to get it," then yes.

15     Q.     But do they often or sometimes

16 come in through the attorney's office

17 directly?

18     A.     Yes.

19     Q.     And when an examiner gets

20 medical records in, what are they required

21 to do with those?

22     A.     They evaluate it.  They break

23 it down, basically in a chronological

24 order from day one of treatment onwards.

25     Q.     So they are summarizing the

1                        HARRIS-GRANT

2     doctor's conclusions?

3          A.        Right.   They are reviewing it.

4          Q.        Are they required to count the

5     number of treatments received?

6          A.        Yes.

7          Q.        So do any of the examiners ever

8     speak with the doctors directly?

9          A.        No.

10         Q.        If they need clarification on

11    medical records, are they allowed to

12    contact the doctors directly?

13         A.        Yes, they can.

14         Q.        How often does that occur?

15         A.        Not very often.

16         Q.        If they need clarification, are

17    they required to go to a supervisor first

18    to get approval to contact the doctor?

19         A.        No, not at all.

20         Q.        But would you agree with me

21    that the examiners are not evaluating

22    causation?

23         A.        They are evaluating causation.

24         Q.        They are evaluating the cause

25    between the injury and the accident?

67

1                      HARRIS-GRANT

2          A.       Yes.

3          Q.       I'm talking about the medical

4     records in particular.

5          A.       Yes.

6          Q.       When they take a medical record

7     and summarize the conclusion of the doctor

8     and they put that summary into the alog or

9     the system, you say that's evaluating

10    causation?

11         A.       They have to evaluate

12    causation.  They look from day one when is

13    the first date -- was there an emergency

14    room visit, was there any delay with the

15    treatment.  You get the entire medicals.

16              And the doctor may sign a

17    signature to something, but in New York

18    State we are so huge where fraud is

19    concerned, and you would think with a

20    doctor putting their name there that

21    everything is A-OK, but you have to read

22    the medical to see did the person mention

23    that they had a chronic history of it.

24              Sometimes the doctors are

25    saying that "This is a long-standing

68

HARRIS-GRANT

1

2    history of my client, I have treated them

3    before." So causation is a big part.

4    They are evaluating that.

5        Q.    Let me put it this way: If the

6    doctor says that the accident caused the

7    injury, then the doctor evaluated the

8    causation, not the examiner?

9        A.    The doctor rendered their

10   opinion on whether it did, but at the end

11   of the day, though, the examiner has a say

12   as to whether they believe that that is

13   truly the case or not.

14       Q.    And would that be more in

15   alerting or trying to recognize fraud?

16       A.    Part of it could be that, but a

17   big part of it is whether we owe it to pay

18   for this injury, whether we owe it to

19   pierce the threshold to put money on the

20   file to resolve it. You can deny a claim

21   to say based on our investigation, we

22   don't believe that the injuries are

23   causally related to the accident.

24       Q.    How often does that usually

25   occur?

69

HARRIS-GRANT

1

2     A.     I couldn't give a number.  But

3    I have seen denials on it where we have

4    denied for causality.

5     Q.     Even if the doctor said there

6    was causation?

7     A.     Yes.

8     Q.     In those cases, would there

9    normally be an IME involved?

10     A.     Well, from the no-fault aspect,

11    that's done.  But from the BI part of it,

12    no, we don't do any independent.  It is

13    only if the file is in litigation at the

14    Continuing Unit, then you get the

15    opportunity for that.  But at the TA2

16    Unit, no.

17     Q.     You said TA2s are responsible

18    for determining coverage?

19     A.     They do coverage investigation.

20     Q.     Would you agree that the vast

21    majority of claims -- in the vast majority

22    of claims, determining whether or not

23    there is coverage is easily done by

24    reviewing the computer data?

25     A.     Yes.

HARRIS-GRANT

1

2      Q.      So that there are very few

3  instances where coverage issues come up

4  that have to be dealt with?

5      A.      Dealt with in what sense?  What

6  do you mean?

7      Q.      Other than outside of the

8  computer system.

9      A.      They look at the system, and

10  based on the information that either the

11  insured or the third party provides to

12  them, they look to see whether there is

13  any permissive use issue, they look at the

14  date of loss.  So our claim is like claim

15  files, like via the telephone.

16      Q.      But most of the data that they

17  need is right in the system?

18      A.      It is right there in front of

19  them.

20      Q.      They can look and make a

21  determination based on that?

22      A.      Yes.

23      Q.      So they don't need to go

24  outside and do -- what kind of possible

25  other investigations would they look to

71

1                    HARRIS-GRANT

2    do?

3         A.      They may look to assign SIU to

4    the file.  You will find it in cases where

5    like the policy lapsed and then the person

6    pays and there is a new policy effective

7    date, but there was no police report filed

8    for the accident.

9         Q.      So they are trying to recognize

10   certain flags?

11        A.      Right.

12        Q.      When that happens, then they

13   are responsible to refer to SIU, did you

14   say?

15        A.      If they determine it needs SIU,

16   they can put SIU on the file.

17        Q.      If they don't determine it

18   needs SIU, but there is a potential

19   coverage issue, are they required to come

20   to you to alert their supervisor?

21        A.      They can resolve it on their

22   own.  If it is something that is outside

23   of, say, their authority level, then they

24   would come in and conference it to say

25   "You know what, I think there is something

1              HARRIS-GRANT

2    here, I can't resolve it on my own, we may

3    need the RLA on it or Claims Home Office."

4         Q.     What is outside their policy

5    authority?

6         A.     If we are disclaiming coverage,

7    say, for nonpermissive use of the

8    vehicle --

9         Q.     What is nonpermissive use?

10        A.     Meaning our insured is saying

11   like "Eric didn't have permission to use

12   my vehicle," and they have conducted their

13   investigation, and either they believe or

14   don't believe the insured, they are going

15   to make a recommendation as to whether we

16   should disclaim or handle the claim on its

17   merit.

18        Q.     So they make a recommendation.

19   Who do they make a recommendation to?

20        A.     They first see me and then they

21   see the RLA and then they speak to Home

22   Office.

23        Q.     What is an RLA?

24        A.     Regional liability

25   administrator.

73

1                    HARRIS-GRANT

2        Q.      So they can't make the

3    decisions themselves, they can make a

4    recommendation, but who makes the ultimate

5    decision?

6        A.      In terms of disclaiming

7    coverage, that goes through Home Office.

8    Home Office really has the say on that.

9    Because that's huge to tell someone you

10   are not afforded coverage.  But in terms

11   of the late notices, they can do that.  In

12   terms of whether there is an implied

13   permissive use, meaning it is a resident

14   relative, they have used the vehicle

15   before, they can waive that on their own

16   and handle that.

17              In terms of whether late notice

18   exists or not, if you have an insured

19   saying "I was never in an accident, so why

20   am I going to be reporting a claim to

21   you," they can make that determination on

22   their own to say there is no late notice

23   issue, even though the date of loss and

24   the report date is, you know --

25       Q.      Because those are easy

HARRIS-GRANT

1

2    determinations to make?

3        A.        Right.

4        Q.        You just mentioned that

5    recognizing fraud is something that the

6    examiners are trained to do?

7        A.        Uh-huh.

8        Q.        Are the examiners required to

9    review a file to determine if there is a

10   fraudulent claim?

11       A.        Every claim that you get, you

12   look to see if there is any fraud

13   indicated.

14       Q.        Did the TA2s and the TA1s, do

15   they have a certain requirement to refer

16   over a certain amount of claims to SIU?

17       A.        No.

18       Q.        Did there used to be a

19   requirement to do that?

20       A.        I believe at one point in the

21   goals there was SIU referral goals.

22       Q.        When they referred -- those

23   goals we are talking about, SIU referral

24   goals, were those contained, for example,

25   in the TA2 goals for a particular year?

75

HARRIS-GRANT

1

2    A.      They may have been.  Anything

3    that was in a goal would have been in this

4    type of format.

5    Q.      And were the goals weighted?

6    A.      Yes.

7    Q.      If they were supposed to refer

8    over a certain amount of claims per year

9    or per month, were those goals met by

10   meeting just the referral or were the

11   claims evaluated?

12   A.      I think just by making the

13   referrals.

14   Q.      So the quality of the fraud

15   referral wasn't reflected in meeting the

16   goal?

17   A.      Not that I know of.  But I

18   believe it may have been coached.

19   Q.      Coached?

20   A.      Like you don't want to see

21   someone referring 50 claims to SIU, but

22   only two got accepted.

23   Q.      How does a TA2 know what to

24   look for?

25   A.      That is in your claims training

76

1                      HARRIS-GRANT

2    when you start.

3         Q.      Is there a list or guide to

4    refer to for certain fraud flags?

5         A.      No.

6         Q.      Is there anything contained in

7    the system, a list or a guide?

8         A.      When they do the referral,

9    there are certain things that they can

10   check off to show that "This is why I

11   think the claim needs to come over, this

12   is why I'm referring the claim to SIU."

13              MR. HEMMENDINGER:  Can we go

14   off the record for a second?

15              MS. McGOLDRICK:  Sure.

16              (Luncheon recess:  12:56 p.m.)

17

18

19

20

21

22

23

24

25

77

1              HARRIS-GRANT

2        A F T E R N O O N   S E S S I O N

3              1:35 p.m.

4    M A R L E N E   H A R R I S - G R A N T,

5    resumed.

6    CONTINUED EXAMINATION

7    BY MS. McGOLDRICK:

8        Q.    You had mentioned when you were

9    talking about some of the responsibilities

10   you have each month, you mentioned a

11   features report.  Can you tell me what

12   that is?

13       A.    It is just a workload report

14   that shows the number of features closed

15   or completed for the month per examiner.

16       Q.    And when you say "features

17   closed," what does that mean?

18       A.    That they actually closed the

19   feature.

20       Q.    What is a feature?

21       A.    It is a symbol that represents

22   a type of claim being made.  So, say, if

23   it is a bodily injury claim for a third

24   party, it would be an RBI feature.  If it

25   is for a first party UM claim, it would be

HARRIS-GRANT

1

2    a UBI.

3        Q.      Are there other features, too,

4    like --

5        A.      Collision, property damage,

6    yes.

7        Q.      You are tracking how many

8    features on a monthly basis your examiners

9    close?

10       A.      Right.

11       Q.      Is there a specific requirement

12   that they meet each month?

13       A.      Depending on the goal for that

14   year or for the month.

15       Q.      Again, that reflects in your

16   performance review if they can meet those

17   goals?

18       A.      Yes.

19       Q.      You mentioned piercing the

20   threshold?

21       A.      It is meeting the New York

22   State verbal threshold, whether the claim

23   meets it or doesn't meet it.

24       Q.      Do TA2s have the authority to

25   approve the piercing of the threshold?

79

1                    HARRIS-GRANT

2       A.      Yes.

3       Q.      They do not need supervisory

4    authority to do so?

5       A.      No.

6       Q.      Is that something new or has

7    that been there all along?

8       A.      It has always been.

9       Q.      No TA2 needs to come to you to

10   approve the piercing of the threshold or

11   the non-piercing of the threshold?

12      A.      When they are going through the

13   orientation phase of the job, yes, they

14   would see a supervisor.

15              (Harris-Grant Exhibit 4 marked

16   for identification.)

17      Q.      This is marked claim number

18   1103, page number 162, it is entitled a

19   claim evaluation short form; is that

20   correct?

21      A.      Yes.

22      Q.      Can you tell me what a claim

23   evaluation short form is?

24      A.      It is a summary of the

25   examiner's medical evaluation of the

                    HARRIS-GRANT

1

2    claim.

3        Q.      It says "negotiation action

4    plan" down in the bottom box, the last

5    box?

6        A.      Yes.

7        Q.      What is a negotiation action

8    plan?

9        A.      That contains the summary that

10   they have written up.

11       Q.      Would an examiner complete a

12   claim evaluation short form when they are

13   ready to negotiate settlement of the

14   claim?

15       A.      Yes.

16       Q.      Would it be done anytime prior?

17       A.      Yes, as the medicals come in.

18   So say the attorney is sending it in,

19   pieces at a time, they would just keep

20   updating it as it comes in.

21       Q.      And is this a separate form

22   that's not on the Claim IQ system?

23       A.      It is within the Claim IQ and

24   they just click a button to print out what

25   they inputted.

1                    HARRIS-GRANT

2       Q.      Now, if you look at page 2, at

3    the bottom of the negotiation action plan

4    where it ends, it says "recommend to

5    pierce the threshold based on limitation

6    more than 90 days from the date of loss";

7    is that correct?

8       A.      Yes.

9       Q.      And Ms. Harper is the primary

10   adjuster on this claim, right, at the top

11   on page 1?

12      A.      Yes.

13      Q.      So would that mean she authored

14   that?

15      A.      Yes.

16      Q.      And then we move down and there

17   is a section that says Offers and Demand.

18   Do you see that?

19      A.      Yes.

20      Q.      Now, is that your handwriting?

21      A.      The offer and demand would be

22   the examiner's, it would be hers.

23      Q.      Where it is signed?

24      A.      Right where it is signed?  I'm

25   sorry, you are talking about --

1              HARRIS-GRANT

2      Q.      Where it says Offers and

3 Demands, the very bottom box.

4      A.      Yes.

5      Q.      So that's your signature?

6      A.      Yes.

7      Q.      Does it say "pierce threshold

8 based on positive ortho IME"?

9      A.      Yes.

10     Q.      What's the remainder of this?

11     A.      "For cervical spine, lumbar

12 spine, thoracic spine on 8-5-08 with

13 treatment up to 10-27-08."

14     Q.      So you were authorizing --

15 approving her recommendation that the

16 threshold be pierced?

17     A.      Yes.

18     Q.      You just told me that TA2s do

19 not need authorization to pierce the

20 threshold?

21     A.      Right.

22     Q.      Then why are you approving the

23 threshold being pierced here?

24     A.      Because it was a file

25 conferenced with me with her

1                    HARRIS-GRANT

2    recommendation.  They can pierce prior to

3    coming in to see me.  There is a section

4    within the Claim IQ where the examiner

5    selects pierce, non-pierce, or it could be

6    a compromise, meaning a business decision

7    where it is a borderline pierce.

8        Q.    They can enter that into the

9    system as pierced?

10       A.    They can enter that into the

11   system, and if they choose to, they can

12   settle it within their authority.  If the

13   examiner wants to come to me to conference

14   a file for settlement and negotiation,

15   they can do that as well.

16       Q.    Why would they come to you if

17   they have the authority to do it without

18   coming to you?

19       A.    Because it is a choice.

20       Q.    But if they are able to do it

21   on their own, what would be the reasons

22   that you find that they come to you to

23   conference the file?

24       A.    A lot of times it is either if

25   they just wanted my stamp of approval on

84

1          HARRIS-GRANT

2     it, a second eye on it, like a second

3     opinion.

4               Sometimes we would end up

5     round-tabling it, maybe speaking to

6     another supervisor or upper-level

7     supervisor or even my manager to say we

8     are not sure, what do you think even in

9     terms of the dollar value, we would

10    discuss that or the causality behind it.

11              If it is a file where, say,

12    liability was being argued and there is

13    some type of disagreement, we would also

14    speak to other people to see how do we

15    think we would fare in this venue.

16    Q.     So when they have questions on

17    the file, they come to you?

18    A.     Yes.

19    Q.     In this instance, she was

20    seeking your approval for the piercing of

21    the threshold?

22    A.     Yes.

23    Q.     And she simply wrote at the top

24    "I recommend to pierce the threshold based

25    on limitation of more than 90 days,"

85

HARRIS-GRANT

1

2      right?

3          A.      Yes.

4          Q.      Then you said, in the bottom,

5      "pierce the threshold based on positive

6      ortho IME."

7                  So that meant that you were

8      required to go in and read the medical

9      information to form your own opinion as to

10     whether or not to pierce?

11         A.      I read her summary that she

12     had, and within the summary it said there

13     was a positive IME.

14         Q.      It didn't say that in her

15     recommendation, did it?

16         A.      No, it just said based on 90

17     days.

18         Q.      So you had to go back and read

19     the information yourself to form your own

20     opinion as to whether or not her

21     recommendation was correct?

22         A.      It is based on what she

23     presented to me.  It is a face to face

24     conference and we are reviewing --

25     basically how it happens is we sit pretty

86

1        HARRIS-GRANT

2    close in proximity to each other.

