# CLAIMS MANUAL

11/15/05
to
3/2/06

**CONFIDENTIAL**

Confidential Information of the GEICO Companies
© Government Employees Insurance Company

# CLAIMS MANUAL

## TABLE OF CHANGES

| Change No. | Section (s) and Page(s) No. | Date of Change | Date Entered |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

This manual was completely revised in 2002.   Chapters I, II and IV through VII were published and distributed May 10, 2002.   Chapters III and VIII through XIII were distributed June 28, 2002.   Changes to the manual are numbered sequentially by year (example, 02-1).  The date of the change is the date of the cover memo distributing the change.   The change number, section, page number, date of change and the date you enter the change should be noted on the Table of Changes page in the front of your manual.

CONFIDENTIAL

# CLAIMS MANUAL

## Table of Contents

| | |
|---|---|
| I | The Insurance Industry and GEICO |
| II | The Claims Function |
| III | Reserving |
| IV | Coverage |
| V | Investigation |
| VI | Principles of Legal Liability |
| VII | Legal Damages – Bodily Injury and Property Damage |
| VIII | Physical Damage |
| IX | Suit Handling |
| X | Exhibits |
| XI | Subrogation |
| XII | Arbitration |
| XIII | Control File Handling and Procedures |
| XIV | Performance Review |

# CHAPTER I

## THE INSURANCE INDUSTRY AND GEICO

### Table of Contents

Page

I.     Development ............................................................................................................... 1

II.    Types of Insurance Companies ............................................................................... 1

III.   Insurance Defined...................................................................................................... 2

IV.    The Contract of Insurance ....................................................................................... 2

V.     Regulation of Insurance............................................................................................ 2

VI.    Horizontal Loss Sharing........................................................................................... 3

VII.   Compulsory Liability Insurance ............................................................................. 3

VIII.  The Company History ............................................................................................... 3

IX.    Some Key Officers and Departments .................................................................... 4

X.     Claims Home Office................................................................................................... 7

CONFIDENTIAL

5-10-02

# CHAPTER I

## THE INSURANCE INDUSTRY AND GEICO

### I.    DEVELOPMENT

The development of the insurance industry has been aligned with major economic needs. Dating back to early civilization, merchants saw the need for a service that would guarantee financial security in the event of a navigational catastrophe during the shipment of goods. The concept was formed to distribute risk among large groups with similar characteristics. As Society evolved, so did the insurance industry. Ocean Marine and Inland Marine may have started the industry but very large insurers occupying "niche" status today have no affiliation with either Ocean Marine or Inland Marine. Variety is the name of the game in insurance today. A couple of broad categories and sub-specialties are listed:

- Personal Insurance includes life, annuities, retirement income, unemployment, accident and health.

- Property and Casualty Insurance guards against loss or damage to property, indemnifies against loss or damage by from specified hazards and protects against legal liability for bodily injury or property damage to others. It includes fire/allied lines (homeowners, boatowners, and CPL), Automobile (Bodily Injury, Liability, Property Damage Liability and Physical Damage), Workers Compensation and Marine.

Furthermore, the insurance industry as a whole continues to change. Mergers such as the one between CITICORP and Travelers show how the services offered by the financial industry continue to blend with Insurance operations. Our Company library has many books on the subject of insurance and its history.

### II.    TYPES OF INSURANCE COMPANIES

Property and Casualty Insurance companies are classified in one of the following ways:

- Stock Companies are companies with stock owned by shareholders and formed for profit making. Example: Allstate.

- Mutual Companies are companies that are essentially owned by their insureds. Their premium payment is treated like an investment in the company. They participate in the companies' function and share in its financial loss or gain. Example: State Farm

I-1

### CONFIDENTIAL

- <u>Reciprocal or Inter-insurance Exchange</u> are companies that are similar in nature to mutual companies as each member shares in the financial loss or gain. These types of organizations are usually unincorporated and are underwritten on a pro-rata basis depending on the individual's underwriter's subscription. Example: Lloyds of London

## III.    INSURANCE DEFINED

There are many varying definitions for the term "insurance." In essence, insurance is an agreement or contract between an insured and the company. In exchange for a premium, the company agrees to indemnify or compensate the insured for compensatory damage or loss.

Insurance is a social device to control individual loss by combining a sufficiently large number of homogeneous exposure units to make their losses collectively predictable.

## IV.    THE CONTRACT OF INSURANCE

Certain elements must be present in order for there to be a valid insurance contract:

- There must be an insurable interest—that an actual loss will be suffered for a specified event by the insured.

- There must be the potential for or risk of loss.

- The insurer assumes the risk described in consideration of the premium payment.

- A premium must be paid in consideration for the protections described in the Policy.

The basic elements of any contract apply as well: an offer (an application for insurance), acceptance (issuance of a policy), consideration (payment of premium and a promise (indemnification by the company).

## V.    REGULATION OF INSURANCE

The purpose of insurance regulation is to protect the public interests. This includes protection from unfair treatment as well as ensuring that carriers maintain financial solvency. Regulations provide a set of standards for the industry to follow in order to best serve the needs of the general public. In most instances, the various States issue and enforce these regulations.

I-2

CONFIDENTIAL

Insurance companies are regulated by legislation, administration and court action. The department of insurance of each state sets regulations in the form of bulletins and codes.

The department of insurance's responsibilities include the establishment of licensing requirements and the supervision of operation and liquidation procedures. It also reviews rates (premiums), wording of policy language and revocation of an insurer's license or certificate, should that be warranted.

Each state has its own code and regulations, so there is no interstate uniformity. It is important for all GEICO associates to maintain a professional and cordial working relationship with the personnel of the department of insurance.

## VI.   HORIZONTAL LOSS SHARING

Since the principle of insurance is based on the concept of many sharing the losses of few, the insurer has to measure the predictability of risk and effect a wide enough distribution of those risks to make insuring them profitable.

The insurer is able to do this though the use of the LAW OF LARGE NUMBERS. The process is an exact science based on selecting good risks, charging an adequate premium, calculating the predictability of risk, and spreading that risk over the larger group. Accumulated experience and calculated studies enable the insurer to refine its system of selection to "profitable insureds" or good risks. The Underwriting Department scrutinizes the acceptability of the applicants. Once the classification of acceptable risks is achieved, an appropriate premium rate is determined.

## VII.   COMPULSORY LIABILITY INSURANCE

There are financial responsibility or compulsory liability insurance laws in most states. These laws require insurance to be made available to all persons including those who represent a less than favorable risk. Insurers have the right to reject risks and states have developed assigned risk plans to assist those who would otherwise be unable to get insurance on their own. These risks are usually charged a higher premium by the insurer and must be retained for a specified period of time, unless canceled for cause. Carriers have traditionally been assigned high-risk policies/drivers based on the number of policies they have written in that state in relation to the total number or policies written by all companies.

## VIII.   THE COMPANY HISTORY

Government Employees Insurance Company ("GEICO") has come a long way since the late Leo Goodwin founded it in 1936. His idea was a new one: to restrict its

5-10-02

CONFIDENTIAL

policyholders to government workers and to sell its automobile policies by direct mail at the lowest possible rates.

With the rapid growth of new policyholders, the home office was moved from Texas to Washington, D. C. In 1937, the company chartered under the laws of the District of Columbia. In 1948, GEICO offered its stock to the public.

Through the years, GEICO has founded many affiliate companies including Government Employees Life Insurance Company (GELICO), GEICO Indemnity, Government Employees Financial Corporation (GEFCO), GEICO General Insurance Company, GEICO Casualty Company, GEICO International, GEICO Annuity and Insurance Company and GEICO Investment Service Company (GEIVEST). Many are no longer operational.

In 1958, GEICO's eligibility list was expanded. It was again expanded in 1973 to open its doors to even more policyholders. However, following this decision, several problems arose in 1976, which almost precipitated the financial demise of the Company. A combination of several factors contributed to the crisis: inadequate underwriting practices; insufficient premium charge, improper claim reserving, and the instability of stock investments.

An immediate plan for recovery was instigated. It not only involved internal measures, but also a reinsurance treaty involving twenty-seven other companies in the Industry. The selling of preferred stock provided the capital needed to return the Company to profitability.

The Company's history has been unique and at times tumultuous, but our future seems brighter than ever. GEICO is now one of the strongest property and casualty insurers in the world.

The Company is a "direct writer" selling the bulk of our policies via telephone sales centers located in various parts of the country. This is very different from "agency companies" which are now attempting to duplicate GEICO's success in this arena. By eliminating agents and selling directly to our customers, we are able to pass along savings via lower premiums.

In 1996, Berkshire Hathaway completed its purchase of 100% of GEICO stock and we became a wholly owned subsidiary. The Company writes personal lines automobile insurance in most states. Like our sales department, we have five regional locations and three field offices throughout the country to handle claims.

## IX.   SOME KEY OFFICERS AND DEPARTMENTS

President and Chief Executive Officer: Insurance Division – The chief executive officer of the Company appoints subordinates, supervises the overall insurance

I-4

CONFIDENTIAL

5-10-02

operation and has broad executive powers to carry out policies and procedures. The CEO reports directly to Berkshire Hathaway.

President and Chief Investment Officer – This officer reports directly to Berkshire Hathaway and is responsible for corporate investments.

Senior Vice Presidents – Responsible for the internal insurance operations of the Company. His or her duty is to assist and implement the decisions of the Chief Executive Officer.

General Counsel – Protects the legal interests of the Company and organizes and directs the Company's corporate programs and operations to assure compliance with corporate legal requirements.

Corporate Secretary – The Office of the Corporate Secretary has responsibility for creating, compiling and maintaining original corporate records pertaining to the GEICO Companies' Boards of Directors, Officers and company transactions; processing associate related garnishments and other withholding orders served on such companies and making certain state insurance compliance/regulatory filings for such companies.

Actuarial Pricing Department – Recommends and implements prices that will allow for profitable growth in GEICO's four property/casualty companies and provides state insurance departments with required statistical filings

Claims Home Office – This department provides claims technical and procedural policy to the regions and regulates the following: training guidelines, audits, statistical reports, claims security, claim forms, claims system and controls claims that are outside of the scope of regional authority.

Communications Department – Compiles and distributes the internal and external publications of the company and provides communications to employees, policyholders, news and media and the community at large.

Corporate Planning and Management Information Department – Manages GEICO Corporation's planning and budget development process. Assists the profit centers in developing key operating statistics and monitors and reports on them throughout the year

Human Resources Department – Provides the Company with personnel, administers salary and records, coordinates compensation and performance measurement, and provides internal services and benefits. Personnel activities are handled through each region's Human Resources Department.

Information Services Department – This department develops and implements programs that allow departments to access quickly and easily any and all information pertinent to their specific needs.

I-5

CONFIDENTIAL

5-10-02

<u>Internal Audit</u> – The mission of the internal audit department is to facilitate management's oversight responsibilities and to provide consultative services that will assist the corporation in achieving its objectives.

<u>Legislative Counsel</u> – Plans and conducts the development and maintenance of Company relations with federal and state government departments, regulatory authorities and trade associations.

<u>Marketing Department</u> – Base on underwriting, actuarial and claims statistics, the marketing department advertises our product. Implements advertising and sales strategies to generate inquiries from prospective policyholders.

<u>Office of the Treasurer/Controller</u> – These departments control corporate finances. This includes the responsibilities for the fiscal day to day operations of the Company including disbursements, budget expenses, tax administration and capital expenditures and banking operations.

<u>Program Manager</u> – A general manager of all matters affecting a particular line. He or she monitors legislative and industry developments, then coordinates the implementation of procedural guidelines with the regions and departments.

<u>Quality Administration</u> – The goal of this department is to oversee the Quality Improvement Process (QIP) management. This is done by forming committees of company associates from varied backgrounds and experience to find ways to improve efficiency, productivity and customer service.

<u>Real Estate and Facilities Management Department</u> – This department manages the Company's real estate transactions, supervises the purchase of properties and mortgages, and controls the tax record papers. It is also responsible for the maintenance, engineering and security functions associated with the facilities.

<u>Regional Function</u> – The Company has divided its operation into regions according to geographic locations. Each region is responsible for the underwriting and claims functions in its territory.

<u>Staff Counsel</u>- This department provides legal representation to individual clients, renders legal advice and assistance to claim representatives on matters in litigation.

<u>Staff Development</u> – This department analyzes business processes and job performances to increase productivity through more effective staffing through GMCS/Cybernetics. It also monitors performance and provides training and evaluation tools to support associates in their jobs, such as coaching and performance analysis. It supports the recruiting, selection, and retention of all associates.

<u>Systems Operations Department</u> – This department is responsible for technical support of large systems, client/server environments, telecommunications, electronic output, the Internet, the Intranet and postal administration.

5-10-02

CONFIDENTIAL

Systems Security – This department is responsible for maintaining the integrity of the Company computer systems. It administers SECURID cards to dial up users. They also provide a list of the latest published versions of the Corporate Security Policies and related Standards, Guidelines and Procedures

Underwriting and Product Management – Establishes underwriting policies and also develops guidelines for the selection of new business and the retention of current business. This department establishes pricing policy, provides controls and audits regional underwriting procedures.

## X.     CLAIMS HOME OFFICE

Claims Home Office is headed by the Vice President of Claims who is assisted by assistant vice presidents, directors and the home office staff.

The claims function is the shared responsibility of Claims Home Office and the regions. The Vice President is responsible for management of the claims function in a manner compatible with concurrent responsibilities of the Regional Vice Presidents. The responsibilities include maintenance of financial soundness and profitability at desired levels while meeting fiduciary obligations to deliver benefits and services due our policyholders expeditiously and at an affordable cost.

The department is also responsible for the development of guidelines for the proper handling of claims. The department provides support in carrying out this responsibility in the following ways:

- Provides training in legal matters, automobile liability, medical management and rehabilitation, auto damage, claims security, systems and procedures and structured settlements.

- Participates in the total development and subsequent implementation of new or revised claims systems and procedures to accomplish efficient and effective claims processing in all jurisdictions.

- Creates and uses claims performance review procedures to ensure that claims are handled within Company Policy and/or Guidelines.

- Formulates productivity standards and claims workloads for all associates involved in handling claims.

- Coordinates complex or unusual claims involving technical and/or legal issues and coordinates any claim when requested by any company claims unit.

- Furnishes authority on claims with values in excess of regional authority limits.

I-7

CONFIDENTIAL

5-10-02

# CHAPTER II

## THE CLAIMS FUNCTION

### Table of Contents

Page

I.   General Statement ................................................................................................. 1

II.   Professional Guidelines ....................................................................................... 1

    A. Code of Conduct............................................................................................. 1
       • The GEICO Claims Code of Conduct Booklet................................................. 2
    B. Responsibility of the Claims Associate ......................................................... 2
    C. Professional Ethics ...................................................................................... 2
    D. Plaintiffs' Attorneys .................................................................................... 3
    E. Confidentiality of Claim File Information....................................................... 3

        1. General ................................................................................................. 3
        2. Double Insured Cases.............................................................................. 4

    F. Our Relationship with Insureds and Claimants ....................................... 5

III.   Technical Claims Handling................................................................................. 5

    A. Facing the Future............................................................................................. 5
    B. Settlement Techniques.................................................................................... 6
    C. Unfair Claim Practices.................................................................................... 7
    D. Our Relationship with Attorneys and Independent Adjusters................................. 7
    E. Letters and Reports ........................................................................................ 9

**CONFIDENTIAL**

# CHAPTER II

## THE CLAIMS FUNCTION

### I.   GENERAL STATEMENT

It is company policy to settle claims fairly and as promptly. Investigation is necessary for every claim presented, but the extent of the investigation depends on the nature of the claim. The real objective of the investigation is a fair resolution at the earliest practicable time. At every step in the claim process the question should be raised, "how can this claim best be resolved?"

Prompt service, however, does not justify paying claims the company does not owe. It is as wrong to pay claims which should not be paid as it is not to pay claims which should be paid. Promptness and fairness should be used throughout the handling of all claims. All associates handling claims have a duty to deal frankly and openly with policyholders, witnesses, attorneys, claimants, medical providers, and the general public.

Our claims associates have the obligation to treat policyholders and all interested parties with respect and deal with their insurance issues fairly and as quickly as possible.

### II.   PROFESSIONAL GUIDELINES

#### A.   Code of Conduct

The nature of claims work requires that claims associates comply with GEICO's standard of competence and ethical conduct. Pride, self-respect and integrity are characteristic of the successful claims person.

Traditionally, fairness, competence, and integrity have also been characteristic of GEICO claims associates. We can be proud of these traditions; through them we have earned the respect of all with whom we come into contact.

To many people, the GEICO claims associate is GEICO and may be the only company employee a large segment of the public will ever deal with. Accordingly, each associate has a responsibility and a corresponding obligation to act in a professional manner that will reflect positively on themselves and the companies.

Today, the insurance industry, as never before, is being examined in depth by various executive and legislative branches of state and federal governments. Significant portions of these examinations are directed toward the system under

CONFIDENTIAL

5-10-02

which claims are handled, and the manner in which the system is used by claims personnel. The GEICO Companies support the NAIC Model Unfair Trade Practices Act, and the individual state acts relating to claims settlement practices. Each claims associate should be familiar with these acts and should abide by their provisions.

- **The GEICO Claims Code of Conduct Booklet**

   Claims associates should be familiar with the code and behave accordingly. Each associate is given the booklet when hired and is required to sign off on any revisions.

## B.    Responsibility of the Claims Associate

The basic responsibility of the claims associate is to bring about an equitable outcome of claims presented under the policy contract. Since the operational funds belong to our policyholders, the claims associate has an obligation to those policyholders to pay just and valid claims and resist those not owed. This should be accomplished efficiently and economically.

Fulfillment of that obligation requires the exercise of sound judgment. The claims associate should be able to select the proper course of action. Decisions should be based on a thorough knowledge of the policy contracts, a working knowledge of legal principles, complete investigations, and sound evaluations.

Responsibility for the proper disposition of a claim rests with the claims associate to whom the case is assigned. The claims associate should bring about suitable results through direct contact with the insured, claimant, or others, as necessary.

The only products we have are Service and Protection. The claims associate delivers both. The claims associate should be equitable, empathetic and accessible and handle all claims with integrity.

The most frequent problem in claims handling is disagreement as to what constitutes a fair settlement. The examiner or adjuster should be prepared to explain the Company's position in a clear and logical manner. The response to a justified claims complaint should focus first on a timely and correct remedy to the complaint, and second on the initiation of appropriate steps to correct any deficiency.

## C.    Professional Ethics

We at GEICO hold all of our claim representatives to a high standard of integrity and professionalism. If, for instance, the settlement of a case is drawn out and the

5-10-02

CONFIDENTIAL

claimant inquires about the existence of a statute of limitations or its applicability to the case, the examiner or adjuster should never mislead the claimant into believing that the statute does not apply to the particular claim, if it actually does, nor should the adjuster tell the claimant that the company will waive the statute without specific permission from the VP of Claims Home Office or AVP of Claims Home Office Legal.

The claims person is expected to adhere to a standard of conduct, which not only is above reproach, but the appearance of which cannot possibly be construed as suggesting fraud or deceit. The corporate reputation of the GEICO Companies and the individual reputation of its claims associates are far too valuable to risk against the temporary advantage that might be gained by resorting to unethical practices in the handling of a claim.

**D.    Plaintiff's Attorneys**

The companies or their representatives should not deal directly with any claimant represented by an attorney without the consent of the attorney. Once the company is put on notice, either by the claimant or by an attorney, that the claimant is represented by the attorney, all future dealings must be with the attorney. It is improper for the claims associate to negotiate directly with a represented claimant from this time forward unless he has the permission of the attorney to do so. However, there is no restriction on the right of the claims person to verify that representation. And there is no prohibition on an adjuster making inquiries about any allegations made by the attorney or in attempting to uncover any information from other sources which the attorney has refused to give.

The claims associate should request information on injuries and expenses and obtain the attorney's theory of liability. He should then advise the attorney that the GEICO Companies are ready and willing to discuss settlement anytime we have sufficient information to evaluate of the claim.

If one of our insured's is represented, it depends on the type of claim the insured is making as to whether or not we should deal directly with the insured instead of the attorney. For example, in a UM or UIM claim, we must deal with the attorney. In a PIP or Medical Payments claim, we may deal directly with the insured unless the attorney advises the insured desires us to deal with the attorney directly.

**E.    Confidentiality of Claim File Information**

1. General

The information contained in our claim files is of a confidential nature and its

II-3

**CONFIDENTIAL**

use is restricted. It should not be reviewed or discussed in idle conversation. Information contained in either a paper file or an electronic file shall not be released except under certain circumstances. Reasonable application of common sense in the evaluation of information requests is most important. Release of any information from a claim file is subject to the guidelines indicated in the privacy acts of the various states, in accord with the discovery rules of the local court, and Company procedures.

The following guidelines are to assist you in deciding whether to release information and what kind of information may be released without either the consent of the insured or the claims manager and/or claims attorney (whichever is indicated):

- Property damage estimates/appraisals/repair bills on insured's car to support our subrogation claim.

- Medical bills, loss of wages or income statements of an insured when it is necessary to support our subrogation claim under Medical Payments, Personal Injury Protection, or Uninsured Motorist Coverages. (Claims associate may release.)

- Requests by governmental agency or by a valid subpoena properly served on us. (Claims Legal must be consulted before complying.)

- BI Index System/Bureau inquiries for medical information about an insured. If we are considering releasing diagnosis, prognosis, course and cost of treatment, both open and closed cases should be reviewed by the claims associate, discussed with the claims manager, and a decision made whether it is necessary to obtain the insured's written consent.

- BI Index System/Bureau inquiries for medical information about a third party claimant. (Claims associate may release.)

If there is a request for information from our file, which does not fall within one of the above categories, the examiner or adjuster should discuss it with the claims manager prior to releasing it. REMEMBER, judgment and common sense should be exercised in responding to all information requests.

2. Double Insured Cases

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits.

5-10-02

CONFIDENTIAL

File contents should not be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross-referenced file and should be retained in the file to be reviewed.

In the event of litigation, a subpoena may be obtained if authorization is not voluntarily given.

Cases in which authorization is needed would include permission to review No-Fault or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

An authorization form has been developed for use in this type of case. It is called the "Information Authorization Form" (C-240). Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

## F.   Our Relationship with Insureds and Claimants

In third party cases, the examiner or the adjuster owes a duty and loyalty to our insureds.

If there is a real doubt concerning the interpretation of a portion of the policy or the dollar value of the claim, every reasonable effort should be made to give fair consideration to the question from the viewpoint of the policyholder, the Company, and the claimant.

In first party cases, the company should analyze the policy contract fairly and attempt to resolve questionable situations equitably whenever possible. We should clearly explain all available coverages and benefits. The policy terms clearly spell out conditions/exclusions and a decision should not be made in favor of the insured if his/her policy indicates the loss is not covered. Likewise, the company owes it to its policyholders to pay only those claims which are covered by the policy.

In addition to our contractual duty to our insureds, we recognize our obligation to claimants. The policy of endeavoring to settle claims as promptly as possible applies to third party claims as well.

## III.   TECHNICAL CLAIMS HANDLING

### A.   Facing the Future

II-5

**CONFIDENTIAL**

Change is fundamental to success. The best insurer is constantly analyzing its operation to provide a better product. As times change, GEICO's method of claims handling will change.

Needed products and services will be determined by the desires of the public as shown in opinion surveys, marketing polls, analysis of legislation, and other public opinion results.

It is our policy to be alert to changing concepts of claims handling which reflect this new climate without violating our duty to our policyholders. This requires the examiner and the adjuster to accept new ideas and accept change.

In keeping with change, the company employs claims handling techniques such as: rehabilitation specialists, structured settlements, computerized estimates, computerized claims systems and handling,

Medical Cost Containment and Benefits Restoration, and Special Investigation Units are but two examples of innovative concepts in claims handling. The years ahead probably will bring other ideas designed to benefit both the insurance industry and the public. It is the responsibility of all claims associates to be aware of new concepts; to recognize individual claims to which the concepts might apply; and to make early recommendations concerning the application of these new methods to individual claim files.

We want to market quality insurance and related services to the insuring public, at a price advantage. Claims associates make this goal a reality.

**B.     Settlement Techniques**

The claims associate should be realistic in the early appraisal of the claim. If we owe it, pay it. Settle claims fairly at the earliest practical time whenever possible.

Recognizing their need, we must utilize various settlement concepts. We have open-end releases, whereby, in addition to the consideration stipulated, we agree to pay additional amounts of money in the future. Property damage claims (including claims for loss-of-use) that are owed, are paid as soon as possible whether or not there are pending bodily injury claims arising from the same accident.

In many cases, we advance money to an injured party so innocent victims can provide for themselves and their families during their period of incapacity. These payments are made with no strings attached, except that the amount will be credited to the ultimate settlement. Advance payments include such things as property damage, medical expenses, loss of income, and many other unusual items determined by particular circumstances. In some cases, without even a prior

II-6

5-10-02

discussion concerning an ultimate settlement, rehabilitation facilities are provided to assist the injured in returning to a productive life at the earliest possible time.

Rehabilitation programs, structured settlements, advanced payments, open-end releases, and "walk-away" settlements are some of our claims handling techniques for serving our industry and our public. Properly utilized, they can be effective responses to the public demand to help the seriously injured more expeditiously. The various types of settlements are covered in Chapter V.

## C.  Unfair Claims Practices

In Chapter I, we referred to the regulation of insurance by grouping the methods into three categories: 1) legislation, 2) administration and 3) court action.

The industry itself imposes self-regulatory systems. Trade associations and various groups related to the industry have developed claims settlement practices within the framework of legal systems, government regulations, and contractual provisions. The National Association of Independent Insurers (NAII), the American Insurance Association (AIA), and the National Association of Independent Insurance Adjusters are a few such organizations.

The National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act (cited in TCM 108 and in the NAII Manual) categorizes these principles generally and specifically by state. The act prohibits unjust, dilatory, and unethical claims practices. The claims associate should be prompt, fair, and forthright. Claims should be settled timely whenever possible, on merit basis, with professional etiquette. Claims associates should be thoroughly familiar with and abide by the Unfair Claims Practices Acts and regulations in each jurisdiction, as well the GEICO Claims Code of Conduct (C-253).

## D.  Our Relationship with Attorneys and Independent Adjusters

The company is represented by attorneys and selected independent adjusters throughout the country. Those who regularly represent the company are listed in the Attorney and Adjuster Code Book, which is now housed in the computer under transaction "AAI".

The selection and replacement of attorneys and claim representatives within regions is made by the assistant vice president for claims with the concurrence of the vice president of claims. (See TCM-29.)

All claims associates have an obligation to keep their regional claims management informed of any developments which might suggest the benefit of a change in representation in any particular area. If an alternate representative is needed on a temporary basis, approval can be obtained from the claims manager with concurrence of Claims Home Office Legal.

II-7

CONFIDENTIAL

The companies' representatives are carefully selected on the basis of ability and reputation. The companies review the quality of service and claims handling of

these representatives, and delegate authority on a case by case basis. The nature of the relationship dictates these representatives should follow GEICO standards of competence, integrity, and professional and ethical conduct.

The instructions to an independent adjuster should be specific so the representative knows precisely what is expected. When authority is delegated, the claims associate should explain exactly how the negotiations should be conducted. All directives should be clearly defined. Any departure from the instructions should be questioned. Normally, the claims associate should direct the investigation and reserve the negotiation phase of the claim for him or her self.

It is the companies' objective to have a mutually beneficial relationship with the independent adjusters and attorneys. The claims manager and the claims associate must be aware of problems in the field and judge the firms accordingly. Disagreeable circumstances can often be avoided by clear supervision given in advance. Open communications and mutual respect are essential to cost effective settlements.

Our defense attorneys are chosen on the basis of their professional knowledge, ability, and experience. In most instances, they are local leaders in their fields. They are limited agents with authority delegated to the particular case assigned. The fiduciary relationship between the attorney and the client-principal dictates that the attorney represent the client with the highest degree of loyalty and fidelity. On each case, the attorney acts solely in the best interest of his client within the bounds of the law.

The primary duties of an attorney are: 1) advise and counsel, 2) prepare legal instruments, and 3) perform services in the courts of justice. The attorney seeks the lawful objectives of the client through reasonable means permitted by law and advises the client of legal considerations. Authority to make a decision is exclusively that of the client. However, the attorney must exert every effort to ensure the decision is made only after the client is informed of all relevant considerations and practicalities of such a decision.

The attorney may represent multiple clients whose interests are not potentially different, such as an insurer and insured. If suit were filed directly against the company, the defense attorney would represent the company as the client. When the insured is sued by a third party, the defense attorney solely represents the insured as the client; but the company has the right, under the policy contract, to select the defense firm to be used and to control the settlement decisions. Situations may arise where there is a conflict of interest. One example of this would be a coverage question in the matter being defended. The attorney must

II-8

5-10-02

promptly inform both the insured and the Company in writing the nature and the extent of the conflicting interests. The insured should be invited to retain his own counsel depending on the circumstances. The attorney owes undivided allegiance to the insured which forbids any collusion between the company and the attorney against the insured. If this situation occurs, the claims associate must discuss the claim with the claim manager, Regional RLA and Claims Home Office Legal.

The companies have a corresponding obligation to their insureds. The insured must be informed of the progress of the pending suit. Although the company provides the defense, it is primarily the insured's suit. The company has the duty to answer the insured's questions and to report any circumstances which may subject the insured to personal loss.

Suit handling is covered in Chapter IX. However, it is important for the claims associate to be aware of the flow of responsibility and the corresponding duties in the special relationship which exists between the principal and agent, the insured and the company, the insured and the attorney, and the company and the representative.

### E. Letters and Reports

The ability to express yourself clearly and persuasively is an essential attribute for a successful claims associate. Because of the nature of the companies operation, a portion of the communications with policyholders, claimants, and attorneys is through correspondence. Little is accomplished if an examiner or adjuster has superior technical knowledge but cannot convey their thoughts to others.

It is company policy to reply courteously to all letters that call for a response within a reasonable period of time.

The claims associate's communications should display leadership, good sound judgment, and decisiveness. Simple and direct language avoids misinterpretation. To be effective, the communication should express the claims associate's position in a clear, concise, easy to read and understand manner. Its tone should be professional and businesslike, words spelled correctly, and proper grammar utilized.

Correspondence with independent adjusters and attorneys requires particular attention. It is through such communication that direction is exercised over the handling of claims. To assure high quality service from independent adjusters and attorneys, and to check the cost of their work, demands intelligent supervision. Proper direction from the claims associate should be reflected in their work product.

Correspondence to independent adjusters should outline what is needed -- early

II-9

CONFIDENTIAL

5-10-02

claimant contact, signed statements, police reports, photos, diagrams -- whatever is necessary to avoid a decision delay. Instructions on negotiation techniques should accompany settlement authority.

The independent adjuster should forward timely and complete status reports within 30 days. Their activities should be in accordance with the claims associate's instructions and within company guidelines. There may be occasions when the claims associate disagrees with a representative's case handling. The claims associate should be able to offer constructive criticism to correct the deficiencies. If the disagreement is of a serious nature, the claims associate's supervisor should become involved.

Our defense attorneys are presumed to be experts in the legal field. The claims associates need not instruct them on points of law or procedure, but should monitor their activities and maintain direction of the case.

Follow-up is essential. Once the claims associate has told the representative what is required, the instructions should be accomplished within a reasonable period of time. The claims associate should assure that the representative responds as promptly as possible. If a timely report is not received, a letter or telephone call may be required.

Do not use hand written correspondence if a letter or phone call is required. Any significant correspondence with anyone should be typed. Handwritten memoranda are unacceptable. All communication, whether by correspondence, telephone, or in person, should create a favorable impression. The claims associate's correspondence reflects the image of the company. It is the responsibility of the examiner or the adjuster to maintain that image of high GEICO standards through effective communication.

5-10-02

CONFIDENTIAL

# CHAPTER III

## RESERVING

## Table of Contents

Page

I.    Basic Reserving Policy ............................................................................................... 1

II.   Importance of Proper Reserve ..................................................................................... 1

III.  Types of Reserves ....................................................................................................... 1

    A.   Average Reserves ............................................................................................. 2
    B.   Case Reserves ................................................................................................... 2

IV.   Developmental Reserves ............................................................................................ 5

V.    Establishing, Adjusting, Maintaining Reserves ......................................................... 5

VI.   Guidelines for Establishing Reserves ........................................................................ 6

*   VII.   Reserve Increase Procedures ..................................................................................... 7

VIII.  The Claims System and Claims Control Lists ............................................................ 8

    A.   90 Day Control List .......................................................................................... 9
*       Control List Summary Format ......................................................................... 11
*       B.   6 Month Control List ....................................................................................... 13
*       C.   18 Month Control List ..................................................................................... 15

IX.   Incurred But Not Reported Claims (IBNR) ............................................................... 17

X.    Reinsurance Recoverable Reserves ........................................................................... 17

XI.   Reinsurance Recoverable Payments .......................................................................... 17

XII.  Reinsurance Treaty .................................................................................................... 17

*       Exhibit 1 - Manager/Supervisor Reserve Worksheet (C-86) ........................................ 18

    Exhibit 2 - Bodily Injury Inflation Rate ....................................................................... 19

CONFIDENTIAL

# CHAPTER III

# RESERVING

## I.  BASIC RESERVING POLICY

A "reserve" is the dollar amount that the Company can reasonably expect to pay for a complete settlement of the claim, including anticipated allocated expenses.  It is based on the facts known at the time the reserve is established or adjusted.

Claim reserves must be established on the basis of probable cost based on present values. A probable cost reserve is that amount of money that the best available judgment indicates it will cost to pay all future losses and expenses under that particular coverage. Present value means that present costs are used to estimate the value of a future damage settlement.

## II.  IMPORTANCE OF PROPER RESERVES

It is impossible to overemphasize the importance of establishing and maintaining accurate claim reserves.  For management to accurately evaluate the company's financial position, it must have assurance that claim reserves are appropriate.

A reserve should be established as soon as it is <u>probable</u> that a claim may be made.  We do not establish a reserve based on the mere possibility that a claim will be made, nor do we fail to reserve for a probable claim even if we believe it can be successfully defended. <u>Reserve adjustments should be made timely as the facts of each case warrant.</u>

When considering the establishment of a BI feature in a no-fault state with a verbal tort threshold, a reserve should not be opened unless there is evidence that the tort threshold has been or will be pierced.  An exception to this is when an attorney represents the BI claimant and the attorney, on behalf of the injured party, has placed us on notice of his representation of the claimant and his intention to prosecute a BI claim.  In this situation, the BI feature should be established.

## III.  TYPES OF RESERVES

The Companies use two types of claim file reserves: Average Reserves and Case Reserves.

III-1

6-28-02

**A.    Average Reserves**

The Actuary determines the average reserve amount required for each claim reported under the various coverages by calculating the actual loss experience under each coverage. At the moment an "open feature" transaction is keyed without a specific dollar amount in the "reserve amount" field of the claim inquiry screen, the system will automatically establish the average (STAT) reserve.

Automobile claims with values of less than $50,000 are initially reserved on an average basis. If the claim has a reserve value of $50,000 or more, case reserves must be established immediately. If any feature, in one claim (BI, UM, UIM or PIP) has a reserve value of $50,000 or more, then all BI, UM, UIM, and PIP features must have a case reserve established immediately. For example, if a claim has three minor BI claims, one BI claim with a reserve value of $50,000 or more and four PIP claims, all BI and PIP claims must be placed on case reserve immediately. In this example, none of the features can be permitted to remain on "stat" reserves. Claims with a value of less than $50,000 are transferred to case reserves at the end of the second month after the reported month.

**B.    Case Reserves**

This type of reserving requires the establishment of a dollar reserve under each feature involved. When case reserves are first set up, there may not be sufficient information to permit a realistic appraisal; as subsequent information is developed, the reserves must be adjusted. Establishing case reserves involves the exercise of good judgment and the consideration of such factors as probable liability, amount of special damages, estimates of damage, nature of injuries and any permanency, probable expenses of investigation, litigation and related matters.

Reserves are established by probable cost based on present values. A probable cost reserve is based on present costs and is used to estimate paying all future losses and expenses under a particular coverage.

At the end of the second month after reported month, a 90 Day Control List (see page III-10) for each claim handler is generated for open files. Reserves for all features, with the exceptions of those noted below, should be changed from average to case basis upon completion of the a 90 Day Control List Summary in ALOG (see page III-11) during the 60 to 90 day case life period. Persons with reserve authority equal to or greater than the suggested reserve must approve case reserves.

Under the Claim Record Information System (CRIS), the physical damage features including Comprehensive, Collision Property Damage, Loss of Use and Medical Payments, and the other listed coverages below do not have to be

6-28-02

CONFIDENTIAL

converted at 90 Day Control List time from average to case reserve unless the examiner estimates that the loss and expense payments under the feature will amount to $10,000 or more. If the feature is to remain open after the completion of a 90 Day Control List Summary in ALOG and the exposure is not $10,000 or more, the feature remains on average reserve.

If a feature is reopened, an individual with the authority to set the reserves as indicated in TCM-50 must reopen it on a case basis.

When establishing case reserves, special damages, location of accident, permanent injuries and any other such factors are taken into consideration.

The following are coverage/claim symbols, which do not require case reserves unless the estimated amount of loss and expense payment are estimated to be $10,000 or more:

| Description | Coverage | Claim Symbol |
|---|---|---|
| Broad Form Collision* | Coll | CBF, CWD |
| Combined Additional Citizens Band Radio | CA PCB | PAO PCB |
| Collision | Coll | COL, CWV |
| Comprehensive | Comp | PVM, PGL, PTH PFO, PPT, PAO PFL, PFI, PAN, PWN, PEF |
| Mechanical Breakdown | MB1 | MBB, MBO, MBS, MBE, MBD, MBT |
| Property Damage | PD | APD, APP, LPD, DPD, EPD, COP |
| Auto Home Contents | Comp | AHC |
| Stereo Buyback | Comp | PST |
| Fire, Lightning, Theft | FLT | PTH, PPT, PFI |
| Loss of Use | PD | LOU |
| Limited Collision* | Coll | LTC |

III-3

CONFIDENTIAL

| | | |
|---|---|---|
| Medical Payments Coverage | MP | MED |
| Personal Effects | PE | PEF |
| Per. Effects/Comb. Additional | PE/CA | PEF |
| Rental Reimbursement | RR | REN |
| Towing & Labor | TOW | TOW |
| Emergency Road Service | ERS | ERS |
| Uninsured Motorist Property Damage | UM | UPD |
| Underinsured Property Damage | UM | XPD |

\* = MI Only

The following are coverage/claim symbols, which do require case reserves:

| | | |
|---|---|---|
| Uninsured Motorist Bodily Injury | UM | UBI, UMD, UMS, UBX |
| Excess Underinsured Bodily Injury | UM | XBI, UMB |
| Underinsured Bodily Injury | UM | UIM, UIX |
| Bodily Injury | BI | ABI, BID, RBI, DBI, DPR, LBI |

III-4

CONFIDENTIAL

| | | |
|---|---|---|
| Basic Personal Injury Protection | PIP | NBB, NBD, NBS, NDB NBF, NBI, NBW, NDF NBM, NBR, NBA, NWL FNL, DBC |
| Basic Preferred Provider Organization | PPO | NPA, NPM, NPR, NPS, NPW, NPC, NPL, NCC, NCR |
| Additional Personal Injury Protection | APIP | NEI, NEM, NEF, NES, NER, NEW, NEA, NEB |
| Additional Preferred Provider Organization | APPO | NAA, NAM, NAR NAS, NAW, NDM, NDR |
| Medical Payments Coverage | MP | LER, MEB |
| Extraordinary Medical Benefits | EMB | EMB |
| Accidental Death and Disability | ADD | ADE, ADI |

## IV.  DEVELOPMENTAL RESERVES

This reserve is developed by the Actuary to compensate for the impact of inflation on claims department establishment of "present values reserves."

## V.  ESTABLISHING, ADJUSTING, MAINTAINING RESERVES

Examiners and adjusters must carefully analyze initial loss reports and indicate the features involved.  Reserves should be established for each feature when a claim appears probable, but not for coverages under which there is no probability of a claim.  As the character of the file changes, it may be necessary to adjust the feature reserves.  Reserves may be changed at any time.  The effectiveness of our reserve procedures depends on the examiner's or adjuster's ability to identify the need to open, close, or revise the reserves as the facts of the case warrant.

Reserves are subject to the guidelines listed in the next section with the requirement that the responsibility for establishing and maintaining all case reserves is vested with

III-5

CONFIDENTIAL

Supervisors, Managers, Directors, RLA's and AVP's. This responsibility cannot be delegated and the authorizing party should review thoroughly the file content prior to extending reserve authority. <u>A Supervisor, Manager, Director or RLA must authorize all reserves under Bodily Injury, Uninsured and Underinsured Motorists Bodily Injury Coverage,</u>

A C-86 Manager/Supervisor Reserve Worksheet form (See Exhibit 1, Page III-17) should be completed for each claim on the 90 Day Control List, accounting for each BI, UM or UIM feature and on any subsequent reserve change under these coverages.

BI, UMBI and UIM loss and expense reserves include an "inflation factor." See Exhibit 2, Page III-18 for current inflation trends.

Examiners and adjusters are responsible for reviewing the accuracy of the reserves <u>each time the file crosses the desk.</u>

## VI.   GUIDELINES FOR ESTABLISHING RESERVES

Automobile claims with exposure of $50,000 or more under one feature or a combination of features should be placed on case reserve immediately.

- All case reserves must be approved by persons with settlement authority equal to or greater than the reserve amount, and where BI, UM or UIM reserves are concerned, the reserve must be approved by a supervisor, manager or director.

- All changes in reserves that will result in the new reserve exceeding the examiner's or adjuster's settlement authority must be approved by a claims associate who has authority to approve the new reserve. See TCM-50 for loss/expense and reserve authorization guidelines.

- Supervisors and Claims managers should approve and review reserves at all 90 day, 6 month and 18 month file reviews.

- Reserves should be changed if the value of the claim changes by $300.00 or more. Adjustments of less than $300.00 should not be made.

- Although it is not necessary to reopen every closed file for the purpose of making a loss or expense payment, premature closure of a file should be avoided. Closed files must be reopened to accommodate loss or expense payments of $300.00 or more.

- We must have detailed facts about the precise nature of injuries, treatment and prognosis to ensure accurate reserves. This is particularly important during the first two months of the case. Examiners and adjusters must obtain complete information promptly from claimants and attorneys and be consistently mindful of reserve maintenance.

III-6

6-28-02

CONFIDENTIAL

- A negative reserve occurs if a payment exceeds the reserve amount established under a specific feature. Our claim systems prevent a negative reserve from occurring; loss payments cannot be issued unless there are reserves established in excess of the loss payment. Therefore, before a payment can be issued, the reserve must be increased to a sufficient amount.

- Catastrophic PIP cases can present a unique problem in accurately predicting case reserve amounts. The type of injury, treatment and rehabilitation periods vary with each claimant. If, after considering all factors, the examiner or adjuster still questions the proper reserve amount, he or she should ask the supervisor or manager for assistance.

- When settlement of a pending case has been negotiated, and the file will be closed within the same calendar month, no reserve adjustment is necessary if the payment is less than the reserve amount.

- Features involving first party physical damages need not be placed on case reserve unless loss and expense are expected to amount to $10,000 or more.

- When a reserve is to be increased beyond regional authority, it may be necessary to call Claims Home Office Legal for approval in order to complete a change before the end of the current month. The Control File Alert Form may also be used to obtain a reserve change (see Exhibit I, Chap. XIII).

- Do not set an inadequate reserve as an interim reserve while awaiting approval from appropriate claims attorney or AVP of Claims Home Office.

- Telephone calls to Claims Home Office Legal (CHOL) are required for reserve approval on new control files when it will take more than 5 days to get the Control Alert Form to CHOL. Telephone calls are also required when we are within 5 days of the end of the month. Otherwise, the Alert Form may be sent with a recommended reserve.

## VII.  RESERVE INCREASE PROCEDURES

When a file is considered for control status (Chapter XIII) and a reserve increase is warranted, a representative from the region (the examiner, manager, or RLA) may call Claims Legal to review the case. This will include providing the Claim Home Office Legal Attorney with the claim number, insured's name, loss location, date of loss, policy limits, facts and circumstances of the loss, and injuries to the claimant(s), age(s), and occupation(s). Notes will be posted to ALOG.

11-15-05

CONFIDENTIAL

The region will recommend a new reserve figure. If the Claims Home Office Claims Attorney is in agreement, it is approved. If not, advice is given to the regional representative on what is appropriate under the circumstances. Approval of the appropriate reserve adjustment is transmitted via ALOG/SYSM. In addition, a notation is placed on ALOG that the file is to be submitted to Claims Home Office in the near future as a control file. ALOG approval of the reserve adjustment is usually done within 24 hours of the phone call and should not exceed two business days. Alternatively, a reserve adjustment may be recommended on a Control File Alert Form.

If a reserve increase has been authorized, but the file has not been placed on control soon after confirmation of the reserve adjustment, either a phone call is placed to the examiner or message via SYSM/ALOG is sent to the examiner requesting that the file be placed on control.

## VIII.  THE CLAIMS SYSTEM AND CLAIMS CONTROL LISTS

The CRT/PC is used for all reserve changes. The systems manual provides the procedures to follow. The following forms are used to review and change reserves and to review file handling:

| |
|---|
| 90 Day Control List |
| 6 Month Control List |
| 18 Month Control List |

6-28-02

CONFIDENTIAL

A.    90 Day Control List

1.    When using this computer-produced list, the supervisor combines file review with changing reserves from average to case for each claim on the list. The list is produced monthly and shows each open file, which has aged for two months from reported date.  A 90 Day Control List summary must be completed by the end of the third month at which time all open features still on average reserve will be transferred to case reserve.

2.    Claims handlers must create a 90 Day Control List Summary in ALOG for every claim on the 90 Day Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG. Each Summary and supervisor/manager review must be completed by the end of the month in which the 90th day falls.

3.    A sample of a 90 Day Control List is on the next page and a sample of a 90 Day Control List Summary Format follows.

6-28-02

CONFIDENTIAL

REPORT NO. CLL50M-101
REPORT DATE 12/29/01

GEICO PROPERTY/CASUALTY COMPANIES
**90 DAY CONTROL LIST**
RELEASE DATE
DECEMBER 29, 2001

PAGE 256
RUN DATE 12/29/01

ADJUSTER CODE:   XXXX
FCC   -   05                                    XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 0018565980101101 | 04 | APD | 01 | 1001 |
|  | 05 | APD | 01 | 1001 |
|  | 06 | APD | 01 | 1001 |
| 0019304400101114 | 02 | LOU | 13 | 1001 |
| 0061300730101052 | 01 | COL | 13 | 1001 |
| 0090599370101091 | 02 | POA | 01 | 1001 |
| 0102558420101044 | 02 | LOU | 01 | 1001 |
| 0122333870101019 | 02 | APD | 01 | 1001 |

III-10

6-28-02

**CONFIDENTIAL**

## CONTROL LIST SUMMARY FORMAT

1. Loss Description   -   What happened?
   Is investigation complete?  If not, why?

2. Coverage          -   Is coverage in order?  Any coverage problems?
   Any limits problem?

3. Liability         -   Who is at fault?  Why?
   Comparative negligence?  What is the % attributed to each?

4. Damages           -   What features are still open?  Name claimant and feature number.
   Note any payments made.
   Any vehicle inspections still pending?
   Any subrogation potential?

   List each injured party's name, age and occupation.
   - Diagnosis (What is the injury?)

   - History (Medical background, related injuries, prior injuries?)

   - What sort of treatment are they receiving?  How often?
     What type of provider?
     - o   MD    Medical doctor
     - o   DC    Chiropractor
     - o   DO    Osteopath
     - o   RPT   Registered Physical Therapist
     - o   LMT   Licensed Massage Therapist

   - Prognosis. How much longer will treatment continue?
     Additional tests recommended?  Other treatment
     recommended? Length of future treatment?

   - What are the total bills paid to date?  Any outstanding
     bills?  Projected future bills?

   - Will they have a loss of earnings claim?  How much?  Any
     disability?

5. Course of Action  -   What needs to be done to close?
   What can we do to resolve?
   Address each open injury feature.  Does any feature need a
   reserve?
   If so, what amount do you recommend?

III-11

CONFIDENTIAL                          11-15-05

\*    Every review should include the elements set out in parts 1 thru 5 above. Reserves should be addressed when completing Part 5. The claims representative, as part of the review process, should discuss each open feature and comment on the reserve for that feature. If no change in reserve is needed, the file should reflect that the reserve was considered and left unchanged. If a change in the reserve is needed, the claims representative should describe the new information which led to this conclusion. The claims representative should then make a recommendation for increasing or decreasing the reserve for the particular feature. Every review <u>must</u> specifically address reserves for every open injury feature. Management personnel are responsible for insuring that reserves are considered and that the consideration is documented when completing all 90 day (C-71), 6 month (C63) and 18 month (C-178) reviews.

III-12

CONFIDENTIAL

11-15-05

B.   6 Month Control List

    1.   The 6 Month Control List is used to identify all open claim files that aged five months from reported month.

    2.   Claims handlers must create a 6 Month Control List Summary in ALOG for every claim on the 6 Month Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG.

\*    3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary. Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

    4.   All 6 Month Control List Summaries and supervisor/manager reviews by. the end of the 6th month

    5.   A sample of a 6 Month Control List is on the next page.

**CONFIDENTIAL**

S-28-02

REPORT NO. CLL50M-201
REPORT DATE  11/24/01

GEICO PROPERTY/CASUALTY COMPANIES
**6 MONTH CONTROL LIST**
RELEASE DATE

PAGE    84
RUN DATE 11/24/01

NOVEMBER 24, 2001

ADJUSTER CODE:  XXXX
FCC    -    05

XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 00942875310101093 | 01 | COL | 13 | 0601 |

III-14

CONFIDENTIAL

C.   18 Month Control List

1.   The 18 Month Control List is used to identify all open claim files that aged 17 months from reported month.

2.   Claims handlers must create an 18 Month Control List Summary in ALOG for every claim on the 18 Month Control List. Supervisors and managers review each summary and give direction, comments and instruction in ALOG.

\*   3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary. Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

\*   4.   All 18 Month Control List Summaries and supervisor/manager reviews must be completed by the end to the 18th month.

5.   A sample of an 18 Month Control List is on the next page.

CONFIDENTIAL

11-15-05

REPORT NO. CLL50M-2Q1
REPORT DATE  11/24/01

PAGE   84
RUN DATE 11/24/01

GEICO PROPERTY/CASUALTY COMPANIES
18 MONTH CONTROL LIST
RELEASE DATE

NOVEMBER 24, 2001

ADJUSTER CODE:    XXXX
FCC   -   05

| CLAIM NUMBER | XXXX | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|---|
| 00942875301 01093 | | 01 | COL | 3 | 0600 |

III-16

6-28-02

**CONFIDENTIAL**

## IX. INCURRED BUT NOT REPORTED CLAIMS (IBNR)

The total amount of money, which the Company earmarks for claim purposes, includes both reported claims and those incurred but not reported. Reported claims are those for which claim files have been established. Incurred but not reported claims are those for which claim files have not been established although the accident or loss has occurred and we may or may not have the report at the Company. Actuary determines the reserve for incurred but not reported claims.

## X. REINSURANCE RECOVERABLE RESERVES

Reinsurance recoverable reserves are not actually reserves but are estimates of the amount in excess of our retention, which we can expect to recover from the reinsurance carrier. Automobile and homeowners, CPL and pacesetter reinsurance recoverable reserves will be established, maintained and closed by Claims Home Office. A copy of the accounting document will be sent to the claims file for retention.

Under the CRIS system, there is no field for the entry of a reinsurance recoverable reserve and these reserves are accounted for in a manual account maintained in Claims Home Office. Where a reinsurance reserve is being maintained on a claim processed under the CRIS system, the reinsurance indicator should be activated in the CRIS system so that the claim is identified as having reinsurance involvement.

Under PIPS, reinsurance recoverable reserves are established and maintained by PIC's Claims Processing Unit at the direction of the Claims Home Office.

## XI. REINSURANCE RECOVERABLE PAYMENTS

The Claims Home Office handles reinsurance recovery payments. Examiners must maintain their claim files on an open basis until notified of the receipt of the reinsurance recovery payment.

## XII. REINSURANCE TREATY

The Company had a reinsurance treaty to protect it against large losses under its policies. Between April 1, 1993 and August 7, 2001, losses were reinsured above $1 million to a limit of $10 million.

As of August 7, 2001, the Company will be self-insured for most of its policies. The exceptions will be motorcycle policies and all policies written in New Hampshire. They will continue to be covered under a reinsurance treaty until February 7, 2002. After February 7, 2002, the Company will be totally self-insured.

6-28-02

**EXHIBIT I**

### MANAGER/SUPERVISOR RESERVE WORKSHEET
### BI-UM-UIM

Page _____ of _____

CLAIM NUMBER _____     POLICY LIMITS_____

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| Approval Initials & Date | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| Approval Initials & Date | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| Approval Initials & Date | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| Approval Initials & Date | _____ | | _____ | | _____ |

| Cumulative Totals: | | | | | |
|---|---|---|---|---|---|
| TOTAL PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| TOTAL NEW NET RESERVE | _____ | | _____ | | _____ |

III-18

**CONFIDENTIAL**

11-15-05

EXHIBIT 2

## BODILY INJURY INFLATION RATE: 10.6%

| MO | FACTOR | MO | FACTOR | MO | FACTOR |
|---|---|---|---|---|---|
| 1. | 1.01 | 21. | 1.19 | 41. | 1.41 |
| 2. | 1.02 | 22. | 1.20 | 42. | 1.42 |
| 3 | 1.03 | 23. | 1.21 | 43. | 1.43 |
| 4. | 1.03 | 24. | 1.22 | 44. | 1.45 |
| 5. | 1.04 | 25. | 1.23 | 45. | 1.46 |
| 6. | 1.05 | 26. | 1.24 | 46. | 1.47 |
| 7. | 1.06 | 27. | 1.25 | 47. | 1.48 |
| 8. | 1.07 | 28. | 1.27 | 48. | 1.50 |
| 9. | 1.08 | 29. | 1.28 | 49. | 1.51 |
| 10. | 1.09 | 30. | 1.29 | 50. | 1.52 |
| 11. | 1.10 | 31. | 1.30 | 51. | 1.53 |
| 12. | 1.11 | 32. | 1.31 | 52. | 1.55 |
| 13. | 1.12 | 33. | 1.32 | 53. | 1.56 |
| 14. | 1.12 | 34. | 1.33 | 54. | 1.57 |
| 15. | 1.13 | 35. | 1.34 | 55. | 1.59 |
| 16. | 1.14 | 36. | 1.35 | 56. | 1.60 |
| 17. | 1.15 | 37. | 1.36 | 57. | 1.61 |
| 18. | 1.16 | 38. | 1.38 | 58. | 1.63 |
| 19. | 1.17 | 39. | 1.39 | 59. | 1.64 |
| 20. | 1.18 | 40. | 1.40 | 60. | 1.65 |

III-19

CONFIDENTIAL

6-28-02

# CHAPTER IV

## COVERAGE

## Table of Contents

Page

I.  Overview ................................................................................................................ 1

II.  Sources of Coverage ............................................................................................. 2

III.  Types of Coverage Questions ............................................................................... 2

    A.  Policy Expiration and Cancellation ................................................. 3
    B.  Is the Vehicle Covered? .................................................................. 3
    C.  Is the Driver or Passenger Covered? ............................................... 4
    D.  Is It a Covered Loss? ...................................................................... 4
    E.  Has the Insured Complied with the Policy Conditions? ................... 5

IV.  Other Possible Coverage Question Situations ....................................................... 5

    A.  Misrepresentations ........................................................................... 5
    B.  Other Insurance, Excess and Escape Clauses .................................. 5
    C.  Who is a Resident of the Same Household for Purposes of the
        Omnibus Clause? ........................................................................... 6
    D.  What Constitutes regular Use of Non-Owned Automobiles? ........... 7

V.  Waiver ................................................................................................................. 9

VI.  Estoppel ................................................................................................................ 9

VII.  Dealing with our Insured in Coverage Question Situation ................................... 10

VIII.  Reservations of Rights (ROR) Letter .................................................................. 10

    A.  Timing of ROR .............................................................................. 10
    B.  Contents of ROR ............................................................................ 11
    C.  Presentation of ROR ...................................................................... 11

IX.  Discussions Regarding ROR ............................................................................... 11

X.  Non-Waiver Agreements ..................................................................................... 12

XI.  Agreements to Defend ......................................................................................... 12

IV–i

CONFIDENTIAL

5-10-02

# CHAPTER IV

## COVERAGE

### Table of Contents

Page

XII.     Declaratory Judgments ........................................................................................ 13

XIII.    Disclaimer ............................................................................................................ 13

XIV.     Coverage Denials ................................................................................................ 14

XV.      Coverage Problem Handling Procedures ............................................................ 16

      A.   General Procedure ....................................................................................... 16
      B.   New Policy (review regional new business procedure) ............................... 19
      C.   Non-Pay Cancellation .................................................................................. 20
      D.   Cancellation – Underwriting Reasons .......................................................... 21
      E.   Vehicles Don't Match (temporary substitute, replacement, additional) ...... 22
      F.   Excluded Diver (UE-199) ............................................................................ 23
      G.   Driver Other than Named Insured ................................................................ 24
      H.   Exclusion or "Definition" Coverage Problems ........................................... 24
      I.    Vehicle Used in Government Business .......................................................... 25

Exhibit 1 – TCM-72 Revised – December 20, 2000 .................................................. 27

CONFIDENTIAL

5-10-02

# CHAPTER IV

## COVERAGE

1.  **OVERVIEW**

In every claims situation, the initial task of the examiner is to verify proper coverage. In the vast majority of claims, this is easily done by reviewing computer data regarding the policy, the insured vehicles and the insured persons involved in the loss. The examiner will review computer screens that provide system information regarding all three of these elements. Occasionally a claims handler, at some level of the claims resolution process, will be confronted with a coverage question. It is the purpose of this Chapter to highlight the most prevalent coverage issues that might be encountered and to outline the procedures to be used to resolve the coverage question. Correct coverage decisions are the most important tasks of the claims examiner at any level. Adverse coverage decisions by the Company expose our insureds to real financial hardship – sometimes catastrophic. Just imagine in your own life if you had a traffic accident resulting in substantial property damage and/or personal injury where your insurance company refused to cover the loss. Regardless of whether the coverage position is right or wrong, from the insured's point of view, a denial of coverage can be devastating. If a disappointed insured proves to a jury that our denial of coverage was wrong and wrongful, the effect upon the Company can also be devastating in terms of extracontractual liability, commonly known as "bad faith liability."

As this Chapter will mention many times, one of the keys to coverage decision-making is prompt and appropriate investigation. Coverage decision-making is not a game nor is it to be viewed as a jousting contest with the insured. Doubts are to be resolved in favor of the insured after appropriate and timely investigation. If our insured refuses to cooperate in our coverage investigation by failing to provide pertinent information, we may have more latitude in our investigation, but we must avoid a "stonewall" or "vendetta" attitude. It is your job to find coverage and to service covered claims. The Company is not served by a cynical approach to coverage issues. On the other hand, if coverage does not exist for a particular loss based upon facts determined by a full and fair investigation, we should not shrink from a coverage denial/disclaimer.

This Chapter will address many of the coverage issues you might encounter and the process by which these issues are to be resolved. Coverage decision-making is more than merely reading the policy and denying coverage. It is much more than reacting "off-the-cuff" to a claim situation presented to you over the phone. Examiners must avoid casual comments to our insureds regarding potential lack of coverage. We must be sure we are on firm ground when we deny coverage to our policyholder.

CONFIDENTIAL

5-10-02

## II.    SOURCES OF COVERAGE

Coverage may be confirmed by the computer record  and/or by the policy file and/or information or papers relevant to the coverage issue held by the insured or others.

The following guidelines apply to coverage:

- In most cases, we will assume that the computer record is correct and proceed with claim handling.

- Payments should not be made if you doubt the credibility of the computer record.  If you "think" the computer record is incorrect, obtain documentary proof from the policy file or possibly even from the insured.

- Search for the policy file if it is necessary to resolve a coverage question.

- Advise the Auto Damage Adjuster or the independent adjuster immediately if there is any coverage problem, which would affect claim handling.  Ask staff and independent adjusters to obtain coverage documents and statements from the insured.  The insured should be advised if we are investigating to determine coverage and nothing should be done to mislead the insured in any way.

- In cases involving BI, UM or UMBI, the Regional Liability Administrator (RLA) and/or a Claims Home Office Attorney should be consulted for permission to deny coverage.  Any decision to deny must be made as soon as possible.

- Making decisions as promptly as possible may at times be difficult, especially in those cases where every effort has been made to confirm coverage from computer records and policy files with no success, and even in cases where the insured is unable to develop and provide any evidence of coverage.  Delaying settlement in the vague hope that coverage may somehow not be valid is a clear disservice to the public and is a violation of most Unfair Claims Practices Acts.

## III.    TYPES OF COVERAGE QUESTIONS

There are two types of coverage questions: those in which no Company policy was in force at the time of the loss and those in which a policy is in force but the loss is not covered by that policy under the particular factual situation.  It is important to understand the distinction between these two types of coverage questions.  In the first situation, all coverage is denied.  In the second situation, coverage for this loss is disclaimed because of particular circumstances.

CONFIDENTIAL

5-10-02

Coverage questions can arise from many situations. Here are a few of the more common questions you will see.

## A.    Policy Expiration And Cancellation

If the computer system shows that the policy **expired** prior to the loss, the insured should be advised of this coverage problem but no direct denial should be made in early conversations with the insured. If the expiration was over 30 days prior to the loss and the insured does not dispute the expiration, the coverage can be denied upon approval by a Claims Manager. Complications can arise if the expiration is 30 days or less or the policyholder denies receipt of the expiration notice. In such cases, the issue must be referred immediately to the RLA for review before a denial can be issued. If the system information indicates that the policy in question was **cancelled** prior to the loss, we must be prepared to prove the validity of the cancellation in the event our coverage position is contested. The necessary evidence should be identified prior to the decision to deny coverage. This will be discussed again later in this Chapter.

There are times when an uninsured person who causes an auto accident tries to purchase coverage over the phone after the fact. Any time a loss is reported to have occurred on the date of policy inception, great care should be taken to confirm the timing of the accident and the binding of the policy. Generally, the police report will establish the time of the accident and our computer system will record the time that the direct sale of coverage was made. If the loss is property damage only and no police report was made, the examiner must be creative in determining the time of the loss and then determine if the policy was in effect.

## B.    Is The Vehicle Covered?

Our automobile policy covers both people (insureds) and vehicles depending upon the circumstance of the loss. For physical damages coverages, the vehicle must be a "described vehicle" – one listed on the declaration page of the policy. For liability coverages, the issue is not so clear. Our defined insureds (named insured, spouse and resident relatives) are insured for use of "owned" and "non-owned" vehicles. Where the vehicle is owned by someone in the insured's household but is not described in the policy declaration page (referred to as a "dec-sheet"), then that vehicle is neither "owned" (because it is not described on the dec-sheet) nor is it"non-owned" (because it is owned by a defined insured). Consequently, use of that vehicle is not covered.

Owned auto – Our insurance policy has a very specific definition of an owned auto. The auto must not only be owned by our named insured, it must be declared on the policy (listed on the dec-sheet). A vehicle properly declared on the policy is called a "described" vehicle. There are also vehicles that meet provision definitions of "owned auto". These are "replacement vehicles," "additional vehicles," and "temporary substitute vehicles".

IV-3

5-10-02

Non-owned auto – Defined insureds are covered, with certain limitations, while driving vehicles owned by others. This coverage is based upon the status of the insured person and the circumstance of his/her operation of the non-owned vehicle. For an insured under a Company policy to be insured while driving a non-owned vehicle, it must be established that the use of the non-owned vehicle was with the permission of the owner of the vehicle and that the use was within the scope of the permission. Permission to use a non-owned vehicle is a rather common coverage question.

**C.     Is The Driver Or Passenger Covered?**

Even when a described vehicle is involved in an accident, there may be issues regarding coverage for the driver or passengers if they aren't insureds. A person driving the described vehicle who lives outside the insured household is covered only if driving with permission of the owner. For example, if any insured loans a described vehicle to his neighbor to run an errand, the neighbor is fully insured as long as she keeps within the scope of the permission given by the owner. In this situation, the neighbor is called a "first permittee". If the neighbor happens to allow her husband to drive the described vehicle, the husband becomes a "second permittee". Coverage for "permittees" is problematic and very fact specific. Permissive use of the described vehicle by a person outside the insured household presents a coverage question. **Cases involving permissive use issues, which involve personal injury, must be presented to the RLA.**

Most states allow the issuance of "Named Driver Exclusions" (called NDEs). There are two types of NDEs: voluntary and involuntary. Voluntary NDEs result when our policyholder elects specifically to exclude a person from the policy who would otherwise qualify as a defined insured. This situation allows the policyholder to reduce her premium by excluding a high-risk resident relative. Involuntary NDEs arise where the Company informs a policyholder that we will continue to insure them only if a specific risk is excluded.

**D.     Is It A Covered Loss?**

Occasionally, there are losses claimed that are not covered by our contract with the insured. It is essential that you refer to the correct policy form and determine if the loss is described under **Losses We Will Pay**. Also, be sure to review the policy definitions under the appropriate section of the policy from which coverage is sought.

5-10-02

CONFIDENTIAL

**E.    Has The Insured Complied With The Policy Conditions?**

The agreement we have with the insured binds both sides to the policy contract conditions. If the insured fails to meet these conditions, a coverage question may evolve. Common breaches include failing to report a loss timely, failing to cooperate and failing to provide timely notification of a lawsuit. The circumstances surrounding the breach should be discussed with your supervisor and/or RLA immediately. Appropriate coverage investigation will follow to determine the extent of the breach and if it has or may influence coverage.

## IV.    OTHER POSSIBLE COVERAGE QUESTION SITUATIONS

**A.    Misrepresentations**

For claims purposes, a misrepresentation may be defined as a misstatement given to the Company to induce it to write a policy. To constitute a valid question of coverage, the misrepresentation must be material. The test of materiality is our answer to the question whether the policy would have been issued, or written at the same premium, if the true information had been know.?

An inaccurate statement of occupation, if both occupations are of the same general character, may not be material to the risk. On the other hand, a false statement about a recent driver's license suspension or revocation is generally regarded as material.

Immediately upon discovering a possible misrepresentation, discuss the file with your supervisor and then refer the claim file to the appropriate Underwriting Manager for a written opinion. On receipt of the Underwriting Manager's decision (paper or electronic) supporting a denial of coverage, <u>Claims Home Office Legal must be consulted immediately before any action is taken.</u> As soon as possible after receipt of the written opinion, the Underwriting Department should be notified as to how the claim will be handled.

**B.    Other Insurance, Excess And Escape Clauses**

To provide for situations where two policies cover the same risk, insurance contracts contain "other insurance" clauses. These clauses apply if the insured has purchased two policies and the policy periods overlap, or when the insured is driving a non-owned vehicle on which there is insurance.

If there are two insurance policies covering the same loss, generally, both policies would contain an excess insurance clause. This clause might read:

5-10-02

> If "the insured has other insurance against a loss covered by
> Section I of this policy, we will not owe more than our pro rata
> share of the total coverage available.
>
> This policy is excess over any other valid and collectible insurance
> that applies to a temporary substitute auto or non-owned auto."

When wording of this type appears in both policies, the general rule is: (1) the
insured must be covered, (2) the terms of each policy are in conflict, and
therefore, (3) both carriers are liable.

In the instance where the insured is driving a non-owned vehicle, which is
covered by insurance, the general rule is that insurance follows the vehicle. The
insurance on the vehicle would be "primary". The driver's insurance would be
"secondary" and only become involved if the limits of the primary carrier had
been exhausted. In potentially serious cases, opinions should be sought from the
Regional Liability Administrator or Claims Home Office Legal.

## C.    Who Is A Resident Of The Same Household For Purposes Of The Omnibus Clause?

The policy contract not only affords protection to the named insured, but under
the omnibus clause, it extends coverage by means of specific language and
definitions to another class of person. This class includes relatives of the named
insured living in the same household, and/or, by definition, a person using the
insured's vehicle with permission.

Under the definition of an <u>owned automobile</u>, an insured is: (1) the named
insured and any resident relative, (2) any other person operating the insured
vehicle within the scope of permission and (3) any other person or organization
liable for the conduct of an insured in the use of an owned auto. Number 3
encompasses both (1) and (2) and would afford coverage, for example, in the case
where the insured is driving his car in the scope of his employment and is
involved in an accident injuring a third party, who would have a subsequent claim
against both the employer and the insured; in this case, the terms of the policy
would apply to each.

There have been several interpretations by the courts on the meaning of the word
"residence". Most courts agree that the term means more than a place of abode
and, in determining the qualifications of a residence, have applied measurement
criteria such as: addresses on bank accounts, voter registration, hospital records,
· registration of automobiles and driver's license. It appears that the term
"residence," when used in a statute is equated by the courts to the term
"domicile". When used in an automobile liability policy, however, the term
"resident" seems to be given a less permanent restriction, so as to cover persons
who are merely temporarily residing with the named insured. This, of course, is

an advantage to the company when excluding coverage for non-owned automobiles (automobiles "not owned by or furnished for the regular use of either the named insured or any relative"), but operates as a disadvantage to the Company when we consider that relatives of the named insured are covered with respect to non-owned automobiles as persons insured under our policy, as are residents of the same household as the named insured with regard to owned automobiles. Likewise, the term "relative" is used under Part II of the Family Automobile Policy covering expenses for medical services, etc.

Under the definition of a <u>non-owned auto</u>, the following persons or organizations are insured: (1) the named insured; (2) any resident relative operating with permission of the owner; (3) any other person or organization liable for the acts or omissions of an insured using an auto not owned or hired by the person or organization. Despite the language used in defining "relative" under the Family Policy, there are certain guidelines for the examiner or adjuster to follow with respect to this matter, which are as follows:

- A person may have several residences but can have only one domicile.

- While the term "resident" as used in our policy should not be interpreted to require that degree of permanency inherent in the term "domicile," it does require more than temporary physical presence in the named insured's household. The presence of the individual claiming to be (or not to be) a resident of the same household as the named insured must be accompanied by an intention to remain there for some length of time, although he need not intend a change of domicile.

- A person on a mere temporary visit to the named insured's home is not a "resident" as contemplated by the policy.

- Domicile means that place where a person has a true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he or she has, whenever absent, the intention of returning.

## D.   What Constitutes Regular Use Of Non-Owned Automobiles?

The Family Automobile Policy defines a non-owned automobile as "an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute automobile. An auto rented or leased for more than 30 days will be considered as furnished for regular use" This raises several questions each time a non-owned automobile is driven, in addition to the question of permissive use. For example, the examiner or adjuster must determine whether the automobile is owned by either the named insured or any relative, or whether it is furnished for the regular use of either named insured or any relative.

IV-7

CONFIDENTIAL

5-10-02

The courts have encountered difficulty in deciding these questions and this section will be directed solely to the question of what constitutes regular use of a non-owned automobile as determined by the courts. Legal opinions vary from state-to-state. When necessary, check with your RLA and/or Claims Legal. The main question to be determined by the claims person is whether the non-owned automobile is being driven without restricted permission as to the time period within which the operator may use the vehicle or whether the vehicle is loaned on a temporary or restricted basis. The courts which have considered this question have generally held that the question is one of determining whether the insured had the unrestricted right to use the vehicle at any time he or she desired, either on business or pleasure, rather than one of determining the specific number of times the car was used. The only situation where the specific number of times the car was used becomes important is where the right to use the car is restricted in time. Generally speaking, if the insured has the unrestricted right to use the vehicle at any time, whether it be a specific vehicle or one of a number of vehicles, furnished for his or her use, the courts have held that this is a vehicle furnished for regular use and is not covered under the Family Insurance Automobile Policy. This would cover, for example, the standard motor pool situation wherein our insured is allowed to use one of any number of vehicles available in the motor pool furnished by an employer. Regardless of the number of times he or she may have used the vehicle in question, the courts have normally held this to be a non-owned automobile furnished for regular use for which there is no coverage under the Family Automobile Policy.

The majority of non-owned auto situations will involve our policy only as excess coverage. The following rules should assist you in making a determination on the coverage issue.

- If the insured has the right to use the vehicle in question at any time he or she so desires, either on business or pleasure, regardless of the fact that it may be one of a number of vehicles in a pool of cars furnished, this is a car that may be furnished for regular use.

- The question to be determined is not a specific number of times which he or she has used the car in issue, but as to whether the insured has the unrestricted right to use the car or any one of a number of cars at any time.

- If the car is furnished for a restricted time period only, or in some instances for a restricted use only, then the question narrows and the majority of courts have decided that the car was not furnished for regular use. This would include short-term rental vehicles rented for a period of one month or less, or the case of a relative not residing with the owner of the car who must have specific permission to use the car each time.

IV-8

5-10-02

- Whenever specific permission is required for each separate use of the vehicle, the courts normally hold that this is not "furnished for the regular use of the named insured" due to the permission restriction.

- The use to which the car is being put at the time of the accident usually has no bearing on the question, the question being one of status of the vehicle and not the use to which it is being put, to wit: is the car furnished (available) for the regular use of the named insured?

## V.   WAIVER

A waiver is the relinquishment of a known right; in this instance, the Company's relinquishment of the right under the policy contract to deny coverage. For a waiver to exist, the Company must know about the coverage question. Although a waiver does not usually have all the elements of a contract, it is in the nature of a contract, based on an expressed or implied intention of the parties. The intention to waive may be implied from the actions of the claims technician.

An example of a waiver might be a case in which there was a delay of six months in reporting an accident. Obviously there is a coverage question based on a breach of the policy condition requiring prompt reporting. The question of coverage may be waived by the claim technician's expressly agreeing to do so or by implying such an intention by investigating and attempting to settle the claim without first issuing a Reservation of Rights or obtaining a signed Non-Waiver Agreement.

## VI.   ESTOPPEL

The doctrine of equitable estoppel may prevent a valid denial or disclaimer of coverage. If the Company acts or fails to act in such a manner that would (1) reasonably lead the insured to believe coverage is in order, and (2) the insured acts to his/her detriment in reliance upon that belief, the Company may be "estopped" from denying or disclaiming coverage.

For example, the Company may learn at the time the insured reports a serious accident, that when the insured applied for insurance, he or she inadvertently neglected to inform the Company of a prior insurance cancellation by another company. Although this may raise a question of coverage, the claims examiner or adjuster may investigate and even attempt to settle the claim. Perhaps suit is filed and the insured sends the suit papers to the Company, but the Company returns the suit papers to the insured ten days before trial, indicating that it is withdrawing from the case and contending that the policy was void ab initio because of misrepresentation.

IV-9

CONFIDENTIAL

5-10-02

Under these circumstances, the insured appears to have been justified in relying on the Company to do what it represented it would do. Because the insured has been deprived of any reasonable opportunity to investigate and attempt to settle the claim, if he or she has acted in good faith, it would appear unjust and inequitable to permit the Company to take advantage of the coverage question at that late date. The Company could be estopped from denying coverage.

It is becoming increasingly difficult to distinguish between waiver and estoppel. In many jurisdictions, they are regarded as synonymous and in others; a waiver is not binding unless it is supported by an estoppel. It is sufficient for you to be aware that the application of either doctrine can prejudice the Company's position.

## VII.   DEALING WITH OUR INSURED IN COVERAGE QUESTION SITUATION

While investigating a coverage question, the claims handler must be careful to preserve the rights of both parties to the insurance contract: the insured (or person seeking coverage) and the Company. Once a coverage question is recognized, the handler must seek guidance from Claims Management and, in appropriate cases, the RLA to determine a plan of action to resolve the coverage question. This plan may include issuance of a Reservation of Rights letter or, in some circumstances, a Non-Waiver Agreement or Agreement to Defend. These devices provide protection to both the people seeking coverage and the Company while the coverage investigation proceeds.

## VIII.  RESERVATION OF RIGHTS (ROR) LETTER

A reservation of rights letter (known as a "RoR") is used promptly to inform an insured that a coverage question has arisen concerning her/his claim and that we (the insurer) require time fully to investigate the question. The RoR is intended to advise the insured that the question exists, the nature of the question and that our efforts to investigate the question will require some additional time. The RoR is an important legal document. It can cause apprehension on the part of the insured. Its use must be carefully controlled and drafted. What follows are essential considerations in drafting and issuing RoRs:

### A.     Timing of RoR

Because the very purpose of a RoR is to give notice to the insured of a coverage question, these declarations must be made promptly after a coverage question is recognized. This does not mean that a RoR letter must be sent before preliminary investigation is made to confirm coverage. The law does not require that we guess about basic coverage based upon bare allegations. Mere suspicion regarding coverage does not require or even justify a RoR. However, there should be no significant delay in sending adequate notice to the person seeking coverage explaining why the coverage decision is not resolved. No RoR should

CONFIDENTIAL                      5-10-02

be sent in any case without documented approval of a supervisor. The level of the supervisory approval required will depend on the loss involved.

**B.     Contents of RoR**

A RoR issued in an auto claim must fully and fairly describe all reasons why the Company questions coverage in the particular case and the general facts, which support the need for the coverage investigation. Where there are genuine questions or facts upon which the coverage depends, these questions should be expressed in a letter, which relates the facts as known, by the Company. The RoR will declare that both parties retain all rights and benefits under the insurance policy during the coverage investigation and that the Company reserves its rights to deny or disclaim coverage if the coverage question is resolved against the person seeking coverage.

**C.     Presentation of RoR**

Questions often arise as to who should receive the RoR (or a copy of the RoR). Again, recognizing that the purpose of a RoR is notice, the RoR should be addressed to the person(s) seeking coverage under the policy. If the named insured is not the person against whom primary liability might be assessed (i.e. the insured vehicle was driven by a permissive user); the RoR is addressed to the permissive user (with an info copy to the named insured). On the other hand, in those states where the owner may be vicariously liable for the negligence of a permissive user. any RoR that sets forth a reservation of rights that is applicable both to the owner and the permissive user should be addressed to both parties. In most states (New York in particular), it is necessary to send a copy of the RoR to an adverse party who may be affected by the potential coverage denial. This is a complex issue and the examiner must seek supervisory guidance.

**IX.     DISCUSSIONS REGARDING ROR**

- RoRs should not be used where we have decided our coverage position. It is not a proper purpose of a RoR to "buy time" when we know our coverage position. If we have a firm coverage position, it should be stated directly and forthrightly.

- Some coverage questions will involve intricate issues involving sales, policy service and underwriting processes and procedures. As a direct-seller, we are subject to allegations involving what was said during a telephone contact with the insured. These issues should be handled with care and with full supervisory involvement.

- When there is more than one person (or other entity) seeking coverage, special care must be taken in resolving the coverage issues. We must recognize our contractual obligations to "other insureds" and satisfy those obligations.

IV-11

5-10-02

CONFIDENTIAL

- By their very nature, RoRs are intended to be temporary. If complications arise in the course of the coverage investigation, the person(s) seeking coverage should be advised of these complications and a stale RoR should be refreshed by another letter reminding the person(s) seeking coverage that the coverage question remains unresolved and that we continue to reserve our rights to deny/disclaim coverage. Ultimately, unresolved coverage questions will often result in the company's having to provide coverage unless the reason the question is unresolved was beyond the control of the Company. A person seeking coverage cannot defeat a coverage question by refusing to cooperate in the coverage investigation. Failure of the person seeking coverage to cooperate in the coverage investigation may be reason for a renewed RoR adding lack of cooperation as a basis for potential disclaimer of coverage.

## X.    NON-WAIVER AGREEMENTS

Non-Waiver Agreements (NWA) are most often used to obtain the agreement of the insured that our coverage for a loss or defense of a lawsuit is conditional upon future events or determinations of fact. This device is useful where the defense of a person seeking coverage is undertaken initially, but it is contemplated that the defense of the lawsuit will be withdrawn if specified events occur or facts are determined. The advantage of a NWA is that it is a bilateral agreement rather than merely a unilateral declaration (RoR). This device is not common in automobile insurance cases. Care should be taken in drafting a NWA to make sure it is clear regarding the nature of the coverage questions and the specific conditions upon which the defense may be withdrawn. A typical example of where a NWA may be used is where the Company undertakes the defense of a person seeking coverage in an underlying tort lawsuit while simultaneously seeking a judicial declaratory judgment regarding its coverage obligations. The NWA would be used to secure the agreement of the person seeking coverage that the defense of the lawsuit would be withdrawn if the court should determine that the Company properly denied/disclaimed coverage. Again, the purpose of the NWA is to put the person seeking coverage on notice of what will happen if a coverage question is resolved adversely to that person. Claims Home Office Legal coordination is required any time a NWA is contemplated.

## XI.   AGREEMENTS TO DEFEND

Occasionally, the Company's first notice of a potentially covered loss will be notice that a lawsuit has been filed. In such a case, there may not be time to conduct a proper coverage investigation (assuming there is a coverage question) before an answer to the lawsuit must be filed. A specific agreement to a limited defense can be used to take immediate action to protect the person seeking coverage. This agreement will specifically limit our obligation to defend and/or indemnify pending resolution of the coverage question. Such an agreement is very similar to a non-waiver agreement except

CONFIDENTIAL

that it is more specific about what the Company will undertake in response to the lawsuit. Care must be taken not to obligate the Company inadvertently to a full defense. Claims Home Office will be contacted prior to entry into an agreement to defend. Every effort should be made to resolve quickly any coverage question where we have undertaken a limited or conditional defense. Undue delay in such a situation can result in the Company not being permitted to withdraw from the defense of the underlying claim.

## XII.  DECLARATORY JUDGMENTS

Critical coverage questions may be appropriate for judicial determination by use of an action for declaratory judgment (DJ) in state or federal court. Such an action – also called an action for declaratory relief in some states – asks the court to decide the parties' obligations under the insurance contract. A variety of coverage issues can be litigated with a DJ action, but it is particularly useful when there is a dispute over the interpretation or application of policy language or the validity of policy exclusions. This remedy can be very expensive because, in most states, if the ruling is against the position taken by the insurer, the insurer must pay the reasonable attorney fees incurred by the insured. <u>DJ actions must not be initiated without the approval of Claims Home Office Legal.</u>

It is important to name all parties in the DJ action. If the parties reside in diverse jurisdictions, a DJ may not be appropriate. Even where a DJ is likely, a reservation-of-rights letter will be needed to cover the time needed to investigate the situation prior to the filing of the DJ action.

## XIII.  DISCLAIMER

Disclaiming is denying liability under an existing policy contract and withdrawing from the handling of the claim because of a breach of a policy condition. The Company takes no further action with respect to investigation, negotiation, defense, etc. Denial of a claim on the basis that the accident or loss occurred after a date of expiration or other proper termination of the policy (or because claim is made under a coverage properly omitted from the policy,) is not a disclaimer, but rather is a "denial" of coverage.

There are certain risks in disclaiming. If the Company disclaims coverage in a Bodily Injury Liability claim and the claimant subsequently files suit, the insured is under no obligation to send suit papers to the Company or to give notice of the suit. In the event that judgment is taken against the insured after a trial, or even by default, for failure to defend, and there is a later determination that the disclaimer was improper and coverage was effective, the Company may be bound by the judgment.

In most states, (in the factual situation of where the insurance company disclaims coverage and the plaintiff proceeds in the lawsuit) after a plaintiff obtains a judgment against the insured, and the insured assigns his or her rights against the insurance

IV-13

**CONFIDENTIAL**

company to the plaintiff, the plaintiff can then proceed directly against the Company. Questions of liability and damages are not then an issue as they have already been settled. The only issue is whether the policy covers the particular accident. If the plaintiff, in the original action, recovers on the judgment and collects from the insured, the insured might then sue the Company for the amount he or she was required to pay within his policy limits, plus expenses. The only issue would be whether the policy was effective.

Disclaimer should always be made by letter to the insured, (person seeking coverage) with copies of the letter sent to all other interested parties. The letter should be sent by Certified Mail, Return Receipt Requested, Addressee Only.

In some states, either a copy of the disclaimer letter to the insured or a separately dictated letter must also be sent to the liability claimant and/or the legal representative within a specific time or the Company loses its right to disclaim.

A letter of disclaimer must be very carefully worded and must set out the specific reasons for disclaiming coverage in understandable terms.

If it is decided to declare a policy void from inception, it may be necessary to arrange, through the Underwriting Manager, to return premiums to the insured. Declaring a policy void ab initio ("ab initio" means from the beginning) is a joint underwriting and claims function and the letter to the insured should go out from the Underwriting Department. We should have a copy of the Underwriting Department's letter in the claim file.

If a decision is made to rescind the policy, it is usually necessary to refund the insurance premium to the insured. The return of the premium to the insured must be coordinated with the appropriate Underwriting Manager. The RLA and Claims Home Office Legal must approve all coverage disclaimers.

## XIV.   COVERAGE DENIALS

Coverage denials are sent when no policy was in effect at the time of the loss. Questions as to whether a policy was in force at the time of the accident or loss, along with proper investigative material, should be referred to Underwriting (via SYSM mailbox) for an opinion as to whether the policy was effective. In certain circumstances, referral to Underwriting may not be necessary if the lapse of coverage is readily apparent after a careful review of the policy screens. If the Supervisor/Claims Manager does not agree with Underwriting's opinion, the case should be discussed with the Regional Liability Administrator.

If the Regional Liability Administrator also disagrees with the opinion of the Underwriting Department, the coverage question should be referred to Claims Home Office for a decision. In these circumstances, the Underwriting Department should be informed how the case will be handled as soon as possible.

IV-14

5-10-02

Managers are permitted to sign off on coverage denials without RLA involvement if all of the following criteria are satisfied:

- The policy must have been cancelled at least 30 days prior to the loss or have expired 30 days or more before the loss.

- The only claim is for property damage (which includes collision and comprehensive).

- The policyholder does not challenge the cancellation or expiration.

- The appropriate PORS and cancellation notice are in the claim file.

- A Coverage Problem Worksheet has been completed.

- A manager has approved the denial in writing.

The Regions are not required to implement this modified rule and may retain mandatory RLA involvement in such cases.

Regional Liability Administrator (RLAs) <u>may approve denials of coverage</u> for claims involving Bodily Injury or UM/UIM Bodily Injury in the following <u>limited circumstances</u>. All conditions must be present:

- The denial is based upon:

    - Cancellation of the policy for failure to pay premium where the cancellation notice and the PORS have been examined and support the cancellation; or

    - A valid named driver exclusion applies to the loss and clear evidence of the exclusion exists in the file; or

    - Cancellation of the policy or removal of the involved auto was done pursuant to the policyholder's request prior to loss if the policy file information is clear and unambiguous.

- The former insured has been contacted and given an opportunity to present arguments. A good faith attempt to make this contact must be made before search for the former insured is deemed unsuccessful.

- There are no complications evident in the file. Such complications for cancellation cases include, but are not limited to:

IV-15

**CONFIDENTIAL**

-   A premium payment was made subsequent to the effective date of the cancellation, which was not honored to resume coverage.

-   The loss occurred within 10 days of the effective date of cancellation and the former insured contests receipt of the cancellation notice.

-   The former insured alleges a telephone contact with the Company subsequent to the cancellation advising of submission of payment for the purpose of reissue.

-   The insured has a prior history of late payments.

- Complications for a named driver exclusion case include:

    -   The most recent UE-119 for an excluded resident relative found in the file is over two years old ; or

    -   The UE-119 is for a named insured; or

    -   The named excluded driver is not a relative and would otherwise be a be a permissive user of the insured vehicle.

- Claims reported by adverse parties where we have no record of insuring the party alleged to be insured with GEICO.

    Generally, guidelines for approval of such denials include checking the policy system under the alleged name or alleged policy number for a match; verification with the underwriting department if the alleged insured could not be located in the policy system; and a concerted effort to locate the person. We must contact the alleged insured either by phone, mail or face to face by an adjuster.

## XV.   COVERAGE PROBLEM HANDLING PROCEDURES

The following are step-by-step outlines on handling various coverage problems.

### A.   General Procedure

1.   Recognize potential coverage problem

2.   Check CRT in IDOC:

    - INDX – Client Index System
    - PHIN – New Business Phone Application Inquiry (PHIN).
    - IDIQ – Mini Accounts Receivable screens
    - BINQ – Billing Inquiry Screen

IV-16

5-10-02

- PLOGI – Screens used to record policy notes
- DRVI – Screen used to identify an excluded driver in UE119 situations

Or check CRT in Oasis:

- Customer Identification Screed
- Critical Info Screen
- Billing Screen
- Driver Summary Screen
- Vehicle Summary Screen
- Coverage Screen
- PLOG Screen

3.  Alert your supervisor/discuss Coverage Screen sending a reservation of rights letter

4.  Investigate (must be resolved in 30 days)

   a.  Contact Insured
      - opening
      - alert to possible problem and take recorded interview
      - explain what will happen next and when
      - thank insured

   b.  Contact Claimant
      - opening
      - explain potential problem
      - explain what will happen next and when
      - thank claimant

   c.  Gather other information

   d.  Gather documentation

5.  Complete coverage worksheet

6.  Obtain approval for denial or disclaimer from Manager, RLA or CHO Legal, whichever is appropriate.

7.  If denial/disclaimer

   a.  By Mail –
      - prepare denial letter
      - address to person seeking coverage; copies to all interested parties

IV-17

CONFIDENTIAL

5-10-02

- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

b. By Phone – Call insured
- opening (name, purpose of call)
- explain clearly that there is no coverage and specific reason
- discuss so that insured's questions are answered
- explain what will happen next and when
- thank insured and again express your concern

c. Call claimant/other interested parties
- opening (name, purpose of call)
- explain clearly that there is no coverage (and why?)
- discuss options available

d. Claimant's own insurance (UM)
- explain that you would like to help but under terms of this policy are unable to.

The following pages show steps that you can follow for particular coverage situations, which should be sufficient for most situations.

IV-18

CONFIDENTIAL

5-10-02

**B.   NEW POLICY**

### (Review regional new business procedure)

1. Check INDX in IDOC or Customer Identification screen in Oasis
   - is there a policy number for insured?

2. Check PHIN
   - is there a new business phone application in the system?

3. Coverage Worksheet (C-380)
   - handle according to your regional procedure

4. Make your supervisor aware of the problem

5. Call insured and take R/I

6. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

7. Gather information
   - copy of binder

8. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney

9. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

10. Obtain approval from Manager, RLA or Claims HO Legal
    - approval should be obtained through the appropriate channels

11. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copies to all other interested parties
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

IV-19

**CONFIDENTIAL**

## C.   NON-PAY CANCELLATION

1. Check BINQ screen in IDOC or Billing screen in Oasis
   - has a reissue payment posted?
   - are there dash policies?

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call insured and take R/I

5. Call claimant
   - let him/her know that there is a coverage problem and that you will keep in contact

6. Gather documentation
   - PORS
   - Cancellation notices

7. Reservation of Rights letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copies to all other interested parties
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

CONFIDENTIAL

5-10-02

## D.   CANCELLATION – UNDERWRITING REASONS

1. Check BINQ screen in IDOC on Billing screen in Oasis
   - has policy been reinstated?
   - is there a dash policy?

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Insured and take R/I
   - ask questions such as:
       Was cancellation letter received?
       When?  How?
       What date cancelled?
       Are you aware of cancellation?
       Have you moved recently?
       When?
       Where?
       Was Company notified?
       How?
       When?
       Where?
       Whom spoke with?

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in
     contact

6. Gather documentation
   - copy of cancellation letter
   - copy of PORS

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the
     policy
   - copy to liability claimant and attorney

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

**CONFIDENTIAL**                                   5-10-02

9.  Obtain approval from Manager, RLA or Claims HO Legal
    -   approval should be obtained through the appropriate channel

10. Denial Letter/Disclaimer Letter
    -   addressed to the person seeking coverage
    -   copies to all other interested parties
    -   send according to TCM-72 guidelines – See Exhibit 1
    -   give specific reasons

**E.   VEHICLES DON'T MATCH - (temporary substitute, replacement, additional)**

1.  Check BINQ screen in IDOC or Billing screen in Oasis
    -   does vehicle show?
    -   is there a dash policy?

2.  Coverage Worksheet (C-380)
    -   handle according to your regional procedure

3.  Make your supervisor aware of the problem

4.  Call Insured and take R/I
    -   determine what category the vehicle will fit in, i.e. temporary substitute, replacement or additional

5.  Call claimant
    -   let him/her know that there is a coverage problem and you will keep in contact

6.  Gather documentation
    -   copy of bill or sale
    -   copy of title

7.  Reservation of Rights Letter
    -   list all possible reasons and be as specific as possible
    -   send according to TCM-72 guidelines – See Exhibit 1
    -   send to the individual or all individuals claiming protection under the policy
    -   copy to liability claimant attorney

8.  Coverage Problem Worksheet
    -   form used to get authorization to deny or disclaim
    -   fill in form completely
    -   get appropriate supervisor/manager signatures

IV-22

5-10-02

9.  Obtain approval from Manager, RLA or Claims HO Legal
    -  approval should be obtained through the appropriate channels

10.  Denial Letter/Disclaimer Letter
    -  addressed to the person seeking coverage
    -  copies to all other interested parities
    -  send according to TCM-72 guidelines – See Exhibit 1
    -  give specific reasons

## F.  EXCLUDED DRIVER  (UE-119)

1.  Check DRVI in IDOC or Driver Summary screen in Oasis
    -  who is the excluded driver

2.  Coverage Worksheet (C-380)
    -  handle according to your regional procedure

3.  Make your supervisor aware of the problem

4.  Call Policyholder and take R/I

5.  Call claimant
    -  let him/her know that there is a coverage problem and you will keep in
       contact

6.  Gather documentation
    -  copy of UE 119 from file

7.  Reservation of Rights Letter
    -  list all possible reasons and be as specific as possible
    -  send according to TCM-72 guidelines – See Exhibit 1
    -  send to the individual or all individuals claiming protection under the
       policy
    -  copy to liability claimant and attorney

8.  Coverage Problem Worksheet
    -  form used to get authorized to deny or disclaim
    -  fill in form completely
    -  get appropriate supervisor/manager signatures

9.  Obtain approval from RLA or Claims HO Legal
    -  approval should be obtained through the appropriate channels

CONFIDENTIAL                                            5-10-02

10. Denial Letter/Disclaimer Letter
- addressed to the person seeking coverage
- copies to all other interested parties
- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

## G.   DRIVER OTHER THAN NAMED INSURED- (Permissive Use Questions)

1. Make your supervisor aware of the problem

2. Call insured and take R/I

3. Call claimant
- let him/her know that there is a coverage problem and you will keep in contact

4. Gather information from other sources
- driver's interview

5. Reservation of Rights Letter
- list all possible reasons and be as specific as possible
- send according to TCM-72 guidelines – See Exhibit 1
- send to the individual or all individuals claiming protection under the policy
- copy to liability claimant and attorney

6. Coverage Problem Worksheet
- form used to get authorized to deny or disclaim
- fill in form completely
- get appropriate supervisor/manager signatures

7. Obtain approval from RLA or Claims HO Legal
- approval should be obtained through the appropriate channels

8. Denial/Disclaimer Letter
- addressed to the person seeking coverage
- copies to all other interested parties
- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

## H.   EXCLUSION OR "DEFINITION" COVERAGE PROBLEMS

1. Make your supervisor aware of the problem

2. Call Insured and take R/I

IV-24

CONFIDENTIAL

5-10-02

- ask questions that will help determine whether the loss does not fall within the terms of the policy or if it might be excluded

3. Call Claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Gather information from other sources

5. Gather documentation

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copies to all other interested parties
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

I.   **VEHICLE USED IN GOVERNMENT BUSINESS**

1. Make your supervisor aware of the problem

2. Call insured and take R/I

3. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Gather information from other sources
   - insured's supervisor's statement

5. Gather documentation

**CONFIDENTIAL**

5-10-02

- copy of government's claim report

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TMC-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney

7. Coverage Problem Worksheet
   - form used to get authorization or deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or HO Claims Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copies to all other interested parties
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-26

CONFIDENTIAL

5-10-02

**EXHIBIT 1**
**TCM-72**
**REVISED**

## M E M O R A N D U M

TO:        ALL CLAIMS TECHNICAL PERSONNEL

FROM:      CLAIMS HOME OFFICE

SUBJECT:   **DENIALS, DISCLAIMERS AND RESERVATIONS OF RIGHTS:**
           **PROPER FORM OF MAILING**

DATE:      December 20, 2000


This revised TCM-72 replaces the one issued on November 22, 2000.

Please adhere to the following guidelines when mailing denials, disclaimers and reservations of rights letters:

1.  Disclaimers, which are issued when there has been a breach of policy condition (e.g. notice, cooperation, etc.) must be sent via certified mail.

2.  Denials and reservations of rights letters may be sent via regular mail unless another form of mailing is mandated by state law or another requirement in the jurisdiction, in which case the letter must be sent in the manner mandated.

3.  Whenever a denial, disclaimer or reservation of rights letter is sent, a copy of the letter must be retained in the claim file.


A. STEPHEN KALINSKY

ASK:ghk


IV-27

**CONFIDENTIAL**

5-10-02

# CHAPTER V

# INVESTIGATION

## Table of Contents

Page

I.     Fundamentals of Investigation ......................................................................... 1

II.    Investigation of the Facts ............................................................................... 3

III.   Sequence of Investigation .............................................................................. 3

IV.    Locating Witnesses......................................................................................... 6

V.     "Police Court" Hearings and Inquests – Pleas to Criminal Charges ............... 7

VI.    Assigning Investigation to Field Representatives ........................................... 8

VII.   Assigning Investigation.................................................................................. 9

VIII.  Rapport With Representatives......................................................................... 9

IX.    Physical Facts .............................................................................................. 11

X.     Determining Coverage ................................................................................. 13

XI.    Determining Contractual Obligation ............................................................ 14

XII.   Determining Liability to Third Parties .......................................................... 16

       A.     Under Contributory Negligence .................................................. 16
       B.     Under Comparative Negligence ................................................... 17

              1.   Pure.................................................................................. 17
              2.   Modified ........................................................................... 17

XIII.  When to Investigate and When to Settle ....................................................... 17

XIV.   Recorded Interviews..................................................................................... 18

XV.    Planning the Statement or Recorded Interview .............................................. 18

XVI.   Preparing for the Statement – Pre-Interview ................................................. 19

V-i

# CHAPTER V

## INVESTIGATION

### Table of Contents

Page

XVII.    Getting the Insured's Recorded Interview or Signed
Statement .................................................................................................................... 20

XVIII.   General Rules for Taking a Signed Statement ............................................................ 20

XIX.    Signing the Statement.................................................................................................. 24

XX.     Taking a Recorded Interview ..................................................................................... 24

XXI.    Interruptions ............................................................................................................... 26

XXII.    General Rules for Recorded Interviews ...................................................................... 27

XXIII.   Types of Statements ................................................................................................... 28

           A.  Negative Statements................................................................. 28
           B.  Statements of Biased Witnesses................................................ 29
           C.  Exonerating Statements............................................................ 29
           D.  Non Injury Statements............................................................. 29
           E.  Statement of Permissive Use.................................................... 30
           F.  Court Reporter Statements....................................................... 30

XXIV.   Negotiating Claims In Suit ......................................................................................... 31

XXV.    Control of Investigation Expense ............................................................................... 31

XXVI.   Guidelines for Settlement Requirements.................................................................... 31

XXVII.  Negotiating the Settlement of Liability Cases ........................................................... 32

           A.  Importance of Early Contact .......................................................... 32
           B.  Walkaway Settlements.................................................................... 33
           C.  Structured Settlements .................................................................... 33

CONFIDENTIAL

5-10-02

# CHAPTER V

## INVESTIGATION

### Table of Contents

Page

XXVIII. Releases ........................................................................................................ 34

    A. General Releases .......................................................................... 34
    B. Covenants Not To Sue and Limited Releases................................. 34
    C. Release and Agreement – Open End Release................................. 35

XXIX.   Voluntary Arbitration................................................................................ 36

XXX.    Voluntary Mediation................................................................................ 37

XXXI.   No Pay Cases.......................................................................................... 38

XXXII.  Guidelines for Closing Claim Files......................................................... 38

XXXIII. Fraudulent and Unethical Claim Activities ............................................. 39

XXXIV. Minors' Claims...................................................................................... 39

    *  A.   Binding Settlements................................................................ 39
    *  B.   Friendly Suits and Court-Approved Settlements ...................... 40
    *  C.   Release Agreement ................................................................ 41
       D.   Settlement Checks ................................................................. 41

11-15-05

# CHAPTER V

## INVESTIGATION

I.  **FUNDAMENTALS OF INVESTIGATION**

The objective of an investigation is a fair settlement at the earliest possible time.

Some investigation of every claim is necessary, and the first step is to ask:

- Was the policy in effect at the time of the loss?

- Is coverage in order?  If so, are the circumstances covered?

- If it is a liability claim, is the insured legally liable?

- How much will it cost to settle the claim?

The extent of the investigation required depends on the nature of the claim.

In some comprehensive losses, i.e., glass and emergency road service claims, the report itself, in most instances, will be sufficient and further investigation may not be needed.

Investigation is not an end in itself.  It is merely the basis for the settlement, denial or compromise of a claim and is of real value only when it is commensurate with the size or the nature of the claim.  Once a claim is settled, there is no longer a need for investigation on that case.

The Company spends large sums of money for investigation of claims and the defense of lawsuits.  Telephone adjusters and claims examiners are responsible for making sound claim settlements and at the same time controlling expenses of investigation and defense.  Ask yourself this question in every claim you handle, "Now that I've got the facts, can this claim be settled?".

While it is costly to over investigate claims, it is even more costly to under investigate.  Judgment cultivated through experience enables a competent telephone adjuster or claims examiner to determine the proper level of investigation.

Liability claims may require a great deal more investigation than do first-party claims since there are always at least two people involved in the liability claim who have divergent interests – the insured, the driver of the other car, a pedestrian, a passenger, or the owner of some property damaged by the insured vehicle.  Experience has shown us that people involved in a liability claim will seldom agree on the facts of an accident.  If

V-1

5-10-02

there are independent witnesses or passenger witnesses, there will frequently be as many different versions as there are witnesses.

Since the claim person's job is to determine whether legal liability exists, accurate facts must be determined. Because one fact frequently leads to others, the claims person must have imagination and initiative. Lawsuits are frequently won because one party made a more thorough investigation than did the other.

Prompt investigation is crucial. Remember, the real objective of investigation is a fair settlement at the earliest possible time.

Avoid drawing conclusions based on assumption or speculation. An erroneous conclusion can make the difference between settlement and denial. If the denial is unsound, the result may be a complaint or a lawsuit, either of which could have been avoided. Because some cases turn on very fine points, reports must be complete and accurate.

It is easy to assume, for example, that there were no witnesses because of the time of day or the area in which the accident occurred, but such a conclusion should not be reached until the possibility of witnesses has been thoroughly investigated. Substitute initiative for assumption.

Remember that the accident probably is also being investigated by the adverse party's insurance carrier. Therefore, the insured should be advised immediately by letter or orally that he or she should not give statements to or discuss the accident with anyone other than a representative of our company or a police official, unless a claim is being pursued against the adverse party. This warning should be emphasized again if the case is being investigated by an adjuster. Statements given to adverse parties or their representatives by the insured may prejudice the insured's and the Company's position in liability or subrogation claims. The adjuster should request that if the insured provides a statement to an adverse party or their representative that a copy be obtained and provided to us, or that we are given written authorization to obtain the statement.

Thorough investigation is needed on files involving coverage issues, complicated factual situations, suspicious circumstances, questionable liability or questionable injuries. The essential items include contact with the insured, claimant(s), potential witnesses and the investigating officer. Recorded interviews or signed statements should be obtained to determine the various versions of the loss, the number of people involved and the injuries sustained.

Inspection of the vehicle is important not only to measure the dollar amount of damage owned, but for investigative purposes, the point of impact. Photos of the accident scene from the direction of travel assist in reconstructing the accident. While photographing the scene, the investigator should be sketching or noting the number of traffic lanes and any landmarks which may have obstructed vision or could be used in distance measurement.

V-2

5-10-02

Other sources of investigation may include DMV driver record information from past accidents (some states require person's permission to obtain driving or license records), weather reports; city engineering records on malfunctioning traffic lights or road maintenance; and private investigating services to conduct activities checks, financial status, work habits, etc. It is important that the examiner or adjuster fit the investigation need to the circumstances.

When investigating an injury claim, we should have the injured person sign a medical authorization form initially. This form enables the investigator to secure the injured person's medical history from doctors and hospitals without lengthy "red tape" procedures and at a minimal cost. If this form cannot be secured, the claims person should request the bills and reports from the claimant or his or her representative directly. Send the medical authorization to claimant's attorney immediately or as soon as you get a letter of representation.

## II.    INVESTIGATION OF THE FACTS

The question of liability always hinges on the facts of the accident. Since no two accidents are precisely the same, it is impossible to suggest exactly how every accident should be investigated. Every item of investigation suggests something else to be done.

The outline below should not be considered exhaustive since it is intended merely to stimulate the thinking of the claims person. In some instances, not all the investigation is necessary, and in others, many things that are not mentioned should be covered. There is no substitute for original thinking, planning, imagination, initiative, and good judgement.

## III.   SEQUENCE OF INVESTIGATION

The sequence of investigation depends on the circumstances. Generally, the first move is to contact the insured driver if any questions on liability exist and/or the claimant as promptly as possible to establish clear communication and make an early disposition. Other investigation should be conducted as soon as possible and in the order dictated by good judgement. The following list applies to the majority of cases:

- Identify the insured car. This means a physical check of the make, model, year, and serial and engine numbers. Read the Auto Damage Adjuster's paperwork carefully,

- Interview the insured driver and obtain a detailed recorded interview or handwritten statement.

- If there is a coverage issue involved, a reservation of rights letter needs to be sent to all appropriate parties. In some states

V-3

5-10-02

the reservation of rights letter would be sent only to those parties (or their attorneys, if represented) who are seeking coverage under the policy; in other states it would be sent to all parties (or their attorneys, if represented) who have an interest in the matter. You will need to check the requirements for each state when preparing and sending the reservation of rights letters.

- If the driver is not the policyholder, spouse or a resident of the insured's household, a recorded interview of permissive use should be obtained from the named insured.

- If the automobile is not the insured automobile, obtain a statement explaining the conditions under which it is being used, i.e., non-owned, temporary substitute, permissive user, etc.

- Obtain recorded interviews from occupants of the insured car, covering fully their status and the circumstances of their presence in the car.

- Obtain recorded and/or handwritten statements from drivers of other cars involved. If the owners were not driving, develop the relationship between the owners and drivers.

- Obtain recorded or handwritten statements from passengers in all other vehicles. Include the status of each and the circumstances of his or her presence in the car.

- Obtain a copy of the police report.

- Take recorded or handwritten statements from impartial witnesses.

- Interview and take recorded interviews from ambulance and wrecker drivers and their assistants as to what they saw and heard at the scene or afterwards. Do they know of any witnesses?

- Interview and take recorded or handwritten statements from the hospital attendants and doctors who admitted and treated the injured people after the accident. Was there evidence of drinking? Were they told or did they hear about how the accident happened?

V-4

CONFIDENTIAL

- Have a field adjuster canvass the scene of the accident, if possible at about the same time of day as the accident, to discover additional witnesses.

- Interview the investigating police officers as to the facts of the accident, physical evidence and possible witnesses. The police report is not a substitute for an interview, and if possible, statements from the investigating officers should be obtained. Police officers can be quite cooperative if properly approached.

- Have a field adjuster prepare a diagram of the scene, showing the width of streets, traffic controls and any other pertinent physical characteristics.

- Consider having the field adjuster take photographs of the vehicles or of the scene. Photographs for information reasons can be taken by the adjuster with an inexpensive camera. (To preserve evidence for possible use in litigation, photographs could be taken by a commercial photographer). Check with your supervisor if any question when professional photographs should be secured.

- Check the applicable traffic laws such as speed limits.

- Look for evidence of drinking by either driver.

- Learn what the weather conditions were at the time of the accident.

- If the accident happened at dusk or dawn, determine whether the lights were in operation on either car and check the applicable ordinance or statute to see whether lights should have been lighted.

- If there was a traffic hearing, learn who testified, what the testimony was, and the result of the hearing.

- In a death case, learn the result of any inquest and obtain a copy of the transcript of the testimony.

- Find out if anyone was hurt and what the injuries were.

- Medical reports from attending physicians should be obtained. Contact and secure loss wage information from employers.

- In a death case, obtain a copy of the death certificate.

V-5

CONFIDENTIAL

- In a death case, learn the measure of damages, i.e., was the person a wage earner, sole supporter of a family, etc.

- List the special damages for each claimant.

- Determine whether independent medical examinations are necessary, and if so, see your supervisor and then arrange for them. Determine whether medical peer review should be secured. If so, see your supervisor.

- Check the extent of any disability or scarring and verify the disability.

- Determine the possibility of obtaining contribution from another defendant or insurance carrier.

- Determine the possibility of recovery of the Company's subrogation interest.

- Accident reconstruction experts may need to be called. See your RLA or Supervisor.

- Photographs of damage on the vehicles should be secured on minimal impact cases and on any other case where the points of impact or the nature of damage to the involved vehicles is significant.

## IV.   LOCATING WITNESSES

One of the most difficult and time-consuming aspects of investigation is discovering disinterested witnesses. Rarely will an independent eyewitness come forward with his or her name and address since there is a natural reluctance to become involved in matters of this nature. People fear that they will be required to make a court appearance as a witness.

Every time anyone is interviewed in the investigation of an accident, the question should be asked, "do you know of anyone, or have you heard of anyone, who saw the accident?".

In some accidents, there simply are no independent witnesses. However, the experienced claims person who has initiative and an inquisitive mind will turn up witnesses in many cases. As the investigation proceeds, one thing leads to another until the identities of probable witnesses are uncovered.

Examine the police and motor vehicle reports for information that might offer a lead. When the officers are interviewed, question them about possible witnesses. They may at least have names and addresses of people who were at the scene and might have been witnesses.

V-6

5-10-02

Have a field adjuster attend police court hearings and inquests on serious cases, because, along with other valuable information, identities of witnesses are sometimes disclosed. Other testimony, together with something else the adjuster knows, may lead to a witness. If it is impossible to attend the hearing, consider obtaining a copy of the transcript of testimony if the case is sufficiently serious to justify the expense. Try to determine what the cost will be before you order the transcript.

A canvass of the scene of the accident is often effective. Because people are, to a large degree, creatures of habit who do the same things at the same times, have the field adjuster make the canvass at approximately the same time of day that the accident occurred. Check with the local transit company for names of drivers who might have been in the area at the time of the accident.

Witnesses have been known to be discovered at busy, downtown intersections simply by having a claims person present at the intersection at the proper time of day and inquiring of people as they pass. When canvassing a residential neighborhood, consider short, negative statements from those who did not personally witness the accident.

Neighborhood stores and supermarkets are frequently visited by the same people at approximately the same time of day and the same day every week. If people interviewed did not see the accident and do not know of any witnesses, sometimes they can remember cars or trucks with signs or other identifying marks which were at the scene. If the name of the organization that owned the vehicle can be determined, the driver can usually be identified.

There may have been a newspaper deliverer or other delivery persons at the scene who are in that general area every day. In every serious accident, it is sometimes fruitful to advertise in newspapers and on neighborhood bulletin boards. To discover witnesses, the claims person must be thorough and persistent. It is easy to say, "There were no witnesses, and that's that!". The telephone adjuster or claims examiner should find that all-important witness through good solid investigation.

## V. "POLICE COURT" HEARINGS AND INQUESTS – PLEAS TO CRIMINAL CHARGES

All matters that have a bearing on liability are important. You should closely follow the developments of the criminal side of your very serious cases.

Pleas of guilty to criminal charges can, in some jurisdictions, be used as detrimental admissions in subsequent civil actions. Such a plea should be avoided when it is likely to adversely affect our ability to properly handle claims, particularly serious cases. Occasionally, an insured will solicit our advice with respect to his or her plea on a criminal charge. Unfortunately, we are precluded from giving direct instructions. We must never, under any circumstances, advise the insured to enter a guilty plea. The insured should be referred to personal counsel of his or her own choosing with respect to any plea regarding criminal charges and the consequences thereof.

V-7

CONFIDENTIAL

5-10-02

In serious cases, have a field adjuster attend the hearings and if the expense seems to be justified, have a court reporter present to take down the testimony.

It should be clearly understood that the Company is under no contractual obligation to provide counsel for the defense of criminal charges. Also, serious cases where the insured has arranged or is arranging an agreement allowing a guilty plea to a lesser charge, e.g., reducing manslaughter to reckless driving, should be discussed with the supervisor.

Sometimes it is helpful to have our attorney contact the insured or the personal attorney and review the case before the hearing to determine how the insured will plead, what the insured's testimony will be, and what other testimony is likely to be.

The insured is not compelled to testify. If it appears that there will be dangerous testimony, every effort should be made to settle the claim before the hearing. If that is impossible, consider having the Company's attorney work with the insured's personal attorney and attempt to obtain a postponement or to change the proposed method of handling; a delay in entering a plea to a criminal charge can allow us to pursue further settlement attempts.

Unusual and serious cases involving civil matters should be brought to the attention of Claims Home Office Legal.

## VI.   ASSIGNING INVESTIVATION TO FIELD REPRESENTATIVES

In providing nationwide claims service, the Company does use independent field adjusters and attorneys to represent it in those areas which are not serviced by staff personnel. Our volume of independent adjuster activity has decreased sharply since the advent of telephone adjusting, but we still have firms on the books.

Claims are reported directly to the Company. Each claim received is assigned to an examiner or a telephone adjuster who is responsible for reviewing the initial report and determining whether it contains the fundamental information needed to process the claim. Some routine matters reported directly to the Company can be economically concluded by either Auto Damage or the telephone adjuster corresponding directly with the insured or claimant. However, if there is a serious loss and a reasonable question as to the facts of the loss or the amount of the claim, the staff examiner may well assign the case investigation to a field adjuster. The size and nature of the loss, the probable cost of the investigation, and the Company's obligation to the insured for prompt and efficient claim service should be carefully weighed. Serious losses in areas not covered by Company field adjusters are then assigned to an independent adjuster. Normally, the examiner will need supervisory approval for this assignment.

When referring a case to the field, select the attorney or adjuster nearest to the center of the area where most of the work will be done. If two adjusters are approximately the same distance, the more competent should get the assignment since the case will probably

CONFIDENTIAL

close earlier and at less cost. Occasionally, the cost of sending an especially competent representative a considerable distance may be justified in a serious claim.

Sometimes, an accident occurs or a lawsuit is brought in a remote area where we do not have a regularly assigned attorney or adjuster, or a conflict of interest situation in which our regular representative is representing another company or another insured may require the selection of some representative other than the regularly appointed one to handle the particular claim or suit for the company. Approval for such temporary representation can readily be obtained by telephone from Claims Home Office Legal. If you have any questions about independent adjusters you are now using, verify that Claims Home Office Legal has given standing approval to use them, and continue to secure such approval if any different firms are to be used. Standing approval of any independent adjuster in an area serviced by one if our company offices should include the purpose for which the approval is granted.

When selecting an independent adjuster, note the terrain between the representative's office and the accident scene. Even though one adjuster appears to be closer as the crow lies, there may be a drive around a mountain range, a lake, or some other natural obstacle that would cause another representative to be closer.

## VII.   ASSIGNING INVESTIGATION

Decide what investigation is needed and how it should be obtained. The importance of the information should be weighed against the cost of obtaining it. If an outside adjuster or investigator is used, give that representative the information needed to complete the assignment without wasted motion. A claim representative's bill is based on time spent; wasted motion is charged to the Company at the same rate as constructive activity.

If the only information available is that an accident has occurred, it is impossible to give detailed instructions. The representative should be advised to commence investigation and to forward a preliminary report promptly. When the preliminary report is received, clear-cut instructions can be given. To determine what additional investigation is needed, analyze the case and then give explicit instructions to the representative.

Do not delay disposition of a claim by attempting to investigate yourself if it can be handled more rapidly by a field representative. Our policyholder should not be penalized in claim service for reasons of economy.

## VIII.   RAPPORT WITH REPRESENTATIVES

One of the Company's major objectives is to have a collectively beneficial and profitable relationship built on mutual confidence and trust with our independent adjusters and attorneys in the field. The Company expects its representatives to provide the best service available in a given area; in turn, our representatives expect us to provide top-flight supervision, and to be the kind of Company they respect and are proud to represent.

V-9

5-10-02

They expect us to be demanding clients in addition to understanding their problems and their limitations. It is the responsibility of the claims person to gain this esteem; earned through tight supervision, administered in an environment of fairness and understanding.

The Company expects the claims adjusters and examiners to guide the destiny of every case through the use of basic claims management and common sense. Because the abilities of the representatives vary, the claims person cannot become a mere initiator of correspondence approving any action taken by the adjuster in the field. In some cases, representatives can be given wide discretion based on prior experience, and in others, nearly every activity must be directed.

Examiners must utilize the abilities of each representative to the greatest advantage. (Normally, the Examiner III will be directing a case involving the use of an independent adjuster.)

All communications, whether by correspondence, telephone or in person, should be calculated to create the impression that you, the claim technician, know your job. Your communications should reflect leadership, good judgment and decisiveness. Your instructions should be specific enough so that the field representative knows precisely what you expect and define those areas you are leaving up to his or her own judgment.

Place yourself in the position of attorneys or independent adjusters and consider their problems. They may represent a dozen or more insurance companies, all of whom have different policies and procedures. Some require more than others in investigation. Few companies agree completely about the need for and the timing of such things as appraisals, medical reports and photographs.

On the other hand, although you must appreciate the problems of the representatives, these problems should not be accepted as excuses for poor claim handling. If it is clearly understood that you demand efficient claim handling at a reasonable cost, representatives will respect you. Conversely, if you set the example for sloppy and inefficient claim handling, there is reason for some representatives to feel that work of a similar nature by them will be accepted.

You have an obligation to make helpful suggestions and must share the responsibility for mistakes. The inclination to offer nothing positive, but to criticize what has been done is detrimental to a proper relationship.

Work toward the creation of an atmosphere in which there can be a frank exchange of ideas. Communications on this basis will reduce misunderstandings and other difficulties. Always be tactful, mature, diplomatic and friendly. Sarcasm must be absolutely avoided. If you do not agree with the way the case was handled, secure the facts before becoming unduly critical. Then point out, in a constructive way, areas of disagreement and instances where Company policy has been broken so that the same mistake does not recur.

5-10-02

CONFIDENTIAL

All problems regarding particular representatives should be brought to the attention of your supervisor so corrective action may be taken. Each section, region and branch office maintains an Attorney and Adjuster File (Adjuster Performance Report – APR) which is periodically reviewed to evaluate the performance of our representatives. Request an extra copy of letters of praise or reprimand to a Claim Representative when:

- Questioning a bill for services.

- Criticizing those cases which reflect a pattern of deficiency in the quality of work from a particular office.

- Complimenting a representative for a particularly outstanding job.

Letters of criticism should usually be signed by the claims manager or supervisor and addressed to the manager of the independent office involved. An extra copy of the letter should be kept in the APR file.

The volume of cases referred to independent adjusters will be minimal, but some discussion of how to handle claims "long distance" is essential to your becoming a complete claims technician.

## IX.  PHYSICAL FACTS

By physical facts we mean tangible evidence at the scene of the accident which tend to show how it occurred. They include skid marks, the damage to either vehicle, position of debris in the street, scraped bark from a tree, a broken telephone pole, the location of traffic controls, obstructions to vision or the characteristics of the accident scene.

Sometimes there are no independent witnesses or the witnesses are inaccurate in their versions of the facts. Physical facts then take on added importance. They can be used to corroborate, to impeach or simply, as direct evidence, and to show what the facts really are.

In the very early investigation of the more serious cases, have the field adjuster make a visit to the scene. The adjuster should observe all there is to see and to make careful notes. In serious accidents, the adjuster is to prepare a diagram and place the various physical facts, including all pertinent physical characteristics of the accident scene, in proper position. The field adjuster should always carry a tape measure and camera. He should proceed to take photos of the scene as well. Photos should be marked as to directions as well as to subject.

It is impossible to prepare an exhaustive checklist of physical facts to be used in every case since they vary from case to case. However, the following is a list of reports that may help you in your investigation process.

V-11

CONFIDENTIAL

- <u>Weather Reports</u> – If weather played some part in the accident, a weather report may be obtained from the United States Weather Bureau through its local station. Such reports include temperature, precipitation, cloudiness and sunshine, etc.

- <u>Diagrams</u> – A diagram by the field adjuster has two principal advantages: (1) it forces an observation of the physical factors in closer detail and (2) it may suggest additional investigation or reappraisal of the case. A good diagram gives a much clearer and more concise picture of what happened for anyone reading the file.

  <u>The claims person's rough diagram should include the following:</u>

  - Compass directions with the top of the page representing north.

  - The width of the streets involved and the location of physical characteristics, such as traffic controls, obstructions to vision, etc.

  - The legal speed limit.

  - The position of vehicles before, during and after the accident.

  - The approximate point of impact in the street with reference to curb lines or other sypsical characteristics.

  - The measurements of skid marks or anything else bearing on the accident.

  - The location of witnesses other than occupants of the vehicles.

- <u>Photographs and Videotapes</u> – Snapshots and/or videotape taken by the field adjuster add information for those reviewing the file. Sometimes it is almost impossible to adequately describe something and yet it can be pictured clearly in one snapshot or on videotape.

  In a serious case, some physical fact or characteristic may have an important bearing on the case's outcome. To preserve this for possible use in a trial, arrange for professional photographs or videotape. The professional photographer or video camera man selected should be competent, and at the same time, be a good witness.

  Because the purpose of photographs or videotape is to show conditions as they existed at the time of the accident, they should be taken as soon after the accident as possible, at approximately the same time of year and at about the same time of day. Shadow and light conditions, as well as foliage, will then be about the same.

CONFIDENTIAL                    5-10-02

An important consideration in taking professional photographs or videotape is the cost. This is usually justified only if there is something specific which the claims person or the trial attorney wants that will have some _real_ bearing on a case.

At the time they are ordered, the claims person should have a clear understanding with the photographer or video camera man as to the amount of photos or videotape needed and the cost of the services provided.

- Surveys and Plats – An engineer's plat is helpful to a jury in visualizing the scene of an accident. Such plats are drawn to scale and are in great detail, showing all the physical characteristics of the surrounding area.

  Because the cost is substantial, the examiner or telephone adjuster should be cautious about arranging for such plats. An agreement as to the cost of the plat should be reached at the time it is ordered. Normally, they should be ordered only at the request of the trial attorney because there is something specific he or she wants to show at the trial.

  Diagrams drawn by adjusters are sufficient for most purposes.

- Accident Reconstruction – In complex or significant cases, accident reconstruction experts can help us analyze and evaluate how and why an accident took place. To be most effective, accident reconstruction should be undertaken as soon as possible after the loss takes place. Supervisory approval must be obtained prior to hiring an accident reconstruction expert.

## X.  DETERMINING COVERAGE

Chapter IV is devoted entirely to the subject of coverage. This section addresses the investigative process to be used when a coverage problem arises.

If coverage cannot be confirmed, coverage investigation will need to be implemented. The adjuster must be certain the Company's rights have been preserved while the investigation is undertaken. This is usually done by a Reservation of Rights letter or a Non-Waiver Agreement. The coverage question and the facts of the accident can usually be investigated simultaneously. However, when securing a recorded interview or signed statement, the questions of accident facts and coverage should be handled apart from each other. Two separate statements should be taken.

Investigation of coverage may include one or both of the following:

- Recorded Interview from the policyholder or from anyone else claiming to be an insured under our policy may be necessary. Do not include

V-13

5-10-02

- information about the facts of the accident and the coverage question in he same statement. Reference to insurance in a statement describing an accident may make the statement useless in a trial. Separate statements should be taken, one regarding coverage, the other concerning the accident.

- A Court Reporter Statement may be necessary if it appears probable that the witness may refuse to sign a statement. Don't waive the Company's Rights to Sworn Statement Under Oath. In coverage questions, the testimony of an impartial recorder (the court reporter) as to the exact language of the witness may be even more important than in liability investigation.

## XI.   DETERMINING CONTRACTUAL OBLIGATION

Once coverage has been confirmed, it is up to the claims examiner or telephone adjuster to determine whether the loss is covered under the policy terms and then consideration is limited to the amount of the payment if one is to be made.

The following list will assist the claims technician in determining contractual obligation:

- Is the policy valid?

- Did the loss occur within the effective dates of the policy?

- Is there an insurable interest?

- Is the loss or damaged property covered under the policy?

- Did the loss result from an insured peril?

- Has the insured complied with all the conditions and terms of the policy?

The telephone adjuster or claims examiner must keep in mind that policyholders frequently are uninformed about the coverage afforded under their policies and the procedure to be followed in establishing the amount of loss compensable under the

policy. To properly manage the claims presented, the telephone adjuster or claims examiner must be totally familiar with the terms and scope of the policy and be able to make the determination of settlement or denial.

There are essentially two types of insuring agreements in the policy contract: those afforded under first party coverages and those under the third party coverages. First party coverages include Medical Payments, Personal Injury Protection, Uninsured Motorist Protection, Collision, Comprehensive, Multi-Risk, and Emergency Road Service. These coverages protect the insured against damage, injury or destruction of his or her person or

V-14

5-10-02

property. Third party coverage, liability, protects the insured when he is obligated to pay to others because of bodily injury or property damage, including loss of use.

When investigation begins, the examiner must determine: (1) coverage, (2) liability or obligation to pay, and (3) damages. The first is based on the effectiveness of the policy contract; the second, based on insuring agreements by limiting payment to cases of legal liability on the part of the insured and/or those first party agreements with the insured; and the third, determined by the amount of damages payable due to the terms of the policy and/or caused by the insured's negligence and is limited by the limits of coverage in the insured's policy.

The examiner or adjuster should first confirm coverage and then determine whether the facts of the loss fall within the terms of the contract. On a few occasions, the claims person may discover that a situation falls within an exclusion or is otherwise not covered.

Generally, prior to obtaining any information where a coverage issue is involved, a reservation in of rights letter needs to be sent to all appropriate parties. In some states the reservation of rights would be sent only to those parties (or their attorneys, if represented) who are seeking coverage under policy; in other states it would be sent to all parties (or their attorneys, if represented) who have an interest in the matter. You will need to check the requirements for each state and speak with your supervisor when preparing and sending the reservation of rights letter.

Because the extent of the contractual obligations under such coverage vary greatly, the investigation of individual cases must be tailored to fit each case.

Under Medical Payments, UM and PIP coverages, answers must be obtained to the following questions:

- Was the claim submitted in accordance with the terms of the policy?

- Does the policy cover the items claimed?

- Are the medical bills or items claimed reasonable and necessary as a result of the injury sustained?

- Is the amount claimed within the limits of the coverage?

- Is the file documented with the forms, reports and bills or receipts required to substantiate the Company's position?

If the answers to these questions are in order, the claim may be ready to be resolved, either by payment or denial.

To determine payments to be made under the Physical Damage Coverages, Comprehensive, Collision, Mechanical Breakdown and ERS, you must determine

V-15

whether coverage exists, verify the cause of loss, and you must know the provisions of the applicable policy contract.

Comprehensive and Collision claim handling is discussed in depth in Chapter VIII.

## XII.   DETERMINING LIABILITY TO THIRD PARTIES

Since payments under the liability coverages must be based on legal liability of the insured, an understanding of the phrase "legal liability" is necessary. Briefly, it means that as a result of some act or failure to act, the law imposes an obligation on the wrongdoer to respond in money damages. For our purposes, we may limit consideration of legal liability to that arising in tort and in limited circumstances, contractual liability.

### A.   Under Contributory Negligence

Since every person using a highway is required to exercise ordinary care for his or her safety, the common-law rule is that a person who fails to exercise that reasonable care cannot recover for his or her injuries or damage by virtue of the fact that he or she contributed to the cause of the accident. In those states which follow a contributory negligence doctrine, if the claimant is guilty of any negligence, however slight, which contributed to the cause of the loss, recovery is barred. As a practical matter, juries may be inclined to overlook contributory negligence if it is not substantial.

The courts have acknowledged that it is inequitable to apply the defense of contributory negligence in all situations and consequently allowed the claimant specific defenses to permit recovery. Examples of those defenses under a contributory negligence statute area: Last Clear Chance, Attractive Nuisance, Rescue doctrine, Emergency doctrine and the doctrine of dangerous instrumentality.

These doctrines are discussed in Chapter VI – Principles of the Legal Liability.

The investigation of this type of claim requires careful examination of the accident facts as well as a full documentation of the Company's position. The investigative material must be sufficient to support the claimant's negligence without doubt. The claims person must weight the facts and measure the claimant's actions against those of a reasonably prudent person, and must then make the determination of probable settlement value. If the negligence was slight and the case can be settled for a reasonable amount, it may be in the insured's and the Company's best interest to make a compromise settlement rather than risking the chance of a favorable verdict for the claimant or incurring the expense of litigation. The negligence factor should be used in the negotiations to effect a compromise settlement.

CONFIDENTIAL

**B.     Under Comparative Negligence**

While a few states still adhere to the contributory negligence doctrine, most states have adopted the doctrine of comparative negligence. Under such a doctrine, the degree of negligence of each party is evaluated or compared and recovery is permitted in relation to the other person's degree of negligence. Since comparative negligence laws differ from state to state, claim persons should be well acquainted with the operation of the applicable comparative negligence statutes.

There are two different types of comparative negligence statutes: (1) the Pure Form, and (2) the Modified Form.

1.     The Pure Form allows the claimant to recover the amount of his or her damages reduced by the percentage of his or her contributing negligence. This is true even though the claimant's negligence is rated at 90% and the defendant's 10%. The claimant (plaintiff) would recover 10% of the value of his or her claim.

2.     Under the Modified Form, the claimant (plaintiff) is able to recover provided that his or her contributory negligence does not exceed that of the defendant. If the claimant's negligence contributed 51% or more to the cause of the accident, he or she is barred from recovery. There are two versions of the Modified Form: the first version allows the claimant to recover if his or her recovery was "not as great as" that of the defendant. (If the claimant and the defendant were both 50% at fault, the claimant could not recover.) and the second version, "not greater than" allows recovery where the parties are equally at fault, but any recovery is reduced by the percentage of negligence attributable to the claimant.

The application of these forms of negligence in liability defense is discussed in Chapter VI. For purposes of this Chapter, it is clear that once the investigation is complete, the examiner or adjuster must be able to: (1) apply the negligence rule of the accident locale to the facts of the accident, (2) evaluate the claimant's damage or injury, and (3) make a determination of settlement value or denial based on any percentage of negligence attributable to the claimant.

## XIII.  WHEN TO INVESTIGATE AND WHEN TO SETTLE

In what detail an accident should be investigated depends upon its nature and probability of a reasonable settlement. It is impossible to predict which cases can be settled promptly and which cases will go into litigation. Claims may be separated into three broad classifications. Variations do exist and you should check with your supervisor.

CONFIDENTIAL

5-10-02

- The obvious cases for settlement; cases of clear liability against the insured.

- The ones of no apparent liability.

- Questionable cases.

As soon as it appears that a case is one for settlement, try to settle it without delay. Some degree of investigation may be necessary. The facts of the case will determine the type of investigation.

Cases of no apparent liability and questionable cases should be thoroughly investigated from the moment of first report.

Occasionally it is necessary to defend cases in court either because there appears to be no liability or because agreement cannot be reached as to settlement value. Litigation of bodily injury claims is a serious matter and should be avoided whenever possible, consistent with good claims handling. The amount of litigation and the results can be controlled to a large extent by the claims person who knows what to look for as he or she investigates.

## XIV.  RECORDED INTERVIEWS

Although investigative techniques may vary among individual claims people, all will agree that the most fundamental step in conducting an investigation is to obtain a good recorded interview.

Statements promptly secured become one of the most accurate records of the facts, as the person being interviewed knows them. When obtained early in the case, the facts are still fresh in the mind of the witness and the danger of the person adopting hearsay as his or her own is minimized. Besides being a permanent record of the witness' version, it is a reliable indication of how this person would testify, leaving few areas of possible misunderstanding.

While a signed statement or recorded interview generally may not be admitted as direct evidence in a lawsuit, courts have sometimes received such statements when witnesses were incapacitated. The statements may be used in lawsuits to impeach or discredit a witness who attempts to change his or her story, or merely to refresh a witness' recollection of the facts of the accident. They may even be useful in convincing an opposing attorney concerning some particular fact.

## XV.  PLANNING THE STATEMENT OR RECORDED INTERVIEW

Prior to making contact with any insured, claimant or witnesses, have the specific points to be covered thoroughly formulated in your mind. If taking a signed statement, be sure

CONFIDENTIAL                    5-10-02

these points are noted on a piece of paper to be used as a reference while taking the statement. Often there is no advance information as to what a particular witness will say, so the need for a comprehensive statement, covering all aspects of the accident, is important. If the statement is taken by recorded interview, be certain to have your interview guide available.

The well-planned interview requires less time. Always allow sufficient time to cover the accident in detail. Schedule the interview at a time convenient to the insured, claimant or witness.

A recorded interview, generally, is preferable to a signed statement because it is less burdensome and time-consuming. It also has the advantage of producing the witnesses' own words and, because it can be taken over the telephone, saves on travel time and expense.

## XVI.  PREPARING FOR THE STATEMENT – PRE-INTERVIEW

Don't take out a statement pad or recorder and start taking the statement as soon as you meet or contact the insured, claimant or witness. Have a preliminary casual conversation to remove the "jitters" and to develop a common understanding. If you are sincere and straightforward, you will gain the trust of all concerned and develop a rapport. Put the person at ease and explain the procedure involved in what you are about to do. This usually develops a feeling of confidence. Use the pre-interview to go over the names of the people involved, street names, spellings, direction of vehicles, etc.

On a few rare occasions, you may be confronted by telephone or in person with someone who refuses to give an interview. Salesmanship is necessary under such circumstances. If your approach is timid and negative, you will have little success. On the other hand, if you assume the attitude that there is no question but that the statement will be given because you are merely attempting to determine exactly how the accident occurred, you would probably be successful.

Before taking the statement, briefly discuss the facts and, if possible, have the witness draw a diagram which can be referred to during the course of the interview. Also, such data as auto registration numbers, license numbers, the names and addresses of parties involved and information regarding expenses, bills, estimates, etc., should be available prior to the actual taking of the statement.

Make sure you know how to work your recorder and be certain you have a new cassette in place.

Make no reference to insurance in the statement. It may be necessary to use the statement at a trial. Generally, any reference to insurance is considered prejudicial and may be cause for a mistrial. When a coverage question or some other matter relating to the subject of insurance is indicated, make it a separate statement.

V-19

CONFIDENTIAL

Because two people rarely see an accident in precisely the same way, a separate statement should be obtained from each witness.

Do not attempt to obtain a statement from someone who is intoxicated, under the influence of drugs or sedatives, or otherwise incapacitated. If a written statement is taken at a hospital, have it witnessed by the doctor or nurse. Obtain a separate statement from the attending doctor or nurse indicating that the witness is not under the influence of drugs or sedatives, or otherwise handicapped so as to be unable to give a lucid statement.

Speed and distance should be described in a manner that will be understandable to others. Reference to "right," "left," "over there," or "about this much" should be avoided. Use compass directions and refer to distance in feet, yards or some other common measurement.

Statements are taken in claims under all coverages, but most are in connection with either liability claims or first-party losses where there is some dispute. A few items appear in all statements, but the purpose for which a statement is being taken governs what is included in it. A statement from the insured on a comprehensive loss differs greatly from the matters covered in liability bodily injury claim.

## XVII.  GETTING THE INSURED'S RECORDED INTERVIEW OR SIGNED STATEMENT

Because the Company is entitled by the terms of the policy to the assistance and cooperation of the insured, there should be no difficulty in obtaining a recorded interview or signed statement.

If an insured either refuses to give a statement or to sign it, he or she should be reminded of the Conditions of the policy requiring cooperation. Also, remind him of the benefits; we will have a permanent record of the facts, in his own words; it will save time; speed up the decision on liability and work towards getting the situation resolved.

## XVIII. GENERAL RULES FOR TAKING A SIGNED STATEMENT

When taking a signed statement write legibly. The statement is of no value if it cannot be read. Use short, simple sentences. Use the vocabulary of the witness. If he or she speaks ungrammatically, there is nothing wrong with such phraseology in a good statement. Conversely, if the person is well educated, your statement should reflect this.

Arrange statements chronologically. This makes for easier reading. Make sure, however, that all the facts are noted even if there is some loss of chronological order.

The statement should be of the straight, narrative type, beginning in the first person with a complete identification of the individual.

V-20

CONFIDENTIAL

5-10-02

Do not include the witness' conclusions and opinions. Describe what the witness saw and heard.

Below are items to be considered in taking written statements. Until you have had considerable experience, keep a similar list available during the interview. Even experienced field adjusters follow this practice. The outline is by no means exhaustive. Analyze the case before taking the statement and sketch in your mind the things you want to cover.

The word "witness" as it appears below should be given a broad meaning. It includes independent witnesses, as well as parties to the accident, insured, claimant, etc.

- Date, Time and Place Where Statement is Taken

    These items should be placed in the upper right hand corner of the first page of the statement. This information may be helpful should a witness deny having made the statement and will assist in pinpointing the circumstances under which the statement was taken.

- Identification

    This should be the first paragraph and should include the witness' name, age, martial status, address, occupation, business address, number of children, residence telephone number and business telephone number. Obtain the witness' Social Security Number, and in the case of service personnel, serial numbers should also be obtained, in addition to a permanent home address or address of relative who can always be reached.

- Date, Time and Location of the Accident

    Pinpoint the hour of day as nearly as possible, particularly in those accidents which occurred near dawn or dusk.

- Location and Reason for Witness' Presence

    Whether the witness was the driver or passenger of a car involved in the accident or in another vehicle, the direction of the vehicle in which he or she was riding and its approximate speed should be stated, as well as the circumstances of the witness being in the car. Where was the witness sitting? Where did the trip begin? Where was it to end?

    If the witness was a pedestrian near the scene, have him or her describe the direction he or she was facing and why the witness was there. Statements from passengers in the cars involved should indicate their relationship to the driver and whether they paid or promised compensation in any form for the ride.

V-21

CONFIDENTIAL

- Owners and Drivers of Cars Involved

  The owner and driver of each car should be identified. If the driver was not the owner, the person should identify the owner and indicate whether the owner gave this person permission to drive. It may be revealed that the person described in our policy as the owner is not the real owner. There is then a coverage question which should immediately be brought to the attention of the supervisor.

  A coverage or permission question might also develop in connection with the other car.

- Identity of All Occupants in Cars Involved

- Facts

  The accident should be described in detail. Cover all matters seen or heard just before, during or after the accident, including such things as:

  - The direction the cars were traveling.

  - The estimated speeds of the vehicles.

  - The approximate distance separating the vehicles when the other car was first observed. Where the witness was not a passenger, the distance separating the vehicle when they were first noticed.

  - The action taken by either driver to avoid the accident.

  - The approximate width of all streets concerned.

  - The approximate point of impact in the street, with reference to the centerline, curb or some other landmark.

  - The points of contact on each car.

  - How far each vehicle traveled and where it came to rest after the impact.

  - The length of skid marks left by either car, the location of debris, or description of any other physical evidence.

  - Detailed location and description of any traffic controls, such as stoplights or stop signs.

  - Describe the weather by indicating whether rain, snow or anything else played a part in the accident. Was the sun a contributing factor?

V-22

5-10-02

- Did either car have its lights on?  Were other cars using lights?  What were the lighting conditions?

- A description of the damage to each vehicle.

- **Drinking and other Influences Impairing Driving Ability**

  Does the witness know if any of the drivers had been drinking, were sleepy or under the influence of narcotics, and if so, to what extent?  What actions suggest such a condition?

- **Cell Phone Use**

  Was either driver using a cellular telephone when the accident occurred?

- **Remarks Overheard by the Witness at the Scene/Admissions Against Interest**

  Was there indication that either driver was in a hurry or had been driving for a long period of time and was drowsy?  Did either make a remark concerning liability, such as, "I'm sorry I hit you," or "I must have fallen asleep"?

  (If such comments are material, they might be used as direct evidence should litigation result.)

- **Was There a Police Investigation?**

  If so, what charges were made?

- **Have the Witness Draw a Rough Diagram of the Accident in the Body of the Statement**

- **Include the Identification of All Injured People, as Well as a Detailed Description of the Injuries if known.**

  A description of the injury is particularly important if the witness is one of the injured persons.  Obtain any background information concerning pre-existing conditions.  If the witness was an occupant of one of the cars involved and was not injured, have him or her say so in the signed statement.

- **The Names and Addresses of any other Witness**

  Obtain from the witness names and addresses of all people observed at the scene, not only people known to be witnesses but also those who might have seen the accident.

V-23

5-10-02

## XIX.  SIGNING THE STATEMENT

Always ask the witness to sign the statement if a handwritten one was taken. Most witnesses will do so without objection. Some, however, will flatly refuse.

Before the statement is signed, the witness should read it and should also make corrections if so desired. If deletions or insertions are made, the witness should put his or her initials in the margin or between the lines near the correction.

There should be a concluding paragraph just above the signature that reads something like this, "I have read the above (number of pages) and they are true to the best of my recollection."

Frequently at the time a statement is taken, only you and the witness are present, and you must witness the statement. It is, however, desirable that there be one, or preferably two, independent witnesses to the signature. If a statement is so witnessed, you should obtain sufficient identifying information to locate these witnesses at some future time. Learn the name and address of a relative or friend who will always know the location of the witness to the signature.

Occasionally, if the person giving the statement refuses to sign it, a third person who is present during the taking of the statement will sign his or her name under a sentence to verify that he or she heard the witness describe the accident and that the statement is a true and correct version of what he or she said.

## XX.  TAKING A RECORDED INTERVIEW

As in a written statement, the first thing to include is the identification of the person being interviewed. So there is no question concerning the identity of the witness, ask the witness his or her full name, address, age, martial status and employer. Next and most important ask, "Do you realize that I am recording this interview?" (Be sure you get a "Yes" answer. Ask then… "Do I have your permission to record this interview?" (Again, be sure to get a "Yes" answer.)) In chronological order, cover the description of the accident, the injuries, if any, treatment and expense involved, any prior injuries, illnesses or accidents and other pertinent information. During the course of the interview, be sure that the witness keeps to the point. If any digression is noted, tactfully steers the witness back on course. Repeat the question if necessary. If it appears that a particular phrase did not record, or that a background noise blotted out the voice of the speaker, a repetition of the answer in a louder tone of voice should be requested. A tactful example of such a request is as follows: "I didn't quite catch your last remark, Ms. _____. Will you please speak a little louder?"

If both parties begin to speak at the same time, it will be necessary to have the question or answer repeated since two voices recorded at the same time garble the reproduction of the sound.

CONFIDENTIAL

5-10-02

You should be prepared to direct and control the interview, ask the pertinent questions and get the answers with little digression. The preliminary interview assists greatly in this respect. There is an <u>Interview Guide</u> for your use which has lists of questions to be asked. It should be handy for reference during the course of the interview. These Interview Guides are only guides and are used more as checklists than as concise outlines.

Use the technical material provided by the manufacturer of the recording machine to ensure a clear and audible record.

Caution the witness not to mention insurance or to ask questions concerning the settlement of a claim while the interview is being recorded. Explain that all such questions will be fully answered when the recording is finished. You are only making a report of what happened at the time of the accident.

When it appears that all of the necessary materials have been covered, end with:

"Are there any facts about this accident that you would like to add?"

(Give the witness a chance to add anything to, or make any corrections of what has previously been said. At this point, the interview is ready to be concluded.)

The following dialogue will serve as an example of the technique used in concluding a recorded interview.

Q:     "Ms. _____, have you understood all of my questions?"

A:     "Yes."

Q:     Have all your answers been correct to the best of your knowledge?"

A:     "They have."

Q:     "You realize that this interview has been recorded?"

A:     "Yes."

Q:     "This recording was made with your permission?"

A:     "Yes."

Q:     "With your permission, I will now turn off the recorder."

A:     "All right."

Immediately after the witness" last words, turn off the recorder.

CONFIDENTIAL

5-10-02

## XXI. INTERRUPTIONS

The recorded interview should run continuously from the time it begins until it is over and the machine is turned off. If, for some reason it becomes absolutely necessary to interrupt the interview, you should make mention of this fact by means of the following dialogue:

Q:     Ms. _____, I understand that it is necessary for you to discontinue this interview for a few moments. Do you agree that it is now 3:15 p.m.?"

A:     "Yes."

Q:     "With your permission, I will now turn the machine off."

A:     "All right."

When the witness is away from the area do not discuss the case with anyone. Upon his or her return and the interview is to be continued, turn on the machine and state,

Q:     "Ms. _____, has now returned. Ms. _____, do you agree that it is now 3:25 p.m.?"

A:     "Yes."

Q:     "Do you also agree, Ms. _____, that while the recorder was turned off there was no discussion of the accident between us or anyone else?"

A:     "That is right."

If the interview covers more than one cassette, the above procedure should be followed when the machine has to be turned off to change the cassette. The time of ending on one tape and the beginning on the next should be mentioned.

Never record the statements of more than one person on the same tape.

The Telephone Interview – The foregoing procedures concerned the person-to-person interview with a portable voice recorder. The recorded telephone interview follows the same general pattern. When calling the witness, explain the purpose of your call, ask for permission to record the interview, and prepare him or her for the actual recording. The preparation will include: requesting the witness to have information, such as names, addresses, vehicle identification numbers, etc. available; and a reminder to the witness to just answer the questions asked until after the interview has been completed and the machine is turned off, at which time any other matters can be discussed.

CONFIDENTIAL

When the machine is turned on, the initial dialogue should adhere fairly close to the following format:

"Ms. _____, this is (identify yourself) calling from (state your phone number). I am talking with Ms. _____ at (the witness' phone number) about an accident which took place (date, time and place). Ms. _____, will you please state your full name and address?"

The witness should then be asked to state his or her age and martial status. If there is any question in your mind about the identification of the witness, have the witness spell out his or her first name or state the names of his or her spouse or children. At this point in the conversation, the witness confirms the fact that the conversation is being recorded and gives permission to proceed with the recording if the interview. The rest of the interview then proceeds in the same general way as the person-to-person interview.

## XXII. GENERAL RULES FOR RECORDED INTERVIEWS

Here are general rules to observe while conducting any recorded interview:

- Be sure the machine is working properly before you begin.

- Be sure the volume is high enough to pick up the conversation and low enough to eliminate undesirable background noise.

- Be sure to speak distinctly and loudly enough to be heard; caution the person being interviewed to do the same.

- Warn bystanders against interruption.

- Don't interrupt witness' answers. If you speak while the witness is speaking, the recording will be garbled. You may stop the witness from otherwise volunteering some valuable information.

- Avoid leading questions. Direct spontaneous answers have more impact than those suggested by the interviewer.

- Don't take information for granted. It may be necessary that he or she clearly explain certain meanings for the record. Other people hearing the recording must also be able to fathom the speaker's meaning.

- Follow-up on all information volunteered. A "somebody" could be a key witness that would otherwise go unnoticed.

- Avoid repeating the person's answers.

CONFIDENTIAL

5-10-02

- Keep your questions simple.

- Don't ask two questions at once. You may only get an answer to one.

- Avoid digression. Strive for direct answers to direct questions that are pertinent to the file.

- Avoid "Uhs," "Oks," "I sees," "All rights," etc.

## XXIII. TYPES OF STATEMENTS

### A.    Negative Statements

Sometimes, particularly in serious injury cases, signed statements should be obtained from people who may have been in a position to have seen an accident but insist that they did not. A signed statement from all such persons, denying that they witnessed the accident, may prove very valuable at some later time should any of them appear as adverse witnesses claiming to have seen the accident.

An illustration in which negative statements might be useful is a child-pedestrian case in a residential area where the child lives. Unless it appears that the injury is not serious or that a reasonable settlement can be made in the near future, the people in the neighborhood should be interviewed and negative statements taken from those who claim not to have seen the accident. Each negative statement should indicate that the witness did not see the accident, has not heard anything about it and knows nothing about it. Request the witness to describe where he or she was at the time of the accident. The witness may have been out of town or some distance from the scene and by so stating, becomes useless as a witness to the other side. If the witness did not see the accident but has heard something about it, include what has been heard and who said it.

There is a tendency when making a canvass of a neighborhood to interview people and not take negative statements. This can be embarrassing at a later date when a person interviewed testifies in a very positive manner during a trial. Taking negative statements is time-consuming, however, and the expense is not warranted in the average case. Good judgment must dictate when this should be done.

Frequently, it is wise to combine elements of the positive and negative statements. The witness might be able to testify in a positive manner as to some of the facts, but claims he or she does not know or did not see other things.

V-28

CONFIDENTIAL

5-10-02

**B.    Statements Of Biased Witnesses**

Occasionally, a witness may attempt to favor one party or another by grossly exaggerating the alleged negligence of the insured, minimizing any negligence of the other party or professing not to know how the accident happened in order to avoid saying anything harmful to the favored party.

**C.    Exonerating Statements**

When taking statements from passengers in the insured car, develop as much information as possible to clearly portray the good driving habits of the driver. Do not distort the facts, but try to establish a pattern of careful driving. Exonerating statements should be taken as soon after the accident as possible before the process of rationalization sets in, when, if the passenger did sustain an injury, he or she may be less and less inclined to give a helpful statement.

Exonerating statements should include how often the witness rides with the driver and whether the driver is regarded as a good and safe operator. If the passenger offers the opinion that the insured was not responsible for the accident, set out in detail the insured's actions just prior to the accident, for example; the speed of the vehicle, the type of lookout the insured kept, what was done to avoid the accident, and whether the driver had been drinking.

If drinking was involved, what had the person consumed and how much? Did the witness believe the insured to have been intoxicated? Why? If not, what did the insured do to suggest that he or she was not under the influence? Did the passenger caution the insured about his or her driving? If not, why not? If the passenger did, how was it done? If it is known that the insured had been drinking, it may be equally important to have the passenger agree in the statement even though the driver was believed under the influence, the passenger rode with this person nonetheless.

**D.    Non-Injury Statements**

A non-injury statement is taken for the purpose of having the interviewee disclaim having been injured. In most accidents, it is desirable to have a non-injury statement from each occupant of all cars involved. Depending on the nature of the accident, it can be a long, detailed statement of facts including a denial that the witness was injured or a brief statement that merely included identification and a declaration of no injury. Every statement from a passenger should include the fact that the person either was or was not injured.

Consideration should be given to the nature of the accident and the severity of the impact. If there is a reasonable possibility of litigation, including the Company's asserting a subrogation claim, take non-injury statements from all passengers and the other driver. If there is no indication of injury and the accident is minor, a Claimant's Accident Report or a Witness Questionnaire may be adequate. If the

V-29

CONFIDENTIAL

5-10-02

accident is being handled by correspondence at the CSR level these forms may be mailed to the passengers or the driver of the other car.

E.    **Statement Of Permissive Use**

When the "owned automobile" is used by someone other than the named insured or any resident of his household, it may be necessary to obtain a recorded interview from the named insured indicating whether or not the driver had permission to use the car for the particular purpose for which it was being used.

If the driver had the named insured's expressed permission, the statement may be a brief one simply indicating this. In minor accidents investigated by mail, at the CSR level, an Accident Report (Form C-4), filled out and signed by the insured indicating that the driver had permission, will suffice.

If there is any indication that there was no permission given by the owner for the driver to drive the vehicle in question, a reservation of rights letter will need to be sent to all interested parties. In some states the reservation of rights letter would be sent to those parties (or their attorneys, if represented) seeking coverage under the policy; in other states, it would be sent to all involved parties (or their attorneys, if represented). You will need to check the requirements of each state when preparing and sending the reservation of rights letter.

If the driver did not have the expressed permission of the named insured, fully cover all the circumstances surrounding use of the vehicle. Include how many times in the past the car was used by the particular driver, the relationship between the named driver and the driver, whether it was necessary for the driver to get permission each time the car was driven and if so, where the keys were kept, etc. The statement should develop all the facts on which to base a decision as to whether there may have been implied permission to use the car.

F.    **Court Reporter Statements**

A court reporter statement is simply a qualified court reporter's recording of questions asked by the claims person and answered by the witness. There is no signature since the court reporter is the witness to what was said and the reporter's notes are the record.

Occasionally in a serious case, the claims person can anticipate that an important witness will be antagonistic or illiterate, or there may be some other impediment to getting an intelligible signed statement. Not only is the court reporter statement useful in such instances, but sometimes this is the only kind of non-injury or negative statement that can be obtained. Because we are charged for this service, make certain that the statement will be worth the expense. See your supervisor before authorizing this technique.

CONFIDENTIAL          5-10-02

## XXIV. NEGOTIATION OF CLAIMS IN SUIT

One of the more difficult aspects of the Claim Examiner's job is to direct settlement negotiations through defense attorneys. Prior experiences with a particular defense attorney should determine the degree of control. Always be certain that the attorney has adequate dollar authorization. Is he or she going to negotiate or, are you? Make sure this is determined at the start of each suit. You, as the person most familiar with the case, are probably best suited to conduct settlement negotiations. However, a particular law office may have an attorney who is a superb negotiator. In that case, we may allow the firm to discuss settlement with the plaintiff's attorney.

As soon as a case appears to be one for settlement and there is sufficient information available on the general nature of the injury or damage, extend a settlement authorization even though the discovery may not yet be complete. Once it is obvious that a case should be settled, it is a waste of time and money to delay preliminary settlement negotiations until all possible discovery is done. Not having enough information to make a final evaluation is never an excuse to delay a preliminary authorization to be used in commencing negotiations.

## XXV. CONTROL OF INVESTIGATION EXPENSE

The cost of our investigations is one of the Company's largest items of expense. Our goal is to provide top quality claims service at reasonable cost, but high quality and low cost are not inconsistent if proper controls are exercised.

Attorneys and independent adjusters provide certain professional services, and they are compensated on the basis of their knowledge and the amount of time and effort exerted. We expect that reasonable charges will be made in every case. Before requisitioning checks in payment of bills, examiners and adjusters must review each bill carefully. The test of the reasonableness of a bill on a particular case is whether all the work done was necessary or helpful and whether we were charged a reasonable amount for the work that was done. Did we get what we paid for? Every bill from an attorney or adjuster should be examined carefully to make certain that it meets this test.

## XXVI. GUIDELINES FOR SETTLEMENT REQUIREMENTS

Every effort should be made to effect settlement as soon as sufficient information is secured to make a determination on liability and injury evaluation.

. Investigation of injury claims includes verification of the injury and special damages. The claim file should contain the name and address of the treating physician and hospital or other medical facility furnishing treatment.

CONFIDENTIAL

5-10-02

All efforts should be made to document the file with bills, receipts and medical reports sufficient to produce an evaluation of injury severity and reasonableness of treatment. If loss of earnings is alleged, the name and address of the employer should be in the file.

Complicated factual situations, suspicious circumstances, questionable liability or questionable injuries may require considerably greater investigation than those cases which do not involve questions or problems. However, do not allow your investigation to prevent your from reaching a reasonable and expeditious settlement.

## XXVII. NEGOTIGATING THE SETTLEMENT OF LIABILITY CASES

### A.   Importance of Early Contact

In every case, there is a time for settlement. Recognition of this time is essential in making good settlements.

The earlier the contact with claimants, the earlier the disposition of cases. The claims person should contact the claimant, or a member of his or her family, as soon as possible after receipt of the assignment unless circumstances make this impossible. (The Company standard is attempt contact within one hour of receipt of claim.) The claim file activity log (ALOG) should clearly record the claims technician's effort to contact the claimant.

As early as possible, the claims handler should convey to the claimant the Company's desire to reach a fair and equitable settlement. The claims person should contact the claimant at proper intervals until settlement can be made, unless an attorney is retained to represent the claimant, in which case the contact should be with that attorney.

A fair resolution of the claim at the earliest appropriate time should be one of the claims person's most compelling interests. Many claims can be settled on first contact. In those that cannot be, the claims person must direct his or her efforts at establishing and maintaining cooperation. Leave the door open for future discussion when it becomes apparent that settlement cannot be made during a particular telephone call.

In a death case, it would be in poor taste to make a settlement offer to the widow of the deceased the day following the accident. Instead, make an early contact with a member of the family, or someone close to the family. Make it known that you are available for discussion at the convenience of the family and disposed to do anything reasonable to assist the family. This establishes a basis for settlement discussion at a later date. It is important that the claims person tactfully assumes the initiative and not rely on the claimants to make the contact.

There are many techniques to ensure an opportunity for further discussion. What works well for one may not work for another. In some instances, it may be better

CONFIDENTIAL

to suggest that the claimant consider the matter further and arrange to call again at a specified time.

The most frequent causes of loss of cooperation are the failure to make an offer when the claimant is looking for one or making an offer that is wholly inadequate. All offers should be fair and reasonable.

Once the Company is put on notice, either by the claimant or by an attorney; that the claimant is represented by an attorney, all future dealings must be made with the attorney. It is improper for the claims person to attempt to negotiate directly with the claimant unless the attorney has given written permission to do so.

**B.    Walkaway Settlements**

Probably the simplest definition of the Walkaway Settlement is that when payment is made, no release is taken, and neither the Company nor the claimant contemplates any additional payment. The technique permits a disposition of the claim while not cutting off the claimant's right to compensation if additional expenses are incurred.

Generally speaking, the Walkaway Settlement is most suitable to cases involving only very moderate injury where it is believed there will be no further out of pocket expense.

Walkaway Settlements may be made in any amount covered by the authorization extended. Questions on value should be discussed with appropriate claims supervisor or manager.

**C.    Structured Settlements**

A structured settlement, unlike a lump sum settlement which provides for a one-time cash payment, consists of payments spread out over a period of time. The payments can be scheduled on a monthly, quarterly, annual or other basis the recipient prefers and can be for a definite number of years or for a lifetime. The periodic payments can be increased or decreased as the anticipated needs of the recipient change over a period of time and can be supplemented by additional fixed dollar payments at specified times. A structured settlement is a financial package tailored to meet the injured party's immediate and future needs.

To our society, a properly structured settlement provides security for the claimant and prevents the dissipation of settlement funds which often can result in a claimant being unable to provide for his or her family needs and causes society to have to provide for those needs.

The structured form of settlement stretches payment to the claimant over a number of years instead of providing a lump sum payment. It may involve up-front money consisting of a lump sum payment of cash for medical expenses and

V-33

CONFIDENTIAL

lost wages, funds for rehabilitation, attorney fees, education, as well as other agreed upon expenses. In addition, an income annuity based on the estimated lost earnings payable periodically for life or for a certain number of years can be agreed upon.

If you have a BI claim (or a UMBI claim) with exposure over $10,000, you may well have a case where the structured settlement could be explored. See your supervisor.

## XXVIII. RELEASES

### A. General Releases

Bodily injury liability claims which <u>do not</u> involve an infant, a death or a husband and wife claim may be settled by having the injured person execute a release form if he or she is mentally competent to give a binding release. Release form C-27, or a similarly drawn document, may be used. If the claimant is mentally incompetent, settlement must be made on the claimant's behalf by a legal guardian. Usually such settlements should be court-approved if the size and nature of the claim justify the expense. If a guardian has not been previously appointed, court approval and appointment of a guardian can usually be handled in the same court proceeding. Husband and wife and parent/guardian releases are discussed in Chapter VI; special handling is required for these claims.

### B. Covenants Not To Sue And Limited Releases

When an injury is caused by the negligence of two or more people, the injured person may have a claim against all the wrongdoers. Usually the most satisfactory manner of settling such a claim is for the individuals against who the claim is made, or their insurers, to contribute to the settlement on a basis mutually satisfactory to all. However, in some instances, it is impossible, or undesirable, to reach such an agreement. The claims person then considers settlement by having the claimant execute a Covenant Not to Sue (form C-47) if applicable to his or her jurisdiction. If the Covenant Not to Sue is not satisfactory, a limited or conditional release may serve the purpose.

A Covenant Not to Sue is an agreement whereby a claimant agrees, for a consideration, not to enforce the claim against the individual in whose favor the Covenant is drawn. The claimant is free to pursue his or her claim against any of the other wrongdoers. It is not a release; it is an attempt to circumvent the rule in most jurisdictions that a release of one tort-feasor releases all.

A Limited or Conditional Release expressly preserves the claimant's right to recover against another individual. To make the Limited or Conditional Release, simply add a statement to the general release to the effect that, "It is agreed that

V-34

5-10-02

this settlement will in no way prejudice any claim which John Smith may have against Henry Brown resulting from....(the accident mentioned in the release)".

One of the dangers in using a Covenant Not to Sue or a limited release is that the individual against whom the claimant has reserved his or her claim may have an action over a cross-claim against the insured. The Claims person must know that protection is provided before utilizing either the Covenant Not to Sue or the limited release. Depending on the law of jurisdiction involved, nothing may be accomplished by either document. If there is a question, the examiner should call one of our attorneys for advice or ask the Regional Liability Administrator or Claims Home Office Legal.

In some states, a Covenant Not to Sue is interpreted as a full release against all parties involved. In other states, it is given no legal recognition. In a few states, the Covenant Not to Sue is regarded the same as a limited release.

In some jurisdictions, the limited release is not recognized. It is either interpreted as a full release or none at all. The claims person must know how the Covenant Not to Sue and the limited release are interpreted in the particular jurisdiction before using either.

### C.  Release And Agreement – Open End Release

The Release of All Claims and Agreement Form (C-52) is simply our standard general release with an added agreement in which we promise to pay any reasonable and necessary medical expense incurred by the claimant within one year from the date of the accident not to exceed a specified sum. It is designed to accomplish earlier and more reasonable liability settlements, particularly with those claimants who expect further treatment and expenses and are reluctant to sign a general release of all claims, whether or not they are represented by an attorney.

The following general rules are to be fully considered regarding the use of the C-52:

- The C-52 is to be used in those cases which are clearly ones for settlement, not as a substitute for the usual general release, but only if a general release is not acceptable. Its particular value will be in those cases we have heretofore been unable to settle within a very few days following the accident because the claimant was fearful of being uncompensated for possible future unforeseen consequences of his or her injury.

- The limits amount in the "Agreement" part should always be a reasonable amount so as not to defeat the purpose of this type of settlement.

V-35

CONFIDENTIAL

- The limits amount in the "Agreement," when combined with amount of the consideration, must not exceed the general or specific authorization of the person taking the release; and obviously the total sum must not exceed the insured's policy limits in the particular case.

- Avoid, if possible, the prospect that we might have to pay the medical expenses of a claimant under both the "Agreement" part and under our medical payments coverage. If it is necessary and proper to obtain a C-52 when the releasor may also be entitled to payment under our medical payments coverage, the name of our Company should be inserted in the "Releasee" blank, in addition to other releasees, as follows: "and Government Employees Insurance Company for any medical payments coverage under policy no. 999-99-99."

It will generally be unnecessary to keep a file open or maintain a reserve solely for possible future payments to claimants who have signed a C-52, however, whether a file can be closed will depend on the likelihood of a further payment being made. See your supervisor if you have any questions on this. The file should be marked "Do Not Destroy" for at least as long as the time specified in the "agreement."

## XXIX. VOLUNTARY ARBITRATION

Voluntary arbitration is considered to be a valuable cost effective settlement technique. It is not to be used to avoid the day-to-day routine of traditional negotiations. Voluntary arbitration should be used only when a stalemate has been reached and there is no dispute over liability, just damages. The claims person must have his or her manager's approval before proposing the method to the claimant's attorney.

Voluntary arbitration was developed as an alternative to disposing of disputed cases through the courts. This involves utilization of a selected list of arbitrators who have agreed to make awards on injury claims. The arbitrators include retired judges, lawyers and claims officials. Fees paid to arbitrators are established as a standard schedule with hourly rates comparable to what we expect to pay attorneys.

Both parties must agree to arbitrate. The agreement must stipulate that, regardless of the amount of the award, the amount paid will neither be greater than the agreed upon high figure nor less than the agreed upon low figure. The arbitrator will not be advised of the agreed upon high and low figures prior to the time he or she enters an award. The arbitrator will make the decision entirely from the material presented.

The procedure for initiating arbitration is to be kept as simple as possible to encourage maximum use of the technique. When the claims person feels that negotiations have become stalemated, with the supervisor's or manager's approval, he or she is to propose voluntary arbitration to the claimant's attorney. Simultaneously, a list of arbitrators should be submitted to the claimant's attorney. If the claimant's attorney agrees to

CONFIDENTIAL

5-10-02

arbitration and selects an arbitrator, the claims person should then undertake to arrange arbitration by calling the arbitrator and sending a confirming letter to the claimant's attorney. Both sides should submit pertinent portions of their files to the arbitrator within a stated period of time. A covering letter should be sent to the arbitrator stating our position and arguing our case with pertinent portions of our file attached.

The arbitrator should be asked to make the award decision within two weeks after receipt of both files. The award should be in writing since it is binding and final.

The claim file should contain sufficient information to fully explain how the case was handled. The section should also maintain records containing brief but pertinent claim file information: the claim number, last demand, last offer, amount of award and name of arbitrator. The records should reflect trends which can be useful in the future. Also, the examiners and managers are encouraged to keep names of good prospects for potential arbitrator selection.

## XXX. VOLUNTARY MEDIATION

Mediation is a private, informal dispute resolution process in which a neutral third person, the mediator, attempts to help disputing parties reach an agreement. The mediator's role is to show both sides the strengths and weaknesses of their cases and to discuss the potential ways a case can be resolved. Mediations are most effective when the mediator is an experienced, forceful and well-respected attorney or retired judge in the area where the case would be litigated. Claims examiners should consult with their managers, a Regional Liability Administrator, the Claims Director or local counsel to identify the names of good mediators in a particular geographical area.

The types of claims or scenarios that are good for voluntary mediation include:

1. Multiple parties and the coverage limit in question is insufficient to fully compensate all parties;

2. The plaintiff has an unrealistically high expectation of the case's worth;

3. Where our getting a chance to see and speak with the claimant in person might help resolve the case (i.e., cases where scarring or disfigurement are involved or claims where we want to get a feel for how a claimant might come across before a jury if the case were to be tried).

Approval for use of a voluntary mediation should come from the examiner's supervisor and arrangements should be made to have someone familiar with the file represent the insured's or the Company's interest at mediation. In some Regions, the examiners assigned to the file fill that role while other Regions use field representatives or even local staff counsel to present the defense side of the case.

V-37

CONFIDENTIAL

5-10-02

Before the mediation is held, the parties should agree to how the mediator's expenses will be paid and where the mediation will take place.

## XXXI. NO PAY CASES

A "No Pay Case" is defined as: "A claim where the liability clearly indicates to the supervisor or manager that a defense verdict will be obtained if the case is litigated to a conclusion."

Potential cases of this type should be discussed with your supervisor or claim manager. The inside of the front file jacket should be marked "No pay" with the supervisor's signature and date added. This designation can be removed only by a supervisor of the same or higher grade than the supervisor who originally placed it in the file.

## XXXII. GUIDELINES FOR CLOSING CLAIM FILES

When sufficient information in the file indicates no reasonable likelihood of exposure, or further exposure, to the Company under coverages available on the policy in question, the file should be closed. The file should not be closed when there is reasonable expectation that there will be a claim or an additional claim payment.

The following may be helpful in applying these guidelines:

- Files containing Third Party Liability exposure should not be closed until one or more of the following conditions exist:

    - All Bodily Injury or Property Damage claims known or reasonably expected are settled or otherwise concluded.

    - Liability is clearly not with the insured and appropriate investigation substantiating this conclusion has been completed.

- If suits have been filed, all suits must be dismissed and satisfactory evidence of this fact is contained in the file (usually a copy of the dismissal notice).

- Files containing Medical Payments coverage or Personal Injury Protection coverage should not be closed when we have knowledge that treatment is continuing and expenses are being incurred which could be the basis for an additional claim, unless sufficient time has elapsed since the claimant was last contacted for us to conclude there will be no claim or no further claim.

- Files containing First Party Physical Damage coverage should not be closed until after settlement, if we believe or have knowledge that damages probably exceed applicable deductibles, unless sufficient time has elapsed for us to reasonably believe there will be no claim, or we know that a claim will not be

V-38

5-10-02

made under our policy (i.e., the other company paid our insured's liability claim).

The guidelines enunciated above may be restated as simply rules of common sense and practice of good judgment. There may be instances when, after files were closed, subsequent claims will be asserted. This is expected. However, it is our policy to close files as quickly as possible. Consistent with this purpose, we must exercise initiative and move aggressively to take all steps preliminary to file closure at the earliest practicable time.

## XXXIII. FRAUDULENT AND UNETHICAL CLAIM ACTIVITIES

As part of a growing industry-wide problem, our claim efforts have been inhibited by the increased occurrence of insurance fraud. A recent study by the United States Chamber of Commerce estimated 15% of all insurance claims involve some element of fraud. The annual cost of such fraud has spiraled to billions of dollars.

The Company has an active Regional Claims Security Investigative Unit to identify vulnerabilities, detect internal and external fraud and coordinate prosecution and recovery efforts with legal authorities. In addition, GEICO is a member of several insurance crime prevention associations and has implemented public relations and educational programs tailored specifically to deter insurance associated crimes.

The impact of insurance crime is recognized both by the insurance industry and by public authorities. Federal laws are in effect requiring automobiles to be equipped with anti-theft devices and all states now have explicit title laws. If the insurance crime involves the use of the United States Postal Service, prosecution would involve federal authorities. Some jurisdictions consider insurance fraud a felony, while others apply the misdemeanor classifications.

The three key areas affected are Property Damage, Personal Injury and support functions. Property Damage violations may appear in the form of inflated estimates, fictitious vehicles, kickbacks, dishonest salvage handling, staged accidents and fictitious thefts. Infractions against Personal Injury may involve collusion, non-existent passengers or claimants, kickbacks, and fabricated employment records. The support functions are susceptible to forgery, non-existent payees and counterfeit checks. The claims person should be constantly aware of the possibility of fraud.

## XXXIV. MINORS' CLAIMS

### A. Binding Settlements

Generally a binding settlement of a bodily injury liability claim for injuries to an infant (anyone below the age of majority) cannot be made without court sanction.
* The age at which majority is reached in most states is eighteen. The law of the

CONFIDENTIAL

11-15-05

state in which a release is executed usually determines whether a claimant has the capacity to give a binding release.

A parent may have a valid claim for loss of his child's services, loss of any income the child may have earned, and for medical expenses. The child's individual claim consists of pain and suffering, disfigurement and disability. When settling a claim of a minor, bear in mind that there are probably two claims to settle, the child's individual claim and that of the parents.

**B.     Friendly Suits And Court-Approved Settlements**

\*       There are generally three ways of making a binding settlement of a minor's claim. The most frequently used is to go before the court indicating that agreement has been reached as to settlement and ask for the court's approval. If approval is given, the court will appoint a guardian and issue an order indicating how the payment should be distributed.

\*       The second way of making a binding settlement is to take the case through normal pleadings and have a judgment entered in the amount of the agreed-upon settlement. It is, of course, necessary that the claimant be represented by counsel.

\*       The third common method is to resolve the case consistent with state statutes. For example, some states permit a parent or guardian to settle a claim of a minor if the amount of the settlement is less than a specific dollar amount. Others may permit them when the "net" to the minor (after paying fees and medical expenses) is less than a certain dollar amount. In those states, for those cases that qualify, court approval may not be necessary in obtaining a binding settlement. See generally the TCMs catalogued under the heading of minor settlements.

In all states, court approval must be obtained if:

- the minor sustained a broken bone,
- the minor sustained a head injury,
- the minor sustained permanent disability or permanent disfigurement, or
- the minor's medical expenses exceeded $1,500.

Court approval may be obtained in any case where it is deemed prudent to do so.

You must understand that, in many states, in any case in which court approval is not obtained, there is no settlement of the minor's claim. In those states, if court approval is not obtained, only the parents' claims arising from the injuries to their child are settled. Please see your RLA to determine if the state with which you are dealing is one of these states.

CONFIDENTIAL

11-15-05

## C. Release Agreement

\* If a decision has been made to waive court approval for any reason, settlement may be made by having the parents or legal guardians execute a Release Agreement. Although this release does not bind the child, it does bind the parents with respect to their claim.

Even though settlement of a minor's claim is court-approved, if money is paid to the parents in settlement of their claim, they should execute a release. It is preferable that the Parents' Release and Indemnity Agreement be used for this purpose, but any other form in which the parents' claim is properly released is satisfactory.

The Parents' and Guardians' Indemnity Release has been held to be unenforceable in some states. Therefore, a general release may suffice.

A C-52, Release of All Claims and Agreement (open-end release) may be modified to accommodate minor settlements by additional wording that spell out that the release is on behalf of the injured child. Any modification of a release requires supervisory approval.

## D. Settlement Checks

When an infant's or minor's claim is settled without court approval, settlement checks or drafts should be drawn to "Joe Doe and Mary Doe, as Parents and Natural Guardians of Richard Doe, a Minor." If there is a legal guardian, or one of the parents is deceased or is not joined in the claim for some reason, an appropriate revision should be made in the way the check is drawn. In each case, the payee should be identified as a parent or guardian on the face of the check. If the settlement is court-approved, the check should be drawn precisely as is indicated by the court order.

CONFIDENTIAL

11-15-05

# CHAPTER VI

## PRINCIPLES OF LEGAL LIABILITY

### Table of Contents

Page

I. Fundamentals ................................................................................................................. 1

    A. Legal Liability Defined ........................................................................................... 1
    B. Criminal Law ........................................................................................................... 1
    C. Civil Law ................................................................................................................. 1
    D. Common Law ........................................................................................................... 1
    E. Common Law vs. Statutes ....................................................................................... 2
    F. Conflict of Laws ...................................................................................................... 2

        1. Lex Locus Delictus ......................................................................................... 2
        2. Significant Contacts Rule ................................................................................ 3
        3. Lex Forum ....................................................................................................... 3

    G. Tort Defined ............................................................................................................ 3

        1. Legally Protected Right or Duty Owed ........................................................... 3
        2. An Invasion of the Right or Breach of that Duty ............................................ 4
        3. Injury ............................................................................................................... 4
        4. Proximate Cause .............................................................................................. 4

    H. Agency ..................................................................................................................... 4

II. Principles of Tort Liability ............................................................................................. 5

    A. Standard of Care ...................................................................................................... 6
    B. Foreseeability .......................................................................................................... 6

        1. The Foreseeable Victim .................................................................................. 6
        2. The Unforeseeable Victim .............................................................................. 7

    C. Rescue Doctrine ...................................................................................................... 7
    D. Superseding Cause (aka Supervening Cause and Intervening Cause) ..................... 8
    E. Concurrent Cause .................................................................................................... 8
    F. Last Clear Chance ................................................................................................... 9
    G. Imputed Negligence ................................................................................................ 9
    H. Joint Enterprise ..................................................................................................... 10
    I. Strict Liability ....................................................................................................... 10
    J. Negligence Per Se ................................................................................................. 11

CONFIDENTIAL

# CHAPTER VI

## PRINCIPLES OF LEGAL LIABILITY

### Table of Contents

Page

K. Res Ipsa Loquitur ........................................................................................... 11
L. Vicarious Liability – Employer's Liability for Act of Employee ......................... 12
M. Bailment ......................................................................................................... 12
N. Omnibus Clause – Owner's Liability where Vehicle is Operated by Another ..... 12
O. Family Purpose Doctrine .................................................................................. 13

III. Defenses to Liability ............................................................................................ 13

A. Affirmative Defenses ....................................................................................... 13
B. Contributory Negligence .................................................................................. 13
C. Imputed Contributory Negligence .................................................................... 14
D. Comparative Negligence .................................................................................. 14
E. Assumption of Risk ......................................................................................... 17
F. Sudden Emergency .......................................................................................... 17
G. Unavoidable Accident ..................................................................................... 17
H. Act of God ...................................................................................................... 18
I. Government Immunity ..................................................................................... 18
J. Intrafamily Immunity ...................................................................................... 19

1. Husband and Wife ............................................................................... 19
2. Parent and Child .................................................................................. 20

K. Charitable Immunity ........................................................................................ 20
L. Statute of Limitations ...................................................................................... 21

IV. Joinder and Contribution ...................................................................................... 21

A. Liquor Control Laws/Dram Shop Laws ............................................................ 21
B. Social Hosts .................................................................................................... 22
C. Municipality Liability ...................................................................................... 22
D. Federal Tort Claims Act (FTCA) ...................................................................... 22
E. Joint Tortfeasors Contribution ......................................................................... 23
F. Joint and Several Liability ............................................................................... 24
G. Contribution and Indemnity ............................................................................ 24
H. Worker's Compensation Exclusion / Family Auto Policy .................................. 25
I. Excess Insurance ............................................................................................. 25

VI-ii

CONFIDENTIAL

11-15-05

# CHAPTER VI

## PRINCIPLES OF LEGAL LIABILITY

### Table of Contents

Page

V. Damages ......................................................................................................................... 25

    A. Survival Statutes ........................................................................................................ 25
    B. Wrongful Death Statutes ........................................................................................... 26

5-10-02

# CHAPTER VI

## PRINCIPLES OF LEGAL LIABILITY

I.   **FUNDAMENTALS**

A.   **Legal Liability Defined**

Liability is defined as a legally enforceable duty of a wrongdoer to respond in money damages to an injured party because of some act or failure to act.  Each person owes the duty of reasonable care to all other persons and the failure to exercise that care constitutes negligence.  The law provides a means of recovery when one fails in his or her duty to another.

The liability portion of the policy contract states that the Company agrees to pay on behalf of the insured all sums which the insured becomes legally obligated to pay.  We note the company's obligation is generally to an insured only and payments are based on the legal liability of an insured.  The insuring agreement obligates the insurer to pay when an insured becomes financially responsible to another party because of some act or failure to act.

B.   **Criminal Law**

Criminal law deals with the conduct of the individual in relation to society (or the state).  Prosecution and punishment of the criminal offender is brought by and at the expense of the government.  Conversely, civil law governs the rights and duties between individuals.  An individual brings a civil action against another; the state merely provides the forum under which the injured party proceeds.

C.   **Civil Law**

Civil law is divided into broad areas; the two which concern us are contract and tort law.   Contract law concerns a voluntary relationship between two or more parties.  Tort law concerns the involuntary or implied rights and duties existing between individuals, i.e., the obligation at law to exercise care for the safety of the person or property of others.

D.   **Common Law**

The common law of England consists of a body of rules of action relating to the government and security of persons and property.  These rules derive from customs and usages and from the judgments and decrees of courts recognizing, affirming, and enforcing such usages. This body of law came with early settlers to America. The American system of jurisprudence is patterned after the English.

VI-1

5-10-02

In the absence of a statute with respect to a particular matter, common law (case law) is usually applied.

## E.   Common Law vs. Statutes

Common law has been handed down by court decisions and tradition. When a dispute is litigated in the courts, the judge must base his or her decision on similar cases decided in the past, known as "precedent". The principle of stare decisis (Latin for "the decision to stand") requires a court to adhere to, and abide by, previously decided cases. Courts can create "new" common law, either by deciding a case of first impression or by overruling prior decisions when such a change is deemed necessary. For major policy changes, courts may defer to the legislature.

Legislatures, both federal and state, enact statutes. When a new statute is enacted, it will then be the task of the courts to construe it and to determine its legal effect. The courts proceed on the basic premise that a statute which is contrary to or "in derogation of" the common law rule previously applied, will be strictly construed. They will hold that the statute changes the common law only to the extent necessary to fulfill legislative intent. Should there be any doubt as to the legislative intent in enacting that statute or its meaning, it will be construed most strongly in favor of the continuance of the common law rule then in existence. The courts look primarily to the plain language of the statute and, secondarily, to the legislative intent which inspired it.

## F.   Conflict of Laws

Since there are sometimes differences among the states as to which rules to apply in various situations, it is important to know which law to follow. Problems appear when an accident occurs in one state and suit is filed in another. Insofar as liability claims are concerned, the law of the state in which the accident occurred is usually applied to determine whether the substantive elements are present to make an enforceable claim. Procedural law is usually determined by the laws of the state in which suit is pending. Such things as rules of evidence, burden of proof and statute of limitations are considered procedural.

Where there is a conflict of laws, there are three significant concepts, which are termed a "choice of law rule".

### 1.   Lex Locus Delictus

Lex locus delictus is a Latin phrase, which means the law of the place where the tort is committed. In conflict of laws situations, the general rule is that the law of the location of the accident determines the rights of the parties, regardless of whether the parties are residents of the state where the accident occurred. Therefore, if an insured and spouse (his passenger) are injured in an accident in New York and bring suit against each other in

VI-2

5-10-02

their home State of Maryland, the court in Maryland would apply the substantive law of New York. The substantive law includes the laws which determine rights and liabilities, such as comparative negligence.

## 2. Significant Contacts Rule

This rule is applicable to those special circumstances that exist where one state has more significant contacts with the parties to the litigation. For instance, if all the parties in an action are residents of the state of Alabama where the action is brought, but the accident happens in Tennessee, it may be unreasonable to apply the law of the place of the accident. In theory, Alabama's interests and contacts with the litigants are more significant and meaningful than Tennessee's and its law should apply.

## 3. Lex Forum

Once the jurisdiction has been decided, the law of the state where the trial will be held will govern the procedure to be followed in the trial. Procedural law includes filing of summons and complaints, answers, interrogatories, deposition, etc. However, if suit is brought in federal court, then federal procedural law will be followed. This choice of law rule is called lex forum, which is Latin for the law of the place where the case is filed.

## G. Tort Defined

We define "tort" as a wrong, an unreasonable interference of one party with the legally protected rights or interests of another party. William Prosser, in his Handbook of the Law of Torts, states, "Broadly speaking, a tort is a civil wrong other then breach of contract for which the court will provide a remedy in the form of an action for damages."

Four essential elements must be present in order to recover damages: (1) a legally protected right or a duty owed; (2) an invasion of that right or breach of that duty; (3) injury; and (4) proximate cause. Failure to allege sufficient facts to establish each element will usually result in dismissal of the complaint.

## 1. Legally Protected Right or Duty Owed

Common law recognized certain basic rights as being legally protected. These are the rights of the individual to liberty, security of person, property and reputation. We have added others, either by passing legislation to create them or by judicial development of the common law. Added rights, created by legislation, include the right of dependents to bring an action for wrongful death or the right to continue an action against a deceased defendant.

VI-3
CONFIDENTIAL
5-10-02

**2.     An Invasion of the Right or Breach of that Duty**

This element means either an intentional or negligent invasion of the legally protected right. It also includes acts which subject one to liability, even though the acts are neither intentional nor negligent, e.g., a situation of "strict liability" in a products liability case.

**3.     Injury**

The term "injury" is often used synonymously with the term "damages", but there are clear conceptual differences. An injury may be a bodily, reputational, or property harm to a person. Obtaining "damages" is the plaintiff's objective and damages may consist of monetary compensation, interest, costs, or punitive awards.

An injury must not be conjectural; tortious conduct that does not result in injury will not result in an award. Traditionally, courts refused to recognize fright as a compensable injury because it is easy to allege and it is difficult to defend against or quantify, it would encourage litigation, and it seems to reward mendacity or fragility. In recent decades, the wall against fright claims has largely crumbled so people now recover for fear of AIDS or increased risk of cancer. With respect to witnesses or bystanders of a traumatic event, most courts impose a "zone of danger" rule. This means that the plaintiff must actually witness the event and must have been very close to the impact. In some states, this requirement is often waived for immediate family members who come upon the scene shortly after impact.

Proof of injury may be established by medical experts, lay witness testimony, photographs, demonstrative evidence, or physical evidence.

**4.     Proximate Cause**

The Plaintiff must establish that he or she sustained an injury as a result of a breach of duty. It must be established that the injury was sustained as a direct result of the tort committed and that there is a direct chain of causation running from the tortious act to the injury. Courts often use a "but for" test: "but for this negligent act, that injury would not have resulted." The connection between negligence and injury must be proximate in both time and space so that no other inference can reasonably be drawn (See Intervening Cause, page VI –8, and Concurrent Cause, page VI – 8 ).

**H.     Agency**

While a legal distinction is made between agent-principal and master-servant, for purposes of this discussion, both relationships will be referred to as employer-

5-10-02

employee.  From a strict legal standpoint, however, employer-employee usually describes only the master-servant relationship.  Generally, a master-servant relationship is employment for wages, whereas a principal-agent need not be.

Under the doctrine of Respondeat Superior (which is Latin for let the employer respond), the master/employer is responsible for tortious acts of employees committed in the scope of their employment relationship.  If an employee is involved in an accident while performing some act in furtherance of his employment, the employer may be held liable.  The employee is also liable for his own negligence, but frequently the prospects are better of recovering a larger verdict from the employer who may also have additional liability insurance available.  If an employer is required to make some payment because of a negligent act of an employee, he is entitled to reimbursement from the employee and usually has a right of action to enforce such a claim.  It is usually held that intentional tortious conduct by servants is not within the scope of employment.

For an agency relationship to exist, it is unnecessary that there be a formal employment   arrangement.  It is sometimes sufficient if one person merely performs some act for another.

## II.   PRINCIPLES OF TORT LIABILITY

Tort liability may arise in one of the three following ways:

- Intentional Tort – An act which is done with the intent and design of causing an injury to the person or property of another.  Although most policy contracts exclude coverage when the bodily injury or property damage is caused intentionally, occasionally, intentional acts are alleged and are covered losses. In all instances, we must investigate thoroughly.

- Liability Without Fault or Strict Liability – This is a legal theory which places a more rigid obligation on those who engage in activities involving more than usual dangers.  The doctrine has its greatest application to situations where injury or damage appears to be almost inevitable.  Although strict liability has little application to automobile liability claims, it can be important in claims under the Comprehensive Liability Policy.

- Negligence – Failure to exercise ordinary care.  The claims person is generally concerned with claims arising as a result of some act of negligence by the insured.  In some instances, legal liability may be imputed to the insured as a result of some negligent act by another person.  This is known as vicarious liability (See Imputed Negligence, page VI –10).

VI-5

## A.    Standard of Care

The negligence theory is predicated on community standards of behavior. The standard may be established by statutes, but in the absence of statutes, it is usually defined as what the ordinary, reasonable and prudent person would do under the same or similar circumstances. For statutory negligence to exist, the injured person must be one of a class of persons the statute was intended to protect and the harm which occurred must be the type the statute was intended to prevent.

The "reasonable man" of ordinary prudence theory is a model only, a legal fiction and is based on reason and custom. The theory is the standard of care measurement. To emphasize this standard, many jurisdictions have made distinctions in terms of the degree of care owed—high, slight or ordinary. Additionally, conduct which is willful, wanton or reckless misconduct is labeled "gross negligence." These distinctions may be made by case law or statute.

## B.    Foreseeability

The doctrine of foreseeability is applied to establish the boundaries of one's duty of care for the safety of others. The "reasonable man" must foresee or expect the potential effect his acts (or failure to act) will have on others. Generally speaking, if there is reason to anticipate one's actions may harm another, then the foreseeability requirement is satisfied.

Where the risk of harm to others cannot be reasonably anticipated or foreseen, one is not liable even though his or her act may be the proximate cause of the injury inflicted.

### 1.    The Forseeable Victim

In the case of injury to another, the defendant is charged with liability for injuries sustained as a result of his or her act where the risk of injury to others can be reasonably anticipated.

For example, assume that the insured has a heart condition and he has been advised by his doctor that he should avoid any stress or strain and, above all, he should not drive an automobile. One day, the insured felt that he had improved to the extent that he could drive his automobile a short distance. He drives his car and, during the course of the drive, suffers a heart attack. The car goes out of control, injuring two pedestrians on the sidewalk. The insured drove his car with the knowledge of his heart condition and against the advice of his physician. He should have reasonably anticipated the risk of harm to others that would come about when he undertook to drive an automobile. The pedestrians are foreseeable victims.

**CONFIDENTIAL**                          5-10-02

2. **The Unforeseeable Victim**

The rule followed in most states is that one owes no duty of care to persons whose exposure to a risk of harm could not be anticipated.

For example, assume that the insured has a latent heart condition of which he was unaware. One day, while driving his car, he suffers a heart attack. The car goes out of control and injures two pedestrians on the sidewalk. The insured had no previous knowledge of his heart condition nor had this condition manifested itself in any way. Clearly, the insured could not foresee the risk of harm to which the pedestrians would be exposed as a result of his driving.

The doctrine of foreseeability can be applied to a number of factual situations. The owner or operator of a motor vehicle owes a duty of care for the safety of people and their property, and a failure to exercise the required degree of care will constitute negligence. The required care consists of careful operation of the motor vehicle, including obedience to traffic signs, signals, speed laws, the maintenance of a careful and proper lookout, and maintaining control of the vehicle. It also includes the proper maintenance of the operating parts of the vehicle. For example, the vehicle must be equipped with satisfactory brakes, lights, tires, engine, transmission, etc.

If the owner knowingly entrusts his or her vehicle to an intoxicated person, or to a driver who has a reputation for recklessness, the owner may be responsible for the damages sustained by others as a result. The owner is obligated to anticipate the risks of harm which will result to other persons as a result of making the vehicle available to unsafe drivers.

C. **Rescue Doctrine**

This doctrine may apply when it is foreseeable that if a tortious act, whether intentional or negligent, places a person in a position of imminent danger, it is reasonable to expect that others will come to the aid of the person in distress. It is likewise reasonable to anticipate that if any of the rescuers are injured in the process of giving such aid, the injury to the rescuer would be the responsibility of the defendant whose tortious act was the proximate cause of the victim's position of peril. The theory is that the same tortious act was the proximate cause of the injuries to the rescuers. Therefore, among the foreseeable consequences of a tortious act endangering one person, is the likelihood of injury to an intervening rescuer. The rescuer is entitled to maintain an action for damages against the person whose tortious act created the necessity for the rescue attempt. This cause of action is maintainable regardless of whether the rescue attempt was successful.

CONFIDENTIAL

5-10-02

In order to establish the liability of the tortfeasor, the rescuer, in addition to proving injuries and the damages, must prove the following elements:

- The tortious act of the defendant was the proximate cause of the victim's position.

- The imminent danger to which the victim was exposed.

- The justifiable exposure to danger assumed by the rescuer in aiding the victim.

**D.    Superseding Cause (aka Supervening Cause and Intervening Cause)**

The doctrine of proximate cause can be defeated by showing a superseding cause: an independent cause, person or thing, which occurs between when the original negligent act was committed and when the claimant sustained damages. If the superseding cause was the immediate cause of the claimant's damages, then the original wrongdoer would be freed from liability since he or she was not the proximate cause of the loss. However, the original wrongdoer is not absolved from liability if the superseding act arose out of the original wrongful act and the intervention was foreseeable by the original wrongdoer, which means that if the superseding force was a foreseeable consequence of the first negligent act, then the original wrongdoer would still be liable.

The issue of superseding cause is normally an issue of fact. Issues of superseding cause are most commonly raised in sequential accidents.

**E.    Concurrent Cause**

If the actions of two or more wrongdoers or events combine to produce indivisible damages to a third party, then that combination of wrongful acts would be deemed concurrent causation. Either or both defendants may be held liable for the entire amount of damages.

An intersectional accident between two cars exceeding the speed limit with a resulting injury to an innocent passenger in one car could be considered a joint tort; the negligent acts of both drivers combined (concurrent causes) to produce the injury.

Another context in which the issue of concurrent causation arises is when an injury or damage results from two distinct causes where one cause is a covered hazard and the other cause is not covered. Plaintiffs have learned to plead artfully a negligent cause of action even though an intentional, non-covered act appears to be the essence of the claim. These issues require legal consultation. Under most such circumstances, a duty to defend is owed even though there is no duty to indemnify.

VI-8
5-10-02

Later in this chapter we will discuss the law affecting the innocent party's recovery rights from the joint tortfeasors and the rights existing between the tortfeasors themselves.

## F.  Last Clear Chance

The doctrine of last clear chance applies when the claimant's (plaintiff) actions contributed to the cause of loss, but the wrongdoer (defendant) has the "last clear chance" to avoid the loss. That failure to avoid the loss would be considered the proximate cause of the loss. The theory is based upon the fact that the wrongdoer (defendant) had sufficient opportunity and time to avoid the accident once the claimant's position of peril was, or should have been, observed. If there wasn't enough time to react, then the theory does not apply.

Recovery may be had under the last clear chance doctrine even though the injured party was contributorily negligent. It is most frequently applicable in those situations in which the injured party is inattentive and oblivious to dangers; for example, an elderly man walking into the path of a car while reading a newspaper.

The last Clear Chance Doctrine usually requires the following elements:

- The injured person must have been in a perilous position from which he could not extricate himself.

- The wrongdoer (defendant) could have discovered the injured person's predicament exercising reasonable vigilance.

- There must have been a sufficient period of time to avoid the accident.

- There must have been a failure on the part of the wrongdoer (defendant) to act with reasonable care.

In some jurisdictions the last clear chance doctrine has been modified, and it may even have been given a different name, such as the "discovered peril" doctrine.

This doctrine has effectively been abolished in comparative negligence jurisdictions because last clear chance is by definition included within the comparative fault calculation.

## G.  Imputed Negligence

Situations involving imputed negligence are generally decided on the basis of the agency relationship existing between the master and servant, principal and agent, owner and driver, or parent and child. For an agency relationship to exist one person must be under the authorization, instruction or command of another. The agent (or driver) must be performing some act for the principal (or owner). If it can be established that this relationship exists, then the negligent actions of the

agent (driver) may be imputed to the principal (owner). The agent does not have to be under the immediate control of the principal, i.e., the owner in the car when the loss occurs. If the owner was in the car, there usually is a presumption of agency, since under ordinary circumstances the owner controls how and where the vehicle is driven.

In some states the negligence of the driver is imputed to the owner by statute if the vehicle is being driven with the permission of the owner. In other states the owner is liable for the negligent operation of a motor vehicle by a member of his family. (Family Purpose Doctrine). A few states make the owner liable only if the driver is a minor. Community property statutes in some states permit the negligence of one spouse to be imputed to the other. Where there are injured passengers involved, if the purpose of the trip was to accomplish something for the benefit of an injured passenger, it may be possible to impute the negligence of the driver to the passenger, thus affording a defense to the passenger's personal injury claim. However, the negligence of a driver usually cannot be imputed to passengers. Therefore, even though the driver may have been negligent, that negligence may not afford a defense to a personal injury claim of a passenger. There are, of course, exceptions to the general rule as a result of agency relationships, the application of the family car doctrine, and other statutes, which make it possible to impute the negligence of a driver to a passenger. Questions in this area should be directed to the RLA.

## H. Joint Enterprise

Joint enterprise exists when two or more persons are engaged for a common purpose and have a common or equal right to control. Each is the agent of the other and is liable for the other's negligent actions.

A common example of joint enterprise is the situation where a driver and passenger are traveling in an auto for the same purpose that primarily benefits the passenger. At common law, the negligence of the driver was imputed to the passenger, so the passenger could not bring an action against the driver. Note the similarities and differences between joint enterprise, family purpose (page VI-13), and Respondeat Superior (Page VI-12).

## I. Strict Liability

The strict or absolute liability concept imposes liability regardless of negligence, bad faith or ignorance. It is based on the right to compensation by an injured party because another's activities were deemed to be abnormally dangerous to the public. This is not predicated on fault, but merely that the act itself was of a dangerous nature and its consequences should have been anticipated and avoided.

An example of this may be applied in those states having Dram Shop laws. These laws impose liability, in the absence of negligence, upon the seller of liquor to an intoxicated person if, as a result of the sale, the intoxicated customer injures an

innocent third party. Although the seller did not actively cause the injuries, his or her activities were intrinsically dangerous and he or she may be held strictly or absolutely liable. Dram Shop Acts are becoming increasingly more important as the drive to keep the drunk driver off the road intensifies.

Strict liability has some application to auto claims in some jurisdictions. For example, the "brake failure" defense is not available in Louisiana. Both owner and driver are strictly liable for damages resulting from latent brake failure.

## J.    Negligence Per Se

Negligence per se refers to the automatic finding of negligence, due to action or omission which is in direct violation of public law, statute or municipal ordinance. Violation of public law, like speeding or double parking, is deemed a breach of public policy and the courts in some states withhold this issue from the jury. No other evidence is required to prove negligence. In other states, violation of a statute is treated only as evidence of breach of duty.

## K.    Res Ipsa Loquitur

This Doctrine raises a rebuttable presumption that the defendant was negligent without specific evidence of negligent conduct. Literally interpreted, this Latin phrase means "the act speaks for itself."

Generally, three conditions must prevail in a "Res Ipsa" case:

- The accident must have been of a type which ordinarily does not occur without a negligent act by someone.

- The agency or instrumentality through which the injury was caused must have been within the exclusive control of the defendant.

- The injured party must not have contributed in any way to the accident.

An example of a potential res ipsa case in the auto context is where a car leaves the roadway and strikes a tree killing both the driver and a passenger. If there are no witnesses and it can be established that there was no mechanical defect, the estate of the passenger could allege that the accident had to be the result of driver negligence because cars normally do not leave the roadway and hit a tree but for negligent operation. The doctrine only creates a presumption of negligence and can be overcome by any evidence that the accident was caused by other than driver negligence.

CONFIDENTIAL

**L.    Vicarious Liability – Employer's Liability For Act of Employee**

The doctrine of "Respondeat Superior" (Let The Master Answer) operates on the same theory as agency (see page VI-5). The Rule is basic:  The master (employer or principal) is responsible not only for his or her own actions, but is also responsible for the negligent acts of the servant (agent or employee) while that person is acting under the master's control or within the scope of the master's directions.

Vicarious liability may be briefly defined as the imputation of responsibility for one person's conduct to another, whose actions may in no way, be wrongful.

**M.    Bailment**

A bailment is generally an arrangement whereby personal property is given by one person, the "bailor", to another, the "bailee", for a particular purpose with the understanding that it is to be returned at the end of a period of time or when the purpose has been accomplished.

If the owner of a car permits another to use his vehicle for a particular purpose, there might be a bailment arrangement.  In the absence of statutes as a general rule, the negligence of the bailee is not imputed to the bailor.  However, if the driver was performing some act for the owner of the car, or was a member of the owner's family, the negligence of the bailee might be imputed to the bailor.  In some states, the negligence of the driver of a motor vehicle is imputed to the owner as long as it was being operated with the permission of the owner.  In a true bailment situation, and in the absence of a statute or relationship which permits the imputation of negligence from the driver to the owner, even though the driver may have been negligent, if there is also some negligence on the part of the other driver, the owner may be able to recover for damage to his car.  The bailor may be liable for his own negligence in entrusting the bailed object.

The relationship between the owner of the other car and his or her driver (the bailor and the bailee) should be thoroughly investigated.  If it develops that at the time of the accident the driver was performing an errand for the owner, or was acting as an agent or employee of the owner, a basis may be found for imputing the negligence of the driver to the owner.

**N.    Omnibus Clause – Owner's Liability Where Vehicle Is Operated By Another**

Applying the common law rule, the owner is not responsible for the negligent acts of the driver when the owner has no control over the operation of the vehicle, unless an agency relationship exists.

Exceptions to this common law rule are 1) Negligent entrustment - the owner knowingly permits an incompetent or irresponsible person to use his or her vehicle; and 2) Modification by state statute.  The latter varies between states.

VI-12

CONFIDENTIAL          5-10-02

Some states have modified the rule by holding the owner liable for the driver's negligent acts if the driver has the owners' consent, either expressed or implied to be driving the vehicle. Other statutes place liability on the owner by implying a presumption of agency relationship or a presumption based on the mere ownership of the vehicle.

The claims person must know the laws of the territories handled, particularly the statutes governing principal-agent, master-servant, employer-employee, and owner-driver (bailor-bailee). The omnibus clause provides coverage for the owner and permissive user. The examiner should therefore consider the likelihood of other insurance in these situations. The examiner should obtain a copy of the driver's liability policy with amendments. If the driver's omnibus clause states that the policy is excess over other insurance that applies to a non-owned auto, then the owner's policy is primary (see Excess Insurance, page V1 – 25).

## O.    Family Purpose Doctrine

To hold the head of a family responsible for the use of the family car by members of the family, a fiction has been devised through which the negligence of the driver is imputed to the head of the family, even though he or she was not present. It is reasoned that the owner of the vehicle, purchased or maintained for the purposes of the entire family, is liable for the injuries inflicted by the vehicle while being used by members of the family for their own purposes. Therefore, when one of the members of the immediate family is operating the family car with the permission of the family head, this is in furtherance of the business of the head of the family and the family head becomes responsible for the negligent operation of the car. For the Family Purpose Doctrine to be applicable, the driver must be a member of the immediate family and the vehicle must be driven with the permission of the family head.

Not all jurisdictions follow the Family Purpose Doctrine.

## III.    DEFENSES TO LIABILITY

### A.    Affirmative Defenses

Affirmative defenses can mitigate or bar the plaintiff's recovery even where the plaintiff proves all of the elements necessary for the cause of action. They are called affirmative defenses because the defendant has an affirmative duty to raise them in its answer to the plaintiff's complaint and to prove them at trial.

### B.    Contributory Negligence

Basic to the Common Law of tort liability is the effect of contributory negligence on the part of the injured party being held as a complete bar to his or her recovery.

V1-13

CONFIDENTIAL

\*    The law has held that even the slightest act of negligence on the part of the injured party, if found to be causally connected with the injury, would rule out a recovery. This negligent act of the claimant (plaintiff) must, of course, be a proximate cause of the injury sustained; if remote, the claimant will not be held to have contributed. When speaking of the negligence involved in a percentage measurement, an act which proximately contributed only 1% (as opposed 99% on the part of the defendant) could, in theory, preclude recovery.

The allegation of contributory negligence is a complete defense to the plaintiff's allegation of negligence. Once contributory negligence is alleged and evidence submitted on the allegation, the jury (or judge in a non-jury case) as the finder of fact must decide whether or not the plaintiff did contribute to his or her own injury.

Contributory negligence, as of 2001, only exists in Alabama, Maryland, North Carolina, Virginia, and the District of Columbia. South Carolina for causes of action arising before 7/1/91.

Contributory negligence is a defense to a negligence claim. As such, it may not be a bar to claims founded on strict liability theories or to the imposition of punitive damages.

**C.    Imputed Contributory Negligence**

Contributory negligence may be imputed from one person to another where the relationship between them is such that the law makes one responsible for the negligent acts of the other. For example, if an employee is driving the employer's vehicle while on employer's business and he negligently collides with another automobile, the employer is liable for the claim since the employer has the theoretical right to control the actions of the employee. Under the Doctrine of Respondeat Superior (let the master answer), the employee's negligence is imputed to the employer (see page VI-12).

It should be emphasized that the application of the principle of imputed negligence applies only to claims asserted by or against third parties.

The defense of imputed contributory negligence maybe encountered in a number of situations, especially where the following relationships are involved: Persons engaged in a Joint Enterprise, Partnership, Child and Parent (by statute), Employer and Employee, Driver and Passenger (compare joint enterprise, page VI-10). In these situations, you should check with your RLA.

**D.    Comparative Negligence**

The theoretical arguments in favor of reducing the harshness of the contributory negligence rule have rested on two bases:

11-15-05

- To avoid the possibility of a capricious application of such a rule when the equities would seem to favor some recovery for an injured party.
- To avoid relieving the defendant of liability when he or she is proximately responsible for injury to the plaintiff.

This later rule means the law is turning away from its original objective of indemnifying the injured party to one of making sure that the tortfeasor pays for the wrongs committed. Carried to its logical conclusion, each tortfeasor will be required to pay for his or her own part in an occurrence; this is the PURE form of comparative negligence.

Comparative negligence, in this pure form, operates to award the injured party, (at least the party that has brought suit) some part of his total damages even though the injured party's negligence would be as much as 99% of the total negligent conduct of all parties. If the defendant is found to be 75%, 50% or 25% negligent, the award to the plaintiff would be 75% or 50% or 25% respectively of the total damages. Under such a rule, if both parties were injured, each could bring an action against the other and collect some part of his own damages.

Comparative negligence does not do away with the contributory aspect, but does modify its effect. Contributory negligence of the injured person, if found, is still considered and will affect the amount of damages ultimately awarded the injured party. Basically, the rule requires that the negligence of the injured party and that of the defendant or defendants be compared, and an award made accordingly.

Few states follow the "pure" form of Comparative negligence, Instead, the majority of states now use a MODIFIED form. Under a modified form of comparative negligence, the injured person will not be awarded a recovery when his or her negligence is "more than" that of the at-fault party, or *tortfeasor*. There are two forms of this rule: (1) the injured person is allowed a recovery only if his negligence is "less than: that of the *tortfeasor*. (2) The injured party is allowed a recovery if his negligence is equal to or less than that of the *tortfeasor*. In each case, the injured person's percentage of recovery is inversely related to his own negligence (i.e. a driver who is 40% at fault may seek an award of 60% of his damages.

The application of this doctrine usually requires either a Special Verdict or a General Verdict from the jury. Most jurisdictions applying comparative negligence utilize the Special Verdict Rule which is a three-step procedure to establish the award; if any, going to the plaintiff. First, the trier of fact must decide two questions:

- What would be the total damages if the plaintiff were completely free of negligence?

CONFIDENTIAL

5-10-02

- On the basis of total negligence being 100%, to what percent did each party contribute to the injury?

The court will then, reduce the damages awarded by the percentage of negligence found attributed to the plaintiff.

In a General Verdict jurisdiction, the trier of fact need only return the damages to be awarded, and it is assumed that they have applied a similar finding of percentage and reduced the total damages by that percentage. Theoretically, both the General and Special Verdict should result in the same award. Proponents of both comparative and contributory negligence doctrines argue this point and it is felt that the precision involved in a Special Verdict will result in a more equitable award being made. It is further felt that the separate finding of damages and the percentage of negligence forces a more thorough study of the evidence and a more deliberate decision on the part of the jury.

The Special or General Verdict system, when applied to a single plaintiff and defendant is a relatively simple rule to follow and administer. When joint tortfeasors are involved, however, the interpretation of the Comparative Negligence Rule has resulted in several applications of the percentage determinations. Not only is there a problem as to what percentage should be awarded to the plaintiff, but whether all or only some of the defendants should be paying toward that amount.

This is best illustrated by a hypothetical case. Imagine the following situation: There are two defendants involved and the jury finds total damages to be $1,000. It further finds that the plaintiff is 25% negligent, defendant "A" is 25% and defendant "B" is 50% negligent. The following determinations could result.

- Defendants "A" and "B" must pay $750 (total damages minus the plaintiff's negligence of 25%) and will be held equally accountable or made to contribute according to their own degree of negligence.

- Defendant "A" is let off: his or her negligence, being equal to the plaintiff's means that he/she is relieved of responsibility. Defendant "B," however, must pay $750 since the damages will be reduced only by the plaintiff's degree of negligence.

- Defendant "A" gets off and Defendant "B" pays $500: his or her own degree of culpability less the plaintiff's 25% negligence.

Additional information on which jurisdictions apply Comparative Negligence is found in the TCM-359 series.

Note that some states follow the "not greater than rule" which means that a plaintiff can recover if his negligence is not greater than the defendants negligence.

VI-16

## E.   Assumption of Risk

In some states, assumption of risk may be used as a defense. The underlying
theory is that the injured person consented (either expressly or implicitly by his
conduct) to relieve the defendant from liability for the defendant's negligence.
For example, if the injured person consents to ride in an automobile driven by one
he knows to be intoxicated, he or she assumes the risk of the consequences, i.e.,
that the driver may have an accident. The following usually makes the defense of
assumption of risk applicable.

    1.   The injured party must have knowledge of and appreciate
         the risk involved.

    2.   The injured party must make a voluntary choice to
         encounter the risk.

Assumption of Risk is a complete defense in those limited states that still follow
the contributory negligence rule. In comparative negligence jurisdictions, the
application has been modified and/or eliminated. The claims person should check
with the RLA for its application to the case at issue.

## F.   Sudden Emergency

Under this rule, applicable in some states, a defendant who acts negligently may
not be liable for that negligence when he acts as a result of a sudden peril created
by someone or something other than himself (and, in rare cases, such as illness,
"by" himself).

The doctrine has three important qualifications: (1) the defense cannot be
invoked by one creating the emergency except possibly a defendant's sudden
illness; (2) the emergency must not have been avoidable through due care; and (3)

the emergency must be so sudden as to leave no room for deliberation or
intelligent action.
Examples of sudden emergencies potentially exonerating a defendant's negligent
actions might be a motorist's evasive (but negligent) maneuver following the
sudden crossing over a double yellow by an oncoming vehicle and a sudden and
unanticipated medical emergency leading to loss of control of a motor vehicle.

## G.   Unavoidable Accident

This defense may be briefly summarized as follows: If a motorist has exercised
the highest degree of care the circumstances require, and has nevertheless injured
another, the accident is said to be unavoidable, i.e., one for which no liability will

VI-17

CONFIDENTIAL

attach. An unavoidable accident is an inevitable occurrence that is not to be foreseen and prevented by vigilance or care.

To successfully use the defense, the defendant must show that the accident happened from an unforeseen cause, or in an unexplainable manner. These are questions for the jury to decide.

An example of situations where the defense might be used include mechanical failure despite proper maintenance or a child "dart-out" where the insured is proceeding at a lawful and reasonable rate of speed, maintaining a proper lookout, and otherwise obeying the rules of the road when a child suddenly runs out from between two parked cares into the driver's path.

## H.    Act of God

An act of God has been defined as any accident, misadventure, or casualty when it happens by the direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man. An act of God can, however, include the sudden illness or death of a person. For example, a heart attack suffered by a driver who does not know, and has no reason to know, he has heart trouble could constitute an act of God. Where the injury or damage occurs solely as the result of an act of God, no liability can be imposed. If human agency or negligence concurs with an act of God, however, the person injured or suffering damage may recover.

Consider, for example, an individual claiming to have been injured due to a tree falling on the car in which he was riding. If the sole cause of the tree falling was the high winds of a tornado, the act of God defense applies. However, if winds and improper maintenance of the tree by the owner combined to cause the collapse, the act of God rule is not a defense.

## I.    Governmental Immunity

The field of law regarding immunity of governmental bodies is complex and full of substantive and procedural traps. Immediate consultation with defense counsel/RLA and/or Claims Home Office Legal is required.

From a contribution or subrogation standpoint, the United States Government and state governments may not be sued without their consent. The United States has set out specifically by statute (entitled the Federal Tort Claims Act), the conditions under which it has consented to be sued (see Federal Tort Claims Act, VI –23. State governments, typically, have enacted statutes analogous to the federal act, which statutes may also govern the liabilities of counties or other political subdivisions. The particular statutes applicable in each state need to be consulted.

VI-18

CONFIDENTIAL                                        5-10-02

Municipal corporations (city governments) usually may not be sued as long as the conduct giving rise to the accident is connected with a "governmental" function as opposed to a "proprietary" one. Operations of the police department, fire department, sanitary department, etc., are normally considered governmental. Therefore, a city government may not be sued for a negligent act committed by a policeman in the performance of his duties, for example.

On the other hand, functions such as the operation of gas, electric power, or water utilities are considered proprietary in nature, so a city government might be sued for a negligent act committed by an employee of the water department. Examples where state or municipal liability may lie: negligent street repairs, inadequate signs, improperly parked vehicles.

The law should be checked carefully in each case to determine the status of governmental immunity, since provisions may be made for entertaining claims even though there may be no right to sue. For example, some municipalities waive immunity and purchase liability insurance. In other instances, statutes set out the conditions under which claims will be entertained.

If you feel that we have a valid claim for contribution or subrogation, notify the municipality (as well as RLA/defense counsel and/or Claims Home Office Legal) immediately. There could be a very short period for filing claims involved and we may well miss our chance if we don't act quickly.

## J.   Intrafamily Immunity

### 1.   Husband and Wife

The original common-law concept of the unity of marriage merged the legal existence of the wife into that of her husband. In a word, when the marriage took place, they became "one." The husband succeeded to all

the legal rights of both with the wife retaining none of them. The wife could sue or be sued only in the name of her husband, with the husband acting as her guardian. The Married Women's Acts emancipated married women from this common-law disability. They allowed them to sue or be sued in their own names, without the involvement or concurrence of the husband. The courts reexamined the question of whether or not a married woman could sue her husband in tort, and what effect, if any, the statute had with relation to the problem. The majority of the courts held that the statute did not affect the family immunity doctrine. Such doctrine constituted a bar to the maintenance of any action against the husband based on tort liability. It was pointed out that even before the married woman was emancipated from her common-law disability, the husband was under no legal disability whatsoever. The family immunity doctrine prevented him from maintaining an action against his wife based on tort liability.

VI-19

CONFIDENTIAL

Inter-spousal immunity has been fully abrogated for torts arising out of automobile accidents in the District of Columbia and all states except Arkansas, Georgia, Louisiana, Utah and other jurisdictions have partially abrogated the immunity to the extent liability insurance exists. Questions in this area should be directed to your RLA.

## 2. Parent and Child

The family immunity doctrine applies to actions in tort between a parent and an un-emancipated child on the theory that the barring of such suits is necessary for the preservation of family harmony and parental authority. The rule has been applied to various family configurations: natural father and mother, stepfather or stepmother, or any other person standing in place of a parent (in loco parentis) to the child. In short, the suit between these two parties is barred, whether brought by the child against the parent or by the parent against the child.

There has been a recent trend in the law to narrow or abolish parent-child immunity. The latest decisional law or statutes should be checked for the particular jurisdiction.

Where the child has attained the age of majority or has been emancipated (released from parental authority) prior to the occurrence of the accident, the reason for the rule no longer exists. Therefore, the doctrine is not applicable, and suits by such a child or suits by a parent against such a child are permitted.

Where the child has not attained his or her majority or has not been emancipated at the time of the accident and suit is begun either by the child against the parent or by the parent against the child after the child has been emancipated or has attained his or her majority, the general rule is that such suits are not maintainable because the rights of the parties are determined as of the date of the accident, not the date suit is brought. If the plaintiff—whether the child or the parent—could not maintain the action as of the date of the accident, the subsequent change in the child's legal status does not create a cause of action where none was permitted before.

## K. Charitable Immunity

There is no uniform rule as to whether charitable organizations are liable for injuries caused by their members while performing the organization's work. In some states, the organizations are immune, and in some, they are not. The tide of the law is away from immunity, however, and the law in each jurisdiction must be checked. Please note, also, that while an organization may be immune, the member performing the negligent act is in all likelihood not immune.

VI-20

CONFIDENTIAL

L.      **Statute of Limitations**

Each state has its own statutes of limitations specifically setting out the period of time within which an action for property damage or bodily injury must be instituted. It is in the interest of orderly society that rights of action do not survive indefinitely. In most states the statutory period for property damage claims is different from that for bodily injury actions.

The statute of limitation usually does not run if the defendant is out of the jurisdiction or conceals himself or herself within the jurisdiction. The statute of limitations usually does not run against insane persons and infants. Infants have a reasonable period of time after they reach majority in which to file suit. Majority is usually considered the age of eighteen.

Time usually begins to run when the tort is committed and ceases when suit is filed. If suit is filed before the statute has run, but service of process is not perfected until after the running of the statute, the action is usually not barred by the statute of limitations. Ordinarily, limitations will be the law of the forum state, but there are exceptions (e.g., wrongful death).

Generally, there is a maximum period of time during which claims against an estate must be made. After the prescribed statutory period, claims against the estate are barred.

IV.     **JOINDER AND CONTRIBUTION**

A.      **Liquor Control Laws/Dram Shop Laws**

All states require retail vendors of alcoholic beverages (i.e., bars, taverns, restaurants, liquor stores) to be licensed as a liquor vendor and require them to follow state regulations. The sale of alcoholic beverages to minors or to obviously intoxicated persons is prohibited by law or regulation. A violation may subject the vendor to a fine or other penalty. Upon violation, the question arises what liability, if any, the vendor may have to a third person who is injured in an automobile accident caused by an impaired driver.

In some jurisdictions, the vendor of liquor to an intoxicated or minor driver is liable for damage caused by the driver. In other states the liquor vendor who sells liquor which causes the purchaser to become intoxicated is responsible for damage which results. Many states have enacted Dram Shop laws (also called Civil Damage acts) which specifically permit an injured person to bring an action against a supplier of intoxicants (usually, but not always limited to commercial vendors) to another person (often limited to a minor or someone obviously

VI-21

CONFIDENTIAL

intoxicated) causing that person to become intoxicated. It is important to explore thoroughly the possibilities of obtaining contribution from liquor vendors in those cases in which the insured is alleged to have been intoxicated.

**B.    Social Hosts**

Some states have now found liability on hosts serving alcohol to guests who later cause injury to themselves or others. When a social host supplies alcoholic beverages to a guest who becomes intoxicated thereby, the question arises whether the social host is liable to the intoxicated person or to third persons who may be injured as a result of the imbiber's condition. The general rule is that a person who supplies alcoholic beverages at a party or other gathering owes no duty to either the guest/drinker or the public at large and is not liable for the consequences of an accident occurring as a result of such intoxication.

This general rule has been modified in some states by statute and imposes liability on social hosts. Usually, these cases involve intoxicated minors, on the theory that the social host has violated a state statute: i.e., prohibiting the furnishing of alcoholic beverages to minors.

Some courts have even imposed liability on social hosts for providing alcoholic beverages to an adult guest. Some recent cases have involved the liability of an employer who hosts a party where alcohol is served. In an attempt to find liability, the plaintiff may argue that even though there is no direct liability for providing alcohol, there may be vicarious liability for the negligence of an intoxicated employee.

**C.    Municipality Liability**

Some states have addressed whether or not police are liable for failing to arrest drunk drivers. Some states have held that a municipality may be held liable for negligent failure of its police officers to remove a motor vehicle operator from the highway who is under the influence of alcohol and who causes injury to others. Other states say that not making an arrest or taking a person into custody or releasing him/her, is a judgmental or discretionary duty from which a police officer or a municipality is immune from negligence (see Governmental Immunity, page VI –18).

**D.    Federal Tort Claims Act (FTCA)**

The Federal Tort Claims Act provides the only mechanism for instituting a claim against the United States Government regarding property damage or personal injury resulting from the acts of persons acting within the course and scope of employment or duty as an employee or agent of the federal government. The FTCA creates an immunity from personal liability for federal employees who cause damage or injury while driving a vehicle within the scope of employment.

VI-22

CONFIDENTIAL

If an insured is sued for damages caused while operating a vehicle in the course of employment with the federal government, the suit papers should be tendered to the individual's supervisor for processing under regulations implementing the FTCA. The first step is for the government agency to determine whether the accident occurred within the scope of employment. If the agency certifies that the accident was within scope, the appropriate US Attorney's office will have the Government substituted - in for the individual and have the case removed from state court into federal court. Once this is done, the insured is out of the action.

In cases where it appears that the FTCA should protect our insured, care must be taken to monitor the situation until the governmental agency has certified scope of employment. If the agency determines that the insured was not acting within the scope of employment at the time of the accident, we must be ready to step in to take over the defense of the insured. While it is possible to litigate the issue of scope of employment, our obligation to defend our insured continues until that issue is decided against the Government.

The FTCA applies only to employees (including military service members) of the federal government. Many states have similar statutes which apply to state government employees. Care should be taken to research local law when confronted with a claim based upon conduct of a state government employee in the scope of that employment. Some states require insurers to provide minimal liability coverage for federal or state employees. Coordinate these issues with your RLA and Claims Home Office Legal.

E. **Joint Tortfeasors Contribution**

A joint tort may be loosely considered as a situation in which the wrongful acts of two or more individuals combine to produce a single indivisible result. Persons committing wrongful acts (torts) are described as tortfeasors. An intersectional collision where two cars are exceeding the speed limit with a resulting injury to a passenger in one car might be a joint tort. At common law, if the injured party recovered from one of the wrongdoers and executed a release, he or she could not recover from the other. A release of one tortfeasor releases all. Also, at common law, if one of the tortfeasors settled the claim, he or she could not obtain contribution or indemnity from the other.

In some jurisdictions the common law rules still prevail. However, in many states an injured party can make recovery from one wrongdoer and expressly reserve his or her claim against the other. In many jurisdictions if one tortfeasor has settled a claim, he or she can enforce contribution or indemnification from the other.

Not all states are in agreement as to whether the release of one tortfeasor releases all and whether contribution between tortfeasors can be enforced. It is important to understand the applicable law in each jurisdiction.

VI-23

5-10-02

When faced with a joint tort situation, we should, as soon as possible, put all joint tortfeasors on notice of our intent to seek contribution from them. We should attempt to reach agreement with the insurers of the joint tortfeasors concerning the proper apportionment of liability among all tortfeasors. In defending cases involving joint tortfeasors, we should attempt to reach cost- sharing agreements where appropriate.

## F.     Joint and Several Liability

The concept of joint and several liability concerns the obligation of one joint tortfeasor to pay the entire judgment even if it exceeds that tortfeasor's proportionate share of liability. At common law, any joint tortfeasor is jointly liable for the entire judgment without a direct right to seek contribution from other joint tortfeasors. For example, if one joint tortfeasor is 25% at fault for an accident and another joint tortfeasor is 75% at fault, the injured party may seek 100% of his/her damages from either one.

The common law in this regard has been changed in many jurisdictions largely as a result of a shift from contributory negligence to comparative negligence. Some states allow a joint tortfeasor to join other tortfeasors in any lawsuit by seeking contribution and/or indemnification from the other tortfeasors for any joint liability imposed upon the tortfeasor initially sued. Other states have done away with joint liability altogether by providing that each joint tortfeasor is liable only to the extent of his/her individual liability. Some states have limited the scope of joint and several liability for non-economic damages (see Damages, Page VI-26).

The claims handler must be aware of the rules regarding joint and several liability in the jurisdiction in hand. Where joint and several liability persists, care must be taken to avoid undervaluing a claim where there is an uninsured or otherwise judgment proof co-defendant. In such situations, the fact that the GEICO insured bears only a small portion of the liability in comparison to the co-defendant will not in reality reduce the exposure of the insured to the full value of the claim.

## G.     Contribution and Indemnity

The legal terms "contribution" and "indemnity" are often used in tandem to express a single concept. However, the terms have distinct meanings. Indemnity refers to the duty to bear the financial consequences of the civil liability of another as determined by contract of indemnification in that the insurer agrees to bear the financial consequences—within limits—of the tort liability of the insured.

. Contribution is a concept based upon equity whereby a joint tortfeasor who is liable for tort damages under theories of joint and several liability may seek contribution to that liability from other joint tortfeasors according to their proportionate liability. Many states have statutes which specifically provide for actions for "indemnity and contribution" to bring unnamed joint tortfeasors into a litigation. The use of the term "indemnity" in this context is largely misleading as

VI-24

there is no contract involved in the obligation of the joint tortfeasor to contribute to the judgment.

Louisiana and Wisconsin allow an injured person to bring a direct action for damages against the insurer of the tortfeasor. This is a tort action based upon the duty of indemnification the insurer bears to its insured.

**H.    Worker's Compensation Exclusion/Family Auto Policy**

This exclusion, when it appears in the "Liability Coverages" section of some automobile policies, reads as follows:

**"When Section I does not apply**

> 6.   Bodily Injury to an employee of an insured arising out of and in the course of employment by an insured is not covered. However, bodily injury of a domestic employee of the insured is covered unless benefits are payable or are required to be provided under a Workers' or Workmen's Compensation Law."

What is the significance of this exclusion in addition to the employee exclusion? It specifies that any obligation imposed upon the employer by workers' compensation and similar laws is not covered under the liability policy.

Remember that the employee exclusion makes the policy inapplicable to claims by an employee against the employer for injuries arising in the course of employment.

**I.    Excess Insurance**

The problem of excess insurance arises in three common situations: 1) the driver (or owner) has an umbrella liability policy; 2) the driver and owner are both liable (see Omnibus Clause, page VI-13); 3) an employee driver and employer are both liable (see Agency, page VI-5 and Vicarious Liability, page VI –12). The important thing to realize is that the excess carrier usually has no duty to defend or indemnify unless the primary policy is exhausted or the coverage is inapplicable. The primary carrier owes certain duties of good faith toward the excess carrier. In this situation, the examiner should contact the RLA or Claims Home Office Legal for guidance.

# V.    DAMAGES

-   Damages should not be confused with "injury" discussed above. We usually distinguish between legal damages (money) and equitable remedies (orders). Elements of damage in the typical bodily injury case consists of medical costs and lost wages (specials), disability, and pain and suffering. At common law, a claim for personal injury was extinguished by death of the victim. Every state has a wrongful death statute and a

5-10-02

CONFIDENTIAL

survival statute which means that some or all of the decedent's damages survive death (see below).

**A.  Survival Statutes**

These apply where the deceased lived for a period after the accident. It must be shown that there was conscious pain and suffering. If the deceased would have had a cause of action against the person whose wrongful act caused his or her injury, the claim survives and passes onto the parties within the degree of kinship specified by statute. Such a claim is no better than it would have been had the deceased lived and the defendant has the same defenses he would have had if the decedent had lived.

The elements of damages in an action under a survival statute are about the same as in the personal injury action, except that usually nothing should be awarded for loss of income or medical expenses beyond those incurred at the time of death. Remember, the damages recoverable under survival of actions are distinct from wrongful death damages.

**B.  Wrongful Death Statutes**

This statute creates a new cause of action on behalf of persons within the degree of kinship specified by the statute. The purpose is to compensate them for the loss (usually financial loss) of a husband, father or other close relative. Only the specified individuals may bring suit.

There are two types of wrongful death statutes: some states follow the "estate" rule and others apply the "beneficiary" rule. Under a typical "estate" rule, specials survive as well as the present value of decedent's earnings reduced for consumption and taxes, and heirs take according to the intestacy statute. Under a typical "beneficiary" rule, immediate family members may assert claims for lost support, services, and consortium (care, guidance, affection). Within the past few decades, there has been a slow trend to apply "beneficiary" damages to injury claims as well as death claims. It should also be noted that a growing number of states recognize a viable fetus as a person in death cases. In medical malpractice, the cause of action of "wrongful birth" is well established, which means that a child may recover for injuries incurred pre-partum. In theory, the same cause of action could apply in auto collisions. A few states recognize "loss of enjoyment of life", or hedonic damages, in addition to those listed earlier. Tort reform is an important trend in the law of damages. The main thrust of tort reform is to put a cap on non-economic damages (pain and suffering, consortium, loss of enjoyment of life).

To evaluate a claim under a wrongful death statute, determine the age, occupation, income, education and social status of the deceased. These are clues to his or her probable future earning capacity. If the deceased was a child, consider the education, occupation and social status of the parents and other

VI-26

5-10-02

relatives as an indication of what the deceased might have done had he or she lived. If the deceased was a school child, school records and teacher's opinion as to the probable future of the child should also be investigated. The martial status of the deceased and the number of dependents must be checked, each dependent identified and his or her relationship to the deceased defined. For example, it would make quite a difference in value if the deceased and his wife had not lived together for several years.

The probable life expectancy and work expectancy of the deceased should be determined. For instance, a 60-year old male laborer might have had a life expectancy of fifteen years, but it is unlikely that his work expectancy would be more than half of that, and this would have a bearing on his probable future earnings had he lived.

Funeral expenses are normally recoverable under wrongful death statutes.

Survival acts and wrongful death statutes are usually combined into one statutory scheme which specifies who the beneficiaries are, who must bring suit, any maximum amount recoverable, the measure of damages, the period of time during which suit must be filed, and other pertinent information.

The applicable death statute is always the statute of the state where the accident occurred. Summary and tabular information is in both the Insurance Bar and Best's Recommended Insurance Attorneys. The Company library may also be used. If there is a question about a statute, an opinion should be obtained from the Regional Liability Administrator or Claims Home Office Legal.

5-10-02

CONFIDENTIAL

# CHAPTER VII

## LEGAL DAMAGES – BODILY INJURY AND PROPERTY DAMAGE

### Table of Contents

Page

I. Compensatory Damages ...................................................................................................... 1

    A. General Damages ..................................................................................................... 1
   * B. Special Damages...................................................................................................... 1

II. Punitive Damages ............................................................................................................... 1

III. Rule of Certainty ................................................................................................................ 2

IV. Collateral Source Rule ....................................................................................................... 3

V. Additur and Remittitur ....................................................................................................... 3

VI. What is the Property Damage ............................................................................................. 4

    A. Damage to the Car ................................................................................................... 4
    B. Loss of Use .............................................................................................................. 5
    C. Damage to Personal Property .................................................................................. 6

VII. Physical and Mental Distress ............................................................................................. 6

VIII. Effect of a Pre-Existing Disability ..................................................................................... 7

IX. Loss of Consortium ............................................................................................................ 7

X. Effect of Divorce or Separation.......................................................................................... 9

XI. Formula Methods of Evaluation ......................................................................................... 9

XII. Permanency Determination .............................................................................................. 10

XIII. Work Life Expectancy...................................................................................................... 12

XIV. Annuity Tables – Structured Settlements......................................................................... 12

11-15-05

CONFIDENTIAL

# CHAPTER VII

## LEGAL DAMAGES – BODILY INJURY AND PROPERTY DAMAGE

### Table of Contents

Page

|   |   |   |
|---|---|---|
| A. | Estimated Range of Verdict | 13 |
| B. | Probable Cost of Handling, Including Investigation and Defense | 13 |

XV. Survival Actions ........................................................................................................ 13

XVI. Death from Causes Other Than Accident ................................................................. 15

XVII. Instantaneous Death Caused by Accident ................................................................ 15

XVIII. Death Due to Accident After an Interval of Time .................................................. 15

XIX. Liens .......................................................................................................................... 16

    A. Real Property ........................................................................................................ 16
    B. Tangible Personal Property ................................................................................. 16
    C. Intangible Personal Property ............................................................................... 16

XX. Priorities of Liens ...................................................................................................... 17

XXI. Attorney's Lien for Services ..................................................................................... 17

XXII. Hospital and Physician's Liens ............................................................................... 18

XXIII. Federal Liens ......................................................................................................... 19

    A. Medicare ............................................................................................................... 19
    B. Federal Medical Care Recovery Act .................................................................... 19
    C. Federal Employees Compensation Act (FECA) .................................................. 19

XXIV. Lien by a Worker's Compensation Carrier ........................................................... 19

XXV. Garagekeeper's Lien ............................................................................................... 20

5-10-02

CONFIDENTIAL

# CHAPTER VII

## LEGAL DAMAGES - BODILY INJURY AND PROPERTY DAMAGE

### I. COMPENSATORY DAMAGES

Compensatory damages are the amount that the plaintiff can recover for his injuries or loss sustained as a natural and probable consequence of the defendant's wrongful act. They are the major concern of the claims technician because recovery of such damages is sought in all claims. There are two types of compensatory damages, general damages and special damages.

#### A. General Damages

General damages are those that usually or necessarily result from the wrongful act alleged to be the basis of the claim. It is unnecessary to mention them specifically in the pleadings since they are covered by general allegations.

For example, if the complaint alleges that two cars collided, it is unnecessary specifically to allege that there was property damage because such damage necessarily follows the impact of two cars. Also, if it is alleged that the plaintiff sustained injury, he or she needs not plead specifically that there was pain and suffering since, if injury was sustained, pain and suffering is a usual or necessary consequence.

#### B. Special Damages

Special damages must be pleaded specifically because they do not necessarily follow as a result of the wrongful conduct alleged. They must be developed in detail since they have an important bearing on the evaluation of a claim.

\* Special damages include such things as loss of earnings, medical expenses, anticipated loss of earnings or earning capacity, anticipated future medical expenses, loss of services of a child or spouse, funeral expenses, loss of support in death cases and loss of use in property damage claims.

### II. PUNITIVE DAMAGES

Punitive damages are intended not to compensate, but to punish. They are awarded in cases of outrageous conduct, and the amount is in relation to the financial condition of the defendant. In a proper punitive damage case, the award against a rich person would be larger than one against a poor one.

CONFIDENTIAL

11-15-05

In most jurisdictions punitive damages cannot be awarded unless there is evidence of malice, ill will, or conscious disregard of the safety of others. Not all states are in agreement as to the conduct necessary to establish punitive damages. The claims person must know the law of the particular state.

Whenever there is a request for punitive damages in a suit against an insured, they must be notified that liability is specifically denied for punitive damages. This will be done in the letter we send to the insured acknowledging we received the suit papers they forwarded to us unless the particular state says that punitive damages are covered.

## III.  RULE OF CERTAINTY

The rule of certainty requires that the plaintiff establish his or her damages, without recourse to speculation or conjecture. The plaintiff must offer evidence as to exactly what damages he or she is claiming, the relationship of the damages to the injury, as well as the provable amount of each item so claimed.  As to claims for injuries, the effects of which will continue beyond the date of trial, it is clear that the plaintiff cannot establish these damages with certainty until the losses have been incurred. In those cases, the rule of certainty is satisfied if the plaintiff can establish with a reasonable degree of certainty that the future losses will be sustained.

The plaintiff encounters difficulty where injuries are complicated by the existence of a pre-existing condition or where he or she has been the victim of more than one accident, all of which contribute to a disabling condition. He or she will be required to separate the effects of the pre-existing condition, or prior injuries, from the injuries for which claim is being made. Plaintiff will satisfy the rule of certainty if he or she can establish, by a preponderance of the evidence, the extent to which the condition is reasonably attributed to the loss. In other words, where there are such complications, the plaintiff must show the entire injury, and also must establish what portion of the injury he or she claims to be caused by the accident that is the subject matter of the suit.

The rule of certainty also applies to a situation where the plaintiff claims, as an item of damage, the value of a lost opportunity, such as an opportunity of employment or contract. The plaintiff must establish that the opportunity existed and that his or her injured condition was such that he or she could not take advantage of it.  In addition, and more importantly, plaintiff must show that he or she would have profited by the acceptance of it, and also the exact extent of the profit. Speculative testimony as to the possibilities of profit will not be sufficient to meet the legal requirements of certainty of proof. In other cases, where the plaintiff's income is derived from a business in which he or she has a monetary investment and he or she claims a loss of salary as a result of a disabling condition, plaintiff will be required to establish the amount of income which is derived from his or her services, as opposed to that portion which represents a return on his or her investment.

VII-2

5-10-02

## IV. COLLATERAL SOURCE RULE

The rule is that the tortfeasor is answerable in damages for the results of his or her wrongful act. Where, as a consequence of the injuries received, the plaintiff is entitled to (or receives) benefits from a source other than the tortfeasor (collateral or side source), the general rule is that the tortfeasor is not entitled to a credit for these benefits as against the total damages for which he or she is liable.

The most common example of this situation is a case in which the employer continues the payment of salary or wages to the injured person during the period of his disability. Such payments do not represent earned income, regardless of whether they are made solely as a gift or in accordance with some contractual obligation assumed in the injured's employment contract. In either case, the payments come from a source other than the wrongdoer and, as a consequence, the wrongdoer is not entitled to a credit for them. The same conclusion would apply to benefits received by the injured party as a result of medical, health, or accident insurance, which the injured party purchased for his or her own benefit. Such insurance benefits could include Blue Cross, Blue Shield, major medical, as well as various accident and health plans.

The practical effect of the application of the collateral source rule is that the injured person may claim the same items of damage, for which he or she has received compensation at least once, from the defendant tortfeasor and, thus, be paid again for the same damage.

### Comment

Keep in mind that in jurisdictions that have adopted a no-fault statute or in which disposition of a claim or suit is regulated by application of such a statute; the claims person must look to the specific language of the statute to determine its effect on the collateral source rule. The applicable "tort threshold" must be met before the collateral source rule comes into play.

## V. ADDITUR AND REMITTITUR

The general rule is that the issue of the amount of damages is a question of fact to be decided by the jury. The court in a jury trial will not interfere or set aside a verdict rendered by the jury unless it is convinced that the verdict is against the weight of evidence or that the verdict is so high, or so low, as to "shock the conscience of the court". While the court may set aside a verdict on its own motion, the matter of the excessiveness or the inadequacy of the verdict is usually brought before the court by means of a motion brought by the aggrieved party for a new trial.

In an effort to reduce litigation and encourage settlement of disputed matters, in some states and on some occasions, the court will recommend either an increase or a decrease in the amount of the verdict. If the court's recommendation is acceptable to the parties, it will enter a verdict by consent and will deny the motion for a new trial.

VII-3

5-10-02

For example, if the verdict for the plaintiff was $1,000.00 and a motion to set aside the verdict as inadequate was made, the court might consider the amount of the special damages and decide that a fair valuation of the case was $2,500.00. The court could suggest that the defendant accept an additur of $1,500.00. If this is agreeable to the defendant, the court will deny the motion for a new trial and enter a judgment in the amount of $2,500.00.

The converse is the procedure where the verdict is excessive. If the court believes that the verdict is excessive, it might suggest that the plaintiff accept a reduction in the amount (a remittitur). If this is acceptable to the plaintiff, the court will deny the motion for a new trial and will enter judgment for the reduced amount, assuming that the defendant also agrees.

## VI.    WHAT IS PROPERTY DAMAGE?

The measure of damages in most jurisdictions in automobile property damage liability claims is the difference in the condition of a car before and after an accident. Usually the best evidence of this is the cost of repair as shown by competitive repair estimates.

After repairs, there should be no diminution in value simply because a car has been involved in an accident. There is a presumption that proper repair will restore it to its condition prior to the accident with no loss in value. Some states permit "diminution of value" claims for damaged vehicles, that is, even though the car was properly repaired, it is not worth now what it was worth before.

Property damage liability claims are evaluated on the basis of the liability picture and the reasonable amount of the damage. Usually there are three elements of damage:

- Damage to the Car
- Loss of use
- Damage to other personal property

### A.    Damage to the Car

The amount of damage to the car is sometimes determined by obtaining competitive repair estimates. If repair estimates are complete and they are obtained from reputable and competent garages, the reasonable amount of the damage is the repair cost as indicated by the low estimate. Your Auto Damage Department can help you determine the reasonableness of competitive estimates. In most instances, however, a Company-employed Auto Damage Adjuster or an independent appraiser will inspect the vehicle and make this determination.

We should make proper deductions for betterment of such things as tires, batteries, seat covers, convertible tops and complete paint jobs. The Auto Damage Department has lists of depreciation schedules in the AD Adjuster Handbook.

CONFIDENTIAL

5-10-02

If the reasonable cost of repair exceeds the value of the vehicle just prior to the accident minus the salvage value, the method of computing the damage changes. The vehicle is then regarded as a total loss and settlement should be based on the value just before the accident. This value is frequently called the "actual cash value". The Auto Damage Department will handle these total losses.

**B.    Loss of Use**

The courts are not in agreement as to when and under what circumstances a plaintiff is entitled to recover for loss of use. Most courts will allow a recovery for the period of time reasonably required to make repairs. Some courts have ruled that loss-of-use payments should start on the date of loss and continue until the car is returned to use. Check the laws and rulings in your area.

Handling these claims should be a coordinated effort between the claims technician and Auto Damage. The date that repairs are to be completed is critical and should be firmly established. If the vehicle is a total loss, reasonable time to find another vehicle should be allowed. In many states, no loss of use is allowed after the settlement of the total loss claim.

A special problem exists where the claimant demands assurance that the loss-of-use claim will be honored before we have enough information to make such a decision. The requirements for loss-of-use can be discussed but be sure to stress that the claimant must assume responsibility for all expenses incurred until we have determined liability.

As soon as you determine liability, let the claimant know. Refer him or her to several rental agencies if no other arrangements can be made. Remind the claimant that damages must be mitigated. Suggest the availability of another vehicle or public transportation, or a car pool, or taxi fares. (But remember that in many instances a daily car rental rate will be less than a day's taxi fares.) Remind the claimant that we will pay only what it costs the claimant over and above normal operating costs for his own vehicle. Mileage charges will usually not be reimbursable, gas expenses will not be paid, and no special charges for insurance will be included if physical damage coverage is applicable to the claimant's car. If the claimant doesn't carry Comprehensive or Collision on his car and the rental company requires that he pay the fee, we owe it.

The claimant is entitled to the same type of transportation he had. If claimant is driving a Cadillac and requests permission to rent a similar vehicle, he or she should be permitted to rent one. If a VW was damaged, we won't reimburse for renting a Cadillac. ·
Parts delays, particularly for older or foreign vehicles, may present a problem. The Company usually cannot be held responsible for undue delays because parts are not available, but some states say we must cover reasonable parts delay. We

VII-5

CONFIDENTIAL

5-10-02

may want to consider special delivery order for parts and a non-driveable car can sometimes have temporary repairs done which would alleviate the need for a rental. Again, you must work closely with the Auto Damage adjuster.

## C. Damage to Other Personal Property

Other items of personal property included in property damage claims are appraised on the basis of value at the time of the accident. In many instances it may be necessary to determine the replacement cost and make a deduction for depreciation based on age and condition. Good judgment should be used in computing depreciation. If it is practical to get competitive estimates, it is well to do so.

As with personal injury claims, the liability picture in property damage claims must be carefully analyzed since, if liability is questionable, a compromise settlement may be in order. If it appears that the claimant might be able to recover, but there is just about as good a chance of successfully defending the claim, we should try to reach a fair and equitable compromise settlement. On the other hand, a firm position should be taken where it appears there is no liability.

## VII. PHYSICAL AND MENTAL DISTRESS

This is an item of general damages the value of which is not subject to direct or certain proof. It is sometimes referred to as "pain and suffering", "discomfort" or "inconvenience", depending upon the degree of pain accompanying and following the injury. It is a non-pecuniary loss in the sense that the injured person has not sustained any monetary deprivation because of it. It is, however, compensatory, since it is designed to reimburse (or pay) the plaintiff for the pain, which he or she has suffered. Distress of this nature has no exchange value in the market, nor is there any guide or standard by which the money value of it can be measured. The value of such distress is a question of fact, which is submitted to the jury, under appropriate instructions from the court. The jury, therefore, is the final arbiter of the valuation of this item of damage. In some states, there is a limit on the amount of money that can be recovered for these damages.

In coming to their conclusions, the jurors usually will hear a description of the injury, the pain that has been experienced, and the extent of the distress from the injured party. He or she will usually be supported by the testimony of the physician, family members, the hospital records, pictures of the injured person following the accident and, in some rare cases, videotape of the operation to which the injured person was subjected.

The injured party is entitled to compensation for the physical or mental distress, which he or she has experienced. Where the distress continues beyond the date of trial, the plaintiff is entitled to recover for future distress, upon a showing by medical testimony that the distress will continue and for what period of time it would be expected to continue. This will include whether the distress will abate in intensity, remain constant, or increase in intensity with the passage of time.

VII-6

5-10-02

## VIII. EFFECT OF A PRE-EXISTING DISABILITY

The innocent victim of a tortious act is entitled to receive an award of money which will reasonably compensate him or her for the injuries suffered. The innocent victim may be young or old, suffering from a disability or disease, or in perfect health. The tortfeasor is responsible for the damages that are caused by his or her tortious act, regardless of the physical condition of the victim prior to the accident. The fact that a person may be in perfect health and would have sustained little disability is not taken into account in reducing the tortfeasor's liability where, by reason of age or existing illness, the victim is subjected to an extended period of medical treatment and disability.

Where the injured person's disability is extended because of a pre-existing condition, be it due to age, prior permanent injuries sustained or an existing illness, the jury's task in determining the amount of the injured person's damages is based on the recovery process for the injuries sustained in the accident. The amount awarded will reflect the damages actually sustained, without regard to the part played by the prior condition in extending the disability. Where the prior condition has been aggravated by accident, when the aggravation has ceased, the liability of the defendant is at an end.

Where there is a prior condition and the injuries sustained in the accident have no relationship to the prior condition (and can be entirely disassociated from it), the liability of the defendant is limited to the effects of the injury caused by the accident. However, a far more serious problem arises when the injuries for which the defendant is responsible, when superimposed upon the pre-existing condition, produce a greater disability than would ordinarily be the case if the injured party had not had the pre-existing condition. Unless the defendant can disassociate the two conditions, he or she will be held responsible for the entire result. For example, A is blind in one eye. Through the negligence of B, A loses the sight of his good eye and is now completely blind. B is answerable for A's blindness. The extent of his liability is not mitigated by the fact that A's prior condition contributed to the final result. Absent the accident, A would not have been blind. Therefore, the accident is the proximate cause of A's blindness and B is answerable in damages.

## IX. LOSS OF CONSORTIUM

At common law, the relationship of the wife to her husband was that of a very superior servant to the master. Any tortious act of a third person (including personal injury) that interfered with the relationship and deprived the master (husband) of the services to which he was entitled gave rise to a cause of action by the master (husband) against the wrongdoer for the damages that he sustained as a consequence of the loss of such services. It should be pointed out that this was an independent cause of action, which accrued to the husband because of the damages, which he himself had suffered, and for which only he could recover. Under our present statutes, the wife may recover for her personal injuries, but the settlement or judgment recovered by the wife will not

VII-7

5-10-02

CONFIDENTIAL

extinguish the husband's cause of action for loss of services. The death of the wife will not abate the husband's cause of action, but it will limit his recovery to the damages, which he has sustained up to the time of her death. In the case of divorce or separation after the tort has been committed, the husband's right to the services of his wife would be limited to the period of time measured from the date of the accident up until the date of the divorce or separation. The modern state of the law permits a wife to bring an action for the loss of her husband's consortium.

Consortium consists of sex, society, and services. Any injury to one spouse, which deprives the other spouse of one or more of these elements, will support the non-injured spouse's cause of action.

"Sex" refers to sexual congress and the amount to be awarded is left to the jury, under instruction from the court. The jury may take into consideration the age and physical capacity of both husband and wife in determining the amount to be awarded.

"Society" refers to companionship. Again, there is no market or exchange value. The jury will decide its value. They may take into account the condition of the home life of the spouses prior to the injury and the changes that have occurred as a result of the injury. If there were no home life to speak of, then there would be at the most a minimal loss. This might be evidenced by the fact that the wife or husband spent very little time at home, consorted with other men or women, and generally neglected her/his marital duties. In such a case, the companionship lost by the husband/wife would be practically nil.

"Services" refers to the injured spouse's domestic services. This loss could be demonstrated by the employment of a housekeeper, gardener or babysitter to accomplish the tasks normally undertaken by the injured spouse. The cost of such a substitute would be the measure of damages. As to services rendered to others, as where the injured spouse is gainfully employed, the non-injured spouse has no interest. The injured spouse's earnings are his/her own and, therefore, any loss of earning capacity which he/she might sustain must be recovered in his or her own action.

As part of the marital obligation, one spouse is responsible for the medical and other care needed by the other spouse. In personal injury cases, where one spouse is injured, this obligation continues. Therefore, the non-injured spouse has a cause of action against the tortfeasor for the money expended for the care of the injured spouse. This item of damage is in addition to the claim for loss of consortium.

## X. EFFECT OF DIVORCE OR SEPARATION

A final decree of divorce terminates the marriage as of the date of the final decree. A divorced husband or wife has no further right to consortium or the services of his or her divorced wife or husband. Where the spouse is divorced prior to injury, no right of action accrues to the ex-spouse for loss of services or for the recovery of her or his medical expenses, even though the alimony decree obligates him or her to pay for her/his medical

VII-8

CONFIDENTIAL     5-10-02

services. As to the children, the parent having custody is the parent who has the right to their services and, therefore, only that parent can assert a cause of action for the loss of such services.

Where the divorce occurs after the injury, the spouse is entitled to maintain a cause of action for loss of consortium and the medical expenses incurred by him or her up to the date of the divorce, but not thereafter. If they were separated prior to divorce, either by agreement or court decree, the spouse's right to consortium ended as of the date of separation.

Where there has not been a divorce and the husband and wife are living apart, either under a mutual agreement of separation or a court decree, the spouse is not entitled to the services of the other spouse. In the case of injury to the spouse under these circumstances, the uninjured spouse has sustained no damage and therefore does not have an actionable claim.

## XI.   FORMULA METHODS OF EVALUATION

Special damages are susceptible to direct and certain proof. Evidence can be offered in the form of the expenses incurred by the plaintiff that he or she otherwise would not have had to assume, but for the occurrence of the defendant's tortious act. Such evidence can take the form of documents, such as hospital records, physicians and surgeon's bills, receipts from physiotherapists, nurses, as well as paid bills for appliances, prostheses, medicines and drugs. The necessity for these charges can be supported by the testimony of the attending physician or surgeon, who can also testify as to the reasonableness of the charges. Employee records, books of account, income tax withheld and paid, and social security taxes paid can support loss of earnings. Thus, no problems of proof are encountered when it comes to establishing the items of the special damages claimed - particularly when the individual is employed on a regular salary basis. Note, however, that a claim for lost wages must satisfy the rule of certainty, discussed previously.

The assessment of general damages poses an entirely different problem. The law recognizes or implies that the plaintiff has suffered some damage as a consequence of the distress that he or she has been forced to undergo as a result of the tortious act of the defendant. The law takes the further position that it is the function of the jury to determine the dollar amount, which will reasonably compensate the plaintiff for this damage. The jury is entitled to hear a description of the kind and type of distress suffered (whether it is mental or physical), as well as whether it involves pain and suffering, discomfort, or mere inconvenience. The plaintiff and the physician or surgeon can testify as to the nature, intensity and duration of the distress. In the final analysis, however, it is the jury's duty to translate these facts into dollars, and to award the plaintiff whatever amount they believe will reasonably compensate him or her for the damage suffered. Unfortunately, the individual juror has no expertise or experience in these matters, nor is he or she given any criteria to guide this decision, except that the juror is to award "reasonable compensation". Clearly, the jury's reaction to the value of this item will

VII-9

5-10-02

vary not only in different areas of the country, but also in the same area, with one jury being more liberal or more conservative than the next.

The problem, which confronts the claims person and the lawyer, is the determination of what constitutes reasonable compensation for general damages. This is important not only for settlement purposes, but also to indicate whether a particular verdict is excessive enough to warrant an appeal. Likewise, the court, when hearing a motion for a new trial based upon the excessiveness of the verdict must make a decision either granting or denying the motion. Thus, the court must apply some criteria to the verdict, in order to come to such a decision.

For many years, some lawyers developed and utilized various formulas for the purpose of determining value in areas other than bodily injury claims. These include the value of alimony paid in a lump sum before issuance of a divorce decree and the value of property condemned for public use. It seemed to be a natural solution for the legal profession to turn to the use of formula for the purpose of determining the amount of general damages. Three such formulas are:

     1. Three Times the Medical Formula
     2. Unit of Time Formula
     3. Three Values Formula

GEICO uses no such formulae in arriving at fair settlement value.

All these formulae are based upon assumptions, which have no basis either in fact or in law. The vast majority of courts do not accept such formulae. The claims person should evaluate each case on its own merit.

## XII. PERMANENCY DETERMINATION

Permanent disability may be defined as a disabling condition, which will not improve with the passage of time. It will either remain stationary or deteriorate as time goes on. If there is evidence that the condition will be subject to further improvement, it has not as yet reached the permanent stage. If the condition improves to the extent of a full recovery, then there is no permanent disability involved in the case. On the other hand, if the condition will improve, but such improvement will not result in a full recovery, then the improved condition, when it reaches a stationary stage is the permanent condition and can be measured and evaluated as of that time. In the case of a suit for bodily injury, the plaintiff is not required to wait until the injury reaches a permanent state before he or she can bring an action. The amount of improvement, if any, which can be expected, can be established by medical evidence. This can be offered as a prognosis as to the time the condition will reach a permanent state and the extent of residual disability that will be present at that time.

Cases involving permanent disability may be divided into two classes:

CONFIDENTIAL

5-10-02

1. Those which involve only minor disabilities, such as restrictions of motion of a finger or a toe joint, or minor amputations, such as the removal of a phalanx of a finger or toe (neither of which have an effect on the plaintiff's earning capacity).

2. Those involving a major disability, such as restrictions of motion in a hip joint, complete immobilization of a knee joint, amputations of major members (such as a hand, foot, arm or leg), the loss of sight in an eye or loss of hearing in both ears.

All of this affects not only the claimant's earning capacity, but also his future enjoyment of life. As to both classes of cases, the jury will decide the amount that will reasonably compensate the injured person for his or her injury. In the first class, they will determine what the permanency is worth, having in mind their own experience, and the extent to which they are convinced that the injury will inconvenience the injured person. They will hear evidence from the claimant as to how the injury affects him or her, and what he or she can do and cannot do because of the condition. They will also hear the testimony of the attending physician as to his appraisal of the permanency, and what it means to the injured person. On the basis of this evidence, the jury will render its verdict. In the second class of cases (involving major permanent disabilities), the plaintiff is entitled to assist the jury in its determination by offering evidence in the form of recognized expectancy tables. These set forth the number of years the injured person would normally be expected to live or the number of years that he or she normally would be expected to have an earning capacity. They are called mortality tables and work life expectancy tables respectively. Since there is no way of predicting with certainty how long a man or woman may live, or how long he or she would be able to continue working, evidence in the form of these tables shows the average expectancy of a large number of persons. Such evidence is admissible for the purpose of assisting the jury in arriving at its verdict but the jury is not bound by it. The general rule is that in the absence of other evidence on the same subject, the jury usually accepts the tabular values.

With respect to permanent disability cases, there are usually three measurements that must be made:

1. The value of the medical attention that the injured person may have for the rest of his or her life, or for the period of time that it would be necessary.

2. The value of the impairment to his or her enjoyment of life.

3. The value of loss of earning capacity.

The first two items will be measured by the injured person's life expectancy, since the impairment will continue for the rest of his or her life, regardless of earning capacity. As to the loss of earning capacity, this would be measured by the period of time that an average person would be able to continue working. The average person does not work up until the day he or she dies. The average person usually retires at some date, or reaches a point in life when she or he can no longer physically carry on with work. Thus, when it comes to the measurement of the loss of earning capacity this can only be computed with reference to a table, based upon the average period of time that a person would be able to

VII-11

CONFIDENTIAL

work. The injured person's life expectancy would obviously exceed his work life expectancy.

The claims person should ascertain which table(s) are currently accepted and used in his or her own jurisdiction.

## XIII. WORK LIFE EXPECTANCY

The average person may be prevented from pursuing his or her usual work occupation because of the infirmities of age, retirement (either mandatory or voluntary), or other contingencies. Where it is necessary to measure the work-life of an individual who has suffered permanent disability or death, it is clear that the period of his future life that could be devoted to work is considerably less than the same person's life expectancy. There are standardized tables in this area.

Some courts calculate the work-life of the plaintiff by using a life expectancy table together with the retirement age established by his employer. The claims person should be aware of the procedure used in his or her jurisdiction.

## XIV. ANNUITY TABLES / STRUCTURED SETTLEMENTS

Annuities are an outgrowth of mortality tables. An annuity is an income payable for a specific number of years. The person on whose life the income is based is generally known as the annuitant. The income may be paid once, twice, four or twelve times yearly to the annuitant or to a third party owner. Annuities differ from one another primarily in two respects:

1.     The number of persons to whom the income is paid.

2.     The method of handling any money remaining at the death of the annuitant.

Various annuity plans are utilized by insurance companies as settlement options in the disposition of bodily injury claims. The insurance company will pay or the annuity and the income from the annuity will be periodically paid to the claimant or, in some plans, to his beneficiary.  Many courts favor the use of annuities especially in the settlement of a minor child's claim where the parents are not financially responsible. Two popular forms of annuities are:

1.     A single premium immediate annuity.  This is a life income purchased by payment of a cash sum and the "pay-out" to the annuitant begins immediately.

2.   ˙ Single premium deferred annuity. This is similar to a paid up reduced pension income endowment policy except that no life insurance is provided.

Both of these plans have many variations or settlement options.

VII-12

5-10-02

In applicable cases, the claims technician should check with his or her supervisor or manager as to whether the annuity approach would be desirable or if there are other alternate settlement options.

## A.   Estimated Range of Verdict

Exercise your judgment based on similar claims and estimate a probable range of verdict should the case be litigated. Most cases should be settled early and without litigation before the range of verdict can be accurately estimated. Even then, enough should be known to enable the claims person to decide whether the settlement figure is well within the probable judgment value.

However, in cases that are difficult to settle, it is necessary to make a detailed analysis in order to estimate the range of verdict as accurately as possible. The viewpoint of the Company's trial attorney must be obtained because of his or her experience and appreciation of local conditions. The weight given his or her opinion depends on prior experience with the particular attorney, the Company's confidence in him or her, and the claims person's judgment.

## B.   Probable Cost of Handling, Including Investigation and Defense

The probable cost of future investigation and litigation should be estimated. There are cases where there is no liability and it would be detrimental to the best interests of the insured or the Company to make any settlement. The cost of defense should be considered along with all the other elements of evaluation.

## XV.   SURVIVAL ACTIONS

The common law rule was that the death of either party to the action ended the litigation. Legislation has modified the rule so that, at present time, the death of either party does not end the action. It can be continued, for or against the deceased party, by the substitution of a personal representative (administrator or executor). This type of action is referred to as a survival action, since it survives the death of either party. Where the defendant dies, the action is merely brought against his or her personal representative. If the action is pending at the time of death, the personal representative is substituted as the defendant. There are not other limitations or changes. The action is tried and the damages awarded (if there is liability) in the same manner and to the same extent as if the defendant were alive.

Where the injured person dies, whether as a result of the accident or from other causes, whatever causes of action he or she may have had during a lifetime against the tortfeasor his or her personal representative may assert. For the cause of action to survive to the personal representative, it must have been a cause of action that the deceased could have asserted in his or her lifetime. Thus, if the deceased has settled the case during his or her lifetime, or the statute of limitations had run against the claim, the deceased could not have asserted the claim had he or she lived. Therefore, there would be no cause of action to survive. The test, therefore, is whether or not the deceased could have asserted the

claim at the time of death. If he or she could, the action survives to his or her personal representative, otherwise, it does not.

The survival statute merely permits the personal representative to take the place of the deceased and to perform whatever acts in connection with the case that the deceased could have performed if death had not intervened. It does not give the personal representative any greater right than the deceased possessed. It does not alter the burden of proof, nor does it affect the running of the statute of limitations. The personal representative must sustain the burden of proof, producing evidence of liability and evidence of the extent of damages. The statute of limitations will continue to run against the case, just as if the deceased were alive. Thus, if the personal representative does not bring the action within the time limited by the statute, regardless of how much time there is left (even one day), the affirmative defense of the running of the statute may be interposed.

The measure of recoverable damages is the same as any other bodily injury claim with the limitation that the damages recoverable in a survival action would be limited to the damages incurred between the date of the accident and the date of death, and not thereafter. It should be noted again, that the cause of action asserted by the personal representative is the same action that the deceased could have asserted had he or she lived. Thus, since the deceased could not have recovered for his or her own funeral expenses if he or she were alive, it would follow that this item, in the absence of a statutory provision allowing such a recovery to the personal representative, could not be asserted by the personal representative. Therefore, the recoverable items of damage in a survival action will be the out-of-pocket expenses, loss of earning capacity, and the mental or physical distress suffered by the deceased, during his or her lifetime.

The damages recoverable are for the benefit of the heirs at law, and are distributed as unbequeathed items of personal property.

## XVI.  DEATH FROM CAUSES OTHER THAN ACCIDENT

The fact that the deceased died from causes other than the accident, which is the subject matter of the action for bodily injuries, will have no effect upon the right of the personal representative to assert the cause of action. However, the recoverable damages are limited to those incurred during the period from the date of the accident, to the date of death.

## XVII.  INSTANTANEOUS DEATH CAUSED BY THE ACCIDENT

If the deceased was killed instantly at the time of the accident, he or she never had a cause of action for bodily injuries that could have been asserted against the tortfeasor. The deceased suffered no injury, no mental or physical distress in the form of conscious

CONFIDENTIAL                5-10-02

pain and suffering. He or she certainly had sustained no out-of-pocket expenses. Under these circumstances, there is no cause of action in the first place, and thus no cause of action to survive to the personal representative. (Don't confuse this item with "Actions for Wrongful Death".)

## XVIII. DEATH DUE TO THE ACCIDENT AFTER AN INTERVAL OF TIME

As far as the survival action is concerned, it makes no difference whether the deceased died as a result of the accident or not. If he or she had an assertable cause of action for bodily injuries at the time of death, the action survives to the personal representative. It may be asserted by the personal representative against the wrongdoer in the place and stead of the deceased.

Death may occur seconds, minutes, days, weeks or years after the accident. The same measurement of damages is utilized in every case, regardless of the interval of time between the accident and the time of death. Where the interval of time between the accident and the time of death is short, a problem arises as to whether or not the personal representative may recover for the mental or physical distress suffered by the deceased. If the deceased was conscious during any part of the interval between accident and death, a claim could be asserted for this item. On the other hand, if the deceased never regained consciousness after the accident, states hold that he or she could not have suffered any physical or mental distress.

Some states have combined the survival action with an action for wrongful death where there is a relationship between the accident and the death. They permit both claims to be presented in the one action. The majority of states, however, have statutes that completely disassociate the two causes of action. It is possible to have an action brought under the survival statute and none under the wrongful death statute where the deceased died as a result of causes other than the accident. On the other hand, where the deceased did survive the accident for any period of time, there are two possible causes of action which may be asserted: one for the damages that the deceased sustained during his lifetime and the other for damages for wrongful death.

## XIX. LIENS

A lien is a charge or encumbrance upon property. The property against which a lien may attach can be either real or personal property and, if personal property, it can be either tangible or intangible. The following will illustrate liens, which may be asserted against the various kinds of property.

### A.    Real Property

A mortgagee has a lien on real property that is the subject of the mortgage to the extent of the outstanding unpaid balance of the mortgage debt. An unpaid workman, who has performed services with respect to the real property, may

5-10-02

CONFIDENTIAL

perfect a mechanic's lien against the property for his material, work, labor, and services. Also, an unsatisfied judgment against the owner of the real property can become a lien on the property. In some states, the judgment must be recorded in the official records of the jurisdiction. Likewise, unpaid taxes become a lien on the property.

**B.    Tangible Personal Property**

Often when personal property is purchased on a time basis, the purchaser gives back a chattel mortgage on the property as security for the balance of the purchase price. The unpaid seller, or the bank to which he assigns this mortgage, has a lien on the chattel to the extent of its unpaid balance. The same result is reached when the sale is made in accordance with the provisions of the Uniform Commercial Code relating to secured transactions.

**C.    Intangible Personal Property**

This property may also be subject to the attachment of a lien. It might consist of a cause of action either for property damage, bodily injury, or a debt, such as the unpaid proceeds of a settlement of a judgment.

Where tangible property is sold or transferred and there is an outstanding lien, the lien remains attached to the property and is binding upon the subsequent purchaser or transferee, providing that he has notice (actual or constructive) of the existence of the lien. Actual notice is where the person has personal knowledge of the lien. Constructive notice in these cases usually consists of the filing of the conditional bill of sale, the chattel mortgage or a real property mortgage with the appropriate public official. In the absence of a contract provision to the contrary, the lienholder has no right to the possession of the property. He does have a right to foreclose the lien in the event of default. In such case, the property will be sold at a public sale and the proceeds used first to satisfy the lien. The balance, if any, will be paid to the owner of the property. It should be emphasized, however, that, as long as the owner of the property meets the terms of the contract by payment or otherwise, the lienholder has no right of foreclosure.

Liens may be discharged by payment, in which case absolute title to the property goes to the owner with no encumbrances whatsoever. It is possible for a potential right of lien to exist prior to the time that the property against which it will attach comes into being. For example, if a statute gives a hospital a lien on the proceeds of the plaintiff's recovery of damages to the extent of his hospital bill, the right to assert a lien exists before there are any proceeds of recovery. When a claim is settled or a judgment in a lawsuit in favor of a plaintiff becomes effective, at that moment the proceeds of recovery come into existence and the lien will attach.

The right of lien may be created by common law, a statute, or by agreement of the parties. Where the lien is created by common law, the lienholder must comply

VII-16

CONFIDENTIAL

with the common law rule with respect to notice and any other requirement that there may be in order to perfect the lien. Where there is a statute involved, strict compliance with the terms of the statute with respect to filing and notice is necessary if the lien is to be perfected. As to contracts, the provisions of the agreement will govern the requirements of the assertion of the lien.

## XX.    PRIORITIES OF LIENS

The general rule applicable to situations where there is more than one lien on an item of property is: "Prior in time is prior in right." This means that the first lien that attaches takes precedence over all subsequent liens and must be satisfied first.

## XXI.    ATTORNEY'S LIEN FOR SERVICES

Common law jealously guarded the right of an attorney to be recompensed for his work, labor and services. Therefore, when an attorney is retained, he or she immediately has a lien on his client's cause of action for his or her work and services. This common law lien attaches to the cause of action. Other liens, created by statute or by agreement, usually attach to the proceeds of recovery. Clearly, the cause of action comes into existence before the proceeds of recovery are realized. As a result, the attorney's lien, which attaches to it, is prior in time and in right with respect to all other liens.

Therefore, when an attorney gives notice to a third party of his employment, this operates as notice to the third party of the existence of the attorney's lien. The third person, which may have possession of the client's property, is bound to recognize the existence of the lien and to protect it. For example, an attorney sends a letter to the liability insurance carrier giving notice of employment as counsel for a bodily injury claimant. The letter also serves as notice of the attorney's lien. The failure of the insurance carrier to recognize the lien when settling with the claimant will expose the insurance carrier to liability to the attorney for his or her fee. The rationale behind this result is that, when the insurance carrier is in possession of any property belonging to the claimant, that property is automatically made subject to the attorney's lien. Thus, when a claim is settled, the insurance carrier has certain property belonging to the claimant in its possession. This property is the amount of money agreed upon as a settlement. To be sure, the insurance carrier's possession is only momentary, but this is sufficient. The failure of the carrier to recognize the lien will expose it to liability to the attorney for the fee.

The attorney's lien can easily be satisfied by merely recognizing it. Placing the name of the attorney on the check as an additional payee usually evidences this recognition. The defendant has no particular interest in the amount of the attorney's fee. The defendant's only concern is to have evidence of the fact that the lien has been satisfied. The evidence in the form of the attorney-lienholder's endorsement of the check or draft is sufficient for this purpose.

5-10-02

CONFIDENTIAL

It sometimes happens that a claimant will employ one attorney and then terminate her or his employment and employ another attorney. When this happens, the defendant third party can be protected only by either placing the names of both attorneys on the draft or check as additional payees or obtaining a release of lien from the first attorney. The latter can be in the form of a letter from the attorney that he or she either has no lien or has waived it.

It should be noted that the lienholder (the attorney) has no cause of action against the defendant unless there is a settlement or judgment at which time the defendant has property belonging to the claimant in his or her hands. If the defendant has no property of the claimant (in the form of money owed) in his or her hands, there is no obligation on the part of the defendant to protect the attorney. Also, there is no means available to the attorney whereby he or she could bring an action against the defendant third party for the fee. It is only in the situation where the defendant has the claimant's money and fails to recognize the attorney's lien that the attorney has any cause of action at all. Thus, where judgment in a lawsuit is in favor of the defendant, the defendant has no money belonging to the claimant and therefore has no obligation to pay the fee of the claimant's attorney.

## XXII. HOSPITAL AND PHYSICIAN'S LIENS

Liens in favor of the physician or hospital did not exist at common law. Where there are such liens, they are created only by statute. Thus, in order for a physician or hospital to perfect a lien, the statutory requirements must be met. Since the statute is contrary to the common law, it is strictly construed. Thus where a statutory lien is asserted, the failure of the lienholder to comply strictly with all of the requirements of the statute will deny him or her benefits of a lien. Most statutes require that notice of the claimed lien be served on the defendant third party at his or her last known address and that the lien be filed with the county clerk, registrar, or other public official.

## XXIII. FEDERAL LIENS

Federal liens, including Medicare liens, liens made under the Federal Medical Care Recovery Act and liens made under the Federal employees Compensation act (the federal equivalent of worker's compensation) are often referred to as "super liens" because they trump all other liens and claims.

A.    Medicare

In third party situations, the government is subrogated to the rights of Medicare recipients against third-party tortfeasors for reimbursement of medical costs and has the right to bring a third-party action against the party responsible for the accident. The government's right to recovery exists even when no notice of the lien has been provided, if it can be shown that the responsible party, or its insurer, knew or should have known of Medicare's involvements on a claim.

B.    Federal Medical Care Recovery Act

The Act grants the government the right to recovery from a third-party tortfeasor for the cost of medical services provided to military personnel as a result of the negligence of a third party. Like in the Medicare situation, the government has the right to bring an independent third party action again the tortfeasor for recovery of the expenses paid, even if the injured party has settled with the tortfeasor's carrier.

C.      Federal Employees Compensation Act (FECA)

FECA liens allow recovery by the government for expenses paid to federal employees who are injured or killed in the scope of their employment for the federal government. The Act allows the government to have the recipient of benefits assign his/her right of action to the United States and also gives the government the right to prosecute an action on its own.

In all of the above federal lien scenarios, care should be taken to ensure that the lien is either protected (by inclusion of the applicable entity as a payee on the settlement draft) or that a hold harmless agreement is secured from the injured party and his/her counsel in which they agree to satisfy the liens out of the settlement proceeds.


## XXIV. LIEN BY A WORKERS' COMPENSATION CARRIER

The workers' compensation laws of most states permit an injured employee several options: file a claim for workers' compensation benefits, file a lawsuit against the party responsible for the injury (but not if the employer was the responsible party), or to do both, either simultaneously or consecutively. In the event that the injured person elects to accept compensation, the workers' compensation carrier is subrogated to all the rights of the injured person against the third party. Where the injured person elects both to accept compensation and sue the third party, the worker's compensation carrier has a lien on the proceeds of recovery to the extent of the compensation and the medical payments made or to be paid in the future. Notice by the workers' compensation carrier to the negligent third party of the existence of its lien is sufficient to create a duty on the part of the third party to recognize the lien when making a settlement or paying any judgment to the injured party. As in the case of an attorney's lien, this can be met by including the insurer's name on the claimant's check.


## XXV. GARAGEKEEPER'S LIEN

The garagekeeper has a bailee's lien on the property in his/her possession, for work, labor and services. This does not give him/her a lien on the owner's cause of action against a negligent third party for property damage. This is so, even though the work, labor and services were required as a result of the damage caused by the third party. The garagekeepers's lien attaches only to the property in his/her possession and the payment to him/her for his/her services, is a matter solely between the garagekeeper and the

VII-19

5-10-02

owner. This lien is frequently encountered when a repair shop refuses to release a car
until the repair bill has been paid.

CONFIDENTIAL                                                 5-10-02

# CHAPTER VIII

## PHYSICAL DAMAGE

### Table of Contents

Page

I. First Party Contracts Defined ................................................................................................ 1

II. Declarations ............................................................................................................................ 1

III. Insuring Agreement ................................................................................................................ 2

IV. Collision Coverage ................................................................................................................. 2

V. Comprehensive Coverage ...................................................................................................... 3

VI. Multi-Risk Physical Damage Coverage ............................................................................... 4

VII. Rental Reimbursement Coverage .......................................................................................... 4

VIII. Additional Payments We Will Make under the Physical Damage Coverages .................... 5

    A. Transportation Expenses ................................................................................................ 5
    B. General Average and Salvage ........................................................................................ 5
    C. Equipment ....................................................................................................................... 6

IX. Emergency Road Service ....................................................................................................... 6

X. Definitions .............................................................................................................................. 7

    A. Insured ............................................................................................................................ 7
    B. Owned Automobiles ....................................................................................................... 7
    C. Non-Owned Automobiles ............................................................................................... 7

XI. Equipment .............................................................................................................................. 8

XII. Exclusions .............................................................................................................................. 8

XIII. Limit of Liability ................................................................................................................... 8

XIV. Market Value .......................................................................................................................... 9

CONFIDENTIAL

6-28-02

# CHAPTER VIII

## PHYSICAL DAMAGE

### Table of Contents

Page

- Determination of Market Value ................................................................... 10

XV.   Other Insurance ..................................................................................... 10

XVI.   Conditions ............................................................................................ 11

XVII.   Endorsements ...................................................................................... 12

- Loss Payable Endorsement................................................................. 13

XVIII.   Notice to Lienholders That a Binder Was Not Issued and No
Policy Was Forthcoming ....................................................................... 13

XIX.   Denial of Liability .................................................................................. 14

XX.   Wrongful Refusal To Pay....................................................................... 14

XXI.   Assignment and Subrogation ................................................................. 15

A. Assignment........................................................................ 15
B. Subrogation........................................................................ 16

XXII.   Real Party in Interest Rule .................................................................... 16

XXIII.   Settlement With the Tortfeasor by the Insured .................................... 17

XXIV.   Bailments............................................................................................ 18

XXV.   Agency ............................................................................................... 18

XXVI.   Imputed Negligence ............................................................................ 18

XXVII.   Liability of the Operator of the Parking Facility.................................19

XXVIII.   Duration of Bailment Contract .......................................................... 19

XXIX.   Effect of Disclaimer of Liability ......................................................... 19

CONFIDENTIAL

6-28-02

# CHAPTER VIII

## PHYSICAL DAMAGE

### I.  FIRST PARTY CONTRACTS DEFINED

First party insurance, is a contract between the insurer and insured protecting the insured's own actual losses and expenses. Since there are only two parties involved in this contract -- the policyholder (the first party) and the insurance carrier (the second party) -- the insurance afforded is referred to as first-party coverage, and the losses thereunder as first party claims, since the loss is sustained and the claim is made by the first party to the contract. Under this coverage, the insurer agrees to protect the policyholder against financial loss from covered perils which he or she would otherwise incur when such loss arises out of damage to, or destruction of, property owned by the insured or in which the insured has an interest.

### II.  DECLARATIONS

The declarations page of an automobile physical damage policy sets forth the name and address of the named insured, that period of time for which the coverage shall be in effect, the description of the automobile(s) to be insured, and the type of insurance coverage that will be provided. Certain representations are made by the insured in the policy application. These representations include:

- That the car principally will be garaged in the area where the insured resides, unless otherwise stated.

- The name of any lienholders having liens against any of the vehicles insured.

These representations all have a material effect on the desirability of the risk which the insurer is being asked to assume. Misrepresentation as to either of them may give the insurer the right to declare its policy void and to decline to accept liability for damage to any vehicle insured by the policy.

Each vehicle insured is specifically described by year, make, model, body type and serial or identification number. No other owned automobiles are insured, except that coverage is generally extended to the newly acquired or replacement vehicles, as described in the appropriate policy contract.

The balance of the face of the policy specifies what perils or losses are insured against and sets forth the limit of the insurer's liability to each vehicle and the limit as to each peril. For example, physical damage insurance can be written to provide coverage against damage caused by a number of specified perils including collision coverage, fire,

VIII-1

CONFIDENTIAL

6-28-02

lightning, transportation, theft, combined additional coverage, towing and labor costs and mechanical breakdown coverage.

## III. INSURING AGREEMENT

The insuring agreement set forth those perils or causes of loss against which the policy provides insurance, as well as the amount of any deductible that may apply. In the early days of automobile insurance, the basic coverage available insured only against collision of the automobile with another object or upset of the automobile. Later came theft coverage which insured against theft of the automobile or its component parts. Then there was coverage for fire, lightning or transportation which insured against loss caused by fire, lightning, smoke damage due to sudden and unusual faulty operation of fixed heating equipment serving the premises where the automobile was located, and loss resulting from stranding, sinking, burning, collision or derailment of any conveyance upon which the automobile was being transported. Coverage was also available against loss by windstorm, hail, earthquake or explosion. The fire, lightning or transportation coverage, coupled with theft coverage, produced still broader insurance by adding combined additional coverage which included insurance against damage caused by windstorm, hail, earthquake, explosion, riot or civil commotion, falling of aircraft, malicious mischief or vandalism, flood or external discharge or leakage of water. Still broader coverage became available under the comprehensive coverage which insured against any loss or damage to the vehicle except that damage caused by collision, wear and tear, or mechanical or electrical breakdown.

The most popular automobile coverage today is the combination of comprehensive and collision coverage, although in some high risk areas (or with older automobiles) insurers may not be willing to write comprehensive coverage and may insist on limiting non-collision coverage to loss by fire and theft or a more limited list of perils.

## IV. COLLISION COVERAGE

Under this coverage, the company agrees to pay for direct and accidental loss of, or damage to, the insured automobile caused by collision of the automobile with another object or by upset of the automobile. (Also under collision in most, but not all policies, we will pay up to $200 per occurrence, less the applicable deductible for loss to personal effects due to a collision.) Whether an insured can recover under his collision coverage depends upon the terms of the policy as applied to the facts of the accident. Many important terms, which are found in the collision coverage, are not defined in the policy. Consequently, it will be useful to define and analyze some terms to determine the scope of collision coverage.

"**Object**" has been defined as any tangible thing that is visible or capable of discernment by the senses. The term "object" is one of the most important words used in the collision policy since there cannot be a collision within the meaning of the policy without the presence of an object with which to collide. An "object", in regard to collision coverage, has been liberally interpreted by the courts. The term, "object", as used in a collision

VIII-2

6-28-02

policy, has been held to include a wide variety of items and hazards. Some typical objects which have been held to be within the coverage of a collision policy include an animal, physical impediments upon the road (a tree stump, water or sewer pipes, boulders, stones) or an impact with the road itself, such as caused by irregularity in the surface of the highway. Many jurisdictions have also held that any impact by the insured automobile with water or land would be a recoverable item under the collision coverage. In all of the enumerated items, it is important to determine the cause of the accident. In other words, did the damage arise from the collision with an object as required by the policy? If the damage was caused by other than a collision, coverage may be afforded under comprehensive.

The term "**upset**", as used in the collision policy, has been defined as the loss of equilibrium or the loss of balance of the insured vehicle, regardless of whether it completely turns over.

Courts have construed the words "**directly caused**" to be synonymous with the term, "proximately caused." The latter term has been defined as a cause which, in an actual and continuous sequence, produces damage, such that without which the damage would not have occurred. This is important under collision coverage because the damage to the insured automobile must be directly caused by a collision. The general rule is that when there are two concurring causes of loss and only one of them is a collision or upset of the insured automobile, it is crucial to determine which cause set the other cause in motion. Where it is determined that a collision or upset started the chain of events, the recovery under the collision policy may be extended to include damages not ordinarily afforded under such a policy. For example, the insured automobile collides with an object on the road damaging the vehicle, which results in an engine fire. The collision insurer would be responsible for the immediate damage caused to the vehicle and also for the fire damage.

## V.   COMPREHENSIVE COVERAGE

The basic agreement does not enumerate all the perils (losses) that are insured against. Coverage is provided on an "all-risk" basis against all direct and accidental loss of or damage to the insured automobile except if the loss or damage was caused by collision. For example, if the insured rips his seat cover with a screwdriver, this would be covered under the insured's Comprehensive Coverage.

Under Comprehensive, we will pay for loss caused other than by collision. Covered losses would include breakage of glass and loss caused by missiles, falling objects, fire, theft or larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion, or colliding with a bird or animal and, in most policies, up to $200 per occurrence for loss to robes, wearing apparel and other personal effects caused by fire, lightning, flood, falling objects, earthquake, explosion or through theft of the entire automobile. Personal effects must be owned by the named insured or a relative and must be in or upon the owned automobile at the time of loss. In some of our policies, the amount for personal effects is $100 for loss due to fire or lightning only.

VIII-3

6-28-02

CONFIDENTIAL

The claims person should realize that any loss caused by one of the above perils is covered under the comprehensive coverage, whether it involves a collision or not. For example, if a vehicle was involved in a collision and the bumper and hood are damaged, and several windows are broken, the comprehensive coverage applies to the windows, even though the breakage resulted from a collision. Of course, the damage to the bumper and the hood will not be covered under comprehensive, but under collision. Also, if a tree falls on the insured automobile, the damage would be covered under comprehensive since it was caused by a falling object. There would be no comprehensive coverage if the insured automobile sustained body damage because it collided with a tree on the road. This is because the loss was caused by collision with another object.

An issue frequently arises whether a particular loss is due to collision or to one of the perils mentioned above. The general rule is that if the proximate cause of the loss is one of the perils specifically mentioned in the policy as "not deemed to be collision," the loss is covered. For example, vandals intentionally release the brakes of an automobile and allow it to crash into a bridge and become a total loss. Coverage would be afforded under the comprehensive agreement because the loss would be considered as caused by vandalism. Also, if the insured automobile is stolen and damaged by the thief in a collision, the damage would be considered to be caused by theft and would be a comprehensive loss.

## VI.    MULTI-RISK PHYSICAL DAMAGE COVERAGE

Although this coverage is not part of the actual policy contract, we do market Multi-Risk Physical Damage Coverage by amendment to the policy. The coverage includes comprehensive, collision and mechanical breakdown protection. In most states, it has a deductible of $250 for each loss except glass breakage which is $50 for each loss. There are state exceptions and the Multi-Risk amendment on the insured's policy should be consulted..

The comprehensive and collision portions of Multi-Risk Physical Damage coverage are the same as comprehensive and collision coverages discussed above.

The mechanical breakdown portion of Multi-Risk Physical Damage coverage covers losses due to mechanical breakdown of the owned auto. There are exclusions such as routine maintenance, tire wear, oxidation and others.

## VII.    RENTAL REIMBURSEMENT COVERAGE

Although this coverage is not part of the actual policy contract, we do market Rental Reimbursement coverage by amendment to the policy. Limits vary from state to state. In two thirds of the states, the limit is $20.00 per day with a maximum of $600. In other states, the limit is $25 per day with a maximum of $750. In Texas, you can choose a daily limit of $20, $25, $30 or $35 and each has a maximum of $600, $750, $900 or $1,050 respectively. Virginia has a maximum of $600 with no daily limit. Check the amendment for each state.

CONFIDENTIAL                6-28-02

Reimbursement for a rental vehicle is limited to that period of time reasonably required to repair or replace the owned auto, and coverage applies only if the owned auto is withdrawn from use for more than 24 consecutive hours. Loss is covered under Comprehensive and Collision only; coverage usually does not apply to theft of the entire auto. In thefts, the supplementary payments under the policy are primary. Do not confuse Rental Reimbursement coverage with reimbursement for transportation expenses under Additional Payments We Will Make Under The Physical Damage Coverages, when there is the total theft of an insured vehicle. However, Rental Reimbursement can apply to a total theft of an insured vehicle if: 1. The period of time reasonably required to repair or replace the stolen auto exceeds 30 days: and 2. Only if the additional benefits provided under the supplementary benefits of the policy have been exhausted.

## VIII. ADDITIONAL PAYMENTS WE WILL MAKE UNDER THE PHYSICAL DAMAGE COVERAGES

The policy obligates the carrier, in addition to the applicable limit of liability:

### A. Transportation Expenses

"We will reimburse the insured for transportation expenses incurred during the period beginning 48 hours after a theft of the entire auto covered by Comprehensive Coverage under this policy has been reported to us and the police. Reimbursement ends when the auto is returned to use or we pay for the loss. Reimbursement will not exceed $20 per day nor $600 per loss".

These amounts can vary; check the policy.

Also, note that the company's obligation to reimburse the insured for expenses in renting a substitute vehicle is not affected by the fact that the policy has expired. For example, the insured has a theft policy with a policy period of August 1, 2001 - March 1, 2002. the insured's car is stolen February 28, 2002. The next day he reports the theft to the police and to his automobile theft insurer. On March 2, he rents a substitute vehicle for $20 a day. The car is never recovered and the insured's daily expense for renting the substitute vehicle continues until April 1, 2002. On this date, the insurer makes a payment for the theft of his automobile. The insured is also entitled to a reimbursement for his or her rental of a substitute vehicle. However, if the policy is not renewed or cancelled there would be no coverage for the substitute vehicle if it were involved in a loss after that expiration/cancellation date.

### B. General Average And Salvage

"We will pay general average and salvage charges for which the insured becomes legally liable when the auto is being transported."

VIII-5

CONFIDENTIAL

6-28-02

General average is a proportional contribution, based on value of property, by each party of interest in a maritime venture to make good a loss sustained under certain conditions.

Salvage is the reward to those (usually another vessel) not part of the ship's venture who voluntarily and successfully save some part of the venture that is in peril.

In either event, the value of the property lost or damaged by the effort is contributed to by all: the ship, the freight (earnings from carrying the cargo), and the cargo. It is based upon the ratio that the sacrificed property bears to the total value of all interests.

A condition of the policy makes it applicable "while the automobile is within the United States of America, its territories or possessions, or Canada, or is being transported between ports thereof."

Your insured may have his or her automobile transported between ports of the described political and geographical locations. If some of the cargo were jettisoned by the master in order to save the ship from a peril not caused by the ship, all interests would contribute in proportion and your policy would pay your insured's share of the loss.

The obligation to pay these charges assessed against the insured is separate and apart from the agreement to pay for physical damage. On the other hand, if the insured's automobile was jettisoned and your company paid under the comprehensive coverage, it would be subrogated to the insured's claim for general average from the other interests.

## C.  Equipment

"We will pay for **loss** to any of the following equipment (including **loss** to accessories and antennas): car phone; citizen's band radio; two-way mobile radio; scanning monitor receiver; or device designed for the recording and/or reproduction of sound, as long as the equipment is permanently installed in or upon an **owned auto**; and that auto is insured under the appropriate coverage."

## IX.  EMERGENCY ROAD SERVICE

The Companies offer Emergency Road Service coverage separately at an additional annual premium. It covers; towing, lockout services, an hour of mechanical labor, changing a tire, and delivery of gas, oil or loaned battery.

CONFIDENTIAL

## X.   DEFINITIONS

It is important to understand the definitions contained in an automobile physical damage policy in order to know who is covered under the policy, for what peril, and to what extent. "Insured" and "automobile" are especially significant.

### A.   Insured

In addition to the insured named in the policy, persons other than the named insured may also be entitled to the status of an "insured" depending upon their relationship to the named insured and other conditions of use. Specifically, this refers to use of owned automobiles and non-owned automobiles.

### B.   Owned Automobiles

An owned automobile (defined in the A-50 contract) means a private passenger, farm or utility automobile or a trailer for which a specific premium is charged; a private passenger, farm or utility automobile or a trailer ownership of which is acquired during the policy period, if it replaces an owned auto as described in the policy or we insure all vehicles owned by the insured on the date of such acquisition and the insured requests us to add it to the policy within 30 days afterward; and a temporary substitute vehicle. In addition to the named insured, coverage is provided for any person or organization using or having custody of the owned automobile with permission of the named insured and within the scope of such permission, except persons in the automobile business or bailees for hire. The insured owner, in allowing another to use the automobile, has the right to limit the use of the car in any manner he or she sees fit. If the user exceeds the scope of permitted use, he or she may become a converter, who is a person who has unauthorized use or control of the automobile, and thereby be deprived of insurance protection. As a converter, he or she may be held absolutely liable to the owner for any damage which the car may sustain while using it.

### C.   Non-Owned Automobiles

This term has been defined in a physical damage policy to mean a private passenger automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute vehicle, while said automobile or trailer is in the possession or custody of the insured or is being operated by him or her. Under the basic policies, coverage for non-owned automobiles extends to the named insured and any relative residing in the same household. Further, it applies to collision coverage and to comprehensive or other physical damage coverages. Coverage is on an excess basis if there is any other applicable insurance which would apply. This is true whether such other insurance covers the interest of the named insured or spouse, the owner of the automobile, or any other person or organization. There is no coverage for non-owned automobiles furnished for regular use of the named insured, spouse or a member of the household.

CONFIDENTIAL

## XI.   EQUIPMENT

The policy includes loss to the automobile and its equipment but does not define "equipment." Normal equipment includes such things as a jack and spare tire, but there are some exclusions for specified equipment. For instance, a radar or laser detector is excluded.

## XII.   EXCLUSIONS

Damage to any covered automobile while it is being used as a public or livery conveyance is excluded unless such use is specifically described in the declarations on the policy. A common problem involves the application of the public or livery conveyance exclusion. The policy specifically excludes coverage under any of its provisions while the insured automobile is used as a public or livery conveyance. Any carrying of passengers for hire, or renting the automobile to others for their use would be excluded from coverage under the policy unless such use is stated in the policy. A typical example of an insured automobile falling within the exclusionary language is its use as a taxicab. The claims person should realize that courts consistently hold that car pools and other "share-the-ride" arrangements, even though the passengers contribute to the expense, are not considered carrying passengers for hire and therefore the exclusion is not applicable.

Also excluded is damage to wear and tear, freezing or mechanical or electrical breakdown unless such damage is the result of loss from another peril which is covered by the policy. Damage to tires is generally excluded unless coincident with and from the same cause as the loss covered by the policy, or unless damage is by fire, by malicious mischief or vandalism, or unless stolen. Coverage is also excluded for loss due to war or radioactive contamination. Glass breakage, due to collision, is excluded under the collision coverage when the car is covered by comprehensive insurance.

The exclusion concerning wear and tear, freezing, mechanical or electrical breakdown has also been the subject of controversy. To be excluded, the loss must be due and confined to one of the listed perils. For example, damage to the car radiator by freezing would not be covered. However, if the electrical system was damaged by fire and it became impossible to move the car and as a result, the radiator was damaged by freezing, coverage would be afforded. This is because freezing was caused by a covered loss.

## XIII.   LIMIT OF LIABILITY

Most physical damage policies are written with the limit of liability as the actual cash value, with or without a deductible.

For example, a typical provision in a physical damage policy reads as follows:

CONFIDENTIAL          6-28-02

Limit of Liability

"The limit of our liability for **loss**: is the **actual cash value** of the property at the time of **loss**; will not exceed the cost to repair or replace the property, or any of its parts, with other of like kind and quality and will not include compensation for any diminution in the property's value that is claimed to result from the **loss**; to personal effects arising out of the one occurrence is $200; to a **trailer** not owned by **you** is $500; for custom options is limited to the **actual cash value** of equipment, furnishings or finishing (including paint) installed in or upon the vehicle only by the auto factory or an authorized auto dealer and included in the purchase price of the vehicle."

The actual cash value is intended to be the Company's maximum liability in the event the car is completely destroyed with no value remaining. In the event the vehicle is a constructive total loss, (i.e., when the cost of repairs plus the value of the salvage equals or exceed the pre-loss value of the vehicle) then the Company's liability is actual cash value, less value of salvage, less any deductible. In the case of partial loss, the Company's liability is intended to be limited to the cost of the necessary repairs, less any deductible.

It should also be recognized that the Company may take over any part of the damaged property at its agreed or appraised value. The insured cannot abandon the damaged property to the insurer and demand payment of its full value in cash. Except in unusual cases, companies seldom exercise the option to repair damaged property because of potential difficulty in satisfying the insured that the repairs were properly made and because, once the repair option is exercised, the Company will be liable for the full cost of the necessary repairs, even if such cost exceeds the actual value of the property. Also, should completion of the repairs be unreasonably delayed, the Company may become liable to reimburse the insured for loss or inconvenience he may sustain by reason of inability to use the automobile.

## XIV. MARKET VALUE

A problem arises when the cost of repairs with parts of other like, kind and quality, would not restore the vehicle to its former market value. In other words, in applying the limit of liability provision contained in the policy, what is the proper measure of damages recoverable under the physical damage policy?

The claims person should realize that a significant number of cases hold that the difference in value or condition of the motor vehicle prior to the collision and after the repairs is the proper measure of damages. If the car cannot be restored to its former condition, even though its outward appearance might be the same, the insured may be allowed an additional recovery to compensate him or her for the loss of market value.

6-28-02

CONFIDENTIAL

- **Determination of Market Value**

It is not the value to the owner which determines market value but the value to those who constitute the market in used cars. The general rule is that market value is measured by the price, which, in all probability, would voluntarily be agreed upon in negotiations between an owner willing (but not forced) to sell and a buyer willing (but not forced) to buy. Therefore, market value does not necessarily mean "book value." This latter term refers to publications used in the insurance industry to evaluate used automobiles such as The Red Book published by National Market Reports, Inc., the N.A.D.A. Official Used Car Guide, published by the National Automobiles Dealers Association or various electronic data bases. Many cases have rejected the carrier's argument that the "book value" method of evaluation is the only guide to determine actual cash value (market value). The arbitration provision of the Physical Damage Policy provides a mechanism for determining disputed evidence as to market value. Competent appraisers are used to judge the market value of an automobile.

A problem sometimes arises as to what automobile is to be evaluated. An automobile may be materially changed from the date of the issuance of the policy to the date of damage or theft. For example, the owner of an auto body repair shop purchases a used Mustang convertible from one of his customers. At the time of the sale, the market value is $5,000. He immediately obtains an actual cash value collision policy. The policy identifies the vehicle by model and year. He or she is charged the standard premium for such a vehicle which is in average condition. Subsequently, he or she substantially rebuilds the vehicle so that it now becomes a customized Mustang with a rebuilt high-powered engine, mag wheels, racing tires, a front sloping chassis and special paint. Upon completion of this work, the market value of the automobile is $12,500. The insured does not notify the carrier of the change in the automobile until the vehicle is in a collision and becomes a total loss. His or her claim is for $12,500. Most courts would hold that the market value of the Mustang, for claims settlement purposes, would be based on the initial selling price of $5,000 (less the usual factors of depreciation, etc.) and not on the increased market value of $12,5000. Such a ruling would be based on the premise that it would be unfair for the insured to recover $12,5000 when his or her premium was based on a vehicle of a certain age with standard options. It is clear that a substantial portion of the increased value in the Mustang was attributable to parts which were not needed to make the car a working vehicle, but to parts designed to make the automobile more aesthetically pleasing. Actual cash value coverage is not designed to insure such value. Finally, the argument could be made that an auto body shop owner should be aware that a customized vehicle (the rebuilt Mustang) must be insured under a stated value policy.

## XV.  OTHER INSURANCE

The Other Insurance provision reads:

6-28-02

> "If the insured has other insurance against a loss covered by Section III (Physical Damage), we will not owe more than our pro rata share of the total coverage available. Any insurance we provide for a vehicle you do not own shall be excess over any other valid and collectible insurance."

Presently, the vast majority of collision policies are written on an actual cash value rather than a limits basis. To illustrate the application of the Other Insurance clause to collision coverage, note the following example using actual cash value policies and limits policies. The insured has an actual cash value collision policy with the A Insurance Company. He or she decides to change carriers and obtains an actual cash value collision policy with B Insurance Company. Both policies have a $100 deductible. Before the effective expiration date of A's policy, but after the inception of B's policy, the insured has a $5,100 collision loss. The effect of the Other Insurance clause in regard to actual cash value policies is that each company will be obligated to pay 50% of the net loss after the application of the $100 deductible ($50 deducted from each policy). In other words, both A and B would contribute $2,500 making a total payment to the insured of $5,000.

If the carriers had limits policies, their contribution would vary. For example, the insured has a $5,000 collision policy with A Insurance Company and a $10,000 collision policy with B Insurance Company. Both of these polices have a $100 deductible. The insured has a $5,100 collision loss. After the application of the $100 deductible, Company A would pay 1/3 of the loss ($1,667) and Company B would pay 2/3 of the loss ($3,333) making a total payment of $5,000.

If the deductibles in the carriers' policies are not identical, the insured would have the benefit of the lower deductible. This means that if one policy contained a $50 deductible and the other policy a $100 deductible, the insured would have only $50 deducted from his or her loss payment. In other words, in both examples (involving actual cash value policies or limits policies) he or she would receive a total payment of $5,050.

## XVI. CONDITIONS

The policy imposes certain duties on the named insured in event of loss. If the insured fails to fulfil these duties, he or she may forfeit the right to recover loss under the policy. One of the more important duties of an insured after loss has occurred is to:

> "Protect the automobile, whether or not the loss is covered by this policy, and any further loss due to the insured's failure to protect the auto will not be covered. Reasonable expenses incurred for this protection will be paid by us."

For example, as the result of an automobile accident, the insured's car is damaged to the extent that it is not driveable. The insured decides to leave the vehicle at the scene of the accident instead of having it towed to a place of safety and arranging for the repairs to be made. As a result, the vehicle is exposed to the elements of the weather and the action of vandals. All of the subsequent damage (after the accident) is **not** recoverable under his or her physical damage policy. Had the insured exercised his or her duty to mitigate

CONFIDENTIAL

6-28-02

damages, any expenses incurred in carrying out this duty, such as the towing charges would be recoverable under the physical damage policy. The insured is also required to give notice to the Company as soon as possible and, in case of theft, the insured must promptly notify the police. The insured is also required to file proof of loss with the Company within the time stated in the policy and allow the Company to examine the damaged property and submit to examination under oath if demanded by the Company. If the insured and the Company are not able to agree to the amount of loss, either the insured or the Company may demand that the amount of loss be determined by appraisal. In an appraisal, the named insured and the Company each select a competent appraiser. The appraisers then select a competent and disinterested umpire. The appraisers each state the actual cash value and the amount of loss. If they are unable to agree, the differences are then submitted to the umpire who makes the final decision. The named insured and the Company each pays its chosen appraiser and they both share equally in the other expenses of the appraisal and the payment of the umpire.

In many agreements involving the transportation of property, the Bill of Lading contains the following clause:

> Any (transportation) carrier or party liable (other bailee for hire) on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been affected upon or on account of said property, so far as this shall not void the policies or contracts of insurance. Provided that the carrier reimburse the claimant for the premium paid thereon.

If the physical damage policy did not contain some restriction on this clause, the carrier or other-than-bailee-for-hire could wipe out the insurer's right of subrogation by taking over the benefit of the policy after the carrier had paid the loss. Consequently, the physical damage policy specifically states that it does not inure directly or indirectly to the benefit of any carrier or other bailee for hire. This is true even if the agreement between the insured and the carrier or other bailee would purport to give the benefit of insurance carried by the owner of the property. This provision voids the agreement and preserves the insurer's right of subrogation against the negligent bailee.

## XVII. ENDORSEMENTS

To know what coverage is provided by a policy, it is important to understand all endorsements attached to the policy. Endorsements attached to a particular policy are indicated in the section reserved for this purpose on the Declarations Sheet. Since endorsements amend the policy contract, the claims person should know how the basic policy has been affected by the attached endorsement. Most endorsements are self-explanatory and readily understood; others require study. Questions of interpretation of endorsements should be taken to your supervisor. Because it is not feasible to comment on every endorsement, only the Loss Payable Endorsement has been selected for discussion. It is used frequently and should be thoroughly understood.

- **Loss Payable Endorsement**

This endorsement is frequently interpreted as a separate contract between the lienholder, (also known as a mortgagee in the real property context) and the Company. It pertains only to Collision and Comprehensive Coverages.

The Company agrees under this endorsement that the interest of the lienholder will be protected should there be loss or damage to the insured car.

It further agrees that the insurance provided shall not be invalidated by any act or neglect of the insured. If the insured fails to fulfill the obligations he or she has under the policy, such a failure would not invalidate the policy as to the lienholder. Should the insured fail to report an accident, the Company might deny liability under the policy to the insured, but would be obligated to make payment on any claim within the Comprehensive or Collision coverages that is presented by the leinholder in whose favor the endorsement is issued. The Company would, after such a payment, be subrogated to all rights of recovery the lienholder might have.

The Company has the option of paying either the amount of the damage less the deductible or the entire principal due under the mortgage with interest. If the entire principle and interest is paid by the Company, the Company is entitled to an assignment and transfer of the security interest (lien) with all such other securities.

The lienholder agrees to notify the Company of any change of ownership or increase in hazard which comes to its attention. Should the insured fail to pay the premium, the lienholder agrees to pay if advised of this condition.

If the insured fails to file proof of loss within the time prescribed by the policy conditions, the lienholder may do so within sixty days thereafter.

The lienholder's name should be included on the settlement draft or permission should be obtained from the lienholder to omit its name from the draft. Otherwise, the interest of the lienholder has not been protected to the extent agreed upon by the endorsement and the Company might be in the position of paying the loss twice, i.e., once to the insured and a second time to the lienholder.

## XVIII. NOTICE TO LIENHOLDERS THAT A BINDER WAS NOT ISSUED AND NO POLICY WAS FORTHCOMING

Lienholders are placed on notice by Underwriting if a binder or policy is not issued or if the policy or binder is cancelled.

CONFIDENTIAL
6-28-02

## XIX.   DENIAL OF LIABILITY

The courts generally have held that when an insurer denies liability because the insured has breached some policy provision, the insurer must precisely specify the grounds which give it the right to avoid liability under its policy.  The purpose of this requirement is two-fold: it gives the insured precise information why his claim is being denied and it gives him or her an opportunity to correct whatever may be wrong, provided that the time within which correction can be made has not expired.  In connection with such a notice it is important that the file be thoroughly reviewed by the insurer so that the notice will contain all violations or breaches known to the insurer at the date of the notice.  Any breaches or violations of which the insurer has knowledge and which have not been listed can be held to have been waived by the insurer if it attempts to assert them as defenses at a later date.

Rights or defenses cannot be waived unless the insurer is, or in the exercise of due diligence should be, aware that they exist.  If, after a denial letter has been sent, the insurer becomes aware of facts which may give it further grounds to support is denial, these grounds should also be the subject of a formal notice to the insured so that they may not be lost by waiver.

Policies of first party insurance generally provide that, within a specified period of time following the occurrence of a loss to the insured property, the insured must file with the insurer a sworn proof of loss setting forth details regarding the property damaged or destroyed and the circumstances under which the damage or destruction took place.  At common law, failure of an insured to file proof of loss within the time required would bar him or her from recovery.  This has been changed by statute in a number of jurisdictions.  Typical modifications postpone the running of the time which proof must be filed until after it has been formally demanded by the insurer.  Others require not only a formal demand but also that the insurer provide appropriate forms on which the required information can be provided by the insured.

In jurisdictions where the policy requirements with regard to filing proofs of loss have not been modified by statute, the courts will deny the insured any recovery if he or she fails to file a proof of loss as required by the terms of the policy unless the court finds that the insurer has waived the requirement, either expressly or impliedly.

## XX.   WRONGFUL REFUSAL TO PAY

In the case of a breach of contract, the party injured by the breach will be entitled only to recover that sum of money as will place him or her in the same financial position he or she would have enjoyed if the breach had not occurred.  Many courts apply the same reasoning when an insurer has breached its contract of insurance by failing to honor the agreement to indemnify its insured against the loss sustained.  Such courts limit an insured's right to recover from the insurer to what the insured should have recovered under the terms of the policy with interest from the date of the breach.

Some courts recognize other damages for breach of contract if, for instance, the failure to settle was an attempt to coerce the insured to accept a lower settlement. The damages are still based upon contract and not in tort.

Other courts have taken the position that there is a particular obligation on the part of an insurer to deal fairly with its insured and if the insurer is found to have been guilty of bad faith in dealing with an insured by wrongfully refusing to pay what was rightfully due him or her, it will be penalized by way of liability in tort for compensatory damages and, in a proper case, punitive damages may be sought in addition to its liability under its policy contract.

To establish a claim for bad faith, an insured must show both the absence of a reasonable basis for denying benefits of the policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent that the tort of bad faith is an intentional tort. Bad faith, by definition, cannot be unintentional. Bad faith has been defined as "deceit, duplicity, or insincerity." Deceit has been defined as a deliberate deceptiveness in behavior or speech. Therefore, when the insurance company's refusal to honor the insured's claim under his or her policy is due to such described behavior, a substantial number of jurisdictions will allow the insured to recover an award for tort damages which will be in addition to what he or she is entitled to receive under the insurance policy.

The general rule is that a denial of liability or refusal to pay, based on an honest disagreement between the insurer and its insured, will not cause the insurer to be liable for consequential or punitive damages. The honest disagreement can be on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy condition. An important consideration in determining whether an honest disagreement existed between the insured and the insurer is whether the latter properly investigated and evaluated the claim. For example, if the insured's refusal to honor the insured's claim was based on a perfunctory investigation or where it recklessly ignored and disregarded a proper investigation, the carrier may be liable in tort also.

It must be noted that some states have significantly changed the concept of bad faith, such that now an insured can far more easily establish a case of bad faith. The claims handler must be aware of the applicable bad faith rules in the states for which he/she has responsibility.

## XXI.   ASSIGNMENT AND SUBROGATION

### A.   Assignment

An assignment is the transfer of property, real or personal, to another. A cause of action for damages is an item of personal property, and, as such, may be the subject of assignment. There is, however, one exception; causes of action for personal injury may not be assigned in whole or in part. This is an ancient common law rule which regarded such causes of action to be personal and to be asserted only by the injured person.

CONFIDENTIAL                6-28-02

The common law rule has been modified in certain areas such as workers' compensation, where some statutes specifically provide for a transfer of the claimant's cause of action to the insurer who has made the compensation payments. On the other hand, property damage causes of action may be assigned, but the third party tortfeasor is not bound by the assignment and is not required to recognize it unless and until notice of the assignment is served on him or her. When notice is served, the tortfeasor has actual knowledge that the original property damage claimant no longer owns the cause of action, and he or she must then deal with the new owner of the cause of action. As to the assignee, he or she obtains no greater rights than those of the original claimant. The same defenses, which were available against the original party, may be asserted against the assignee. Where there has been an assignment and the third party tortfeasor has no notice of the assignment, he or she owes no duty to the assignee. An assignment will require that the insurer bring suit against a third party in its own name, as assignee of the insured.

### B.    Subrogation

When an insurer has fulfilled its legal obligation under its policy by making payment to its insured, it becomes entitled to succeed to the rights of its insured, against any third party who may be legally liable for having caused the damage for which payment was made. The right of subrogation was an equitable right at the comon law and came into existence immediately upon payment without the necessity of any affirmative action on the part of the insured. As the business of insurance evolved and became more complex, the policy forms used to provide different types of coverage, in many instances, spelled out in detail exactly what rights the insurer acquired and what requirements were placed on the insured with regard to the subrogation rights of the insurer. The courts have held that when these rights and obligations were spelled out in the policy, the policy provision would take precedence over the equitable right of subrogation as it existed at the common law so that, today, reference should be made to the policy conditions of the particular policy form involved to determine the rights and obligation of the insurer and the insured with regard to claims involving damage caused by a third party.

## XXII. REAL PARTY IN INTEREST RULE

The courts, generally, require that all actions be brought in the name of the real party in interest. That is, the party who is legally entitled to receive the amount of any judgment which may be rendered by the court. This rule is designed to prevent defendants from being badgered by legal actions which might be commenced by those with no legal rights to recover from him or her. In the early cases, the courts held that an insurer who succeeded to the rights of its insured by way of subrogation, had become the real party in interest and would be required to bring any legal action against an allegedly responsible party in its own name.

There was considerable thinking that bringing suits in the name of the insurer might result in jury prejudice against an insurer suing a third party, so various documents were developed in an attempt to continue the insured as the real party in interest despite the fact the insured had been paid by his or her insurer so that suit could be brought in the name of the insured.

An early document developed to meet this requirement was the loan receipt which attempted to create the legal fiction that the payment was not a payment at all, but was merely a loan from the insurer to the insured, which would be repayable only out of any recovery, the insured might make from a third party. Some jurisdictions recognized the loan receipt as sufficient to accomplish this purpose while others held that the insurer was still the real party in interest and should appear in the action as the party plaintiff.

A later development was a trust agreement in which the insured agreed to prosecute the action in his or her own name as trustee for his or her insurer and hold any recovery in trust for the benefit of the insured. The argument supporting the use of a trust agreement as a subrogation document is based on the fact that when an insured who has been paid for his or her loss brings a suit against a third party and makes any recovery, he or she holds such recovery as an equitable trustee for the benefit of his or her insurer. Many jurisdictions permit the trustee of an express trust to sue in his or her own name without naming the beneficiary of the trust as an additional plaintiff. As the only difference between an express trust and an equitable trust is that the trustee under an express trust is made a trustee by a formal document rather than as a matter of equity, it was a simple matter to transform the equitable trust into an express trust by having the insured execute a formal trust agreement. Some jurisdictions permit an insurer to bring suit in the name of its insured under any form of subrogation document. In these jurisdictions, a subrogation agreement or subrogation receipt will be just as effective as either a loan receipt or a trust agreement.

## XXIII.  SETTLEMENT WITH THE TORTFEASOR BY THE INSURED

The general rule is that a release given by the insured to a tortfeasor who is primarily liable for the injury destroys the insurance company's right of subrogation and is a bar to recovery on the policy. This rests on the fundamental principle that the insured is not entitled to double compensation for the same loss. Some cases go so far as to hold that, where certain items of damage are reserved in the release, the right to recovery is nevertheless extinguished, because most courts hold that a release from liability for a tort extinguishes all claims for damages growing out of it.

Furthermore, any payment for damages received by the insured from the wrongdoer, before settlement with the insurer, reduces by operation of law the liability of that insurer to the extent of the payment. Where the insured releases his or her right of action·against the wrongdoer before settlement with the insurer, that release destroys, by operation of law, the insured's right of action on the policy.

VIII-17

CONFIDENTIAL

6-28-02

If the insurance company has paid the claim and thereafter the insured releases the claim, as between the insurer and the insured, cases hold that the insured holds such payment in trust for the benefit of the insurance carrier. It should be emphasized that the foregoing is limited to the rights and obligations of the insured and the insurer as between themselves. Where the insurer has made a payment and the third-party tortfeasor is on notice of the payment, the insurer will have a cause of action against the tortfeasor to recover its damages, regardless of whether the tortfeasor settles with the insured or not.

## XXIV.   BAILMENTS

In some instances, particularly in those states which follow the contributory negligence doctrine, negligence of the driver of the other car may not constitute a defense to any claim of the owner of the vehicle.

For example, the owner of an automobile may have loaned his or her car to a friend, and while it was being used by the friend in the friend's own business, the accident occurred. Under these circumstances, the transfer of custody of the owner's car is called a bailment. If the friend were negligent and his or her negligence contributed to the accident, it might still be impossible to impute that negligence to the owner, depending upon the law of the state where the accident occurred. Consequently, if there is evidence of negligence on the insured, he or she may be legally liable to the owner of the damaged property because the contributory negligence of the driver of the other vehicle would not afford a defense.

## XXV.   AGENCY

The relationship between the owner of the other car and his or her driver (the bailor and the bailee) should be thoroughly investigated. If it develops that at the time of the accident the driver was performing an errand for the owner or was acting as an agent or employee of the owner, a basis may be found for imputing the negligence of the driver of the other vehicle to the owner, thus avoiding payment by the Company.

## XXVI.   IMPUTED NEGLIGENCE

In some states, the negligence of the driver is imputed to the owner by statute if the vehicle is being driven with the permission of the owner. In other states, the owner is liable for the negligent operation of a motor vehicle by members of his family. A few states make the owner liable only if the driver is a minor. Community property statutes in some states permit the negligence of one spouse to be imputed to the other.

All claims technicians should know the law of the jurisdictions in which they handle claims. This information is generally available in summary or table form in the Insurance Bar and Best's Recommended Insurance Attorneys. These are available in all regions.

CONFIDENTIAL                                          6-28-02

## XXVII. LIABILITY OF THE OPERATOR OF THE PARKING FACILITY

Under a contract of bailment, the parking lot operator is under a duty to exercise reasonable care for the preservation and the protection of the property. His or her failure to do so will expose the operator to liability. Where the operator is either unable to deliver the property or delivers it in a damaged condition, a presumption arises in favor of the owner of the automobile that the loss or damage is due to the negligence of the parking lot operator. This presumption can be overcome only by proof that the loss or damage was not due to any failure on the part of the operator to exercise ordinary care.

Where the owner is not able to establish a bailment contract, whether the relationship is that of lessor-lessee or licensor-licensee, the parking facility operator assumes no duty with respect to the protection and preservation of the property. He or she is liable to the owner only if the loss or damage is caused by wrongful act. Therefore, in such a case, the owner is confronted with the problem of establishing the operator's wrongful act as the cause of the damage, and no presumption in favor of the motorist arises from the relationship.

## XXVIII. DURATION OF THE BAILMENT CONTRACT

Many parking facilities do not offer service on a 24-hour basis, but are open for a limited number of hours during the day or night as the case might be. When cars are left in the parking lot beyond the closing time, it is customary for the attendant to place the keys to the car either under the mat near the driver's seat or on the back of the sun visor above the driver's seat. Where the owner is aware of the limited hours of operation and of the custom with regard to the disposition of the car keys when the car is left on the lot beyond the closing hour, the courts will hold that the owner has agreed to the termination of the bailment contract as of the closing time, and that any loss or damage to the car occurring after the closing hour will not involve the bailee's responsibility. Since the owner will be faced with a problem of proof as to whether the loss or damage occurred during the period of the bailment or after the closing time, the courts generally hold that, in such a situation, the usual presumption in favor of the bailor still is applicable. The bailee must establish that the loss or damage did not occur during the period of the bailment contract. This usually can be accomplished by the testimony of an attendant that the car was present on the lot and was undamaged at the closing hour.

## XXIX. EFFECT OF DISCLAIMER OF LIABILITY

Frequently, parking lot operators attempt to avoid the consequences of a bailment contract by printing on the back of the claim check a recital to the effect that the management assumes no responsibility of any kind for the property and that the charges are for the rental of space; or a limitation of liability to $100.00 in the event of loss or damage; or a complete disclaimer of liability for fire or theft. The weight of authority holds these disclaimers to be ineffective, regardless of whether the limitation or the terms were called to the attention of the motorist or not, the general rule being that a bailee for

CONFIDENTIAL

6-28-02

hire cannot, by contract, exempt himself or herself from liability for his or her own
negligence or for that of his or her agents or servants.

CONFIDENTIAL

6-28-02

# CHAPTER XI

## SUBROGATION

### Table of Contents

Page

I.      Introduction ............................................................................................................................ 1

II.     Basis of Subrogation Claims ................................................................................................. 1

III.    Prorating Expenses ................................................................................................................ 1

IV.     Making Claim on the Insured's Behalf ................................................................................. 2

V.      Considerations in Settling ..................................................................................................... 2

VI.     Settlement by Insured ............................................................................................................ 2

VII.    Notice of Subrogation ........................................................................................................... 2

VIII.   Evaluating the Subrogation Claim ........................................................................................ 3

CONFIDENTIAL

6-28-02

# CHAPTER XI

## SUBROGATION

### I.    INTRODUCTION

The importance of subrogation cannot be overemphasized.  Dollars paid on all Physical Damage Coverages, especially, have been greatly reduced through the use of subrogation. With the growing popularity of Uninsured and Underinsured Motorists coverage, it is probable that the future will bring an increase in recoveries under this coverage.

### II.    BASIS OF SUBROGATION CLAIMS

When an insured's car is damaged in a collision with another car, whose driver was at fault, the insured can either make a claim under his or her Collision Coverage or proceed against the other driver.  If the insured accepts payment under the policy, the Company then "stands in the shoes" of the insured and can attempt to recover that payment from the wrongdoer.  The Company's right of recovery is known as "subrogation" and, in most states, is acquired by operation of law after the Company makes payment in conformity with the policy contract.  The individual against whom the claim is made has the same defenses against the Company that he or she has against the insured.

The Company has no right of subrogation until after payment has been made under the terms of the policy.  The Company must have a clear obligation to make payment to our insured for there is no right of subrogation if the Company makes a payment that is not required by the policy.

To eliminate any questions as to the Company's rights, a condition of the policy expressly provides for subrogation under the Liability, Physical Damage, and Uninsured Motorists Coverages.  The insured assigns to the Company any claim he or she may have against a third party, to the extent of the Company's payment.

### III.    PRORATING EXPENSES

Although the Company is not required to do so, as an additional service, it normally includes the insured's deductible amount in the subrogation claim. Often it is economically wise to settle or make payment arrangements for less than a full recovery, particularly when liability in the subrogation claim is doubtful or when the person against whom the claim is made is not insured and has few assets.  The insured may share with the Company any expenses involved in the recovery in the same proportion as his or her deductible amount bears to the total settlement.

XI-1

6-28-02

CONFIDENTIAL

## IV.   MAKING CLAIM ON THE INSURED'S BEHALF

It is improper for the Company to pursue any claim other than a subrogation on the behalf of the insured.  For example, the Company cannot seek recovery on the insured's behalf for personal injury, loss of use, damage to other personal property, etc.  To do so would be considered the unauthorized practice of law.  A corporation may not practice law.

## V.   CONSIDERATIONS IN SETTLING

The subrogation claim can frequently be used to advantage in settling liability claims arising out of the same accident, since the relinquishment or waiver by the Company of a subrogation claim is as much an exchange of value as the payment of money.  Often the maximum recovery can be made of the Company's subrogation claims if they are handled in conjunction with other claims.  Although examiners are not primarily concerned with the handling of subrogation claims, they cannot properly fulfill the requirements of their job unless they are alert to all subrogation possibilities.

## VI.   SETTLEMENT BY INSURED

Before settling Physical Damage claims, be certain that the insured has not already recovered for damage from the other party or insurance company.  If the insured has accepted such a settlement, he or she is not entitled to payment under the policy because the subrogation condition contained in the policy contract has been breached.  However, if any subrogation claim the Company would have acquired would have been of doubtful merit, or if the insured made as good a settlement as the Company would have made, he or she may be paid the difference between the amount payable under the policy and what he or she settled for.

Whether any payment will be made to an insured under these conditions is a matter of judgment.  Each case must be considered on its own merits.

If the Company makes payment to the insured after he or she has settled his or her claim against the other party, no subrogation claim is acquired as the Company "stands in the insured's shoes."  This means that the Company's claim is no better than the insured's claim was.  If the insured's claim was dissolved by a settlement before the Company had a subrogation claim, the subrogation claim is lost.

## VII.   NOTICE OF SUBROGATION

If there is any appreciable delay in the insured's decision as to whether he or she will collect under his or her Physical Damage Coverage or proceed against the wrongdoer, put the other insurance company on notice of the Company's possible subrogation claim.  If the name of the other company is unknown or if the other driver is uninsured, the notice

XI-2

CONFIDENTIAL

should go to the driver of the other vehicle or the person responsible for its use. If the notification is directed to the other driver, he or she should be requested to forward it to his or her insurance company. Form letter CL-24 may be used for this purpose.

After a payment has been made in which we have a subrogation interest, the file is to remain open and the examiner or adjuster is to refer the file to the Payment Recovery Unit without closing the file.

If the identity of the responsible carrier is known, the Payment Recovery examiner is responsible for sending form letter S-6. This letter should be sent as soon as payment is made so that the Company's subrogation claim is not prejudiced. For example, after the insured settles with the Company, he or she might then also accept payment from the other party or their insurer for the same damage.

In some states, the insured's execution of a release of his or her liability claim against the other party effectively destroys the Company's subrogation claim. The only recourse then is for the Company to attempt to recover from the insured. In some states, a release executed by the insured does not bar the insurance company's subrogation claim if notice of the subrogation claim is given prior to settlement by the insured. If the other party or his or her insurance company settles with the insured after notice of the Company's subrogation interest, it does so at its own peril. Failure to protect the subrogee (the holder of a subrogation claim) may subject the paying company to paying twice for the same damage.

## VIII. EVALUATING THE SUBROGATION CLAIM

Many subrogation claims are settled on a compromise basis because of questions of liability or of the amount of damages. If the insurance company against which the subrogation claim is made can establish that the subrogee paid more than the reasonable cost of repairs, the recovery may be limited to the reasonable repair cost.

In evaluating a subrogation claim, the Payment Recovery examiner must carefully consider the same elements of liability and damages as a Liability Examiner does on a Property Damage Liability claim. He or she must decide when to accept a compromise and when to insist on full recovery. The percentage of recovery should be in line with the chances of prevailing in the event of litigation.

There are also questions of expense in pursuing subrogation claims. If the probable expense necessary for a greater recovery is not proportionate to the increase in the recovery, serious consideration should be given to a compromise. Because a subrogee will lose a portion of its recovery if it files a suit, some insurance companies refuse to consider subrogation claims on their merits. Instead, offers are made on clean liability cases representing the value of the claims less litigation expense.

XI-3

6-28-02

CONFIDENTIAL

If the claim examiner or adjuster is of the opinion that it would be prejudicial to attempt recovery of subrogation, he should discuss the file with his supervisor. If the supervisor agrees, the adjuster will not direct the file to the Payment Recovery Unit. If the subrogation examiner feels it unwise to assert a claim because of possible exposure to Bodily Injury Liability claims, he or she should discuss the matter with the Payment Recovery manager.

A great deal can be done to eliminate risks incident to subrogation if claims are handled properly.

XI-4

6-28-02

CONFIDENTIAL

# CHAPTER XII

## ARBITRATION

### Table of Contents

Page

I.    Introduction ........................................................................................................ 1

II.   Arbitration Defined ......................................................................................... 1

III.  Purpose .............................................................................................................. 1

IV.  Participating Members ..................................................................................... 1

V.   Claims Personnel Responsibility ................................................................... 2

VI.  Payment Recovery Examiner's Responsibility ....................................... 2

VII. The Automobile Subrogation Forum Application ("A" Form) ........................ 2

VIII. Supporting Papers ......................................................................................... 3

IX.  Special Arbitration Agreement ...................................................................... 4

X.   American Arbitration Association ................................................................. 4

XI.  International Reciprocal Arbitration ............................................................. 5

CONFIDENTIAL

6-28-02

# CHAPTER XII

## ARBITRATION

**I.   INTRODUCTION**

Arbitration is not considered a substitute for good claims handling.  Subrogation claims against the adverse carrier and liability claims made against GEICO are to be reviewed realistically to determine the liability and valuation.  Cases of questionable liability or questionable valuation will be negotiated directly with the adverse carrier as long as an amicable settlement is possible.  Every effort is to be made to keep problem cases from going into arbitration simply because they are a problem.

**II.   ARBITRATION DEFINED**

Arbitration is a method of resolving a dispute.  It is the resolution of a dispute by an impartial (third) party chosen by the parties to the dispute who agree in advance to abide by the arbitrator's award that is issued after a hearing at which both parties have an opportunity to be heard.

**III.   PURPOSE**

To minimize lawsuits, a number of property and casualty insurance companies, including our Company, have entered into a series of agreements that provide certain types of disputes between the various companies be resolved through arbitration.

In general, subrogation arbitration applies to material damage subrogation claims of not more than $100,000, but not to claims as to which a company asserts a defense of lack of coverage on grounds other than (1) delayed notice, (2) no notice or (3) non-cooperation. Note that the types of disputes that are covered by these agreements are disputes between insurance companies that are due to a subrogation claim involving property damage.

**IV.   PARTICIPATING MEMBERS**

The examiner or adjuster should make every effort to determine whether the adverse insurance company is a signatory to the arbitration agreements so as to avoid the unnecessary filing and withdrawal of suits.  The examiner or adjuster should seek the advice and assistance of the Payments Recovery Unit before any unfamiliar step is taken. We should be careful to avoid allowing any statute of limitations to run, and particular care must be given to claims against governmental agencies because of the likelihood of unusually short periods of limitations and notice requirements.  For claims involving the U. S. government, see the Federal Tort Claims Act.  See the Arbitration Forums

CONFIDENTIAL                                    6-28-02

Membership Directory for lists of companies that are signatories to the arbitration.

## V.    CLAIMS PERSONNEL RESPONSIBILITY

- If arbitration is filed against the Company in a claim file that is closed, reopen the file and establish the proper reserve(s).  Complete the Respondents portion of the Arbitration Forums, Inc. Automobile Subrogation Arbitration Forum Application ("A" Form).

- If an "A" Form is filed by the adverse carrier, but we believe we would prevail in arbitration, the claims examiner or adjuster should complete the "Respondent Information and Allegations" portion and file a counter-claim against the adverse carrier.

- If we receive an adverse decision, the award is to be paid promptly.  The award does not include the claimant's deductible, so our check is paid to the applicant only.  If the claimant's deductible has not been paid, a second check should be requisitioned, made payable to the claimant, and forwarded with the applicant's check so they are aware of the payment.  The applicant will forward the check to the claimant.

## VI.    PAYMENT RECOVERY EXAMINER'S RESPONSIBILITY

- If reasonable efforts to effect a subrogation recovery fail and it is determined that we should be successful in arbitration, the subrogation examiner should file an "A" form.

- If our "A" Form draws a counter-claim, the Payment Recovery Examiner is to refer the file immediately to the claims examiner or adjuster to answer as respondent.

- Handle all procedural matters concerning collection and apportionment of recoveries made through arbitration.

## VII.    THE AUTOMOBILE SUBROGATION FORUM APPLICATION ("A" FORM)

This form was created by the Arbitration Forums (AF) for use by both Applicant and Respondent. The following notes refer to the various parts. The Applicant Carrier sends an original and one copy of the "A" Form and Contentions Sheet to the proper (AF) field office and three copies to each Respondent Company. The Respondent(s) completes the first copy and sends it along with its Contention Sheet and other supporting documents to the proper AF field office. It also completes the second copy and sends it along with a copy of its Contentions Sheet to the Applicant. The third copy is kept in the Respondent's file.

XII-2

- Before submitting our application, as Applicant or Respondent, review the entire form for accuracy and neatness. We are judged on our appearance in Arbitration the same as we would be in court.

- As Respondent, we must answer "yes" or "no" to the Admission of Coverage question. A "yes" answer or a failure to answer will "estop" (i.e., prevent) us from making a later denial.

- Whether it is better to have an individual case heard by a single arbitrator will depend on our previous experience with a particular committee. Check with someone in your division or office who is acquainted with that Committee. If the dollar value on the case is less than $2,500, hearing by a one-man panel will occur. If the damages are over $2,500, you must send a written request to have a three-man panel hear the case.

- The Applicant must have contacted the Respondent prior to submitting an "A" Form to AF. The applicant, as evidence of satisfaction of the condition precedent to arbitration, must include on the respondent's portion of the form the name of the respondent company, its representative's name and address, and the file number. If this information is not available, the "A" Form must be accompanied by a memorandum explaining why the information is not available.

- The contentions are a synopsis of the case. They should be brief and relevant, inconsistencies are to be avoided.

## VIII. SUPPORTING PAPERS

A good file, in application or answer, contains the material listed below. GEICO's experience with arbitration has shown that a completely documented file is the best way to ensure a favorable decision

- Behind the Contentions Sheet, attach copies of all referenced statements and any other reports or factual documents, which would be helpful in our case. When attaching copies of statements, it is helpful to the Committee to indicate by mark, or some other designation, the highlights of each statement. Should the Committee wish to review the statements, their attention will be called to the important areas and the entire statement will not have to be read.

- When we wish to contest the amount of damages claimed, we must submit evidence of our evaluation. Point out the discrepancies when the adverse carrier's evaluation differs from ours. Include pictures of damage, if helpful.

- Virtually all states recognize the loss of use as a recoverable damage in tort.

XII-3

6-28-02

If loss of use is being subrogated, it is important to identify the elements necessary in that state to prove loss of use. All states require that the amount requested must be reasonable. Specifically, the length of time it took to repair the damaged vehicle must be reasonable under the circumstances, and the cost of the rental per day must be reasonable for a vehicle of like kind. In some states a replacement vehicle must actually be rented before loss of use will be recoverable. In other states the plaintiff just has to show that the amount being requested is reasonable and that he/she was without the use of the vehicle for the time requested. Still other states do not require the plaintiff to actually have incurred the expense of alternate transportation, but do require the plaintiff to show that he/she needed a vehicle during the time requested. Once you know the necessary elements for the state involved, you can argue appropriate defenses.

## IX. SPECIAL ARBITRATION AGREEMENT

This agreement is an outgrowth of the Automobile and Property Subrogation Arbitration Agreement, wherein certain companies have agreed to resolve inter-company disputes concerning:

- Contribution on bodily injury and property damage claims.

- Coverage, if they are insurers of the same insured.

If, after referring to the Agreement, Rules, and list of signatory companies, the examiner or adjuster believes arbitration should be initiated, it should be discussed with the Claims Manager prior to filing an application.

For Membership information contact Arbitration Forums telephonically: 888 ARB – FILE

If the claim is a Control File, the Claims Attorney should be advised by memorandum if we decide to submit a claim to arbitration or if a Notice of Hearing is received. The memorandum should include the following information:

- The claim number under which the claims office filed an application or received such a Notice of Hearing.

- The decision rendered by the arbitration panel.

## X. AMERICAN ARBITRATION ASSOCIATION

This Association in used to resolve disputes arising under Uninsured Motorist Coverage. If the insured and the Company cannot agree on whether there is legal liability on the part of the uninsured driver or to the settlement value of the claim presented, either or both matters shall be settled in accordance with the rules of the American Arbitration

XII-4

CONFIDENTIAL

6-28-02

Association as provided for under the terms of the policy.

## XI. INTERNATIONAL RECIPROCAL ARBITRATION

The Automobile Physical Damage Subrogation Arbitration Agreement (to which the Company is a signatory) and Canadian Inter-Company Arbitration Agreements (to which the Company is not a signatory) are subject to geographic limitations, as they only have jurisdiction over disputes which arise out of losses occurring within their respective countries involving companies which are signatories to their Agreements.

The International Reciprocal Arbitration Agreement was created to provide an instrument which would permit the signatory companies to the two above Arbitration Agreements to cross the international boundary in pursuit of their right of recovery.

This Agreement applies the compulsory features of the Automobile Physical Damage Subrogation Arbitration ("Agreement") or the Canadian Inter-Company Arbitration Agreement to accidents between nationals of the respective programs and to the nationals of one country involved in an accident in the other country.

The place of the accident determines which organization has jurisdiction. If the accident occurs in Canada and the companies have signed the International Reciprocal Arbitration Agreement, jurisdiction is conferred to the Canadian Agreement. If the loss occurs in the United States, jurisdiction is conferred to the Automobile Physical Damage Subrogation Arbitration Agreement.

# CHAPTER XIV

## Liability Performance Review

## Table of Contents

Page

I. Claims Reporting System - Call Handling.........................................................................1

    A. Review Criteria:

        i.   CSR
        ii.  TCRI

    B. Monitor Keying:  Entering and Editing

II. Claims Reporting System - File Handling .........................................................................3

    A. Review Criteria:

        i.   CSR
        ii.  Total Theft
        iii. PRU
        iv.  Suit
        v.   TCR/CU

    B. SPR Keying:  Entering and Editing

III. Claims Reporting System – Roll-up Reports.....................................................................5

IV. TIP Requirements ..............................................................................................................6

    A.  1-Hour Attempt TIP
    B.  24- Hour Contact TIP
    C.  Interested Parties
    D.  Internet

        i. Inquiries
        ii. Loss Reports

CONFIDENTIAL

02-3-05

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

## I. Claims Reporting System – Call Handling

### A. Review Criteria:

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use <u>stricter</u> standards.

Ratings will be the following:

- **A** – Outstanding performance
- **3** – Adequate performance
- **2** – Unsatisfactory performance which is below acceptable standards
- **1** – Integrity issues, violations of company policy and unfair claims practices

In order for the call to be considered an A Call, each category must be rated an **A**. However, a rating of **1** in a category does not automatically make the **Overall** rating a 1. Good claims judgment and common sense should be used when deciding upon the **Overall** rating.

The review criteria are available via the following links:

#### i. CSR Monitor Criteria:
CSR Link

#### ii. TCRI Monitor Criteria:
TCRI Link

CONFIDENTIAL

02-03-05

**B. Monitor Keying: Entering and Editing**

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>. Select the **Staff Dept** site and choose **Claims Home Office**. *Presently, the DirectNet site may only be used for CSR Monitors.*

Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

<u>CHO Monitor System Link</u>

In order to enter a Monitor, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting system. To enter a Monitor click **Monitors**. You will then have three choices:

- **Enter** a Review for a Monitor
- **Edit** a Previously Entered Review for a Monitor
- **Search** for a Monitor by Claim Number.

Click **Enter a Review for a Monitor**.

Enter the associate number of the file handler being reviewed and your associate number as the reviewer, and then click **Submit**.

The on-line system was developed to help the reviewer with questions on how to complete any portion of the form. Hold the cursor over the particular area in question and instructions will pop up on the screen regarding what should go in each box. If you attempt to submit a Monitor that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the Monitor you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed Monitor. The supervisor should review completed Monitors with the call handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

If the supervisor chooses not to use the Claims Reporting System to complete Monitors or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the call handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review for a**

02-03-05

CONFIDENTIAL

**Monitor** in the Claims Reporting System. Then enter the call handler's associate number, Section Code and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously entered Monitor by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number of the review you want to retrieve.

## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

Ratings to be used will be the following:

- **S (Satisfactory) -** Documentation/performance in accordance with company and state regulatory requirements
- **NS (Not Satisfactory) -** Documentation./performance which is below acceptable standards
- **N/A (Not Applicable) -** Does not apply.

An NS in any subcategory automatically makes the category an NS; for example, an NS rating in the subcategory of *Coverage* will make the entire category of *Investigation* an NS. However, an NS in a category does not automatically make the *Overall* rating an NS. Good claims judgment should be used when deciding whether the *Overall* rating is NS. The *Overall* should be NS when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

The review criteria are available via the following links:

    **i. CSR SPR Criteria**
      CSR Criteria Link


    **ii. Total Theft/Fire SPR Criteria**
      Total Theft Criteria Link

CONFIDENTIAL

02-03-05

iii. **PRU SPR Criteria**
     PRU Criteria Link

iv. **Suit SPR Criteria**
     Suit Criteria Link

v. **TCR/CU SPR Criteria**
     TCR/CU Criteria Link


**B. SPR Keying: Entering and Editing**

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>. Select the **Staff Dept** site and choose **Claims Home Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:


     <u>SPR System Link</u>


In order to enter an SPR, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting system. To enter a SPR click **SPR Forms**. You will then have three choices:

- **Enter** a Review for a SPR
- **Edit** a Previously Entered Review for a SPR
- **Search** for a Review by Claim Number.

Click **Enter a Review for a SPR**.

Enter the associate number of the file handler being reviewed and click the type of SPR to be completed:

- **CSR** – CSR and CSRII
- **Total Theft** – Total Theft and Fire
- **PRU** – Payment Recovery Unit
- **Suit SPR** – Suit files only
- **TCR CU SPR** – TCRI, TCRII, PIP & CU (non-suit only)

The on-line SPR system has been designed to help the reviewer with questions of how to complete any portion of the form. Hold the cursor over the particular area in question and instructions will pop up regarding the screen of what should go in each box. If you attempt to submit a SPR that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

CONFIDENTIAL

02-03-05

When you have properly completed the SPR you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed SPR. The supervisor should review completed SPR's with the file handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

If the supervisor chooses not to use the Claims Reporting System to complete SPR's or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the file handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review** in the Claims Reporting System. Select the type of review to be corrected, the file handler's associate number and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously completed SPR by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number and type of review you want to retrieve.

## III.  Claims Reporting System – Roll-up Reports

The on-line Performance Review System Roll-up Report is located on Direct Net. Select the **Staff Dept** site and choose **Claims Homes Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

Reporting System Link

To review a Roll-up Report, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting System. To review any of the Roll-up reports, click **Rollup Reports**. You have three choices for the time frame you want to review:

- **Week** – For reviewing results for one or multiple weeks
- **Month** –  For reviewing results for a particular month
- **Year** – For reviewing results for the year to date

CONFIDENTIAL

Choose the type of report you want to review. There are four choices:

- **Individual** – For reviewing the results of a single individual.  Enter the associate number, section code and the FCC applicable to the individual.
- **Supervisor** – For reviewing the results of a particular Supervisor's unit. Enter the section code and FCC applicable to the unit.
- **Manager** – For reviewing the results of all units by level.  Enter the FCC applicable to the units.
- **Regional** – For reviewing the results of each level in a region or profit center. Enter the FCC applicable to the region or profit center.

Once you have chosen the time frame and report type you want to review, click **Submit**. This will take you to the summary report of the results for review and analysis.  You may also obtain more detailed roll up reports by clicking on any of the areas which are highlighted; such as, the associate number, section code or reports.

## IV.   TIP Requirements

*This will update the previous TIP Guidelines dated May 7, 2004.*

### A. 1-Hour Attempt TIP

File handlers will have 1-Hour <u>from the time of an initial assignment</u> to *attempt contact*[1] <u>on all interested parties.  This will be measured between the hours of 8:00 a.m. and 8:00</u> p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays.  For those losses reported outside of these time frames, 1-Hour Attempt is exempt (N/A), but 24-Hour Contact TIP guidelines still apply.

CHO recommends that the profit centers develop alternate off-hour staffing plans to address 1-Hour Attempt TIP on weekends and holidays.  These teams may be staffed with TCRI's, TCRII's and file handlers who will satisfy the TIP requirements after traditional hours, regardless of the level of the claim.  For example, a TCRI making 1-Hour Attempt on a CU level file has satisfied the TIP requirement.

On transfer cases and newly assigned losses, for those interested parties who already have spoken directly to a GEICO file handler (CSR, TCRI, TCRII, CU, PIP or Total Theft), 1-Hour Attempt is exempt (N/A).  Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt (N/A) from 1-Hour Attempt.  To qualify for this exemption, the ALOGI/Activity Log must be documented as

---

[1] Attempted contact is placing a call, but not being able to leave a message.

CONFIDENTIAL

02-03-05

such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

In cases where GEICO has been notified that a suit has been filed against our insured, the assigned CU examiner will have 1-Hour to make contact with that insured.

## B.  24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment,</u> <u>transfer from another claims level</u> or <u>once additional information is received</u> to make *actual contact*[2] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact. For example, a file transferred from TCRII to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact.  To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message.  In these cases, aggressive attempts should be made to contact the interested party.  Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

## C.  Interested Parties

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-Hour Attempt and 24-Hour Contact TIP.

---

[2] Actual contact is placing a call, then either talking to the person or leaving a message.

CONFIDENTIAL

02-03-05

The following interested parties **are subject** to 1-Hour Attempt and 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers
- Claimant owner and/or spouse
- Claimant driver

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-Hour Attempt is exempt **(N/A)** but the 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## D. Internet

### i. Inquires:

File handlers will have 2 hours to acknowledge and respond to an E-mail Inquiry ("Contact Us") with appropriate responses occurring by telephone contact or CHO approved email template. Use of any "free form" email response is unacceptable.

### ii. Loss Reports:

All Internet loss reports ("INET") must be established within 1 hour of receipt. Standard contact TIP will then apply. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays.

02-03-05

CONFIDENTIAL

# CHAPTER II

## THE CLAIMS FUNCTION

### I.    GENERAL STATEMENT

It is company policy to settle claims fairly and promptly. Investigation is necessary for every claim presented, but the extent of the investigation depends on the nature of the claim. The real objective of the investigation is a fair resolution at the earliest practicable time. At every step in the claim process the question should be raised, "how can this claim best be resolved?"

Prompt service, however, does not justify paying claims the company does not owe. It is as wrong to pay claims which should not be paid as it is not to pay claims which should be paid. Promptness and fairness should be used throughout the handling of all claims. All associates handling claims have a duty to deal frankly and openly with policyholders, witnesses, attorneys, claimants, medical providers, and the general public.

Our claims associates have the obligation to treat policyholders and all interested parties with respect and deal with their insurance issues fairly and as quickly as possible.

### II.   PROFESSIONAL GUIDELINES

#### A.    Code of Conduct

The nature of claims work requires that claims associates comply with GEICO's standard of competence and ethical conduct. Pride, self-respect and integrity are characteristic of the successful claims person.

Traditionally, fairness, competence, and integrity have also been characteristic of GEICO claims associates. We can be proud of these traditions; through them we have earned the respect of all with whom we come into contact.

To many people, the GEICO claims associate is GEICO and may be the only company employee a large segment of the public will ever deal with. Accordingly, each associate has a responsibility and a corresponding obligation to act in a professional manner that will reflect positively on themselves and the companies.

Today, the insurance industry, as never before, is being examined in depth by various executive and legislative branches of state and federal governments. Significant portions of these examinations are directed toward the system under

II-1

CONFIDENTIAL

which claims are handled, and the manner in which the system is used by claims personnel. The GEICO Companies support the NAIC Model Unfair Trade Practices Act, and the individual state acts relating to claims settlement practices. Each claims associate should be familiar with these acts and should abide by their provisions.

- **The GEICO Claims Code of Conduct Booklet**

    Claims associates should be familiar with the code and behave accordingly. Each associate is given the booklet when hired and is required to sign off on any revisions.

## B.    Responsibility of the Claims Associate

The basic responsibility of the claims associate is to bring about an equitable outcome of claims presented under the policy contract. Since the operational funds belong to our policyholders, the claims associate has an obligation to those policyholders to pay just and valid claims and resist those not owed. This should be accomplished efficiently and economically.

Fulfillment of that obligation requires the exercise of sound judgment. The claims associate should be able to select the proper course of action. Decisions should be based on a thorough knowledge of the policy contracts, a working knowledge of legal principles, complete investigations, and sound evaluations.

Responsibility for the proper disposition of a claim rests with the claims associate to whom the case is assigned. The claims associate should bring about suitable results through direct contact with the insured, claimant, or others, as necessary.

The only products we have are Service and Protection. The claims associate delivers both. The claims associate should be equitable, empathetic and accessible and handle all claims with integrity.

The most frequent problem in claims handling is disagreement as to what constitutes a fair settlement. The examiner or adjuster should be prepared to explain the Company's position in a clear and logical manner. The response to a justified claims complaint should focus first on a timely and correct remedy to the complaint, and second on the initiation of appropriate steps to correct any deficiency.

## C.    Professional Ethics

We at GEICO hold all of our claim representatives to a high standard of integrity and professionalism. If, for instance, the settlement of a case is drawn out and the

5-10-02

CONFIDENTIAL

claimant inquires about the existence of a statute of limitations or its applicability to the case, the examiner or adjuster should never mislead the claimant into believing that the statute does not apply to the particular claim, if it actually does, nor should the adjuster tell the claimant that the company will waive the statute without specific permission from the VP of Claims Home Office or AVP of Claims Home Office Legal.

The claims person is expected to adhere to a standard of conduct, which not only is above reproach, but the appearance of which cannot possibly be construed as suggesting fraud or deceit. The corporate reputation of the GEICO Companies and the individual reputation of its claims associates are far too valuable to risk against the temporary advantage that might be gained by resorting to unethical practices in the handling of a claim.

## D. Plaintiff's Attorneys

The companies or their representatives should not deal directly with any claimant represented by an attorney without the consent of the attorney. Once the company is put on notice, either by the claimant or by an attorney, that the claimant is represented by the attorney, all future dealings must be with the attorney. It is improper for the claims associate to negotiate directly with a represented claimant from this time forward unless he has the permission of the attorney to do so. However, there is no restriction on the right of the claims person to verify that representation. And there is no prohibition on an adjuster making inquiries about any allegations made by the attorney or in attempting to uncover any information from other sources which the attorney has refused to give.

The claims associate should request information on injuries and expenses and obtain the attorney's theory of liability. He should then advise the attorney that the GEICO Companies are ready and willing to discuss settlement anytime we have sufficient information to evaluate of the claim.

If one of our insured's is represented, it depends on the type of claim the insured is making as to whether or not we should deal directly with the insured instead of the attorney. For example, in a UM or UIM claim, we must deal with the attorney. In a PIP or Medical Payments claim, we may deal directly with the insured unless the attorney advises the insured desires us to deal with the attorney directly.

## E. Confidentiality of Claim File Information

1. General

The information contained in our claim files is of a confidential nature and its

II-3

CONFIDENTIAL

use is restricted. It should not be reviewed or discussed in idle conversation. Information contained in either a paper file or an electronic file shall not be released except under certain circumstances. Reasonable application of common sense in the evaluation of information requests is most important. Release of any information from a claim file is subject to the guidelines indicated in the privacy acts of the various states, in accord with the discovery rules of the local court, and Company procedures.

The following guidelines are to assist you in deciding whether to release information and what kind of information may be released without either the consent of the insured or the claims manager and/or claims attorney (whichever is indicated):

- Property damage estimates/appraisals/repair bills on insured's car to support our subrogation claim.

- Medical bills, loss of wages or income statements of an insured when it is necessary to support our subrogation claim under Medical Payments, Personal Injury Protection, or Uninsured Motorist Coverages. (Claims associate may release.)

- Requests by governmental agency or by a valid subpoena properly served on us. (Claims Legal must be consulted before complying.)

- BI Index System/Bureau inquiries for medical information about an insured. If we are considering releasing diagnosis, prognosis, course and cost of treatment, both open and closed cases should be reviewed by the claims associate, discussed with the claims manager, and a decision made whether it is necessary to obtain the insured's written consent.

- BI Index System/Bureau inquiries for medical information about a third party claimant. (Claims associate may release.)

  If there is a request for information from our file, which does not fall within one of the above categories, the examiner or adjuster should discuss it with the claims manager prior to releasing it. REMEMBER, judgment and common sense should be exercised in responding to all information requests.

·2. Double Insured Cases

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits.

II-4

CONFIDENTIAL

File contents should not be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross-referenced file and should be retained in the file to be reviewed. (This does not apply to non-conflict of interest claims handled at the CSR level. See TCM titled "ADJUSTER AGENT OR INDEPENDENT CONTRACTOR-MULTIPLE GEICO INSUREDS'-CLAIMS HANDLING-ALL".)

In the event of litigation, a subpoena may be obtained if authorization is not voluntarily given.

Cases in which authorization is needed would include permission to review No-Fault or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

An authorization form has been developed for use in this type of case. It is called the "Information Authorization Form" (C-240). Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

## F.    Our Relationship with Insureds and Claimants

In third party cases, the examiner or the adjuster owes a duty and loyalty to our insureds.

If there is a real doubt concerning the interpretation of a portion of the policy or the dollar value of the claim, every reasonable effort should be made to give fair consideration to the question from the viewpoint of the policyholder, the Company, and the claimant.

In first party cases, the company should analyze the policy contract fairly and attempt to resolve questionable situations equitably whenever possible. We should clearly explain all available coverages and benefits. The policy terms clearly spell out conditions/exclusions and a decision should not be made in favor of the insured if his/her policy indicates the loss is not covered. Likewise, the company owes it to its policyholders to pay only those claims which are covered by the policy.

In addition to our contractual duty to our insureds, we recognize our obligation to claimants. The policy of endeavoring to settle claims as promptly as possible applies to third party claims as well.

1-30-08

CONFIDENTIAL

## III.   TECHNICAL CLAIMS HANDLING

### A.   Facing the Future

Change is fundamental to success. The best insurer is constantly analyzing its operation to provide a better product. As times change, GEICO's method of claims handling will change.

Needed products and services will be determined by the desires of the public as shown in opinion surveys, marketing polls, analysis of legislation, and other public opinion results.

It is our policy to be alert to changing concepts of claims handling which reflect this new climate without violating our duty to our policyholders. This requires the examiner and the adjuster to accept new ideas and accept change.

In keeping with change, the company employs claims handling techniques such as: rehabilitation specialists, structured settlements, computerized estimates, computerized claims systems and handling,

Medical Cost Containment and Benefits Restoration, and Special Investigation Units are but two examples of innovative concepts in claims handling. The years ahead probably will bring other ideas designed to benefit both the insurance industry and the public. It is the responsibility of all claims associates to be aware of new concepts; to recognize individual claims to which the concepts might apply; and to make early recommendations concerning the application of these new methods to individual claim files.

We want to market quality insurance and related services to the insuring public, at a price advantage. Claims associates make this goal a reality.

### B.   Settlement Techniques

The claims associate should be realistic in the early appraisal of the claim. If we owe it, pay it. Settle claims fairly at the earliest practical time whenever possible.

Recognizing their need, we must utilize various settlement concepts. We have open-end releases, whereby, in addition to the consideration stipulated, we agree to pay additional amounts of money in the future. Property damage claims (including claims for loss-of-use) that are owed, are paid as soon as possible . whether or not there are pending bodily injury claims arising from the same accident.

In many cases, we advance money to an injured party so innocent victims can provide for themselves and their families during their period of incapacity. These

II-6

CONFIDENTIAL

payments are made with no strings attached, except that the amount will be credited to the ultimate settlement. Advance payments include such things as property damage, medical expenses, loss of income, and many other unusual items determined by particular circumstances. In some cases, without even a prior discussion concerning an ultimate settlement, rehabilitation facilities are provided to assist the injured in returning to a productive life at the earliest possible time.

Rehabilitation programs, structured settlements, advanced payments, open-end releases, and "walk-away" settlements are some of our claims handling techniques for serving our industry and our public. Properly utilized, they can be effective responses to the public demand to help the seriously injured more expeditiously. The various types of settlements are covered in Chapter V.

## C.  Unfair Claims Practices

In Chapter 1, we referred to the regulation of insurance by grouping the methods into three categories: 1) legislation, 2) administration and 3) court action.

The industry itself imposes self-regulatory systems. Trade associations and various groups related to the industry have developed claims settlement practices within the framework of legal systems, government regulations, and contractual provisions. The National Association of Independent Insurers (NAII), the American Insurance Association (AIA), and the National Association of Independent Insurance Adjusters are a few such organizations.

The National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act (cited in TCM 108 and in the NAII Manual) categorizes these principles generally and specifically by state. The act prohibits unjust, dilatory, and unethical claims practices. The claims associate should be prompt, fair, and forthright. Claims should be settled timely whenever possible, on merit basis, with professional etiquette. Claims associates should be thoroughly familiar with and abide by the Unfair Claims Practices Acts and regulations in each jurisdiction, as well the GEICO Claims Code of Conduct (C-253).

## D.  Our Relationship with Attorneys and Independent Adjusters

The company is represented by attorneys and selected independent adjusters throughout the country. Those who regularly represent the company are listed in the Attorney and Adjuster Code Book, which is now housed in the computer under transaction "AAI".

The selection and replacement of attorneys and claim representatives within regions is made by the assistant vice president for claims with the concurrence of the vice president of claims. (See TCM-29.)

5-10-02

CONFIDENTIAL

All claims associates have an obligation to keep their regional claims management informed of any developments which might suggest the benefit of a change in representation in any particular area. If an alternate representative is needed on a temporary basis, approval can be obtained from the claims manager with concurrence of Claims Home Office Legal.

The companies' representatives are carefully selected on the basis of ability and reputation. The companies review the quality of service and claims handling of

these representatives, and delegate authority on a case by case basis. The nature of the relationship dictates these representatives should follow GEICO standards of competence, integrity, and professional and ethical conduct.

The instructions to an independent adjuster should be specific so the representative knows precisely what is expected. When authority is delegated, the claims associate should explain exactly how the negotiations should be conducted. All directives should be clearly defined. Any departure from the instructions should be questioned. Normally, the claims associate should direct the investigation and reserve the negotiation phase of the claim for him or her self.

It is the companies' objective to have a mutually beneficial relationship with the independent adjusters and attorneys. The claims manager and the claims associate must be aware of problems in the field and judge the firms accordingly. Disagreeable circumstances can often be avoided by clear supervision given in advance. Open communications and mutual respect are essential to cost effective settlements.

Our defense attorneys are chosen on the basis of their professional knowledge, ability, and experience. In most instances, they are local leaders in their fields. They are limited agents with authority delegated to the particular case assigned. The fiduciary relationship between the attorney and the client-principal dictates that the attorney represent the client with the highest degree of loyalty and fidelity. On each case, the attorney acts solely in the best interest of his client within the bounds of the law.

The primary duties of an attorney are: 1) advise and counsel, 2) prepare legal instruments, and 3) perform services in the courts of justice. The attorney seeks the lawful objectives of the client through reasonable means permitted by law and advises the client of legal considerations. Authority to make a decision is exclusively that of the client. However, the attorney must exert every effort to ensure the decision is made only after the client is informed of all relevant ·considerations and practicalities of such a decision.

The attorney may represent multiple clients whose interests are not potentially different, such as an insurer and insured. If suit were filed directly against the company, the defense attorney would represent the company as the client. When

5-10-02

CONFIDENTIAL

the insured is sued by a third party, the defense attorney solely represents the insured as the client; but the company has the right, under the policy contract, to select the defense firm to be used and to control the settlement decisions. Situations may arise where there is a conflict of interest. One example of this would be a coverage question in the matter being defended. The attorney must promptly inform both the insured and the Company in writing the nature and the extent of the conflicting interests. The insured should be invited to retain his own counsel depending on the circumstances. The attorney owes undivided allegiance to the insured which forbids any collusion between the company and the attorney against the insured. If this situation occurs, the claims associate must discuss the claim with the claim manager, Regional RLA and Claims Home Office Legal.

The companies have a corresponding obligation to their insureds. The insured must be informed of the progress of the pending suit. Although the company provides the defense, it is primarily the insured's suit. The company has the duty to answer the insured's questions and to report any circumstances which may subject the insured to personal loss.

Suit handling is covered in Chapter IX. However, it is important for the claims associate to be aware of the flow of responsibility and the corresponding duties in the special relationship which exists between the principal and agent, the insured and the company, the insured and the attorney, and the company and the representative.

\*    **E.**    **Correspondence and Documentation**

The ability to express yourself clearly and persuasively is an essential attribute for a successful claims associate. Because of the nature of the companies operation, a portion of the communications with policyholders, claimants, and attorneys is through correspondence. Little is accomplished if an examiner or adjuster has superior technical knowledge but cannot convey their thoughts to others.

It is company policy to reply courteously to all letters that call for a response within a reasonable period of time.

The claims associate's communications should display leadership, good sound judgment, and decisiveness. Simple and direct language avoids misinterpretation. To be effective, the communication should express the claims associate's position in a clear, concise, easy to read and understand manner. Its tone should be professional and businesslike, words spelled correctly, and proper grammar utilized.

Correspondence with independent adjusters and attorneys requires particular attention. It is through such communication that direction is exercised over the handling of claims. To assure high quality service from independent adjusters and

II-9

CONFIDENTIAL

attorneys, and to check the cost of their work, demands intelligent supervision. Proper direction from the claims associate should be reflected in their work product.

Correspondence to independent adjusters should outline what is needed -- early claimant contact, signed statements, police reports, photos, diagrams -- whatever is necessary to avoid a decision delay. Instructions on negotiation techniques should accompany settlement authority.

The independent adjuster should forward timely and complete status reports within 30 days. Their activities should be in accordance with the claims associate's instructions and within company guidelines. There may be occasions when the claims associate disagrees with a representative's case handling. The claims associate should be able to offer constructive criticism to correct the deficiencies. If the disagreement is of a serious nature, the claims associate's supervisor should become involved.

Our defense attorneys are presumed to be experts in the legal field. The claims associates need not instruct them on points of law or procedure, but should monitor their activities and maintain direction of the case.

Follow-up is essential. Once the claims associate has told the representative what is required, the instructions should be accomplished within a reasonable period of time. The claims associate should assure that the representative responds as promptly as possible. If a timely report is not received, a letter or telephone call may be required.

Do not use hand written correspondence if a letter or phone call is required.  Any significant correspondence with anyone should be typed.   Handwritten memoranda are unacceptable. All communication, whether by correspondence, telephone, or in person, should create a favorable impression. The claims associate's correspondence reflects the image of the company. It is the responsibility of the examiner or the adjuster to maintain that image of high GEICO standards through effective communication.

\* Claim system enhancements have added form letters and templates to our arsenal of claim tools that improve efficiencies in claim file documentation. We generally know when to send such letters and what events trigger a specific letter or template.

Unfair claim settlement practice acts generally set out requirements for responding to correspondence. In addition, we have claim processes and procedures regarding documenting telephone calls, facsimile transmissions and other communication in the claim file. These various sources set minimum standards.

1-30-08

CONFIDENTIAL

We need to be constantly vigilant that we are not shortsighted in our task of documenting claim files with correspondence made to fit into an existing format.

There are times when telephone communication is best documented by both an Alog entry and sending a confirmatory letter. Unusual requests or those that cause us not to do something are examples of situations that should cause us to send a letter. It should detail what was said and why we are doing or not doing what we planned to do. For instance, if we receive a telephone call from an attorney who tells us he would not accept an offer of our policy limits, if made, and we believe it is a case where we should be tendering our limits, in addition to documenting the conversation in Alog, we should confirm in writing that we are prepared to offer the limits but for his refusal. In addition, we also convey our intent to pay the limits once he tells us how to make the check payable and otherwise offer the limits notwithstanding his professed inability to accept them.

This is especially necessary where it can be reasonably anticipated that the contents of a singular ALOG entry may be denied later by the speaker.

We must constantly be aware of the best method of communicating and documenting our claim files, using multiple methods where prudent.

1-30-08

CONFIDENTIAL

# SLIP SHEET

CONFIDENTIAL

# CHAPTER II

## THE CLAIMS FUNCTION

### I.   GENERAL STATEMENT

It is company policy to settle claims fairly and promptly. Investigation is necessary for every claim presented, but the extent of the investigation depends on the nature of the claim. The real objective of the investigation is a fair resolution at the earliest practicable time. At every step in the claim process the question should be raised, "how can this claim best be resolved?"

Prompt service, however, does not justify paying claims the company does not owe. It is as wrong to pay claims which should not be paid as it is not to pay claims which should be paid. Promptness and fairness should be used throughout the handling of all claims. All associates handling claims have a duty to deal frankly and openly with policyholders, witnesses, attorneys, claimants, medical providers, and the general public.

Our claims associates have the obligation to treat policyholders and all interested parties with respect and deal with their insurance issues fairly and as quickly as possible.

### II.   PROFESSIONAL GUIDELINES

#### A.   Code of Conduct

The nature of claims work requires that claims associates comply with GEICO's standard of competence and ethical conduct. Pride, self-respect and integrity are characteristic of the successful claims person.

Traditionally, fairness, competence, and integrity have also been characteristic of GEICO claims associates. We can be proud of these traditions; through them we have earned the respect of all with whom we come into contact.

To many people, the GEICO claims associate is GEICO and may be the only company employee a large segment of the public will ever deal with. Accordingly, each associate has a responsibility and a corresponding obligation to act in a professional manner that will reflect positively on themselves and the companies.

Today, the insurance industry, as never before, is being examined in depth by various executive and legislative branches of state and federal governments. Significant portions of these examinations are directed toward the system under

Il-1

5-10-02

which claims are handled, and the manner in which the system is used by claims personnel. The GEICO Companies support the NAIC Model Unfair Trade Practices Act, and the individual state acts relating to claims settlement practices. Each claims associate should be familiar with these acts and should abide by their provisions.

- **The GEICO Claims Code of Conduct Booklet**

    Claims associates should be familiar with the code and behave accordingly. Each associate is given the booklet when hired and is required to sign off on any revisions.

## B. Responsibility of the Claims Associate

The basic responsibility of the claims associate is to bring about an equitable outcome of claims presented under the policy contract. Since the operational funds belong to our policyholders, the claims associate has an obligation to those policyholders to pay just and valid claims and resist those not owed. This should be accomplished efficiently and economically.

Fulfillment of that obligation requires the exercise of sound judgment. The claims associate should be able to select the proper course of action. Decisions should be based on a thorough knowledge of the policy contracts, a working knowledge of legal principles, complete investigations, and sound evaluations.

Responsibility for the proper disposition of a claim rests with the claims associate to whom the case is assigned. The claims associate should bring about suitable results through direct contact with the insured, claimant, or others, as necessary.

The only products we have are Service and Protection. The claims associate delivers both. The claims associate should be equitable, empathetic and accessible and handle all claims with integrity.

The most frequent problem in claims handling is disagreement as to what constitutes a fair settlement. The examiner or adjuster should be prepared to explain the Company's position in a clear and logical manner. The response to a justified claims complaint should focus first on a timely and correct remedy to the complaint, and second on the initiation of appropriate steps to correct any deficiency.

## C. Professional Ethics

We at GEICO hold all of our claim representatives to a high standard of integrity and professionalism. If, for instance, the settlement of a case is drawn out and the

claimant inquires about the existence of a statute of limitations or its applicability to the case, the examiner or adjuster should never mislead the claimant into believing that the statute does not apply to the particular claim, if it actually does, nor should the adjuster tell the claimant that the company will waive the statute without specific permission from the VP of Claims Home Office or AVP of Claims Home Office Legal.

The claims person is expected to adhere to a standard of conduct, which not only is above reproach, but the appearance of which cannot possibly be construed as suggesting fraud or deceit. The corporate reputation of the GEICO Companies and the individual reputation of its claims associates are far too valuable to risk against the temporary advantage that might be gained by resorting to unethical practices in the handling of a claim.

## D.   Plaintiff's Attorneys

The companies or their representatives should not deal directly with any claimant represented by an attorney without the consent of the attorney. Once the company is put on notice, either by the claimant or by an attorney, that the claimant is represented by the attorney, all future dealings must be with the attorney. It is improper for the claims associate to negotiate directly with a represented claimant from this time forward unless he has the permission of the attorney to do so. However, there is no restriction on the right of the claims person to verify that representation. And there is no prohibition on an adjuster making inquiries about any allegations made by the attorney or in attempting to uncover any information from other sources which the attorney has refused to give.

The claims associate should request information on injuries and expenses and obtain the attorney's theory of liability. He should then advise the attorney that the GEICO Companies are ready and willing to discuss settlement anytime we have sufficient information to evaluate of the claim.

If one of our insured's is represented, it depends on the type of claim the insured is making as to whether or not we should deal directly with the insured instead of the attorney. For example, in a UM or UIM claim, we must deal with the attorney. In a PIP or Medical Payments claim, we may deal directly with the insured unless the attorney advises the insured desires us to deal with the attorney directly.

## E.   Confidentiality of Claim File Information

1. General

The information contained in our claim files is of a confidential nature and its

5-10-02

CONFIDENTIAL

use is restricted. It should not be reviewed or discussed in idle conversation. Information contained in either a paper file or an electronic file shall not be released except under certain circumstances. Reasonable application of common sense in the evaluation of information requests is most important. Release of any information from a claim file is subject to the guidelines indicated in the privacy acts of the various states, in accord with the discovery rules of the local court, and Company procedures.

The following guidelines are to assist you in deciding whether to release information and what kind of information <u>may</u> be released without either the consent of the insured or the claims manager and/or claims attorney (whichever is indicated):

- Property damage estimates/appraisals/repair bills on insured's car to support our subrogation claim.

- Medical bills, loss of wages or income statements of an insured when it is necessary to support our subrogation claim under Medical Payments, Personal Injury Protection, or Uninsured Motorist Coverages. (Claims associate may release.)

- Requests by governmental agency or by a valid subpoena properly served on us. (Claims Legal must be consulted before complying.)

- BI Index System/Bureau inquiries for medical information about an <u>insured</u>. If we are considering releasing diagnosis, prognosis, course and cost of treatment, both open and closed cases should be reviewed by the claims associate, discussed with the claims manager, and a decision made whether it is necessary to obtain the insured's written consent.

- BI Index System/Bureau inquiries for medical information about a third party claimant. (Claims associate may release.)

If there is a request for information from our file, which does not fall within one of the above categories, the examiner or adjuster should discuss it with the claims manager prior to releasing it. REMEMBER, judgment and common sense should be exercised in responding to all information requests.

·2. Double Insured Cases

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits.

II-4

5-10-02

File contents should not be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross-referenced file and should be retained in the file to be reviewed.

\*   Written authorization is <u>not</u> always needed when:

- handling non-conflict of interest claims at the CSR level. See TCM titled "ADJUSTER AGENT OR INDEPENDENT CONTRACTOR-MULTIPLE GEICO INSUREDS'-CLAIMS HANDLING-ALL".

- sharing recorded interviews if verbal authorization is secured on the recording. The adjuster should request authorization to share the interview by asking the following question: **There may be other examiners who will handle other aspects of this accident. Do I have your permission to share this recorded interview with the other examiners on this and/or the other file?**

In the event of litigation, a subpoena may be obtained if authorization is not voluntarily given.

Cases in which authorization is needed would include permission to review No-Fault or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

An authorization form has been developed for use in this type of case. It is called the "Information Authorization Form" (C-240). Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

**F.   Our Relationship with Insureds and Claimants**

In third party cases, the examiner or the adjuster owes a duty and loyalty to our insureds.

If there is a real doubt concerning the interpretation of a portion of the policy or the dollar value of the claim, every reasonable effort should be made to give fair consideration to the question from the viewpoint of the policyholder, the Company, and the claimant.

II-5

In first party cases, the company should analyze the policy contract fairly and attempt to resolve questionable situations equitably whenever possible. We should clearly explain all available coverages and benefits. The policy terms clearly spell out conditions/exclusions and a decision should not be made in favor of the insured if his/her policy indicates the loss is not covered. Likewise, the company owes it to its policyholders to pay only those claims which are covered by the policy.

In addition to our contractual duty to our insureds, we recognize our obligation to claimants. The policy of endeavoring to settle claims as promptly as possible applies to third party claims as well.

## III.   TECHNICAL CLAIMS HANDLING

### A.   Facing the Future

Change is fundamental to success. The best insurer is constantly analyzing its operation to provide a better product. As times change, GEICO's method of claims handling will change.

Needed products and services will be determined by the desires of the public as shown in opinion surveys, marketing polls, analysis of legislation, and other public opinion results.

It is our policy to be alert to changing concepts of claims handling which reflect this new climate without violating our duty to our policyholders. This requires the examiner and the adjuster to accept new ideas and accept change.

In keeping with change, the company employs claims handling techniques such as: rehabilitation specialists, structured settlements, computerized estimates, computerized claims systems and handling,

Medical Cost Containment and Benefits Restoration, and Special Investigation Units are but two examples of innovative concepts in claims handling. The years ahead probably will bring other ideas designed to benefit both the insurance industry and the public. It is the responsibility of all claims associates to be aware of new concepts; to recognize individual claims to which the concepts might apply; and to make early recommendations concerning the application of these new methods to individual claim files.

We want to market quality insurance and related services to the insuring public, at a price advantage. Claims associates make this goal a reality.

5-10-02

CONFIDENTIAL

**B.** **Settlement Techniques**

The claims associate should be realistic in the early appraisal of the claim. If we owe it, pay it. Settle claims fairly at the earliest practical time whenever possible.

Recognizing their need, we must utilize various settlement concepts. We have open-end releases, whereby, in addition to the consideration stipulated, we agree to pay additional amounts of money in the future. Property damage claims (including claims for loss-of-use) that are owed, are paid as soon as possible whether or not there are pending bodily injury claims arising from the same accident.

In many cases, we advance money to an injured party so innocent victims can provide for themselves and their families during their period of incapacity. These payments are made with no strings attached, except that the amount will be credited to the ultimate settlement. Advance payments include such things as property damage, medical expenses, loss of income, and many other unusual items determined by particular circumstances. In some cases, without even a prior discussion concerning an ultimate settlement, rehabilitation facilities are provided to assist the injured in returning to a productive life at the earliest possible time.

Rehabilitation programs, structured settlements, advanced payments, open-end releases, and "walk-away" settlements are some of our claims handling techniques for serving our industry and our public. Properly utilized, they can be effective responses to the public demand to help the seriously injured more expeditiously. The various types of settlements are covered in Chapter V.

**C.** **Unfair Claims Practices**

In Chapter I, we referred to the regulation of insurance by grouping the methods into three categories: 1) legislation, 2) administration and 3) court action.

The industry itself imposes self-regulatory systems. Trade associations and various groups related to the industry have developed claims settlement practices within the framework of legal systems, government regulations, and contractual provisions. The National Association of Independent Insurers (NAII), the American Insurance Association (AIA), and the National Association of Independent Insurance Adjusters are a few such organizations.

The National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act (cited in TCM 108 and in the NAII Manual) categorizes these principles generally and specifically by state. The act prohibits unjust, dilatory, and unethical claims practices. The claims associate should be prompt, fair, and forthright. Claims should be settled timely whenever possible, on merit basis, with professional etiquette. Claims associates should be thoroughly familiar with

5-10-02

CONFIDENTIAL

and abide by the Unfair Claims Practices Acts and regulations in each jurisdiction, as well the GEICO Claims Code of Conduct (C-253).

**D.** **Our Relationship with Attorneys and Independent Adjusters**

The company is represented by attorneys and selected independent adjusters throughout the country. Those who regularly represent the company are listed in the Attorney and Adjuster Code Book, which is now housed in the computer under transaction "AAJ".

The selection and replacement of attorneys and claim representatives within regions is made by the assistant vice president for claims with the concurrence of the vice president of claims. (See TCM-29.)

All claims associates have an obligation to keep their regional claims management informed of any developments which might suggest the benefit of a change in representation in any particular area. If an alternate representative is needed on a temporary basis, approval can be obtained from the claims manager with concurrence of Claims Home Office Legal.

The companies' representatives are carefully selected on the basis of ability and reputation. The companies review the quality of service and claims handling of these representatives, and delegate authority on a case by case basis. The nature of the relationship dictates these representatives should follow GEICO standards of competence, integrity, and professional and ethical conduct.

The instructions to an independent adjuster should be specific so the representative knows precisely what is expected. When authority is delegated, the claims associate should explain exactly how the negotiations should be conducted. All directives should be clearly defined. Any departure from the instructions should be questioned. Normally, the claims associate should direct the investigation and reserve the negotiation phase of the claim for him or her self.

It is the companies' objective to have a mutually beneficial relationship with the independent adjusters and attorneys. The claims manager and the claims associate must be aware of problems in the field and judge the firms accordingly. Disagreeable circumstances can often be avoided by clear supervision given in advance. Open communications and mutual respect are essential to cost effective settlements.

Our defense attorneys are chosen on the basis of their professional knowledge, ability, and experience. In most instances, they are local leaders in their fields. They are limited agents with authority delegated to the particular case assigned. The fiduciary relationship between the attorney and the client-principal dictates that the attorney represent the client with the highest degree of loyalty and fidelity.

CONFIDENTIAL

5-10-02

On each case, the attorney acts solely in the best interest of his client within the bounds of the law.

The primary duties of an attorney are: 1) advise and counsel, 2) prepare legal instruments, and 3) perform services in the courts of justice. The attorney seeks the lawful objectives of the client through reasonable means permitted by law and advises the client of legal considerations. Authority to make a decision is exclusively that of the client. However, the attorney must exert every effort to ensure the decision is made only after the client is informed of all relevant considerations and practicalities of such a decision.

The attorney may represent multiple clients whose interests are not potentially different, such as an insurer and insured. If suit were filed directly against the company, the defense attorney would represent the company as the client. When the insured is sued by a third party, the defense attorney solely represents the insured as the client; but the company has the right, under the policy contract, to select the defense firm to be used and to control the settlement decisions. Situations may arise where there is a conflict of interest. One example of this would be a coverage question in the matter being defended. The attorney must promptly inform both the insured and the Company in writing the nature and the extent of the conflicting interests. The insured should be invited to retain his own counsel depending on the circumstances. The attorney owes undivided allegiance to the insured which forbids any collusion between the company and the attorney against the insured. If this situation occurs, the claims associate must discuss the claim with the claim manager, Regional RLA and Claims Home Office Legal.

The companies have a corresponding obligation to their insureds. The insured must be informed of the progress of the pending suit. Although the company provides the defense, it is primarily the insured's suit. The company has the duty to answer the insured's questions and to report any circumstances which may subject the insured to personal loss.

Suit handling is covered in Chapter IX. However, it is important for the claims associate to be aware of the flow of responsibility and the corresponding duties in the special relationship which exists between the principal and agent, the insured and the company, the insured and the attorney, and the company and the representative.

5-10-02

CONFIDENTIAL

* **E.** **Correspondence and Documentation**

1. Letters

The ability to express yourself clearly and persuasively is an essential attribute for a successful claims associate. Because of the nature of the companies operation, a portion of the communications with policyholders, claimants, and attorneys is through correspondence. Little is accomplished if an examiner or adjuster has superior technical knowledge but cannot convey their thoughts to others.

It is company policy to reply courteously to all letters that call for a response within a reasonable period of time.

The claims associate's communications should display leadership, good sound judgment, and decisiveness. Simple and direct language avoids misinterpretation. To be effective, the communication should express the claims associate's position in a clear, concise, easy to read and understand manner. Its tone should be professional and businesslike, words spelled correctly, and proper grammar utilized.

Correspondence with independent adjusters and attorneys requires particular attention. It is through such communication that direction is exercised over the handling of claims. To assure high quality service from independent adjusters and attorneys, and to check the cost of their work, demands intelligent supervision. Proper direction from the claims associate should be reflected in their work product.

Correspondence to independent adjusters should outline what is needed – early claimant contact, signed statements, police reports, photos, diagrams -- whatever is necessary to avoid a decision delay. Instructions on negotiation techniques should accompany settlement authority.

The independent adjuster should forward timely and complete status reports within 30 days. Their activities should be in accordance with the claims associate's instructions and within company guidelines. There may be occasions when the claims associate disagrees with a representative's case handling. The claims associate should be able to offer constructive criticism to correct the deficiencies. If the disagreement is of a serious nature, the claims associate's supervisor should become involved.

Our defense attorneys are presumed to be experts in the legal field. The claims associates need not instruct them on points of law or procedure, but should monitor their activities and maintain direction of the case.

**CONFIDENTIAL**

Follow-up is essential. Once the claims associate has told the representative what is required, the instructions should be accomplished within a reasonable period of time. The claims associate should assure that the representative responds as promptly as possible. If a timely report is not received, a letter or telephone call may be required.

Do not use hand written correspondence if a letter or phone call is required. Any significant correspondence with anyone should be typed. Handwritten memoranda are unacceptable. All communication, whether by correspondence, telephone, or in person, should create a favorable impression. The claims associate's correspondence reflects the image of the company. It is the responsibility of the examiner or the adjuster to maintain that image of high GEICO standards through effective communication.

* Claim system enhancements have added form letters and templates to our arsenal of claim tools that improve efficiencies in claim file documentation. We generally know when to send such letters and what events trigger a specific letter or template.

Unfair claim settlement practice acts generally set out requirements for responding to correspondence. In addition, we have claim processes and procedures regarding documenting telephone calls, facsimile transmissions and other communication in the claim file. These various sources set minimum standards.

We need to be constantly vigilant that we are not shortsighted in our task of documenting claim files with correspondence made to fit into an existing format.

There are times when telephone communication is best documented by both an Alog entry and sending a confirmatory letter. Unusual requests or those that cause us not to do something are examples of situations that should cause us to send a letter. It should detail what was said and why we are doing or not doing what we planned to do. For instance, if we receive a telephone call from an attorney who tells us he would not accept an offer of our policy limits, if made, and we believe it is a case where we should be tendering our limits, in addition to documenting the conversation in Alog, we should confirm in writing that we are prepared to offer the limits but for his refusal. In addition, we also convey our intent to pay the limits once he tells us how to make the check payable and otherwise offer the limits notwithstanding his professed inability to accept them.

This is especially necessary where it can be reasonably anticipated that the contents of a singular ALOG entry may be denied later by the speaker.

II-11

1-30-08

We must constantly be aware of the best method of communicating and documenting our claim files, using multiple methods where prudent.

\*        2. Email

One of the most used communication tools today is email. The growing use and importance of email requires that we use it as effectively as possible to communicate with customers regarding claims. To ensure the proper use of email, the following practices and policies should be followed by all associates, contractors, consultants, and temporary workers that use our email system.

The use of email is intended to be used for communicating with other associates and, where approved, with other businesses and customers. The right to use internal or external email is subject to your adherence to the following guidelines:

a. To send ECF or Eloquence letters approved for email if permission to communicate by email has been secured from the interested party.

b. For iNet CSRs to respond when appropriate to customer email inquiries received through the Cisco E-mail Manager (CEM).

c. To communicate with our defense counsel. Email may be used instead of letters or written memos to our counsel and may be used with either staff or fee counsel.

d. To deliver arbitration packages to Arbitration Forums or adverse carriers. These messages should have no text, only the arbitration package as an attachment.

e. To send estimates or total loss evaluations to customers if they request copies by email.

**Email should not be used other than for these four (4) purposes unless authorized by CHO.**

Email other than ECF letters:

Customers may request that we communicate with them via email other than ECF letters. Each of these requests should be considered on a *case-by-case basis*. Any exception should be approved by regional management Exceptions should be considered based on the <u>need</u> of the customer to

II-12

12-23-08

communicate with us by email, not on the customer's desire to communicate with us by e-mail.

This exception will be most common in the following two scenarios:

1) A customer is unable to communicate via the telephone and requests communication via email (ex: military personnel deployed on ships at sea).
2) A customer wishes to send us digital photos.

In these types of circumstances, if regional management determines e-mail communication is acceptable, claims associates should use the following procedure:

1) The communication should be sent and received by a designated "Email Coordinator". This coordinator will be either the claims handler's supervisor or a representative chosen by management. The coordinator will review all outgoing email for content, spelling, grammar (spelling and grammar check should be used on all outgoing e-mail) and format. All e-mail will be sent or received by the designated coordinator. No email will be sent or received by the claims handler.
2) The body of any incoming or outgoing email should be cut and pasted to ALOGI or the e-mail should be printed and scanned to the ECF file as a document.
3) Any attachment (such as digital photos) should be printed and scanned to the ECF file.

Claim emails should contain only claim specific information and should include the claim number. They should not include any solicitations or marketing , such a recommendations to add or increase coverage.

Auto-signatures should include the claims handler's name, title and phone number and should not include quotes, logos or graphics. Stationary backgrounds or borders should not be used. All email should be in 12-point Arial font.

When the Email Coordinator is not in the office, a designated substitute should monitor the coordinator's incoming email and review any outgoing email as needed.

As more uses for email become available, this manual will be updated and claims users will be notified.

All claims associates, contractors, consultants, and temporary workers that use our email system must follow proper procedures when using email to avoid releasing information that could be damaging to either the customer or the

II-13

12-23-08

CONFIDENTIAL

Company.  Following the guidelines outlined above will ensure email is used properly to efficiently and effectively communicate with customers regarding their claims.

12-23-08

**CONFIDENTIAL**

# SLIP SHEET

CONFIDENTIAL
CONFIDENTIAL

# CHAPTER II

# THE CLAIMS FUNCTION

## I.    GENERAL STATEMENT

It is company policy to settle claims fairly and promptly. Investigation is necessary for every claim presented, but the extent of the investigation depends on the nature of the claim. The real objective of the investigation is a fair resolution at the earliest practicable time. At every step in the claim process the question should be raised, "how can this claim best be resolved?"

Prompt service, however, does not justify paying claims the company does not owe. It is as wrong to pay claims which should not be paid as it is not to pay claims which should be paid. Promptness and fairness should be used throughout the handling of all claims. All associates handling claims have a duty to deal frankly and openly with policyholders, witnesses, attorneys, claimants, medical providers, and the general public.

Our claims associates have the obligation to treat policyholders and all interested parties with respect and deal with their insurance issues fairly and as quickly as possible.

## II.   PROFESSIONAL GUIDELINES

### A.    Code of Conduct

The nature of claims work requires that claims associates comply with GEICO's standard of competence and ethical conduct. Pride, self-respect and integrity are characteristic of the successful claims person.

Traditionally, fairness, competence, and integrity have also been characteristic of GEICO claims associates. We can be proud of these traditions; through them we have earned the respect of all with whom we come into contact.

To many people, the GEICO claims associate is GEICO and may be the only company employee a large segment of the public will ever deal with. Accordingly, each associate has a responsibility and a corresponding obligation to act in a professional manner that will reflect positively on themselves and the companies.

Today, the insurance industry, as never before, is being examined in depth by various executive and legislative branches of state and federal governments. Significant portions of these examinations are directed toward the system under

5-10-02

CONFIDENTIAL

which claims are handled, and the manner in which the system is used by claims personnel. The GEICO Companies support the NAIC Model Unfair Trade Practices Act, and the individual state acts relating to claims settlement practices. Each claims associate should be familiar with these acts and should abide by their provisions.

- **The GEICO Claims Code of Conduct Booklet**

  Claims associates should be familiar with the code and behave accordingly. Each associate is given the booklet when hired and is required to sign off on any revisions.

B. **Responsibility of the Claims Associate**

The basic responsibility of the claims associate is to bring about an equitable outcome of claims presented under the policy contract. Since the operational funds belong to our policyholders, the claims associate has an obligation to those policyholders to pay just and valid claims and resist those not owed. This should be accomplished efficiently and economically.

Fulfillment of that obligation requires the exercise of sound judgment. The claims associate should be able to select the proper course of action. Decisions should be based on a thorough knowledge of the policy contracts, a working knowledge of legal principles, complete investigations, and sound evaluations.

Responsibility for the proper disposition of a claim rests with the claims associate to whom the case is assigned. The claims associate should bring about suitable results through direct contact with the insured, claimant, or others, as necessary.

The only products we have are Service and Protection. The claims associate delivers both. The claims associate should be equitable, empathetic and accessible and handle all claims with integrity.

The most frequent problem in claims handling is disagreement as to what constitutes a fair settlement. The examiner or adjuster should be prepared to explain the Company's position in a clear and logical manner. The response to a justified claims complaint should focus first on a timely and correct remedy to the complaint, and second on the initiation of appropriate steps to correct any deficiency.

C. **Professional Ethics.**

We at GEICO hold all of our claim representatives to a high standard of integrity and professionalism. If, for instance, the settlement of a case is drawn out and the

CONFIDENTIAL

claimant inquires about the existence of a statute of limitations or its applicability to the case, the examiner or adjuster should never mislead the claimant into believing that the statute does not apply to the particular claim, if it actually does, nor should the adjuster tell the claimant that the company will waive the statute without specific permission from the VP of Claims Home Office or AVP of Claims Home Office Legal.

The claims person is expected to adhere to a standard of conduct, which not only is above reproach, but the appearance of which cannot possibly be construed as suggesting fraud or deceit. The corporate reputation of the GEICO Companies and the individual reputation of its claims associates are far too valuable to risk against the temporary advantage that might be gained by resorting to unethical practices in the handling of a claim.

**D.      Plaintiff's Attorneys**

The companies or their representatives should not deal directly with any claimant represented by an attorney without the consent of the attorney. Once the company is put on notice, either by the claimant or by an attorney, that the claimant is represented by the attorney, all future dealings must be with the attorney. It is improper for the claims associate to negotiate directly with a represented claimant from this time forward unless he has the permission of the attorney to do so. However, there is no restriction on the right of the claims person to verify that representation. And there is no prohibition on an adjuster making inquiries about any allegations made by the attorney or in attempting to uncover any information from other sources which the attorney has refused to give.

The claims associate should request information on injuries and expenses and obtain the attorney's theory of liability. He should then advise the attorney that the GEICO Companies are ready and willing to discuss settlement anytime we have sufficient information to evaluate of the claim.

If one of our insured's is represented, it depends on the type of claim the insured is making as to whether or not we should deal directly with the insured instead of the attorney. For example, in a UM or UIM claim, we must deal with the attorney.   In a PIP or Medical Payments claim, we may deal directly with the insured unless the attorney advises the insured desires us to deal with the attorney directly.

**E.      Confidentiality of Claim File Information**

1.   General

The information contained in our claim files is of a confidential nature and its

5-10-02

CONFIDENTIAL

use is restricted. It should not be reviewed or discussed in idle conversation. Information contained in either a paper file or an electronic file shall not be released except under certain circumstances. Reasonable application of common sense in the evaluation of information requests is most important. Release of any information from a claim file is subject to the guidelines indicated in the privacy acts of the various states, in accord with the discovery rules of the local court, and Company procedures.

The following guidelines are to assist you in deciding whether to release information and what kind of information may be released without either the consent of the insured or the claims manager and/or claims attorney (whichever is indicated):

- Property damage estimates/appraisals/repair bills on insured's car to support our subrogation claim.

- Medical bills, loss of wages or income statements of an insured when it is necessary to support our subrogation claim under Medical Payments, Personal Injury Protection, or Uninsured Motorist Coverages. (Claims associate may release.)

- Requests by governmental agency or by a valid subpoena properly served on us. (Claims Legal must be consulted before complying.)

- BI Index System/Bureau inquiries for medical information about an insured. If we are considering releasing diagnosis, prognosis, course and cost of treatment, both open and closed cases should be reviewed by the claims associate, discussed with the claims manager, and a decision made whether it is necessary to obtain the insured's written consent.

- BI Index System/Bureau inquiries for medical information about a third party claimant. (Claims associate may release.)

If there is a request for information from our file, which does not fall within one of the above categories, the examiner or adjuster should discuss it with the claims manager prior to releasing it. REMEMBER, judgment and common sense should be exercised in responding to all information requests.

2. Double Insured Cases

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits.

II-4

CONFIDENTIAL

File contents should not be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross-referenced file and should be retained in the file to be reviewed.

\* Written authorization is <u>not</u> always needed when:

- Handling non-conflict of interest claims at the CSR level. See TCM titled "ADJUSTER AGENT OR INDEPENDENT CONTRACTOR-MULTIPLE GEICO INSUREDS'-CLAIMS HANDLING-ALL".

- Sharing recorded interviews if verbal authorization is secured on the recording. The adjuster should request authorization to share the interview by asking the following question: **There may be other examiners who will handle other aspects of this accident. Do I have your permission to share this recorded interview with the other examiners on this and/or the other file?**

In the event of litigation, a subpoena may be obtained if authorization is not voluntarily given.

Cases in which authorization is needed would include permission to review No-Fault or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

An authorization form has been developed for use in this type of case. It is called the "Information Authorization Form" (C-240). Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

**F.    Our Relationship with Insureds and Claimants**

In third party cases, the examiner or the adjuster owes a duty and loyalty to our insureds.

If there is a real doubt concerning the interpretation of a portion of the policy or the dollar value of the claim, every reasonable effort should be made to give fair consideration to the question from the viewpoint of the policyholder, the Company, and the claimant.

12-23-08

CONFIDENTIAL

In first party cases, the company should analyze the policy contract fairly and attempt to resolve questionable situations equitably whenever possible. We should clearly explain all available coverages and benefits. The policy terms clearly spell out conditions/exclusions and a decision should not be made in favor of the insured if his/her policy indicates the loss is not covered. Likewise, the company owes it to its policyholders to pay only those claims which are covered by the policy.

In addition to our contractual duty to our insureds, we recognize our obligation to claimants. The policy of endeavoring to settle claims as promptly as possible applies to third party claims as well.

## III.  TECHNICAL CLAIMS HANDLING

### A.  Facing the Future

Change is fundamental to success. The best insurer is constantly analyzing its operation to provide a better product. As times change, GEICO's method of claims handling will change.

Needed products and services will be determined by the desires of the public as shown in opinion surveys, marketing polls, analysis of legislation, and other public opinion results.

It is our policy to be alert to changing concepts of claims handling which reflect this new climate without violating our duty to our policyholders. This requires the examiner and the adjuster to accept new ideas and accept change.

In keeping with change, the company employs claims handling techniques such as: rehabilitation specialists, structured settlements, computerized estimates, computerized claims systems and handling,

Medical Cost Containment and Benefits Restoration, and Special Investigation Units are but two examples of innovative concepts in claims handling. The years ahead probably will bring other ideas designed to benefit both the insurance industry and the public. It is the responsibility of all claims associates to be aware of new concepts; to recognize individual claims to which the concepts might apply; and to make early recommendations concerning the application of these new methods to individual claim files.

We want to market quality insurance and related services to the insuring public, at a price advantage. Claims associates make this goal a reality.

5-10-02

CONFIDENTIAL

**B.     Settlement Techniques**

The claims associate should be realistic in the early appraisal of the claim. <u>If we owe it, pay it.</u> Settle claims fairly at the earliest practical time whenever possible.

Recognizing their need, we must utilize various settlement concepts. We have open-end releases, whereby, in addition to the consideration stipulated, we agree to pay additional amounts of money in the future. Property damage claims (including claims for loss-of-use) that are owed, are paid as soon as possible whether or not there are pending bodily injury claims arising from the same accident.

*

Rehabilitation programs, structured settlements, advanced payments, open-end releases, and "walk-away" settlements are some of our claims handling techniques for serving our industry and our public. Properly utilized, they can be effective responses to the public demand to help the seriously injured more expeditiously. The various types of settlements are covered in Chapter V.

**C.     Unfair Claims Practices**

In Chapter I, we referred to the regulation of insurance by grouping the methods into three categories: 1) legislation, 2) administration and 3) court action.

The industry itself imposes self-regulatory systems. Trade associations and various groups related to the industry have developed claims settlement practices within the framework of legal systems, government regulations, and contractual provisions. The National Association of Independent Insurers (NAII), the American Insurance Association (AIA), and the National Association of Independent Insurance Adjusters are a few such organizations.

The National Association of Insurance Commissioners (NAIC) Model Unfair Trade Practices Act (cited in TCM 108 and in the NAII Manual) categorizes these principles generally and specifically by state. The act prohibits unjust, dilatory, and unethical claims practices. The claims associate should be prompt, fair, and forthright. Claims should be settled timely whenever possible, on merit basis, with professional etiquette. Claims associates should be thoroughly familiar with and abide by the Unfair Claims Practices Acts and regulations in each jurisdiction, as well the GEICO Claims Code of Conduct (C-253).

**D.     Our Relationship with Attorneys and Independent Adjusters**

The company is represented by attorneys and selected independent adjusters throughout the country. Those who regularly represent the company are listed in the Attorney and Adjuster Code Book, which is now housed in the computer under transaction "AAI".

11-24-09

CONFIDENTIAL

The selection and replacement of attorneys and claim representatives within regions is made by the assistant vice president for claims with the concurrence of the vice president of claims. (See TCM-29.)

All claims associates have an obligation to keep their regional claims management informed of any developments which might suggest the benefit of a change in representation in any particular area. If an alternate representative is needed on a temporary basis, approval can be obtained from the claims manager with concurrence of Claims Home Office Legal.

The companies' representatives are carefully selected on the basis of ability and reputation. The companies review the quality of service and claims handling of these representatives, and delegate authority on a case by case basis. The nature of the relationship dictates these representatives should follow GEICO standards of competence, integrity, and professional and ethical conduct.

The instructions to an independent adjuster should be specific so the representative knows precisely what is expected. When authority is delegated, the claims associate should explain exactly how the negotiations should be conducted. All directives should be clearly defined. Any departure from the instructions should be questioned. Normally, the claims associate should direct the investigation and reserve the negotiation phase of the claim for him or her self.

It is the companies' objective to have a mutually beneficial relationship with the independent adjusters and attorneys. The claims manager and the claims associate must be aware of problems in the field and judge the firms accordingly. Disagreeable circumstances can often be avoided by clear supervision given in advance. Open communications and mutual respect are essential to cost effective settlements.

Our defense attorneys are chosen on the basis of their professional knowledge, ability, and experience. In most instances, they are local leaders in their fields. They are limited agents with authority delegated to the particular case assigned. The fiduciary relationship between the attorney and the client-principal dictates that the attorney represent the client with the highest degree of loyalty and fidelity. On each case, the attorney acts solely in the best interest of his client within the bounds of the law.

The primary duties of an attorney are: 1) advise and counsel, 2) prepare legal instruments, and 3) perform services in the courts of justice. The attorney seeks the lawful objectives of the client through reasonable means permitted by law and advises the client of legal considerations. Authority to make a decision is exclusively that of the client. However, the attorney must exert every effort to ensure the decision is made only after the client is informed of all relevant considerations and practicalities of such a decision.

II-8

12-23-08

CONFIDENTIAL

The attorney may represent multiple clients whose interests are not potentially different, such as an insurer and insured. If suit were filed directly against the company, the defense attorney would represent the company as the client. When the insured is sued by a third party, the defense attorney solely represents the insured as the client; but the company has the right, under the policy contract, to select the defense firm to be used and to control the settlement decisions. Situations may arise where there is a conflict of interest. One example of this would be a coverage question in the matter being defended. The attorney must promptly inform both the insured and the Company in writing the nature and the extent of the conflicting interests. The insured should be invited to retain his own counsel depending on the circumstances. The attorney owes undivided allegiance to the insured which forbids any collusion between the company and the attorney against the insured. If this situation occurs, the claims associate must discuss the claim with the claim manager, Regional RLA and Claims Home Office Legal.

The companies have a corresponding obligation to their insureds. The insured must be informed of the progress of the pending suit. Although the company provides the defense, it is primarily the insured's suit. The company has the duty to answer the insured's questions and to report any circumstances which may subject the insured to personal loss.

Suit handling is covered in Chapter IX. However, it is important for the claims associate to be aware of the flow of responsibility and the corresponding duties in the special relationship which exists between the principal and agent, the insured and the company, the insured and the attorney, and the company and the representative.

\*    **E.    Correspondence and Documentation**

1. Letters

The ability to express yourself clearly and persuasively is an essential attribute for a successful claims associate. Because of the nature of the companies operation, a portion of the communications with policyholders, claimants, and attorneys is through correspondence. Little is accomplished if an examiner or adjuster has superior technical knowledge but cannot convey their thoughts to others.

It is company policy to reply courteously to all letters that call for a response within a reasonable period of time.

The claims associate's communications should display leadership, good sound judgment, and decisiveness. Simple and direct language avoids misinterpretation. To be effective, the communication should express the claims associate's position in a clear, concise, easy to read and understand

II-9

12-23-08

manner. Its tone should be professional and businesslike, words spelled correctly, and proper grammar utilized.

Correspondence with independent adjusters and attorneys requires particular attention. It is through such communication that direction is exercised over the handling of claims. To assure high quality service from independent adjusters and attorneys, and to check the cost of their work, demands intelligent supervision. Proper direction from the claims associate should be reflected in their work product.

Correspondence to independent adjusters should outline what is needed – early claimant contact, signed statements, police reports, photos, diagrams -- whatever is necessary to avoid a decision delay. Instructions on negotiation techniques should accompany settlement authority.

The independent adjuster should forward timely and complete status reports within 30 days. Their activities should be in accordance with the claims associate's instructions and within company guidelines. There may be occasions when the claims associate disagrees with a representative's case handling. The claims associate should be able to offer constructive criticism to correct the deficiencies. If the disagreement is of a serious nature, the claims associate's supervisor should become involved.

Our defense attorneys are presumed to be experts in the legal field. The claims associates need not instruct them on points of law or procedure, but should monitor their activities and maintain direction of the case.

Follow-up is essential. Once the claims associate has told the representative what is required, the instructions should be accomplished within a reasonable period of time. The claims associate should assure that the representative responds as promptly as possible. If a timely report is not received, a letter or telephone call may be required.

Do not use hand written correspondence if a letter or phone call is required. Any significant correspondence with anyone should be typed. Handwritten memoranda are unacceptable. All communication, whether by correspondence, telephone, or in person, should create a favorable impression. The claims associate's correspondence reflects the image of the company. It is the responsibility of the examiner or the adjuster to maintain that image of high GEICO standards through effective communication.

* Claim system enhancements have added form letters and templates to our arsenal of claim tools that improve efficiencies in claim file documentation. We generally know when to send such letters and what events trigger a specific letter or template.

II-10

CONFIDENTIAL

Unfair claim settlement practice acts generally set out requirements for responding to correspondence. In addition, we have claim processes and procedures regarding documenting telephone calls, facsimile transmissions and other communication in the claim file. These various sources set minimum standards.

We need to be constantly vigilant that we are not shortsighted in our task of documenting claim files with correspondence made to fit into an existing format.

There are times when telephone communication is best documented by both an Alog entry and sending a confirmatory letter. Unusual requests or those that cause us not to do something are examples of situations that should cause us to send a letter. It should detail what was said and why we are doing or not doing what we planned to do. For instance, if we receive a telephone call from an attorney who tells us he would not accept an offer of our policy limits, if made, and we believe it is a case where we should be tendering our limits, in addition to documenting the conversation in Alog, we should confirm in writing that we are prepared to offer the limits but for his refusal. In addition, we also convey our intent to pay the limits once he tells us how to make the check payable and otherwise offer the limits notwithstanding his professed inability to accept them.

This is especially necessary where it can be reasonably anticipated that the contents of a singular ALOG entry may be denied later by the speaker

We must constantly be aware of the best method of communicating and documenting our claim files, using multiple methods where prudent.

2. Email

One of the most used communication tools today is email. The growing use and importance of email requires that we use it as effectively as possible to communicate with customers regarding claims. To ensure the proper use of email, the following practices and policies should be followed by all associates, contractors, consultants, and temporary workers that use our email system.

The use of email is intended to be used for communicating with other associates and, where approved, with other businesses and customers. The right to use internal or external email is subject to your adherence to the following guidelines:

a. To send ECF or Eloquence letters approved for email if permission to communicate by email has been secured from the interested party.

II-11

12-23-08

b. For iNet CSRs to respond when appropriate to customer email inquiries received through the Cisco E-mail Manager (CEM).

c. To communicate with our defense counsel. Email may be used instead of letters or written memos to our counsel and may be used with either staff or fee counsel.

d. To deliver arbitration packages to Arbitration Forums or adverse carriers. These messages should have no text, only the arbitration package as an attachment.

e. To send estimates or total loss evaluations to customers if they request copies by email.

**Email should not be used other than for these four (4) purposes unless authorized by CHO.**

Email other than ECF letters:

Customers may request that we communicate with them via email other than ECF letters. Each of these requests should be considered on a *case-by-case basis.* Any exception should be approved by regional management Exceptions should be considered based on the need of the customer to communicate with us by email, not on the customer's desire to communicate with us by e-mail.

This exception will be most common in the following two scenarios:

1) A customer is unable to communicate via the telephone and requests communication via email (ex: military personnel deployed on ships at sea).
2) A customer wishes to send us digital photos.

In these types of circumstances, if regional management determines e-mail communication is acceptable, claims associates should use the following procedure:

1) The communication should be sent and received by a designated "Email Coordinator". This coordinator will be either the claims handler's supervisor or a representative chosen by management. The coordinator will review all outgoing email for content, spelling, grammar (spelling and grammar check should be used on all outgoing e-mail) and format. All e-mail will be sent or received by the designated coordinator. No email will be sent or received by the claims handler.

II-12

12-23-08

2) The body of any incoming or outgoing email should be cut and pasted
   to ALOGl or the e-mail should be printed and scanned to the ECF file
   as a document.
3) Any attachment (such as digital photos) should be printed and scanned
   to the ECF file.

Claim emails should contain only claim specific information and
should include the claim number. They should not include any solicitations
or marketing , such a recommendations to add or increase coverage.

Auto-signatures should include the claims handler's name, title and phone
number and should not include quotes, logos or graphics. Stationary
backgrounds or borders should not be used. All email should be in 12-point
Arial font.

When the Email Coordinator is not in the office, a designated substitute
should monitor the coordinator's incoming email and review any outgoing
email as needed.

As more uses for email become available, this manual will be updated and
claims users will be notified.

All claims associates, contractors, consultants, and temporary workers that use
our email system must follow proper procedures when using email to avoid
releasing information that could be damaging to either the customer or the
Company. Following the guidelines outlined above will ensure email is used
properly to efficiently and effectively communicate with customers regarding
their claims.

II-13

12-23-08

CONFIDENTIAL

# CHAPTER III

## RESERVING

### I.   BASIC RESERVING POLICY

A "reserve" is the dollar amount that the Company can reasonably expect to pay for a complete settlement of the claim, including anticipated allocated expenses.  It is based on the facts known at the time the reserve is established or adjusted.

Claim reserves must be established on the basis of probable cost based on present values. A probable cost reserve is that amount of money that the best available judgment indicates it will cost to pay all future losses and expenses under that particular coverage. Present value means that present costs are used to estimate the value of a future damage settlement.

### II.   IMPORTANCE OF PROPER RESERVES

It is impossible to overemphasize the importance of establishing and maintaining accurate claim reserves.  For management to accurately evaluate the company's financial position, it must have assurance that claim reserves are appropriate.

A reserve should be established as soon as it is probable that a claim may be made.  We do not establish a reserve based on the mere possibility that a claim will be made, nor do we fail to reserve for a probable claim even if we believe it can be successfully defended. Reserve adjustments should be made timely as the facts of each case warrant.

When considering the establishment of a BI feature in a no-fault state with a verbal tort threshold, a reserve should not be opened unless there is evidence that the tort threshold has been or will be pierced.  An exception to this is when an attorney represents the BI claimant and the attorney, on behalf of the injured party, has placed us on notice of his representation of the claimant and his intention to prosecute a BI claim.  In this situation, the BI feature should be established.

### III.   TYPES OF RESERVES

The Companies use two types of claim file reserves: Average Reserves and Case Reserves.

III-1

6-28-02

## A.    Average Reserves

The Actuary determines the average reserve amount required for each claim reported under the various coverages by calculating the actual loss experience under each coverage. At the moment an "open feature" transaction is keyed without a specific dollar amount in the "reserve amount" field of the claim inquiry screen, the system will automatically establish the average (STAT) reserve.

Automobile claims with values of less than $50,000 are initially reserved on an average basis. If the claim has a reserve value of $50,000 or more, case reserves must be established immediately. If any feature, in one claim (BI, UM, UIM or PIP) has a reserve value of $50,000 or more, then all BI, UM, UIM, and PIP features must have a case reserve established immediately. For example, if a claim has three minor BI claims, one BI claim with a reserve value of $50,000 or more and four PIP claims, all BI and PIP claims must be placed on case reserve immediately. In this example, none of the features can be permitted to remain on "stat" reserves. Claims with a value of less than $50,000 are transferred to case reserves at the end of the second month after the reported month.

## B.    Case Reserves

This type of reserving requires the establishment of a dollar reserve under each feature involved. When case reserves are first set up, there may not be sufficient information to permit a realistic appraisal; as subsequent information is developed, the reserves must be adjusted. Establishing case reserves involves the exercise of good judgment and the consideration of such factors as probable liability, amount of special damages, estimates of damage, nature of injuries and any permanency, probable expenses of investigation, litigation and related matters.

Reserves are established by probable cost based on present values. A probable cost reserve is based on present costs and is used to estimate paying all future losses and expenses under a particular coverage.

At the end of the second month after reported month, a 90 Day Control List (see page III-10) for each claim handler is generated for open files. Reserves for all features, with the exceptions of those noted below, should be changed from average to case basis upon completion of the a 90 Day Control List Summary in ALOG (see page III-11) during the 60 to 90 day case life period. Persons with reserve authority equal to or greater than the suggested reserve must approve case reserves.

· Under the Claim Record Information System (CRIS), the physical damage features including Comprehensive, Collision Property Damage, Loss of Use and Medical Payments, and the other listed coverages below do not have to be

III-2

CONFIDENTIAL

converted at 90 Day Control List time from average to case reserve unless the examiner estimates that the loss and expense payments under the feature will amount to $10,000 or more. If the feature is to remain open after the completion of a 90 Day Control List Summary in ALOG and the exposure is not $10,000 or more, the feature remains on average reserve.

If a feature is reopened, an individual with the authority to set the reserves as indicated in TCM-50 must reopen it on a case basis.

When establishing case reserves, special damages, location of accident, permanent injuries and any other such factors are taken into consideration.

The following are coverage/claim symbols, which do not require case reserves unless the estimated amount of loss and expense payment are estimated to be $10,000 or more:

| Description | Coverage | Claim Symbol |
|---|---|---|
| Broad Form Collision* | Coll | CBF, CWD |
| Combined Additional Citizens Band Radio | CA PCB | PAO PCB |
| Collision | Coll | COL, CWV,CDV |
| Comprehensive | Comp | PVM, PGL, PTH, PDV, PFO, PPT, PAO PFL, PFI, PAN, PWN, PEF |
| Mechanical Breakdown | MBI | MBB, MBO, MBS, MBE, MBD, MBT |
| Property Damage | PD | APD, APP, LPD, ADV DPD, EPD, COP |
| Auto Home Contents | Comp | AHC |
| Stereo Buyback | Comp | PST |
| Fire, Lightning, Theft | FLT | PTH, PPT, PFI |

III-3

1-30-08

CONFIDENTIAL

| | | |
|---|---|---|
| Loss of Use | PD | LOU |
| Limited Collision* | Coll | LTC |
| Medical Payments Coverage | MP | MED |
| Personal Effects | PE | PEF |
| Per. Effects/Comb. Additional | PE/CA | PEF |
| Rental Reimbursement | RR | REN |
| Towing & Labor | TOW | TOW |
| Emergency Road Service | ERS | ERS |
| Uninsured Motorist Property Damage | UM | UPD |
| Underinsured Property Damage | UM | XPD |

\* = MI Only

The following are coverage/claim symbols, which do require case reserves:

| | | |
|---|---|---|
| Uninsured Motorist Bodily Injury | UM | UBI, UMD, UMS, UBX |
| Excess Underinsured Bodily Injury | UM | XBI, UMB |
| Underinsured Bodily Injury | UM | UIM, UIX |

III-4

6-28-02

CONFIDENTIAL

| | | |
|---|---|---|
| Bodily Injury | BI | ABI, BID, RBI, DBI, DPR, LBI |
| Basic Personal Injury Protection | PIP | NBB, NBD, NBS, NDB NBF, NBI, NBW, NDF NBM, NBR, NBA, NWL FNL, DBC |
| Basic Preferred Provider Organization | PPO | NPA, NPM, NPR, NPS, NPW, NPC, NPL, NCC, NCR |
| Additional Personal Injury Protection | APIP | NEI, NEM, NEF, NES, NER, NEW, NEA, NEB |
| Additional Preferred Provider Organization | APPO | NAA, NAM, NAR NAS, NAW, NDM, NDR |
| Medical Payments Coverage | MP | LER, MEB |
| Extraordinary Medical Benefits | EMB | EMB |
| Accidental Death and Disability | ADD | ADE, ADI |

## IV.   DEVELOPMENTAL RESERVES

This reserve is developed by the Actuary to compensate for the impact of inflation on claims department establishment of "present values reserves."

## V.   ESTABLISHING, ADJUSTING, MAINTAINING RESERVES

Examiners and adjusters must carefully analyze initial loss reports and indicate the features involved.  Reserves should be established for each feature when a claim appears probable, but not for coverages under which there is no probability of a claim.  As the character of the file changes, it may be necessary to adjust the feature reserves.  Reserves may be changed at any time.  The effectiveness of our reserve procedures depends on the examiner's or adjuster's ability to identify the need to open, close, or revise the reserves as the facts of the case warrant.

III-5

6-28-02

CONFIDENTIAL

Reserves are subject to the guidelines listed in the next section with the requirement that the responsibility for establishing and maintaining all case reserves is vested with Supervisors, Managers, Directors, RLA's and AVP's. This responsibility cannot be delegated and the authorizing party should review thoroughly the file content prior to extending reserve authority.  <u>A Supervisor, Manager, Director or RLA</u> must authorize all <u>reserves under Bodily Injury, Uninsured and Underinsured Motorists Bodily Injury Coverage,</u>

A C-86 Manager/Supervisor Reserve Worksheet form (See Exhibit 1, Page III-17) should be completed for each claim on the 90 Day Control List, accounting for each BI, UM or UIM feature and on any subsequent reserve change under these coverages.

BI, UMBI and UIM loss and expense reserves include an "inflation factor." See Exhibit 2, Page III-18 for current inflation trends.

Examiners and adjusters are responsible for reviewing the accuracy of the reserves <u>each time the file crosses the desk.</u>

## VI.   GUIDELINES FOR ESTABLISHING RESERVES

Automobile claims with exposure of $50,000 or more under one feature or a combination of features should be placed on case reserve immediately.

- All case reserves must be approved by persons with settlement authority equal to or greater than the reserve amount, and where BI, UM or UIM reserves are concerned, the reserve must be approved by a supervisor, manager or director.

- All changes in reserves that will result in the new reserve exceeding the examiner's or adjuster's settlement authority must be approved by a claims associate who has authority to approve the new reserve.  See TCM-50 for loss/expense and reserve authorization guidelines.

- Supervisors and Claims managers should approve and review reserves at all 90 day, 6 month and 18 month file reviews.

- Reserves should be changed if the value of the claim changes by $300.00 or more. Adjustments of less than $300.00 should not be made.

- Although it is not necessary to reopen every closed file for the purpose of making a loss or expense payment, premature closure of a file should be avoided. Closed files must be reopened to accommodate loss or expense payments of $300.00 or more.

- A negative reserve occurs if a payment exceeds the reserve amount established under

III-6

11-15-05

CONFIDENTIAL

a specific feature. Our claim systems prevent a negative reserve from occurring; loss payments cannot be issued unless there are reserves established in excess of the loss payment. Therefore, before a payment can be issued, the reserve must be increased to a sufficient amount.

- Catastrophic PIP cases can present a unique problem in accurately predicting case reserve amounts. The type of injury, treatment and rehabilitation periods vary with each claimant. If, after considering all factors, the examiner or adjuster still questions the proper reserve amount, he or she should ask the supervisor or manager for assistance.

\* - When settlement of a pending case has been negotiated, and the file will be closed within the same calendar month, no reserve adjustment is necessary if the payment is less than the reserve amount.

- Features involving first party physical damages need not be placed on case reserve unless loss and expense are expected to amount to $10,000 or more.

- When a reserve is to be increased <u>beyond</u> regional authority, it may be necessary to call Claims Home Office Legal for approval in order to complete a change before the end of the current month. The Control File Alert Form may also be used to obtain a reserve change (see Exhibit I, Chap. XIII).

- Do not set an inadequate reserve as an interim reserve while awaiting approval from appropriate claims attorney or AVP of Claims Home Office.

- Telephone calls to Claims Home Office Legal (CHOL) are required for reserve approval on new control files when it will take more than 5 days to get the Control Alert Form to CHOL. Telephone calls are also required when we are within 5 days of the end of the month. Otherwise, the Alert Form may be sent with a recommended reserve.

## VII.   RESERVE INCREASE PROCEDURES

When a file is considered for control status (Chapter XIII) and a reserve increase is warranted, a representative from the region (the examiner, manager, or RLA) may call Claims Legal to review the case. This will include providing the Claim Home Office Legal Attorney with the claim number, insured's name, loss location, date of loss, policy limits, facts and circumstances of the loss, and injuries to the claimant(s), age(s), and occupation(s). Notes will be posted to ALOG.

The region will recommend a new reserve figure. If the Claims Home Office Claims Attorney is in agreement, it is approved. If not, advice is given to the regional representative on what is appropriate under the circumstances. Approval of the

III-7

## CONFIDENTIAL

appropriate reserve adjustment is transmitted via ALOG/SYSM. In addition, a notation is placed on ALOG that the file is to be submitted to Claims Home Office in the near future as a control file. ALOG approval of the reserve adjustment is usually done within 24 hours of the phone call and should not exceed two business days. Alternatively, a reserve adjustment may be recommended on a Control File Alert Form.

If a reserve increase has been authorized, but the file has not been placed on control soon after confirmation of the reserve adjustment, either a phone call is placed to the examiner or message via SYSM/ALOG is sent to the examiner requesting that the file be placed on control.

## VIII.   THE CLAIMS SYSTEM AND CLAIMS CONTROL LISTS

The CRT/PC is used for all reserve changes. The systems manual provides the procedures to follow. The following forms are used to review and change reserves and to review file handling:

| |
|---|
| 90 Day Control List |
| 6 Month Control List |
| 18 Month Control List |

A.   90 Day Control List

    1.   When using this computer-produced list, the supervisor combines file review with changing reserves from average to case for each claim on the list. The list is produced monthly and shows each open file, which has aged for two months from reported date. A 90 Day Control List summary must be completed by the end of the third month at which time all open features still on average reserve will be transferred to case reserve.

    2.   Claims handlers must create a 90 Day Control List Summary in ALOG for every claim on the 90 Day Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG. Each Summary and supervisor/manager review must be completed by the end of the month in which the 90th day falls.

    3.   A sample of a 90 Day Control List is on the next page and a sample of a 90 Day Control List Summary Format follows.

III-8

6-28-02

CONFIDENTIAL

REPORT NO. CLL5DM-101
REPORT DATE  12/29/01

ADJUSTER CODE:  XXXX
FCC  -  05

XXXX

GEICO PROPERTY/CASUALTY COMPANIES
**90 DAY CONTROL LIST**
RELEASE DATE
DECEMBER 29, 2001

PAGE 256
RUN DATE 12/29/01

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 0018565980101101 | 04 | APD | 01 | 1001 |
| | 05 | APD | 01 | 1001 |
| | 06 | APD | 01 | 1001 |
| 0019304400101114 | 02 | LOU | 01 | 1001 |
| 0061300730101052 | 01 | COL | 13 | 1001 |
| 0090599370101091 | 02 | POA | 13 | 1001 |
| 0102558420101044 | 02 | LOU | 01 | 1001 |
| 0122333870101019 | 02 | APD | 01 | 1001 |

III-9

6-28-02

CONFIDENTIAL

## CONTROL LIST SUMMARY FORMAT

1. Loss Description -   What happened?
   Is investigation complete?  If not, why?

2. Coverage   -   Is coverage in order?   Any coverage problems?
   Any limits problem?

3. Liability   -   Who is at fault?   Why?
   Comparative negligence?   What is the % attributed to each?

4. Damages   -   What features are still open?  Name claimant and feature number.
   Note any payments made.
   Any vehicle inspections still pending?
   Any subrogation potential?

   List each injured party's name, age and occupation.
- Diagnosis (What is the injury?)

- History (Medical background, related injuries, prior injuries?)

- What sort of treatment are they receiving?  How often? What type of provider?
  - o   MD   Medical doctor
  - o   DC   Chiropractor
  - o   DO   Osteopath
  - o   RPT   Registered Physical Therapist
  - o   LMT   Licensed Massage Therapist

- Prognosis. How much longer will treatment continue? Additional tests recommended?  Other treatment recommended?  Length of future treatment?

- What are the total bills paid to date?   Any outstanding bills?  Projected future bills?

- Will they have a loss of earnings claim?  How much?  Any disability?

5. Course of Action -   What needs to be done to close?
   What can we do to resolve?
   Address each open feature.   Does any feature need a reserve?
   If so, what amount do you recommend?

6-28-02

CONFIDENTIAL

B.    6 Month Control List

1.    The 6 Month Control List is used to identify all open claim files that aged five months from reported month.

2.    Claims handlers must create a 6 Month Control List Summary in ALOG for every claim on the 6 Month Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG.

3.    All reserves should be reviewed for accuracy and changed on the CRT if necessary.

4.    All 6 Month Control List Summaries and supervisor/manager reviews must be completed by the end of the 6th month.

5.    A sample of a 6 Month Control List is on the next page.

6-28-02

CONFIDENTIAL

6-28-02

REPORT NO. CLL50M-201
REPORT DATE   11/24/01

GEICO PROPERTY/CASUALTY COMPANIES
6 MONTH CONTROL LIST
RELEASE DATE

PAGE    84
RUN DATE 11/24/01

NOVEMBER 24, 2001

ADJUSTER CODE:   XXXX
FCC    -    05

XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 00942875301010193 | 01 | COL | 13 | 0601 |

III-12

CONFIDENTIAL

C.    18 Month Control List

    1.   The 18 Month Control List is used to identify all open claim files that aged 17 months from reported month.

    2.   Claims handlers must create an 18 Month Control List Summary in ALOG for every claim on the 18 Month Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG.

    3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary.  Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

    4.   All 18 Month Control List Summaries and supervisor/manager reviews must be completed by the end to the 18th month.

    5.   A sample of an 18 Month Control List is on the next page.

6-28-02

CONFIDENTIAL

REPORT NO. CLL50M-201
REPORT DATE  11/24/01

ADJUSTER CODE:
FCC      -     05

XXXX

CLAIM NUMBER

009428753010 1093

GEICO PROPERTY/CASUALTY COMPANIES
**18 MONTH CONTROL LIST**
RELEASE DATE

NOVEMBER 24, 2001

XXXXX

CLMNT                CLAIM
                     SYMBOL

            01       COL          CO

                                  3

PAGE   84
RUN DATE  11/24/01

REPORT
DATE

0600

III-14

CONFIDENTIAL

6-28-02

## IX.  INCURRED BUT NOT REPORTED CLAIMS (IBNR)

The total amount of money, which the Company earmarks for claim purposes, includes both reported claims and those incurred but not reported. Reported claims are those for which claim files have been established. Incurred but not reported claims are those for which claim files have not been established although the accident or loss has occurred and we may or may not have the report at the Company. Actuary determines the reserve for incurred but not reported claims.

## X.  REINSURANCE RECOVERABLE RESERVES

Reinsurance recoverable reserves are not actually reserves but are estimates of the amount in excess of our retention, which we can expect to recover from the reinsurance carrier. Automobile and homeowners, CPL and pacesetter reinsurance recoverable reserves will be established, maintained and closed by Claims Home Office. A copy of the accounting document will be sent to the claims file for retention.

Under the CRIS system, there is no field for the entry of a reinsurance recoverable reserve and these reserves are accounted for in a manual account maintained in Claims Home Office. Where a reinsurance reserve is being maintained on a claim processed under the CRIS system, the reinsurance indicator should be activated in the CRIS system so that the claim is identified as having reinsurance involvement.

Under PIPS, reinsurance recoverable reserves are established and maintained by PIC's Claims Processing Unit at the direction of the Claims Home Office.

## XI.  REINSURANCE RECOVERABLE PAYMENTS

The Claims Home Office handles reinsurance recovery payments. Examiners must maintain their claim files on an open basis until notified of the receipt of the reinsurance recovery payment.

## XII.  REINSURANCE TREATY

The Company had a reinsurance treaty to protect it against large losses under its policies. Between April 1, 1993 and August 7, 2001, losses were reinsured above $1 million to a limit of $10 million.

As of August 7, 2001, the Company will be self-insured for most of its policies. The exceptions will be motorcycle policies and all policies written in New Hampshire. They will continue to be covered under a reinsurance treaty until February 7, 2002. After February 7, 2002, the Company will be totally self-insured.

6-28-02

CONFIDENTIAL

**EXHIBIT I**

## MANAGER/SUPERVISOR RESERVE WORKSHEET
## BI -UM-UIM

POLICY LIMITS _____

CLAIM NUMBER _____

CLAIMANT NAME _____
CLAIM IN SUIT:        YES_____ NO_____
IF NO – CIRCLE % CHANGE OF SUIT
        0-33      34-67      68-100
# MOS. EXPECTED TO PEND _____
INFLATION RATE                    _____

PROBABLE CURRENT COST (LOSS)          $_____
PROBABLE CURRENT COST (EXPENSE) (+)$_____
TOTAL PROBABLE CURRENT COST      (=)$_____
INFLATION FACTOR (FROM TABLE)      (X) _____
NEW NET RESERVE . . . . . . . . . .      (=)$_____
(TOTAL PROBABLE CURRENT COST X INFLATION FACTOR)

CLAIMANT NAME _____
CLAIM IN SUIT:        YES_____ NO_____
IF NO – CIRCLE % CHANGE OF SUIT
        0-33      34-67      68-100
# MOS. EXPECTED TO PEND _____
INFLATION RATE                    _____

PROBABLE CURRENT COST (LOSS)          $_____
PROBABLE CURRENT COST (EXPENSE) (+)$_____
TOTAL PROBABLE CURRENT COST      (=)$_____
INFLATION FACTOR (FROM TABLE)      (X) _____
NEW NET RESERVE . . . . . . . . . .      (=)$_____
(TOTAL PROBABLE CURRENT COST X INFLATION FACTOR)

CLAIMANT NAME _____
CLAIM IN SUIT:        YES_____ NO_____
IF NO – CIRCLE % CHANGE OF SUIT
        0-33      34-67      68-100
# MOS. EXPECTED TO PEND _____
INFLATION RATE                    _____

PROBABLE CURRENT COST (LOSS)          $_____
PROBABLE CURRENT COST (EXPENSE) (+)$_____
TOTAL PROBABLE CURRENT COST      (=)$_____
INFLATION FACTOR (FROM TABLE)      (X) _____
NEW NET RESERVE . . . . . . . . . .      (=)$_____
(TOTAL PROBABLE CURRENT COST X INFLATION FACTOR)

CLAIMANT NAME _____
CLAIM IN SUIT:        YES_____ NO_____
IF NO – CIRCLE % CHANGE OF SUIT
        0-33      34-67      68-100
# MOS. EXPECTED TO PEND _____
INFLATION RATE                    _____

PROBABLE CURRENT COST (LOSS)          $_____
PROBABLE CURRENT COST (EXPENSE) (+)$_____
TOTAL PROBABLE CURRENT COST      (=)$_____
INFLATION FACTOR (FROM TABLE)      (X) _____
NEW NET RESERVE . . . . . . . . . .      (=)$_____
(TOTAL PROBABLE CURRENT COST X INFLATION FACTOR)

TOTAL PROBABLE CURRENT COST (LOSS)            _____
TOTAL PROBABLE CURRENT COST (EXPENSE)        _____
TOTAL PROBABLE CURRENT COST                          _____
TOTAL NEW NET RESERVE                                   _____

DATE COMPLETED _____     MANAGER/SUPERVISOR _____

C-86 (12-01)

6-28-02

**CONFIDENTIAL**

**EXHIBIT 2**

## BODILY INJURY INFLATION RATE: 10.6%

| MO | FACTOR | | MO | FACTOR | | MO | FACTOR |
|-----|--------|---|-----|--------|---|-----|--------|
| 1.  | 1.01 | | 21. | 1.19 | | 41. | 1.41 |
| 2.  | 1.02 | | 22. | 1.20 | | 42. | 1.42 |
| 3   | 1.03 | | 23. | 1.21 | | 43. | 1.43 |
| 4.  | 1.03 | | 24. | 1.22 | | 44. | 1.45 |
| 5.  | 1.04 | | 25. | 1.23 | | 45. | 1.46 |
| 6.  | 1.05 | | 26. | 1.24 | | 46. | 1.47 |
| 7.  | 1.06 | | 27. | 1.25 | | 47. | 1.48 |
| 8.  | 1.07 | | 28. | 1.27 | | 48. | 1.50 |
| 9.  | 1.08 | | 29. | 1.28 | | 49. | 1.51 |
| 10. | 1.09 | | 30. | 1.29 | | 50. | 1.52 |
| 11. | 1.10 | | 31. | 1.30 | | 51. | 1.53 |
| 12. | 1.11 | | 32. | 1.31 | | 52. | 1.55 |
| 13. | 1.12 | | 33. | 1.32 | | 53. | 1.56 |
| 14. | 1.12 | | 34. | 1.33 | | 54. | 1.57 |
| 15. | 1.13 | | 35. | 1.34 | | 55. | 1.59 |
| 16. | 1.14 | | 36. | 1.35 | | 56. | 1.60 |
| 17. | 1.15 | | 37. | 1.36 | | 57. | 1.61 |
| 18. | 1.16 | | 38. | 1.38 | | 58. | 1.63 |
| 19. | 1.17 | | 39. | 1.39 | | 59. | 1.64 |
| 20. | 1.18 | | 40. | 1.40 | | 60. | 1.65 |

6-28-02

**CONFIDENTIAL**

# SLIP SHEET

CONFIDENTIAL

# CHAPTER III

## RESERVING

### I.   BASIC RESERVING POLICY

A "reserve" is the dollar amount that the Company can reasonably expect to pay for a complete settlement of the claim, including anticipated allocated expenses.  It is based on the facts known at the time the reserve is established or adjusted.

Claim reserves must be established on the basis of probable cost based on present values. A probable cost reserve is that amount of money that the best available judgment indicates it will cost to pay all future losses and expenses under that particular coverage. Present value means that present costs are used to estimate the value of a future damage settlement.

### II.   IMPORTANCE OF PROPER RESERVES

It is impossible to overemphasize the importance of establishing and maintaining accurate claim reserves.  For management to accurately evaluate the company's financial position, it must have assurance that claim reserves are appropriate.

A reserve should be established as soon as it is <u>probable</u> that a claim may be made.  We do not establish a reserve based on the mere possibility that a claim will be made, nor do we fail to reserve for a probable claim even if we believe it can be successfully defended. <u>Reserve adjustments should be made timely as the facts of each case warrant.</u>

Examples:

\*   1.   Insured calls in the at-fault loss; indicates he has damage to his vehicle and wants to make a COL claim; indicates there was no damage to the claimant's vehicle.

   Do not open a property damage reserve at this time.  You must speak to the claimant first.  Open a property damage reserve if he tells you that there is damage to his vehicle.

\*   2.   Insured calls in the at-fault loss; indicates he has damage to his vehicle; indicates he is unsure of the claimant had damage or not.

   Do not open a property damage reserve at this time.  You must speak to the claimant first.  Open a property damage reserve if he tells you that there is damage to his vehicle.

III-1

12-23-08

CONFIDENTIAL

* 3.  Insured calls in the at-fault loss; indicates he has damage to his vehicle; indicates there may have been damage to the claimant's vehicle or property but has no info on the claimant owner and left none of his info for the claimant.

> Do not open a property damage reserve at this time. You must speak to the claimant first. Open a property damage reserve if he tells you that there is damage to his vehicle/property.

When considering the establishment of a BI feature in a no-fault state with a verbal tort threshold, a reserve should not be opened unless there is evidence that the tort threshold has been or will be pierced. An exception to this is when an attorney represents the BI claimant and the attorney, on behalf of the injured party, has placed us on notice of his representation of the claimant and his intention to prosecute a BI claim. In this situation, the BI feature should be established.

## III.   TYPES OF RESERVES

The Companies use two types of claim file reserves: Average Reserves and Case Reserves.

### A.   Average Reserves

The Actuary determines the average reserve amount required for each claim reported under the various coverages by calculating the actual loss experience under each coverage. At the moment an "open feature" transaction is keyed without a specific dollar amount in the "reserve amount" field of the claim inquiry screen, the system will automatically establish the average (STAT) reserve.

Automobile claims with values of less than $50,000 are initially reserved on an average basis. If the claim has a reserve value of $50,000 or more, case reserves must be established immediately. If any feature, in one claim (BI, UM, UIM or PIP) has a reserve value of $50,000 or more, then all BI, UM, UIM, and PIP features must have a case reserve established immediately. For example, if a claim has three minor BI claims, one BI claim with a reserve value of $50,000 or more and four PIP claims, all BI and PIP claims must be placed on case reserve immediately. In this example, none of the features can be permitted to remain on "stat" reserves. Claims with a value of less than $50,000 are transferred to case reserves at the end of the second month after the reported month.

### B.   Case Reserves

This type of reserving requires the establishment of a dollar reserve under each feature involved. When case reserves are first set up, there may not be sufficient information to permit a realistic appraisal; as subsequent information is developed, the reserves must be adjusted. Establishing case reserves involves the

III-2

12-23-08

exercise of good judgment and the consideration of such factors as probable liability, amount of special damages, estimates of damage, nature of injuries and any permanency, probable expenses of investigation, litigation and related matters.

Reserves are established by probable cost based on present values. A probable cost reserve is based on present costs and is used to estimate paying all future losses and expenses under a particular coverage.

At the end of the second month after reported month, a 90 Day Control List (see page III-10) for each claim handler is generated for open files. Reserves for all features, with the exceptions of those noted below, should be changed from average to case basis upon completion of the a 90 Day Control List Summary in ALOG (see page III-11) during the 60 to 90 day case life period. Persons with reserve authority equal to or greater than the suggested reserve must approve case reserves.

Under the Claim Record Information System (CRIS), the physical damage features including Comprehensive, Collision Property Damage, Loss of Use and Medical Payments, and the other listed coverages below do not have to be converted at 90 Day Control List time from average to case reserve unless the examiner estimates that the loss and expense payments under the feature will amount to $10,000 or more. If the feature is to remain open after the completion of a 90 Day Control List Summary in ALOG and the exposure is not $10,000 or more, the feature remains on average reserve.

If a feature is reopened, an individual with the authority to set the reserves as indicated in TCM-50 must reopen it on a case basis.

When establishing case reserves, special damages, location of accident, permanent injuries and any other such factors are taken into consideration.

The following are coverage/claim symbols, which do not require case reserves unless the estimated amount of loss and expense payment are estimated to be $10,000 or more:

| Description | Coverage | Claim Symbol |
|---|---|---|
| Broad Form Collision* | Coll | CBF, CWD |
| Combined Additional Citizens Band Radio | CA PCB | PAO PCB |
| Collision | Coll | COL, CWV, CDV |

III-3

CONFIDENTIAL

| | | |
|---|---|---|
| Comprehensive | Comp | PVM, **PGL**, PTH, PDV, PFO, **PPT**, PAO, PFL, **PFI**, PAN, PWN, PEF |
| Mechanical Breakdown | MBI | MBB, **MBO**, MBS, MBE, **MBD**, MBT |
| Property Damage | PD | APD, APP, LPD, ADV, DPD, EPD, COP |
| Auto Home Contents | Comp | AHC |
| Stereo Buyback | Comp | PST |
| Fire, Lightning, Theft | FLT | PTH, PPT, PFI |
| Loss of Use | PD | LOU |
| Limited Collision* | Coll | LTC |
| Medical Payments Coverage | MP | MED |
| Personal Effects | PE | PEF |
| Per. Effects/Comb. Additional | PE/CA | PEF |
| Rental Reimbursement | RR | REN |
| Towing & Labor | TOW | TOW |
| Emergency Road Service | ERS | ERS |
| Uninsured Motorist Property Damage | UM | UPD |
| Underinsured Property Damage | UM | XPD |

* = MI Only

III-4

6-28-02

CONFIDENTIAL

The following are coverage/claim symbols, which do require case reserves:

| | | |
|---|---|---|
| Uninsured Motorist Bodily Injury | UM | UBI, UMD, UMS, UBX |
| Excess Underinsured Bodily Injury | UM | XBl, UMB |
| Underinsured Bodily Injury | UM | UIM, UIX |
| Bodily Injury | BI | ABI, BID, RBI, DBI, DPR, LBI |
| Basic Personal Injury Protection | PIP | NBB, NBD, NBS, NDB NBF, NBI, NBW, NDF NBM, NBR, NBA, NWL FNL, DBC |
| Basic Preferred Provider Organization | PPO | NPA, NPM, NPR, NPS, NPW, NPC, NPL, NCC, NCR |
| Additional Personal Injury Protection | APIP | NEl, NEM, NEF, NES, NER, NEW, NEA, NEB |
| Additional Preferred Provider Organization | APPO | NAA, NAM, NAR NAS, NAW, NDM, NDR |
| Medical Payments Coverage | MP | LER, MEB |
| Extraordinary Medical Benefits | EMB | EMB |
| Accidental Death and Disability | ADD | ADE, ADI |

III-5

**CONFIDENTIAL**

## IV.    DEVELOPMENTAL RESERVES

This reserve is developed by the Actuary to compensate for the impact of inflation on claims department establishment of "present values reserves."

## V.    ESTABLISHING, ADJUSTING, MAINTAINING RESERVES

Examiners and adjusters must carefully analyze initial loss reports and indicate the features involved. Reserves should be established for each feature when a claim appears probable, but not for coverages under which there is no probability of a claim. As the character of the file changes, it may be necessary to adjust the feature reserves. Reserves may be changed at any time. The effectiveness of our reserve procedures depends on the examiner's or adjuster's ability to identify the need to open, close, or revise the reserves as the facts of the case warrant.

Reserves are subject to the guidelines listed in the next section with the requirement that the responsibility for establishing and maintaining all case reserves is vested with Supervisors, Managers, Directors, RLA's and AVP's. This responsibility cannot be delegated and the authorizing party should review thoroughly the file content prior to extending reserve authority. A Supervisor, Manager, Director or RLA must authorize all reserves under Bodily Injury, Uninsured and Underinsured Motorists Bodily Injury Coverage.

A C-86 Manager/Supervisor Reserve Worksheet form (See Exhibit 1, Page III-17) should be completed for each claim on the 90 Day Control List, accounting for each BI, UM or UIM feature and on any subsequent reserve change under these coverages.

BI, UMBI and UIM loss and expense reserves include an "inflation factor." See Exhibit 2, Page III-18 for current inflation trends.

Examiners and adjusters are responsible for reviewing the accuracy of the reserves each time the file crosses the desk.

## VI.    GUIDELINES FOR ESTABLISHING RESERVES

Automobile claims with exposure of $50,000 or more under one feature or a combination of features should be placed on case reserve immediately.

- All case reserves must be approved by persons with settlement authority equal to or greater than the reserve amount, and where BI, UM or UIM reserves are concerned, the reserve must be approved by a supervisor, manager or director.

- All changes in reserves that will result in the new reserve exceeding the examiner's or adjuster's settlement authority must be approved by a claims associate who has

III-6

6-28-02

CONFIDENTIAL

- authority to approve the new reserve. See TCM-50 for loss/expense and reserve authorization guidelines.
- 
- Supervisors and Claims managers should approve and review reserves at all 90 day, 6 month and 18 month file reviews.

- Reserves should be changed if the value of the claim changes by $300.00 or more. Adjustments of less than $300.00 should not be made.

- Although it is not necessary to reopen every closed file for the purpose of making a loss or expense payment, premature closure of a file should be avoided. Closed files must be reopened to accommodate loss or expense payments of $300.00 or more.

- We must have detailed facts about the precise nature of injuries, treatment and prognosis to ensure accurate reserves. This is particularly important during the first two months of the case. Examiners and adjusters must obtain complete information promptly from claimants and attorneys and be consistently mindful of reserve maintenance.

- A negative reserve occurs if a payment exceeds the reserve amount established under a specific feature. Our claim systems prevent a negative reserve from occurring; loss payments cannot be issued unless there are reserves established in excess of the loss payment. Therefore, before a payment can be issued, the reserve must be increased to a sufficient amount.

- Catastrophic PIP cases can present a unique problem in accurately predicting case reserve amounts. The type of injury, treatment and rehabilitation periods vary with each claimant. If, after considering all factors, the examiner or adjuster still questions the proper reserve amount, he or she should ask the supervisor or manager for assistance.

- When settlement of a pending case has been negotiated, and the file will be closed within the same calendar month, no reserve adjustment is necessary if the payment is less than the reserve amount.

- Features involving first party physical damages need not be placed on case reserve unless loss and expense are expected to amount to $10,000 or more.

- When a reserve is to be increased beyond regional authority, it may be necessary to call Claims Home Office Legal for approval in order to complete a change before the end of the current month. The Control File Alert Form may also be used to obtain a reserve change (see Exhibit I, Chap. XIII).

- Do not set an inadequate reserve as an interim reserve while awaiting approval from appropriate claims attorney or AVP of Claims Home Office

III-7

**CONFIDENTIAL**

- Telephone calls to Claims Home Office Legal (CHOL) are required for reserve approval on new control files when it will take more than 5 days to get the Control Alert Form to CHOL. Telephone calls are also required when we are within 5 days of the end of the month. Otherwise, the Alert Form may be sent with a recommended reserve.

## VII.   RESERVE INCREASE PROCEDURES

When a file is considered for control status (Chapter XIII) and a reserve increase is warranted, a representative from the region (the examiner, manager, or RLA) may call Claims Legal to review the case. This will include providing the Claim Home Office Legal Attorney with the claim number, insured's name, loss location, date of loss, policy limits, facts and circumstances of the loss, and injuries to the claimant(s), age(s), and occupation(s). Notes will be posted to ALOG

The region will recommend a new reserve figure. If the Claims Home Office Claims Attorney is in agreement, it is approved. If not, advice is given to the regional representative on what is appropriate under the circumstances. Approval of the appropriate reserve adjustment is transmitted via ALOG/SYSM. In addition, a notation is placed on ALOG that the file is to be submitted to Claims Home Office in the near future as a control file. ALOG approval of the reserve adjustment is usually done within 24 hours of the phone call and should not exceed two business days. Alternatively, a reserve adjustment may be recommended on a Control File Alert Form.

If a reserve increase has been authorized, but the file has not been placed on control soon after confirmation of the reserve adjustment, either a phone call is placed to the examiner or message via SYSM/ALOG is sent to the examiner requesting that the file be placed on control.

## VIII.   THE CLAIMS SYSTEM AND CLAIMS CONTROL LISTS

The CRT/PC is used for all reserve changes. The systems manual provides the procedures to follow. The following forms are used to review and change reserves and to review file handling:

| |
|---|
| 90 Day Control List |
| 6 Month Control List |
| 18 Month Control List |

III-8

CONFIDENTIAL

A.   90 Day Control List

    1.   When using this computer-produced list, the supervisor combines file review with changing reserves from average to case for each claim on the list. The list is produced monthly and shows each open file, which has aged for two months from reported date.  A 90 Day Control List summary must be completed by the end of the third month at which time all open features still on average reserve will be transferred to case reserve.

    2.   Claims handlers must create a 90 Day Control List Summary in ALOG for every claim on the 90 Day Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG. Each Summary and supervisor/manager review must be completed by the end of the month in which the 90th day falls.

    3.   A sample of a 90 Day Control List is on the next page and a sample of a 90 Day Control List Summary Format follows.

III-9

6-28-02

CONFIDENTIAL

REPORT NO. CLL50M-101
REPORT DATE 12/29/01

GEICO PROPERTY/CASUALTY COMPANIES
90 DAY CONTROL LIST
RELEASE DATE
DECEMBER 29, 2001

PAGE 256
RUN DATE 12/29/01

ADJUSTER CODE:   XXXX
FCC   -   05                              XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | CO | REPORT DATE |
|---|---|---|---|---|
| 0018565980101101 | 04 | APD | 01 | 1001 |
| | 05 | APD | 01 | 1001 |
| | 06 | APD | 01 | 1001 |
| 0019304401101114 | 02 | LOU | 01 | 1001 |
| 0061300730101052 | 01 | COL | 13 | 1001 |
| 0090599370101091 | 02 | POA | 13 | 1001 |
| 0102558420101044 | 02 | LOU | 01 | 1001 |
| 0122333870101019 | 02 | APD | 01 | 1001 |

III-10

6-28-02

CONFIDENTIAL

## CONTROL LIST SUMMARY FORMAT

1. Loss Description  -    What happened?
Is investigation complete?  If not, why?

2. Coverage  -    Is coverage in order?  Any coverage problems?
Any limits problem?

3. Liability  -    Who is at fault?  Why?
Comparative negligence?  What is the % attributed to each?

4. Damages  -    What features are still open?  Name claimant and feature number.
Note any payments made.
Any vehicle inspections still pending?
Any subrogation potential?

List each injured party's name, age and occupation.
- Diagnosis (What is the injury?)

- History (Medical background, related injuries, prior injuries?)

- What sort of treatment are they receiving?  How often? What type of provider?
  - o    MD    Medical doctor
  - o    DC    Chiropractor
  - o    DO    Osteopath
  - o    RPT    Registered Physical Therapist
  - o    LMT    Licensed Massage Therapist

- Prognosis.  How much longer will treatment continue? Additional tests recommended?  Other treatment recommended?  Length of future treatment?

- What are the total bills paid to date?  Any outstanding bills?  Projected future bills?

- Will they have a loss of earnings claim?  How much?  Any disability?

5. Course of Action  -    What needs to be done to close?
What can we do to resolve?
Address each open injury feature.  Does any feature need a reserve?
If so, what amount do you recommend?

III-11

CONFIDENTIAL

\* Every review should include the elements set out in parts 1 thru 5 above. Reserves should be addressed when completing Part 5. The claims representative, as part of the review process, should discuss each open feature and comment on the reserve for that feature. If no change in reserve is needed, the file should reflect that the reserve was considered and left unchanged. If a change in the reserve is needed, the claims representative should describe the new information which led to this conclusion. The claims representative should then make a recommendation for increasing or decreasing the reserve for the particular feature. Every review <u>must</u> specifically address reserves for every open injury feature. Management personnel are responsible for insuring that reserves are considered and that the consideration is documented when completing all 90 day (C-71), 6 month (C63) and 18 month (C-178) reviews.

III-12

CONFIDENTIAL

11-15-05

B.    6 Month Control List

    1.    The 6 Month Control List is used to identify all open claim files that aged five months from reported month.

    2.    Claims handlers must create a 6 Month Control List Summary in ALOG for every claim on the 6 Month Control List. Supervisors and managers review each summary and give direction, comments and instructions in ALOG.

\*    3.    All reserves should be reviewed for accuracy and changed in the Claims system if necessary. Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

    4.    All 6 Month Control List Summaries and supervisor/manager reviews by the end of the 6th month

    5.    A sample of a 6 Month Control List is on the next page.

11-15-05

CONFIDENTIAL

6-28-02

REPORT NO. CLL50M-201
REPORT DATE  11/24/01

GEICO PROPERTY/CASUALTY COMPANIES
6 MONTH CONTROL LIST
RELEASE DATE

PAGE    84
RUN DATE 11/24/01

ADJUSTER CODE:   XXXX
FCC    -    05

NOVEMBER 24, 2001

XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL | | CO | REPORT DATE |
|---|---|---|---|---|---|
| | | COL | | | |
| 00942875301 01093 | 01 | COL | | 13 | 0601 |

III-14

**CONFIDENTIAL**

C.   18 Month Control List

    1.   The 18 Month Control List is used to identify all open claim files that aged 17 months from reported month.

    2.   Claims handlers must create an 18 Month Control List Summary in ALOG for every claim on the 18 Month Control List. Supervisors and managers review each summary and give direction, comments and instruction in ALOG.

\*    3.   All reserves should be reviewed for accuracy and changed in the Claims system if necessary.  Supervisors and managers must document ALOG with respect to the adequacy of the reserves.

\*    4.   All 18 Month Control List Summaries and supervisor/manager reviews must be completed by the end to the 18th month.

    5.   A sample of an 18 Month Control List is on the next page.

III-15

11-15-05

CONFIDENTIAL

REPORT NO. CLL50M-201
REPORT DATE  11/24/01

GEICO PROPERTY/CASUALTY COMPANIES
18 MONTH CONTROL LIST
RELEASE DATE

PAGE  84
RUN DATE 11/24/01

NOVEMBER 24, 2001

ADJUSTER CODE:
FCC  -   05

XXXX

| CLAIM NUMBER | CLMNT | CLAIM SYMBOL COL | CO | REPORT DATE |
|---|---|---|---|---|
| | XXXX | | | |
| 0094287530101093 | 01 | | 3 | 0600 |

III-16

6-28-02

CONFIDENTIAL

## IX.   INCURRED BUT NOT REPORTED CLAIMS (IBNR)

The total amount of money, which the Company earmarks for claim purposes, includes both reported claims and those incurred but not reported. Reported claims are those for which claim files have been established. Incurred but not reported claims are those for which claim files have not been established although the accident or loss has occurred and we may or may not have the report at the Company. Actuary determines the reserve for incurred but not reported claims.

## X.   REINSURANCE RECOVERABLE RESERVES

Reinsurance recoverable reserves are not actually reserves but are estimates of the amount in excess of our retention, which we can expect to recover from the reinsurance carrier. Automobile and homeowners, CPL and pacesetter reinsurance recoverable reserves will be established, maintained and closed by Claims Home Office. A copy of the accounting document will be sent to the claims file for retention.

Under the CRIS system, there is no field for the entry of a reinsurance recoverable reserve and these reserves are accounted for in a manual account maintained in Claims Home Office. Where a reinsurance reserve is being maintained on a claim processed under the CRIS system, the reinsurance indicator should be activated in the CRIS system so that the claim is identified as having reinsurance involvement.

Under PIPS, reinsurance recoverable reserves are established and maintained by PIC's Claims Processing Unit at the direction of the Claims Home Office.

## XI.   REINSURANCE RECOVERABLE PAYMENTS

The Claims Home Office handles reinsurance recovery payments. Examiners must maintain their claim files on an open basis until notified of the receipt of the reinsurance recovery payment.

## XII.   REINSURANCE TREATY

The Company had a reinsurance treaty to protect it against large losses under its policies. Between April 1, 1993 and August 7, 2001, losses were reinsured above $1 million to a limit of $10 million.

As of August 7, 2001, the Company will be self-insured for most of its policies. The exceptions will be motorcycle policies and all policies written in New Hampshire. They will continue to be covered under a reinsurance treaty until February 7, 2002. After February 7, 2002, the Company will be totally self-insured.

6-28-02

CONFIDENTIAL

**EXHIBIT I**

### MANAGER/SUPERVISOR RESERVE WORKSHEET
### BI-UM-UIM

Page _____ of _____

CLAIM NUMBER _____     POLICY LIMITS_____

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| **Approval Initials & Date** | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| **Approval Initials & Date** | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| **Approval Initials & Date** | _____ | | _____ | | _____ |

| CLAIMANT NAME _____ | % Chance of suit | 0-33 | 34-67 | 68-100 | |
|---|---|---|---|---|---|
| PROBABLE CURRENT LOSS | _____ | | _____ | | _____ |
| PROBABLE CURRENT EXPENSE | _____ | | _____ | | _____ |
| TOTAL PROBABLE CURRENT COST | _____ | | _____ | | _____ |
| INFLATION FACTOR | _____ | | _____ | | _____ |
| NEW NET RESERVE | _____ | | _____ | | _____ |
| **Approval Initials & Date** | _____ | | _____ | | _____ |

**Cumulative Totals:**

| | | | | |
|---|---|---|---|---|
| **TOTAL PROBABLE CURRENT LOSS** | _____ | | _____ | _____ |
| **TOTAL PROBABLE CURRENT EXPENSE** | _____ | | _____ | _____ |
| **TOTAL PROBABLE CURRENT COST** | _____ | | _____ | _____ |
| **TOTAL NEW NET RESERVE** | _____ | | _____ | _____ |

III-18

11-15-05

CONFIDENTIAL

**EXHIBIT 2**

## BODILY INJURY INFLATION RATE: 10.6%

| MO | FACTOR | MO | FACTOR | MO | FACTOR |
|-----|--------|-----|--------|-----|--------|
| 1. | 1.01 | 21. | 1.19 | 41. | 1.41 |
| 2. | 1.02 | 22. | 1.20 | 42. | 1.42 |
| 3 | 1.03 | 23. | 1.21 | 43. | 1.43 |
| 4. | 1.03 | 24. | 1.22 | 44. | 1.45 |
| 5. | 1.04 | 25. | 1.23 | 45. | 1.46 |
| 6. | 1.05 | 26. | 1.24 | 46. | 1.47 |
| 7. | 1.06 | 27. | 1.25 | 47. | 1.48 |
| 8. | 1.07 | 28. | 1.27 | 48. | 1.50 |
| 9. | 1.08 | 29. | 1.28 | 49. | 1.51 |
| 10. | 1.09 | 30. | 1.29 | 50. | 1.52 |
| 11. | 1.10 | 31. | 1.30 | 51. | 1.53 |
| 12. | 1.11 | 32. | 1.31 | 52. | 1.55 |
| 13. | 1.12 | 33. | 1.32 | 53. | 1.56 |
| 14. | 1.12 | 34. | 1.33 | 54. | 1.57 |
| 15. | 1.13 | 35. | 1.34 | 55. | 1.59 |
| 16. | 1.14 | 36. | 1.35 | 56. | 1.60 |
| 17. | 1.15 | 37. | 1.36 | 57. | 1.61 |
| 18. | 1.16 | 38. | 1.38 | 58. | 1.63 |
| 19. | 1.17 | 39. | 1.39 | 59. | 1.64 |
| 20. | 1.18 | 40. | 1.40 | 60. | 1.65 |

III-19

**CONFIDENTIAL**

6-28-02

# CHAPTER IV

## COVERAGE

### I.   OVERVIEW

In every claims situation, the initial task of the examiner is to verify proper coverage. In the vast majority of claims, this is easily done by reviewing computer data regarding the policy, the insured vehicles and the insured persons involved in the loss. The examiner will review computer screens that provide system information regarding all three of these elements. Occasionally a claims handler, at some level of the claims resolution process, will be confronted with a coverage question. It is the purpose of this Chapter to highlight the most prevalent coverage issues that might be encountered and to outline the procedures to be used to resolve the coverage question. Correct coverage decisions are the most important tasks of the claims examiner at any level. Adverse coverage decisions by the Company expose our insureds to real financial hardship – sometimes catastrophic. Just imagine in your own life if you had a traffic accident resulting in substantial property damage and/or personal injury where your insurance company refused to cover the loss. Regardless of whether the coverage position is right or wrong, from the insured's point of view, a denial of coverage can be devastating. If a disappointed insured proves to a jury that our denial of coverage was wrong and wrongful, the effect upon the Company can also be devastating in terms of extracontractual liability, commonly known as "bad faith liability."

As this Chapter will mention many times, one of the keys to coverage decision-making is prompt and appropriate investigation. Coverage decision-making is not a game nor is it to be viewed as a jousting contest with the insured. Doubts are to be resolved in favor of the insured after appropriate and timely investigation. If our insured refuses to cooperate in our coverage investigation by failing to provide pertinent information, we may have more latitude in our investigation, but we must avoid a "stonewall" or "vendetta" attitude. It is your job to find coverage and to service covered claims. The Company is not served by a cynical approach to coverage issues. On the other hand, if coverage does not exist for a particular loss based upon facts determined by a full and fair investigation, we should not shrink from a coverage denial/disclaimer.

This Chapter will address many of the coverage issues you might encounter and the process by which these issues are to be resolved. Coverage decision-making is more than merely reading the policy and denying coverage. It is much more than reacting "off-the-cuff" to a claim situation presented to you over the phone. Examiners must avoid casual comments to our insureds regarding potential lack of coverage. We must be sure we are on firm ground when we deny coverage to our policyholder.

5-10-02

CONFIDENTIAL

## II.   SOURCES OF COVERAGE

Coverage may be confirmed by the computer record and/or by the policy file and/or information or papers relevant to the coverage issue held by the insured or others.

The following guidelines apply to coverage:

- In most cases, we will assume that the computer record is correct and proceed with claim handling.

- Payments should not be made if you doubt the credibility of the computer record. If you "think" the computer record is incorrect, obtain documentary proof from the policy file or possibly even from the insured.

- Search for the policy file if it is necessary to resolve a coverage question.

- Advise the Auto Damage Adjuster or the independent adjuster immediately if there is any coverage problem, which would affect claim handling. Ask staff and independent adjusters to obtain coverage documents and statements from the insured. The insured should be advised if we are investigating to determine coverage and nothing should be done to mislead the insured in any way.

- In cases involving BI, UM or UMBI, the Regional Liability Administrator (RLA) and/or a Claims Home Office Attorney should be consulted for permission to deny coverage. Any decision to deny must be made as soon as possible.

- Making decisions as promptly as possible may at times be difficult, especially in those cases where every effort has been made to confirm coverage from computer records and policy files with no success, and even in cases where the insured is unable to develop and provide any evidence of coverage. Delaying settlement in the vague hope that coverage may somehow not be valid is a clear disservice to the public and is a violation of most Unfair Claims Practices Acts.

## III.   TYPES OF COVERAGE QUESTIONS

There are two types of coverage questions: those in which no Company policy was in force at the time of the loss and those in which a policy is in force but the loss is not covered by that policy under the particular factual situation. It is important to understand the distinction between these two types of coverage questions. In the first situation, all coverage is <u>denied</u>. In the second situation, coverage for <u>this</u> <u>loss</u> is <u>disclaimed</u> because of particular circumstances.

IV-2

5-10-02

**CONFIDENTIAL**

Coverage questions can arise from many situations. Here are a few of the more common questions you will see.

## A.     Policy Expiration And Cancellation

If the computer system shows that the policy **expired** prior to the loss, the insured should be advised of this coverage problem but no direct denial should be made in early conversations with the insured. If the expiration was over 30 days prior to the loss and the insured does not dispute the expiration, the coverage can be denied upon approval by a Claims Manager. Complications can arise if the expiration is 30 days or less or the policyholder denies receipt of the expiration notice. In such cases, the issue must be referred immediately to the RLA for review before a denial can be issued. If the system information indicates that the policy in question was **cancelled** prior to the loss, we must be prepared to prove the validity of the cancellation in the event our coverage position is contested. The necessary evidence should be identified prior to the decision to deny coverage. This will be discussed again later in this Chapter.

There are times when an uninsured person who causes an auto accident tries to purchase coverage over the phone after the fact. Any time a loss is reported to have occurred on the date of policy inception, great care should be taken to confirm the timing of the accident and the binding of the policy. Generally, the police report will establish the time of the accident and our computer system will record the time that the direct sale of coverage was made. If the loss is property damage only and no police report was made, the examiner must be creative in determining the time of the loss and then determine if the policy was in effect.

## B.     Is The Vehicle Covered?

Our automobile policy covers both people (insureds) and vehicles depending upon the circumstance of the loss. For physical damages coverages, the vehicle must be a "described vehicle" – one listed on the declaration page of the policy. For liability coverages, the issue is not so clear. Our defined insureds (named insured, spouse and resident relatives) are insured for use of "owned" and "non-owned" vehicles. Where the vehicle is owned by someone in the insured's household but is not described in the policy declaration page (referred to as a "dec-sheet"), then that vehicle is neither "owned" (because it is not described on the dec-sheet) nor is it"non-owned" (because it is owned by a defined insured). Consequently, use of that vehicle is not covered.

Owned auto – Our insurance policy has a very specific definition of an owned auto. The auto must not only be owned by our named insured, it must be declared on the policy (listed on the dec-sheet). A vehicle properly declared on the policy is called a "described" vehicle. There are also vehicles that meet provision definitions of "owned auto". These are "replacement vehicles," "additional vehicles," and "temporary substitute vehicles".

IV-3

Non-owned auto – Defined insureds are covered, with certain limitations, while driving vehicles owned by others. This coverage is based upon the status of the insured person and the circumstance of his/her operation of the non-owned vehicle. For an insured under a Company policy to be insured while driving a non-owned vehicle, it must be established that the use of the non-owned vehicle was with the permission of the owner of the vehicle and that the use was within the scope of the permission. Permission to use a non-owned vehicle is a rather common coverage question.

## C.   Is The Driver Or Passenger Covered?

Even when a described vehicle is involved in an accident, there may be issues regarding coverage for the driver or passengers if they aren't defined insureds. A person driving the described vehicle who lives outside the insured household is covered only if driving with permission of the owner. For example, if any insured loans a described vehicle to his neighbor to run an errand, the neighbor is fully insured as long as she keeps within the scope of the permission given by the owner. In this situation, the neighbor is called a "first permittee". If the neighbor happens to allow her husband to drive the described vehicle, the husband becomes a "second permittee". Coverage for "permittees" is problematic and very fact specific. Permissive use of the described vehicle by a person outside the insured household presents a coverage question. **Cases involving permissive use issues, which involve personal injury, must be presented to the RLA.**

Most states allow the issuance of "Named Driver Exclusions" (called NDEs). There are two types of NDEs: voluntary and involuntary. Voluntary NDEs result when our policyholder elects specifically to exclude a person from the policy who would otherwise qualify as a defined insured. This situation allows the policyholder to reduce her premium by excluding a high-risk resident relative. Involuntary NDEs arise where the Company informs a policyholder that we will continue to insure them only if a specific risk is excluded.

## D.   Is It A Covered Loss?

Occasionally, there are losses claimed that are not covered by our contract with the insured. It is essential that you refer to the correct policy form and determine if the loss is described under **Losses We Will Pay**. Also, be sure to review the policy definitions under the appropriate section of the policy from which coverage is sought.

IV-4

**CONFIDENTIAL**

5-10-02

**E.     Has The Insured Complied With The Policy Conditions?**

The agreement we have with the insured binds both sides to the policy contract conditions. If the insured fails to meet these conditions, a coverage question may evolve. Common breaches include failing to report a loss timely, failing to cooperate and failing to provide timely notification of a lawsuit. The circumstances surrounding the breach should be discussed with your supervisor and/or RLA immediately. Appropriate coverage investigation will follow to determine the extent of the breach and if it has or may influence coverage.

## IV.    OTHER POSSIBLE COVERAGE QUESTION SITUATIONS

**A.     Misrepresentations**

For claims purposes, a misrepresentation may be defined as a misstatement given to the Company to induce it to write a policy. To constitute a valid question of coverage, the misrepresentation must be material. The test of materiality is our answer to the question whether the policy would have been issued, or written at the same premium, if the true information had been know.?

An inaccurate statement of occupation, if both occupations are of the same general character, may not be material to the risk. On the other hand, a false statement about a recent driver's license suspension or revocation is generally regarded as material.

Immediately upon discovering a possible misrepresentation, discuss the file with your supervisor and then refer the claim file to the appropriate Underwriting Manager for a written opinion. On receipt of the Underwriting Manager's decision (paper or electronic) supporting a denial of coverage, Claims Home Office Legal must be consulted immediately before any action is taken. As soon as possible after receipt of the written opinion, the Underwriting Department should be notified as to how the claim will be handled.

**B.     Other Insurance,  Excess And Escape Clauses**

To provide for situations where two policies cover the same risk, insurance contracts contain "other insurance" clauses. These clauses apply if the insured has purchased two policies and the policy periods overlap, or when the insured is driving a non-owned vehicle on which there is insurance.

If there are two insurance policies covering the same loss, generally, both policies would contain an excess insurance clause. This clause might read:

IV-5

5-10-02

CONFIDENTIAL

> If "the insured has other insurance against a loss covered by
> Section I of this policy, we will not owe more than our pro rata
> share of the total coverage available.
>
> This policy is excess over any other valid and collectible insurance
> that applies to a temporary substitute auto or non-owned auto."

When wording of this type appears in both policies, the general rule is: (1) the insured must be covered, (2) the terms of each policy are in conflict, and therefore, (3) both carriers are liable.

In the instance where the insured is driving a non-owned vehicle, which is covered by insurance, the general rule is that insurance follows the vehicle. The insurance on the vehicle would be "primary". The driver's insurance would be "secondary" and only become involved if the limits of the primary carrier had been exhausted. In potentially serious cases, opinions should be sought from the Regional Liability Administrator or Claims Home Office Legal.

## C.   Who Is A Resident Of The Same Household For Purposes Of The Omnibus Clause?

The policy contract not only affords protection to the named insured, but under the omnibus clause, it extends coverage by means of specific language and definitions to another class of person. This class includes relatives of the named insured living in the same household, and/or, by definition, a person using the insured's vehicle with permission.

Under the definition of an <u>owned automobile</u>, an insured is: (1) the named insured and any resident relative, (2) any other person operating the insured vehicle within the scope of permission and (3) any other person or organization liable for the conduct of an insured in the use of an owned auto. Number 3 encompasses both (1) and (2) and would afford coverage, for example, in the case where the insured is driving his car in the scope of his employment and is involved in an accident injuring a third party, who would have a subsequent claim against both the employer and the insured; in this case, the terms of the policy would apply to each.

There have been several interpretations by the courts on the meaning of the word "residence". Most courts agree that the term means more than a place of abode and, in determining the qualifications of a residence, have applied measurement criteria such as: addresses on bank accounts, voter registration, hospital records, registration of automobiles and driver's license. It appears that the term "residence," when used in a statute is equated by the courts to the term "domicile". When used in an automobile liability policy, however, the term "resident" seems to be given a less permanent restriction, so as to cover persons who are merely temporarily residing with the named insured. This, of course, is

IV-6

CONFIDENTIAL

an advantage to the company when excluding coverage for non-owned automobiles (automobiles "not owned by or furnished for the regular use of either the named insured or any relative"), but operates as a disadvantage to the Company when we consider that relatives of the named insured are covered with respect to non-owned automobiles as persons insured under our policy, as are residents of the same household as the named insured with regard to owned automobiles. Likewise, the term "relative" is used under Part II of the Family Automobile Policy covering expenses for medical services, etc.

Under the definition of a <u>non-owned auto</u>, the following persons or organizations are insured: (1) the named insured; (2) any resident relative operating with permission of the owner; (3) any other person or organization liable for the acts or omissions of an insured using an auto not owned or hired by the person or organization. Despite the language used in defining "relative" under the Family Policy, there are certain guidelines for the examiner or adjuster to follow with respect to this matter, which are as follows:

- A person may have several residences but can have only one domicile.

- While the term "resident" as used in our policy should not be interpreted to require that degree of permanency inherent in the term "domicile," it does require more than temporary physical presence in the named insured's household. The presence of the individual claiming to be (or not to be) a resident of the same household as the named insured must be accompanied by an intention to remain there for some length of time, although he need not intend a change of domicile.

- A person on a mere temporary visit to the named insured's home is not a "resident" as contemplated by the policy.

- Domicile means that place where a person has a true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he or she has, whenever absent, the intention of returning.

**D.    What Constitutes Regular Use Of Non-Owned Automobiles?**

The Family Automobile Policy defines a non-owned automobile as "an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute automobile. An auto rented or leased for more than 30 days will be considered as furnished for regular use" This raises several questions each time a non-owned automobile is driven, in addition to the question of permissive use. For example, the examiner or adjuster must determine whether the automobile is owned by either the named insured or any relative, or whether it is furnished for the regular use of either named insured or any relative.

IV-7

5-10-02

CONFIDENTIAL

The courts have encountered difficulty in deciding these questions and this section will be directed solely to the question of what constitutes regular use of a non-owned automobile as determined by the courts. Legal opinions vary from state-to-state. When necessary, check with your RLA and/or Claims Legal. The main question to be determined by the claims person is whether the non-owned automobile is being driven without restricted permission as to the time period within which the operator may use the vehicle or whether the vehicle is loaned on a temporary or restricted basis. The courts which have considered this question have generally held that the question is one of determining whether the insured had the unrestricted right to use the vehicle at any time he or she desired, either on business or pleasure, rather than one of determining the specific number of times the car was used. The only situation where the specific number of times the car was used becomes important is where the right to use the car is restricted in time. Generally speaking, if the insured has the unrestricted right to use the vehicle at any time, whether it be a specific vehicle or one of a number of vehicles, furnished for his or her use, the courts have held that this is a vehicle furnished for regular use and is not covered under the Family Insurance Automobile Policy. This would cover, for example, the standard motor pool situation wherein our insured is allowed to use one of any number of vehicles available in the motor pool furnished by an employer. Regardless of the number of times he or she may have used the vehicle in question, the courts have normally held this to be a non-owned automobile furnished for regular use for which there is no coverage under the Family Automobile Policy.

The majority of non-owned auto situations will involve our policy only as excess coverage. The following rules should assist you in making a determination on the coverage issue.

- If the insured has the right to use the vehicle in question at any time he or she so desires, either on business or pleasure, regardless of the fact that it may be one of a number of vehicles in a pool of cars furnished, this is a car that may be furnished for regular use.

- The question to be determined is not a specific number of times which he or she has used the car in issue, but as to whether the insured has the unrestricted right to use the car or any one of a number of cars at any time.

- If the car is furnished for a restricted time period only, or in some instances for a restricted use only, then the question narrows and the majority of courts have decided that the car was not furnished for regular use. This would include short-term rental vehicles rented for a period of one month or less, or the case of a relative not residing with the owner of the car who must have specific permission to use the car each time.

IV-8

**CONFIDENTIAL**

- Whenever specific permission is required for each separate use of the vehicle, the courts normally hold that this is not "furnished for the regular use of the named insured" due to the permission restriction.

- The use to which the car is being put at the time of the accident usually has no bearing on the question, the question being one of status of the vehicle and not the use to which it is being put, to wit: is the car furnished (available) for the regular use of the named insured?

## V.    WAIVER

A waiver is the relinquishment of a known right; in this instance, the Company's relinquishment of the right under the policy contract to deny coverage. For a waiver to exist, the Company must know about the coverage question. Although a waiver does not usually have all the elements of a contract, it is in the nature of a contract, based on an expressed or implied intention of the parties. The intention to waive may be implied from the actions of the claims technician.

An example of a waiver might be a case in which there was a delay of six months in reporting an accident. Obviously there is a coverage question based on a breach of the policy condition requiring prompt reporting. The question of coverage may be waived by the claim technician's expressly agreeing to do so or by implying such an intention by investigating and attempting to settle the claim without first issuing a Reservation of Rights or obtaining a signed Non-Waiver Agreement.

## VI.    ESTOPPEL

The doctrine of equitable estoppel may prevent a valid denial or disclaimer of coverage. If the Company acts or fails to act in such a manner that would (1) reasonably lead the insured to believe coverage is in order, and (2) the insured acts to his/her detriment in reliance upon that belief, the Company may be "estopped" from denying or disclaiming coverage.

For example, the Company may learn at the time the insured reports a serious accident, that when the insured applied for insurance, he or she inadvertently neglected to inform the Company of a prior insurance cancellation by another company. Although this may raise a question of coverage, the claims examiner or adjuster may investigate and even attempt to settle the claim. Perhaps suit is filed and the insured sends the suit papers to the Company, but the Company returns the suit papers to the insured ten days before trial indicating that it is withdrawing from the case and contending that the policy was void ab initio because of misrepresentation.

5-10-02

CONFIDENTIAL

Under these circumstances, the insured appears to have been justified in relying on the Company to do what it represented it would do. Because the insured has been deprived of any reasonable opportunity to investigate and attempt to settle the claim, if he or she has acted in good faith, it would appear unjust and inequitable to permit the Company to take advantage of the coverage question at that late date. The Company could be estopped from denying coverage.

It is becoming increasingly difficult to distinguish between waiver and estoppel. In many jurisdictions, they are regarded as synonymous and in others; a waiver is not binding unless it is supported by an estoppel. It is sufficient for you to be aware that the application of either doctrine can prejudice the Company's position.

## VII.  DEALING WITH OUR INSURED IN COVERAGE QUESTION SITUATION

While investigating a coverage question, the claims handler must be careful to preserve the rights of both parties to the insurance contract: the insured (or person seeking coverage) and the Company. Once a coverage question is recognized, the handler must seek guidance from Claims Management and, in appropriate cases, the RLA to determine a plan of action to resolve the coverage question. This plan may include issuance of a Reservation of Rights letter or, in some circumstances, a Non-Waiver Agreement or Agreement to Defend. These devices provide protection to both the people seeking coverage and the Company while the coverage investigation proceeds.

## VIII.  RESERVATION OF RIGHTS (ROR) LETTER

A reservation of rights letter (known as a "RoR") is used promptly to inform an insured that a coverage question has arisen concerning her/his claim and that we (the insurer) require time fully to investigate the question. The RoR is intended to advise the insured that the question exists, the nature of the question and that our efforts to investigate the question will require some additional time. The RoR is an important legal document. It can cause apprehension on the part of the insured. Its use must be carefully controlled and drafted. What follows are essential considerations in drafting and issuing RoRs:

### A.  Timing of RoR

Because the very purpose of a RoR is to give notice to the insured of a coverage question, these declarations must be made promptly after a coverage question is recognized. This does not mean that a RoR letter must be sent before preliminary investigation is made to confirm coverage. The law does not require that we guess about basic coverage based upon bare allegations. Mere suspicion regarding coverage does not require or even justify a RoR. However, there should be no significant delay in sending adequate notice to the person seeking coverage explaining why the coverage decision is not resolved. No RoR should

IV-10

5-10-02

be sent in any case without documented approval of a supervisor. The level of the supervisory approval required will depend on the loss involved.

**B.     Contents of RoR**

A RoR issued in an auto claim must fully and fairly describe all reasons why the Company questions coverage in the particular case and the general facts, which support the need for the coverage investigation. Where there are genuine questions or facts upon which the coverage depends, these questions should be expressed in a letter, which relates the facts as known, by the Company. The RoR will declare that both parties retain all rights and benefits under the insurance policy during the coverage investigation and that the Company reserves its rights to deny or disclaim coverage if the coverage question is resolved against the person seeking coverage.

**C.     Presentation of RoR**

Questions often arise as to who should receive the RoR (or a copy of the RoR). Again, recognizing that the purpose of a RoR is notice, the RoR should be addressed to the person(s) seeking coverage under the policy. If the named insured is not the person against whom primary liability might be assessed (i.e. the insured vehicle was driven by a permissive user); the RoR is addressed to the permissive user (with an info copy to the named insured). On the other hand, in those states where the owner may be vicariously liable for the negligence of a permissive user, any RoR that sets forth a reservation of rights that is applicable both to the owner and the permissive user should be addressed to both parties. In most states (New York in particular), it is necessary to send a copy of the RoR to an adverse party who may be affected by the potential coverage denial. This is a complex issue and the examiner must seek supervisory guidance.

**IX.    DISCUSSIONS REGARDING ROR**

- RoRs should not be used where we have decided our coverage position. It is not a proper purpose of a RoR to "buy time" when we know our coverage position. If we have a firm coverage position, it should be stated directly and forthrightly.

- Some coverage questions will involve intricate issues involving sales, policy service and underwriting processes and procedures. As a direct-seller, we are subject to allegations involving what was said during a telephone contact with the insured. These issues should be handled with care and with full supervisory involvement.

- When there is more than one person (or other entity) seeking coverage, special care must be taken in resolving the coverage issues. We must recognize our contractual obligations to "other insureds" and satisfy those obligations.

IV-11

5-10-02

- By their very nature, RoRs are intended to be temporary. If complications arise in the course of the coverage investigation, the person(s) seeking coverage should be advised of these complications and a stale RoR should be refreshed by another letter reminding the person(s) seeking coverage that the coverage question remains unresolved and that we continue to reserve our rights to deny/disclaim coverage. Ultimately, unresolved coverage questions will often result in the company's having to provide coverage unless the reason the question is unresolved was beyond the control of the Company. A person seeking coverage cannot defeat a coverage question by refusing to cooperate in the coverage investigation. Failure of the person seeking coverage to cooperate in the coverage investigation may be reason for a renewed RoR adding lack of cooperation as a basis for potential disclaimer of coverage.

## X.   NON-WAIVER AGREEMENTS

Non-Waiver Agreements (NWA) are most often used to obtain the agreement of the insured that our coverage for a loss or defense of a lawsuit is conditional upon future events or determinations of fact. This device is useful where the defense of a person seeking coverage is undertaken initially, but it is contemplated that the defense of the lawsuit will be withdrawn if specified events occur or facts are determined. The advantage of a NWA is that it is a bilateral agreement rather than merely a unilateral declaration (RoR). This device is not common in automobile insurance cases. Care should be taken in drafting a NWA to make sure it is clear regarding the nature of the coverage questions and the specific conditions upon which the defense may be withdrawn. A typical example of where a NWA may be used is where the Company undertakes the defense of a person seeking coverage in an underlying tort lawsuit while simultaneously seeking a judicial declaratory judgment regarding its coverage obligations. The NWA would be used to secure the agreement of the person seeking coverage that the defense of the lawsuit would be withdrawn if the court should determine that the Company properly denied/disclaimed coverage. Again, the purpose of the NWA is to put the person seeking coverage on notice of what will happen if a coverage question is resolved adversely to that person. Claims Home Office Legal coordination is required any time a NWA is contemplated.

## XI.   AGREEMENTS TO DEFEND

Occasionally, the Company's first notice of a potentially covered loss will be notice that a lawsuit has been filed. In such a case, there may not be time to conduct a proper coverage investigation (assuming there is a coverage question) before an answer to the lawsuit must be filed. A specific agreement to a limited defense can be used to take immediate action to protect the person seeking coverage. This agreement will specifically limit our obligation to defend and/or indemnify pending resolution of the coverage question. Such an agreement is very similar to a non-waiver agreement except

IV-12

5-10-02

that it is more specific about what the Company will undertake in response to the lawsuit. Care must be taken not to obligate the Company inadvertently to a full defense. Claims Home Office will be contacted prior to entry into an agreement to defend. Every effort should be made to resolve quickly any coverage question where we have undertaken a limited or conditional defense. Undue delay in such a situation can result in the Company not being permitted to withdraw from the defense of the underlying claim.

## XII.   DECLARATORY JUDGMENTS

Critical coverage questions may be appropriate for judicial determination by use of an action for declaratory judgment (DJ) in state or federal court. Such an action – also called an action for declaratory relief in some states – asks the court to decide the parties' obligations under the insurance contract. A variety of coverage issues can be litigated with a DJ action, but it is particularly useful when there is a dispute over the interpretation or application of policy language or the validity of policy exclusions. This remedy can be very expensive because, in most states, if the ruling is against the position taken by the insurer, the insurer must pay the reasonable attorney fees incurred by the insured. <u>DJ actions must not be initiated without the approval of Claims Home Office Legal.</u>

It is important to name all parties in the DJ action. If the parties reside in diverse jurisdictions, a DJ may not be appropriate. Even where a DJ is likely, a reservation-of-rights letter will be needed to cover the time needed to investigate the situation prior to the filing of the DJ action.

## XIII.   DISCLAIMER

Disclaiming is denying liability under an existing policy contract and withdrawing from the handling of the claim because of a breach of a policy condition. The Company takes no further action with respect to investigation, negotiation, defense, etc. Denial of a claim on the basis that the accident or loss occurred after a date of expiration or other proper termination of the policy (or because claim is made under a coverage properly omitted from the policy,) is not a disclaimer, but rather is a "denial" of coverage.

There are certain risks in disclaiming. If the Company disclaims coverage in a Bodily Injury Liability claim and the claimant subsequently files suit, the insured is under no obligation to send suit papers to the Company or to give notice of the suit. In the event that judgment is taken against the insured after a trial, or even by default, for failure to defend, and there is a later determination that the disclaimer was improper and coverage was effective, the Company may be bound by the judgment.

In most states, (in the factual situation of where the insurance company disclaims coverage and the plaintiff proceeds in the lawsuit) after a plaintiff obtains a judgment against the insured, and the insured assigns his or her rights against the insurance

IV-13

CONFIDENTIAL

company to the plaintiff, the plaintiff can then proceed directly against the Company. Questions of liability and damages are not then an issue as they have already been settled. The only issue is whether the policy covers the particular accident. If the plaintiff, in the original action, recovers on the judgment and collects from the insured, the insured might then sue the Company for the amount he or she was required to pay within his policy limits, plus expenses. The only issue would be whether the policy was effective.

\* Disclaimer should always be made by letter to the insured, (person seeking coverage). The disclaimer letter should be sent by Certified Mail, Return Receipt Requested, Addressee Only.

\* A copy of the disclaimer should be sent to all other interested parties when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is not providing coverage for the loss should be sent to the interested parties.

In some states, either a copy of the disclaimer letter to the insured or a separately dictated letter must also be sent to the liability claimant and/or the legal representative within a specific time or the Company loses its right to disclaim.

A letter of disclaimer must be very carefully worded and must set out the specific reasons for disclaiming coverage in understandable terms.

If it is decided to declare a policy void from inception, it may be necessary to arrange, through the Underwriting Manager, to return premiums to the insured. Declaring a policy void ab initio ("ab initio" means from the beginning) is a joint underwriting and claims function and the letter to the insured should go out from the Underwriting Department. We should have a copy of the Underwriting Department's letter in the claim file.

If a decision is made to rescind the policy, it is usually necessary to refund the insurance premium to the insured. The return of the premium to the insured must be coordinated with the appropriate Underwriting Manager. The RLA and Claims Home Office Legal must approve all coverage disclaimers.

## XIV.   COVERAGE DENIALS

Coverage denials are sent when no policy was in effect at the time of the loss. Questions as to whether a policy was in force at the time of the accident or loss, along with proper investigative material, should be referred to Underwriting (via SYSM mailbox) for an opinion as to whether the policy was effective. In certain circumstances, referral to Underwriting may not be necessary if the lapse of coverage is readily apparent after a careful review of the policy screens. If the Supervisor/Claims Manager does not agree with Underwriting's opinion, the case should be discussed with the Regional Liability

**CONFIDENTIAL**

1-10-07

Administrator.

If the Regional Liability Administrator also disagrees with the opinion of the Underwriting Department, the coverage question should be referred to Claims Home Office for a decision. In these circumstances, the Underwriting Department should be informed how the case will be handled as soon as possible.

Managers are permitted to sign off on coverage denials without RLA involvement if all of the following criteria are satisfied:

- The policy must have been cancelled at least 30 days prior to the loss or have expired 30 days or more before the loss.

- The only claim is for property damage (which includes collision and comprehensive).

- The policyholder does not challenge the cancellation or expiration.

- The appropriate PORS and cancellation notice are in the claim file.

- A Coverage Problem Worksheet has been completed.

- A manager has approved the denial in writing.

The Regions are not required to implement this modified rule and may retain mandatory RLA involvement in such cases.

Regional Liability Administrator (RLAs) may approve denials of coverage for claims involving Bodily Injury or UM/UIM Bodily Injury in the following limited circumstances. All conditions must be present:

- The denial is based upon:

  - Cancellation of the policy for failure to pay premium where the cancellation notice and the PORS have been examined and support the cancellation; or

  - A valid named driver exclusion applies to the loss and clear evidence of the exclusion exists in the file; or

  - Cancellation of the policy or removal of the involved auto was done pursuant to the policyholder's request prior to loss if the policy file information is clear and unambiguous.

- The former insured has been contacted and given an opportunity to present

IV-15

5-10-02

CONFIDENTIAL

arguments. A good faith attempt to make this contact must be made before search for the former insured is deemed unsuccessful.

- There are no complications evident in the file. Such complications for cancellation cases include, but are not limited to:

  - A premium payment was made subsequent to the effective date of the cancellation, which was not honored to resume coverage.

  - The loss occurred within 10 days of the effective date of cancellation and the former insured contests receipt of the cancellation notice.

  - The former insured alleges a telephone contact with the Company subsequent to the cancellation advising of submission of payment for the purpose of reissue.

  - The insured has a prior history of late payments.

- Complications for a named driver exclusion case include:

  - The most recent UE-119 for an excluded resident relative found in the file is over two years old ; or

  - The UE-119 is for a named insured; or

  - The named excluded driver is not a relative and would otherwise be a be a permissive user of the insured vehicle.

- Claims reported by adverse parties where we have no record of insuring the party alleged to be insured with GEICO.

  Generally, guidelines for approval of such denials include checking the policy system under the alleged name or alleged policy number for a match; verification with the underwriting department if the alleged insured could not be located in the policy system; and a concerted effort to locate the person. We must contact the alleged insured either by phone, mail or face to face by an adjuster.

## XV. COVERAGE PROBLEM HANDLING PROCEDURES

The following are step-by-step outlines on handling various coverage problems.

### A. General Procedure

1. Recognize potential coverage problem

IV-16

5-10-02

**CONFIDENTIAL**

2. Check CRT in IDOC:

- INDX – Client Index System
- PHIN – New Business Phone Application Inquiry (PHIN).
- IDIQ – Mini Accounts Receivable screens
- BINQ – Billing Inquiry Screen
- PLOGI – Screens used to record policy notes
- DRVl – Screen used to identify an excluded driver in UE119 situations

Or check CRT in Oasis:

- Customer Identification Screed
- Critical Info Screen
- Billing Screen
- Driver Summary Screen
- Vehicle Summary Screen
- Coverage Screen
- PLOG Screen

3. Alert your supervisor/discuss Coverage Screen sending a reservation of rights letter

4. Investigate (must be resolved in 30 days)

a. Contact Insured
   - opening
   - alert to possible problem and take recorded interview
   - explain what will happen next and when
   - thank insured

b. Contact Claimant
   - opening
   - explain potential problem
   - explain what will happen next and when
   - thank claimant

c. Gather other information

d. Gather documentation

5. Complete coverage worksheet

6. Obtain approval for denial or disclaimer from Manager, RLA or CHO Legal, whichever is appropriate.

IV-17

5-10-02

CONFIDENTIAL

7.    If denial/disclaimer

a.  By Mail –
-    prepare denial letter
-    address to person seeking coverage; copy all interested
      parties only when required by statute or regulations.  Otherwise
      send a separate letter instead of the copy.
-    send according to TCM-72 guidelines – See Exhibit 1
-    give specific reasons

b.  By Phone – Call insured
-    opening (name, purpose of call)
-    explain clearly that there is no coverage and specific reason
-    discuss so that insured's questions are answered
-    explain what will happen next and when
-    thank insured and again express your concern

c.  Call claimant/other interested parties
-    opening (name, purpose of call)
-    explain clearly that there is no coverage (and why?)
-    discuss options available

d.  Claimant's own insurance (UM)
-    explain that you would like to help but under terms of this policy
      are unable to.

The following pages show steps that you can follow for particular coverage situations, which should be sufficient for most situations.

CONFIDENTIAL

1-10-07

## B.    NEW POLICY

### (Review regional new business procedure)

1. Check INDX in IDOC or Customer Identification screen in Oasis
   - is there a policy number for insured?

2. Check PHIN
   - is there a new business phone application in the system?

3. Coverage Worksheet (C-380)
   - handle according to your regional procedure

4. Make your supervisor aware of the problem

5. Call insured and take R/I

6. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

7. Gather information
   - copy of binder

8. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

9. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

10. Obtain approval from Manager, RLA or Claims HO Legal
    - approval should be obtained through the appropriate channels

11. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of a copy.
    - send according to TCM-72 guidelines – See Exhibit 1

IV-19

CONFIDENTIAL

- give specific reasons

## C.   NON-PAY CANCELLATION

1. Check BINQ screen in IDOC or Billing screen in Oasis
   - has a reissue payment posted?
   - are there dash policies?

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call insured and take R/I

5. Call claimant
   - let him/her know that there is a coverage problem and that you will keep in contact

6. Gather documentation
   - PORS
   - Cancellation notices

7. Reservation of Rights letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1

IV-20

1-10-07

- give specific reasons

## D. CANCELLATION – UNDERWRITING REASONS

1. Check BINQ screen in IDOC on Billing screen in Oasis
   - has policy been reinstated?
   - is there a dash policy?

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Insured and take R/I
   - ask questions such as:
     Was cancellation letter received?
     When? How?
     What date cancelled?
     Are you aware of cancellation?
     Have you moved recently?
     When?
     Where?
     Was Company notified?
     How?
     When?
     Where?
     Whom spoke with?

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Gather documentation
   - copy of cancellation letter
   - copy of PORS

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim

IV-21

1-10-07

CONFIDENTIAL

- fill in form completely
- get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channel

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy to all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

### E.   VEHICLES DON'T MATCH – (temporary substitute, replacement, additional)

1. Check BINQ screen in IDOC or Billing screen in Oasis
   - does vehicle show?
   - is there a dash policy?

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Insured and take R/I
   - determine what category the vehicle will fit in, i.e. temporary substitute, replacement or additional

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Gather documentation
   - copy of bill or sale
   - copy of title

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant attorney only when required by statute regulation. Otherwise send a separate letter instead of the copy.

IV-22

**CONFIDENTIAL**

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
 *  - copy to all other interested parities only when required by statute or
      regulation. Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

### F.   EXCLUDED DRIVER (UE-119)

1. Check DRVI in IDOC or Driver Summary screen in Oasis
   - who is the excluded driver

2. Coverage Worksheet (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Policyholder and take R/1

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in
     contact

6. Gather documentation
   - copy of UE 119 from file

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the
     Policy
 *  - copy to liability claimant and attorney only when required by statute or
      regulation. Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

1-10-07

CONFIDENTIAL

9. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy to all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

## G.   DRIVER OTHER THAN NAMED INSURED- (Permissive Use Questions)

1. Make your supervisor aware of the problem

2. Call insured and take R/1

3. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Gather information from other sources
   - driver's interview

5. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

6. Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

7. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

8. Denial/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-24

## CONFIDENTIAL

## H.  EXCLUSION OR "DEFINITION" COVERAGE PROBLEMS

1.  Make your supervisor aware of the problem

2.  Call Insured and take R/I
    - ask questions that will help determine whether the loss does not fall within the terms of the policy or if it might be excluded

3.  Call Claimant
    - let him/her know that there is a coverage problem and you will keep in contact

4.  Gather information from other sources

5.  Gather documentation

6.  Reservation of Rights Letter
    - list all possible reasons and be as specific as possible
    - send according to TCM-72 guidelines – See Exhibit 1
    - send to the individual or all individuals claiming protection under the policy
    - copy to liability claimant and attorney only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

7.  Coverage Problem Worksheet
    - form used to get authorization to deny or disclaim
    - fill in form completely
    - get appropriate supervisor/manager signatures

8.  Obtain approval from RLA or Claims HO Legal
    - approval should be obtained through the appropriate channels

9.  Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

## I.  VEHICLE USED IN GOVERNMENT BUSINESS

1.  Make your supervisor aware of the problem

2.  Call insured and take R/I

1-10-07

CONFIDENTIAL

3. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Gather information from other sources
   - insured's supervisor's statement

5. Gather documentation
   - copy of government's claim report

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TMC-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization or deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or HO Claims Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instated of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-26

**CONFIDENTIAL**

**EXHIBIT 1**
**TCM-72**
**REVISED**

## MEMORANDUM

TO:  ALL CLAIMS TECHNICAL PERSONNEL

FROM:  CLAIMS HOME OFFICE

SUBJECT:  **DENIALS, DISCLAIMERS AND RESERVATIONS OF RIGHTS: PROPER FORM OF MAILING**

DATE:  December 20, 2000

This revised TCM-72 replaces the one issued on November 22, 2000.

Please adhere to the following guidelines when mailing denials, disclaimers and reservations of rights letters:

1.  Disclaimers, which are issued when there has been a breach of policy condition (e.g. notice, cooperation, etc.) must be sent via certified mail.

2.  Denials and reservations of rights letters may be sent via regular mail unless another form of mailing is mandated by state law or another requirement in the jurisdiction, in which case the letter must be sent in the manner mandated.

3.  Whenever a denial, disclaimer or reservation of rights letter is sent, a copy of the letter must be retained in the claim file.

A. STEPHEN KALINSKY

ASK:ghk

IV-27

5-10-02

CONFIDENTIAL

# SLIP SHEET

CONFIDENTIAL

# CHAPTER IV

## COVERAGE

### I. OVERVIEW

In every claims situation, the initial task of the examiner is to verify proper coverage. In the vast majority of claims, this is easily done by reviewing computer data regarding the policy, the insured vehicles and the insured persons involved in the loss. The examiner will review computer screens that provide system information regarding all three of these elements. Occasionally a claims handler, at some level of the claims resolution process, will be confronted with a coverage question. It is the purpose of this Chapter to highlight the most prevalent coverage issues that might be encountered and to outline the procedures to be used to resolve the coverage question. Correct coverage decisions are the most important tasks of the claims examiner at any level. Adverse coverage decisions by the Company expose our insureds to real financial hardship – sometimes catastrophic. Just imagine in your own life if you had a traffic accident resulting in substantial property damage and/or personal injury where your insurance company refused to cover the loss. Regardless of whether the coverage position is right or wrong, from the insured's point of view, a denial of coverage can be devastating. If a disappointed insured proves to a jury that our denial of coverage was wrong and wrongful, the effect upon the Company can also be devastating in terms of extracontractual liability, commonly known as "bad faith liability."

As this Chapter will mention many times, one of the keys to coverage decision-making is prompt and appropriate investigation. Coverage decision-making is not a game nor is it to be viewed as a jousting contest with the insured. Doubts are to be resolved in favor of the insured after appropriate and timely investigation. If our insured refuses to cooperate in our coverage investigation by failing to provide pertinent information, we may have more latitude in our investigation, but we must avoid a "stonewall" or "vendetta" attitude. It is your job to find coverage and to service covered claims. The Company is not served by a cynical approach to coverage issues. On the other hand, if coverage does not exist for a particular loss based upon facts determined by a full and fair investigation, we should not shrink from a coverage denial/disclaimer.

This Chapter will address many of the coverage issues you might encounter and the process by which these issues are to be resolved. Coverage decision-making is more than merely reading the policy and denying coverage. It is much more than reacting "off-the-cuff" to a claim situation presented to you over the phone. Examiners must avoid casual comments to our insureds regarding potential lack of coverage. We must be sure we are on firm ground when we deny coverage to our policyholder.

5-10-02

CONFIDENTIAL

## II.    SOURCES OF COVERAGE

Coverage may be confirmed by the computer record and/or by the policy file and/or information or papers relevant to the coverage issue held by the insured or others.

The following guidelines apply to coverage:

- In most cases, we will assume that the computer record is correct and proceed with claim handling.

- Payments should not be made if you doubt the credibility of the computer record. If you "think" the computer record is incorrect, obtain documentary proof from the policy file or possibly even from the insured.

- Search for the policy file if it is necessary to resolve a coverage question.

- Advise the Auto Damage Adjuster or the independent adjuster immediately if there is any coverage problem, which would affect claim handling. Ask staff and independent adjusters to obtain coverage documents and statements from the insured. The insured should be advised if we are investigating to determine coverage and nothing should be done to mislead the insured in any way.

- In cases involving BI, UM or UMBI, the Regional Liability Administrator (RLA) and/or a Claims Home Office Attorney should be consulted for permission to deny coverage. Any decision to deny must be made as soon as possible.

- Making decisions as promptly as possible may at times be difficult, especially in those cases where every effort has been made to confirm coverage from computer records and policy files with no success, and even in cases where the insured is unable to develop and provide any evidence of coverage. Delaying settlement in the vague hope that coverage may somehow not be valid is a clear disservice to the public and is a violation of most Unfair Claims Practices Acts.

## III.   TYPES OF COVERAGE QUESTIONS

There are two types of coverage questions: those in which no Company policy was in force at the time of the loss and those in which a policy is in force but the loss is not covered by that policy under the particular factual situation. It is important to understand the distinction between these two types of coverage questions. In the first situation, all coverage is <u>denied</u>. In the second situation, coverage for <u>this</u> <u>loss</u> is <u>disclaimed</u> because of particular circumstances.

IV-2

**CONFIDENTIAL**

Coverage questions can arise from many situations. Here are a few of the more common questions you will see.

## A.   Policy Expiration And Cancellation

If the computer system shows that the policy **expired** prior to the loss, the insured should be advised of this coverage problem but no direct denial should be made in early conversations with the insured. If the expiration was over 30 days prior to the loss and the insured does not dispute the expiration, the coverage can be denied upon approval by a Claims Manager. Complications can arise if the expiration is 30 days or less or the policyholder denies receipt of the expiration notice. In such cases, the issue must be referred immediately to the RLA for review before a denial can be issued. If the system information indicates that the policy in question was **cancelled** prior to the loss, we must be prepared to prove the validity of the cancellation in the event our coverage position is contested. The necessary evidence should be identified prior to the decision to deny coverage. This will be discussed again later in this Chapter.

There are times when an uninsured person who causes an auto accident tries to purchase coverage over the phone after the fact. Any time a loss is reported to have occurred on the date of policy inception, great care should be taken to confirm the timing of the accident and the binding of the policy. Generally, the police report will establish the time of the accident and our computer system will record the time that the direct sale of coverage was made. If the loss is property damage only and no police report was made, the examiner must be creative in determining the time of the loss and then determine if the policy was in effect.

## B.   Is The Vehicle Covered?

Our automobile policy covers both people (insureds) and vehicles depending upon the circumstance of the loss. For physical damages coverages, the vehicle must be a "described vehicle" – one listed on the declaration page of the policy. For liability coverages, the issue is not so clear. Our defined insureds (named insured, spouse and resident relatives) are insured for use of "owned" and "non-owned" vehicles. Where the vehicle is owned by someone in the insured's household but is not described in the policy declaration page (referred to as a "dec-sheet"), then that vehicle is neither "owned" (because it is not described on the dec-sheet) nor is it "non-owned" (because it is owned by a defined insured). Consequently, use of that vehicle is not covered.

Owned auto – Our insurance policy has a very specific definition of an owned auto. The auto must not only be owned by our named insured, it must be declared on the policy (listed on the dec-sheet). A vehicle properly declared on the policy is called a "described" vehicle. There are also vehicles that meet provision definitions of "owned auto". These are "replacement vehicles," "additional vehicles," and "temporary substitute vehicles".

5-10-02

CONFIDENTIAL

Non-owned auto – Defined insureds are covered, with certain limitations, while driving vehicles owned by others. This coverage is based upon the status of the insured person and the circumstance of his/her operation of the non-owned vehicle. For an insured under a Company policy to be insured while driving a non-owned vehicle, it must be established that the use of the non-owned vehicle was with the permission of the owner of the vehicle and that the use was within the scope of the permission. Permission to use a non-owned vehicle is a rather common coverage question.

## C.   Is The Driver Or Passenger Covered?

Even when a described vehicle is involved in an accident, there may be issues regarding coverage for the driver or passengers if they aren't defined insureds. A person driving the described vehicle who lives outside the insured household is covered only if driving with permission of the owner. For example, if any insured loans a described vehicle to his neighbor to run an errand, the neighbor is fully insured as long as she keeps within the scope of the permission given by the owner. In this situation, the neighbor is called a "first permittee". If the neighbor happens to allow her husband to drive the described vehicle, the husband becomes a "second permittee". Coverage for "permittees" is problematic and very fact specific. Permissive use of the described vehicle by a person outside the insured household presents a coverage question. **Cases involving permissive use issues, which involve personal injury, must be presented to the RLA.**

Most states allow the issuance of "Named Driver Exclusions" (called NDEs). There are two types of NDEs: voluntary and involuntary. Voluntary NDEs result when our policyholder elects specifically to exclude a person from the policy who would otherwise qualify as a defined insured. This situation allows the policyholder to reduce her premium by excluding a high-risk resident relative. Involuntary NDEs arise where the Company informs a policyholder that we will continue to insure them only if a specific risk is excluded.

## D.   Is It A Covered Loss?

Occasionally, there are losses claimed that are not covered by our contract with the insured. It is essential that you refer to the correct policy form and determine if the loss is described under **Losses We Will Pay**. Also, be sure to review the policy definitions under the appropriate section of the policy from which coverage is sought.

IV-4

**E.     Has The Insured Complied With The Policy Conditions?**

The agreement we have with the insured binds both sides to the policy contract conditions. If the insured fails to meet these conditions, a coverage question may evolve. Common breaches include failing to report a loss timely, failing to cooperate and failing to provide timely notification of a lawsuit. The circumstances surrounding the breach should be discussed with your supervisor and/or RLA immediately. Appropriate coverage investigation will follow to determine the extent of the breach and if it has or may influence coverage.

## IV.   OTHER POSSIBLE COVERAGE QUESTION SITUATIONS

**A.     Misrepresentations**

For claims purposes, a misrepresentation may be defined as a misstatement given to the Company to induce it to write a policy. To constitute a valid question of coverage, the misrepresentation must be material. The test of materiality is our answer to the question whether the policy would have been issued, or written at the same premium, if the true information had been known.

An inaccurate statement of occupation, if both occupations are of the same general character, may not be material to the risk. On the other hand, a false statement about a recent driver's license suspension or revocation is generally regarded as material.

Immediately upon discovering a possible misrepresentation, discuss the file with your supervisor and then refer the claim file to the appropriate Underwriting Manager for a written opinion. On receipt of the Underwriting Manager's decision (paper or electronic) supporting a denial of coverage, <u>Claims Home Office Legal must be consulted immediately before any action is taken.</u> As soon as possible after receipt of the written opinion, the Underwriting Department should be notified as to how the claim will be handled.

**B.     Other Insurance, Excess And Escape Clauses**

To provide for situations where two policies cover the same risk, insurance contracts contain "other insurance" clauses. These clauses apply if the insured has purchased two policies and the policy periods overlap, or when the insured is driving a non-owned vehicle on which there is insurance.

If there are two insurance policies covering the same loss, generally, both policies would contain an excess insurance clause. This clause might read:

> If "the insured has other insurance against a loss covered by
> Section I of this policy, we will not owe more than our pro rata
> share of the total coverage available.
>
> This policy is excess over any other valid and collectible insurance
> that applies to a temporary substitute auto or non-owned auto."

When wording of this type appears in both policies, the general rule is: (1) the
insured must be covered, (2) the terms of each policy are in conflict, and
therefore, (3) both carriers are liable.

In the instance where the insured is driving a non-owned vehicle, which is
covered by insurance, the general rule is that insurance follows the vehicle. The
insurance on the vehicle would be "primary". The driver's insurance would be
"secondary" and only become involved if the limits of the primary carrier had
been exhausted. In potentially serious cases, opinions should be sought from the
Regional Liability Administrator or Claims Home Office Legal.

## C. Who Is A Resident Of The Same Household For Purposes Of The Omnibus Clause?

The policy contract not only affords protection to the named insured, but under
the omnibus clause, it extends coverage by means of specific language and
definitions to another class of person. This class includes relatives of the named
insured living in the same household, and/or, by definition, a person using the
insured's vehicle with permission.

Under the definition of an <u>owned automobile</u>, an insured is: (1) the named
insured and any resident relative, (2) any other person operating the insured
vehicle within the scope of permission and (3) any other person or organization
liable for the conduct of an insured in the use of an owned auto. Number 3
encompasses both (1) and (2) and would afford coverage, for example, in the case
where the insured is driving his car in the scope of his employment and is
involved in an accident injuring a third party, who would have a subsequent claim
against both the employer and the insured; in this case, the terms of the policy
would apply to each.

There have been several interpretations by the courts on the meaning of the word
"residence". Most courts agree that the term means more than a place of abode
and, in determining the qualifications of a residence, have applied measurement
criteria such as: addresses on bank accounts, voter registration, hospital records,
registration of automobiles and driver's license. It appears that the term
·"residence," when used in a statute is equated by the courts to the term
"domicile". When used in an automobile liability policy, however, the term
"resident" seems to be given a less permanent restriction, so as to cover persons
who are merely temporarily residing with the named insured. This, of course, is

IV-6

CONFIDENTIAL

an advantage to the company when excluding coverage for non-owned automobiles (automobiles "not owned by or furnished for the regular use of either the named insured or any relative"), but operates as a disadvantage to the Company when we consider that relatives of the named insured are covered with respect to non-owned automobiles as persons insured under our policy, as are residents of the same household as the named insured with regard to owned automobiles. Likewise, the term "relative" is used under Part II of the Family Automobile Policy covering expenses for medical services, etc.

Under the definition of a <u>non-owned auto</u>, the following persons or organizations are insured: (1) the named insured; (2) any resident relative operating with permission of the owner; (3) any other person or organization liable for the acts or omissions of an insured using an auto not owned or hired by the person or organization. Despite the language used in defining "relative" under the Family Policy, there are certain guidelines for the examiner or adjuster to follow with respect to this matter, which are as follows:

- A person may have several residences but can have only one domicile.

- While the term "resident" as used in our policy should not be interpreted to require that degree of permanency inherent in the term "domicile," it does require more than temporary physical presence in the named insured's household. The presence of the individual claiming to be (or not to be) a resident of the same household as the named insured must be accompanied by an intention to remain there for some length of time, although he need not intend a change of domicile.

- A person on a mere temporary visit to the named insured's home is not a "resident" as contemplated by the policy.

- Domicile means that place where a person has a true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he or she has, whenever absent, the intention of returning.

## D. What Constitutes Regular Use Of Non-Owned Automobiles?

The Family Automobile Policy defines a non-owned automobile as "an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute automobile. An auto rented or leased for more than 30 days will be considered as furnished for regular use" This raises several questions each time a non-owned automobile is driven, in addition to the question of permissive use. For example, the examiner or adjuster must determine whether the automobile is owned by either the named insured or any relative, or whether it is furnished for the regular use of either named insured or any relative.

IV-7

5-10-02

CONFIDENTIAL

The courts have encountered difficulty in deciding these questions and this section will be directed solely to the question of what constitutes regular use of a non-owned automobile as determined by the courts. Legal opinions vary from state-to-state. When necessary, check with your RLA and/or Claims Legal. The main question to be determined by the claims person is whether the non-owned automobile is being driven without restricted permission as to the time period within which the operator may use the vehicle or whether the vehicle is loaned on a temporary or restricted basis. The courts which have considered this question have generally held that the question is one of determining whether the insured had the unrestricted right to use the vehicle at any time he or she desired, either on business or pleasure, rather than one of determining the specific number of times the car was used. The only situation where the specific number of times the car was used becomes important is where the right to use the car is restricted in time. Generally speaking, if the insured has the unrestricted right to use the vehicle at any time, whether it be a specific vehicle or one of a number of vehicles, furnished for his or her use, the courts have held that this is a vehicle furnished for regular use and is not covered under the Family Insurance Automobile Policy. This would cover, for example, the standard motor pool situation wherein our insured is allowed to use one of any number of vehicles available in the motor pool furnished by an employer. Regardless of the number of times he or she may have used the vehicle in question, the courts have normally held this to be a non-owned automobile furnished for regular use for which there is no coverage under the Family Automobile Policy.

The majority of non-owned auto situations will involve our policy only as excess coverage. The following rules should assist you in making a determination on the coverage issue.

- If the insured has the right to use the vehicle in question at any time he or she so desires, either on business or pleasure, regardless of the fact that it may be one of a number of vehicles in a pool of cars furnished, this is a car that may be furnished for regular use.

- The question to be determined is not a specific number of times which he or she has used the car in issue, but as to whether the insured has the unrestricted right to use the car or any one of a number of cars at any time.

- If the car is furnished for a restricted time period only, or in some instances for a restricted use only, then the question narrows and the majority of courts have decided that the car was not furnished for regular use. This would include short-term rental vehicles rented for a period of one month or less, or the case of a relative not residing with the owner of the car who must have specific permission to use the car each time.

IV-8

5-10-02

- Whenever specific permission is required for each separate use of the vehicle, the courts normally hold that this is not "furnished for the regular use of the named insured" due to the permission restriction.

- The use to which the car is being put at the time of the accident usually has no bearing on the question, the question being one of status of the vehicle and not the use to which it is being put, to wit: is the car furnished (available) for the regular use of the named insured?

## V.   WAIVER

A waiver is the relinquishment of a known right; in this instance, the Company's relinquishment of the right under the policy contract to deny coverage. For a waiver to exist, the Company must know about the coverage question. Although a waiver does not usually have all the elements of a contract, it is in the nature of a contract, based on an expressed or implied intention of the parties. The intention to waive may be implied from the actions of the claims technician.

An example of a waiver might be a case in which there was a delay of six months in reporting an accident. Obviously there is a coverage question based on a breach of the policy condition requiring prompt reporting. The question of coverage may be waived by the claim technician's expressly agreeing to do so or by implying such an intention by investigating and attempting to settle the claim without first issuing a Reservation of Rights or obtaining a signed Non-Waiver Agreement.

## VI.   ESTOPPEL

The doctrine of equitable estoppel may prevent a valid denial or disclaimer of coverage. If the Company acts or fails to act in such a manner that would (1) reasonably lead the insured to believe coverage is in order, and (2) the insured acts to his/her detriment in reliance upon that belief, the Company may be "estopped" from denying or disclaiming coverage.

For example, the Company may learn at the time the insured reports a serious accident, that when the insured applied for insurance, he or she inadvertently neglected to inform the Company of a prior insurance cancellation by another company. Although this may raise a question of coverage, the claims examiner or adjuster may investigate and even attempt to settle the claim. Perhaps suit is filed and the insured sends the suit papers to the Company, but the Company returns the suit papers to the insured ten days before trial indicating that it is withdrawing from the case and contending that the policy was void ab initio because of misrepresentation.

IV-9

5-10-02

CONFIDENTIAL

Under these circumstances, the insured appears to have been justified in relying on the Company to do what it represented it would do. Because the insured has been deprived of any reasonable opportunity to investigate and attempt to settle the claim, if he or she has acted in good faith, it would appear unjust and inequitable to permit the Company to take advantage of the coverage question at that late date. The Company could be estopped from denying coverage.

It is becoming increasingly difficult to distinguish between waiver and estoppel. In many jurisdictions, they are regarded as synonymous and in others; a waiver is not binding unless it is supported by an estoppel. It is sufficient for you to be aware that the application of either doctrine can prejudice the Company's position.

## VII.   DEALING WITH OUR INSURED IN COVERAGE QUESTION SITUATION

While investigating a coverage question, the claims handler must be careful to preserve the rights of both parties to the insurance contract: the insured (or person seeking coverage) and the Company. Once a coverage question is recognized, the handler must seek guidance from Claims Management and, in appropriate cases, the RLA to determine a plan of action to resolve the coverage question. This plan may include issuance of a Reservation of Rights letter or, in some circumstances, a Non-Waiver Agreement or Agreement to Defend. These devices provide protection to both the people seeking coverage and the Company while the coverage investigation proceeds.

## VIII.   RESERVATION OF RIGHTS (ROR) LETTER

A reservation of rights letter (known as a "RoR") is used promptly to inform an insured that a coverage question has arisen concerning her/his claim and that we (the insurer) require time fully to investigate the question. The RoR is intended to advise the insured that the question exists, the nature of the question and that our efforts to investigate the question will require some additional time. The RoR is an important legal document. It can cause apprehension on the part of the insured. Its use must be carefully controlled and drafted. What follows are essential considerations in drafting and issuing RoRs:

### A.   Timing of RoR

Because the very purpose of a RoR is to give notice to the insured of a coverage question, these declarations must be made promptly after a coverage question is recognized. This does not mean that a RoR letter must be sent before preliminary investigation is made to confirm coverage. The law does not require that we guess about basic coverage based upon bare allegations. Mere suspicion regarding coverage does not require or even justify a RoR. However, there should be no significant delay in sending adequate notice to the person seeking coverage explaining why the coverage decision is not resolved. No RoR should

IV-10

be sent in any case without documented approval of a supervisor. The level of the supervisory approval required will depend on the loss involved.

**B.     Contents of RoR**

A RoR issued in an auto claim must fully and fairly describe all reasons why the Company questions coverage in the particular case and the general facts, which support the need for the coverage investigation. Where there are genuine questions or facts upon which the coverage depends, these questions should be expressed in a letter, which relates the facts as known, by the Company. The RoR will declare that both parties retain all rights and benefits under the insurance policy during the coverage investigation and that the Company reserves its rights to deny or disclaim coverage if the coverage question is resolved against the person seeking coverage.

**C.     Presentation of RoR**

Questions often arise as to who should receive the RoR (or a copy of the RoR). Again, recognizing that the purpose of a RoR is notice, the RoR should be addressed to the person(s) seeking coverage under the policy. If the named insured is not the person against whom primary liability might be assessed (i.e. the insured vehicle was driven by a permissive user); the RoR is addressed to the permissive user (with an info copy to the named insured). On the other hand, in those states where the owner may be vicariously liable for the negligence of a permissive user, any RoR that sets forth a reservation of rights that is applicable both to the owner and the permissive user should be addressed to both parties. A copy of the RoR should be sent to all other interested parties affected by the coverage denial when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is reserving its rights to disclaim or deny coverage for the loss should be sent to the interested parties. This is a complex issue and the examiner must seek supervisory guidance.

**IX.     DISCUSSIONS REGARDING ROR**

- RoRs should not be used where we have decided our coverage position. It is not a proper purpose of a RoR to "buy time" when we know our coverage position. If we have a firm coverage position, it should be stated directly and forthrightly.

- Some coverage questions will involve intricate issues involving sales, policy service and underwriting processes and procedures. As a direct-seller, we are subject to allegations involving what was said during a telephone contact with the insured. These issues should be handled with care and with full supervisory involvement.

IV-11

- When there is more than one person (or other entity) seeking coverage, special care must be taken in resolving the coverage issues. We must recognize our contractual obligations to "other insureds" and satisfy those obligations.

- By their very nature, RoRs are intended to be temporary. If complications arise in the course of the coverage investigation, the person(s) seeking coverage should be advised of these complications and a stale RoR should be refreshed by another letter reminding the person(s) seeking coverage that the coverage question remains unresolved and that we continue to reserve our rights to deny/disclaim coverage. Ultimately, unresolved coverage questions will often result in the company's having to provide coverage unless the reason the question is unresolved was beyond the control of the Company. A person seeking coverage cannot defeat a coverage question by refusing to cooperate in the coverage investigation. Failure of the person seeking coverage to cooperate in the coverage investigation may be reason for a renewed RoR adding lack of cooperation as a basis for potential disclaimer of coverage.

## X.   NON-WAIVER AGREEMENTS

Non-Waiver Agreements (NWA) are most often used to obtain the agreement of the insured that our coverage for a loss or defense of a lawsuit is conditional upon future events or determinations of fact. This device is useful where the defense of a person seeking coverage is undertaken initially, but it is contemplated that the defense of the lawsuit will be withdrawn if specified events occur or facts are determined. The advantage of a NWA is that it is a bilateral agreement rather than merely a unilateral declaration (RoR). This device is not common in automobile insurance cases. Care should be taken in drafting a NWA to make sure it is clear regarding the nature of the coverage questions and the specific conditions upon which the defense may be withdrawn. A typical example of where a NWA may be used is where the Company undertakes the defense of a person seeking coverage in an underlying tort lawsuit while simultaneously seeking a judicial declaratory judgment regarding its coverage obligations. The NWA would be used to secure the agreement of the person seeking coverage that the defense of the lawsuit would be withdrawn if the court should determine that the Company properly denied/disclaimed coverage. Again, the purpose of the NWA is to put the person seeking coverage on notice of what will happen if a coverage question is resolved adversely to that person. Claims Home Office Legal coordination is required any time a NWA is contemplated.

## XI.   AGREEMENTS TO DEFEND

Occasionally, the Company's first notice of a potentially covered loss will be notice that a lawsuit has been filed. In such a case, there may not be time to conduct a proper

IV-12

5-10-02

coverage investigation (assuming there is a coverage question) before an answer to the lawsuit must be filed. A specific agreement to a limited defense can be used to take immediate action to protect the person seeking coverage. This agreement will specifically limit our obligation to defend and/or indemnify pending resolution of the coverage question. Such an agreement is very similar to a non-waiver agreement except that it is more specific about what the Company will undertake in response to the lawsuit. Care must be taken not to obligate the Company inadvertently to a full defense. Claims Home Office will be contacted prior to entry into an agreement to defend. Every effort should be made to resolve quickly any coverage question where we have undertaken a limited or conditional defense. Undue delay in such a situation can result in the Company not being permitted to withdraw from the defense of the underlying claim.

## XII. DECLARATORY JUDGMENTS

Critical coverage questions may be appropriate for judicial determination by use of an action for declaratory judgment (DJ) in state or federal court. Such an action – also called an action for declaratory relief in some states – asks the court to decide the parties' obligations under the insurance contract. A variety of coverage issues can be litigated with a DJ action, but it is particularly useful when there is a dispute over the interpretation or application of policy language or the validity of policy exclusions. This remedy can be very expensive because, in most states, if the ruling is against the position taken by the insurer, the insurer must pay the reasonable attorney fees incurred by the insured. <u>DJ actions must not be initiated without the approval of Claims Home Office Legal.</u>

It is important to name all parties in the DJ action. If the parties reside in diverse jurisdictions, a DJ may not be appropriate. Even where a DJ is likely, a reservation-of-rights letter will be needed to cover the time needed to investigate the situation prior to the filing of the DJ action.

## XIII. DISCLAIMER

Disclaiming is denying liability under an existing policy contract and withdrawing from the handling of the claim because of a breach of a policy condition. The Company takes no further action with respect to investigation, negotiation, defense, etc. Denial of a claim on the basis that the accident or loss occurred after a date of expiration or other proper termination of the policy (or because claim is made under a coverage properly omitted from the policy,) is not a disclaimer, but rather is a "denial" of coverage.

There are certain risks in disclaiming. If the Company disclaims coverage in a Bodily Injury Liability claim and the claimant subsequently files suit, the insured is under no obligation to send suit papers to the Company or to give notice of the suit. In the event that judgment is taken against the insured after a trial, or even by default, for failure to

5-10-02

CONFIDENTIAL

defend, and there is a later determination that the disclaimer was improper and coverage was effective, the Company may be bound by the judgment.

In most states, (in the factual situation of where the insurance company disclaims coverage and the plaintiff proceeds in the lawsuit) after a plaintiff obtains a judgment against the insured, and the insured assigns his or her rights against the insurance company to the plaintiff, the plaintiff can then proceed directly against the Company. Questions of liability and damages are not then an issue as they have already been settled. The only issue is whether the policy covers the particular accident. If the plaintiff, in the original action, recovers on the judgment and collects from the insured, the insured might then sue the Company for the amount he or she was required to pay within his policy limits, plus expenses. The only issue would be whether the policy was effective.

Disclaimer should always be made by letter to the insured, (person seeking coverage). The disclaimer letter should be sent by Certified Mail, Return Receipt Requested, Addressee Only.

A copy of the disclaimer should be sent to all other interested parties when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is not providing coverage for the loss should be sent to the interested parties.

In some states, either a copy of the disclaimer letter to the insured or a separately dictated letter must also be sent to the liability claimant and/or the legal representative within a specific time or the Company loses its right to disclaim.

A letter of disclaimer must be very carefully worded and must set out the specific reasons for disclaiming coverage in understandable terms.

If it is decided to declare a policy void from inception, it may be necessary to arrange, through the Underwriting Manager, to return premiums to the insured. Declaring a policy void ab initio ("ab initio" means from the beginning) is a joint underwriting and claims function and the letter to the insured should go out from the Underwriting Department. We should have a copy of the Underwriting Department's letter in the claim file.

If a decision is made to rescind the policy, it is usually necessary to refund the insurance premium to the insured. The return of the premium to the insured must be coordinated with the appropriate Underwriting Manager. The RLA and Claims Home Office Legal must approve all coverage disclaimers.

## XIV.  COVERAGE DENIALS

Coverage denials are sent when no policy was in effect at the time of the loss. Questions as to whether a policy was in force at the time of the accident or loss, along with proper investigative material, should be referred to Underwriting for an opinion as to whether

IV-14

5-10-02

the policy was effective. In certain circumstances, referral to Underwriting may not be necessary if the lapse of coverage is readily apparent after a careful review of the policy screens. If the Supervisor/Claims Manager does not agree with Underwriting's opinion, the case should be discussed with the Regional Liability Administrator.

If the Regional Liability Administrator also disagrees with the opinion of the Underwriting Department, the coverage question should be referred to Claims Home Office for a decision. In these circumstances, the Underwriting Department should be informed how the case will be handled as soon as possible.

Managers are permitted to sign off on coverage denials without RLA involvement if all of the following criteria are satisfied:

- The policy must have been cancelled at least 30 days prior to the loss or have expired 30 days or more before the loss.

- The only claim is for property damage (which includes collision and comprehensive).

- The policyholder does not challenge the cancellation or expiration.

- The appropriate PORS and cancellation notice are in the claim file.

- A Coverage Problem Worksheet has been completed.

- A manager has approved the denial in writing.

The Regions are not required to implement this modified rule and may retain mandatory RLA involvement in such cases.

Regional Liability Administrator (RLAs) may approve denials of coverage for claims involving Bodily Injury or UM/UIM Bodily Injury in the following limited circumstances. All conditions must be present:

- The denial is based upon:

    - Cancellation of the policy for failure to pay premium where the cancellation notice and the PORS have been examined and support the cancellation; or

    - A valid named driver exclusion applies to the loss and clear evidence of the exclusion exists in the file; or

IV-15

5-10-02

CONFIDENTIAL

- Cancellation of the policy or removal of the involved auto was done pursuant to the policyholder's request prior to loss if the policy file information is clear and unambiguous.

- The former insured has been contacted and given an opportunity to present arguments. A good faith attempt to make this contact must be made before search for the former insured is deemed unsuccessful.

- There are no complications evident in the file. Such complications for cancellation cases include, but are not limited to:

  - A premium payment was made subsequent to the effective date of the cancellation, which was not honored to resume coverage.

  - The loss occurred within 10 days of the effective date of cancellation and the former insured contests receipt of the cancellation notice.

  - The former insured alleges a telephone contact with the Company subsequent to the cancellation advising of submission of payment for the purpose of reissue.

  - The insured has a prior history of late payments.

- Complications for a named driver exclusion case include:

  - The most recent UE-119 for an excluded resident relative found in the file is over two years old ; or

  - The UE-119 is for a named insured; or

  - The named excluded driver is not a relative and would otherwise be a be a permissive user of the insured vehicle.

- Claims reported by adverse parties where we have no record of insuring the party alleged to be insured with GEICO.

  Generally, guidelines for approval of such denials include checking the policy system under the alleged name or alleged policy number for a match; verification with the underwriting department if the alleged insured could not be located in the policy system; and a concerted effort to locate the person. We must contact the alleged insured either by phone, mail or face to face by an adjuster.

IV-16

**CONFIDENTIAL**

## XV.   COVERAGE PROBLEM HANDLING PROCEDURES

The following are step-by-step outlines on handling various coverage problems.

### A.   General Procedure

1.   Recognize potential coverage problem

\*   2.   Send Coverage Issue Referral (C-380) or go to step 3 depending on coverage problem

\*   3.   Check PC in Oasis:

- Policy/Vehicle Summary Screen
- Vehicle Detail Inquiry Screen
- Additional Interest Vehicle Screen
- Transaction Detail Screen
- Driver Information Inquiry Screen
- Accident Detail Inquiry Screen
- Conviction Detail Inquiry Screen
- Related Policy Inquiry Screen

\*   Or for Assigned Risk policies, check PC in IDOC:

- INDX – Client Index System
- IDIQ – Mini Accounts Receivable screens
- BINQ – Billing Inquiry Screen
- PLOGI – Screens used to record policy notes
- DRVI – Screen used to identify an excluded driver in UE119 situations

\*   4.   Alert your supervisor/discuss Coverage Screen sending a reservation of rights letter or transfer file for further investigation.

5.   Investigate (must be resolved in 30 days)

a.   Contact Insured
- opening
- alert to possible problem and take recorded interview
- explain what will happen next and when
- thank insured

IV-17

2-9-07

CONFIDENTIAL

    b.   Contact Claimant
-   opening
-   explain potential problem
-   explain what will happen next and when
-   thank claimant

    c.   Obtain other information

    d.   Obtain documentation

6.    Complete coverage worksheet

7.    Obtain approval for denial or disclaimer from Manager, RLA or CHO Legal, whichever is appropriate.

8.    If denial/disclaimer

    a.  By Mail –
-   prepare denial letter
-   address to person seeking coverage; copy all interested parties only when required by statute or regulations. Otherwise send a separate letter instead of the copy.
-   send according to TCM-72 guidelines – See Exhibit 1
-   give specific reasons

    b.  By Phone – Call insured
-   opening (name, purpose of call)
-   explain clearly that there is no coverage and specific reason
-   discuss so that insured's questions are answered
-   explain what will happen next and when
-   thank insured and again express your concern

    c.  Call claimant/other interested parties
-   opening (name, purpose of call)
-   explain clearly that there is no coverage (and why?)
-   discuss options available

    d.  Claimant's own insurance (UM)
-   explain that you would like to help but under terms of this policy are unable to.

The following pages show steps that you can follow for particular coverage situations, which should be sufficient for most situations.

IV-18

**CONFIDENTIAL**

1-10-07

## B.   NEW POLICY

### (Review regional new business procedure)

1. Check INDX in IDOC or Customer Identification screen in Oasis
   - is there a policy number for insured?

\*

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call insured and take R/1

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in
     contact

6. Obtain information
   - copy of binder

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit1
   - send to the individual or all individuals claiming protection under the
     policy
   - copy to liability claimant and attorney, only when required by statute or
     regulation.  Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or
      regulation.  Otherwise send a separate letter instead of a copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

IV-19

1-10-07

CONFIDENTIAL

## C.   NON-PAY CANCELLATION

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call insured and take R/I

4. Call claimant
   - let him/her know that there is a coverage problem and that you will keep in contact

5. Obtain documentation
   - PORS
   - Cancellation notices

6. Reservation of Rights letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

**CONFIDENTIAL**

1-10-07

## D.   CANCELLATION – UNDERWRITING REASONS

\*

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured and take R/l
   - ask questions such as:
        Was cancellation letter received?
        When?  How?
        What date cancelled?
        Are you aware of cancellation?
        Have you moved recently?
        When?
        Where?
        Was Company notified?
        How?
        When?
        Where?
        Whom spoke with?

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in
     contact

5. Obtain documentation
   - copy of cancellation letter
   - copy of PORS

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the
     policy
   - copy to liability claimant and attorney only when required by statute or
     regulation.  Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channel

1-10-07

CONFIDENTIAL

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

**E.**   **VEHICLES DON'T MATCH - (temporary substitute, replacement, additional)**

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured
   - if necessary, take R/1
   - determine what category the vehicle will fit in, i.e. temporary substitute, replacement or additional

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

5. Obtain documentation
   - copy of bill or sale
   - copy of title

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant attorney only when required by statute regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

IV-22

**CONFIDENTIAL**

1-10-07

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parities only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

## F.   EXCLUDED DRIVER  (UE-119)

1. Check DRVI in IDOC or Driver Summary screen in Oasis
   - who is the excluded driver

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Policyholder and take R/I

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Obtain documentation
   - copy of UE 119 from file

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy to all other interested parties only when required by statute or

IV-23

CONFIDENTIAL

regulation.  Otherwise send a separate letter instead of the copy.
- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

## G.   DRIVER OTHER THAN NAMED INSURED- (Permissive Use Questions)

1.  Make your supervisor aware of the problem

2.  Call insured and take R/I

3.  Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4.  Obtain information from other sources
   - driver's interview

5.  Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

6.  Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

7.  Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

8   Denial/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

## H.   EXCLUSION OR "DEFINITION" COVERAGE PROBLEMS

1.  Make your supervisor aware of the problem

2.  Call Insured and take R/I
   - ask questions that will help determine whether the loss does not fall within

IV-24

**CONFIDENTIAL**

1-10-07

the terms of the policy or if it might be excluded

3. Call Claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Obtain information from other sources

5. Obtain documentation

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

## I.   VEHICLE USED IN GOVERNMENT BUSINESS

1. Make your supervisor aware of the problem

2. Call insured and take R/I

3. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4. Obtain information from other sources
   - insured's supervisor's statement

CONFIDENTIAL

5. Obtain documentation
   - copy of government's claim report

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TMC-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization or deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or HO Claims Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instated of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-26

CONFIDENTIAL

1-10-07

**EXHIBIT 1**
**TCM-72**
**REVISED**

# M E M O R A N D U M

TO:        ALL CLAIMS TECHNICAL PERSONNEL

FROM:     CLAIMS HOME OFFICE

SUBJECT:  **DENIALS, DISCLAIMERS AND RESERVATIONS OF RIGHTS:**
          **PROPER FORM OF MAILING**

DATE:     December 20, 2000

This revised TCM-72 replaces the one issued on November 22, 2000.

Please adhere to the following guidelines when mailing denials, disclaimers and reservations of rights letters:

1.   Disclaimers, which are issued when there has been a breach of policy condition (e.g. notice, cooperation, etc.) must be sent via certified mail.

2.   Denials and reservations of rights letters may be sent via regular mail unless another form of mailing is mandated by state law or another requirement in the jurisdiction, in which case the letter must be sent in the manner mandated.

3.   Whenever a denial, disclaimer or reservation of rights letter is sent, a copy of the letter must be retained in the claim file.


A. STEPHEN KALINSKY

ASK:ghk

IV-27

5-10-02

CONFIDENTIAL

# SLIP SHEET

CONFIDENTIAL

# CHAPTER IV

## COVERAGE

### I.  OVERVIEW

In every claims situation, the initial task of the examiner is to verify proper coverage. In the vast majority of claims, this is easily done by reviewing computer data regarding the policy, the insured vehicles and the insured persons involved in the loss. The examiner will review computer screens that provide system information regarding all three of these elements. Occasionally a claims handler, at some level of the claims resolution process, will be confronted with a coverage question. It is the purpose of this Chapter to highlight the most prevalent coverage issues that might be encountered and to outline the procedures to be used to resolve the coverage question. Correct coverage decisions are the most important tasks of the claims examiner at any level. Adverse coverage decisions by the Company expose our insureds to real financial hardship – sometimes catastrophic. Just imagine in your own life if you had a traffic accident resulting in substantial property damage and/or personal injury where your insurance company refused to cover the loss. Regardless of whether the coverage position is right or wrong, from the insured's point of view, a denial of coverage can be devastating. If a disappointed insured proves to a jury that our denial of coverage was wrong and wrongful, the effect upon the Company can also be devastating in terms of extracontractual liability, commonly known as "bad faith liability."

As this Chapter will mention many times, one of the keys to coverage decision-making is prompt and appropriate investigation. Coverage decision-making is not a game nor is it to be viewed as a jousting contest with the insured. Doubts are to be resolved in favor of the insured after appropriate and timely investigation. If our insured refuses to cooperate in our coverage investigation by failing to provide pertinent information, we may have more latitude in our investigation, but we must avoid a "stonewall" or "vendetta" attitude. It is your job to find coverage and to service covered claims. The Company is not served by a cynical approach to coverage issues. On the other hand, if coverage does not exist for a particular loss based upon facts determined by a full and fair investigation, we should not shrink from a coverage denial/disclaimer.

This Chapter will address many of the coverage issues you might encounter and the process by which these issues are to be resolved. Coverage decision-making is more than merely reading the policy and denying coverage. It is much more than reacting "off-the-cuff" to a claim situation presented to you over the phone. Examiners must avoid casual comments to our insureds regarding potential lack of coverage. We must be sure we are on firm ground when we deny coverage to our policyholder.

5-10-02

CONFIDENTIAL

## II.    SOURCES OF COVERAGE

Coverage may be confirmed by the computer record and/or by the policy file and/or information or papers relevant to the coverage issue held by the insured or others.

The following guidelines apply to coverage:

- In most cases, we will assume that the computer record is correct and proceed with claim handling.

- Payments should not be made if you doubt the credibility of the computer record. If you "think" the computer record is incorrect, obtain documentary proof from the policy file or possibly even from the insured.

- Search for the policy file if it is necessary to resolve a coverage question.

- Advise the Auto Damage Adjuster or the independent adjuster immediately if there is any coverage problem, which would affect claim handling. Ask staff and independent adjusters to obtain coverage documents and statements from the insured. The insured should be advised if we are investigating to determine coverage and nothing should be done to mislead the insured in any way.

- In cases involving BI, UM or UMBI, the Regional Liability Administrator (RLA) and/or a Claims Home Office Attorney should be consulted for permission to deny coverage. Any decision to deny must be made as soon as possible.

- Making decisions as promptly as possible may at times be difficult, especially in those cases where every effort has been made to confirm coverage from computer records and policy files with no success, and even in cases where the insured is unable to develop and provide any evidence of coverage. Delaying settlement in the vague hope that coverage may somehow not be valid is a clear disservice to the public and is a violation of most Unfair Claims Practices Acts.

## III.   TYPES OF COVERAGE QUESTIONS

There are two types of coverage questions: those in which no Company policy was in force at the time of the loss and those in which a policy is in force but the loss is not covered by that policy under the particular factual situation. It is important to understand the distinction between these two types of coverage questions. In the first situation, all coverage is denied. In the second situation, coverage for this loss is disclaimed because of particular circumstances.

IV-2

**CONFIDENTIAL**

5-10-02

Coverage questions can arise from many situations. Here are a few of the more common questions you will see.

## A.   Policy Expiration And Cancellation

If the computer system shows that the policy **expired** prior to the loss, the insured should be advised of this coverage problem but no direct denial should be made in early conversations with the insured. If the expiration was over 30 days prior to the loss and the insured does not dispute the expiration, the coverage can be denied upon approval by a Claims Manager. Complications can arise if the expiration is 30 days or less or the policyholder denies receipt of the expiration notice. In such cases, the issue must be referred immediately to the RLA for review before a denial can be issued. If the system information indicates that the policy in question was **cancelled** prior to the loss, we must be prepared to prove the validity of the cancellation in the event our coverage position is contested. The necessary evidence should be identified prior to the decision to deny coverage. This will be discussed again later in this Chapter.

There are times when an uninsured person who causes an auto accident tries to purchase coverage over the phone after the fact. Any time a loss is reported to have occurred on the date of policy inception, great care should be taken to confirm the timing of the accident and the binding of the policy. Generally, the police report will establish the time of the accident and our computer system will record the time that the direct sale of coverage was made. If the loss is property damage only and no police report was made, the examiner must be creative in determining the time of the loss and then determine if the policy was in effect.

## B.   Is The Vehicle Covered?

Our automobile policy covers both people (insureds) and vehicles depending upon the circumstance of the loss. For physical damages coverages, the vehicle must be a "described vehicle" – one listed on the declaration page of the policy. For liability coverages, the issue is not so clear. Our defined insureds (named insured, spouse and resident relatives) are insured for use of "owned" and "non-owned" vehicles. Where the vehicle is owned by someone in the insured's household but is not described in the policy declaration page (referred to as a "dec-sheet"), then that vehicle is neither "owned" (because it is not described on the dec-sheet) nor is it"non-owned" (because it is owned by a defined insured). Consequently, use of that vehicle is not covered.

Owned auto – Our insurance policy has a very specific definition of an owned auto. The auto must not only be owned by our named insured, it must be declared on the policy (listed on the dec-sheet). A vehicle properly declared on the policy is called a "described" vehicle. There are also vehicles that meet provision definitions of "owned auto". These are "replacement vehicles," "additional vehicles," and "temporary substitute vehicles".

IV-3

Non-owned auto – Defined insureds are covered, with certain limitations, while driving vehicles owned by others. This coverage is based upon the status of the insured person and the circumstance of his/her operation of the non-owned vehicle. For an insured under a Company policy to be insured while driving a non-owned vehicle, it must be established that the use of the non-owned vehicle was with the permission of the owner of the vehicle and that the use was within the scope of the permission. Permission to use a non-owned vehicle is a rather common coverage question.

## C.   Is The Driver Or Passenger Covered?

Even when a described vehicle is involved in an accident, there may be issues regarding coverage for the driver or passengers if they aren't defined insureds. A person driving the described vehicle who lives outside the insured household is covered only if driving with permission of the owner. For example, if any insured loans a described vehicle to his neighbor to run an errand, the neighbor is fully insured as long as she keeps within the scope of the permission given by the owner. In this situation, the neighbor is called a "first permittee". If the neighbor happens to allow her husband to drive the described vehicle, the husband becomes a "second permittee". Coverage for "permittees" is problematic and very fact specific. Permissive use of the described vehicle by a person outside the insured household presents a coverage question. **Cases involving permissive use issues, which involve personal injury, must be presented to the RLA.**

Most states allow the issuance of "Named Driver Exclusions" (called NDEs). There are two types of NDEs: voluntary and involuntary. Voluntary NDEs result when our policyholder elects specifically to exclude a person from the policy who would otherwise qualify as a defined insured. This situation allows the policyholder to reduce her premium by excluding a high-risk resident relative. Involuntary NDEs arise where the Company informs a policyholder that we will continue to insure them only if a specific risk is excluded.

## D.   Is It A Covered Loss?

Occasionally, there are losses claimed that are not covered by our contract with the insured. It is essential that you refer to the correct policy form and determine if the loss is described under **Losses We Will Pay**. Also, be sure to review the policy definitions under the appropriate section of the policy from which coverage is sought.

CONFIDENTIAL

5-10-02

**E.     Has The Insured Complied With The Policy Conditions?**

The agreement we have with the insured binds both sides to the policy contract conditions. If the insured fails to meet these conditions, a coverage question may evolve. Common breaches include failing to report a loss timely, failing to cooperate and failing to provide timely notification of a lawsuit. The circumstances surrounding the breach should be discussed with your supervisor and/or RLA immediately. Appropriate coverage investigation will follow to determine the extent of the breach and if it has or may influence coverage.

**IV.    OTHER POSSIBLE COVERAGE QUESTION SITUATIONS**

**A.     Misrepresentations**

For claims purposes, a misrepresentation may be defined as a misstatement given to the Company to induce it to write a policy. To constitute a valid question of coverage, the misrepresentation must be material. The test of materiality is our answer to the question whether the policy would have been issued, or written at the same premium, if the true information had been known.

An inaccurate statement of occupation, if both occupations are of the same general character, may not be material to the risk. On the other hand, a false statement about a recent driver's license suspension or revocation is generally regarded as material.

Immediately upon discovering a possible misrepresentation, discuss the file with your supervisor and then refer the claim file to the appropriate Underwriting Manager for a written opinion. On receipt of the Underwriting Manager's decision (paper or electronic) supporting a denial of coverage, <u>Claims Home Office Legal must be consulted immediately before any action is taken.</u> As soon as possible after receipt of the written opinion, the Underwriting Department should be notified as to how the claim will be handled.

**B.     Other Insurance, Excess And Escape Clauses**

To provide for situations where two policies cover the same risk, insurance contracts contain "other insurance" clauses. These clauses apply if the insured has purchased two policies and the policy periods overlap, or when the insured is driving a non-owned vehicle on which there is insurance.

If there are two insurance policies covering the same loss, generally, both policies would contain an excess insurance clause. This clause might read:

> If "the insured has other insurance against a loss covered by
> Section 1 of this policy, we will not owe more than our pro rata
> share of the total coverage available.
>
> This policy is excess over any other valid and collectible insurance
> that applies to a temporary substitute auto or non-owned auto."

When wording of this type appears in both policies, the general rule is: (1) the
insured must be covered, (2) the terms of each policy are in conflict, and
therefore, (3) both carriers are liable.

In the instance where the insured is driving a non-owned vehicle, which is
covered by insurance, the general rule is that insurance follows the vehicle. The
insurance on the vehicle would be "primary". The driver's insurance would be
"secondary" and only become involved if the limits of the primary carrier had
been exhausted. In potentially serious cases, opinions should be sought from the
Regional Liability Administrator or Claims Home Office Legal.

## C. Who Is A Resident Of The Same Household For Purposes Of The Omnibus Clause?

The policy contract not only affords protection to the named insured, but under
the omnibus clause, it extends coverage by means of specific language and
definitions to another class of person. This class includes relatives of the named
insured living in the same household, and/or, by definition, a person using the
insured's vehicle with permission.

Under the definition of an <u>owned automobile</u>, an insured is: (1) the named
insured and any resident relative, (2) any other person operating the insured
vehicle within the scope of permission and (3) any other person or organization
liable for the conduct of an insured in the use of an owned auto. Number 3
encompasses both (1) and (2) and would afford coverage, for example, in the case
where the insured is driving his car in the scope of his employment and is
involved in an accident injuring a third party, who would have a subsequent claim
against both the employer and the insured; in this case, the terms of the policy
would apply to each.

There have been several interpretations by the courts on the meaning of the word
"residence". Most courts agree that the term means more than a place of abode
and, in determining the qualifications of a residence, have applied measurement
criteria such as: addresses on bank accounts, voter registration, hospital records,
registration of automobiles and driver's license. It appears that the term
"residence," when used in a statute is equated by the courts to the term
"domicile". When used in an automobile liability policy, however, the term
"resident" seems to be given a less permanent restriction, so as to cover persons
who are merely temporarily residing with the named insured. This, of course, is

5-10-02

CONFIDENTIAL

an advantage to the company when excluding coverage for non-owned automobiles (automobiles "not owned by or furnished for the regular use of either the named insured or any relative"), but operates as a disadvantage to the Company when we consider that relatives of the named insured are covered with respect to non-owned automobiles as persons insured under our policy, as are residents of the same household as the named insured with regard to owned automobiles. Likewise, the term "relative" is used under Part II of the Family Automobile Policy covering expenses for medical services, etc.

Under the definition of a <u>non-owned auto,</u> the following persons or organizations are insured: (1) the named insured; (2) any resident relative operating with permission of the owner; (3) any other person or organization liable for the acts or omissions of an insured using an auto not owned or hired by the person or organization. Despite the language used in defining "relative" under the Family Policy, there are certain guidelines for the examiner or adjuster to follow with respect to this matter, which are as follows:

- A person may have several residences but can have only one domicile.

- While the term "resident" as used in our policy should not be interpreted to require that degree of permanency inherent in the term "domicile," it does require more than temporary physical presence in the named insured's household. The presence of the individual claiming to be (or not to be) a resident of the same household as the named insured must be accompanied by an intention to remain there for some length of time, although he need not intend a change of domicile.

- A person on a mere temporary visit to the named insured's home is not a "resident" as contemplated by the policy.

- Domicile means that place where a person has a true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he or she has, whenever absent, the intention of returning.

## D.   What Constitutes Regular Use Of Non-Owned Automobiles?

The Family Automobile Policy defines a non-owned automobile as "an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute automobile. An auto rented or leased for more than 30 days will be considered as furnished for regular use" This raises several questions each time a non-owned automobile is driven, in addition to the question of permissive use. For example, the examiner or adjuster must determine whether the automobile is owned by either the named insured or any relative, or whether it is furnished for the regular use of either named insured or any relative.

5-10-02

The courts have encountered difficulty in deciding these questions and this section will be directed solely to the question of what constitutes regular use of a non-owned automobile as determined by the courts. Legal opinions vary from state-to-state. When necessary, check with your RLA and/or Claims Legal. The main question to be determined by the claims person is whether the non-owned automobile is being driven without restricted permission as to the time period within which the operator may use the vehicle or whether the vehicle is loaned on a temporary or restricted basis. The courts which have considered this question have generally held that the question is one of determining whether the insured had the unrestricted right to use the vehicle at any time he or she desired, either on business or pleasure, rather than one of determining the specific number of times the car was used. The only situation where the specific number of times the car was used becomes important is where the right to use the car is restricted in time. Generally speaking, if the insured has the unrestricted right to use the vehicle at any time, whether it be a specific vehicle or one of a number of vehicles, furnished for his or her use, the courts have held that this is a vehicle furnished for regular use and is not covered under the Family Insurance Automobile Policy. This would cover, for example, the standard motor pool situation wherein our insured is allowed to use one of any number of vehicles available in the motor pool furnished by an employer. Regardless of the number of times he or she may have used the vehicle in question, the courts have normally held this to be a non-owned automobile furnished for regular use for which there is no coverage under the Family Automobile Policy.

The majority of non-owned auto situations will involve our policy only as excess coverage. The following rules should assist you in making a determination on the coverage issue.

- If the insured has the right to use the vehicle in question at any time he or she so desires, either on business or pleasure, regardless of the fact that it may be one of a number of vehicles in a pool of cars furnished, this is a car that may be furnished for regular use.

- The question to be determined is not a specific number of times which he or she has used the car in issue, but as to whether the insured has the unrestricted right to use the car or any one of a number of cars at any time.

- If the car is furnished for a restricted time period only, or in some instances for a restricted use only, then the question narrows and the majority of courts have decided that the car was not furnished for regular use. This would include short-term rental vehicles rented for a period of one month or less, or the case of a relative not residing with the owner of the car who must have specific permission to use the car each time.

IV-8

5-10-02

- Whenever specific permission is required for each separate use of the vehicle, the courts normally hold that this is not "furnished for the regular use of the named insured" due to the permission restriction.

- The use to which the car is being put at the time of the accident usually has no bearing on the question, the question being one of status of the vehicle and not the use to which it is being put, to wit: is the car furnished (available) for the regular use of the named insured?

## V.   WAIVER

A waiver is the relinquishment of a known right; in this instance, the Company's relinquishment of the right under the policy contract to deny coverage. For a waiver to exist, the Company must know about the coverage question. Although a waiver does not usually have all the elements of a contract, it is in the nature of a contract, based on an expressed or implied intention of the parties. The intention to waive may be implied from the actions of the claims technician.

An example of a waiver might be a case in which there was a delay of six months in reporting an accident. Obviously there is a coverage question based on a breach of the policy condition requiring prompt reporting. The question of coverage may be waived by the claim technician's expressly agreeing to do so or by implying such an intention by investigating and attempting to settle the claim without first issuing a Reservation of Rights or obtaining a signed Non-Waiver Agreement.

## VI.   ESTOPPEL

The doctrine of equitable estoppel may prevent a valid denial or disclaimer of coverage. If the Company acts or fails to act in such a manner that would (1) reasonably lead the insured to believe coverage is in order, and (2) the insured acts to his/her detriment in reliance upon that belief, the Company may be "estopped" from denying or disclaiming coverage.

For example, the Company may learn at the time the insured reports a serious accident, that when the insured applied for insurance, he or she inadvertently neglected to inform the Company of a prior insurance cancellation by another company. Although this may raise a question of coverage, the claims examiner or adjuster may investigate and even attempt to settle the claim. Perhaps suit is filed and the insured sends the suit papers to the Company, but the Company returns the suit papers to the insured ten days before trial indicating that it is withdrawing from the case and contending that the policy was void ab initio because of misrepresentation.

5-10-02

CONFIDENTIAL

Under these circumstances, the insured appears to have been justified in relying on the Company to do what it represented it would do. Because the insured has been deprived of any reasonable opportunity to investigate and attempt to settle the claim, if he or she has acted in good faith, it would appear unjust and inequitable to permit the Company to take advantage of the coverage question at that late date. The Company could be estopped from denying coverage.

It is becoming increasingly difficult to distinguish between waiver and estoppel. In many jurisdictions, they are regarded as synonymous and in others; a waiver is not binding unless it is supported by an estoppel. It is sufficient for you to be aware that the application of either doctrine can prejudice the Company's position.

## VII.   DEALING WITH OUR INSURED IN COVERAGE QUESTION SITUATION

While investigating a coverage question, the claims handler must be careful to preserve the rights of both parties to the insurance contract: the insured (or person seeking coverage) and the Company. Once a coverage question is recognized, the handler must seek guidance from Claims Management and, in appropriate cases, the RLA to determine a plan of action to resolve the coverage question. This plan may include issuance of a Reservation of Rights letter or, in some circumstances, a Non-Waiver Agreement or Agreement to Defend. These devices provide protection to both the people seeking coverage and the Company while the coverage investigation proceeds.

## VIII.   RESERVATION OF RIGHTS (ROR) LETTER

A reservation of rights letter (known as a "RoR") is used promptly to inform an insured that a coverage question has arisen concerning her/his claim and that we (the insurer) require time fully to investigate the question. The RoR is intended to advise the insured that the question exists, the nature of the question and that our efforts to investigate the question will require some additional time. The RoR is an important legal document. It can cause apprehension on the part of the insured. Its use must be carefully controlled and drafted. What follows are essential considerations in drafting and issuing RoRs:

### A.   Timing of RoR

Because the very purpose of a RoR is to give notice to the insured of a coverage question, these declarations must be made promptly after a coverage question is recognized. This does not mean that a RoR letter must be sent before preliminary investigation is made to confirm coverage. The law does not require that we guess about basic coverage based upon bare allegations. Mere suspicion regarding coverage does not require or even justify a RoR. However, there should be no significant delay in sending adequate notice to the person seeking coverage explaining why the coverage decision is not resolved. No RoR should

IV-10

**CONFIDENTIAL**

5-10-02

be sent in any case without documented approval of a supervisor. The level of the supervisory approval required will depend on the loss involved.

**B.     Contents of RoR**

A RoR issued in an auto claim must fully and fairly describe all reasons why the Company questions coverage in the particular case and the general facts, which support the need for the coverage investigation. Where there are genuine questions or facts upon which the coverage depends, these questions should be expressed in a letter, which relates the facts as known, by the Company. The RoR will declare that both parties retain all rights and benefits under the insurance policy during the coverage investigation and that the Company reserves its rights to deny or disclaim coverage if the coverage question is resolved against the person seeking coverage. The insured must be advised of his/her right to retain personal counsel and must be advised clearly of the issues, if any, that create a conflict of interest between the insured and the company. Individual states may have specific requirements for such letters and these must be addressed. Please consult all applicable TCMs.

**C.     Presentation of RoR**

Questions often arise as to who should receive the RoR (or a copy of the RoR). Again, recognizing that the purpose of a RoR is notice, the RoR should be addressed to the person(s) seeking coverage under the policy. If the named insured is not the person against whom primary liability might be assessed (i.e. the insured vehicle was driven by a permissive user); the RoR is addressed to the permissive user (with an info copy to the named insured). On the other hand, in those states where the owner may be vicariously liable for the negligence of a permissive user, any RoR that sets forth a reservation of rights that is applicable both to the owner and the permissive user should be addressed to both parties. A copy of the RoR should be sent to all other interested parties affected by the coverage denial when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is reserving its rights to disclaim or deny coverage for the loss should be sent to the interested parties. This is a complex issue and the examiner must seek supervisory guidance.

**IX.   DISCUSSIONS REGARDING ROR**

- RoRs should not be used where we have decided our coverage position. It is not a proper purpose of a RoR to "buy time" when we know our coverage position. If we have a firm coverage position, it should be stated directly and forthrightly.

1-30-08

CONFIDENTIAL

- Some coverage questions will involve intricate issues involving sales, policy service and underwriting processes and procedures. As a direct-seller, we are subject to allegations involving what was said during a telephone contact with the insured. These issues should be handled with care and with full supervisory involvement.

- When there is more than one person (or other entity) seeking coverage, special care must be taken in resolving the coverage issues. We must recognize our contractual obligations to "other insureds" and satisfy those obligations.

- By their very nature, RoRs are intended to be temporary. If complications arise in the course of the coverage investigation, the person(s) seeking coverage should be advised of these complications and a stale RoR should be refreshed by another letter reminding the person(s) seeking coverage that the coverage question remains unresolved and that we continue to reserve our rights to deny/disclaim coverage. Ultimately, unresolved coverage questions will often result in the company's having to provide coverage unless the reason the question is unresolved was beyond the control of the Company. A person seeking coverage cannot defeat a coverage question by refusing to cooperate in the coverage investigation. Failure of the person seeking coverage to cooperate in the coverage investigation may be reason for a renewed RoR adding lack of cooperation as a basis for potential disclaimer of coverage.

## X.   NON-WAIVER AGREEMENTS

Non-Waiver Agreements (NWA) are most often used to obtain the agreement of the insured that our coverage for a loss or defense of a lawsuit is conditional upon future events or determinations of fact. This device is useful where the defense of a person seeking coverage is undertaken initially, but it is contemplated that the defense of the lawsuit will be withdrawn if specified events occur or facts are determined. The advantage of a NWA is that it is a bilateral agreement rather than merely a unilateral declaration (RoR). This device is not common in automobile insurance cases. Care should be taken in drafting a NWA to make sure it is clear regarding the nature of the coverage questions and the specific conditions upon which the defense may be withdrawn. A typical example of where a NWA may be used is where the Company undertakes the defense of a person seeking coverage in an underlying tort lawsuit while simultaneously seeking a judicial declaratory judgment regarding its coverage obligations. The NWA would be used to secure the agreement of the person seeking coverage that the defense of the lawsuit would be withdrawn if the court should determine that the Company properly denied/disclaimed coverage. Again, the purpose of the NWA is to put the person seeking coverage on notice of what will happen if a coverage question is resolved adversely to that person. Claims Home Office Legal coordination is required any time a NWA is contemplated.

IV-12

CONFIDENTIAL

5-10-02

## XI.   AGREEMENTS TO DEFEND

Occasionally, the Company's first notice of a potentially covered loss will be notice that a lawsuit has been filed. In such a case, there may not be time to conduct a proper coverage investigation (assuming there is a coverage question) before an answer to the lawsuit must be filed. A specific agreement to a limited defense can be used to take immediate action to protect the person seeking coverage. This agreement will specifically limit our obligation to defend and/or indemnify pending resolution of the coverage question. Such an agreement is very similar to a non-waiver agreement except that it is more specific about what the Company will undertake in response to the lawsuit. Care must be taken not to obligate the Company inadvertently to a full defense. Claims Home Office will be contacted prior to entry into an agreement to defend. Every effort should be made to resolve quickly any coverage question where we have undertaken a limited or conditional defense. Undue delay in such a situation can result in the Company not being permitted to withdraw from the defense of the underlying claim.

## XII.   DECLARATORY JUDGMENTS

Critical coverage questions may be appropriate for judicial determination by use of an action for declaratory judgment (DJ) in state or federal court. Such an action – also called an action for declaratory relief in some states – asks the court to decide the parties' obligations under the insurance contract. A variety of coverage issues can be litigated with a DJ action, but it is particularly useful when there is a dispute over the interpretation or application of policy language or the validity of policy exclusions. This remedy can be very expensive because, in most states, if the ruling is against the position taken by the insurer, the insurer must pay the reasonable attorney fees incurred by the insured. <u>DJ actions must not be initiated without the approval of Claims Home Office Legal.</u>

It is important to name all parties in the DJ action. If the parties reside in diverse jurisdictions, a DJ may not be appropriate. Even where a DJ is likely, a reservation-of-rights letter will be needed to cover the time needed to investigate the situation prior to the filing of the DJ action.

## XIII.   DISCLAIMER

Disclaiming is denying liability under an existing policy contract and withdrawing from the handling of the claim because of a breach of a policy condition. The Company takes no further action with respect to investigation, negotiation, defense, etc. Denial of a claim on the basis that the accident or loss occurred after a date of expiration or other proper termination of the policy (or because claim is made under a coverage properly omitted from the policy,) is not a disclaimer, but rather is a "denial" of coverage.

IV-13

5-10-02

CONFIDENTIAL

There are certain risks in disclaiming. If the Company disclaims coverage in a Bodily Injury Liability claim and the claimant subsequently files suit, the insured is under no obligation to send suit papers to the Company or to give notice of the suit. In the event that judgment is taken against the insured after a trial, or even by default, for failure to defend, and there is a later determination that the disclaimer was improper and coverage was effective, the Company may be bound by the judgment.

In most states, (in the factual situation of where the insurance company disclaims coverage and the plaintiff proceeds in the lawsuit) after a plaintiff obtains a judgment against the insured, and the insured assigns his or her rights against the insurance company to the plaintiff, the plaintiff can then proceed directly against the Company. Questions of liability and damages are not then an issue as they have already been settled. The only issue is whether the policy covers the particular accident. If the plaintiff, in the original action, recovers on the judgment and collects from the insured, the insured might then sue the Company for the amount he or she was required to pay within his policy limits, plus expenses. The only issue would be whether the policy was effective.

Disclaimer should always be made by letter to the insured, (person seeking coverage). The disclaimer letter should be sent by Certified Mail, Return Receipt Requested, Addressee Only.

A copy of the disclaimer should be sent to all other interested parties when required by statute or regulation. In all other cases, a separate letter that simply advises that the company is not providing coverage for the loss should be sent to the interested parties.

In some states, either a copy of the disclaimer letter to the insured or a separately dictated letter must also be sent to the liability claimant and/or the legal representative within a specific time or the Company loses its right to disclaim.

A letter of disclaimer must be very carefully worded and must set out the specific reasons for disclaiming coverage in understandable terms.

If it is decided to declare a policy void from inception, it may be necessary to arrange, through the Underwriting Manager, to return premiums to the insured. Declaring a policy void ab initio ("ab initio" means from the beginning) is a joint underwriting and claims function and the letter to the insured should go out from the Underwriting Department. We should have a copy of the Underwriting Department's letter in the claim file.

If a decision is made to rescind the policy, it is usually necessary to refund the insurance premium to the insured. The return of the premium to the insured must be coordinated with the appropriate Underwriting Manager. The RLA and Claims Home Office Legal must approve all coverage disclaimers.

IV-14

5-10-02

## XIV. COVERAGE DENIALS

Coverage denials are sent when no policy was in effect at the time of the loss. Questions as to whether a policy was in force at the time of the accident or loss, along with proper investigative material, should be referred to Underwriting for an opinion as to whether the policy was effective. In certain circumstances, referral to Underwriting may not be necessary if the lapse of coverage is readily apparent after a careful review of the policy screens. If the Supervisor/Claims Manager does not agree with Underwriting's opinion, the case should be discussed with the Regional Liability Administrator.

If the Regional Liability Administrator also disagrees with the opinion of the Underwriting Department, the coverage question should be referred to Claims Home Office for a decision. In these circumstances, the Underwriting Department should be informed how the case will be handled as soon as possible.

Managers are permitted to sign off on coverage denials without RLA involvement if all of the following criteria are satisfied:

- The policy must have been cancelled at least 30 days prior to the loss or have expired 30 days or more before the loss.

- The only claim is for property damage (which includes collision and comprehensive).

- The policyholder does not challenge the cancellation or expiration.

- The appropriate PORS and cancellation notice are in the claim file.

- A Coverage Problem Worksheet has been completed.

- A manager has approved the denial in writing.

The Regions are not required to implement this modified rule and may retain mandatory RLA involvement in such cases.

Regional Liability Administrator (RLAs) may approve denials of coverage for claims involving Bodily Injury or UM/UIM Bodily Injury in the following limited circumstances. All conditions must be present:

- The denial is based upon:

    - Cancellation of the policy for failure to pay premium where the cancellation notice and the PORS have been examined and support the cancellation; or

IV-15

5-10-02

CONFIDENTIAL

- A valid named driver exclusion applies to the loss and clear evidence of the exclusion exists in the file; or

- Cancellation of the policy or removal of the involved auto was done pursuant to the policyholder's request prior to loss if the policy file information is clear and unambiguous.

- The former insured has been contacted and given an opportunity to present arguments. A good faith attempt to make this contact must be made before search for the former insured is deemed unsuccessful.

- There are no complications evident in the file. Such complications for cancellation cases include, but are not limited to:

  - A premium payment was made subsequent to the effective date of the cancellation, which was not honored to resume coverage.

  - The loss occurred within 10 days of the effective date of cancellation and the former insured contests receipt of the cancellation notice.

  - The former insured alleges a telephone contact with the Company subsequent to the cancellation advising of submission of payment for the purpose of reissue.

  - The insured has a prior history of late payments.

- Complications for a named driver exclusion case include:

  - The most recent UE-119 for an excluded resident relative found in the file is over two years old ; or

  - The UE-119 is for a named insured; or

  - The named excluded driver is not a relative and would otherwise be a be a permissive user of the insured vehicle.

- Claims reported by adverse parties where we have no record of insuring the party alleged to be insured with GEICO.

  Generally, guidelines for approval of such denials include checking the policy system under the alleged name or alleged policy number for a match; verification with the underwriting department if the alleged insured could not be located in the policy system; and a concerted effort to locate the person. We must contact the alleged insured either by phone, mail or face to face by an adjuster.

IV-16

CONFIDENTIAL

5-10-02

## XV.   COVERAGE PROBLEM HANDLING PROCEDURES

The following are step-by-step outlines on handling various coverage problems.

### A.   General Procedure

1.   Recognize potential coverage problem

\*   2.   Send Coverage Issue Referral (C-380) or go to step 3 depending on coverage problem

\*   3.   Check PC in Oasis:

- Policy/Vehicle Summary Screen
- Vehicle Detail Inquiry Screen
- Additional Interest Vehicle Screen
- Transaction Detail Screen
- Driver Information Inquiry Screen
- Accident Detail Inquiry Screen
- Conviction Detail Inquiry Screen
- Related Policy Inquiry Screen

\*   Or for Assigned Risk policies, check PC in IDOC:

- INDX – Client Index System
- IDIQ – Mini Accounts Receivable screens
- BINQ – Billing Inquiry Screen
- PLOGI – Screens used to record policy notes
- DRVI – Screen used to identify an excluded driver in UE119 situations

\*   4.   Alert your supervisor/discuss Coverage Screen sending a reservation of rights letter or transfer file for further investigation.

5.   Investigate (must be resolved in 30 days)

a.   Contact Insured
   -   opening
   -   alert to possible problem and take recorded interview
   -   explain what will happen next and when
   -   thank insured

IV-17

2-9-07

CONFIDENTIAL

      b.   Contact Claimant
- opening
- explain potential problem
- explain what will happen next and when
- thank claimant

      c.   Obtain other information

      d.   Obtain documentation

6.     Complete coverage worksheet

7.     Obtain approval for denial or disclaimer from Manager, RLA or CHO Legal, whichever is appropriate.

8.     If denial/disclaimer

      a.  By Mail –
- prepare denial letter
- address to person seeking coverage; copy all interested parties only when required by statute or regulations. Otherwise send a separate letter instead of the copy.
- send according to TCM-72 guidelines – See Exhibit 1
- give specific reasons

      b.  By Phone – Call insured
- opening (name, purpose of call)
- explain clearly that there is no coverage and specific reason
- discuss so that insured's questions are answered
- explain what will happen next and when
- thank insured and again express your concern

      c.  Call claimant/other interested parties
- opening (name, purpose of call)
- explain clearly that there is no coverage (and why?)
- discuss options available

      d.  Claimant's own insurance (UM)
- explain that you would like to help but under terms of this policy are unable to.

The following pages show steps that you can follow for particular coverage situations, which should be sufficient for most situations.

IV-18

CONFIDENTIAL

1-10-07

## B.   NEW POLICY

### (Review regional new business procedure)

1. Check INDX in IDOC or Customer Identification screen in Oasis
   - is there a policy number for insured?

\*

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call insured and take R/l

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Obtain information
   - copy of binder

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

10. Denial Letter/Disclaimer Letter
    - addressed to the person seeking coverage
    - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of a copy.
    - send according to TCM-72 guidelines – See Exhibit 1
    - give specific reasons

IV-19

CONFIDENTIAL

## C.    NON-PAY CANCELLATION

*

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call insured and take R/I

4. Call claimant
   - let him/her know that there is a coverage problem and that you will keep in contact

5. Obtain documentation
   - PORS
   - Cancellation notices

6. Reservation of Rights letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney, only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

**CONFIDENTIAL**

2-9-07

## D. CANCELLATION – UNDERWRITING REASONS

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured and take R/I
   - ask questions such as:
     Was cancellation letter received?
     When? How?
     What date cancelled?
     Are you aware of cancellation?
     Have you moved recently?
     When?
     Where?
     Was Company notified?
     How?
     When?
     Where?
     Whom spoke with?

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

5. Obtain documentation
   - copy of cancellation letter
   - copy of PORS

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channel

IV-21

2-9-07

CONFIDENTIAL

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

**E.    VEHICLES DON'T MATCH - (temporary substitute, replacement, additional)**

1. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

2. Make your supervisor aware of the problem

3. Call Insured
   - if necessary, take R/I
   - determine what category the vehicle will fit in, i.e. temporary substitute, replacement or additional

4. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

5. Obtain documentation
   - copy of bill or sale
   - copy of title

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant attorney only when required by statute regulation.  Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from Manager, RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

IV-22

**CONFIDENTIAL**

2-9-07

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parities only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

## F.   EXCLUDED DRIVER  (UE-119)

1. Check DRVI in IDOC or Driver Summary screen in Oasis
   - who is the excluded driver

2. Coverage Issue Referral (C-380)
   - handle according to your regional procedure

3. Make your supervisor aware of the problem

4. Call Policyholder and take R/1

5. Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

6. Obtain documentation
   - copy of UE 119 from file

7. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

8. Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

9. Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

CONFIDENTIAL

10. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy to all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy     - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

## G.    DRIVER OTHER THAN NAMED INSURED- (Permissive Use Questions)

1.  Make your supervisor aware of the problem

2.  Call insured and take R/I

3.  Call claimant
   - let him/her know that there is a coverage problem and you will keep in contact

4.  Obtain information from other sources
   - driver's interview

5.  Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TCM-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

6.  Coverage Problem Worksheet
   - form used to get authorized to deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

7.  Obtain approval from RLA or Claims HO Legal
   - approval should be obtained through the appropriate channels

8   Denial/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instead of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

IV-24

CONFIDENTIAL

1-10-07

**H.    EXCLUSION OR "DEFINITION" COVERAGE PROBLEMS**

    1.  Make your supervisor aware of the problem

    2.  Call Insured and take R/I
       - ask questions that will help determine whether the loss does not fall within the terms of the policy or if it might be excluded

    3.  Call Claimant
       - let him/her know that there is a coverage problem and you will keep in contact

    4.  Obtain information from other sources

    5.  Obtain documentation

    6.  Reservation of Rights Letter
       - list all possible reasons and be as specific as possible
       - send according to TCM-72 guidelines – See Exhibit 1
       - send to the individual or all individuals claiming protection under the policy
       - copy to liability claimant and attorney only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.

    7.  Coverage Problem Worksheet
       - form used to get authorization to deny or disclaim
       - fill in form completely
       - get appropriate supervisor/manager signatures

    8.  Obtain approval from RLA or Claims HO Legal
       - approval should be obtained through the appropriate channels

    9.  Denial Letter/Disclaimer Letter
       - addressed to the person seeking coverage
       - copy all other interested parties only when required by statute or regulation.  Otherwise send a separate letter instead of the copy.
       - send according to TCM-72 guidelines – See Exhibit 1
       - give specific reasons

**I.    VEHICLE USED IN GOVERNMENT BUSINESS**

    1.  Make your supervisor aware of the problem

    2.  Call insured and take R/I

    3.  Call claimant

1-10-07

CONFIDENTIAL

- let him/her know that there is a coverage problem and you will keep in contact

4. Obtain information from other sources
   - insured's supervisor's statement

5. Obtain documentation
   - copy of government's claim report

6. Reservation of Rights Letter
   - list all possible reasons and be as specific as possible
   - send according to TMC-72 guidelines – See Exhibit 1
   - send to the individual or all individuals claiming protection under the Policy
   - copy to liability claimant and attorney only when required by statute or regulation. Otherwise send a separate letter instead of the copy.

7. Coverage Problem Worksheet
   - form used to get authorization or deny or disclaim
   - fill in form completely
   - get appropriate supervisor/manager signatures

8. Obtain approval from RLA or HO Claims Legal
   - approval should be obtained through the appropriate channels

9. Denial Letter/Disclaimer Letter
   - addressed to the person seeking coverage
   - copy all other interested parties only when required by statute or regulation. Otherwise send a separate letter instated of the copy.
   - send according to TCM-72 guidelines – See Exhibit 1
   - give specific reasons

CONFIDENTIAL

1-10-07

EXHIBIT 1
TCM-72
REVISED

# M E M O R A N D U M

TO:        ALL CLAIMS TECHNICAL PERSONNEL

FROM:      CLAIMS HOME OFFICE

SUBJECT:   **DENIALS, DISCLAIMERS AND RESERVATIONS OF RIGHTS:**
           **PROPER FORM OF MAILING**

DATE:      December 20, 2000

This revised TCM-72 replaces the one issued on November 22, 2000.

Please adhere to the following guidelines when mailing denials, disclaimers and reservations of rights letters:

1.  Disclaimers, which are issued when there has been a breach of policy condition (e.g. notice, cooperation, etc.) must be sent via certified mail.

2.  Denials and reservations of rights letters may be sent via regular mail unless another form of mailing is mandated by state law or another requirement in the jurisdiction, in which case the letter must be sent in the manner mandated.

3.  Whenever a denial, disclaimer or reservation of rights letter is sent, a copy of the letter must be retained in the claim file.

A. STEPHEN KALINSKY

ASK:ghk

IV-27

5-10-02

CONFIDENTIAL

# CHAPTER XII

## ARBITRATION

### I.     INTRODUCTION

Arbitration is not considered a substitute for good claims handling.  Subrogation claims against the adverse carrier and liability claims made against GEICO are to be reviewed realistically to determine the liability and valuation.  Cases of questionable liability or questionable valuation will be negotiated directly with the adverse carrier as long as an amicable settlement is possible.  Every effort is to be made to keep problem cases from going into arbitration simply because they are a problem.

### II.    ARBITRATION DEFINED

Arbitration is a method of resolving a dispute.  It is the resolution of a dispute by an impartial (third) party chosen by the parties to the dispute who agree in advance to abide by the arbitrator's award that is issued after a hearing at which both parties have an opportunity to be heard.

### III.   PURPOSE

To minimize lawsuits, a number of property and casualty insurance companies, including our Company, have entered into a series of agreements that provide certain types of disputes between the various companies be resolved through arbitration.

In general, subrogation arbitration applies to material damage subrogation claims of not more than $100,000, but not to claims as to which a company asserts a defense of lack of coverage on grounds other than (1) delayed notice, (2) no notice or (3) non-cooperation.  Note that the types of disputes that are covered by these agreements are disputes between insurance companies that are due to a subrogation claim involving property damage.

### IV.    PARTICIPATING MEMBERS

The examiner or adjuster should make every effort to determine whether the adverse insurance company is a signatory to the arbitration agreements so as to avoid the unnecessary filing and withdrawal of suits.  The examiner or adjuster should seek the advice and assistance of the Payments Recovery Unit before any unfamiliar step is taken.  We should be careful to avoid allowing any statute of limitations to run, and particular care must be given to claims against governmental agencies because of the likelihood of

6-28-02

CONFIDENTIAL

unusually short periods of limitations and notice requirements. For claims involving the U. S. government, see the Federal Tort Claims Act. See the Arbitration Forums Membership Directory for lists of companies that are signatories to the arbitration.

## V.   CLAIMS PERSONNEL RESPONSIBILITY

- If arbitration is filed against the Company in a claim file that is closed, reopen the file and establish the proper reserve(s). Complete the Respondents portion of the Arbitration Forums, Inc. Automobile Subrogation Arbitration Forum Application ("A" Form).

- If an "A" Form is filed by the adverse carrier, but we believe we would prevail in arbitration, the claims examiner or adjuster should complete the "Respondent Information and Allegations" portion and file a counter-claim against the adverse carrier.

- It is also imperative that we recognize that damages demanded in arbitration can exceed the limits or remaining limits available under a policy on any given claim. It is the obligation of the adjuster handling any response to recognize these circumstances and protect both the insured and company from any excess potential.

  In these circumstances an affirmative defense is necessary to address the allegations made by the initiating party. Where damages are sought in excess of available coverage the examiner should state as an Affirmative Defense the policy limits available.

- If we receive an adverse decision, the award is to be paid promptly. The award does not include the claimant's deductible, so our check is paid to the applicant only. If the claimant's deductible has not been paid, a second check should be requisitioned, made payable to the claimant, and forwarded with the applicant's check so they are aware of the payment. The applicant will forward the check to the claimant.

## VI.   PAYMENT RECOVERY EXAMINER'S RESPONSIBILITY

- If reasonable efforts to effect a subrogation recovery fail and it is determined that we should be successful in arbitration, the subrogation examiner should file an "A" form.

- If our "A" Form draws a counter-claim, the Payment Recovery Examiner is to refer the file immediately to the claims examiner or adjuster to answer as respondent.

- Handle all procedural matters concerning collection and apportionment of recoveries made through arbitration.

XII-2

1-30-08

**CONFIDENTIAL**

## VII. THE AUTOMOBILE SUBROGATION FORUM APPLICATION ("A" FORM)

This form was created by the Arbitration Forums (AF) for use by both Applicant and Respondent. The following notes refer to the various parts. The Applicant Carrier sends an original and one copy of the "A" Form and Contentions Sheet to the proper (AF) field office and three copies to each Respondent Company. The Respondent(s) completes the first copy and sends it along with its Contention Sheet and other supporting documents to the proper AF field office. It also completes the second copy and sends it along with a copy of its Contentions Sheet to the Applicant. The third copy is kept in the Respondent's file.

- Before submitting our application, as Applicant or Respondent, review the entire form for accuracy and neatness. We are judged on our appearance in Arbitration the same as we would be in court.

- As Respondent, we must answer "yes" or "no" to the <u>Admission of Coverage</u> question. A "yes" answer or a failure to answer will "estop" (i.e., prevent) us from making a later denial.

- Whether it is better to have an individual case heard by a single arbitrator will depend on our previous experience with a particular committee. Check with someone in your division or office who is acquainted with that Committee. If the dollar value on the case is less than $2,500, hearing by a one-man panel will occur. If the damages are over $2,500, you must send a written request to have a three-man panel hear the case.

- The Applicant must have contacted the Respondent prior to submitting an "A" Form to AF. The applicant, as evidence of satisfaction of the condition precedent to arbitration, must include on the respondent's portion of the form the name of the respondent company, its representative's name and address, and the file number. If this information is not available, the "A" Form must be accompanied by a memorandum explaining why the information is not available.

- The contentions are a synopsis of the case. They should be brief and relevant, inconsistencies are to be avoided.

## VIII. SUPPORTING PAPERS

A good file, in application or answer, contains the material listed below. GEICO's experience with arbitration has shown that a completely documented file is the best way to ensure a favorable decision

- Behind the Contentions Sheet, attach copies of all referenced statements and any other reports or factual documents, which would be helpful in our case. When attaching copies of statements, it is helpful to the

XII-3

6-28-02

CONFIDENTIAL

Committee to indicate by mark, or some other designation, the highlights of each statement. Should the Committee wish to review the statements, their attention will be called to the important areas and the entire statement will not have to be read.

- When we wish to contest the amount of damages claimed, we must submit evidence of our evaluation. Point out the discrepancies when the adverse carrier's evaluation differs from ours. Include pictures of damage, if helpful.

- Virtually all states recognize the loss of use as a recoverable damage in tort. If loss of use is being subrogated, it is important to identify the elements necessary in that state to prove loss of use. All states require that the amount requested must be reasonable. Specifically, the length of time it took to repair the damaged vehicle must be reasonable under the circumstances, and the cost of the rental per day must be reasonable for a vehicle of like kind. In some states a replacement vehicle must actually be rented before loss of use will be recoverable. In other states the plaintiff just has to show that the amount being requested is reasonable and that he/she was without the use of the vehicle for the time requested. Still other states do not require the plaintiff to actually have incurred the expense of alternate transportation, but do require the plaintiff to show that he/she needed a vehicle during the time requested. Once you know the necessary elements for the state involved, you can argue appropriate defenses.

## IX.    SPECIAL ARBITRATION AGREEMENT

This agreement is an outgrowth of the Automobile and Property Subrogation Arbitration Agreement, wherein certain companies have agreed to resolve inter-company disputes concerning:

- Contribution on bodily injury and property damage claims.

- Coverage, if they are insurers of the same insured.

If, after referring to the Agreement, Rules, and list of signatory companies, the examiner or adjuster believes arbitration should be initiated, it should be discussed with the Claims Manager prior to filing an application.

For Membership information contact Arbitration Forums telephonically: 888 ARB – FILE

If the claim is a Control File, the Claims Attorney should be advised by memorandum if we decide to submit a claim to arbitration or if a Notice of Hearing is received. The memorandum should include the following information:

- The claim number under which the claims office filed an application or

XII-4

**CONFIDENTIAL**

received such a Notice of Hearing.

- The decision rendered by the arbitration panel.

## X.    AMERICAN ARBITRATION ASSOCIATION

This Association in used to resolve disputes arising under Uninsured Motorist Coverage. If the insured and the Company cannot agree on whether there is legal liability on the part of the uninsured driver or to the settlement value of the claim presented, either or both matters shall be settled in accordance with the rules of the American Arbitration Association as provided for under the terms of the policy.

## XI.    INTERNATIONAL RECIPROCAL ARBITRATION

The Automobile Physical Damage Subrogation Arbitration Agreement (to which the Company is a signatory) and Canadian Inter-Company Arbitration Agreements (to which the Company is not a signatory) are subject to geographic limitations, as they only have jurisdiction over disputes which arise out of losses occurring within their respective countries involving companies which are signatories to their Agreements.

The International Reciprocal Arbitration Agreement was created to provide an instrument which would permit the signatory companies to the two above Arbitration Agreements to cross the international boundary in pursuit of their right of recovery.

This Agreement applies the compulsory features of the Automobile Physical Damage Subrogation Arbitration ("Agreement") or the Canadian Inter-Company Arbitration Agreement to accidents between nationals of the respective programs and to the nationals of one country involved in an accident in the other country.

The place of the accident determines which organization has jurisdiction. If the accident occurs in Canada and the companies have signed the International Reciprocal Arbitration Agreement, jurisdiction is conferred to the Canadian Agreement. If the loss occurs in the United States, jurisdiction is conferred to the Automobile Physical Damage Subrogation Arbitration Agreement.

XII-5

6-28-02

**CONFIDENTIAL**

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

## I. Claims Reporting System – Call Handling

### A. Review Criteria:

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

Ratings will be the following:

- **A** – Outstanding performance
- **3** – Adequate performance
- **2** – Unsatisfactory performance which is below acceptable standards
- **1** – Integrity issues, violations of company policy and unfair claims practices

In order for the call to be considered an A Call, each category must be rated an **A.** However, a rating of **1** in a category does not automatically make the **Overall** rating a **1**. Good claims judgment and common sense should be used when deciding upon the **Overall** rating.

The review criteria are available via the following links:

\*   i.   **CSR Monitor Criteria:**
     CSR Link

\*   ii.   **TCRI Monitor Criteria:**
     TCRI Link

XIV-1

**CONFIDENTIAL**

3/2/06

**B. Monitor Keying: Entering and Editing**

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>. Select the **Staff Dept** site and choose **Claims Home Office.** *Presently, the DirectNet site may only be used for CSR Monitors.*

Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

> <u>CHO Monitor System Link</u>

In order to enter a Monitor, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting system. To enter a Monitor click **Monitors**. You will then have three choices:

- **Enter** a Review for a Monitor
- **Edit** a Previously Entered Review for a Monitor
- **Search** for a Monitor by Claim Number.

Click **Enter a Review for a Monitor**.

Enter the associate number of the file handler being reviewed and your associate number as the reviewer, and then click **Submit.**

The on-line system was developed to help the reviewer with questions on how to complete any portion of the form. Hold the cursor over the particular area in question and instructions will pop up on the screen regarding what should go in each box. If you attempt to submit a Monitor that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the Monitor you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed Monitor. The supervisor should review completed Monitors with the call handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

If the supervisor chooses not to use the Claims Reporting System to complete Monitors or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the call handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review for a**

XIV – 2

**Monitor** in the Claims Reporting System. Then enter the call handler's associate number, Section Code and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously entered Monitor by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number of the review you want to retrieve.


## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

Ratings to be used will be the following:

- **S** (Satisfactory) -      Documentation/performance in accordance with company and state regulatory requirements
- **NS** (Not Satisfactory) -  Documentation./performance which is below acceptable standards
- **N/A** (Not Applicable) -  Does not apply.

An **NS** in any subcategory automatically makes the category an **NS**; for example, an **NS** rating in the subcategory of ***Coverage*** will make the entire category of ***Investigation*** an **NS**. However, an **NS** in a category does not automatically make the ***Overall*** rating an **NS**. Good claims judgment should be used when deciding whether the ***Overall*** rating is **NS**. The ***Overall*** should be **NS** when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

The review criteria are available via the following links:

\* **i.  CSR SPR Criteria**
        CSR Criteria Link

**ii.  Total Theft/Fire SPR Criteria**
        Total Theft Criteria Link

**iii.  PRU SPR Criteria**
        PRU Criteria Link

XIV- 3

3/2/06

**CONFIDENTIAL**

* **iv. Suit SPR Criteria**
    CU Suit Criteria Link

* **v. TCR/CU/PIP SPR Criteria**
    TCR/CU/PIP Criteria Link


## B.  SPR Keying:  Entering and Editing

The on-line Performance Review system is located on the CHO Direct Net site.  Select the **Staff Dept** site and choose **Claims Home Office.**  Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**.  The link below may also be utilized:


SPR System Link


In order to enter an SPR, choose **Claims Reporting System** and click **Submit**.  You are now in the Claims Reporting system. To enter a SPR click **SPR Forms**.  You will then have three choices:

- **Enter** a Review for a SPR
- **Edit** a Previously Entered Review for a SPR
- **Search** for a Review by Claim Number.

Click **Enter a Review for a SPR**.

Enter the associate number of the file handler being reviewed and click the type of SPR to be completed:

- **CSR** – CSR and CSRII
- **Total Theft** – Total Theft and Fire
- **PRU** – Payment Recovery Unit
- **Suit SPR** – Suit files only
- **TCR CU SPR** – TCRI, TCRII, PIP & CU (non-suit only)

The on-line SPR system has been designed to help the reviewer with questions of how to complete any portion of the form.  Hold the cursor over the particular area in question and instructions will pop up regarding the screen of what should go in each box. If you attempt to submit a SPR that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the SPR you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed SPR

XIV- 4

3/2/06

The supervisor should review completed SPR's with the file handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

If the supervisor chooses not to use the Claims Reporting System to complete SPR's or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the file handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review** in the Claims Reporting System. Select the type of review to be corrected, the file handler's associate number and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously completed SPR by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number and type of review you want to retrieve.

## III. Claims Reporting System – Roll-up Reports

The on-line Performance Review System Roll-up Report is located on Direct Net. Select the **Staff Dept** site and choose **Claims Homes Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

Reporting System Link

To review a Roll-up Report, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting System. To review any of the Roll-up reports, click **Rollup Reports**. You have three choices for the time frame you want to review:

- **Week** – For reviewing results for one or multiple weeks
- **Month** – For reviewing results for a particular month
- **Year** – For reviewing results for the year to date

**CONFIDENTIAL**

2/3/05

Choose the type of report you want to review. There are four choices:

- **Individual** – For reviewing the results of a single individual. Enter the associate number, section code and the FCC applicable to the individual.
- **Supervisor** – For reviewing the results of a particular Supervisor's unit. Enter the section code and FCC applicable to the unit.
- **Manager** – For reviewing the results of all units by level. Enter the FCC applicable to the units.
- **Regional** – For reviewing the results of each level in a region or profit center. Enter the FCC applicable to the region or profit center.

Once you have chosen the time frame and report type you want to review, click **Submit**. This will take you to the summary report of the results for review and analysis. You may also obtain more detailed roll up reports by clicking on any of the areas which are highlighted; such as, the associate number, section code or reports.

## IV.  TIP Requirements

### A. 1-Hour Attempt TIP

File handlers will have 1-Hour from the time of an initial assignment to *attempt contact*[1] on all interested parties. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. For those losses reported outside of these time frames, 1-Hour Attempt is exempt **(N/A)**, but 24-Hour Contact TIP guidelines still apply.

CHO recommends that the profit centers develop alternate off-hour staffing plans to address 1-Hour Attempt TIP on weekends and holidays. These teams may be staffed with TCRI's, TCRII's and file handlers who will satisfy the TIP requirements after traditional hours, regardless of the level of the claim. For example, a TCRI making 1-Hour Attempt on a CU level file has satisfied the TIP requirement.

On transfer cases and newly assigned losses, for those interested parties who already have spoken directly to a GEICO file handler (CSR, TCRI, TCRII, CU, PIP or Total Theft), 1-Hour Attempt is exempt **(N/A).** Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 1-Hour Attempt. To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

In cases where GEICO has been notified that a suit has been filed against our insured, the assigned CU examiner will have 1-Hour to make contact with that insured.

---

[1] Attempted contact is placing a call, but not being able to leave a message.

XIV - 6

## B.  24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment, transfer from another claims level</u> or <u>once additional information is received</u> to make *actual contact*[2] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact.  For example, a file transferred from TCRII to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact.  To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message.  In these cases, aggressive attempts should be made to contact the interested party.  Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

## C.  Interested Parties

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-Hour Attempt and 24-Hour Contact TIP.

The following interested parties **are subject** to 1-Hour Attempt and 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers
- Claimant owner and/or spouse
- Claimant driver

---

[2] Actual contact is placing a call, then either talking to the person or leaving a message.

XIV - 7

**CONFIDENTIAL**

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-Hour Attempt is exempt **(N/A)** but the 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## D. Internet

### i. Inquires:

File handlers will have 2 hours to acknowledge and respond to an E-mail Inquiry ("Contact Us") with appropriate responses occurring by telephone contact or CHO approved email template. Use of any "free form" email response is unacceptable.
* This will be measured for CSR, TCRI, TCRII and CU units between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. Auto Damage, PRU and Theft units will be measured between the hours of 8:00 am and 4:30 pm (local time) on Monday through Friday only.

### ii. Loss Reports:

All Internet loss reports ("INET") must be established within 1 hour of receipt. Standard contact TIP will then apply. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and
* 6:00 p.m. on Sundays and Holidays.

XIV- 8

3/2/06

CONFIDENTIAL

# SLIP SHEET

CONFIDENTIAL

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

## I.  Claims Reporting System – Call Handling

\*   **A. Monitoring Purpose:**
Incoming calls are recorded and evaluated as part of an ongoing effort to maintain and improve the quality of our customer interactions, our compliance with state and local laws, and our promotion of fair claims practices. These recordings are not, and will not, be used for claims investigative purposes.

**B. Review Criteria:**

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

\*   Ratings for each category and the overall score consist of "**A**" or "**Non-A**." In order for the call to be considered an A Call, each category must be rated an "**A.**"  Good claims judgment and common sense should be used when deciding upon the rating.

The review criteria are available via the following links:

> i.   **CSR Monitor Criteria:**
>      CSR Link
>
> ii.  **TCRI Monitor Criteria:**
>      TCRI Link

XIV-1

2/9/07

CONFIDENTIAL

## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

Ratings to be used will be the following:

- **S** (Satisfactory) -        Documentation/performance in accordance with company and state regulatory requirements
- **NS** (Not Satisfactory) -   Documentation./performance which is below acceptable standards
- **N/A** (Not Applicable) -   Does not apply.

An **NS** in any subcategory automatically makes the category an **NS**; for example, an **NS** rating in the subcategory of ***Coverage*** will make the entire category of ***Investigation*** an **NS**. However, an **NS** in a category does not automatically make the ***Overall*** rating an **NS**. Good claims judgment should be used when deciding whether the ***Overall*** rating is **NS**. The ***Overall*** should be **NS** when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

The review criteria are available via the following links:

   i.  **CSR SPR Criteria**
         CSR Criteria Link

   ii. **Total Theft/Fire SPR Criteria**
         Total Theft Criteria Link

   iii. **PRU SPR Criteria**
         PRU Criteria Link
   iv. **Suit SPR Criteria**
         CU Suit Criteria Link

   v. **TCR/CU/PIP SPR Criteria**
      ·   TCR/CU/PIP Criteria Link

XIV- 2

**CONFIDENTIAL**

## B.  SPR Keying:  Entering and Editing

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>.  Select the **Staff Dept** site and choose **Claims Home Office**.  Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**.  The link below may also be utilized:

<u>SPR System Link</u>

In order to enter an SPR, choose **Claims Reporting System** and click **Submit**.  You are now in the Claims Reporting system. To enter a SPR click **SPR Forms**.  You will then have three choices:

- **Enter** a Review for a SPR
- **Edit** a Previously Entered Review for a SPR
- **Search** for a Review by Claim Number.

Click **Enter a Review for a SPR**.

Enter the associate number of the file handler being reviewed and click the type of SPR to be completed:

- **CSR** – CSR and CSRII
- **Total Theft** – Total Theft and Fire
- **PRU** – Payment Recovery Unit
- **Suit SPR** – Suit files only
- **TCR CU SPR** – TCRI, TCRII, PIP & CU (non-suit only)

The on-line SPR system has been designed to help the reviewer with questions of how to complete any portion of the form.  Hold the cursor over the particular area in question and instructions will pop up regarding the screen of what should go in each box. If you attempt to submit a SPR that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the SPR you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed SPR. The supervisor should review completed SPR's with the file handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

XIV- 3

3/2/06

CONFIDENTIAL

If the supervisor chooses not to use the Claims Reporting System to complete SPR's or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the file handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review** in the Claims Reporting System. Select the type of review to be corrected, the file handler's associate number and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously completed SPR by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number and type of review you want to retrieve.

## III. Claims Reporting System – Roll-up Reports

The on-line Performance Review System Roll-up Report is located on Direct Net. Select the **Staff Dept** site and choose **Claims Homes Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

Reporting System Link

To review a Roll-up Report, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting System. To review any of the Roll-up reports, click **Rollup Reports**. You have three choices for the time frame you want to review:

- **Week** – For reviewing results for one or multiple weeks
- **Month** – For reviewing results for a particular month
- **Year** – For reviewing results for the year to date

Choose the type of report you want to review. There are four choices:

- **Individual** – For reviewing the results of a single individual. Enter the associate number, section code and the FCC applicable to the individual.

XIV - 4

**CONFIDENTIAL**

- **Supervisor** – For reviewing the results of a particular Supervisor's unit. Enter the section code and FCC applicable to the unit.
- **Manager** – For reviewing the results of all units by level.  Enter the FCC applicable to the units.
- **Regional** – For reviewing the results of each level in a region or profit center. Enter the FCC applicable to the region or profit center.

Once you have chosen the time frame and report type you want to review, click **Submit**. This will take you to the summary report of the results for review and analysis.  You may also obtain more detailed roll up reports by clicking on any of the areas which are highlighted; such as, the associate number, section code or reports.

## IV.  TIP Requirements

### A. 1-Hour Attempt TIP

File handlers will have 1-Hour <u>from the time of an initial assignment</u> to *attempt contact[1]* on all interested parties.  This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays.  For those losses reported outside of these time frames, 1-Hour Attempt is exempt **(N/A)**, but 24-Hour Contact TIP guidelines still apply.

CHO recommends that the profit centers develop alternate off-hour staffing plans to address 1-Hour Attempt TIP on weekends and holidays.  These teams may be staffed with TCRI's, TCRII's and file handlers who will satisfy the TIP requirements after traditional hours, regardless of the level of the claim.  For example, a TCRI making 1-Hour Attempt on a CU level file has satisfied the TIP requirement.

On transfer cases and newly assigned losses, for those interested parties who already have spoken directly to a GEICO file handler at the same level to which the claim was assigned, 1-Hour Attempt is exempt **(N/A).**  Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 1-Hour Attempt.  To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer.  Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

In cases where GEICO has been notified that a suit has been filed against our insured, the assigned CU examiner will have 1-Hour to make contact with that insured.

---

[1] Attempted contact is placing a call, but not being able to leave a message.

XIV - 5

2/9/07

CONFIDENTIAL

## B.  24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment,</u> <u>transfer from</u> <u>another claims level</u> or <u>once additional information is received</u> to make *actual contact*[2] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact.  For example, a file transferred from TCRII to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured.  However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact.  To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message.  In these cases, aggressive attempts should be made to contact the interested party.  Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

## C.  Interested Parties

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-Hour Attempt and 24-Hour Contact TIP.

The following interested parties **are subject** to 1-Hour Attempt and 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers

---

[2] Actual contact is placing a call, then either talking to the person or leaving a message.

XIV - 6

**CONFIDENTIAL**

- Claimant owner and/or spouse
- Claimant driver

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-Hour Attempt is exempt **(N/A)** but the 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## D. Internet

### i. Inquires:

File handlers will have 2 hours to acknowledge and respond to an E-mail Inquiry ("Contact Us") with appropriate responses occurring by telephone contact or CHO approved email template. Use of any "free form" email response is unacceptable. This will be measured for CSR, TCRI, TCRII and CU units between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. Auto Damage, PRU and Theft units will be measured between the hours of 8:00 am and 4:30 pm (local time) on Monday through Friday only.

### ii. Loss Reports:

All Internet loss reports ("INET") must be established within 1 hour of receipt. Standard contact TIP will then apply. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays.

XIV- 7

**CONFIDENTIAL**

# SLIP SHEET

CONFIDENTIAL

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

## I.  Claims Reporting System – Call Handling

\* **A. Monitoring Purpose:**

Incoming calls are recorded and evaluated as part of an ongoing effort to maintain and improve the quality of our customer interactions, our compliance with state and local laws, and our promotion of fair claims practices. These recordings are not, and will not, be used for claims investigative purposes.

**B. Review Criteria:**

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

\*  Ratings for each category and the overall score consist of "**A**" or "**Non-A**." In order for the call to be considered an A Call, each category must be rated an "**A.**"  Good claims judgment and common sense should be used when deciding upon the rating.

The review criteria are available via the following links:

    i.  **CSR Monitor Criteria:**
        CSR Link

    ii.  **TCRI Monitor Criteria:**
        TCRI Link

2/9/07

CONFIDENTIAL

## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline.  Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below.  Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use <u>stricter</u> standards.

Ratings to be used will be the following:

- **S** (Satisfactory) -       Documentation/performance in accordance with company and state regulatory requirements
- **NS** (Not Satisfactory) -  Documentation./performance which is below acceptable standards
- **N/A** (Not Applicable) -   Does not apply.

An **NS** in any subcategory <u>automatically</u> makes the category an **NS**; for example, an **NS** rating in the subcategory of ***Coverage*** will make the entire category of ***Investigation*** an **NS**.  However, an **NS** in a category does <u>not</u> automatically make the ***Overall*** rating an **NS**.  Good claims judgment should be used when deciding whether the ***Overall*** rating is **NS**.  The ***Overall*** should be **NS** when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

The review criteria are available via the following links:

   **i.**   **CSR SPR Criteria**
        CSR Criteria Link

   **ii.**  **Total Theft/Fire SPR Criteria**
        Total Theft Criteria Link

  **iii.**  **PRU SPR Criteria**
        PRU Criteria Link

   **iv.**  **Suit SPR Criteria**
        CU Suit Criteria Link

   **v.**  **TCR/CU/PIP SPR Criteria**
        TCR/CU/PIP Criteria Link

XIV- 2

**CONFIDENTIAL**

3/2/06

## B. SPR Keying: Entering and Editing

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>. Select the **Staff Dept** site and choose **Claims Home Office.** Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System.** The link below may also be utilized:

<u>SPR System Link</u>

In order to enter an SPR, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting system. To enter a SPR click **SPR Forms**. You will then have three choices:

- **Enter** a Review for a SPR
- **Edit** a Previously Entered Review for a SPR
- **Search** for a Review by Claim Number.

Click **Enter a Review for a SPR**.

Enter the associate number of the file handler being reviewed and click the type of SPR to be completed:

- **CSR** – CSR and CSRII
- **Total Theft** – Total Theft and Fire
- **PRU** – Payment Recovery Unit
- **Suit SPR** – Suit files only
- **TCR CU SPR** – TCRI, TCRII, PIP & CU (non-suit only)

The on-line SPR system has been designed to help the reviewer with questions of how to complete any portion of the form. Hold the cursor over the particular area in question and instructions will pop up regarding the screen of what should go in each box. If you attempt to submit a SPR that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the SPR you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed SPR. The supervisor should review completed SPR's with the file handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

XIV- 3

3/2/06

CONFIDENTIAL

If the supervisor chooses not to use the Claims Reporting System to complete SPR's or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the file handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review** in the Claims Reporting System. Select the type of review to be corrected, the file handler's associate number and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously completed SPR by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number and type of review you want to retrieve.

## III. Claims Reporting System – Roll-up Reports

The on-line Performance Review System Roll-up Report is located on Direct Net. Select the **Staff Dept** site and choose **Claims Homes Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

Reporting System Link

To review a Roll-up Report, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting System. To review any of the Roll-up reports, click **Rollup Reports**. You have three choices for the time frame you want to review:

- **Week** – For reviewing results for one or multiple weeks
- **Month** – For reviewing results for a particular month
- **Year** – For reviewing results for the year to date

Choose the type of report you want to review. There are four choices:

- **Individual** – For reviewing the results of a single individual. Enter the associate number, section code and the FCC applicable to the individual.

XIV - 4

**CONFIDENTIAL**

- **Supervisor** – For reviewing the results of a particular Supervisor's unit. Enter the section code and FCC applicable to the unit.
- **Manager** – For reviewing the results of all units by level. Enter the FCC applicable to the units.
- **Regional** – For reviewing the results of each level in a region or profit center. Enter the FCC applicable to the region or profit center.

Once you have chosen the time frame and report type you want to review, click **Submit**. This will take you to the summary report of the results for review and analysis. You may also obtain more detailed roll up reports by clicking on any of the areas which are highlighted; such as, the associate number, section code or reports.

## IV. TIP Requirements

### A. 1-Hour Attempt TIP

File handlers will have 1-Hour from the time of an initial assignment to *attempt contact*[1] on all interested parties. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. For those losses reported outside of these time frames, 1-Hour Attempt is exempt **(N/A)**, but 24-Hour Contact TIP guidelines still apply.

CHO recommends that the profit centers develop alternate off-hour staffing plans to address 1-Hour Attempt TIP on weekends and holidays. These teams may be staffed with TCRI's, TCRII's and file handlers who will satisfy the TIP requirements after traditional hours, regardless of the level of the claim. For example, a TCRI making 1-Hour Attempt on a CU level file has satisfied the TIP requirement.

The 1-Hour Contact Attempt is exempt (N/A) on new losses for those interested parties who have already spoken directly to a GEICO file handler at the same level to which the claim was assigned. Transfers within the same level are also exempt from the 1-Hour Attempt; however, transfers within the same level **are** subject to the 24-Hour Contact requirement. Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence may be exempt **(N/A)** from 24-Hour Contact. To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer to facilitate proper file handling.

In cases where GEICO has been notified that a suit has been filed against our insured, the assigned CU examiner will have 1-Hour to make contact with that insured.

---

[1] Attempted contact is placing a call, but not being able to leave a message.

XIV - 5

**CONFIDENTIAL**

## B. 24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment,</u> <u>transfer from another claims level</u> or <u>once additional information is received</u> to make *actual contact*[2] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact. For example, a file transferred from TCRll to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRll due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact. To qualify for this exemption, the ALOGl/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message. In these cases, aggressive attempts should be made to contact the interested party. Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

## C. Interested Parties

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-Hour Attempt and 24-Hour Contact TIP.

The following interested parties **are subject** to 1-Hour Attempt and 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers

---

[2] Actual contact is placing a call, then either talking to the person or leaving a message.

2/3/05

**CONFIDENTIAL**

- Claimant owner and/or spouse
- Claimant driver

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-Hour Attempt is exempt **(N/A)** but the 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## D. Internet

### i. Inquires:

File handlers will have 2 hours to acknowledge and respond to an E-mail Inquiry ("Contact Us") with appropriate responses occurring by telephone contact or CHO approved email template. Use of any "free form" email response is unacceptable. This will be measured for CSR, TCRI, TCRII and CU units between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. Auto Damage, PRU and Theft units will be measured between the hours of 8:00 am and 4:30 pm (local time) on Monday through Friday only.

### ii. Loss Reports:

All Internet loss reports ("INET") must be established within 1 hour of receipt. Standard contact TIP will then apply. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays.

XIV- 7

3/2/06

CONFIDENTIAL

# SLIP SHEET

CONFIDENTIAL

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

## I.  Claims Reporting System – Call Handling

\*   **A. Monitoring Purpose:**

Incoming calls are recorded and evaluated as part of an ongoing effort to maintain and improve the quality of our customer interactions, our compliance with state and local laws, and our promotion of fair claims practices. These recordings are not, and will not, be used for claims investigative purposes.

**B. Review Criteria:**

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

\*     Ratings for each category and the overall score consist of "**A**" or "**Non-A.**" In order for the call to be considered an A Call, each category must be rated an "**A.**" Good claims judgment and common sense should be used when deciding upon the rating.

The review criteria are available via the following links:

1.  **CSR Monitor Criteria:**
    CSR Link

2.  **TCRI Monitor Criteria:**
    TCRI Link

2/9/07

CONFIDENTIAL

## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use <u>stricter</u> standards.

Ratings to be used will be the following:

- **S** (Satisfactory) - Documentation/performance in accordance with company and state regulatory requirements
- **NS** (Not Satisfactory) - Documentation./performance which is below acceptable standards
- **N/A** (Not Applicable) - Does not apply.

An **NS** in any subcategory <u>automatically</u> makes the category an **NS**; for example, an **NS** rating in the subcategory of ***Coverage*** will make the entire category of ***Investigation*** an **NS**. However, an **NS** in a category does <u>not</u> automatically make the ***Overall*** rating an **NS**. Good claims judgment should be used when deciding whether the ***Overall*** rating is **NS**. The ***Overall*** should be **NS** when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

The review criteria are available via the following links:

1. **CSR SPR Criteria**
   CSR Criteria Link

2. **Total Theft/Fire SPR Criteria**
   Total Theft Criteria Link

3. **PRU SPR Criteria**
   PRU Criteria Link

4. **Suit SPR Criteria**
   CU Suit Criteria Link

5. .**TCR/CU/PIP SPR Criteria**
   TCR/CU/PIP Criteria Link

XIV- 2

**CONFIDENTIAL**

3/2/06

## B. SPR Keying:  Entering and Editing

The on-line Performance Review system is located on the <u>CHO Direct Net site</u>.  Select the **Staff Dept** site and choose **Claims Home Office**.  Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**.  The link below may also be utilized:

<u>SPR System Link</u>

In order to enter an SPR, choose **Claims Reporting System** and click **Submit**.  You are now in the Claims Reporting system. To enter a SPR click **SPR Forms**.  You will then have three choices:

- **Enter** a Review for a SPR
- **Edit** a Previously Entered Review for a SPR
- **Search** for a Review by Claim Number.

Click **Enter a Review for a SPR**.

Enter the associate number of the file handler being reviewed and click the type of SPR to be completed:

- **CSR** – CSR and CSRII
- **Total Theft** – Total Theft and Fire
- **PRU** – Payment Recovery Unit
- **Suit SPR** – Suit files only
- **TCR CU SPR** – TCRI, TCRII, PIP & CU (non-suit only)

The on-line SPR system has been designed to help the reviewer with questions of how to complete any portion of the form.  Hold the cursor over the particular area in question and instructions will pop up regarding the screen of what should go in each box. If you attempt to submit a SPR that has not been properly completed, the system will take you back to the area that needs to be completed or corrected.

When you have properly completed the SPR you must select **Submit/Print Preview** to enter the completed form into the Claims Reporting System or print the completed SPR. The supervisor should review completed SPR's with the file handler to keep the associate up to date on their performance and use the review as an opportunity to coach when appropriate.

XIV- 3

3/2/06

If the supervisor chooses not to use the Claims Reporting System to complete SPR's or uses some alternative form of performance review, **they must retain the completed reviews for a period of not less then 18 months** or longer if the file handler's performance is considered substandard.

The Claims Reporting System allows the user to edit a previously completed review if corrections are necessary. Simply select **Edit a Previously Entered Review** in the Claims Reporting System. Select the type of review to be corrected, the file handler's associate number and month and year of the review to be edited.

If needed, the Claims Reporting System also allows the user to search for a previously completed SPR by claim number; this is the third option of the system. Select **Search for a Review by Claim Number**, then type in the claim number and type of review you want to retrieve.

## III. Claims Reporting System – Roll-up Reports

The on-line Performance Review System Roll-up Report is located on Direct Net. Select the **Staff Dept** site and choose **Claims Homes Office**. Once in the Claims Home Office section of the site, click on to **Performance Review** and then choose the **Claims Roll-up Reporting System**. The link below may also be utilized:

Reporting System Link

To review a Roll-up Report, choose **Claims Reporting System** and click **Submit**. You are now in the Claims Reporting System. To review any of the Roll-up reports, click **Rollup Reports**. You have three choices for the time frame you want to review:

- **Week** – For reviewing results for one or multiple weeks
- **Month** – For reviewing results for a particular month
- **Year** – For reviewing results for the year to date

Choose the type of report you want to review. There are four choices:

- **Individual** – For reviewing the results of a single individual. Enter the associate number, section code and the FCC applicable to the individual.

XIV - 4

**CONFIDENTIAL**

- **Supervisor** – For reviewing the results of a particular Supervisor's unit. Enter the section code and FCC applicable to the unit.
- **Manager** – For reviewing the results of all units by level. Enter the FCC applicable to the units.
- **Regional** – For reviewing the results of each level in a region or profit center. Enter the FCC applicable to the region or profit center.

Once you have chosen the time frame and report type you want to review, click **Submit**. This will take you to the summary report of the results for review and analysis. You may also obtain more detailed roll up reports by clicking on any of the areas which are highlighted; such as, the associate number, section code or reports.

## IV. TIP Requirements

### A. 1-Hour Attempt TIP

File handlers will have 1-Hour <u>from the time of an initial assignment</u> to *attempt contact*[1] on all interested parties. This will be measured between the hours of 8:00 a.m. and 8:00 p.m.[2] on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. For those losses reported outside of these time frames, 1-Hour Attempt is exempt **(N/A)**, but 24-Hour Contact TIP guidelines still apply.

CHO recommends that the profit centers develop alternate off-hour staffing plans to address 1-Hour Attempt TIP on weekends and holidays. These teams may be staffed with TCRI's, TCRII's and file handlers who will satisfy the TIP requirements after traditional hours, regardless of the level of the claim. For example, a TCRI making 1-Hour Attempt on a CU level file has satisfied the TIP requirement.

\* The 1-Hour Contact Attempt is exempt (N/A) on new losses for those interested parties who have already spoken directly to a GEICO file handler at the same level to which the claim was assigned. Transfers within the same level are also exempt from the 1-Hour Attempt; however, transfers within the same level **are** subject to the 24-Hour Contact requirement. Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence may be exempt **(N/A)** from 24-Hour Contact. To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer to facilitate proper file handling.

In cases where GEICO has been notified that a suit has been filed against our insured, the assigned CU examiner will have 1-Hour to make contact with that insured.

---

[1] Attempted contact is placing a call, but not being able to leave a message.
[2] All times in Part IV are local.

XIV - 5

**CONFIDENTIAL**

**B. 24-Hour Contact TIP**

File handlers will have 24 hours from the time of an initial assignment, transfer from another claims level or once additional information is received to make *actual contact*[3] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact. For example, a file transferred from TCRII to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact. To qualify for this exemption, the ALOGI/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message. In these cases, aggressive attempts should be made to contact the interested party. Such attempts need to be clearly documented in ALOGI/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

**C. Interested Parties**

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-Hour Attempt and 24-Hour Contact TIP.

The following interested parties **are subject** to 1-Hour Attempt and 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers

---

[3] Actual contact is placing a call, then either talking to the person or leaving a message.

XIV - 6

**CONFIDENTIAL**

- Claimant owner and/or spouse
- Claimant driver

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-Hour Attempt is exempt **(N/A)** but the 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## * D. Internet

### 1. Inquires:

a. **2 Hour TIP**. All email "Inquiries" must be acknowledged and responded to **within two hours of receipt in the profit center's GEM mailbox** and in accordance with the TIP guidelines outlined below. Contact attempts must be made by telephone or CHO approved email templates. Contact by the ICSR does not constitute TIP on Upper Level or AD inquiries, unless such contact completely satisfies all aspects of the inquiry.

b. **Date and Time**. "Inquiry" TIP will be measured during the following times:

CSR units:
   8:00 a.m. – 8:00 p.m., Monday through Saturday
   10:00 a.m. and 6:00 p.m. on Sundays and holidays

All other claims units:
   8:00 a.m. – 4:30 p.m., Monday through Friday only.

**The two hour TIP will begin at 8:00 a.m. the next business day only for inquiries that come in after-hours**.

c. **Customer Specified Time**. The standard two-hour contact TIP will not apply when the customer indicates a "best time to contact" on their email inquiry. If a specific time is indicated, contact must be made within 2 hours (+/-) of that time. The following parameters will also apply:

**"Morning"** – anytime between 8:00 a.m. (10:00 a.m. on Sundays and holidays) and 11:59 a.m.
**"Afternoon"** – anytime between 12:00 p.m. and 5:59 p.m.
**"Evening"** – anytime between 6:00 p.m. and 9:00 p.m.
**"Holiday"** – refers to the holiday's actual calendar date, not necessarily the date observed by the company.

XIV- 7

8/2/07

CONFIDENTIAL

**d. Inquiry/Response Retention**. A copy of all "Inquiry" emails and our response to those questions must be retained, by either copy/pasting to ALOGI, or by scanning a printed copy to the ECF file.

**e. Response Quality**. The ICSR may respond using an email template alone if an email template satisfies all aspects of the inquiry. The GEM email templates have been approved by Claims Home Office. Additional email templates will require CHO approval. Email should not be used to communicate with customers other than by the approved GEM email templates or in the exception situations outlined in the Claims Email Policy. The use of any "free form" email is unacceptable.

## 2. Loss Reports:

**a. One Hour TIP.** Internet loss reports must be established, assigned and TIP must be attempted within 1 hour of receipt in GEM mailbox. If the loss is not automatically established and assigned via ATLAS, upper level file handlers will have 1-Hour from the time of an initial assignment to *attempt contact* on all interested parties. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and holidays.

> If an INET loss report is received after-hours, **one hour TIP** will begin at 8:00 a.m. the next applicable business day.

**h. Out-of-Region Guidelines.** TIP will be measured according to the previously stated TIP guidelines, from the time the new loss is assigned to the handing region's adjuster code (or notice is given to the handling region).

XIV- 8

**CONFIDENTIAL**

8/2/07

# SLIP SHEET

CONFIDENTIAL
CONFIDENTIAL

# CHAPTER XIV

## Liability Performance Review

The objective of performance reviews is to ensure that files are being handled in accordance with state regulatory and company procedures and standards. By conducting reviews and analyzing trends, execution and results can be accurately measured. When appropriate, enhancements are made and coaching is provided in situations where the performance is not at the desired level.

Performance review criteria and guidelines may be accessed via the link below.

\*    Performance Review Criteria and Guidelines

## I.  Claims Reporting System – Call Handling

### A. Monitoring Purpose:
Incoming calls are recorded and evaluated as part of an ongoing effort to maintain and improve the quality of our customer interactions, our compliance with state and local laws, and our promotion of fair claims practices. These recordings are not, and will not, be used for claims investigative purposes.

### B. Review Criteria:

The review criteria for **CSR** and **TCRI** level calls are not meant to be an exhaustive check list to be used by the reviewer; it is meant to be used as a Company-wide guideline. Standards applicable to each category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center.

Ratings for each category consist of "SAT" or "Non-SAT." Good claims judgment and common sense should be used when deciding upon the rating.

## II. Claims Reporting System – File Handling

### A. Review Criteria and SPR Forms

The criteria for each Claim Level are not meant to be an exhaustive check list to be used by the reviewer; rather, it is meant to be a Company-wide guideline. Standards applicable to each category and each sub-category will be measured against the performance requirements set forth in the review criteria listed below. Each location may enhance the criteria to include state specific requirements in their profit center and are **encouraged** to use stricter standards.

XIV - 1

**CONFIDENTIAL**

3/25/09

Ratings to be used will be the following:

- **S** (Satisfactory) -    Documentation/performance in accordance with company and state regulatory requirements
- **NS** (Not Satisfactory) -    Documentation./performance which is below acceptable standards
- **N/A** (Not Applicable) -    Does not apply.

An **NS** in any subcategory <u>automatically</u> makes the category an **NS**; for example, an **NS** rating in the subcategory of *Coverage* will make the entire category of *Investigation* an **NS**. However, an **NS** in a category does <u>not</u> automatically make the *Overall* rating an **NS**. Good claims judgment should be used when deciding whether the *Overall* rating is **NS**. The *Overall* should be **NS** when the performance is substandard and affects critical areas of the case and violates company policy or is a violation of an Unfair Claims Practice Act.

## III.    TIP Requirements

### A. 24-Hour Contact TIP

File handlers will have 24 hours from the <u>time of an initial assignment, transfer from another claims level</u> or <u>once additional information is received</u> to make *actual contact*[1] with all interested parties who require contact.

The insured may be notified of a file transfer via letter provided posture of the case has not changed since the last contact. For example, a file transferred from TCRII to CU due to age of the case would be exempt **(N/A)** from 24-Hour Contact with respect to the insured. However, a case transferred from TCRI to TCRII due to a recently discover third party injury, would require telephone contact with the insured within 24 hours by the newly assigned TCRII to discuss the latest developments. If the insured was already aware of the injury prior to transfer, then the 24-Hour TIP would be exempt **(N/A).**

Cases transferred within the same level due to reasons such as turnover, promotions or leaves of absence will be exempt **(N/A)** from 24-Hour Contact. To qualify for this exemption, the ALOGl/Activity Log must be documented as such at the time of transfer. Although TIP may be exempt, the merits of the case may require **immediate** telephone contact with the customer.

CHO recognizes that there are situations where we have a valid phone number, but are not able to leave a message. In these cases, aggressive attempts should be made to contact the interested party. Such attempts need to be clearly documented in ALOGl/Activity Log in order to satisfy the 24-Hour Contact TIP requirement.

---

[1] Actual contact is placing a call, then either talking to the person or leaving a message.

XIV - 2

3/25/09

CONFIDENTIAL

## B. Interested Parties

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 24-Hour Contact TIP.

The following interested parties **are subject** to 24-Hour Contact TIP:

- Named insured and/or spouse
- Insured driver
- All passengers
- Claimant owner and/or spouse
- Claimant driver

**All** attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 24-Hour Contact TIP requirement is required. Contact with an adult or any resident relative is acceptable for minors.

## C. Internet

### 1. Inquires:

a. **2 Hour TIP**. All email "Inquiries" must be acknowledged and responded to **within two hours of receipt in the profit center's GEM mailbox** and in accordance with the TIP guidelines outlined below. Contact attempts must be made by telephone or CHO approved email templates. Contact by the ICSR does not constitute TIP on Upper Level or AD inquiries, unless such contact completely satisfies all aspects of the inquiry.

b. **Date and Time**. "Inquiry" TIP will be measured during the following times:

CSR units:
   8:00 a.m. – 8:00 p.m., Monday through Saturday
   10:00 a.m. and 6:00 p.m. on Sundays and holidays

All other claims units:
   8:00 a.m. – 4:30 p.m., Monday through Friday only.

**The two hour TIP will begin at 8:00 a.m. the next business day only for inquiries that come in after-hours**.

XIV - 3

CONFIDENTIAL

3/25/09

c. **Customer Specified Time**. The standard two-hour contact TIP will not apply when the customer indicates a "best time to contact" on their email inquiry. If a specific time is indicated, contact must be made within 2 hours (+/-) of that time. The following parameters will also apply:

**"Morning"** – anytime between 8:00 a.m. (10:00 a.m. on Sundays and holidays) and 11:59 a.m.
**"Afternoon"** – anytime between 12:00 p.m. and 5:59 p.m.
**"Evening"** – anytime between 6:00 p.m. and 9:00 p.m.
**"Holiday"** – refers to the holiday's actual calendar date, not necessarily the date observed by the company.

d. **Inquiry/Response Retention**. A copy of all "Inquiry" emails and our response to those questions must be retained, by either copy/pasting to ALOGI, or by scanning a printed copy to the ECF file.

e. **Response Quality**. The ICSR may respond using an email template alone if an email template satisfies all aspects of the inquiry. The GEM email templates have been approved by Claims Home Office. Additional email templates will require CHO approval. Email should not be used to communicate with customers other than by the approved GEM email templates or in the exception situations outlined in the Claims Email Policy. The use of any "free form" email is unacceptable.

2. **Loss Reports:**

a. **One Hour TIP.** Internet loss reports must be established, assigned and TIP must be attempted within 1 hour of receipt in GEM mailbox. If the loss is not automatically established and assigned via ATLAS, upper level file handlers will have 1-Hour <u>from the time of an initial assignment</u> to *attempt contact* on all interested parties. This will be measured between the hours of 8:00 a.m. and 8:00 p.m. on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and holidays.

> If an INET loss report is received after-hours, **one hour TIP** will begin at 8:00 a.m. the next applicable business day.

b. **Out-of-Region Guidelines.** TIP will be measured according to the previously stated TIP guidelines, from the time the new loss is assigned to the handing region's adjuster code (or notice is given to the handling region).

XIV - 4