UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CANDACE HARPER, Individually and on Behalf of All Other Persons Similarly Situated, | * | |
| | * | |
| Plaintiff | * | |
| | * | Case No.:  09-CV-2254-LDW-GRB |
| vs. | * | |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY | * | |
| | * | |
| Defendant | | |

**DEFENDANT'S MOTION TO
DECERTIFY PLAINTIFFS' COLLECTIVE ACTION**

Eric Hemmendinger, Esq.
Teresa D. Teare, Esq.
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD  21201
410-752-1040 Telephone
410-752-8861 Facsimile
eh@shawe.com
tdt@shawe.com

Barry I. Levy, Esq.
Kenneth A. Novikoff, Esq.
RIVKIN RADLER
RXR Plaza, Uniondale, NY  11556
516-357-3000 Telephone
516-357-3333 (212) 953-7201 Facsimile
barry.levy@rivkin.com
ken.novikoff@rivkin.com

July 19, 2013          *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CANDACE HARPER, Individually and on Behalf of All Other Persons Similarly Situated, | * | |
| | * | |
| Plaintiff | * | Case No.: 09-CV-2254-LDW-GRB |
| | * | |
| vs. | * | |
| | * | |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY | * | |
| | * | |
| Defendant | | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on this 19th day of July, 2013, a copy of

Defendant's Notice of Motion to Decertify Plaintiffs' Collective Action, Memorandum of Law

in Support thereof, and accompanying Exhibits were electronically mailed to:

| | | |
|---|---|---|
| Jeffrey A. Klafter<br>Seth R. Lesser<br>Fran L. Rudich<br>Michael Palitz<br>Rachel Berlin<br>KLAFTER, OLSEN & LESSER LLP<br>Two International Drive, Suite 350<br>Rye Brook, NY 10573 | Bradley I. Berger<br>BERGER & ASSOCIATES<br>321 Broadway<br>New York, NY 10007 | Marilyn T. McGoldrick<br>THORNTON & NAUMES, LLP<br>100 Summer Street, 30th Floor<br>Boston, MA 02110<br><br>*Attorneys for Plaintiffs* |

*/s/*

_____

Eric Hemmendinger

Doc.#368391

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CANDACE HARPER, Individually and          *
on Behalf of All Other Persons Similarly
Situated,                                 *

               Plaintiff          *          Case No.: 09-CV-2254-LDW-GRB

       vs.                                    *

GOVERNMENT EMPLOYEES                       *
INSURANCE COMPANY
                      *

           Defendant
_____/

## NOTICE OF MOTION TO DECERTIFY
## PLAINTIFFS' COLLECTIVE ACTION

PLEASE TAKE NOTICE that, upon (i) the Declaration of Howard Dickstein, dated July 18, 2013; (ii) the Declaration of Eric Hemmendinger, dated July 19, 2013; (iii) Defendants' Memorandum of Law in Support of Motion to Decertify Plaintiff's Collective Action, dated July 19, 2013; and (iv) upon all the prior proceedings heretofore had herein, Defendant Government Employees Insurance Company, shall move this Court for an order decertifying the collective action, together with any such other or further relief that the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to the schedule established by the Court in connection with this matter, (i) Plaintiffs' service of opposing papers and legal memoranda shall be made on or before August 5, 2013, and (ii) Defendant's service of its reply papers and legal memoranda shall be made on or before August 15, 2013.

Dated:  July 19, 2013

Respectfully submitted,

/s/

Eric Hemmendinger, Esq.
Teresa D. Teare, Esq.
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD  21201
410-752-1040 Telephone
410-752-8861 Facsimile
eh@shawe.com
tdt@shawe.com

Barry I. Levy, Esq.
Kenneth A. Novikoff, Esq.
RIVKIN RADLER
RXR Plaza, Uniondale, NY  11556
516-357-3000 Telephone
516-357-3333 (212) 953-7201 Facsimile
barry.levy@rivkin.com
ken.novikoff@rivkin.com

*Attorneys for Defendant*

Doc.#368481

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

EXHIBIT LIST ............................................................................................... iv

INTRODUCTION ........................................................................................... 1

STATEMENT OF RELEVANT FACTS ............................................................ 2

ARGUMENT ..............................................................................................  15

I.   THE STAGE TWO STANDARD ................................................................ 15

II.  THE LEGAL FRAMEWORK FOR THIS CASE ......................................... 17

III. THE COLLECTIVE ACTION SHOULD BE DECERTIFIED ...................... 18

     A.   Plaintiffs Perform Administrative Work ....................................... 18

     B.   Testimony From the Representative Plaintiffs Demonstrate
          That Some Exercise Discretion and Independent Judgment
          as to Matters of Significance ....................................................... 19

     C.   Plaintiffs' Arguments Should Be Rejected .................................. 20

CONCLUSION ............................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>PAGES</u>

*Blinston v. Hartford Accident and Indem. Co.,*
441 F.2d 1365 (8th Cir. 1971) ...................................................................................18

*Cheatham v. Allstate Ins. Co.,*
465 F.3d 578 (5th Cir. 2006) ...............................................................................18, 21

*Comcast Corp. v. Behrend,*
133 S. Ct. 1426 (2013)................................................................................................15

*Damassia v. Duane Reed,*
250 F.R.D. 152 (S.D.N.Y. 2008) ...............................................................................15

*Davis v. J.P. Morgan Chase,*
587 F.3d 529 (2d Cir. 2009)........................................................................................17

*Espenscheid v. DirectSat USA LLC,*
705 F.3d 770 (7th Cir. 2013) ...........................................................................15, 16, 22

*In re Farmers Ins. Exch.,*
481 F.3d 1119 (9th Cir. 2007) .............................................................................18, 21

*Foster v. Nationwide Mut. Ins. Co.,*
710 F.3d 640 (6th Cir. 2013) .....................................................................................18

*Frye v. Baptist Memorial Hosp.,*
495 Fed. Appx. 669 (6th Cir. 2012)............................................................................22

*Gardner v. Western Beef Properties,*
No. 07–CV–2345, 2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013) .........................16, 17

*Genesis Healthcare Corp. v. Symczyk,*
133 S. Ct. 1523, 1530 (2013)......................................................................................16