3            I say "What do we have?"  The

4    person would say "You know what, it is a

5    threshold value.  I'm working with this

6    firm.  They are either difficult, not

7    difficult.  I have already started

8    discussing it.  They are in the high

9    double-digits.  This is what I'm looking

10   at."  The person would walk me through the

11   meds.  But I'm not taking the medical

12   specialist and reading it, I'm reading the

13   summary that is written here.

14           So she said she is piercing it

15   based on the limitations more than 90

16   days.  I picked out of this and said

17   "Well, a stronger argument is a positive

18   IME."  It is an independent medical

19   examination.  It is not that she is

20   incorrect, but we have to take that into

21   account as well.

22   Q.     But you didn't agree with --

23   you thought there was more reasons to

24   recommend piercing the threshold than she

25   had laid out to you?

1                      HARRIS-GRANT
2      A.      Not necessarily.  It is not a
3  disagreement, to be honest with you.  It
4  is just my basis based on me looking at it
5  and what she presented.
6              I said "Okay, if this was
7  something that went to the court, the
8  positive IME would have a heavier weight
9  than just the treatment."
10     Q.      You pointed that out and you
11 gave your approval based on that?
12     A.      Yes.
13     Q.      Now, in this claims evaluation
14 short form, you said that this is on the
15 computer?
16     A.      Yes.
17     Q.      And it could just be printed
18 out?
19     A.      Yes.
20     Q.      In every instance that you are
21 looking at a claims evaluation short form,
22 are you sitting with the examiner?
23     A.      If they are conferencing the
24 file with me.
25     Q.      But on other occasions you can

88

HARRIS-GRANT

1
2  be looking at it and you are not sitting

3  with them?

4      A.      Right.

5              (Harris-Grant Exhibit 5 marked

6  for identification.)

7      Q.      Would you agree with me this is

8  essentially a snapshot of the Claims IQ

9  screen?

10     A.      Yes.

11     Q.      It is marked claim 1103 pages,

12  42 through 70.  Do you see that?

13     A.      Yes.

14     Q.      So if we go to page 56, please,

15  in the middle, it says "determine tort

16  threshold factors."

17              Now, are these the screens that

18  you were talking about earlier?

19     A.      This is one of the screens.

20     Q.      So are these the statutory

21  factors that determine whether or not the

22  threshold is pierced?

23     A.      Yes.

24     Q.      So the examiner is required to

25  go to a pull-down memo and yes or no to

89

HARRIS-GRANT

1

2    each one of these questions, correct?

3         A.    Yes.

4         Q.    Here it is no to all except

5    impairment for 90 of the first 180 days?

6         A.    Yes.

7         Q.    Then if we go to the next page,

8    we see "evaluate threshold decision," and

9    it says "pierced."

10               Is this what you were talking

11   about when Candace made the decision to

12   pierce it in the system?

13        A.    Yes.

14        Q.    Then there is a

15   computer-generated portion that says "see

16   supervisor."  Why would it say "see

17   supervisor" if your approval is not

18   required?

19        A.    I'm not sure.  There is a lot

20   of things within the system that we are

21   not held to or that we don't even look at,

22   to be honest with you.

23        Q.    But where it says "see

24   supervisor" and Candace had it in her

25   file, she would have to go to see you?

HARRIS-GRANT

1

2    A.    No, she didn't have to.

3    Because even just a look at where it says

4    "general pain and suffering" and where it

5    says, like under "Recommend," and it says

6    the $8,850, I was just trying to point out

7    to say not everything that is within the

8    system do we adhere to and go through and

9    say that this is mandatory.

10    Q.    I'm sorry, go back to that.

11    A.    You were saying where it says

12    "recommend see supervisor," and you asked

13    me doesn't that mean that, and I said no.

14    You know, you somewhat seemed to have

15    scoffed at it.

16        I'm trying to explain to you

17    that not everything within here means that

18    it is mandatory and that you are adhering

19    to it.  I was just giving you as an

20    example that, for instance, the dollar

21    amount, it is there, but we don't even

22    look at it.  It is not even paid attention

23    to in terms of the value there that the

24    system generated.

25    Q.    So the whole point in having

91

HARRIS-GRANT

1

2      this system is to guide you as a tool,

3      correct?

4          A.      Right.

5          Q.      If they are giving you a value

6      or a range, you don't look at it or take

7      it into account?

8          A.      No.  Because basically the

9      system is there just as a guidance.  You

10     are using your claims judgment, your

11     claims experience and what it is that you

12     know outside of the system.

13         Q.      This is a pretty sophisticated

14     system, isn't it?

15         A.      I don't have anything to

16     compare it to to say whether it is or

17     isn't.

18         Q.      Prior to the system coming into

19     effect and everything was in paper form,

20     now all of this is done on the computer?

21         A.      Right.

22         Q.      Isn't that a pretty

23     sophisticated system to be able to

24     generate outputs and generate ranges?

25         A.      It is much better than having

HARRIS-GRANT

1

2      to rely on a paper form where you could

3      lose the paper or someone's handwriting

4      isn't clear enough that you wrote when you

5      have something that anyone can go into as

6      a reference.

7                  (Harris-Grant Exhibit 6 marked

8      for identification.)

9          Q.      This is another claim

10     evaluation short form.  It is also for

11     claim 1013.  It starts on page 110 through

12     111.

13                  Again, the primary adjuster is

14     Candace Harper and the claimant is Alyssa

15     on the first page?

16         A.      Yes.

17         Q.      If we go to the second page, at

18     the top, it says "no threshold."  Do you

19     know whether or not Candace entered that

20     information?

21         A.      She is the primary adjuster on

22     the top of the short form.  Then you would

23     have to look at the footprint to see.  But

24     I would take that most likely it is her.

25         Q.      You say when you have to look

93

HARRIS-GRANT

1
2     at the footprint, that would be the

3     snapshot?

4         A.     Yes.

5         Q.     So it says "no threshold," but

6     it doesn't provide any reason for the

7     recommendation?

8         A.     Uh-huh.

9         Q.     Would you agree with me?

10        A.     Yes.

11        Q.     And then we go back down to

12    Supervisor Manager/RLA Authority.  What is

13    the Supervisor Manager/RLA Authority

14    required for?

15        A.     It should be the same, it is

16    the same thing as in that box area.  I'm

17    not sure, because a manager isn't signing

18    off on these or an RLA.  So this would be

19    one of those things that I'm saying again

20    is in the system and it is not necessarily

21    used.

22        Q.     But the one that I just showed

23    you and this one were used in this

24    instance, correct?

25        A.     The Supervisor Manager/RLA

94

HARRIS-GRANT

1

2      Authority, in the other one it looks like

3      I signed it in the offer/demand, and in

4      this one I'm signing in the manager/RLA.

5      More than likely I just signed there

6      because it was the first box available.

7          Q.      You are giving your authority

8      in both instances?

9          A.      Right, based on the

10     recommendation.

11         Q.      So here it says "Okay to deny

12     for no" -- is that "treatment"?

13         A.      "No T seen in meds."

14         Q.      Is that "treatment"?

15         A.      "No threshold seen in meds."

16         Q.      And it is signed by you on

17     2-25-09?

18         A.      Yes.

19         Q.      Again, Candace doesn't give a

20     reason for the no threshold

21     recommendation, so you would have to

22     evaluate the information she provided in

23     making the decision whether or not the

24     threshold had been pierced?

25         A.      I disagree with that.  We are

95

HARRIS-GRANT

1

2      conferencing, having a face to face

3      conference, and the examiner is walking me

4      through the medicals and why it is the

5      person made the recommendation to say that

6      it is a no threshold or not.

7          Q.      Why did you feel it was

8      necessary to put the reason for the no

9      threshold denial?

10         A.      It is not really a reason.  I'm

11     just saying based on the medical specials

12     presented, that there is no threshold

13     limit.

14         Q.      In this case, the claim was

15     being denied, correct?

16         A.      Yes.

17         Q.      What occurs when a claim is

18     denied?

19         A.      Well, the examiner just goes

20     back and mails out the letter.  Normally

21     they had the conversation already with the

22     attorney and heard or listened to the

23     attorney's counterargument as to whether

24     there is more meds, why they disagree, if

25     they disagree, or whether or not they

1                    HARRIS-GRANT

2    agree.

3              It could be they are just going

4    in to mail out a denial letter and could

5    be probably closing the file.

6        Q.    When you are conferencing the

7    file on that claim evaluation, you go

8    through all the arguments that the

9    attorney made with the examiner in order

10   to determine whether or not the

11   recommendation to not meet the threshold

12   was correct?

13       A.    I go by what the examiner has

14   presented to me and what the examiner said

15   the attorney reported.  Oftentimes it

16   could have been a verbal, I just got off

17   the phone with them, I'm going to document

18   it when I get back.  Or I spoke to them

19   last week, this is what they are saying.

20   They disagree, or, you know, they agree

21   with me or they are asking for nuisance

22   value, stuff like that.

23       Q.    So you said that if there is a

24   denial for no threshold, then a denial

25   letter is sent?

97

1                      HARRIS-GRANT

2        A.      Yes.

3        Q.      Is that a standard form letter?

4        A.      Yes.

5        Q.      Is it somewhere in the system?

6        A.      Yes.

7        Q.      So Candace didn't draft the

8    letter herself?

9        A.      She is the one pulling it up

10   and entering the information that she

11   needs to enter, but the language part of

12   it that breaks down in No. 5 where the

13   reasons were for not meeting it, like

14   that's outlined, like within the body of

15   the letter, instead of an examiner having

16   to retype that verbatim, it is

17   automatically there.

18       Q.      You mean a statutory?

19       A.      Yes, a statutory.

20       Q.      Is it a form letter otherwise,

21   she adds the name?

22       A.      She adds the name, the client's

23   name, and you could edit the letter, too,

24   to point out other specific stuff.

25               (Harris-Grant Exhibit 7 marked

HARRIS-GRANT

1

2      for identification.)

3          Q.      Would this be considered one of

4      the form denial letters?

5          A.      Yes.

6          Q.      This is signed by Candace

7      Harper?

8          A.      Yes.

9          Q.      Is this something that you pull

10     up -- did you say it was

11     in the DocMagic system?

12         A.      Yes.

13         Q.      It basically says "To Whom It

14     May Concern:  We have reviewed the medical

15     records for the injuries sustained by your

16     client in the above-mentioned accident.

17     We do not feel that the injuries meet the

18     definition of 'serious injury' as defined

19     by the insurance law."  And then it

20     describes the insurance law.

21         A.      Right.

22         Q.      So that is pretty much a form

23     letter and there is nothing significant as

24     to the claim?

25         A.      But it can be edited.

99

1                    HARRIS-GRANT

2        Q.      But in this case it was not?

3        A.      No.

4        Q.      I believe you also said one of

5    the duties of an examiner is to determine

6    liability?

7        A.      Yes.

8        Q.      Does a TCR2 and TCR1 use Claims

9    IQ in making this determination?

10       A.      They make their own

11   determination, because they have to fill

12   out the subjective area and render their

13   own decision and negotiate the file on

14   their own, but in terms of what I said

15   before, the question guide in terms of the

16   recorded statement that they are entering

17   the police report, they will enter.

18       Q.      Did Candace have the authority

19   to determine the liability percentage

20   without using Claims IQ?

21       A.      Yes.

22       Q.      So she wouldn't have to enter

23   any of that information in Claims IQ, she

24   could just come up with a number on her

25   own?

1          HARRIS-GRANT

2      A.      Yes, she could do that if she

3  wants to, but the system is there to use

4  as a tool and as a guide to do that.  But

5  there is so many things that is not within

6  the system, like scene photos.  If you

7  take a look at the scene photos, there is

8  no area to enter that to say whether it

9  was a two-lane road or not.  Those are

10  things that is not within the system.  How

11  someone comes across to you, whether they

12  are a credible witness, not credible, do

13  they testify on their own or not.

14          There is so many things not

15  within there.  It just houses the question

16  guide and like a police report, and then

17  they render how the person came across in

18  terms of the duties that were owed.

19      Q.      So if Candace got a new file

20  that came in, she could just go through

21  the information, not enter any information

22  in Claims IQ and decide to negotiate up to

23  her authority?

24      A.      She can do that, yes.

25      Q.      So the file does not have to be

1          HARRIS-GRANT

2    tracked through Claims IQ at all?

3         A.    It is there for them to utilize

4    and to use.  But she can do it if she

5    chooses not to use it, but that's not how

6    they were trained.  They are trained to

7    say you should house the information so

8    that anyone picking up that file can see

9    how you arrived at your decision, did you

10   take a recorded statement from all of the

11   parties that you needed to, did you secure

12   the police report, if it was necessary to

13   do so.  And then whatever else was added

14   within the system.

15        Q.    That's also a way that you have

16   to review and audit and monitor the file,

17   if the information is not in Claims IQ,

18   you can't do that?

19        A.    In terms of how you are saying

20   like review, audit and monitor, we do the

21   SPR audit to make sure we are within the

22   guidelines and they are doing what they

23   are supposed to do according to the claims

24   manual to investigate the claim, resolve

25   it quickly, and in a fair manner.

1          HARRIS-GRANT

2                You know, that's what the alog

3     is about, them documenting what they did

4     and the steps and how they arrived at

5     their decision and the Claim IQ is there

6     as a tool.

7          Q.     But you are saying that they

8     don't have to use it?

9          A.     If someone bypasses it and says

10    "This is what I'm doing," but they justify

11    on the alog what they did, then that's a

12    different story.  They can do that.

13         Q.     So if they do it without going

14    through Claims IQ, they have to justify it

15    somewhere else?

16         A.     They would document the file to

17    say "I didn't use it because," whatever.

18         Q.     And how often does that

19    normally happen?

20         A.     It can happen.  If they

21    probably documented the system was down.

22    I normally see it like if the system was

23    down or someone just chooses to not use

24    it.  It does happen.

25         Q.     Let's go back to the claims

103

                    HARRIS-GRANT

1

2    snapshot, which is Exhibit 5, please.  Can

3    you turn to page 49.

4              If they are going to use Claims

5    IQ to assess the liability, would they

6    start here at the Liability Assessment

7    screen?

8        A.    Yes.

9        Q.    So we see at the top it says

10   Liability Assessment, then Determine

11   Scenario, so it must have been a

12   pedestrian, correct?

13       A.    Yes.

14       Q.    Would Candace have entered that

15   information?

16       A.    Yes.

17       Q.    And then we have Review Parties

18   for the Negligence Evaluation and they

19   list the parties and their role and their

20   description, right?

21       A.    Yes.

22       Q.    Then the next section is

23   Determine Duty Breaches and Proximate

24   Cause.

25              Now, we have a list of what

HARRIS-GRANT

1

2     appears to be rules of the road; is that

3     what it is?

4          A.     Yes.

5          Q.     Then we have a section that is

6     entitled Breach and Proximate Cause.  And

7     we have five boxes.  I'm assuming that is

8     no breach; yes, breach, but no proximate

9     cause; yes, breach, low proximate cause;

10    yes, breach, medium proximate cause; yes,

11    breach, high proximate cause.  Is that

12    what that is?

13         A.     Yes.

14         Q.     Now, who makes the

15    determination as to the breaches and the

16    proximate cause?

17         A.     The examiner.

18         Q.     Are there breach determinations

19    ever made when conferencing the file?

20         A.     Maybe if the person is going

21    through orientation and they are not used

22    to, like, say, this is a good example of a

23    pedestrian case and you sit with your

24    supervisor and you are like "Listen, this

25    is what my investigation yielded" and they

105

1                    HARRIS-GRANT

2   want to walk through it with you, then

3   yes, they may choose it.  But the vast

4   majority don't.  As the supervisor, you

5   are seeing this well after the fact.

6        Q.     So you don't often sit with the

7   examiners to discuss the breaches?

8        A.     No.

9        Q.     If you do sit with the

10  examiners to discuss the breaches, do you

11  ever change the breaches in the system as

12  you go along?

13       A.     Me personally, I may click

14  something, yeah.

15       Q.     And change the breach?

16       A.     Yes, based on my conference

17  with them.

18       Q.     And would you do that yourself

19  or instruct them to do it?