*Hoffmann-La Roche v. Sperling,*
493 U.S. 165 (1989)....................................................................................................16

*Johnson v. Big Lots Stores, Inc.,*
561 F. Supp. 2d 567 (E.D. La. 2008)..........................................................................17

*McAllister v. Transamerica Occidental Life Ins. Co.,*
325 F.3d 997 (8th Cir. 2003) .....................................................................................18

*Munizza v. State Farm Mut. Auto Ins. Co.,*
103 F.3d 139 (table), 1996 WL 711563 (9th Cir. 1996)............................................18

*Myers v. The Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010).........................................................................................15

*RBS Citizens v. Ross,*
133 S. Ct. 1722 (2013)..................................................................................................15

*Robinson-Smith v. GEICO,*
590 F.3d 886 (D.C. Cir. 2010)................................................................................18, 21

*Roe-Midgett v. CC Services,*
512 F.3d 865 (7th Cir. 2008) ..................................................................................18, 21

*Talbert v. Am. Risk Ins. Co.,*
405 Fed. Appx., 848 (5th Cir. Dec. 20, 2010) .............................................................18

*Tracy v. NVR Inc.,*
No. 04–CV–6541L, 2013 WL 1800197, at *2 (W.D.N.Y. Apr. 29, 2013) ......................15, 16, 22

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011)........................................................................................16, 20, 22

*White v. Western Beef Properties,*
No. 07 CV 2345, 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013)...................................16

## STATUTES, RULES AND REGULATIONS

29 C.F.R. § 541.200(a)(3)..............................................................................................17
29 C.F.R. § 541.202(c)...................................................................................................18
29 C.F.R. § 541.203(a).............................................................................................1, 17, 18

*Preamble,* 69 Fed. Reg. at 22143..................................................................................18
69 Fed. Reg. at 22144 (April 23, 2004) ...................................................................17, 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CANDACE HARPER, Individually and
on Behalf of All Other Persons Similarly
Situated,

               Plaintiff

               vs.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY

               Defendant

Case No.: 09-CV-2254-LDW-GRB

## **LIST OF EXHIBITS**

| Exhibit No. | Description |
|:-----------:|-------------|
| 1 | Declaration of Howard Dickstein |
| 2 | TCR 1 Training |
| 3 | Kirkland Claim IQ Reports |
| 4 | Schmidt Affidavit |
| 5 | Brengle Affidavit |
| 6 | M. Brown Affidavit |
| 7 | Abel Affidavit |
| 8 | Bernard Deposition Transcript |
| 9 | Bezold Deposition Transcript |
| 10 | Carr Deposition Transcript |

| 11 | Courtnage Deposition Transcript |
|----|--------------------------------|
| 12 | Harper Deposition Transcript |
| 13 | Hughes Deposition Transcript |
| 14 | Kirkland Deposition Transcript |
| 15 | Norris Deposition Transcript |
| 16 | Roberson Deposition Transcript |
| 17 | S. Brown Deposition Transcript |
| 18 | Schott Deposition Transcript |
| 19 | Torres Deposition Transcript |
| 20 | Declaration of Eric Hemmendinger |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CANDACE HARPER, Individually and on Behalf of All Other Persons Similarly Situated, | * | |
| | * | |
| Plaintiff | * | |
| | * | Case No.:  09-CV-2254-LDW-GRB |
| vs. | * | |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY | * | |
| | * | |
| Defendant | | |

/

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DECERTIFY PLAINTIFFS' COLLECTIVE ACTION

### INTRODUCTION

Plaintiffs' central theory in this case is that GEICO's Telephone Claims Representatives ("TCR") are so closely supervised in the performance of their job duties that they do not exercise discretion and independent judgment.  That theory was contradicted by one of the first opt-in Plaintiffs whom GEICO deposed as well as by others thereafter in both their deposition testimony and affidavits provided to GEICO after they elected to withdraw from the case.  Nadia Kirkland, who worked as a TCR I and II in GEICO's Virginia Beach claim office, testified that she performed adjuster duties listed in the administrative exemption regulation, 29 C.F.R. § 541.203(a), including evaluating and making recommendations concerning coverage, interviewing insureds and witnesses, determining liability and total value of a claim and negotiating settlements, without the involvement of her supervisor.  Kirkland's testimony, along with the testimony of others like her, leaves the Plaintiffs with two choices.  Either the other 314

1

opt-in Plaintiffs are similar to Kirkland *et al.*, in which case Plaintiffs' position that they are all closely supervised is factually incorrect, or that they are different from Kirkland *et al.*, in which case they are not similarly situated. Either way, a class-wide adjudication that the Plaintiffs are closely supervised is impossible based on the record in this case, which makes it pointless for this case to proceed further as a collective action. Furthermore, even if a class-wide adjudication of liability were feasible, there are factual variations preventing a class-wide adjudication of the remedy.

## STATEMENT OF RELEVANT FACTS

This collective action consists of 315 present and former GEICO employees who were employed in the job classifications of Telephone Claim Representative I and/or II. GEICO employs TCRs in ten regional offices in nine (9) separate locations in the United States including Woodbury, NY; Buffalo, NY; Virginia Beach, VA; Macon, GA; Lakeland, FL; Fredericksburg, VA; Dallas, TX; Tucson, AZ and San Diego, CA. *See* http://careers.geico.com/careers/office-locations

TCR Is adjust property damage claims, addressing coverage and liability issues as well as first-party (GEICO policyholders) medical claims. TCR IIs adjust claims that include a bodily injury. Both job classifications evaluate and make recommendations concerning coverage, investigate claims by interviewing claimants, insureds and other witnesses, determine liability, which controls the percentage of the damages (if any) that GEICO will pay, and negotiate liability percentages with claimants or other insurance carriers. In addition, TCR IIs evaluate, negotiate and settle bodily injury claims, typically negotiating with claimants' lawyers. *See* Ex. 1, Dickstein Dec. ¶ 6. TCRs generally work in units of five to eight, all reporting to a supervisor. *See* Ex. 9, Bezold Tr. at 122; Ex. 12, Harper Tr. at 203; Ex. 13, Hughes Tr. at 32.