20       A.     They would either do it

21  themselves or it is something we reviewed

22  and agreed to and we would do it as we go.

23            But it is not me picking it up

24  and overriding it.  It is usually at their

25  request we are conferencing the liability,

106

HARRIS-GRANT

1

2      and it may be the attorney disagreeing and

3      they are giving me what the attorney is

4      arguing, and I may say "I agree with that,

5      did you take this into account or that

6      into account."  But that is very rare when

7      that happens.

8          Q.      Let's go to page 51.  It says

9      Liability Decision, Evaluate Liability.

10     And you see under "Kim," the percentage is

11     computer-generated to 33 to 53 percent; is

12     that right?

13         A.      Yes.

14         Q.      And then in the next Evaluate

15     box, it says 50 percent.  Who determines

16     what number goes in there?

17         A.      The examiner.

18         Q.      And how does the TCR2 know what

19     number to enter?

20         A.      Based on their claims

21     experience and their decision to do that.

22         Q.      Can they randomly pick a number

23     between that range and enter it in there?

24         A.      Yeah, or even outside of it if

25     they choose to.

107

HARRIS-GRANT

1

2      Q.      So they can pick a number

3  outside of the range as well?

4      A.      Yes.

5      Q.      And if she picks a number, is

6  she required to justify or document her

7  choice?

8      A.      She would just document it.  So

9  that the thing is with our claims file,

10 any one person who might be out on

11 vacation, out sick, on FML, anyone should

12 be able to pick up the file and understand

13 what transpired and what went on.

14          The examiner as part of the

15 claims handling would document liability

16 based on XYZ.

17     Q.      So it is important to complete

18 the Claims IQ form?

19     A.      Yes.

20     Q.      And how many open files do

21 TCR2s normally have on a daily basis?

22     A.      I could do it by probably a

23 year.  I would say over 150 or so of

24 actual files.

25     Q.      So they have a lot of cases

HARRIS-GRANT

1
2  pending at one time, right?
3      A.      Yeah, I would say so.
4      Q.      So they have a busy caseload?
5      A.      Yes.
6      Q.      Would it be possible that more
7  often than not they just pick a number
8  because they can pick that number and they
9  are not evaluating that claim?
10     A.      Can someone do that?  Yes.  But
11 is that supposed to happen?  Absolutely
12 not.  That would go against every training
13 that anyone in the insurance industry is
14 given.
15     Q.      If they are provided a guide,
16 though, a range, 33 to 53 percent, and
17 they are busy and they pick a number in
18 between, then they may not feel as if they
19 are doing anything wrong?
20     A.      That would be on the
21 individual.  Then, again, they have
22 someone that they have to go negotiate it
23 with, be it an adverse carrier, an
24 attorney, or our insureds, that you have
25 to explain to our customer why did you

HARRIS-GRANT

1

2      come up with that liability assessment.

3      They are doing that on their own.

4              I don't think anyone would just

5      randomly pick a number and throw it in

6      there, because they have to give an

7      account to the insured or whoever they are

8      going to negotiate the file with.

9          Q.     If they randomly pick a number

10     between the range given, then they can use

11     that as reasoning for why the percentage

12     is what it is?

13         A.     What they would use, that the

14     range gave that to them?  That wouldn't

15     justify.  They would be doing it based on

16     their breaches and how they assessed it.

17     That's what they would be using to

18     negotiate it with our customer or third

19     parties.

20         Q.     So they entered breaches, and

21     the breaches that they entered, the

22     computer generated an amount.  So if they

23     pick an amount within that range, how is

24     that unfair claims handling, if they don't

25     have to justify the actual number that

HARRIS-GRANT

1

2    they picked?

3        A.      They have to justify the actual

4    number that they picked.

5        Q.      Where do they justify that?

6        A.      Where they chose the breaches

7    and what degree each interested party

8    breached it to.

9        Q.      You just told me once they

10   entered the breaches and the computer

11   generates the amount, there is a range in

12   this of 20 percent.  You told me they

13   could enter a number lower or higher, it

14   is their choice.

15           Well, if the value that is

16   arrived at through their breaches, how can

17   they explain that the liability assessment

18   that came out was between a certain range,

19   but they are picking something else?

20       A.      Because the Claim IQ doesn't

21   contain everything, all aspects of their

22   investigation.  They are assessing

23   credibility.  There is no area in here

24   that says this person was credible or not

25   credible.  They are using that.  They are

HARRIS-GRANT

1
2    using scene photos, if they got that or

3    not, and it is good to have it.  So they

4    would be using that as well in their

5    judgment and assessment.

6            The bottom line is no one is

7    trained, it would be just unfair and not

8    good claims handling to just choose a

9    random number.  You are doing your

10   breaches, as an examiner that is your

11   evaluation to say this duty was owed, it

12   was breached by this person, to what

13   degree or not degree, or no degree at all.

14       Q.     But you have no way of knowing

15   whether or not the number that they

16   actually picked was random?

17       A.     I couldn't say, based on their

18   summary that they are giving to me, and,

19   you know, they have to negotiate the

20   files.

21       Q.     Can we go back to Exhibit 3,

22   please.  At some point before authority is

23   given on a file to settle a claim up to a

24   certain amount, will you review the

25   liability percentage determination?

112

                        HARRIS-GRANT

1

2          A.     I would look at the three-month

3     review to see was liability already

4     resolved or not, and if it wasn't, what

5     was the hold-up for it and what was

6     evaluated, whether it was fair or not.

7          Q.     If we go to page 3, please.  On

8     2-21 at 9:17 p.m. there is a negotiation

9     strategy snapshot entered.  Do you see

10    that?

11         A.     Yes.

12         Q.     If you go to the next page, was

13    that entered by Candace Harper?

14         A.     Yes.

15         Q.     And in this negotiation

16    strategy, it says "liability, 33 percent"?

17         A.     Yes.

18         Q.     Do you see that?

19         A.     Yes.

20         Q.     Then we move up to 2-25-09 at

21    2:13 p.m.  Is that a note entered by you?

22         A.     Yes.

23         Q.     So it says -- and this is for

24    Jamie, pedestrian Jamie again -- it says

25    "Briefly discussed claim for this

113

1                    HARRIS-GRANT

2      interested party or injured party"?

3           A.     Yes.

4           Q.     "Examiner will revisit

5      liability with scene photos."

6                  So upon review you disagreed

7      with the liability determination of 33

8      percent, right?

9           A.     Upon review with her, I

10     realized that her liability investigation

11     was incomplete because she did not review

12     scene photos to make her liability

13     determination or to assist with it.

14          Q.     So you disagreed with her

15     liability determination?

16          A.     It is not necessarily that I

17     disagreed with it.  It is the fact that

18     upon reviewing the file with her,

19     especially in a pedestrian case when you

20     are conferencing a file with an examiner,

21     your first thing is going to be is there

22     any coverage issue, okay, liability, is

23     the attorney going to be surprised by the

24     liability or not, was that already

25     discussed with the attorney, this is a

114

HARRIS-GRANT

1              HARRIS-GRANT

2     pedestrian case, did we speak to our

3     insured, how did they come across, what

4     venue are we in and what was used in your

5     liability determination.

6              And if I'm looking and seeing

7     that this was a pedestrian case and no

8     scene photos, I would say "You need to

9     take another look at it, look at the scene

10    photos to make sure your liability that

11    you have is solidified."

12         Q.     But you found that there was

13    something --

14         A.     Missing.

15         Q.     Missing?

16         A.     Yes.

17         Q.     So then we have -- it appears

18    if you go up to Saturday, 3-7, an entry

19    from Candace Harper at 9:46 a.m.

20              So she was basically getting

21    the photos that you asked.  She did review

22    Google Maps, and which photos "showed

23    there was a defined crosswalk for peds, as

24    policyholder stated in her recorded

25    interview."

1           HARRIS-GRANT

2                Is that something that Candace

3      had missed, the policyholder had told her

4      that there was no crosswalk?

5           A.    She is saying that there is a

6      defined crosswalk for the pedestrian, as

7      policyholder stated in her ROI.

8      Pedestrians were not in the crosswalk.

9           Q.    So based on that, she was going

10     to redo her breaches, which means what?

11          A.    She is retaking another look at

12     everything and she has decided that she is

13     going to change it or not change it.  Did

14     she say whether she changed it here?

15          Q.    She doesn't say.  I don't

16     believe so.

17                So then would that be fair, if

18     we go back to Exhibit 5, page 51, now,

19     would this be the redo of those breaches,

20     the result after?

21          A.    We would have to look at the

22     footprint to see whether or not the

23     breaches were redone.  I don't know if the

24     breaches were redone.  She may have just

25     typed over what she had in there.  I may

116

HARRIS-GRANT

1
2    not even know whether she had 50 from
3    before or not.
4             Because sometimes, given my
5    history with this person, you may see 1
6    percent on a file and you look someplace
7    else and there is something else and you
8    are like "Which is your liability, is it
9    50 or is it X number?"  So I'm not sure.
10        Q.    Why don't we go to page 43 of
11   Exhibit 5.  Is this what you were talking
12   about?
13        A.    Yes.
14        Q.    So I think if we look down at
15   the bottom on 3-7-2009, it says "decision
16   Jamie, 33 percent deleted"?
17        A.    Yes.
18        Q.    Does that mean she deleted the
19   33 percent liability and changed it?
20        A.    Yes.
21        Q.    So the Exhibit 4, the claims
22   evaluation short form we were looking at,
23   is essentially -- I'm sorry, not Exhibit
24   4.
25             Go back to Exhibit 5, back to

1                    HARRIS-GRANT

2       page 51, so when we have that 50 percent

3       determination, so is that essentially the

4       redo of the breaches?

5            A.    Yes.

6            Q.    So once she redid the breaches,

7       a new range came out, between 33 and 53?

8                  MR. HEMMENDINGER:  I'm sorry,

9       that's a different person, the 50 percent.

10           Q.    If we go back to the front,

11      3-7-2009 she also deletes the 33 percent

12      for Alyssa?

13           A.    Yes.

14           Q.    So if prior to that all three

15      of them were 33 percent liable, this is a

16      redo of her breaches that reflects now a

17      different percentage, correct?

18           A.    Yes.

19           Q.    And then she had resubmitted

20      that for conference to you, if you look at

21      alog on 3-7-09?

22           A.    Yes.

23           Q.    Why would she need to resubmit

24      it for conference if she is not required

25      to do so?

HARRIS-GRANT

1

2      A.      It looks like we started to

3  conference 03, Jamie, and then she took

4  another look at the liability.  From this

5  she changed it and then she is coming back

6  in to review the claim.

7      Q.      Why would she need to come back

8  in to review?

9      A.      I'm not sure.  Because I'm not

10  documenting for her to come back to see

11  me.

12      Q.      And then on Wednesday, 3-25 at

13  9 a.m., Supervisor Note, it is at the top

14  of the page, "Conferenced file and gave

15  settlement authority as noted in the file

16  based on liability reassessed and meds on

17  file."

18      A.      Yes.

19      Q.      So you can't give settlement

20  authority until liability assessed is

21  approved?

22      A.      Well, the liability, you do all

23  cases at 100 percent, in terms of the

24  value, then liability is assessed to it.

25  So the liability, you would had to have

119

HARRIS-GRANT

1

2      resolved that and made sure at some point,

3      you know, that you are comfortable with it

4      and then your percent is applied to

5      whatever value.

6          Q.      Because that number is

7      important going forward to get a value of

8      the claim, right?

9          A.      Not a value of the claim.  To

10     make sure that whatever settlement that

11     you are going to make with the attorney,

12     that you are on board, your liability is

13     solid, that you properly investigated and

14     looked at all aspects of the claim.

15              So when we look at every claim

16     in terms of value, it is always looked at

17     at 100 percent.  Then the examiner applies

18     the percent net to it and that rolls down.

19     But all claims, just to add a little bit,

20     we have a say in claims where we say

21     claims begin with coverage liability

22     damages.  So your coverage had to have

23     been investigated, properly resolved, your

24     reliability properly investigated and

25     resolved, and then you evaluate the

120

HARRIS-GRANT

1

2   damages portion, which is the case value.

3       Q.      But you had to agree on a

4   liability because the liability percentage

5   is used to determine settlement value?

6       A.      The liability percentage rolls

7   out the number, right.

8       Q.      And it is reduced accordingly?

9       A.      Right.

10       Q.      When are reserves set on a

11   file?

12       A.      At a three-month marker is the

13   normal time to set a reserve.

14       Q.      Who sets reserves?

15       A.      The supervisor.

16       Q.      Do examiners have any authority

17   to set or reset reserves on file?

18       A.      Yes.

19       Q.      When do they have authority to

20   do that?

21       A.      They can do it mostly on

22   property damage claims they would do that,

23   like to reopen a PD feature and post a

24   reserve.

25       Q.      Can they do that on bodily

1          HARRIS-GRANT

2   injury claims?

3        A.    I don't see it being done.  And

4   to be honest with you, it is not that I

5   don't know if they have the authority, I

6   believe they can, but most three months

7   are on stat and it comes to the

8   supervisor, meaning there is an underlying

9   dollar amount, but it doesn't show a

10  dollar-dollar amount.  Like it says stat

11  versus a true dollar figure.

12            (Harris-Grant Exhibit 8 marked

13  for identification.)

14        Q.    Can you go to page 6, Chapter

15  3.  It talks about reserves.

16        A.    Guidelines for Establishing

17  Reserves?

18        Q.    Yes.  It says "Reserves are

19  subject to the guidelines listed in the

20  next section with the requirement that the

21  responsibility for establishing and

22  maintaining all case reserves is vested

23  with the supervisors, managers, directors

24  RLAs and AVPs.  This responsibility cannot

25  be delegated and the authorizing party

122

HARRIS-GRANT

1
2  should review thoroughly the file content

3  prior to extending reserve authority.  A

4  supervisor, manager, director, or RLA must

5  authorize all reserves under bodily

6  injury, uninsured and underinsured

7  motorists bodily injury coverage."

8            Is that what it says?

9      A.    Yes.

10     Q.    So can examiners change or set

11 reserves?

12     A.    In terms of this, it is saying

13 on BI features, they can't.

14     Q.    So in bodily injury claims,

15 they can't?

16     A.    They can't.  This is what this

17 is saying on property damage.  It doesn't

18 say anything, so they should be able to.

19     Q.    On property damage, but not on

20 bodily injury?

21     A.    Uh-huh.

22     Q.    Are adjustments normally made

23 to the reserves as the claims handling

24 proceeds?

25     A.    Yes, based on the claims

HARRIS-GRANT

1
2      handler's recommendation and the
3      information as they obtain as the file
4      ages.
5          Q.      What kind of recommendation do
6      they make?
7          A.      They could say I need you to
8      post the policy or the file needs to be
9      transferred up to a higher level or you
10     can reduce the reserve or I need it to
11     increase, because I now have an MRI that
12     shows a knee tear or there is a couple of
13     positive IMEs or the file is now 12 months
14     old and I know the person has been out of
15     work all this time.  So the reserves need
16     to go up.
17         Q.      And how often does that occur?
18         A.      It occurs frequently.
19         Q.      Does the ultimate
20     responsibility for that decision rest with
21     you?
22         A.      With the examiner.
23         Q.      To change the reserves?
24         A.      Uh-huh.
25         Q.      The ultimate responsibility

124

1                          HARRIS-GRANT

2       rests with the examiner?

3            A.      To make the recommendation to

4       change a reserve.

5            Q.      But who has the authority to

6       change the reserves?

7            A.      The supervisor does.

8            Q.      So the examiner doesn't have

9       any authority to change the reserves, they

10      can only make a recommendation?

11           A.      Yes.

12           Q.      If we go back to the snapshot,

13      please, which was Exhibit No. 5, page 57.

14      Under "Evaluate Injury Damages" -- do you

15      see where I'm at?

16           A.      Yes.

17           Q.      Now, under here we see damages

18      submitted, recommended, and there are

19      pull-down menus.  I assume that's for the

20      examiners to add information?

21           A.      Yes.

22                   MR. HEMMENDINGER:  Off the

23      record.

24                   (Discussion off the record.)

25      BY MS. McGOLDRICK:

125

1                    HARRIS-GRANT

2        Q.      There is nothing entered at

3    this point in the top three?

4        A.      They have zeros keyed in.  It

5    comes blank.