The supervisors to whom the TCRs report often change due to promotions, transfers and reorganizations. See Ex. 10, Carr Tr. at 97; Ex. 13, Hughes Tr. at 32.

The first step in handling a claim is evaluating the existence of coverage. The Plaintiffs' testimony concerning the amount of autonomy they exercised in performing this function varied. For example, some of the Plaintiffs testified that if they determine good coverage, they proceed to the liability investigation without seeking supervisory approval unless they feel they need guidance. *See* Ex. 9, Bezold Tr. at 16, 24, 85-86; Ex. 10, Carr Tr. at 84; Ex. 11, Courtnage Tr. at 93-94; Ex. 15, Norris Tr. at 43; Ex. 19, Torres Tr. at 142. They fill out a Coverage Problem Worksheet containing their recommendation only if they have concluded that coverage should not be afforded. *Id.* Others testified that in all coverage questions, they fill out a coverage problem worksheet, including their recommendation regarding whether coverage should or should not be afforded, and submit it to their supervisors. *See* Ex. 13, Hughes Tr. at 114-115, 123; Ex. 14, Kirkland Tr. at 40; Ex. 16, Roberson Tr. at 69; Ex. 19, Torres Tr. at 156-157.

The next step in handling a claim is conducting an investigation. The TCRs call the policyholder, claimant(s) and other witnesses and take statements concerning the accident. *See* Ex. 1, Dickstein Dec. ¶ 7. While GEICO provides a list of potential questions for common accident scenarios in a computer program called Claim IQ, whether TCRs rely on them differs dependent on their level of confidence and experience. *See* Ex. 8, Bernard Tr. at 167-168, Norris Tr. at 54. TCRs decide what checklist questions to include and which to omit (*See* Ex. 8, Bernard Tr. at 167-168; Ex. 13, Hughes Tr. at 56, Norris Tr. at 55) and formulate their own follow up questions in order to clarify the facts and probe inconsistencies. *See* Ex. 8, Bernard Tr. at 167-168; Ex. 9, Bezold Tr. at 25; Ex. 17, S. Brown Tr. at 78; Ex. 12, Harper Tr. at 65-66; Ex. 13, Hughes Tr. at 56; Ex. 14, Kirkland Tr. at 46; Ex. 19, Torres Tr. at 199. TCRs also gather

3

evidence from other sources, including medical records (Ex. 10, Carr Tr. at 69), police reports (Ex. 12, Harper Tr. at 58; Ex. 19, Torres Tr. at 176) and photographs (Ex. 10, Carr Tr. at 69). The TCRs normally perform these investigations on their own. See Ex. 9, Bezold Tr. at 151; Ex. 17, S. Brown Tr. at 52; Ex. 13, Hughes Tr. at 83, Norris Tr. at 132.

Once the TCRs believe the investigation is sufficient to make a decision, the TCRs assess the evidence to determine liability. Liability can range from zero to 100 percent. Most states follow the doctrine of comparative negligence, which means that the liability can be shared. For example, in a claim governed by pure comparative negligence, the TCR could determine that GEICO's policyholder was 30 percent liable and the claimant was 70 percent liable. In this example, GEICO would pay 30 percent of the damages. See Ex. 1, Dickstein Dec. ¶ 8.

The liability module of Claim IQ lists, for common accident scenarios, possible breaches of the duty of care for the TCRs to consider, such as "observe right of way," "respect control of intersection," or "conform to traffic code." Based on their investigations, the TCRs independently decide, for each driver, whether there was a breach, and if so, the extent to which the breach was the cause of the accident, the choices being "no breach," "Y[es]-low," "Y-Medium" and "Y-High." See Ex. 2, TCR I Training 9. After the TCRs enter their opinions concerning the breaches, Claim IQ converts the TCRs assessments (no breach, low, medium high) into recommended liability percent ranges for each driver, normally with a 20 point spread. Thus, based on the TCR's assessments, Claim IQ could recommend that GEICO's policyholder was 20 to 40 percent liable and the claimant was 60 to 80 percent liable. For each driver, the TCRs choose a liability percent and then enter it into Claim IQ. See Ex. 2, TCR 1 Training 10.

The TCRs cannot "enter the breaches" without having first decided, based on their investigations, the cause and/or causes of the accident. See Ex. 2, TCR 1 Training 9. In other

4

words, the program's recommended liability ranges are simply a reflection of the TCR's own assessments of fault on the scale of no breach, low, medium or high. TCRs enter the breaches so that Claim IQ will match their own conclusions regarding liability, and have the ability to re-enter the breaches if the Claim IQ range is not what they had anticipated. *See* Ex. 9, Bezold Tr. at 39-40; Ex. 14, Kirkland Tr. at 55-56; Ex. 16, Roberson Tr. at 30-31, 85; Ex. 19, Torres Tr. at 207. TCRs are not bound by the Claims IQ recommendation. *See* Ex. 2, TCR 1 Training 10; Ex. 9, Bezold Tr. at 93-95.

The testimony demonstrates that while TCRs normally make liability determinations independent of any immediate supervision, the amount and nature of supervisory involvement varied from employee to employee and from supervisor to supervisor. For example:

- **Bernard** entered the breaches without consulting her supervisor. *See* Ex. 8, Bernard Tr. at 165.

- **Bezold** made liability decisions and entered them into Claim IQ. If the liability range generated by Claim IQ differed from her expectation, she would either discuss it with her supervisor or simply go back and redo the breaches to make it conform to her own judgment. *See* Ex. 9, Bezold Tr. at 39-40.

- **M. Brown** stated that she entered her own evaluation of liability without supervisory involvement. *See* Ex. 6, M. Brown Aff. at ¶ 5.

- **S. Brown** went to her supervisor for help inputting the breaches on her own volition but that was the exception, not the rule. *See* Ex. 17, S. Brown Tr. at 80, 177-178. She was required to consult her supervisor only if she was recommending that GEICO accept 100% liability. *See* Ex. 17, S. Brown Tr. at 176.

- **Carr** testified that some of the time she made liability determinations in Claim IQ without supervisory input. *See* Ex. 10, Carr Tr. at 144.