6        Q.      It comes blank and you have to

7    key it in?

8        A.      Yes, the examiner keys it in.

9        Q.      We have under "Generals:  Pain

10   and Suffering," there is a

11   computer-generated range; is that right?

12       A.      Yes.

13       Q.      And that says $8,650 to

14   $12,000?

15       A.      Yes.

16       Q.      Is that range based on

17   information that was input earlier?

18       A.      Yes.

19       Q.      And then we have a number

20   entered of $7,500?

21       A.      Yes.

22       Q.      Who would have put that number

23   in there?

24       A.      The examiner.

25       Q.      How is $7,500 determined?

126

HARRIS-GRANT

1

2      A.      The examiner, based on their

3   claims experience and their evaluation of

4   the medical specials.

5      Q.      This number is lower than what

6   has been estimated to be the range?

7      A.      Yes.

8      Q.      Is that a mistake or something

9   they are allowed to do?

10     A.      They are allowed to do that.

11     Q.      If an examiner testified that

12  they would get a downgrade because they

13  put that number in, they would be

14  incorrect?

15     A.      They would be incorrect.

16     Q.      So they are not required to

17  determine a value within that range?

18     A.      No.

19     Q.      Again, as to this number,

20  what's to stop an examiner from randomly

21  picking a number within that range or any

22  number?

23     A.      Nothing.  We train and we

24  coach, for that question it would just be

25  unheard of in claims handling.

127

1              HARRIS-GRANT

2      Q.      But there is nothing to stop

3  them is your answer?

4      A.      Uh-huh.

5      Q.      And, again, there is no place

6  where she has to document here on this

7  Evaluation Injury Damages section the

8  reason for choosing the number that she

9  did?

10     A.      No.

11     Q.      I believe I read somewhere, it

12 was probably in interrogatory answer No.

13 6, and I'm sorry, I don't have copies of

14 it with me, but if you go below -- let me

15 rephrase that.

16             When you are starting a

17 negotiation and you have a value that has

18 been given in Claims IQ on a low end and

19 then you have an approved value on the

20 high end, if you start negotiations below

21 that range, that could be considered

22 evidence of bad faith?

23     A.      If the examiner keyed a range

24 in -- can I move us forward?

25     Q.      Yes.

128

HARRIS-GRANT

1

2      A.      So on page 59 -- well, you can

3   look at 58 and 59.  So if you will look,

4   you will see the person, she had keyed

5   that at 100 percent value.  My first offer

6   to this claimant or his or her attorney

7   would have been $7,500.  But then when you

8   look at page 59, with the liability that's

9   supplied, the lowest fair offer would have

10  been $3,750.

11          So when you look at the file,

12  you see that the person offered $2,000,

13  then that's bad faith to say why are you

14  offering lower than you said your lowest

15  number would have been.  Because you can

16  change this or fix this whatever way you

17  choose to.  They can document on the file

18  as to why they did that.

19      Q.      If we go back to general pain

20  and suffering --

21      A.      Which page number?

22      Q.      I'm sorry, page 57.

23          And there is a

24  computer-generated range of $8,650 and

25  $12,000, and she chose $7,500, she chose a

HARRIS-GRANT

1

2  number outside the range that was given.

3  Why would this not be considered evidence

4  of bad faith?

5      A.      Because she is not governed by

6  this.  There is no guideline, no one goes

7  by this number.

8      Q.      No one goes by that number?

9      A.      No, not in New York State, not

10  in Region 2.  When we look at it, I don't

11  even see that number.  No one looks, no

12  one is held to that number.  Because the

13  system just houses -- it gives you out

14  this information, but you are using your

15  claims judgment of what you know a value

16  is and that's what you are entering in

17  there.

18      Q.      If Candace wanted the number to

19  be lower to begin with, couldn't she just

20  have changed the breaches?

21      A.      Yeah, she could do that.

22      Q.      Why would she enter the

23  breaches one way and then choose a lower

24  number?

25      A.      She would have to explain that.

130

HARRIS-GRANT

1

2     Q.      Again, if Candace said she

3   would be downgraded for choosing a number

4   outside the range, she would be incorrect?

5     A.      The same I said on page 59,

6   with no explanation on the file as to why

7   that was done, it would be a downgrade.

8     Q.      So there has to be an

9   explanation on file?

10    A.      She would need to explain why

11  would you put that your first offer to the

12  attorney would be $3,750, but you

13  low-balled the person.  That is unfair

14  claims practice.

15    Q.      You are telling me she doesn't

16  need to document a number lower than the

17  range provided by Claims IQ for an

18  injury -- for a valuation of pain and

19  suffering at page 57?

20    A.      On page 57 is her lowest fair

21  number at 100 percent.  What ultimately is

22  looked at is page 58, that's what is

23  looked at.

24    Q.      Why would page 57 not be looked

25  at if there is also provided a range from

HARRIS-GRANT

1

2      the computer?  How would that not be

3      evidence of bad faith?

4          A.      Because page 59 is what governs

5      it, because the liability is applied on

6      page 59.

7          Q.      And the liability is determined

8      in part by the number that Candace puts in

9      on page 57, correct?

10         A.      That she chose, uh-huh.

11         Q.      How is that not governing

12     anything going forward?  If she picks a

13     number for general pain and suffering and

14     that goes forward when evaluating the

15     number that ultimately comes out on page

16     59, the range, how can you say that that

17     original number she picked of $7,500 is

18     not important?

19         A.      It is not.  Because she is not

20     driven -- I don't know which other way to

21     explain it.  She is not held to -- no one

22     is held to that number that the system

23     gives.  In Region 2 that I know of, no one

24     looks at that.  She is held based on her

25     evaluation of the medical specials to say

HARRIS-GRANT

1

2     at 100 percent, this would be my lowest

3     fair offer to the attorney.

4          Q.     And let me ask you this:  Since

5     you said that Candace has the authority to

6     settle a file up to $10,000, why would she

7     even be going through this exercise?

8          A.     Because it is what we have in

9     place for the examiners to house and to

10    input in so that anyone looking at the

11    file would be able to see it, even just

12    for our auditing purpose, so that we can

13    see, you know, what did the examiner use

14    to fully evaluate or arrive at a value.

15               How I look at it or how it is

16    viewed, it would be like the questions

17    that you are asking me to say how do you

18    know this person didn't just randomly pick

19    a number.  Like if that's a case, then

20    anyone could say I got your medical

21    specials, here is $8,000, here is $9,000.

22    This is really there to show an in-depth

23    analysis that we looked at everything, we

24    looked at causation, we looked at the

25    impacts on the lives, we looked at all of

HARRIS-GRANT

1
2      these to arrive at our numbers.
3          Q.      Again, if you wanted the number
4      to change, she could pick whatever number
5      she wanted?  If she wanted that final
6      range to change, she could enter any
7      number she wanted or change the breaches
8      to reflect whatever number she wanted?
9          A.      I'm not understanding.
10          Q.      If she wanted the ultimate
11      liability adjusted value to come up to a
12      certain amount, are you telling me that
13      she could change the breaches or put in
14      any number she wanted under the pain and
15      suffering value to arrive at that amount?
16          A.      I'm not fully understanding the
17      question.  Here is the thing --
18          Q.      Then let me rephrase it.
19          A.      Please, thank you.
20          Q.      You are saying that if Candace
21      as the examiner determines the $7,500
22      amount based on what she believes the
23      claim is valued at, at 100 percent, but
24      then she is ultimately -- strike that.
25              Then we go down to Authority.

134

1                    HARRIS-GRANT

2    It says 3-25 --

3         A.    Which page number?

4         Q.    I'm sorry, back on page 59.

5    The amount is $5,200.  Did you authorize

6    settlement up to $5,200?

7         A.    Yes.

8         Q.    Do you recollect why you gave

9    more than the value range of $3,750 to

10   $5,000?

11        A.    Based on our conference of the

12   file.

13        Q.    Do you have a specific

14   recollection of that?

15        A.    No.

16        Q.    Is it possible that after

17   review of the file you determined the

18   negotiation range to be insufficient?

19        A.    No, I can't recall why I came

20   up with $5,200.

21        Q.    And you believe that it could

22   have been because Candace wanted more on

23   the file?

24        A.    I didn't say that.  I don't

25   recall.

135

1            HARRIS-GRANT

2       Q.      What would be the reasons that

3    you would approve more than the liability

4    adjusted value to settle a claim?

5       A.      Because I'm not driven by the

6    liability adjusted value.

7       Q.      What are you driven by?

8       A.      I'm driven by my claims

9    experience, my conferencing with the

10   examiner, the information that's made

11   available to me, the liability.

12      Q.      So after review you determined

13   the liability was insufficient and you

14   gave a higher authority than what is --

15      A.      It is a possibility.

16      Q.      Now, if Candace was the one who

17   came in and said that she wanted more than

18   $5,000 to settle the case, is that a

19   possibility of what could have occurred?

20      A.      Yes.

21      Q.      And if that was the case,

22   couldn't Candace have just adjusted the

23   breaches to get more money in the

24   liability adjusted value range?

25      A.      She can do that, yes.

HARRIS-GRANT

1

2    Q.      In this instance where the

3    amount approved was $5,200 and it is over

4    the liability adjusted value range, it is

5    unlikely that Candace requested the

6    additional amounts because she could have

7    simply adjusted Claims IQ to get a higher

8    amount?

9    A.      I wouldn't say that.  I

10   wouldn't say that.  It is not necessarily

11   so.  We could be conferencing together and

12   the examiner can say "You know what, now

13   that I think of it, I think this file is

14   worth X or whatever."

15   Q.      "Now that we have had a

16   conversation and I have run it by you and

17   you have given me your advice and you have

18   given me your opinions, I think it is

19   worth more"?

20   A.      Not so much my advice, because

21   sometimes folks come over to you and they

22   are talking to you about something and

23   they end up answering their own question.

24        So it could be not that I

25   directed her to change her decision, she

137

1                HARRIS-GRANT

2    may have just been talking it through with

3    me and decided to say "You know what,

4    Marlene, this is what I want."

5                In terms of Candace and I, this

6    was one of her really good strengths in

7    negotiating files.  So oftentimes if

8    Candace came to me, she is making a

9    recommendation to say "You know what, I

10   think this file is worth X, this is what I

11   want," and often that's what I would go by

12   because I trust her judgment.

13        Q.    But it could have also been

14   that you determined that liability was

15   insufficient and you wanted to give more

16   money on the file, you thought it wouldn't

17   settle for the range --

18        A.    I would have to look, to be

19   honest with you.  I don't know.  I would

20   have to look at the entire file all over

21   and recall back everything.  But I don't

22   know.

23        Q.    In this case, again, you said

24   that Candace had the authority, or all of

25   the adjusters had the authority to settle

138

HARRIS-GRANT

1

2     a case up to $10,000 on an individual

3     bodily injury claim and $12,500 on a total

4     claim without authority?

5          A.     Yes.

6          Q.     Why then would Candace have to

7     come to you to obtain your authority to

8     settle the case up to $5,200?

9          A.     Because, again, she chose to

10    come to me.  When I took over this

11    section, this is how they would come in

12    and conference in.  I went along with it

13    because I didn't know these examiners.  I

14    had to get up and running in knowing them,

15    knowing their strengths.

16              If someone is faltering in a

17    negotiation, I find out that Candace is

18    strong, I say "Candace, you are strong in

19    negotiation, do you mind taking this file

20    and negotiating it for this person."

21              So part of this is getting to

22    know my examiners and their strengths and

23    weaknesses.

24         Q.     And when did you come on as a

25    TA2?

1              HARRIS-GRANT

2        A.    4-28-08.  And she was out for a

3    couple of months in that year.

4        Q.    This was in '09, so this was

5    close to a year, minus a few months, that

6    you had been working with her on a regular

7    basis?

8        A.    Yes.

9        Q.    So you probably knew her pretty

10   well by then?

11       A.    Yeah, I would say so.

12       Q.    You also said that

13   negotiations -- TA2s are responsible for

14   negotiating a claim once a settlement

15   authority has been established, right?

16       A.    Yes.

17       Q.    Before a TA2 can begin

18   negotiations on a claim, are you required

19   to review the action plan with them?

20       A.    No.  What action plan?

21       Q.    The negotiation action plan

22   that's contained in an alog.

23             If you go to page 2, actually

24   page 3, the negotiation strategy snapshot

25   down at the bottom of 2-21-09, are you

140

HARRIS-GRANT

1

2    required to review that before a TA2 can

3    move forward with negotiations?

4        A.    What is here is actually the

5    short-form summary.  So when they come in

6    to conference, this is their summary of

7    the meds versus us sitting there and going

8    through the meds one page at a time.

9        Q.    So you review their negotiation

10   plan?

11       A.    Uh-huh.

12       Q.    And if you don't agree with a

13   plan or way that they plan to negotiate

14   the file, can they move forward as they

15   had planned?

16       A.    We talk it through to have some

17   type of an agreement.  If they convince me

18   of their point, that is perfectly fine.

19   But normally we are at an agreement, and

20   oftentimes with this particular examiner,

21   she was on point with whatever it is that

22   she recommended.

23       Q.    And how do you know that?

24       A.    Based on the time that I've

25   been with her, that I have conferenced

141

HARRIS-GRANT

1

2      files with her, based on the settlements

3      that she has made.

4              I remember when I wrote up her

5      PA, there were two files that I had her,

6      you know, negotiate, and she successfully

7      did that, that belonged to someone else.

8          Q.      So you did go over the

9      negotiation plan and you had to come to

10     agreement before they could move forward

11     with the settlement negotiations?

12         A.      We made sure we were both

13     comfortable and on board.  Because

14     basically it is us versus the plaintiff's

15     attorney.  So we would, you know, speak,

16     "Okay, Marlene, this is what the attorney

17     is saying to me.  What do you think as a

18     counter?" It is role-playing, so on and so

19     forth.

20         Q.      Do you ever discuss the

21     strategy with the TA2s?

22         A.      Yes, especially when they are

23     going through the orientation phase.

24         Q.      Do you do it afterwards as well

25     as a part of your coaching duties?

142

HARRIS-GRANT

1

2      A.      As a part of the coaching,

3  depending on how successful they are being

4  at the job.

5      Q.      So you might do it more often

6  when they are a newer examiner, but you

7  continue coaching them all along?

8      A.      Right.

9      Q.      That's part of your job?

10     A.      Right, that's part of my job.

11     Q.      Do you ever advise on what

12  number to begin negotiations with?

13     A.      We come to an agreement on it.

14     Q.      Can you estimate how often you

15  do that?

16     A.      I wouldn't say that often.

17  Because given the group that I have and

18  how long I have been with them, maybe in

19  the entry part of when I just started the

20  job function in getting to know them.

21     Q.      So when you are having a

22  conversation about a negotiation strategy,

23  is it normal for you to say "Hey, I think

24  you should start with this number" and

25  then possibly go up in increments of this

HARRIS-GRANT

1
2   number, is that something you might

3   discuss?

4       A.      That is something we would

5   discuss.  The examiners are asking that.

6   I have examiners saying "You know what, I

7   think this is worth my 10, but I don't

8   want to turn the attorney off by offering

9   too low a number.  What do you think?"

10  Sometimes I will say "That sounds like a

11  fair number."  Stuff like that.

12      Q.      So you give your advice?

13      A.      Yes.  But it is up to them what

14  they are going to do with it.

15      Q.      If you don't agree with how

16  they plan to negotiate or what number they

17  start with, do you advise them to start

18  with a different number?

19      A.      We come to an agreement on it.

20  We have a discussion.  Because the thing

21  is you don't want to generate bad-faith

22  letters and responses.  That gets very

23  involved.  You have your insured that you

24  are looking to protect their exposure and

25  so forth and you are building a

144

HARRIS-GRANT

1

2     relationship with these attorneys because

3     you are going to have future claims with

4     them.

5         Q.     So it is important that you

6     come to an agreement with the examiner on

7     where to start for those reasons that you

8     have just mentioned?

9         A.     If they choose to come in and

10    conference that with me.  You know, they

11    may say "I want to start with X."  Most of

12    the time I'm saying "Yes, I agree with

13    that" or "You know what, you may want to

14    start a little higher."  But I'm not like

15    throwing out a specific number.

16        Q.     Or you are advising them to

17    perhaps start higher?