- **Courtnage** testified that she did not need supervisory approval to make liability determinations. *See* Ex. 11, Courtnage Tr. at 143.

- **Harper** testified that she "sometimes" discussed liability percents with her supervisor. *See* Ex. 12, Harper Tr. at 119.

- **Hughes** testified that that as a TCR I, he made liability determinations independently 50%-70% of the time. *See* Ex. 13, Hughes Tr. at 72.

- **Kirkland** testified that she made liability determinations without any supervisory input. *See* Ex. 14, Kirkland Tr. at 29, 54-55. In five years as TCR I and II, she could only recall one time that a supervisor changed her liability decision. *See* Ex. 14, Kirkland Tr. at 36.

- **Norris** filled in the breaches without supervisor input. *See* Norris Tr. at 65.

- **Roberson** testified that he would input the breaches before his supervisor reviewed the claim if he was confident in his decision. *See* Ex. 16, Roberson Tr. at 19-21.

- **Schmidt** stated that she made liability decisions without supervisory involvement. *See* Ex. 4, Schmidt Aff. at ¶ 11(e).

- **Torres** served as a TCR I briefly. He sought his supervisor's advice on liability determinations if he did not have experience with the issue. He handled 70% of the liability determinations on his own. *See* Ex. 19, Torres Tr. at 187-190, 194.

TCR IIs perform the same work as TCR Is but have the additional responsibility of adjusting bodily injury claims with exposures up to the $25,000. *See* Ex. 1, Dickstein Dec. at ¶ 6. TCR IIs enter into Claim IQ accident-related medical expenses as well as a number of

subjective determinations concerning the effect of the claimant's injuries, after which the program returns a recommended settlement range. Ex. 4, Schmidt Aff., ¶ 14-16.   The TCR IIs are not required to use that recommendation and may choose a settlement range based on their own independent evaluation of the claim. Ex. 4, Schmidt Aff., ¶ 16.   Furthermore, some types of injuries are outside the scope of Claim IQ. *See* Ex. 11, Courtnage Tr. at 176; Ex. 14, Kirkland Tr. at 82. The settlement range typically spans thousands of dollars. *See* Ex. 3, Kirkland Claim IQ Reports.  For claims in New York State, in contrast to others, the TCR II also has the responsibility of recommending whether the claim has "pierced" the no-fault threshold for purposes of determining whether any form of payment should be made. *See* Ex. 12, Harper Tr. at 27.  Additionally, TCR IIs do not use Claim IQ for bodily injury claims in Montana. See Ex. 11, Courtnage Tr. at 148.

In some instances, supervisors required TCR IIs to obtain the supervisors' prior settlement authorization before entering into negotiations. *See* Ex. 8, Bernard Tr. at 75; Ex. 17, S. Brown Tr. at 126-27; Ex. 10, Carr Tr. at 95.  Some supervisors allowed TCR IIs to negotiate settlements within the TCR IIs' own authority level without supervisory approval, and required them to seek approval only if the settlement exceeded that level. *See* Ex. 11, Courtnage Tr. at 152-154; Ex. 14, Kirkland Tr. at 77, 83; Norris Tr. at 176; Ex. 16, Roberson Tr. at 35;  Ex. 4, Schmidt Aff. at ¶ 12(e).  One of Bezold's supervisors required her to obtain approval for settlements within Bezold's own authority while the other did not. *See* Ex. 9, Bezold Tr. at 50-52.

Once the negotiations start, the TCR IIs have full control of the back and forth exchanges with claimants' lawyers.  The TCR IIs choose what arguments to make (Ex. 8, Bernard Tr. at 62), and assess the strength of the lawyers' arguments (Ex. 8, Bernard Tr. at 91-92).  Sometimes,

they settle claims for less than their full authorization. *See* Ex. 8, Bernard Tr. at 69; Ex. 9, Bezold Tr. at 54; Ex. 12, Harper Tr. at 102; Ex. 16, Roberson Tr. at 37-38; Ex. 18, Schott Tr. at 34.  If the negotiations do not produce an agreement, the TCR IIs decide whether to stand firm on their settlement offer or whether to seek additional authorization.  *See* Ex. 9, Bezold Tr. at 56; Ex. 14, Kirkland Tr. at 84; Ex. 18, Schott Tr. at 35-36.

The TCR IIs conduct settlement negotiations on their own, using their own independent judgment.

- **Bernard** exercised her judgment on how to negotiate to achieve a fair resolution of the claim without going back to her supervisor.  *See* Ex. 8, Bernard Tr. at 41-45.

- **Bezold's** supervisor was not involved in any of her settlement negotiation phone calls.  *See* Ex. 9, Bezold Tr. at 53.

- **M. Brown** needed to obtain her supervisor's approval only if she needed settlement authority above her own personal authority.  *See* Ex. 6, M. Brown Aff. at ¶ 8.

- **S. Brown** did not need her supervisor's approval to settle within her authority. *See* Ex. 17, S. Brown Tr. at 127.

- **Carr** testified that there were scenarios in which she negotiated to resolution without going back to her supervisor.  *See* Ex. 10, Carr Tr. at 105.

- **Courtnage** did not need to go back to her supervisor every time there was a counteroffer unless she had questions.  *See* Ex. 11, Courtnage Tr. at 153-154.

- **Harper** testified that her first supervisor discussed the arguments to make before she started negotiating a claim but made no such claim as to her second supervisor.  *See* Ex. 12, Harper Tr. at 220.  Harper did not say that she consulted her supervisor during negotiations.

- **Kirkland** negotiated without a supervisor being involved. *See* Ex. 14, Kirkland Tr. at 84.

- **Norris** did not need her supervisor's approval to settle within her authorization. *See* Ex. 15, Norris Tr. at 93, 120.

- **Roberson** testified that all this negotiation is going on without his supervisor being involved. *See* Ex. 16, Roberson Tr. at 46.

- **Schott** testified that the only time she went back to her supervisor during negotiations was when she needed additional authorization. *See* Ex. 18, Schott Tr. at 74-75.

- **Schmidt** negotiated on her own, without supervisory approval. *See* Ex. 4, Schmidt Aff. at ¶ 12(d).