18        A.     Maybe a little higher.

19        Q.     Do you ever advise them on what

20    increments to go up during negotiation?

21        A.     I have coached my examiners to

22    say it is better to start out stronger,

23    and then if you choose go in smaller

24    increments, versus starting out real low

25    and then you are going up in double

145

1          HARRIS-GRANT

2   digits.  That doesn't look good to the

3   attorney.  It comes across like you are

4   playing games with them, and they have had

5   success with that.

6       Q.     When you talked about examiners

7   having authority to settle up to $10,000

8   without authority, can they start at any

9   number?

10      A.     Yes, they could.

11      Q.     When you were talking about

12  there being potential evidence of bad

13  faith, would it be important for them to

14  come to you in those situations to discuss

15  a negotiation plan?

16      A.     No.  You are saying for every

17  file?

18      Q.     Not every file.  In the

19  circumstances where they decide that they

20  are going to settle a case on their own

21  without your authority of a certain

22  amount, they can settle it up to $10,000,

23  correct, for an individual claim?

24      A.     Yes.

25      Q.     In those instances, do you ever

146

HARRIS-GRANT

1

2      speak to them beforehand because they have

3      a wide range to work with?

4          A.    No.  Because they are so

5      experienced by that time, that once they

6      are off the orientation, and because I

7      know, I personally coach to say it is

8      better to start out with a stronger number

9      than to nickel and dime an attorney, it

10     just doesn't look good.

11         Q.    In those cases, are they using

12     the adjusted value range calculated in

13     Claims IQ as a guide?

14         A.    They are using their own input

15     as the guide.

16         Q.    The adjusted value that comes

17     out in Claims IQ --

18         A.    They are not using that.  Is

19     that the one on 59 that you kept asking

20     about?  They are not using that as a

21     guide.

22         Q.    No, not that.

23         A.    Page 58?

24         Q.    Page 59, the liability adjusted

25     value.

1                    HARRIS-GRANT

2        A.        They are using that lower

3    value, but that's based on their

4    liability.  That is based on what they put

5    in as the lowest and the highest fair

6    value.

7        Q.        So are you saying that in cases

8    where Candace decides to settle a claim up

9    to her $10,000 authority on her own

10   without coming to you, would she need to

11   use this liability adjusted value as a

12   guide and start no lower than $3,750?

13       A.        It is not a guide.  It is based

14   on her number.  She pretty much knows what

15   it is going to come out to if she does the

16   math and says her liability is 50 percent

17   and I'm starting at $7,500.

18                 You see this where it says the

19   $3,750, she can offer the attorney $4,000,

20   $5,000.

21       Q.        My question is, can she offer

22   lower in this instance?

23       A.        She can offer it, but it would

24   be in bad faith.  It wouldn't look good.

25       Q.        In those cases she needs to use

148

HARRIS-GRANT

1

2      Claims IQ, the negotiation range value

3      that comes out, as a starting guide?

4          A.      She should use this as her

5      guide that she input, that she came up

6      with this.  So the question would be you

7      did all of this, why were you offering

8      this attorney lower than what you

9      personally put in.

10         Q.      I was just asking if she can

11     start any lower than the $3,750 in those

12     cases.

13         A.      It would be in bad faith to do

14     that.

15         Q.      You are saying in this

16     instance, had you not -- actually, even in

17     this instance you approved the file up to

18     $5,200?

19         A.      Yes.

20         Q.      You said Candace has settlement

21     authority up to $10,000?

22         A.      Yes.

23         Q.      Would she have been able to on

24     her own settle the case for more than the

25     $5,200?

HARRIS-GRANT

1

2     A.      She can do it.  But she would

3  be coming back, because I'm on the file --

4  if she had done it on her own, there is no

5  need.  Because I'm on it, she would be

6  saying "Marlene, I know I came in, I was

7  probably asking for maybe the $5,200, and

8  you had given me this, the attorney is at

9  X, what do you think?"

10          So because I'm on the file, she

11  would come back to me.  If she had done it

12  on her own, there would be no need for

13  that.

14     Q.      If you are on the file, she

15  doesn't have authority to settle up to

16  $10,000 without approval?

17     A.      Right, if I'm on the file.

18     Q.      When you say "on the file,"

19  does that mean you had to conference the

20  file and give settlement authority?

21     A.      If she had conferenced it and

22  asked me, yes.  That's what I mean by

23  being on the file.

24     Q.      If Candace and any of the other

25  examiners testified that they had to come

HARRIS-GRANT

1

2    to you for authority to settle every

3    claim, would they be incorrect?

4        A.      No.  If they would be incorrect

5    saying they had to come -- repeat the

6    question for me.

7        Q.      If Candace and/or any of the

8    other examiners testified that they did

9    not have settlement authority up to

10   $10,000 without approval, would they be

11   incorrect?

12       A.      They would be incorrect.

13       Q.      If they said they had to come

14   to you for approval of a settlement amount

15   in every case, would they be incorrect?

16       A.      That would be incorrect.

17       Q.      Back to negotiations.  You said

18   you did do role-playing with your

19   examiners?

20       A.      Yes, during the orientation.

21       Q.      Just during orientation, or

22   would you do it when you conference a

23   file?

24       A.      If we conference a file, it is

25   not so much role-playing, it is just

151

HARRIS-GRANT

1

2    arguing what are the pros and cons of

3    this, how are you going to approach this

4    with the attorney.

5         Q.      Did you ever go over specific

6    arguments?

7         A.      Yes, we would coach through it.

8    And it depends on the strength of the

9    examiner.  If it was someone like her, I'm

10   not role-playing with her because she is a

11   strong negotiator.  I had people that were

12   weaker, even though they had tenure, and

13   we would go through it where I would say

14   "What's your pros and cons?"

15        Q.      That's part of your coaching

16   responsibility for your examiners?

17        A.      Yes.

18        Q.      And how are TA2s trained to

19   negotiate?

20        A.      They receive training.

21        Q.      What kind of training do they

22   receive?

23        A.      They have in-classroom

24   training, when they are out on the floor

25   and going through the orientation phase.

1                    HARRIS-GRANT
2     When they meet with the supervisors, they
3     do the write-up of the meds and come in
4     with the supervisor and we argue the pros
5     and cons, and you go through as a
6     supervisor and explain, you know, this is
7     why this is a good argument when the
8     attorney comes back with this, so on and
9     so forth.  That's part of the training.
10         Q.    Are there written policies or
11    guidelines?
12         A.    No, not that I know of.
13         Q.    Are TA2s monitored during
14    negotiations?
15         A.    Right now, this year, we are
16    doing that.
17         Q.    Right now?
18         A.    Uh-huh.
19         Q.    Is there a new policy in
20    effect?
21         A.    In terms of --
22         Q.    That requires you to monitor
23    them?
24         A.    It is part of one of my duties
25    now that I have to do.

153

HARRIS-GRANT

1
2   Q.     What are you required to do
3   when you monitor them?
4   A.     I'm basically monitoring to
5   make sure that there is professionalism
6   there, to make sure that they are not
7   bidding against themselves.
8   Q.     How are you doing it?
9   A.     By just listening.
10  Q.     By listening, standing next to
11  them?
12  A.     No, at my desk.
13  Q.     So you can listen in on the
14  phone?
15  A.     Yes.  They e-mail me and say
16  "Marlene, I'm going to call this attorney
17  up," and I would listen in.  I would patch
18  into the line.
19  Q.     What is the new policy
20  requiring, a certain amount of times per
21  week?
22  A.     Two per examiner.
23  Q.     For the week?
24  A.     For the month.
25  Q.     And you have six examiners, so

154

HARRIS-GRANT

1

2    you have to do twelve per month?

3        A.    Yes.

4        Q.    You say this is a new policy.

5    Had you never listened in on phone

6    conversations before?

7        A.    I have listened in when they

8    have shot me e-mails and stuff like that

9    saying "Oh my God, listen to this."  If it

10   was a call they tried before and they knew

11   it would be difficult, they would.

12       Q.    When you are listening in,

13   would you ever provide them advice via

14   e-mail?

15       A.    Yes.

16       Q.    What kinds of advice would you

17   give them?

18       A.    I remember one examiner saying

19   "Is this true?"  I think the attorney was

20   citing some legal jargon and they wanted

21   to know if that was accurate or not.  I

22   think it was a joint and several issue.

23            Or if they are citing that "You

24   know what, I'm going to send you a bad

25   faith," I would send back to say a good

155

HARRIS-GRANT

1

2      argument would be to say disagreement on

3      value is not bad faith.  Stuff like that.

4           Q.     Do you ever instruct to say,

5      for example, go up $500?

6           A.     No.

7           Q.     You have never instructed while

8      you are listening on the phone an

9      incremental amount to go up?

10          A.     No.

11          Q.     Did you ever instruct, for

12     example, to hold firm on the offer that

13     they just gave?

14          A.     No.

15          Q.     Do you ever sit with the TAs

16     while they are on the call and listen in?

17          A.     I personally haven't, no.

18          Q.     Do you ever stand next to them

19     or over them and listen in on a call?

20          A.     No.

21          Q.     If Candace or some of the other

22     supervisors said you do this, they would

23     be incorrect?

24          A.     They would be incorrect.

25          Q.     Do you ever meet with the TA2s

156

HARRIS-GRANT

1

2      after negotiations to discuss or critique

3      a settled negotiation?

4          A.      No.  We have a good working

5      relationship.  They would come over and

6      say "Did you hear that?  Could you believe

7      that?"

8          Q.      So you do talk about it?

9          A.      Yeah, we talk about it with

10     them coming over.

11         Q.      If they weren't able to reach a

12     settlement, you might discuss how they can

13     get a settlement going forward and what

14     strategy to take and what didn't work,

15     what might work going forward?

16         A.      Yes, you can do that, yes.

17         Q.      You can do that or you do do

18     that?

19         A.      Say I monitored and I saw that

20     the attorney was hammering at something we

21     hadn't taken into consideration, that's

22     something we would say "Let's come in and

23     meet again to review that.  Is that truly

24     in the meds or not?"

25              I have monitored negotiations

HARRIS-GRANT

1

2       and heard an attorney mention positive

3       IMEs, but meanwhile my examiner wrote

4       there was never anything positive.  That

5       is something we need to look at.  I found

6       when we look at it, that it was positive.

7       So it is stuff like that.

8            Q.      So you do monitor the

9       negotiations?

10           A.      The two per month now.

11           Q.      And prior to that you didn't do

12      that?

13           A.      I would monitor some calls, but

14      not so much, say, the negotiation.  It was

15      for customer service, are the calls being

16      returned on time, stuff like that.

17           Q.      What is second voicing?

18           A.      Someone else, like what I said

19      Candace did with a file, like if you are

20      negotiating a file, you are at an impasse

21      with the attorney or the attorney is not

22      returning your phone calls or whatever,

23      then I may give it to this examiner and

24      say "Why don't you ask this person."  They

25      may say "I asked X to do it for me and

158

HARRIS-GRANT

1

2    they were able to get the settlement."

3        Q.        So someone else might handle

4    the settlement for them or they would sit

5    with them and listen in on what was going

6    on?

7        A.        They don't sit with them.  They

8    just give them the file.

9        Q.        They take over the file?

10       A.        They take over the negotiation

11   part of it.  The file and credits for the

12   settlements remains with the original

13   examiner.

14       Q.        When someone is asked to second

15   voice, do you go over the file with them

16   and what is the problem?

17       A.        The examiner that owns the file

18   goes over that with them.

19       Q.        Are you involved in that

20   conversation at all?

21       A.        I may or may not be.

22            MS. McGOLDRICK:  Can we take a

23   break.

24            (Recess taken.)

25   BY MS. McGOLDRICK:

1                   HARRIS-GRANT

2        Q.      I think you said that TA2s have

3   annual performance reviews?

4        A.      Yes.

5        Q.      And they are reviewed by you?

6        A.      Yes, it is reviewed by me.

7        Q.      Do they have performance

8   reviews by anybody else?

9        A.      No, my manager just signs off

10  on it and I give a copy to them.

11               (Harris-Grant Exhibit 9 marked

12  for identification.)

13       Q.      Are you familiar with this

14  document?

15       A.      Yes.  In terms of a performance

16  review, I go over it with them, but then I

17  have to meet with all the managers and

18  then I present each of them to the -- it

19  is three managers that we have.  But I

20  have one direct report, it is Rob.

21               So when we are doing the

22  annual, I go in with my whole group's PA

23  and I present each and go over it with

24  them.

25       Q.      To Rob and the other -- I'm

1                    HARRIS-GRANT

2    sorry, two managers?

3        A.       Yes.

4        Q.       Who are they?

5        A.       This here one, the '09, it was

6    Rob, Charlie Capo and Jeanne Butler.

7        Q.       And why are you meeting with

8    them, just to go over it?

9        A.       It is annual performance review

10   for merit increases.  So they are the

11   managers.  So they go over the entire

12   floor.  It is with every supervisor they

13   would meet.

14       Q.       Once you conference with them,

15   then whatever her increase may or may not

16   be is determined by them and not you?

17       A.       Correct.  I make the

18   recommendation.

19       Q.       Would it be anybody in

20   particular here who makes the

21   determination?

22       A.       It is everyone together.

23       Q.       All four of you?

24       A.       Yes.  And they run it by me

25   like I'm there and they are like "Okay,

HARRIS-GRANT

1

2    this is what you proposed, yes, I'm in

3    agreement" or  "You know what, no, why is

4    this?"  And then I will explain.

5              If they disagree, I will make

6    the counterarguments or whatever.  They

7    will get my input and they will say "Are

8    you comfortable with that?"  And I say

9    "Yes, I am."

10       Q.    Do you actually make a

11   recommendation as to percentage of

12   increase, salary increase?

13       A.    Yes.

14       Q.    What do you base that on?

15       A.    Based on their performance

16   reviews, the additional stuff that is

17   listed at the bottom, like are they a team

18   player, have they done anything where they

19   contribute to the unit, to the department,

20   do they do anything extra, are they

21   pursuing their -- it is more than just the

22   statistics.

23       Q.    But is there a particular guide

24   that you go by that allows you to pick a

25   number?  For example, do you go in and say

162

HARRIS-GRANT

1

2    for all of these reasons, Candace should

3    be given a 5 percent increase?  Do you

4    recommend a percentage of increase?

5         A.     I recommend a percentage of

6    increase based on the guide that I'm given

7    to say this is an X amount of increase we

8    are given per unit.

9         Q.     So you are given a guide?

10        A.     Yes.

11        Q.     You have to go within a guide?

12        A.     Within what's being allowed for

13   that particular year, and then I

14   distribute it amongst my examiners.

15        Q.     Within your unit you will get a

16   particular amount and you have to

17   determine who gets what?

18        A.     Yes.

19        Q.     So this document marked Exhibit

20   9 is GEICO 0178 through GEICO 0181, and it

21   is the GEICO Performance Guide and

22   Appraisal, correct?

23        A.     Yes.

24        Q.     It looks like it is for the

25   ratings period 1-2008 through 12-31-2008?

1                HARRIS-GRANT
2      A.      Yes.
3      Q.      This is for Candace Harper?
4      A.      Yes.
5      Q.      And the supervisor/rater is
6   you?
7      A.      Yes.
8      Q.      The next section has
9   Instructions, I, II and III.  The first
10  one says "Goal Setting:  At the beginning
11  of the performance rating period, meet
12  with the associate to define and record
13  goals."
14               Is that Exhibit 2, the TA2
15  Examiner Goals?
16     A.      Yes.
17     Q.      And you were not Candace's
18  supervisor in May of '07, were you?
19     A.      No.
20     Q.      But those were the goals she
21  was supposed to meet in May of '07 based
22  on the TA2 Examiner Goals, Exhibit 2?
23     A.      It says '08 on here.  Remember
24  I was saying I was confused with why she
25  has that date.

HARRIS-GRANT

1

2    Q.      And you started in April of

3    '08?

4    A.      April of '08.

5    Q.      So at the beginning of the

6    performance period -- so Candace should

7    have received the TA2 goals prior to

8    January of '08, she should have had a

9    meeting with her supervisor prior to --

10   A.      Not prior.  It is within the

11   year of '08 that she would have gotten

12   this.