If, as Plaintiffs claim, the Plaintiffs are similarly situated, then it should be possible to use any one of them as an exemplar to measure the extent of their discretion and independent judgment. For example, GEICO could choose Nadia Kirkland, an opt-in Plaintiff employed as a TCR I and II in Virginia Beach, VA. *See* Ex. 14, Kirkland Tr. at 22-23. Kirkland testified that she:

- made coverage recommendations (Ex. 14, Kirkland Tr. at 40),

- used her judgment to figure out what interview questions to ask (Ex. 14, Kirkland Tr. at 46),

- made liability decisions before she entered the breaches into Claim IQ (Ex. 14, Kirkland Tr. at 54),

- exercised independent judgment in making those liability decisions (Ex. 14, Kirkland Tr. at 20),

- made those liability decisions without her supervisor's involvement (Ex. 14, Kirkland Tr. at 29-30),

- entered the breaches in Claim IQ so that the result would match her own decisions (Ex. 14, Kirkland Tr. at 55-56), and

- negotiated and settled bodily injury claims without her supervisor's involvement (Ex. 14, Kirkland Tr. at 77, 84).

Kirkland disputed many of the statements contained in named-Plaintiff Harper's affidavit (*See* ECF No. 35-21 and Ex. 14, Kirkland Tr. at 96-104). Specifically, Kirkland disagreed with Harper's statement that she only asked questions suggested by Claim IQ (Ex. 14, Kirkland Tr. at 97), that the supervisor advised her if the liability range was appropriate and that she selected a number within that range (Ex. 14, Kirkland Tr. at 99), that she could not make a settlement offer without holding a conference with her supervisor (Ex. 14, Kirkland Tr. at 102) and that she could not consider factors outside Claim IQ in conducting her investigations (Ex. 14, Kirkland Tr. at 102-104). Kirkland's testimony demonstrates not only that she is exempt, but also that it would not be possible to extrapolate Plaintiffs' core factual theory, i.e., that the TCRs work under close supervision, to all of the Plaintiffs.

Another example is Katie Courtnage, who was employed in GEICO's Tucson, Arizona claims office as both a TCR I and TCR II. *See* Ex. 11, Courtnage Tr. at 10. As a TCR I, Courtnage resolved some coverage questions herself and in other instances made recommendations concerning coverage to her supervisor (Ex. 11, Courtnage Tr. at 96-97). During the investigation of a claim, she used her discretion to decide what investigations questions to ask (Tr. at 106) and made credibility determinations (Ex. 11, Courtnage Tr. at 166). She entered the breaches into Claim IQ (Ex. 11, Courtnage Tr. at 119-120), but testified that

10

different adjusters could come to different conclusions based on the same set of facts (Ex. 11, Courtnage Tr. at 119-120).  She negotiated settlements of liability percentages within the range without obtaining her supervisor's approval (Ex. 11, Courtnage Tr. at 125, 131-132) and without supervisory oversight (Ex. 11, Courtnage Tr. at 125, 131-132).  As a TCR II, her personal authority was $5,000 per individual or $6,000 per claim.  She did not have to obtain her supervisor's approval to negotiate a bodily injury settlement within her personal authority (Ex. 11, Courtnage Tr. at 150).  If she needed more authority, she could conference the claim with her supervisor (Ex. 11, Courtnage Tr. at 177).  Once she had authority to negotiate, she did not need to go back to her supervisor unless she had a question (Ex. 11, Courtnage Tr. at 154).  Courtnage did not agree with the assertion that her duties did not involve the exercise of independent judgment (Ex. 11, Courtnage Tr. at 181).  Like Kirkland's testimony, Courtnage's testimony demonstrates not only that she is exempt, but also that Plaintiffs' core factual theory cannot be applied as the basis for a class-wide factual determination.

During discovery in this case, GEICO was limited to deposing a fraction of the opt-Plaintiffs.  GEICO noticed the depositions of nineteen (19) of the Plaintiffs.  After being informed that their depositions were being taken, seven (7) of them filed notices of withdrawal. Four of the seven opt-outs provided affidavits to GEICO, including Laura Schmidt, Mary Brengle, Michelle Brown and Crystal Able.  The number of opt-outs, along with their testimony, further refutes the claim that the TCRs are similarly situated with respect to Plaintiffs' central claim.

Laura Schmidt disagreed with Plaintiffs' theory that Claim IQ rendered her a "computerized monkey."  *See* Ex. 4, Schmidt Aff. ¶ 8.  She stated in her affidavit that she was

employed as a TCR I from July 2010 to February 2011, when she was promoted to her current

job as a TCR II. She described a telephone call she received from Plaintiff's counsel.

> When I understood that Plaintiffs allege that TCR I and TCR IIs do not make
> liability decisions and do not have any discretion in evaluating claims for
> settlement value, I explained to Mr. Palitz and Ms. Berlin that I did not agree with
> those propositions. I advised them that I conducted the investigation and make
> my own liability decisions without supervisory approval. I took offense that they
> perceived my job to be that of a "computerized monkey" and had the wrong
> impression of the positions. Mr. Palitz told me I should consider answering the
> questions during the deposition in a way that made it seem I had no independent
> judgment or discretion. I did not feel comfortable with the words he was asking
> me to use and did not want to perjure myself.

*See* Ex. 4, Schmidt Aff. ¶¶ 7-9.

Schmidt went on to describe that as a TCR I, using her own judgment, and without

supervisory approval, she:

- afforded coverage when warranted,

- recommended denials of coverage,

- investigated claims,

- decided liability before going into Claim IQ,

- denied liability,

- reviewed first party medical bills and denied them for excessive treatment or
  unrelated injuries,

- referred suspicious claims to the Special Investigations Unit,

- initiated and defended subrogation claims, and

- defended arbitration claims.

*See* Ex. 4, Schmidt ¶ 11. Aff. Ms. Schmidt further explained that as a TCR II, using her own

judgment, and without supervisory approval, she also evaluates settlement demands, determines

the settlement range, negotiates settlements within her authority of $3,000 per person or $6,000

12

per accident, requests additional authority, and conducts settlement negotiations. *See* Ex. 4, Schmidt Aff. at ¶ 12.