13   Q.      Exhibit 9, the first line,

14   Section 1, Goal Setting, "at the beginning

15   of the performance rating period," so you

16   mean in January of '08 you would had to

17   have met with her?

18   A.      Right, to administer the goals.

19   That's why that date, '07 --

20   Q.      Would there have been a

21   different TA2 2008 goals, perhaps?

22   A.      Not that I know.

23   Q.      Something subsequent?

24   A.      No.  And for it to happen in

25   '07, this is odd.  Like no one sets their

HARRIS-GRANT

1

2   goal, to give it out for the next year

3   coming up, in the middle of the previous

4   year.

5       Q.    So the date may have been

6   wrong?

7       A.    Yeah.

8       Q.    But you also thought that

9   May -- if she met with you in May of '08,

10  that might have been too far ahead?

11      A.    Right.  Like if she was given

12  this in May of '08, yes.

13      Q.    But you started in April '08.

14  Perhaps did you meet with your examiners

15  when you became the supervisor?

16      A.    It would have been the prior

17  supervisor that would have administered

18  it.

19      Q.    In any event, the TA2 examiner

20  goals sheet, Exhibit 2, is essentially

21  what she was -- what she believed were her

22  goals for 2008, what she had to meet?

23      A.    Right.

24      Q.    When we look at Exhibit 2,

25  these were the department goals, correct?

166

1                    HARRIS-GRANT

2        A.      Yes.

3        Q.      So these aren't for your

4    particular section, these are for the

5    department?

6        A.      Per examiner, this is the goal

7    that the department arrived at this goal

8    for each examiner.

9        Q.      For each examiner, but for your

10   entire department this applies to?

11       A.      Yes.

12       Q.      And then the one given the most

13   weight is "net closures minus reopens"?

14       A.      Right.

15       Q.      Why was this given the most

16   weight?

17       A.      I'm not sure.  But I know that

18   this is one of the core goals, file

19   quality and net closures, like completed

20   or net closure is often heavily weighted,

21   bringing a file to resolution.

22       Q.      We are looking at Exhibit 2.

23   The first one says "net closures."  It

24   doesn't say "file quality," does it?

25       A.      No.  It says "net closure."

HARRIS-GRANT

1

2      Q.      So do you have any

3  understanding of why the net closures

4  itself is so highly rated?

5      A.      Because it ties in with file

6  resolution.

7      Q.      Does it have anything to do

8  with reserves being open on certain files

9  and so the more files you close, the

10  better the bottom line is for GEICO?

11      A.      No.  I don't understand that

12  question.

13      Q.      If you have 100 files that are

14  open and each have reserves pending on

15  them, if you are closing a file, then

16  those reserves can be used somewhere else,

17  it affects the bottom line of the company,

18  right?

19      A.      Right.  But it depends on what

20  you are paying out and then you are

21  frequently bumping up reserves.  You might

22  have a reserve where you are using

23  everything.  So that's a net zero.  Or you

24  may have a file where you denied

25  liability, and yes, that will free up

168

1                    HARRIS-GRANT

2     money for the company for investing.

3          Q.      So it is important to close

4     files?

5          A.      It is important to bring the

6     files to resolution.

7          Q.      To close them?

8          A.      Right, to close the file.

9          Q.      That's why the net closure

10    weight is rated so high, right?

11         A.      There is a lot that goes into

12    the goal setting.  I wouldn't say that the

13    bottom line in terms of profitability is

14    the sole reason.

15         Q.      That's not what I asked.

16         A.      I thought that's what you

17    asked.

18         Q.      I said would one of the reasons

19    that you wanted to close --

20         A.      I didn't hear the "one," I'm

21    sorry.

22         Q.      It is just important for you to

23    close files?

24         A.      Yes, it would be one -- I'm

25    sorry, when I heard it, I heard that's the

HARRIS-GRANT

1

2      reason why the goal is set.

3          Q.      Then we have "total completed

4      features."  Does that mean features

5      closed?

6          A.      This is features that gets

7      transferred to the Continuing Unit.

8          Q.      But within that claim

9      adjuster's claims files, those features

10     had been closed?

11         A.      It is not closed.  It is

12     transferred up to the Continuing Unit.

13         Q.      But she is not going to be

14     working on the file anymore?

15         A.      Right.  But she got credit for

16     the work that she did on the file for the

17     period that she had it for.

18         Q.      And her completed features

19     allowed it to get moved up to the next

20     level?

21         A.      The fact she moved it up to the

22     next level, that falls into the completed

23     feature.  And it had to be an open

24     feature.

25         Q.      That is 15 percent, right?

170

1                    HARRIS-GRANT

2        A.      Yes.

3        Q.      Then we have all of the audits?

4        A.      Uh-huh.

5        Q.      And they amount to

6    approximately 55 percent, I think.  Then

7    what is ARX?

8        A.      That's our auto express repair

9    shop, auto repair express.

10        Q.      Are claims examiners supposed

11    to refer over to the body shops for the

12    auto repair, GEICO-approved?

13        A.      Yes.

14        Q.      If they refer over a certain

15    number, the weight will be 5 percent, they

16    met their goal?

17        A.      Yes.

18        Q.      It says Other Considerations,

19    and it says "technical knowledge,

20    evaluation and negotiation skills, case

21    preparation, presentation skills," there

22    is a number of other things listed under

23    there, correct?

24        A.      Yes.

25        Q.      So those are taken into

                    HARRIS-GRANT

1
2  consideration as well?

3      A.     Yes.

4      Q.     But there is no weight given to

5  that?

6      A.     Correct.

7      Q.     Then it says "No matter how

8  good you are, it doesn't count if you are

9  not here.  It puts an unfair burden on

10  coworkers.  Both dependability and

11  schedule adherence will be used in the

12  evaluation of the performance and the

13  determination of salary increase."

14           What is meant by

15  "dependability"?

16      A.     You being at work.

17      Q.     And "schedule adherence"?

18      A.     You being at work on time.

19      Q.     So that's on time, and

20  dependability is being there?

21      A.     Uh-huh.

22      Q.     Would you agree that there is a

23  direct correlation between hours worked

24  and the goals met?

25      A.     No.  I'm not sure if I

172

1              HARRIS-GRANT

2   understand that.

3       Q.    If a claims examiner works more

4   hours, will she possibly close more files?

5       A.    Not necessarily.

6       Q.    What is the average work week

7   for your claims examiners?

8       A.    It is 38.75.  I'm thinking of

9   the 7.75, 38.75 for the week.

10      Q.    The 7.75, do claims examiners

11  often work later than that?

12      A.    Not often.

13      Q.    Do they work on the weekends?

14      A.    Some may choose to.  It is by

15  choice and how they structure their day.

16      Q.    I'm sorry, you are going to

17  have to explain that.

18      A.    It is not a choice -- it is not

19  mandatory to say that you have to work on

20  the weekend.  The workweek is on Monday

21  through Friday on the hours that you have

22  arranged.  For Candace, I believe her

23  hours were 7:30 to 4.  It is how

24  productive you are throughout your day.

25             I remember some of my coaching

173

HARRIS-GRANT

1

2    with examiners are you have to watch your

3    non-value-added time.  Some people will

4    spend the day having a lot of conversation

5    that is not work-related, and then they

6    find they are having to make that up at

7    the end of the day.

8          So you coach to that as a

9    supervisor to point out that "Listen, you

10   have to know when to make certain people

11   who are talkers, and that's distracting

12   you from your work, move on, so you can

13   focus on what you have to do."

14   Q.     Are you saying that Candace was

15   a talker and she worked a lot on the

16   weekends because she wasn't using her time

17   wisely?

18   A.     Some of it, because I had to

19   have a conversation saying I need to move

20   her seat from her buddy that was next to

21   her.  I had that conversation with her

22   once.

23   Q.     Was that documented anywhere?

24   A.     No, I didn't document it.

25   Q.     Why would you not document a

HARRIS-GRANT

1

2      conversation where you are talking about

3      her performance in her file?

4          A.     Because it wasn't something

5      that rose to that level at that point.  I

6      just started in the section, that is

7      something I was observing and noticing

8      that she was doing and doing more so than

9      anyone else within the section.

10                So she and I had a face to face

11     and she admitted to it.  She said "You

12     know what, Marlene, I'm correct, in that

13     I'm going to learn to tell Karen let's

14     talk after work."  They were really close

15     buddies.  A lot of conversation was

16     non-work-related and she admitted to that.

17                I don't have to document every

18     single thing like a coaching session like

19     that.  That was just an observation and a

20     quick hit, like just make the turnaround

21     and correct that.

22          Q.     Did she turn it around and

23     correct it?

24          A.     For the most part, I would say.

25          Q.     If we are looking through alog,

175

HARRIS-GRANT

1

2     for example, on Exhibit 3, do you have it

3     in front of you?

4          A.     Yes.

5          Q.     Was the normal day for Candace

6     you said about 7:30 to 4?

7          A.     Yes.

8          Q.     What about your other

9     examiners?

10         A.     8 to 4:30.

11         Q.     So when we see on here times

12    past 4:30 or weekend, those are people

13    that needed to make up their time because

14    they weren't using it wisely?

15         A.     Not make up their time.  They

16    chose to work beyond.  Sometimes I know

17    for her when I'm going by and I'm there in

18    the evening, I would be shocked to see

19    that she is there, and she would say to me

20    "Well, my son is having basketball

21    practice, it doesn't make sense for me to

22    go home, so I'm just staying here and

23    doing some work while I'm here."

24         Q.     Can you look on page 39.  So,

25    for example, that's a day that Candace

176

HARRIS-GRANT

1

2     Harper -- it is a Sunday and it looks like

3     she was in from 10 a.m.?

4          A.     Yes.

5          Q.     I'm not going to be able to go

6     through all of these individually, but it

7     wasn't a regular occurrence for Candace or

8     any of your other examiners to work on the

9     weekends?

10         A.     Not my regular examiners.

11    Candace would come in to work her TRRs,

12    the C71 reviews or six months or whatever.

13    That is something that I have spoken with

14    her about to say "What's the sense in you

15    doing it on a weekend when you should be

16    on those claims making calls to the

17    attorney's office, the adverse carrier's

18    office, you are simply leaving voice mail

19    messages here."

20         Q.     If they didn't get their net

21    closures done and the audits didn't result

22    in high satisfactory numbers, they

23    wouldn't meet their performance goals,

24    correct?

25         A.     The audit doesn't have anything

HARRIS-GRANT

1

2    to do with your SPR, how your file comes

3    out.  And you can find an examiner putting

4    in time, it is what they are doing with

5    that time, and still be nonproductive.

6         Q.     But they have goals that they

7    have to meet.  So if they are coming in on

8    the weekends, it is because they have not

9    met those goals during the week?

10         A.     No, not necessarily.  They

11    could be catching up on work that they

12    didn't get to.

13         Q.     Which would lead to them

14    meeting their goals for 2008 or whatever

15    the year was?

16         A.     They would put in the time,

17    from my understanding, of having

18    discussions with my examiner, based on how

19    their week went or what they choose to do.

20         Q.     So you are saying these people

21    just chose to work the weekends because

22    they enjoyed it?

23         A.     I'm not saying they enjoyed it.

24    That would be putting words in my mouth.

25    They chose to come in and do it on those

HARRIS-GRANT

1

2  days, and she is one that if she admits to

3  it, she can say I have spoken to her about

4  coming in on the weekends to work like her

5  C71s.

6          If you are doing C71s on a

7  weekend, you are calling an attorney to

8  say are you still pursuing this claim, but

9  you are not getting anyone, so you are not

10  getting closure.

11      Q.     Did you testify at an

12  unemployment hearing for Ms. Harper?

13      A.     Yes, I did.

14      Q.     Do you know the results of that

15  hearing?

16      A.     Yes.

17      Q.     What was the result of that

18  hearing?

19      A.     She won the hearing.

20      Q.     Do you know why she won the

21  hearing?

22      A.     No, to be honest, I didn't read

23  the thing.  I just deleted it after the

24  decision came in.

25          (Harris-Grant Exhibit 10 marked

179

                    HARRIS-GRANT

1    for identification.)

2        Q.      This is the Decision and Notice

3    of Decision in Candace Harper's claim

4    against GEICO for unemployment benefits.

5            If we go to page 5 --

6            MR. HEMMENDINGER:  Is there a

7    page 4 or a page 7?

8            MS. KOROLEVA:  The other side

9    of the page just had standard writing on

10   it.  But this is a complete copy.

11           MR. HEMMENDINGER:  I don't get

12   it, I'm sorry.  It says 3, 5, 7.

13           MS. KOROLEVA:  If you read the

14   bottom of this page, it is just that the

15   other side had boilerplate basically, the

16   same thing on all the other pages.

17           MR. HEMMENDINGER:  All right.

18       Q.      So you had to testify at this

19   hearing, correct?

20       A.      Yes.

21       Q.      On page 5 at the bottom where

22   it says "Decision," it says "The

23   Commissioner of Labor's timeliness

24   objections are overruled.  The claims

180

HARRIS-GRANT

1

2    application to reopen is granted."

3              And she essentially, then, is

4    allowed benefits with regard to the issue

5    decided herein, correct?

6         A.    Yes.

7         Q.    If we go up to the paragraph

8    right above "Decision," it talks about the

9    credible evidence.

10             In the third sentence, do you

11   see that, it starts with "I find the

12   supervisor's testimony that she gave no

13   admonition to her subordinates around the

14   end of October to be less credible than

15   the claimant's testimony that she did,

16   based upon the subsequent immediate

17   precipitous drop in the claiman't opening

18   of LOU and REN features."

19             Do you see that?

20        A.    Yes.

21        Q.    So they determined your

22   testimony to be less credible than

23   Ms. Candace Harper's?

24        A.    Yes.

25        Q.    So going back to the TA2

1              HARRIS-GRANT

2    examiner goals, and you wouldn't agree

3    that there is a direct correlation between

4    the hours worked and the individual's

5    goals?

6         A.     No.

7         Q.     If you can look at the

8    Performance Guide, please, Exhibit 9.  At

9    the end of the year, the ratings period,

10   you evaluate the associate's performance

11   against each of the goals, right?

12        A.     Yes.

13        Q.     So when we have net closures,

14   it is a weight of 20 percent, I'm on page

15   179, the goal is 44 to 52, and the result

16   is 46.7, right?

17        A.     Yes.

18        Q.     Were these closures basically

19   just counting up how many were closed?

20        A.     How many features, the net

21   feature.

22        Q.     We are talking about net

23   closures.

24        A.     The net closure is the closures

25   minus reopens.

1              HARRIS-GRANT

2        Q.      So it is how many claim files

3    were closed?

4        A.      How many features were closed,

5    not claim file.

6        Q.      Then you have Completed

7    Features underneath that.  What is the

8    difference?

9        A.      You may have features that

10   close, but it doesn't close out the entire

11   claim file.

12       Q.      Then what closes out the entire

13   claim file?

14       A.      When every feature in the file

15   is paid or denied, when every feature in

16   the file closes.

17       Q.      You are saying when Candace

18   gets a net closure, it is when her

19   features have been closed and the features

20   get moved up?

21       A.      Net closure is when a feature

22   closes.  You said a moment ago, files.

23   But it is features, feature-driven.  Even

24   though it says "net closure," it really

25   should say "net features."  But it is

HARRIS-GRANT

1

2    always referred to as net closure.

3              But that has to do with closed

4    features minus the reopens.  The completed

5    features are features that are open that

6    gets transferred up to the higher level,

7    which is the Continuing Unit.

8        Q.      But with regard to those, when

9    you get the result, it is basically

10   counting up how many, correct?

11       A.      Right.

12       Q.      And then you gave a rating of 3

13   because it fits within the ratings scale

14   on the other side?

15       A.      Yes.

16       Q.      Now, when you give the rating

17   result there, there is no other

18   consideration taken to the net closure

19   except how many are closed, right?

20       A.      Minus the reopens.

21       Q.      And these goals, are they

22   different on the chart that you have here

23   compared with the TA2 goals on Exhibit 2?

24       A.      Yes.  That's what I'm looking

25   at, and I'm --

184

1                   HARRIS-GRANT

2        Q.        Or are they condensed?  Would

3    all of these audit results go into file

4    quality in some other section?

5        A.        It looks like it is different.

6    If you look at the total completed

7    features, it said 15 percent, and this is

8    saying 20 percent.