Mary Brengle is employed in GEICO's Lakeland, Florida claims office and has been employed as both a TCR I and TCR II. *See* Ex. 5, Brengle Aff. She also disagreed with Plaintiffs' factual theory:

> On March 27, 2013 during my lunch break I received a call from one of the Plaintiffs' lawyers about my deposition. The purpose of the call was to prepare me for my deposition. During the call he asked me questions about my use of Claim IQ. I felt he had the wrong perception of Claim IQ. I didn't want to be specific in my answers to him about CIQ. I felt like he was putting words in my mouth. I had to tell him that's not the way Claim IQ works. If felt he was trying to get me to say that CIQ gives you a recommendation as to the settlement, which it does, but I explained we don't have to use it as we handle each case by case. I did not feel his perception of CIQ was correct.

*See* Ex. 5, Brengle Aff.

Michele Brown is employed in GEICO's Macon, Georgia claims office, and has been employed as both a TCR I and TCR II. *See* Ex. 6, M. Brown Aff. She stated:

> In every claim, I had to determine coverage, interview claimants and insureds and other witnesses, and decide liability. I negotiated liability percents with adverse carriers and negotiated damages for personal injury with claimants and claimant's counsel. I looked out for fraudulent claims and referred them to SIU. I handled first call settlements. I used my own discretion and independent judgment in making decisions about claims.
>
> Throughout my handling of a claim, the only time I had to obtain my supervisor's approval is when I needed settlement authorization above my own authorization. I went to my supervisor if I had questions, but that was my own decision and I did not ask questions if I felt comfortable handling the situation. Also, if it was my judgment that coverage should be denied, I filled out a coverage problem worksheet with my recommendation. I took the worksheet to the Regional Liability Administrator and met with the RLA.

*See* Ex. 6, Brown Aff. at ¶¶ 3-4.

Crystal Abel was a TCR I in Fredericksburg from 2006 to 2008, when she was promoted to the position of TCR II, the position she currently holds. Ex. 7, Abel Aff. She stated in her

affidavit that "[b]oth positions of TCR I and TCR II require" "independent judgment and discretion in every aspect" of the job. Ex. 7, Abel Aff. ¶ 5. She stated that as a TCR I and II, she:

- investigates claims by gathering evidence, and in doing so, she determines who to talk to, what additional information is necessary, and the order of the investigation,

- makes coverage recommendations and can make the decision to afford good coverage or recommend that coverage be denied

- determines liability for an accident and decides liability before going into Claim IQ.

- denies liability, reviews first party medical bills and denies them for excessive treatment or unrelated injuries,

- refers suspicious claims to the Special Investigations Unit, and initiates and defends subrogation claims.

Ex. 7, Abel Aff. ¶ 6. As a TCR II, Abel stated that she evaluates settlement demands, determines the settlement range, negotiates settlements within her authority of $2,000 per person or $4,000 per accident, requests additional authority, and conducts settlement negotiations. Ex. 7, Abel Aff. ¶ 7.

Deponents admitted that some TCRs work only normal business hours (38.75 hours per week at GEICO). *See* Ex. 11, Courtnage Tr. at 32-33; Ex. 15, Norris Tr. at 20; Ex. 17, S. Brown Tr. at 14; Ex. 10, Carr Tr. at 28. The number of hours per week in excess of normal business hours that Plaintiffs claimed to have worked varies widely. The claimed average additional time was:

Weekly Hours

| | |
|---|---|
| 2.5 | Ex. 16, Roberson Tr. at 9 |
| 2.5 | Ex. 11, Courtnage Tr. at 81 |

| | |
|---|---|
| 5-8 | Ex. 14, Kirkland Tr. at 112 |
| 7-12 | Ex. 19, Torres Tr. at 102 |
| 7-15 | Ex. 12, Harper Tr. at 14 |
| 10-15 as TCR I, 10-12 as TCR II. | Ex. 17, S. Brown Tr. at 184 |
| 14 | Ex. 18, Schott Tr. at 41-42 |
| 15-18 | Ex. 9, Bezold Tr. at 73 |

## ARGUMENT

### I.      THE STAGE TWO STANDARD.

Under the lenient standard applicable to collective actions at stage one, *see e.g.,* *Damassia v. Duane Reed*, 250 F.R.D. 152 (S.D.N.Y. 2008), the Court ruled that there was sufficient general similarity for the case to proceed as a collective action. At stage two, however, a more searching inquiry applies. *See Myers v. The Hertz Corp.,* 624 F.3d 537, 555 (2d Cir. 2010). "At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.*

In deciding whether to certify or decertify a class, the court is free to consider factual issues even if they overlap with the merits. *See RBS Citizens v. Ross*, 133 S. Ct. 1722 (2013); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). The same is true of collective actions; otherwise there would be no point in reserving the stage two certification decision until after discovery. *Espenscheid v. DirectSat USA LLC*, 705 F.3d 770 (7th Cir. 2013) (discussing similarities between class and collective action).

The burden of establishing that a case should proceed as a collective action at both stages ultimately rests on the plaintiffs. *Tracy v. NVR Inc.*, No. 04–CV–6541L, 2013 WL 1800197, at

*2 (W.D.N.Y. Apr. 29, 2013). This requires more than simply showing a general similarity, which may suffice at stage one. At stage two, the Plaintiffs must demonstrate that their claims, viewed in light of the legal standard and evidence, can be resolved on a collective basis. *Espenscheid*, 705 F.3d at 773. There is no entitlement to bring a collective action. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013). Collective actions are a case-management tool, not a right. *Id.; Hoffmann-La Roche v. Sperling,* 493 U.S. 165 (1989).

At the second stage, courts consider "(1) whether the factual and employment settings of the individual plaintiffs are disparate; (2) whether the defenses available to the defendant are individual to each plaintiff; and (3) the fairness and procedural considerations militating for or against collective action treatment." *Tracy,* 2013 WL at 1800197, at *2. *See also Gardner v. Western Beef Properties*, No. 07–CV–2345, 2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013) (Azrack, M.J.) (recommending de-certification), *adopted White v. Western Beef Properties*, No. 07 CV 2345, 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013).