9        Q.        So if Candace was able to

10   settle her files -- settle a file for less

11   than, for example, the authority given by

12   you in a particular case, would that

13   change any of the ratings up here?

14       A.        If she achieved a closure

15   through settlement, it would show up under

16   Net Closures.

17       Q.        But it is not being evaluated

18   on whether she settled on the low end of

19   the authority given or the high end?

20       A.        No, it is a pure number.

21       Q.        So her productivity performance

22   is measured in large part on net closures,

23   completed features, referrals to

24   GEICO-approved auto body shops?

25       A.        Yes.

1          HARRIS-GRANT

2      Q.      And then file quality and

3  audits are important as well?

4      A.      The ARX, I don't think that is

5  a productivity.  That would be more like a

6  customer service, that's why it is 5

7  percent of the goal, because it doesn't

8  measure productivity.  Productivity is

9  measured really in the first two.

10     Q.      But she is measured on the

11  number that she refers over?

12     A.      Yes.

13     Q.      She met that goal?

14     A.      Yes.

15     Q.      And it is not on the quality of

16  the referrals, it is just the number?

17     A.      It is a number that gets

18  referred.

19     Q.      The body of this is your

20  evaluation for Candace?

21     A.      Yes.

22     Q.      It talks about a report card.

23  What is a report card?

24     A.      The monthly, you show your

25  examiners monthly how they are doing.

1                     HARRIS-GRANT

2        Q.      So you meet with your examiners

3    monthly to show them how they are doing in

4    meeting their goals?

5        A.      Yes, and you give them a report

6    card.

7        Q.      And then it says "Candace has

8    shown improvement in her use of CIQ."  Is

9    that Claims IQ?

10       A.      Yes.

11       Q.      And that relates to training

12   given.  So you were continuing training

13   with Candace on Claims IQ?

14       A.      Yes.

15       Q.      So the training they received

16   wasn't just at the beginning when the

17   program was open?

18       A.      Right, new system enhancements

19   and so on and so forth.

20       Q.      Then it says "For 2009, Candace

21   will work to consistently apply for

22   coaching and training given."  Is that

23   coaching and training from you?

24       A.      And the department as well.

25       Q.      What kind of other department

187

HARRIS-GRANT

1

2    training does she have?

3        A.      You have like seminars that are

4    given, you know, to show feedback, any

5    trends that we are seeing and things like

6    that.

7        Q.      It says "Candace shall continue

8    to utilize Claims IQ in her liability

9    investigation and resolution"?

10       A.      Uh-huh.

11       Q.      And it is important for her to

12   use Claims IQ in her ongoing investigation

13   and resolution, isn't it?

14       A.      She needs to utilize it in the

15   investigation and applying the VTL in her

16   investigation and the applicable

17   comparative negligence.

18       Q.      When you mentioned before that

19   she doesn't need to use Claims IQ in order

20   to evaluate her claims, that would be not

21   what you are saying here?  Here you are

22   saying she will work to apply the VTL in

23   her liability investigation and

24   application?

25       A.      In terms of where the breaches

HARRIS-GRANT

1

2    are concerned, and actually pulling it

3    out.  Because you conference with an

4    examiner, you review a file, and there is

5    clear breaches of the vehicle and traffic

6    law that you see folks aren't utilizing

7    that they need to utilize and they are

8    not.

9         Q.     And that's when you conference

10   the file, you find those things?

11        A.     Yeah, if you conference a file

12   or maybe you do a file audit of the file

13   and you will see that certain things are

14   missing.

15        Q.     And it says "She will apply the

16   coaching given to review alog for

17   supervisor instructions"?

18        A.     Yes.

19        Q.     And supervisor instructions

20   only after there is a file conference, or,

21   again, is this you going in --

22        A.     It is almost quarterly, like

23   the three-month, the six-month, and the

24   12-month review, if I'm in the file and I

25   see something and I'm given an

189

HARRIS-GRANT

1

2    instruction, like that would probably

3    explain in one of the other things that

4    you had entered into evidence before why I

5    would, because she was not the best at

6    following instructions.

7         Q.    So if you have examiners that

8    worked for you that weren't the best at

9    following instructions, it was important

10   to follow them closely?

11        A.    I would have to follow up to

12   make sure whatever instruction that was

13   given was followed, especially if it was

14   critical to the claim.

15        Q.    Here it says "in addition to

16   working her e-mails timely."  What is

17   important about working her e-mails

18   timely?

19        A.    She would have backed up

20   e-mails.  It is unheard of to have like

21   over 100 e-mails.  These are the little

22   things that you coach to as a supervisor

23   to say you may not be achieving your

24   completed feature goals or whatever,

25   because if someone is shooting you an

190

HARRIS-GRANT

1

2 e-mail to say "I received a call from the

3 attorney's office, they are no longer

4 representing the person," and you are

5 behind in your e-mails by a month or a

6 couple of weeks, you are not closing out

7 that feature in a timely manner.

8            If you are behind in like your

9 e-mails, that ties into your file quality

10 and your productivity.

11    Q.    Those would be reasons why you

12 would come in on the weekends or stay

13 late, to get these things caught up on?

14    A.    Depending on how the person

15 structures their day and what they are

16 doing.

17    Q.    And then there is a section on

18 page 180 where Candace can comment.  And

19 is that just her commenting on your

20 review?

21    A.    Yes.

22    Q.    She is basically agreeing, and

23 then states that she "will give 110

24 percent along with the tutelage of my

25 supervisor," and that was you, correct?

191

                    HARRIS-GRANT

1

2       A.      Yes.

3       Q.      Then they have their own

4    self-appraisal?

5       A.      Yes.

6       Q.      Are they required to do this?

7       A.      Yes, it is part of the review.

8       Q.      We received a supplemental

9    witness disclosure list in this case.  I'm

10   sorry, I don't have an extra copy, but I'm

11   curious if you would be able to tell me

12   who some of these people are.

13              Who is Sharon Batson?

14      A.      One of my associates.

15      Q.      What do you mean, "associate"?

16      A.      That works for me.

17      Q.      Is she a claims rep?

18      A.      Yes, she is.

19      Q.      How long has she worked for

20   you?

21      A.      Maybe a little over a year.  I

22   think she started July or August of '08.

23      Q.      Then Joseph Pace and John

24   Renwick, would they be the same?

25      A.      John Renwick worked for me back

192

                        HARRIS-GRANT
1
2    in TA1.  He is now in Continuing.
3         Q.     He is still with GEICO?
4         A.     Yes.  And Joseph Pace, when I
5    took the section, he was there.
6         Q.     He is a TA2?
7         A.     Yes.
8         Q.     Is he still with GEICO?
9         A.     Yes.
10        Q.     Are there any TA2s or TA1s that
11   you have supervised besides Candace Harper
12   that are no longer with GEICO?
13        A.     No.
14        Q.     And Victoria Lynn Fuchs, do you
15   know who that is?
16        A.     Yes.  She is a trainer.
17        Q.     Does she still work at GEICO?
18        A.     Yes, she does.
19        Q.     And John Jones?
20        A.     Yes.
21        Q.     He is a trainer?
22        A.     He was a trainer.  He is now in
23   the Continuing Unit.
24        Q.     And he still works at GEICO?
25        A.     Yes.

193

1                    HARRIS-GRANT

2        Q.      What is a closure contest?

3        A.      It is a contest that the

4   managers may decide to have with prizes at

5   a given quarter that they choose to do so.

6        Q.      So if a TA2 wins a closure

7   contest, they get a certain prize?

8        A.      Yes.

9        Q.      You just count up simply how

10  many they close within a certain period

11  and they get the prize?

12       A.      Yes.

13       Q.      So they have an incentive to

14  close those files?

15       A.      Yes.

16       Q.      How are the hours of the

17  employees tracked at GEICO?

18       A.      I don't know that we track the

19  hours.

20       Q.      Do they have a swipe card to

21  get in and out?

22       A.      We swipe in and out to enter

23  the building and when we are leaving.

24       Q.      So if someone comes in on the

25  weekend, or at any time, actually, their

194

HARRIS-GRANT

1

2   entry and exit are tracked?

3        A.      I'm not sure if it is tracked.

4   I just know that that's our policy to

5   swipe them in and out.  I thought it was

6   more as a security procedure, because you

7   would have to have a visitor's pass,

8   security gets involved, so I think it is

9   more of a security.

10       Q.      Do you know who might know

11  whether or not hours are tracked?

12       A.      I'm not sure.  Maybe Human

13  Resources.  I'm not sure.

14       Q.      I had asked you before whether

15  or not in March of this year new policies

16  were instituted regarding the powers that

17  examiners have, TA2 examiners have, and

18  you said there wasn't anything?

19       A.      You said in regards to if their

20  job function changed.

21       Q.      Have any new policies been

22  instituted with regard to what TA2s can

23  do, what authority they have in 2010?

24       A.      That at the supervisor's

25  discretion, the examiners that had the

195

                    HARRIS-GRANT

1

2      authority, they could continue, or you can

3      just look and say everyone in my section

4      has the authority to settle within the 10

5      or the 12.5.

6          Q.      Can you break that down a

7      little bit, if they have the authority?  I

8      thought you said earlier that all TA2s had

9      the authority to settle without approval

10     up to $10,000 per injury claim and $12,500

11     total?

12         A.      It is not every examiner that

13     has it.  So I might have misunderstood.

14                 Within the department, I

15     remember even back for myself as an

16     examiner, I remember conferencing with my

17     supervisor initially.  After that, I

18     didn't go back.  I utilized my 10K.  When

19     I took my section, they came to me and I

20     wanted them to continue to come to me to

21     conference files that they chose to,

22     because I needed to get to know them and

23     know their strengths and their weaknesses.

24                 The situation in terms of the

25     authority to pierce or not pierce, it

196

                    HARRIS-GRANT

1

2    fluctuates throughout the department.  So

3    you do have examiners that had the

4    authority and utilized it fully as they

5    choose to.

6         Q.     Is this written down anywhere?

7         A.     No, it is not a written thing.

8         Q.     Is it per supervisor or is

9    it --

10        A.     Each supervisor can choose to

11   do it a certain way within their section.

12   Like you may have a supervisor that has

13   like 50 percent of their section that does

14   it.  In my unit, I have 100 percent of my

15   people.

16        Q.     100 percent of your people do

17   what?

18        A.     Settle within their authority,

19   pierce is denied and settle within their

20   authority.

21        Q.     And how often has this been,

22   since you took over as a TA2?

23        A.     Not since I have taken over.

24        Q.     Since when?

25        A.     Since this year.  I think it is

197

                    HARRIS-GRANT

1

2    either February or March.  I'm not sure.

3        Q.    Are there any other changes in

4    policy?

5        A.    No.

6        Q.    Anything with regard to

7    determining liability percentages, has

8    that changed?

9        A.    No.

10        Q.    And you said that now -- what

11    kind of authority do your TA2s have now

12    with regard to settlement authority up to

13    $10,000 or 12.5?

14        A.    That's it, that's what they

15    have.

16        Q.    They have 100 percent, they can

17    do it without your approval?

18        A.    Yes.

19        Q.    You said you misspoke, because

20    when you told me before that they had this

21    authority all along, that that was not

22    correct?

23        A.    You have examiners that did

24    have -- that have the authority and were

25    doing it.  It was section by section.

198

HARRIS-GRANT

1

2    Q.    Within your section, when this

3    new policy took effect that they can now

4    settle up to 100 percent without

5    supervisor approval, prior to that, what

6    was the makeup of your group?

7    A.    The makeup of my group, I had

8    examiners that when I did bundle reviews,

9    I would see that they did a settlement

10   within their own authority, and I didn't

11   coach to it or do anything about it.

12   Q.    How many of your examiners?

13   A.    It was one examiner that I saw

14   do that.

15   Q.    That you allowed to settle up

16   to?

17   A.    She did it, and I didn't coach

18   or say anything because she did have the

19   authority to.

20   Q.    She had the authority?

21   A.    Yes.

22   Q.    Did anybody else have the

23   authority or was it just this one?

24   A.    They all had the underlying

25   authority that they can do that.  But

HARRIS-GRANT

1

2  examiners would come in and conference

3  with me.  I never had a conversation with

4  my people and said "You don't have the

5  authority, you have to see me on every

6  single file."

7       Q.     Let's step back.

8              What was the new policy with

9  regard to settlement authority that was

10  instituted in February or March of this

11  year?

12      A.     That it was at the supervisor's

13  discretion, if the person was fully

14  oriented and you were comfortable with

15  them, based on what they have been doing,

16  they can say they no longer need to see

17  you.  They don't have to come in.

18      Q.     They don't have to seek

19  authority from you?

20      A.     Uh-huh.

21      Q.     Prior to this you are telling

22  me that within your department, that was

23  the same policy in effect?

24      A.     Pretty much, yes, because there

25  were sections that didn't require and I

HARRIS-GRANT

1

2     had people that would pierce on their own

3     and did not come in to me, to see me.

4                    If I saw it in a bundle, I

5     didn't call them out on it to say "Why

6     didn't you see me on this?"  There is also

7     claims that is resolved where nothing is

8     entered into Claim IQ because they have

9     the authority where they can do walk-way

10    BI settlements, meaning if it is a

11    pedestrian or bicyclist and they choose to

12    give them a dollar amount --

13         Q.    What was the purpose of

14    instituting a new policy if that was

15    already the policy in effect?

16         A.    I wasn't there on the day of

17    and it was my peers that told me.  It was

18    more for a clarification to clear up to

19    the examiners that you do have the

20    authority, you don't have to see your

21    supervisors if you choose not to.

22                    Believe it or not, people still

23    come in and see you, even with that

24    clarification.

25         Q.    And there was also

1                    HARRIS-GRANT

2    clarification needed regarding piercing

3    the threshold as well?

4        A.      No.

5        Q.      What was the policy change

6    regarding piercing the threshold?

7        A.      There was no policy change

8    about piercing the threshold or not

9    piercing.

10       Q.      And there was no policy change

11   with regard to determining percentage of

12   liability?

13       A.      No.  I had one examiner that I

14   removed this authority to accept 100

15   percent because he would just blanketly

16   accept 100 percent.  And that was just one

17   of my six.

18       Q.      If a TA2 who works in your

19   department said there were clear changes

20   to the policy that took effect March 24,

21   2010 they would be incorrect?

22       A.      I think it was more of a

23   clarification.

24       Q.      And do you know what prompted

25   this clarification?

1                    HARRIS-GRANT

2        A.       No, I don't.

3        Q.       Would it be this lawsuit?

4        A.       I don't know.

5                 MS. McGOLDRICK:  I think that's

6    all I have.

7                 MR. HEMMENDINGER:  Well,

8    unfortunately, it is going to be a little

9    longer because I have a couple of

10   questions.

11   EXAMINATION BY MR. HEMMENDINGER:

12       Q.       Earlier today you testified

13   about the Claims Manual.  I want to ask

14   you some follow-up questions about that.

15       A.       Okay.

16       Q.       Is there anywhere, any table or

17   matrix or other information, you can look

18   up in the Claims Manual to see what the

19   percentage of liability should be on a

20   given set of facts?

21       A.       Absolutely not, no.

22       Q.       Is there anywhere you can look

23   up to see what the amount of damages for

24   pain and suffering would be for any set of

25   facts?

                    HARRIS-GRANT

1

2       A.      No, absolutely not.

3       Q.      You testified at one point I

4   believe that there was a determination

5   that was easy to make regarding coverage.

6   I forget what you said was easy to make.

7               But are there coverage

8   questions -- are all coverage questions

9   that have to be looked into by a TA2 easy

10  to decide?

11      A.      No, it is not easy.  The thing

12  is an investigation is needed in every

13  single coverage issue that arises.  So say

14  what I was discussing earlier about

15  nonpermissive use, late notices, you can't

16  just arbitrarily look at the file and say

17  it is not an issue.  You have to do an

18  investigation.

19              So it is not an easy resolution

20  where you just look and say oh, there is

21  no issue.  You have to investigate it by

22  speaking to all the interested parties.

23      Q.      And if the TA2 determines there

24  is no issue concerning coverage, she can

25  record that in the file, correct?

204

1                    HARRIS-GRANT

2      A.      Correct.

3      Q.      If the TA2 just decides that

4  there is an issue involving coverage, what

5  does the TA2 do after that?