A critical consideration is whether the Plaintiffs' claims are susceptible to a blanket adjudication, or whether they would require individualized inquiries and determinations. *Id.; accord Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("That common contention, moreover, must be of such a nature that it is capable of class-wide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."). In *Gardner*, the court de-certified a misclassification collective action with 30-40 opt-ins whose duties "cannot be established through generalized proof." *See* 2103 WL 1629299, at *12. In *Tracy*, the court decertified a misclassification collective action involving sales representatives stating: "Given the broad variations demonstrated by the exemplar SMRs, I conclude that it would be impossible to make a blanket determination

16

concerning the FLSA exempt status of the entire class of putative plaintiffs in this case, or to extrapolate the experiences of the exemplar SMRs to the more than one hundred opt-in plaintiffs."  Ultimately, "the decertification determination is extremely fact-dependent and appears to be largely in the court's discretion." *See Gardner*, 2013 WL at 1629299, at *4.

It is important to take a careful, practical look at this issue at the present stage of the litigation.  No one would choose to replicate the experience of *Johnson v. Big Lots Stores*, Inc., 561 F. Supp. 2d 567 (E.D. La. 2008), in which a nationwide collective action alleging that assistant store managers were misclassified as exempt was decertified after trial, because the evidence was too varied to support a common adjudication.

## II.     THE LEGAL FRAMEWORK FOR THIS CASE.

Whether a case lends itself to a class-wide adjudication depends on the legal standard and evidence involved.  The duties test for the administrative exemption has two prongs.  First, the employees must perform administrative work as defined in the regulation.  *See* 29 C.F.R. § 541.201(a)(2).  This test examines the type of work performed, not the level of responsibility.  *Davis v. J.P. Morgan Chase*, 587 F.3d 529 (2d Cir. 2009).  The regulation goes on to state that the type of work performed by insurance adjusters is generally exempt.  *See* 29 C.F.R. § 541.203(a).  That provision was specifically included in the regulation to foreclose the Plaintiffs' argument that adjusters are "production" workers.  *See* 69 Fed. Reg. 22144 (April 23, 2004).

The second prong of the duties test requires that the employee's duties include the exercise of discretion and independent judgment with respect to matters of significance.  *See* 29 C.F.R. § 541.200(a)(3).  The regulation specifically provides that insurance adjusters generally meet this test.  *See* 29 C.F.R. § 541.203(a).  Exempt functions typical of adjusters include evaluating and making recommendations concerning coverage, interviewing insureds and

17

witnesses, determining liability, and negotiating settlements. *Id.* "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *See* 29 C.F.R. § 541.202(c). The exercise of discretion and independent judgment does not have to comprise a majority of the employee's work or even be regular or customary. It is sufficient that the employee's duties "include" discretion and independent judgment. *See Robinson-Smith v GEICO,* 590 F.3d 886, 894 (D.C. Cir. 2010); *see also Preamble*, 69 Fed. Reg. at 22143 (setting forth the requirement that employees customary and regularly exercise discretion and independent judgment is eliminated).

## III.  THE COLLECTIVE ACTION SHOULD BE DECERTIFIED.

### A.  Plaintiffs Perform Administrative Work.

Plaintiffs' argument that there is a common question as to whether the Plaintiffs perform administrative work is pure makeweight. In 2004, the Department of Labor amended the administrative exemption regulations to foreclose that argument, by specifically providing that insurance adjusters are generally exempt. *See* 29 C.F.R. § 541.203(a); 69 Fed. Reg. 22144. Every Court of Appeals to have considered the issue has found insurance adjusters and allied employees exempt.[1] This case should not retain certification as a collective action based on an extinct legal theory.

---

[1] *See Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640 (6th Cir. 2013) (insurance investigators); *Talbert v. Am. Risk Ins. Co.*, 405 Fed. Appx. 848 (5th Cir. 2010); *Robinson-Smith*, 590 F.3d at 886; *Roe-Midgett v. CC Services*, 512 F.3d 865 (7th Cir. 2008); *In re Farmers Ins. Exch.*, 481 F.3d 1119 (9th Cir. 2007); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578 (5th Cir. 2006); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997 (8th Cir. 2003); *Munizza v. State Farm Mutual Auto Ins. Co.* 103 F.3d 129 (table), No. 95-35794, 1996 WL 711563 (9th Cir. 1996); *Blinston v. Harford Accident and Idemn. Co.*, 441 F.2 1365 (8th Cir. 1971).

18

**B.      Testimony From the Representative Plaintiffs Demonstrate that Some Exercise Discretion and Independent Judgment as to Matters of Significance.**

The other issue is whether the TCRs exercise discretion and independent judgment with respect to matters of significance, under the second prong of the duties test.  Plaintiffs' theory is that the TCRs are so closely supervised that they cannot exercise discretion and independent judgment.  Under this theory, in order to establish class-wide liability, the jury would have to conclude that *none* of the 315 opt-in Plaintiffs made typical adjuster decisions using their own judgment.  Given that the collective action includes 315 individuals, in two job classifications, one higher than the other, in 10 separate offices, who worked under different supervisors, with different and continuously increasing levels of experience, the claim that none of them do their jobs without constant immediate direction from their supervisor is not even plausible.

In any event, it only takes one exception to negate the proposition that none of the Plaintiffs perform their jobs without constant immediate supervision.  Kirkland admitted that she performs typical adjuster tasks without the involvement of her supervisor.  Others did too.  This leaves Plaintiffs with two mutually exclusive choices.  Either the other Plaintiffs are similarly situated to Kirkland, which contradicts Plaintiffs' main theory of the case, or they are different from Kirkland, in which case the similarity that is necessary for a collective action evaporates.

Kirkland cannot be dismissed as an exception to the rule, for several reasons.  First, the evidence shows that she is not an exception.  Others gave similar testimony in their depositions and affidavits.  For instance, Michele Brown stated that "I used my own discretion and independent judgment in making decisions about claims."  *See* Ex. 6, M. Brown Aff. ¶ 3.  In fact, out of the nineteen (19) opt-in Plaintiffs whose deposition were noticed by GEICO, seven (7) (37% of the total pool) withdrew their claims when their depositions were noticed.  Four of the drop-outs (21 % of the total pool noticed for depositions) provided GEICO with affidavits

19

materially disagreeing with Plaintiffs' factual theory.  Others, such as Courtnage, stayed in the case but gave testimony contradicting Plaintiffs' theory.  For example, Courtnage disagreed with the assertion that her duties did not involve exercise of independent judgment.  *See* Ex. 11, Courtnage Tr. at 181.  Undoubtedly, there are other members of the opt-in class who would also disagree with Plaintiffs' theory if it was explained to them.