6      A.      They make a recommendation.

7      Q.      How do they come up with the

8  recommendation?

9      A.      Based on their investigation

10  and assessment.

11      Q.      Are there some facts that bear

12  on that that could be looked up in GEICO's

13  computer system?

14      A.      If it is --

15      Q.      For example, when the policy

16  was issued?

17      A.      Yeah, the policy effective

18  date, cancellation dates.

19      Q.      Are there other pertinent facts

20  that you would not be able to look up in

21  GEICO's system?

22      A.      Absolutely.

23      Q.      What kind of things?

24      A.      Such as when a loss took place,

25  especially when no police report was

HARRIS-GRANT

1

2  filed, permissive use, whether or not we

3  were involved in an accident.  To see

4  whether we were at the time and place of

5  occurrence, you need to inspect the file,

6  take a recorded statement, you may have to

7  use SIU.  It is involved.

8      Q.    I will ask you about the audits

9  for a second.  I'm not talking about the

10  quarterly reviews, but the audits that you

11  do of people's files.

12          You review two people on your

13  team per month and one person on somebody

14  else's team?

15      A.    Yes.

16      Q.    That's not right, is it?  Let

17  me make sure I articulate this correctly,

18  or you articulate it correctly.

19          In a month, how many files do

20  you audit?

21      A.    I audit three per examiner.

22      Q.    On your team?

23      A.    Two from my team and one for a

24  cross team.

25      Q.    So in a given month, three

HARRIS-GRANT

1

2  files that, say, Ms. Harper had, would

3  have been audited?

4       A.     Yes.

5       Q.     And that's out of her total

6  number of open files?

7       A.     Yes.  That's what I'm required

8  to do.  If you have a bad month, you may

9  not get to do all three or two.

10       Q.     There is a document or an entry

11  that is called negotiation action plan,

12  and this appears in the claim evaluation

13  short form and it also appears in the

14  alog -- that doesn't appear in Claims IQ,

15  does it, the negotiation action plan?

16       A.     That's their summary that they

17  made on that section in Claim IQ, and they

18  save it, snapshot it, onto the alog.

19       Q.     The negotiation action plan of

20  that is preprinted, correct?

21       A.     Yes, it is preprinted.

22       Q.     Do the TA2 fill that out with

23  what their actual negotiation tactics are

24  going to be?

25       A.     No.

207

1                    HARRIS-GRANT

2       Q.      Do they tell you what number

3   they are going to start with?

4       A.      No.

5       Q.      Do they tell you what numbers

6   are going to go up?

7       A.      No.

8       Q.      Do they tell you when they are

9   going to increase their offer?

10      A.      Absolutely not, no.

11      Q.      Is any of that covered in what

12  is labeled as an action plan?

13      A.      No.  That thing should really

14  be named like a file summary or something,

15  or medical summary.

16      Q.      Does it discuss the negotiation

17  tactics at all?

18      A.      No.

19      Q.      In Candace Harper's case, once

20  you gave her settlement authorization, how

21  often or in what percentage of cases, if

22  you can answer that, would you have a

23  follow-up conversation with her about her

24  negotiation tactics?

25      A.      About her negotiation tactics?

```
 1              HARRIS-GRANT
 2   Hardly ever.
 3        Q.    Did she come to you and ask for
 4   your advice on when to increase it?
 5        A.    No.
 6        Q.    Or how much to increase the
 7   offer?
 8        A.    No.
 9        Q.    Typically when you dealt with
10   her, when you were discussing settlement
11   authority, did she make a recommendation
12   as to a figure she was looking for?
13        A.    Yes.
14        Q.    And if she did not settle for
15   within that figure, what happened then?
16        A.    She would either come back and
17   see me to conference it or to give me an
18   update on what is going on.
19        Q.    And we know that in some cases
20   the authorization was increased, correct?
21        A.    Yes.
22        Q.    In those cases did she say
23   "Well, what do you think I should do?"
24        A.    No, she came in with a number
25   that she wanted and that's what I would
```

209

1                    HARRIS-GRANT

2    give to her.

3        Q.    What percentage of your time do

4    you think you spend on administrative

5    tasks that doesn't involve actuallily

6    overseeing files?

7        A.    I think over 50 percent, well

8    over, on my administrative stuff.

9        Q.    Would that include doing

10   evaluations?

11       A.    Like conferencing files with

12   examiners?

13       Q.    Personnel stuff.  Do you have

14   to do payroll?

15       A.    Yes, approve.

16       Q.    Do you have to handle time-off

17   requests?

18       A.    Yes.

19       Q.    Do you have to orient new

20   employees?

21       A.    Yes.

22       Q.    Do you have meetings to go to?

23       A.    Yes.

24       Q.    Special tasks?

25       A.    Yes.

210

1                HARRIS-GRANT

2        Q.      Reports?

3        A.      Uh-huh, projects, stuff like

4    that.

5        Q.      The scripts that are provided

6    by Claims IQ for interviews, are the TA2s

7    required to adhere to those verbatim?

8        A.      No.

9        Q.      How closely do they adhere to

10   them?

11       A.      They have radio buttons for

12   them to check off if they did, and you

13   rarely ever see it checked off.  But you

14   don't even coach to it.  They just go off

15   their own mental script from doing this.

16   It is like routine, in a sense, for them.

17       Q.      Are there cases where they are

18   required to go completely off the script?

19       A.      No.

20       Q.      What if they still have

21   questions after they are done asking these

22   questions?

23       A.      They can ask them, even during.

24   They can ask follow-up.  Even after the

25   recording is finished, they can call up

1                     HARRIS-GRANT

2    the interested party later on without it

3    being recorded and ask follow-up questions

4    to say "You know what, I missed so and

5    so," or "I received new information, this

6    is what is told to me," and ask follow-up

7    questions based on that, based on

8    information received.

9         Q.    How often does that happen?

10        A.    I'm not quite sure.  But it

11   does happen.  Maybe they are negotiating

12   liability with an attorney, and the

13   attorney says "Oh, I had a witness to the

14   accident," and you may have to call up

15   your insured.  And you would say "Well,

16   you said there was no witness.  You don't

17   remember there being a witness at the

18   scene?"  Stuff like that.

19        Q.    If Ms. Harper was in a

20   negotiation, would she come to you and say

21   "Look, the attorney is at 10, I'm at 8,

22   what do you think I should do next?"

23        A.    No, she would come to me to say

24   "This is what I'm recommending.  We are at

25   an impasse.  This is what I'm

                    HARRIS-GRANT

1

2      recommending."

3          Q.      If she was just in an ordinary

4      negotiation, let's say her authorization

5      was 12 and the attorney asked for 15 and

6      she offered 6 and the attorney moves to

7      10, would she come back to you and say

8      "What do I do next?"

9          A.      No.

10         Q.      How independently of you did

11     she handle her negotiations?

12         A.      Very independently.  That's one

13     of her assets, she was really good at

14     that.

15              MR. HEMMENDINGER:  I have no

16     other questions.

17     EXAMINATION BY MS. McGOLDRICK:

18         Q.      When you were talking about the

19     Claims Manual not having a table that

20     shows the amount of damages for any given

21     set of facts and you said there wasn't a

22     table, now, are there guidelines within

23     the manual on to how go about determining

24     damages?

25         A.      Not that I can think of.  The

1          HARRIS-GRANT

2    whole Claims Manual is on claims handling

3    and guidance.

4         Q.    Are there details within there

5    on how to do that?

6         A.    No.  Not that I can recall, no.

7         Q.    For example, if there is a

8    coverage problem, does the Claims Manual

9    give you detail on what you should do to

10   handle that coverage problem?

11        A.    I don't recall if there is a

12   section in there.  I don't recall that.

13              (Harris-Grant Exhibit 11 marked

14   for identification.)

15        Q.    On the front page, Chapter IV,

16   Coverage, the first chapter says Overview.

17   It says "In every claims situation, the

18   initial task of the examiner is to verify

19   proper coverage."

20              Would you agree with that?

21        A.    Yes.

22        Q.    Then it says "In the vast

23   majority of claims, this is easily done by

24   reviewing computer data regarding policy,

25   insured's vehicles and the insured person

1              HARRIS-GRANT

2    involved in the loss."

3              Do you agree with that?

4        A.    Not necessarily, no.  It

5    depends on the coverage conditions that

6    come up.  But then the investigation

7    starts.

8        Q.    It says "The examiner will

9    review computer screens that provide

10   system information regarding all three of

11   these elements.  Occasionally a claims

12   handler at some level of a claims

13   resolution problem will be confronted with

14   a coverage question."

15             So in this manual it is saying

16   in the vast majority of claims coverage,

17   issues are easily verified?

18        A.    I don't think so.

19        Q.    Is that what the manual says?

20        A.    No, that is not what it says.

21   It does not say "easily."

22        Q.    If we go to page 17, Coverage

23   Problem Handling Procedures.  "The

24   following are step-by-step outlines on

25   handling various coverage problems."  Then

HARRIS-GRANT

1
2    we have Sections A through I, and it is
3    from page 17 to 26.  Do you see that?
4         A.      Mine is on 16.
5         Q.      You see Coverage Problem
6    Handling Procedures?
7         A.      Yes, that is on page 16.
8         Q.      There is a step by step guide
9    in the Claims Handling Manual for how
10   coverage claims should be handled?
11        A.      This is showing screens that
12   they could look at, if it is a coverage
13   issue that can be quickly resolved.  Like
14   they are showing IDIQ.  Say it is a claim
15   where you want to verify permissive use,
16   you can check the policy system to see if
17   this is a listed driver on the policy or
18   not.
19        Q.      It is telling you how to do
20   that, right?
21        A.      Uh-huh.
22        Q.      Number 4, it says "Alert your
23   supervisor/discuss coverage screens,
24   sending a reservation of rights letter."
25        A.      I can tell you the reservation

HARRIS-GRANT

1

2      of rights letter is rarely sent.

3          Q.      Is that what it says?

4          A.      But I'm letting you know what's

5      in common practice right now.  Not from

6      day one does someone see me.  They may see

7      me if they choose to for guidance and so

8      forth.

9          Q.      But there is a detailed step by

10     step guideline here contained in the

11     Claims Manual?

12         A.      I don't think this is

13     all-encompassing.  I think it is saying to

14     transfer -- hold on.

15              (Witness perusing document.)

16         Q.      I'm simply asking if there is a

17     step by step guide in the Claims Handling

18     Manual.

19         A.      This is what this looks like,

20     yes.

21         Q.      And you were talking about the

22     negotiation action plan.  You said the

23     plan itself as listed may not contain

24     specifics of what the examiner intends to

25     do.

1                  HARRIS-GRANT

2          But when you discussed the file

3     with the examiner, you conference it,

4     that's when you have those discussions,

5     correct?

6          A.     You ask them what are they

7     going to argue.  And it is not everyone

8     that you do that with.  With an examiner

9     who is as strong as Candace, I'm not doing

10    that on every file with her.

11         Q.     But you do have those

12    discussions?

13         A.     Mostly with people who are not

14    certified, who are not oriented.

15         Q.     Then you said you handle about

16    50 percent of your time on personnel

17    stuff, like approving payroll and time

18    off, new employees?

19         A.     Uh-huh.

20         Q.     But I think you had testified

21    earlier if your TA2s meet their goals,

22    your performance review rating will be

23    higher, right?

24         A.      If it is met, if they meet

25    their goals, I'm meeting my goals.

218

1                    HARRIS-GRANT

2        Q.      So the priority is working with

3    your TA2 examiners to make sure they meet

4    the goals?

5        A.      They are my main priority, but

6    I'm not with them every day.  Like I

7    testified earlier, I can have an examiner

8    that I don't meet with or conference with

9    anything for an entire week.

10       Q.      But you could review their alog

11   files or their alog notes?

12       A.      If it comes up for review or if

13   they come in to see me.

14       Q.      Or as we mentioned in a prior

15   exhibit, when you went into alog and you

16   found that the individual didn't do as you

17   instructed, and you --

18       A.      That was from my review, again.

19       Q.      It was from your review, and

20   then you instructed her to do something,

21   and it was a few days later the file

22   wasn't being rereviewed, was it?

23       A.      Because she was an examiner

24   that was not good at following supervisor

25   instruction, as I wrote in her PA, and

219

1                    HARRIS-GRANT

2       that she agreed to.

3            Q.      So you had to monitor her and

4       other examiners who were not good at

5       following instructions?

6            A.      And if it was critical to the

7       file.

8                    MS. McGOLDRICK:  That's all I

9       have.

10      EXAMINATION BY MR. HEMMENDINGER:

11           Q.      Once you investigated a

12      coverage issue, could you look up in this

13      manual, Exhibit 11, to find out what the

14      answer is, to tell you if it was covered,

15      not covered?

16           A.      Absolutely not.

17                   (Continued on the next page.)

18

19

20

21

22

23

24

25

220

1                    HARRIS-GRANT

2              MR. HEMMENDINGER:  That's all I

3    have.

4              MS. McGOLDRICK:  Thank you.

5

6              [TIME NOTED:  4:15 p.m.]

7

8

9

10

11

12

13

14

15

16

17

     _____

18             MARLENE HARRIS-GRANT

19

     _____

20   Subscribed and sworn to

     before me this _____

21   day of _____, 2010.

22   _____

       Notary Public

23

24

25

1

2              I N D E X

3

WITNESS          EXAMINATION BY          PAGE

4

HARRIS-GRANT   McGOLDRICK            3, 212

5              HEMMENDINGER          202, 219

6

7

8

              E X H I B I T S

9

HARRIS-GRANT       DESCRIPTION        PAGE

10

Exhibit 1  GEICO 00130              26

11  Exhibit 2  GEICO 00147              43

Exhibit 3  Claim #1013-0001        63

12            through #1013-0041

Exhibit 4  Claim #1013-0162        79

13            through #1013-0163

Exhibit 5  Claim #1013-0042        88

14            through #1013-0070

Exhibit 6  Claim #1013-0110        92

15            through #1013-0111

Exhibit 7  Claim #1013-0109        97

16  Exhibit 8  Chapter III -          121

            Reserving

17  Exhibit 9  GEICO 00178-00181      159

Exhibit 10 Decision and Notice     178

18            of Decision from

            Unemployment Insurance

19            Appeal Board

Exhibit 11 Chapter IV -            213

20            Coverage

21

22

23

24

25

222

1

2    DIRECTIONS NOT TO ANSWER

3    Page        Line

4         (NONE)

5

6

7


     REQUESTS

8

     Page        Line

9

          (NONE)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

223

1

2          CERTIFICATION

3

4     I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7     That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12     I further certify that I am not related

13   to any of the parties to this action by

14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16     IN WITNESS WHEREOF, I have hereunto set

17   my hand this 3rd day of May, 2010.

18

19

        _____

20            TODD DESIMONE

21

22        *     *     *

23

24

25

224

```
 1
 2              ERRATA SHEET
          VERITEXT REPORTING COMPANY
 3
    CASE NAME: HARPER V. GEICO
 4  DATE OF DEPOSITION: 5/3/10
    WITNESS' NAME: MARLENE HARRIS-GRANT
 5
    PAGE/LINE(S)/    CHANGE           REASON
 6  _____/_____/_____/_____
    _____/_____/_____/_____
 7  _____/_____/_____/_____
    _____/_____/_____/_____
 8  _____/_____/_____/_____
    _____/_____/_____/_____
 9  _____/_____/_____/_____
    _____/_____/_____/_____
10  _____/_____/_____/_____
    _____/_____/_____/_____
11  _____/_____/_____/_____
    _____/_____/_____/_____
12  _____/_____/_____/_____
    _____/_____/_____/_____
13  _____/_____/_____/_____
    _____/_____/_____/_____
14  _____/_____/_____/_____
    _____/_____/_____/_____
15  _____/_____/_____/_____
    _____/_____/_____/_____
16  _____/_____/_____/_____
    _____/_____/_____/_____
17  _____/_____/_____/_____
    _____/_____/_____/_____
18  _____/_____/_____/_____
    _____/_____/_____/_____
19  _____/_____/_____/_____
20
            _____
21            MARLENE HARRIS-GRANT
22  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS_____DAY
23  OF_____,2010.
24  _____
            NOTARY PUBLIC
25  MY COMMISSION EXPIRES_____
```