Second, it stands to reason that Kirkland, Courtnage and others testified that they worked free from supervision.  The TCR I and II jobs are designed to be performed that way.  The supervisors have too many TCRs to supervise and too many other demands on their time to make all the TCRs' decisions for them.  Of course, less experienced TCRs may have more questions, and may need more instruction, than more experienced ones.  However, TCRs are expected to handle their workload on their own, precisely as Kirkland and others described.

Third, the Plaintiffs' proposition that the TCRs are similarly situated precludes the assertion that some of the Plaintiffs are exceptions.  The collective action procedure contemplates a class-wide adjudication.  Those whom the Plaintiffs may deem to be exceptions cannot be swept under the carpet in the interest of maintaining a collective action.  The collective action procedure does not trump GEICO's due process right to present individual defenses.  *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2560 ("Wal-Mart is entitled to individualized determination of each employee's eligibility for backpay.").  Thus, given the existence of some Plaintiffs who clearly do not fit Plaintiffs' factual theory, the most Plaintiffs can hope for would be a mixed bag, in which some Plaintiffs work free from immediate supervision and some do not.  Sorting out a mixed bag would require individualized determinations, which is antithetical to a collective action.

## C.      Plaintiffs Arguments Should be Rejected.

Plaintiffs' cannot salvage a collective action by arguing that Claim IQ makes them similarly situated.  The adjustment of insurance claims is essentially a legal process.  Claim IQ cannot perform any adjuster function that requires a thought process in drawing factual conclusions from the evidence, in applying the law to the factual conclusions or in negotiating settlements.  The argument that claims adjusters are non-exempt because claims software limits their decision-making has been consistently rejected, simply because no insurance company has yet developed a computer that can replace human judgment.  *Robinson-Smith*, 590 F.3d at 888 ("In assessing vehicle damages and estimating repair costs, the adjuster relies on software that walks him through the appraisal process."); *Roe-Midgett*, 512 F.3d at 876 ("The adjusting manual and the estimating software are more accurately characterized as tools that channel rather than eliminate the MDA's discretion."); *In re Farmers*, 481 F.3d at 1125 ("Claims adjusters use computer software to help them estimate the damage or loss."); *Cheatham v. Allstate, Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (rejecting claim "that they are limited in their ability to negotiate by having to adhere to computer software.").  In any event, Claim IQ is only part of the Plaintiffs' claim.   Their other core claim concerns the nature and extent of the TCRs' supervision.  To reach a class-wide adjudication, both claims have to be decided.

Plaintiffs cannot finesse the factual problems with their close supervision theory by attempting to turn around the argument and contending that GEICO has the burden of proving that all of the Plaintiffs are exempt.  Plaintiffs have the burden, at this second stage, of showing that the Court can render a class-wide adjudication based on representative evidence.  Once there is reason to believe, based on record evidence, that Plaintiffs' core factual theory about close supervision cannot be applied to all of the Plaintiffs, a collective adjudication of liability would

be inconsistent with due process, which gives GEICO the right to defend itself on individual-by-individual basis if necessary. *Wal-Mart Stores,* 131 S. Ct. at 2560; *Tracy,* 2013 WL 1800197, at *4. Thus, the only appropriate response to variations within the class is to decertify the collective action.

Plaintiffs argue that is inconsistent for GEICO to move for summary judgment and to decertify the class at the same time. That is not correct. For purposes of summary judgment, GEICO submits that the record supports the conclusion that *all* of the Plaintiffs exercised sufficient discretion and independent judgment in performing adjuster functions listed in the regulation. For purposes of evaluating the appropriateness of decertifying the collective action, however, it is sufficient to know that at least *some* of the Plaintiffs performed their work independently and without close supervision, which makes it impossible to extrapolate Plaintiffs' main factual theory on a class-wide basis.

The problem would only get worse if this case were somehow to result in a common judgment for Plaintiffs on liability. During depositions, Plaintiffs were asked how many hours of overtime they worked. The answer ranged from negligible to 15-18 hours per week. Some of the TCRs worked no overtime. Courts cannot certify collective actions on the assumption they will be compromised. Rather, it is the Plaintiffs' burden to show that the case lends itself to an adjudication that respects the Defendant's right to present individualized defenses. *Espenscheid,* 705 F.3d at 770 (affirming decertification based on lack of common evidence of overtime hours); *Frye v. Baptist Memorial Hosp.*, 495 Fed. Appx. 669 (6th Cir. 2012) (affirming decertification based on lack of common measurement of unpaid meal break). The variation in the number of hours makes that impossible in this case.

## CONCLUSION

Plaintiffs have the burden of demonstrating that their claim can be adjudicated on a collective basis.  One of their theories - that the Plaintiffs do not perform administrative work - is generic, but it is also completely contrary to the governing regulation and a uniform body of federal appellate decisions.  Their other theory - that they are so closely supervised that they cannot exercise discretion and independent judgment in performing adjuster functions - plainly is not true for all of them, which precludes a class-wide application of the theory.  Even if Plaintiffs could obtain a class-wide adjudication of liability, there would still be variations preventing a class-wide adjudication of the remedy.  That being the case, the collective action should be decertified.

/s/

_____
Barry I. Levy, Esq.
Kenneth A. Novikoff, Esq.
RIVKIN RADLER
RXR Plaza, Uniondale, NY  11556
516-357-3000 Telephone
516-357-3333 (212) 953-7201 Facsimile
barry.levy@rivkin.com
ken.novikoff@rivkin.com

/s/

_____
Eric Hemmendinger, Esq.
Teresa D. Teare, Esq.
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD  21201
410-752-1040 Telephone
410-752-8861 Facsimile
eh@shawe.com
tdt@shawe.com

*Attorneys for Defendant, Government Employees Insurance Company*